**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) Case No. 19-11466 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| UNITED STATES OF AMERICA | ) |
| | ) |
| Appellant, | ) BAP No. 19-51 |
| | ) |
| v. | ) Case No. 19-cv-01711-RGA |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*, | ) |
| | ) |
| Appellees. | ) |

**ANSWERING BRIEF OF APPPELLEE CENTER CITY HEALTHCARE, LLC,
d/b/a HAHNEMANN UNIVERSITY HOSPITAL**

**SAUL EWING ARNSTEIN & LEHR LLP**

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

Dated: November 5, 2019

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

36145851.6 11/05/2019

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ........................................................................................ 1

**ISSUES PRESENTED ON APPEAL AND STANDARD OF REVIEW** ............................... 4

**STATEMENT OF THE CASE** ......................................................................................... 6

    A.   The Residency Program Sale Motion ........................................................... 6

    B.   The Auction and Winning Bid ...................................................................... 7

    C.   The Consortium ............................................................................................ 8

    D.   The Bankruptcy Court's Ruling .................................................................... 9

**SUMMARY OF ARGUMENT** ...................................................................................... 10

**ARGUMENT** .............................................................................................................. 10

  I.    THE BANKRUPTCY COURT CORRECTLY CONCLUDED THAT HAHNEMANN'S
      MEDICARE PROVIDER AGREEMENT IS A STATUTORY ENTITLEMENT THAT
      MAY BE SOLD UNDER SECTION 363 OF THE BANKRUPTCY CODE, AND NOT
AN EXECUTORY CONTRACT ........................................................................................ 10

    A.   Hahnemann's Medicare Provider Agreement is a Statutory Entitlement .................... 10

    B.   The Affordable Care Act's Redistribution Scheme is Inapplicable ............................ 13

  II.   THE BANKRUPTCY COURT CORRECTLY CONCLUDED THAT THE SALE IS
      PERMISSIBLE UNDER APPLICABLE MEDICARE STATUTES AND
      REGULATIONS ......................................................................................................... 14

    A.   42 C.F.R. § 489.18 Does Not Limit Assignments of Provider Agreements ................. 15

    B.   The Bankruptcy Court Correctly Concluded that the Sale Complies with
       42 C.F.R. § 489.18 and is a CHOW .......................................................................... 17

  III.  THE BANKRUPTCY COURT CORRECTLY CONCLUDED THAT HAHNEMANN
      REMAINED IN BUSINESS AND THAT ITS MEDICARE PROVIDER AGREEMENT
      HAD NOT BEEN TERMINATED .............................................................................. 18

IV.   THE BANKRUPTCY PROPERLY EXERCISED ITS JURISDICTION IN APPROVING THE SALE AND OVERRULING CMS'S OBJECTIONS ............................................. 20

V.   CMS'S UNILATERAL ACTIONS SHOULD NOT PROHIBIT HAHNEMANN AND JEFFERSON FROM CLOSING ON THE SALE ............................................................ 21

**CONCLUSION** ................................................................................................................ 23

**BANKRUPTCY RULE 8015(A)(7)(C) CERTIFICATION** .................................................... 24

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Germantown Hospital & Medical Center v. Heckler, 590 F.Supp. 24 (E.D. Pa. 1983), aff'd, Germantown Hospital & Medical Center v. Schweiker, 738 F.2d 631 (3d Cir. 1984)..........................................................................................................11

Hollander v. Brezenoff, 787 F.2d 834 (2d Cir. 1986)....................................................11

In re Access Beyond Technologies, Inc., 237 B.R. 32 (Bankr. D. Del. 1999) .............................12

In re Application of Adan, 437 F.3d 381 (3d Cir. 2006) ........................................................14, 19

In re B.D.K. Health Management, Inc., 1998 WL 34188241, Case No. 98-00609 (Bankr. M.D. Fla. Nov. 16, 1998)..........................................................................................11

In re Columbia Gas Sys. Inc., 50 F.3d 233 (3d Cir. 1995) ............................................................12

In re Exide Technologies, 607 F.3d 957 (3d. Cir. 2010) ........................................................12, 13

In re Fugazy Express, Inc., 124 B.R. 426 (S.D.N.Y. 1991)............................................................13

In re Kings Terrace Nursing Home and Health Related Facility, 1995 WL 65531 (Bankr. S.D.N.Y. 1995), aff'd, 184 B.R. 200 (S.D.N.Y. 1995)................................................11

In re SuperMedia, Inc., 2013 WL 5567838, Case No. 13-10545(KG) (Bankr. D. Del. Oct. 9, 2013)..........................................................................................................13

In re Tak Communications, 985 F.2d 916 (7th Cir. 1993) ............................................................13

In re University Medical Center, 973 F.2d 1065 (3d Cir. 1992) ........................................5, 11, 12

Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.), 188 F.3d 116 (3d Cir. 1999)..........................................................................................................4

Matter of Benjamin, 932 F.3d 293 (5th Cir. 2019)........................................................21

Memorial Hosp. v. Heckler, 706 F.2d 1130 (11th Cir. 1983)........................................................11

PAMC, Ltd. v. Sebelius, 747 F.3d 1214 (9th Cir. 2014)........................................................11

United States v. Belletiere, 971 F.2d 961 (3d Cir. 1992)................................................................4

Wright v. Bayview Loan Svcs., LLC, 2014 WL 5817019, Case No. 2:11-CV-10267-CAS (C.D. Cal., Nov. 6, 2014)........................................................................................5

**FEDERAL STATUTES**

42 C.F.R. § 489.18 ............................................................................................15, 16, 17

42 C.F.R. § 489.20 ....................................................................................................16

42 U.S.C. § 405(h) ..............................................................................................20, 21

42 U.S.C. § 13955cc ..................................................................................................16

Affordable Care Act § 5506 ................................................................................13, 14

Social Security Act § 1871(a)(2) ......................................................................16, 17

**OTHER AUTHORITIES**

Samuel R. Maizel and Jody A. Bedenbaugh, *The Medicare Provider Agreement: Is It a Contract or Not? Any Why Does Anyone Care?* The Business Lawyer, Vo. 71, Fall 2016, at 1207 .......................................................................................13

The United States of America (the "**United States**"), on behalf of the Department of Health and Human Services ("**HHS**"), acting through its designated component, the Centers for Medicare and Medicaid Services ("**CMS**"), has appealed the *Order Under 11 U.S.C. §§ 105, 106, 363, 365, 503, 507, and 527 (A) Approving Asset Purchase Agreement with Thomas Jefferson University Hospitals, Inc., (B) Authorizing Sale of Certain of Debtor's Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtor's Executory Contracts, and (D) Granting Related Relief* (the "**Sale Order**") [Appx. 562 to 790],[1] entered by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in favor of Appellee Center City Healthcare, LLC, d/b/a Hahnemann University Hospital ("**Hahnemann**"), one of the debtors and debtors in possession (the "**Debtors**") in the above-captioned bankruptcy cases (the "**Chapter 11 Cases**").  For the reasons set forth herein, the Bankruptcy Court's ruling and the Sale Order should be affirmed in all respects.

## PRELIMINARY STATEMENT

Through the Sale Order, the Bankruptcy Court approved the Debtors' proposed transfer of Hahnemann's graduate medical education training programs (the "**Sale**") to Thomas Jefferson University Hospitals, Inc. ("**Jefferson**"), acting on behalf of a consortium of non-profit entities including Jefferson, Temple University Health System ("**Temple**"), Albert Einstein Health Network ("**Einstein**"), Main Line Health, Inc. ("**Main Line**"), Christiana Care Health System ("**Christiana**"), and The Cooper Health Systems, a New Jersey Non-Profit Corporation ("**Cooper**" and, collectively with Jefferson, Temple, Einstein, Main Line and Christiana, the "**Consortium**").

---

[1]    Citations herein to "Appx. __" are to pages of the *Appendix to Answering  Brief of Appellee Center City Healthcare, LLC d/b/a Hahnemann University Hospital*, filed contemporaneously herewith.

Without question, the Sale promotes the interests of the greater Philadelphia region. Among other things, it will facilitate the long-term placement of medical residents in the Philadelphia area, for the benefit of the entire community.  The Sale also will provide critical resources to local hospitals, especially Jefferson, Temple and Einstein, which already are caring for a significant portion of the at-risk patient population historically served by Hahnemann and employing a number of displaced physicians (including residents) and other employees from Hahnemann.  The Sale also will protect Hahnemann's current and former medical residents (and, by extension, former patients) by requiring and providing needed funding for the purchase of their tail insurance coverage.

The Sale also will result in a greatly needed influx of liquidity into the Debtors' bankruptcy estates.  Among other things, the Sale will provide the Debtors with urgently needed funding to complete their wind-down of the operations of Hahnemann, continue administering the Chapter 11 Cases, and continue operating St. Christopher's Hospital for Children ("**St. Christopher's**") during and through the completion of its own sale process.

CMS's objection before the Bankruptcy Court, and in this appeal, is based on a myopic interpretation of Medicare regulations, and cannot be squared with CMS's own past practices and positions, the applicable provisions of Title 11 of the United States Code (the "**Bankruptcy Code**"), the Social Security Act (the enabling statute of the Medicare program that governs CMS's operations), or even the plain language of CMS's own regulations and sub-regulatory guidance.  While couched in context of a complex regulatory scheme, most of CMS's objections on appeal boil down to disagreements over the Bankruptcy Court's factual findings – which are subject to a clear error standard of review and should be given even more

deference in light of CMS's failure to introduce any evidence in support of its objections in the proceedings below.

For the reasons set forth below, this Court should affirm the Bankruptcy Court's Sale Order. ***First***, Hahnemann's Medicare provider number and provider agreement are statutory entitlements and not executory contracts, and thus constitute property of Hahnemann's bankruptcy estate that may be sold free and clear under section 363 of the Bankruptcy Code. ***Second***, assignment of Hahnemann's Medicare provider agreement and provider number fully complies with all applicable Medicare statutes and regulations. ***Third***, the Bankruptcy Court correctly concluded, based on the evidence before it, that Hahnemann remained open and that its Medicare provider agreement had not been terminated. Finally, ***fourth***, the Bankruptcy Court properly exercised its jurisdiction in ruling on the foregoing matters and issuing the Sale Order, including with respect to the sale and assignment of Hahnemann's Medicare provider number and provider agreement.

36145851.6 11/05/2019

**<u>ISSUES PRESENTED ON APPEAL AND STANDARD OF REVIEW</u>**

In CMS's opening brief, CMS sets forth seven issues on appeal. CMS Opening Brief, at

pp. 2-3.  Appellee submits that these issues can be reduced and simplified to the following

issues on appeal as follows:

1. Whether the Bankruptcy Court committed clear error in determining that Hahnemann's Medicare provider agreement is a statutory entitlement and not an executory contract.

2. Whether the Bankruptcy Court had jurisdiction to conclude that Hahnemann's proposed assignment of its Medicare provider number and provider agreement complies with applicable Medicare statutes and regulations.

3. Whether the Bankruptcy Court committed clear error in finding that Hahnemann's Medicare provider agreement had not terminated in light of the fact that Hahnemann continued to conduct business.

4. Whether the Bankruptcy Court had jurisdiction to enjoin CMS and other parties in interest to effectuate the Sale.

The District Court "review[s] the Bankruptcy Court's legal determinations *de novo*, its

factual findings for clear error, and its exercise of discretion for abuse thereof  . . . .  A

bankruptcy court abuses its discretion when its ruling is founded on an error of law or a

misapplication of law to the facts."  <u>Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envt'l.</u>

<u>Energy, Inc.)</u>, 188 F.3d 116, 122 (3d Cir. 1999) (internal quotations and citations omitted).  A

finding is deemed "clearly erroneous" only where the reviewing court has a "firm conviction

that a mistake has been made."  <u>United States v. Belletiere</u>, 971 F.2d 961, 969 (3d Cir. 1992).

The  Bankruptcy  Court's  decision  was  premised  on  the  following  ***factual***

***determinations*** that must be reviewed on a clearly erroneous standard:  (a) whether

Hahnemann's Medicare provider agreement is a statutory entitlement and not an executory

contract; (b) whether Hahnemann continued to operate its business; and (c) whether the Sale

constitutes a change of ownership (as described further below, a "**CHOW**") in light of the

unique circumstances of the case.  The Bankruptcy Court's **legal** conclusions, which should be reviewed on a *de novo* standard, include: (x) whether a statement on an issue not before the Court in <u>In re University Medical Center, 973 F.2d 1065</u> (3d Cir. 1992) constitutes binding precedent or *dicta*; and (y) whether applicable Medicare statutes and regulations prohibit the Sale even in light of the Bankruptcy Court's factual finding that the Sale constitutes a CHOW. Determinations of the Bankruptcy Court's underlying jurisdiction are also subject to a *de novo* review.  <u>See</u>, <u>e.g.</u>, <u>Wright v. Bayview Loan Svcs., LLC</u>, 2014 WL 5817019, at *4, Case No. 2:11-CV-10267-CAS (C.D. Cal., Nov. 6, 2014).

**STATEMENT OF THE CASE**

**A.     The Residency Program Sale Motion**

The Debtors filed the Chapter 11 Cases on June 30 and July 1, 2019 (collectively, the "**Petition Date**").   As of the Petition Date, Hahnemann operated a 496-bed tertiary care academic medical center in Philadelphia. [Appx. 6].  Hahnemann was also the primary teaching hospital for Drexel University d/b/a Drexel University College of Medicine. [Appx. 6]. Hahnemann's Graduate Medical Education Residency Program (the "**Residency Program**") was one of the largest in the United States, comprising nearly 600 residents and over 100 fellows in a wide range of specialties. [Appx. 6].

On July 9, 2019, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Residents Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, and (C) Approving the Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; and (II)(A) Approving the Sale of the Debtors' Residents Program Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief*   (the "**Residency Program Sale Motion**") [Appx. 1 to 97]. Through the Residency Program Sale Motion, the Debtors sought to sell Hahnemann's Residency Program to Tower Health ("**Tower**"), as the stalking horse bidder (the "**Stalking Horse Bidder**"), or such other successful bidder (the "**Successful Bidder**") as determined through a competitive bidding and auction process.

On July 19, 2019, the Debtors filed the proposed stalking horse asset purchase agreement with Tower reflecting the terms of its stalking horse bid (the "**Stalking Horse APA**") [Appx.

114 to 170].  In summary, the Stalking Horse APA reflected a purchase price of $7,500,000, of which $3,000,000 would be placed into escrow to cover the following items:  (a) the cost of purchasing tail insurance coverage for Hahnemann residents who chose to continue their training with Tower; (b) an amount necessary, with agreement of CMS, to discharge and satisfy any potential claims for overpayment liability with respect to Hahnemann's Medicare provider number arising prior to closing; (c) cure costs associated with assigned contracts; and (d) other indemnifiable losses incurred by Tower. [Appx. 121 to 122].

On July 19, 2019, the Court entered the *Order (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale* [Appx. 267 to 324] approving, among other things, certain bidding procedures (the "**Bidding Procedures**") in connection with the Residency Program Sale Motion.

### B.     The Auction and Winning Bid

The Debtors received more than one qualified bid, and accordingly conducted an Auction on August 8, 2019.  At the conclusion of the Auction, the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), designated Jefferson as the Successful Bidder, with an asset purchase agreement (the "**Jefferson APA**") reflecting an aggregate purchase price of $55,000,000, and the Stalking Horse Bidder was selected as the Back-Up Bidder (as defined in the Bidding Procedures), with an aggregate purchase price of $51,000,000.  [Appx. 338 to 493].

While structurally similar to the Stalking Horse APA, in addition to the significant increase in purchase price, the Jefferson APA includes a material difference with respect to tail

insurance for residents.  The Stalking Horse APA did not address tail insurance coverage for current and former residents of Hahnemann, other than those certain residents who chose to continue their training with the Stalking Horse Bidder.  Under the Jefferson APA, however, the Debtors covenanted, contingent upon closing of the Sale, to purchase tail insurance coverage for *all residents*, as a deliverable at closing.  [Appx. 357].  The Jefferson APA also includes, as a separate component of the purchase price and in addition to the Escrow Amount, up to $1,000,000 to reimburse the Debtors for the cost of obtaining such tail insurance.  [Appx. 351].

## C.     The Consortium

Hahnemann is a safety-net hospital that has provided care to one of the most at-risk patient populations in Philadelphia.  Although there was significant public concern at the beginning of the Chapter 11 Cases about the potential impact of Hahnemann's anticipated closure on patients, the actual impact on patient care has been diminished, due in large part to the coordinated and focused efforts of other local hospitals, including in particular Jefferson, Temple and Einstein, to ensure continuity in care to patients historically cared for at Hahnemann.  [Appx. 839, 863 to 864].

Hahnemann is physically located in the geographic center of Philadelphia.  Jefferson's primary hospital is located six blocks east and four blocks south of Hahnemann; Temple is less than 3.5 miles away; Einstein is less than 6 miles away.  As a result of this physical proximity, the members of the Consortium are the logical and natural choices for patients who were previously seen at Hahnemann. [Appx. 839].

The Consortium is also already employing a significant number of former Hahnemann employees including, without limitation, nearly 300 of Hahnemann's 583 residents plus a significant number of other former Hahnemann employees. [Appx. 863].  In short, a significant portion of the patient services that were historically provided by Hahnemann are now being

8

provided by members of the Consortium.  Consortium members are treating former Hahnemann patients, in many cases using former Hahnemann doctors.  Without the formality of an acquisition, the Consortium has assumed critical components of the legacy Hahnemann operations.  [Appx. 863 to 864]

Through this transaction, the Consortium seeks to formally undertake the last significant aspect of Hahnemann's legacy operations – its Residency Programs.  Upon closing of the Sale, the Consortium will, for all practical purposes and in all material ways, have assumed responsibility for Hahnemann patient care and graduate medical education training operations.

### D.       The Bankruptcy Court's Ruling

CMS filed objections several objections in connection with the Residency Program Sale Motion, [Appx. 98 to 109, 325 to 337, 494 to 557, and 558 to 561], generally raising the same arguments CMS now raises on appeal.  The Bankruptcy Court conducted a hearing over September 4, 2019 and September 5, 2019.  The Debtors introduced evidence through two witnesses at the hearing, J. Scott Victor, the Debtors' investment banker, and Allen Wilen, the Debtors' Chief Restructuring Officer.  [Appx. 814 to 857].  Jefferson introduced evidence through its witness, Laurence Merlis, Jefferson's executive vice president.  [Appx. 860 to 878]. Significantly, neither CMS nor any other objecting party introduced any evidence at the hearing. The Bankruptcy Court issued a comprehensive ruling on September 5, 2019 overruling CMS's objections and granting the Residency Program Sale Motion.  [Appx. 999 to Appx. 1090].

The Bankruptcy Court ruled that Hahnemann's Medicare provider agreement does not meet the standard established by the Third Circuit Court of Appeals to constitute an executory contract.  [Appx. 1009].  Instead, the Bankruptcy Court held that it is a statutory entitlement that may be sold pursuant to section 363 of the Bankruptcy Code, free and clear of claims and interests, including successor liability.  [Appx. 1010].

The Bankruptcy Court also concluded, from the evidence before it, that Hahnemann remains in business and continues to provide medical services. [Appx. 1010]. The Bankruptcy Court also ruled that an asset purchase agreement is a valid form of CHOW and that CMS has recognized asset purchase agreements as a change of ownership in the past. [Appx. 1010]. On September 10, 2019, the Bankruptcy Court entered the Sale Order. [Appx. 562 to 790].

## SUMMARY OF ARGUMENT

The Bankruptcy Court carefully considered and correctly overruled CMS's objections in approving the Sale and entering the Sale Order. CMS neither presented any evidence nor meaningfully refuted any of the Debtors' evidence, and thus cannot credibly or successfully challenge the Bankruptcy Court's factual findings. The Bankruptcy Court properly determined that Hahnemann's Medicare provider agreement is a statutory entitlement, and not an executory contract. The Bankruptcy Court properly concluded that the Sale to Jefferson constitutes a CHOW under applicable Medicare statutes and regulations. The Bankruptcy Court properly concluded that Hahnemann's Medicare provider agreement was not terminated, and that Hahnemann remained in business. Accordingly, the Bankruptcy Court properly overruled CMS's objections and entered the Sale Order, and its decision should be affirmed in all respects.

## ARGUMENT

I.  **THE BANKRUPTCY COURT CORRECTLY CONCLUDED THAT HAHNEMANN'S MEDICARE PROVIDER AGREEMENT IS A STATUTORY ENTITLEMENT THAT MAY BE SOLD UNDER SECTION 363 OF THE BANKRUPTCY CODE, AND NOT AN EXECUTORY CONTRACT**

### A.  Hahnemann's Medicare Provider Agreement is a Statutory Entitlement

The Bankruptcy Court correctly ruled that Hahnemann's Medicare provider agreement is not a contractual relationship, but a statutory entitlement. In reaching this conclusion, the Bankruptcy Court relied on substantial case law, including circuit-level decisions in both the

Ninth and Eleventh circuits holding that Medicare programs are statutory entitlements and not contracts. [Appx. 1,008 to 1,010], referencing PAMC, Ltd. v. Sebelius, 747 F.3d 1214, 1221 (9th Cir. 2014) and Memorial Hosp. v. Heckler, 706 F.2d 1130, 1136 (11th Cir. 1983). These cases confirm that a Medicare program is not contractual, consistent with the position CMS took in those cases. In fact, virtually every court to have actually considered the issue has determined that Medicare provider agreements are not contracts. See, e.g., Hollander v. Brezenoff, 787 F.2d 834, 838-39 (2d Cir. 1986); Germantown Hospital & Medical Center v. Heckler, 590 F.Supp. 24 (E.D. Pa. 1983), aff'd, Germantown Hospital & Medical Center v. Schweiker, 738 F.2d 631 (3d Cir. 1984); In re Kings Terrace Nursing Home and Health Related Facility, 1995 WL 65531 (Bankr. S.D.N.Y. 1995), aff'd, 184 B.R. 200 (S.D.N.Y. 1995); and In re B.D.K. Health Management, Inc., 1998 WL 34188241, Case No. 98-00609 (Bankr. M.D. Fla. Nov. 16, 1998)

The BDK decision, relied upon by the Bankruptcy Court in reaching its decision, is the only bankruptcy-court or bankruptcy-related decision to have actually analyzed the issue and ruled on whether a provider agreement is a statutory entitlement or an executory contract. In BDK, the Florida bankruptcy court held that a Medicare provider agreement is a statutory entitlement that may be sold under section 363 of the Bankruptcy Code free and clear of any successor liability obligations. BDK, 1998 WL 34188241 at *6-7.

CMS relies on In re University Medical Center, 973 F.2d 1065 (3d Cir. 1992) in an attempt to rebut the weight of authority on this point. This reliance is misplaced. In University Medical Center, the issue of whether a provider agreement is an executory contract was presumed but never actually considered by the Court. The Third Circuit Court of Appeals never analyzed the issue and the statement regarding such status, which appears in a footnote, is nothing more than dicta. Moreover, such dicta ignored contrary precedent. Cf. Germantown

11

Hosp. & Med. Ctr. v. Heckler, 590 F. Supp. 24, 30-31 (E.D. Pa. 1983) ("There is no contractual requirement requiring [CMS] to provide Medicare reimbursement. Rather, upon joining the Medicare program, providers gain a statutory entitlement to reimbursement."), aff'd 738 F.2d 631 (3d Cir. 1984). CMS's assertion that University Medical Center stands as binding precedent in the Third Circuit is simply wrong. Dicta does not constitute binding precedent. See, e.g., In re Access Beyond Technologies, Inc., 237 B.R. 32 (Bankr. D. Del. 1999).

In the absence of actual precedent dictating a ruling, the Bankruptcy Court properly considered the evidence before it to determine whether Hahnemann's Medicare provider agreement constitutes an executory contract. The Bankruptcy Court applied established and undisputed case law regarding what constitutes an executory contract, noting in its ruling as follows:

> An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so under-performed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. Thus, unless both parties have un-performed obligations that would constitute a material breach if not performed the contract is not executory under section 365.

Appx. 1,009; see also, In re Exide Technologies, 607 F.3d 957, 962 (3d. Cir. 2010) ("Congress intended the term to mean a contract 'on which performance is due to some extent on both sides'"), citing H.R. Rep. No. 95-595, 347 (1977), 1978 U.S.C.C.A.N. 5787, 5963 and In re Columbia Gas Sys. Inc., 50 F.3d 233, 239 (3d Cir. 1995).

The Bankruptcy Court correctly determined that it was not bound by the Third Circuit's dicta in University Medical Center because, as the Bankruptcy Court noted, "it simply was not an issue in University Medical Center." [Appx. 1009 to 1010]. The Bankruptcy Court applied the Columbia Gas standard to the relationship between Hahnemann and CMS and correctly concluded that Hahnemann's Medicare provider agreement is not an executory contract. See,

e.g., Exide, 607 F.3d at 962 (in determining whether a contract is executory, courts must look to whether material unperformed obligations existed on both sides at the time of the bankruptcy filing); In re SuperMedia, Inc., 2013 WL 5567838, at *3, Case No. 13-10545(KG) (Bankr. D. Del. Oct. 9, 2013) (same).  Indeed, the "contract" in question, a one-page document that was introduced into evidence and considered by the Bankruptcy Court, merely incorporates the Medicare statutory and regulatory scheme, but does not create any material obligations.[2]  [Appx. 1,091].

Having correctly determined that the provider agreement is not an executory contract, the Bankruptcy Court correctly noted that it is a statutory entitlement that Hahnemann may sell pursuant to section 363 of the Bankruptcy Code.  See e.g., In re Tak Communications, 985 F.2d 916 (7th Cir. 1993) (government licenses may fall within the scope of property of a debtor's bankruptcy estate); In re Fugazy Express, Inc., 124 B.R. 426 (S.D.N.Y. 1991) (same).

### B.   The Affordable Care Act's Redistribution Scheme is Inapplicable

CMS argues that the Sale "subverts the Congressionally-mandated public redistribution process" because "Congress mandates that the Secretary redistribute the Residency Positions previously held by Hahnemann, a closed provider, according to a statutory order of priority." CMS Opening Brief, at p. 24, citing 42 U.S.C. § 1395ww(h)(4)(H)(vi) (section 5506 of the Affordable Care Act, or ACA).

---

[2]   See also, Samuel R. Maizel and Jody A. Bedenbaugh, *The Medicare Provider Agreement: Is It a Contract or Not? Any Why Does Anyone Care?*, The Business Lawyer, Vo. 71, Fall 2016, at 1207 ("For thirty years, the United States Government has successfully argued in federal district and circuit courts nationwide that the [Medicare Provider Agreement] is *not* a contract between the Government, on the one hand, and various providers of healthcare services or goods on the other hand . . . .  How the Medicare Provider Agreement could be a contract inside of bankruptcy and not a contract outside of bankruptcy is hard to fathom, because the Bankruptcy Code does not define the term 'contract' and precedent holds that applicable non-bankruptcy law controls the property rights held by a debtor in bankruptcy." (footnotes omitted).

As quoted by CMS, section 5506 of the ACA only becomes applicable "in the case where a hospital . . . with an approved medical residency program closes."  CMS Opening Brief, at p. 24.  CMS's entire legal argument, accordingly, is predicated on a key factual finding – that the hospital had closed – which the Bankruptcy Court, as discussed below, found was not the case.

Simply put, CMS wrongly equates "closing" with "closed."  At the time of the hearing before the Bankruptcy Court, the uncontroverted evidence presented to the Bankruptcy Court demonstrated that Hahnemann was not yet closed.  While such a closure in the future was contemplated, and indeed the Debtors had been and to this day continue working to implement and effectuate such a closure, the evidence before the Bankruptcy Court was sufficient to support a factual finding that Hahnemann was still conducting business and thus was not closed. CMS's entire argument related to section 5506 of the ACA fails because the Bankruptcy Court did not conclude that Hahnemann was closed and, as noted below, CMS cannot successfully challenge this factual finding, especially as it failed to offer any evidence in support of its position before the Bankruptcy Court.  As discussed below, CMS's attempt, in its opening brief, to introduce new evidence that it failed to present in its case before the Bankruptcy Court, should be given no weight.  See In re Application of Adan, 437 F.3d 381 (3d Cir. 2006) ("Rule 10(e)(2) allows amendment of the record on appeal only to correct inadvertent omissions, not to introduce new evidence.")

## II.   THE BANKRUPTCY COURT CORRECTLY CONCLUDED THAT THE SALE IS PERMISSIBLE UNDER APPLICABLE MEDICARE STATUTES AND REGULATIONS

Although the Debtors do not concede it was necessary for the Bankruptcy Court to have concluded that the Sale constitutes a CHOW under the Medicare statutes and regulations, its decision on this point was likewise sound and should be affirmed.

A.     **42 C.F.R. § 489.18 Does Not Limit Assignments of Provider Agreements**

CMS incorrectly argues, as it did before the Bankruptcy Court, that 42 C.F.R. § 489.18 provides the only method for assignment of a Medicare provider agreement and that the Sale fails to comply with that regulation.   42 C.F.R. § 489.18, entitled "Change of ownership or leasing:  Effect on provider agreement," provides, in pertinent part, that:

(a)     What constitutes change of ownership —

. . .

(3) Corporation.  The merger of the provider corporation into another corporation, or the consolidation of two or more corporations, resulting in the creation of a new corporation constitutes change of ownership. Transfer of corporate stock or the merger of another corporation into the provider corporation does not constitute change of ownership.

. . .

(c)     Assignment of agreement.  When there is a change of ownership as specified in paragraph (a) of this section, the existing provider agreement will automatically be assigned to the new owner.

42 C.F.R. § 489.18 (a) and (c).

The plain language of this regulation makes clear its purpose and intent – to provide that certain transactions that a corporation may undertake constitute changes of ownership, and to make clear that a provider agreement is automatically assigned when one of those transactions occurs.  This regulation exists because, in ordinary transactions outside of bankruptcy, a change of ownership transaction triggers administrative filing requirements, and a change of ownership that involves assignment of a provider agreement imposes on the purchaser ongoing responsibility for Medicare liabilities.  In those cases, providing for automatic assignment of a provider agreement serves CMS' interests.  CMS asserts, instead, unreasonably interprets section 489.18 to dictate that the only circumstance through which a provider agreement may be assigned is a change of ownership described in the regulation.  CMS' interpretation of the

regulation presents a classic logical fallacy and should not be sustained.  Specifically, just because a change of ownership always results in transfer of a provider agreement does not mean that provider agreements are only transferred in connection with a change of ownership.

CMS's argument is also unsupported by the Social Security Act or the regulations.  The Social Security Act contains extensive provisions regarding hospitals' qualifications to hold provider agreements, see e.g., 42 U.S.C. § 13955cc, but CMS fails to point to any statutory provision limiting the situations in which provider agreements may be transferred.  CMS regulations and the provider agreement itself echo the statutory provisions regarding hospitals' qualification to hold provider agreements, see 42 C.F.R. § 489.20, but they, too, are not limiting with respect to transferability.  And, of course, any limitation on the transferability of a provider agreement would "establish[] or chang[e] a substantive legal standard governing . . . payment for services, or the eligibility of . . . entities . . . to furnish or receive services or benefits under [title XVIII of the Social Security Act]" and therefore must be "promulgated by the Secretary by regulation."  Social Security Act § 1871(a)(2).  CMS has not identified any action by the Secretary of the U.S. Department of Health and Human Services to establish such limitation by regulation, and CMS cannot establish it by fiat here.

CMS's argument is also belied by its own sub-regulatory guidance and practice. In sub-regulatory guidance, CMS has written that a "provider may undergo a financial or administrative change that it considers to be a [change of ownership], but does not meet the regulatory definition identified in § 489.18," and that CMS' Regional Office can then make a determination of whether a change of ownership has occurred.  CMS, Program Integrity Manual, ch. 15, §§ 15.7.7.1, 15.7.7.1.1.  In related guidance regarding filings that accompany changes of ownership, CMS instructs that "[m]ost of the events described [in a list similar to 42 C.F.R.

§ 489.18] represent common forms of changes of ownership, but are not intended to represent an exhaustive list."  CMS, Provider Reimbursement Manual, pt. 1, ch. 15, § 1500.  For CMS to assert in these proceedings that a change of ownership cannot occur outside of the transaction types described in 42 C.F.R. § 489.18, despite having posted detailed guidance to the contrary, is untenable.

In practice, and on a regular basis, hospitals acquire each other *not* through transactions described in 42 C.F.R. § 489.18, but through asset sales.  On a regular basis, CMS recognizes those transactions to be changes of ownership that involve a transfer of the seller's Medicare provider agreement. [Appx. 520].  Were CMS's argument correct – if the transactions described in section 489.18 constitute the only route to a change of ownership and assignment of a Medicare provider agreement – CMS's routine recognition of asset sales as changes of ownership that result in provider agreements' transfer would be unlawful.  To this point, CMS appears to apply a newly devised standard that considers transactions that involve a sale of substantially all of a provider's assets to be changes of ownership.  But that standard has no basis in statute or regulation, and if developed and applied outside of the formal rulemaking process would be a violation of section 1871(a)(2) of the Social Security Act[3] – not to mention an unreasonable interpretation of a regulation the meaning of which is plain on its face.

B.    **The Bankruptcy Court Correctly Concluded that the Sale Complies with 42 C.F.R. § 489.18 and is a CHOW**

The Bankruptcy Court correctly concluded, *from the evidence before it*, that the Sale constituted a CHOW so as to comply with section 489.18.  As noted above, while 42 C.F.R. § 489.18 describes two forms of corporate change of ownership (merger and consolidation), CMS's own practices and precedent make clear that this list is not exclusive.  CMS's own sub-

---

[3]    42 U.S.C. § 1395hh.

regulatory guidance makes clear that changes of ownership may include transactions in which "two or more Medicare-enrolled entities combine," in which a "provider may undergo a[nother] financial or administrative change," in which "the new owner is accepting assignment of the Medicare assets and liabilities of the old owner," and in which a "new owner may propose to relocate the provider."   CMS, Program Integrity Manual, ch. 15, §§ 15.7.7.1.1, 15.7.7.1.2, 15.7.7.1.3.

The evidence presented to the Bankruptcy Court in support of the Sale, *which CMS did not challenge and as to which CMS offered no evidence of its own*, was more than sufficient to establish that the Sale constitutes a CHOW.  The Sale will involve assignment of Medicare assets and, subject to a conventional cap regularly agreed by CMS in bankruptcy proceedings, Medicare liabilities.  Upon closing of the Sale, the Consortium will have taken over the last remaining vestiges of Hahnemann's operations – its remaining graduate medical education program assets.  The fact that such operations are being conducted from the Consortium's locations, rather than buildings historically operated by Hahnemann, does not materially alter this determination.

## III.   THE BANKRUPTCY COURT CORRECTLY CONCLUDED THAT HAHNEMANN REMAINED IN BUSINESS AND THAT ITS MEDICARE PROVIDER AGREEMENT HAD NOT BEEN TERMINATED

The Bankruptcy Court correctly determined that Hahnemann remained in business and was thus able to proceed with the Sale.  As set forth above, the Bankruptcy Court's factual determinations are subject to the deferential "clear error" standard of review, which CMS cannot overcome in this case.

It is critical to note that CMS chose not to introduce any evidence to the Bankruptcy Court on this (or any other) issue. CMS had the opportunity to present evidence, but chose not to. Accordingly, the Bankruptcy Court properly considered the only evidence presented to it on this

point, which was the testimony of Allen Wilen, the Debtors' Chief Restructuring Officer.  Mr. Wilen testified that Hahnemann was still in business and conducting business operations.  [Appx. 833].  CMS's current challenge to the Court's factual determination on this point falls flat, especially when viewed against the backdrop of CMS's *decision* not to introduce any evidence to the Bankruptcy Court.

Seeking a second bite at the apple, in its opening brief CMS improperly seeks to introduce substantial new evidence to this Court on appeal that was not presented to the Bankruptcy Court in connection with its decision on the Sale Order.  Indeed, CMS's opening brief includes references to (1) an earlier motion filed by the Debtors in connection with the *anticipated* closure of Hahnemann, (2) statements on Hahnemann's website, (3) a report filed by the Patient Care Ombudsman for Hahnemann, (4) the website of the Federation of State Medical Boards, (5) an October 1, 2019 survey by the Pennsylvania Department of Health (the "**DOH**"), and (6) an October 4, 2019 termination letter from CMS to Hahnemann purportedly involuntarily terminating Hahnemann's participation in the Medicare program.  CMS Opening Brief, at pp. 15-16.  Incredibly, CMS failed to present any of this *evidence* to the Bankruptcy Court in connection with the evidentiary hearing below.  To present such facts in its brief on appeal is improper, and such evidence should be given no weight by this Court in analyzing the Bankruptcy Court's decision.  See Adan, supra at n.3 ("we will not consider new evidence on appeal absent extraordinary circumstances. . . .")  CMS's inclusion in its brief of evidence that did not even exist at the time the Bankruptcy Court issued its ruling (i.e., the October 1, 2019 DOH Survey and the October 4, 2019 CMS letter) is even more outrageous.

The Bankruptcy Court made a factual determination based on the evidence presented to it. CMS had ample opportunity to present evidence but chose not to.  This Court should not

19

consider evidence that CMS presents for the first time in its briefing on appeal but either chose not to introduce at trial or that did not even exist at the time of trial.  Because CMS cannot point to any clear error by the Bankruptcy Court in issuing its factual conclusions based on the evidence actually before it, the Bankruptcy Court's ruling that Hahnemann remained open should be affirmed.

## IV.   THE BANKRUPTCY PROPERLY EXERCISED ITS JURISDICTION IN APPROVING THE SALE AND OVERRULING CMS'S OBJECTIONS

The Bankruptcy Court properly exercised its subject matter jurisdiction in determining that Hahnemann's Medicare provider agreement and provider number were assets of the bankruptcy estate that could be sold to Jefferson pursuant to section 363 of the Bankruptcy Code, and that the Sale constitutes a CHOW under applicable Medicare statutes and regulations.

In challenging the Bankruptcy Court's exercise of its jurisdiction, CMS relies on the Social Security Act's jurisdictional bar, 42 U.S.C. § 405(h), which it quotes as "'[n]o action . . . shall be brought under section 1331 or 1346 of Title 28 . . .' 'except as herein provided.'"  CMS Opening Brief, at pp. 29-30.  CMS's selective and limited recitation of the text of section 405(h) is misleading.  For avoidance of doubt, the full text of section 405(h) is as follows:

> The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h).

Reading the actual text of this statute clearly demonstrates the fatal flaw in CMS's jurisdictional argument.  The first two sentences, by the plain language, only apply to findings and decisions by the Commissioner of Social Security after a hearing. These prohibitions have

no bearing on the instant case because there was never a hearing, let alone any findings or decisions, by the Commissioner of Social Security.  The Bankruptcy Court's entry of the Sale Order and its rulings in connection therewith cannot constitute a review of "findings of fact or decision of the Commissioner" because no such findings or decisions were ever made.

Moreover, the final sentence of section 405(h), from which CMS's quotation is derived, clearly, by its plain language, only apply to actions brought against the Commissioner of Social Security, or an officer or employee thereof, to recover on a claim under the Medicare laws.  See, e.g., Matter of Benjamin, 932 F.3d 293, 296-98 (5th Cir. 2019) (interpreting section 405(h) by its plain language to not only preclude actions under section 1331 or 1346, but not to include a jurisdictional bar in bankruptcy).  No action was ever brought against the Commissioner, an officer or employee thereof, or anyone else, to recover on a claim arising under the Medicare laws. CMS's argument that section 405(h) bars a bankruptcy court, or any federal court, from interpreting Medicare statutes and regulations and applying them in the context of a bankruptcy case cannot be supported by the plain language of the statute.   This Court should find that the Bankruptcy Court's rulings reflected a proper exercise of the Bankruptcy Court's jurisdiction.

## V.    CMS'S UNILATERAL ACTIONS SHOULD NOT PROHIBIT HAHNEMANN AND JEFFERSON FROM CLOSING ON THE SALE

As noted above, in its opening brief, CMS seeks to introduce evidence that was not before the Bankruptcy Court in furtherance of its argument that the Bankruptcy Court's determination that Hahnemann continued to conduct business was clearly erroneous.  Among other things, CMS acknowledges that "[o]n October 4, 2019, CMS issued a termination letter to Hahnemann, finding that it had voluntarily terminated its Medicare participation  effective of September 6, 2019, and involuntarily terminating Hahnemann's participation in Medicare effective October 22, 2019."  CMS's Opening Brief, at p. 16.

As a threshold matter, Hahnemann notes that such actions by CMS or other parties after issuance of the Sale Order should have no bearing on Hahnemann's ability to close on the Sale with Jefferson.  Notably, paragraph 35 of the Sale Order provides as follows:

> Provided that the Closing occurs within seven calendar days following the effectiveness and enforceability of this Order, the findings of fact and conclusions of law set forth in this Order shall, for all purposes related to the Order and the Transaction, be deemed to have been made as of the Closing.

[Appx. 587]. Accordingly, so long as Hahnemann and Jefferson close on the sale within seven calendar days of the conclusion of this appeal and the termination of the current stay pending appeal, the parties will be able to treat the Bankruptcy Court's factual findings, including with respect to the operational status of Hahnemann and the validity and transferability of Hahnemann's Medicare provider agreement, as in effect on the date of closing.[4]

Indeed, Hahnemann relies on its ability to close pursuant to paragraph 35 of the Sale Order as it defends this appeal, given that CMS has taken action since entry of the Sale Order that would otherwise jeopardize the sale. While the Debtors raised concerns regarding the potential impact of changed circumstances in their opposition to CMS's request for a stay pending appeal, the Debtors have nonetheless continued with the good faith understanding that a stay of the Sale Order during the pendency of this appeal will not ultimately inhibit the parties' ability to close on the Sale once the Sale Order and the Bankruptcy Court's rulings are affirmed.

Notwithstanding the foregoing, the Debtors have recently learned that, in addition to issuing a termination notice, and notwithstanding the pendency of this appeal, on November 1, 2019, CMS announced the opening of the application process for teaching hospitals to apply for

---

[4] The foregoing applies with equal force with respect to actions of the DOH after the entry of the Sale Order but prior to its effectiveness in connection with any revocation or termination of Hahnemann's hospital license.

Hahnemann's residency slots that are the subject of the Sale. [Appx. 1092 to 1104]. Specifically, CMS has proposed a 90-day application period for hospitals to apply for Hahnemann's residency slots, notwithstanding the pendency of this appeal. Notably, in its *United States' Emergency Motion for Stay Pending Appeal* of the Sale Order [Docket No. 4 of this appeal], CMS asserted that "no immediate urgency exists that justifies denial of a stay" and that "the resident slots at issue are permanent slots that cannot be filled (thus eligible for compensation) until the residents finish their temporarily-funded residencies. . . Even those slots that open next year will not be eligible for funding until at least July 1, 2020." Id. at pp. 24-25. While Hahnemann does not know CMS's contemplated timeline, it is possible that CMS will seek to redistribute Hahnemann's residency slots prior to the completion of this appeal. Hahnemann accordingly urges the Court to affirm the Sale Order as expeditiously as possible so that the parties may proceed with closing without concerns regarding the impact of an intervening redistribution by CMS of Hahnemann's residency slots.

## CONCLUSION

The Bankruptcy Court's ruling and the Sale Order should be affirmed in all respects, and such other and further relief should be granted in favor of Hahnemann as the Court deems appropriate.

36145851.6 11/05/2019

## BANKRUPTCY RULE 8015(a)(7)(C) CERTIFICATION

Pursuant to Federal Rule of Bankruptcy Procedure 8015(a)(7)(C), the undersigned certifies that this brief complies with the 13,000-word limitation set forth in Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i).  As calculated by Microsoft Word, this brief contains 6,817 words, excluding the cover page, table of contents and table of authorities.

Dated: November 5, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:   */s/ Mark Minuti*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Counsel for Debtors and Debtors in Possession*

36145851.6 11/05/2019