## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) Case No. 19-11466 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| UNITED STATES OF AMERICA | ) |
| | ) |
| Appellant, | ) BAP No. 19-51 |
| | ) |
| v. | ) Case No. 19-cv-01711-RGA |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*, | ) |
| | ) |
| Appellees. | ) |

## APPENDIX TO ANSWERING BRIEF OF APPPELLEE CENTER CITY HEALTHCARE, LLC, d/b/a HAHNEMANN UNIVERSITY HOSPITAL

### SAUL EWING ARNSTEIN & LEHR LLP

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

Dated:  November 5, 2019

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

**INDEX OF DOCUMENTS RELATING TO
APPENDIX TO ANSWERING BRIEF OF APPELLEE CENTER CITY
HEALTHCARE, d/b/a HAHNEMANN UNIVERSITY HOSPITAL**

| Tab | Bankr. Docket No. / Date | Document | Page |
|---|---|---|---|
| 1 | 142 / July 9, 2019 | Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Residents Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, and (C) Approving the Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; and (II)(A) Approving the Sale of the Debtors' Residents Program Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief | 00001 |
| 2 | 188 / July 15, 2019 | Limited Objection of the United States to Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Residents Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, and (C) Approving the Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; and (II)(A) Approving the Sale of the Debtors' Residents Program Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief | 00098 |
| 3 | 246 / July 19, 2019 | Certification of Counsel Regarding Asset Purchase Agreement and Revised Order (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Residents Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving the Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale | 00110 |
| 4 | 249 / July 19, 2019 | Order (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale | 00267 |

| 5 | 363 / August 5, 2019 | Objection of the United States to Debtors' Motion for Entry of Order Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests to the Stalking Horse Bidder on the Terms of the Stalking Horse Bid as Set Forth in the Stalking Horse Sale Agreement | 00325 |
| 6 | 590 / August 29, 2019 | Certification of Counsel  Regarding Auction Relating to the Sale of the Debtors' Residents Program Assets | 00338 |
| 7 | 633 / September 4, 2019 | Objection of the United States to Debtors' Motion for Entry of Order Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests to Jefferson as Set Forth in the Asset Purchase Agreement | 00494 |
| 8 | 671 / September 6, 2019 | Limited Objection to Proposed Sale Order | 00558 |
| 9 | 681 / September 10, 2019 | Order Under 11 U.S.C. § 105, 106, 363, 365, 503, 507, and 525 (A) Approving Asset Purchase Agreement with Thomas Jefferson University Hospitals, Inc., (B) Authorizing Sale of Certain of Debtor's Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtor's Executory Contracts, and (D) Granting Related Relief | 00562 |
| 10 | n/a | Transcript of Omnibus Hearing Before the Honorable Kevin Gross United States Bankruptcy Judge (September 4, 2019) | 00791 |
| 11 | n/a | Transcript of Hearing Before the Honorable Kevin Gross United States Bankruptcy Judge (September 5, 2019) | 00995 |
| 12 | n/a | Exhibit D-5 from Bankruptcy Court Hearing of September 4, 2019 – Provider Agreement | 01091 |
| 13 | n/a | Department of Health and Human Services, Centers for Medicare and Medicaid Services – Final rule with comment period (relevant pages only) | 1092 |

# TAB 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (III) GRANTING RELATED RELIEF**

Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), by and through their proposed undersigned counsel, file this motion (the "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "**Bankruptcy Code**"), for the entry of: (I) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Order"), (a) establishing bidding procedures (the "**Bidding Procedures**") relating to the sale of certain of the Debtors' assets (as defined in paragraph 26 below, the "**Residents Program Assets**"), including approving a break-up fee, (b) establishing procedures (the "**Assumption and Assignment Procedures**") relating to the assumption and assignment of certain executory contracts (the "**Assumed Contracts**"), including notice of proposed cure amounts, (c) approving the form and manner of notice relating thereto, and (d) scheduling a hearing (the "**Sale Hearing**") for approval of a sale (the "**Sale**"); and (II) an order (the "**Sale Order**"),[2] (a) approving the Sale of the Residents Program Assets free and clear of all liens, claims, encumbrances and interests (collectively, "**Interests**"); (b) authorizing the assumption and assignment of the Assumed Contracts in connection therewith; and (c) granting related relief.  In support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     This Motion is designed the facilitate the transition of the Debtors' residents and fellows who are currently training at Hahnemann University Hospital ("**Hahnemann**") to alternative hospitals and provides the best opportunity for the continuity of programs for the residents and fellows.

2.     As detailed in the First Day Declaration (defined below), the Debtors' operations primarily consist of two hospital facilities in Philadelphia, Pennsylvania – Hahnemann and St. Christopher's Hospital for Children.

3.     The Debtors commenced these cases, among other reasons, because of ongoing, unsustainable losses at Hahnemann, and therefore to implement and facilitate an orderly closure of Hahnemann while ensuring patient safety and quality patient care.

---

[2]     The Debtors will file the applicable form of Sale Order as soon as practicable after such documents are negotiated with the purchaser in consultation with the Official Committee of Unsecured Creditors (if any).

2

4.     Attendant with the myriad of issues involved in the closure of Hahnemann is the effect such closure has had and will continue to have on the approximately 583 residents and fellows (collectively, the "**Residents**") training as part of the 35 accredited residency and fellowship programs at Hahnemann.

5.     With these concerns in mind, a prompt postpetition marketing and sale process for the Residents Program Assets is essential to ensure that Hahnemann's Residents are afforded an opportunity to continue their training without significant interruption while also maximizing the value of the Residents Program Assets for the benefit of the Debtors' estates, creditors and other stakeholders.  Approval of the Bidding Procedures is a critical and necessary step, which is designed to permit a fair and reasonable marketing process, on an accelerated basis, to obtain the best offer for the Debtors' Residents Program Assets while protecting the interests of patients and the Residents.

6.     The Debtors, with the assistance of their advisors, considered all strategic options and concluded that a sale in accordance with the Bidding Procedures set forth herein is the best way to maximize the value of the Residents Program Assets, yield the best recovery for creditors, and promote and ensure the best interests of Residents.

7.     As a result of these efforts, the Debtors executed a letter of intent (the "**Stalking Horse LOI**") with Tower Health ("**Tower Health**" or the "**Stalking Horse Bidder**") for the purchase of the Residents Program Assets, which include Hahnemann's: (a) National provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) Hahnemann's programs for training Residents (the "**Program**s").  The Stalking Horse LOI provides for a purchase price of $7.5 million, subject to certain adjustments, and includes a

guarantee that Tower Health will assume responsibility for the training of all Hahnemann's Residents, including the right to be placed in one of six of Tower Health's hospitals, except for a limited number of Programs to be specified in the definitive purchase documentation that will be closed by Hahnemann prior to the consummation of the transaction. Alternatively, the Stalking Horse LOI contemplates that Residents may voluntarily accept a position elsewhere.

8. As described herein, the Debtors seek approval of the Bidding Procedures and the Sale on an expedited timeline as required by the Stalking Horse Bidder as necessary to effectuate the transition of the Residents. The Debtors submit that the nature of the relief requested and the protections proposed to be granted herein to the Residents supports this accelerated timeframe and should be approved.

## JURISDICTION AND VENUE

9. The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules.

## BACKGROUND

11.     On June 30, 2019 and July 1, 2019 (the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

12.     A description of the Debtors' businesses, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**")[3] [D.I. 2].

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**: (a) approving the proposed Bidding Procedures attached hereto as **Exhibit B**, including approval of the Break-Up Fee as allowed administrative expenses with priority pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code; (b) establishing the Assumption and Assignment Procedures, including notice of proposed cure amounts; (c) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (d) scheduling the Sale Hearing to approve the Sale.

14.     The Debtors also seek entry of the Sale Order:[4] (a) approving the sale of the Debtors' Residents Program Assets free and clear of all Interests; and (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases.

---

[3]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

[4]     The proposed form of Sale Order will be filed with the Court on the date that is one (1) calendar day prior to the Sale Hearing.

15.     Contemporaneously herewith, the Debtors have filed a motion seeking to have this motion heard on shortened notice pursuant to Rule 2002 and Local Rules 6004-1(c) and 9006-1(e) (the "**Motion to Shorten**").

## THE PROPOSED SALE

**A.      The Debtors' Marketing Efforts**

16.     As set forth more fully in the First Day Declaration, Hahnemann is a 496-bed tertiary care academic medical center in center city Philadelphia.  It has a long history of providing healthcare services, dating back to 1848.  Hahnemann is fully accredited by the Joint Commission and historically has provided a range of specialty services, including Level I adult trauma, kidney and liver transplantation, OB/GYN services, medical and radiation oncology, minimally invasive robotic surgery, neonatal intensive care unit services, bariatric surgery, bloodless medicine and surgery and renal dialysis, among other inpatient and outpatient services.

17.     Hahnemann is also the primary teaching hospital for Drexel University d/b/a Drexel University College of Medicine ("**DUCOM**").  Hahnemann's Graduate Medical Education Residency Program is one of the largest in the United States, including approximately 583 residents and fellows practicing in a wide range of medical specialties, as well as training numerous rotating medical students and nursing students.

18.     In early June, 2019, the Debtors retained SSG Advisors, LLC ("**SSG**") to assist in pursuing a financing, sale or restructuring transaction.  Immediately upon its retention, SSG developed marketing materials, including a "teaser" and a confidential information memorandum.  SSG also established an electronic data room containing key information for parties to conduct in depth due diligence on Hahnemann.

6

Appx. 00006

19.     As described in the First Day Declaration, to date, no party has expressed an interest in acquiring Hahnemann's assets as a going concern, leading to the Debtors' determination that it is necessary and appropriate to implement an orderly closure of Hahnemann. However, while the Debtors' prepetition marketing efforts did not result in a going concern buyer for Hahnemann, they did result in the successful execution of the Stalking Horse LOI with respect to the Residents Program Assets, which includes critical protections for the Residents as described herein.

20.     Through the Stalking Horse LOI, and subject to the execution of a definitive asset purchase agreement, Tower Health agreed to act as the Stalking Horse Bidder for the sale of the Residents Program Assets for a purchase price of $7.5 million, subject to adjustments, including, notably, guaranteed placement opportunities for Residents. A copy of the Stalking Horse LOI is attached hereto as **Exhibit C**.[5]

21.     Tower Health operates six (6) hospitals in the region, including Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania (collectively, the "**Tower Health Hospitals**").

**B.     The Primary Terms of the Stalking Horse LOI**

22.     The Stalking Horse LOI contemplates the sale of the Residents Program Assets to the Stalking Horse Bidder, subject to higher and better bids, on the following material terms:

23.     <u>Seller</u>: Debtor CCH (in such capacity, "**Seller**").

---

[5]     To preserve confidentiality, Schedules A and B to the Stalking Horse LOI are not included with the filing. The information contained therein will be addressed in connection with the confidentiality provisions of the proposed Bidding Procedures and, as applicable, the filing of the Stalking Horse Sale Agreement.

35587432.3 07/09/2019

24.   <u>Purchaser</u>:  Tower Health or one of its subsidiary entities (in such capacity, the "**Purchaser**").

25.   <u>Purchase Price</u> (Stalking Horse LOI ¶4):  $7.5 million ("**Base Purchase Price**") in cash at closing, subject to a $500,000 purchase price adjustment on account of the amount paid by Purchaser to Seller on June 28, 2019 as consideration for the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020,  In addition, the amount of $3 million (the "**Escrow Amount**") will be withheld from the Base Purchase Price and placed into an escrow account with a third-party financial institution (the "**Escrow Account**") to cover the following losses, damages and expenses: (a) the Tail Coverage Costs,[6] (b) the CMS Discharge Amount,[7] (c) the Cure Amounts,[8] and (d) the Indemnity Amounts.[9]  To the extent there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, the remaining funds will be returned to the Seller.  If the sum of the Tail Coverage Costs, the CMS Discharge Amount and the Cure Amounts exceeds the Escrow Amount, each of the Purchaser and Seller has the right to terminate the Stalking Horse Sale Agreement (defined below).

26.   <u>Residents Program Assets</u> (Stalking Horse LOI ¶ 1):  The Stalking Horse LOI provides that the Purchaser will acquire Hahnemann's: (a) National Provider Identifiers (general

---

[6]   As set forth in the Stalking Horse LOI, the Tail Coverage Costs refer to certain of the Stalking Horse Bidder's cost of a reporting endorsement (tail coverage) to insure against professional liabilities of Continuing Residents related to the period of Seller's ownership and operation of Hahnemann.  If the cost of such endorsement exceeds $100,000 in the aggregate, any and all amounts in excess of $100,000 are deemed "Tail Coverage Costs."  *See* Stalking Horse LOI at ¶ 7(b).

[7]   As set forth in the Stalking Horse LOI, the CMS Discharge Amount refers to the limitation agreed to by the Centers for Medicare and Medicaid Services (the "**CMS**") with respect to the amount of claims of offset or recoupment.  *See* Stalking Horse LOI at ¶ 7(d).

[8]   As set forth in the Stalking Horse LOI, the Cure Amounts refer to the cure amounts related to assumed and assigned contracts that are part of the Assets.  *See* Stalking Horse LOI at ¶ 7(c).

[9]   As set forth in the Stalking Horse LOI, the Indemnity Amounts refers to all loss, damages and expense arising out of third party claims for Seller's acts or omissions arising out of the Residents Program Assets.  *See* Stalking Horse LOI at ¶ 9.

8

Appx. 00008

and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, Hahnemann's Programs, so that one or more of the Tower Health Hospitals will become the principal training site for all the Programs, except for a limited number of Programs that will be closed by Hahnemann prior to Closing.

27.     <u>Excluded Assets</u> (Stalking Horse LOI ¶ 2):  The Stalking Horse LOI provides that the Purchaser will not acquire any assets other than those described in section 1, and specifically excludes cash and accounts receivable.  The Stalking Horse LOI also provides that the Purchaser will not acquire or assume any present or future obligation or liability of Seller, including with respect to trade accounts payable, employee obligations,[10] obligations under contracts other than Assumed Contracts, debt obligations, tax obligations, environmental obligations and any other obligations arising prior to the Closing Date (defined below).

28.     <u>Residents</u> (Stalking Horse LOI ¶ 3):  Most importantly, the Purchaser will assume responsibility for the continued training of the Residents, and will give each Resident the right to be placed in one of the Tower Health Hospitals or to accept a position elsewhere.  Either the Debtors or the Purchaser, as applicable, will release the related cap on Medicare reimbursement on a temporary basis for those current Residents who elect to complete their training elsewhere. Purchaser will provide free housing for applicable Residents who continue with the Purchaser (as defined in the Stalking Horse LOI, the "**Continuing Residents**").  Purchaser will also seek to transfer the faculty with whom the Residents have been training to ensure that the Residents' training cohort remains intact.

---

[10]     Notwithstanding the exclusion of employee-related obligations, the Stalking Horse LOI provides that, subject to the Stalking Horse Bidder's completion of due diligence, Stalking Horse Bidder may elect to assume Seller's employment agreements with Continuing Residents.

29.     The Stalking Horse LOI further provides that the Seller and Stalking Horse Bidder will work cooperatively to determine clinical rotation assignments for Continuing Residents, with such assignments to commence as soon as practicable after the execution of the Stalking Horse Sale Agreement.

30.     <u>Closing and Other Deadlines</u> (Stalking Horse LOI ¶¶ 8 and 16): The Stalking Horse LOI requires the execution of a definitive purchase agreement (the "**Stalking Horse Sale Agreement**")[11] by July 12, 2019 and entry of the Bidding Procedures Order by July 17, 2019. The Stalking Horse LOI provides that closing shall occur by August 1, 2019 or such later date as is required to obtain necessary government and regulatory approvals as the Stalking Horse Bidder and Seller shall mutually agree.

31.     <u>Break-Up Fee</u> (Stalking Horse LOI ¶5):  The Stalking Horse LOI provides that, subject to Court approval as part of the Bidding Procedures Order, the Debtors will be required to pay the Stalking Horse Bidder a fee (the "**Break-Up Fee**") in the amount of $225,000, if the Stalking Horse Sale Agreement is not approved by the Court and the offer of a third party for the Residents Program Assets is approved by the Court and the Debtors close on such third-party sale instead of the Sale to the Stalking Horse Bidder.

32.     <u>"Fiduciary Duty" Out</u>: The Bidding Procedures provide that, "[n]othing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Debtors' board of managers determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law . . . ."

---

[11]     The Debtors will file a copy of the Stalking Horse Sale Agreement promptly after it is executed.

## C.    The Bidding Procedures

33.    The Bidding Procedures, which are attached hereto as **<u>Exhibit B</u>**, are designed to maximize value for the Debtors' estates and promote the interest of Residents, while effectuating an expeditious sale of the Residents Program Assets.   Among other things, the Bidding Procedures set forth procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of an ultimately successful bidder (the "**Successful Bidder**"), and the deadlines with respect to the foregoing.

34.    Certain of the salient terms of the Bidding Procedures are highlighted below:[12]

- **<u>Key Proposed Dates (subject to the Court's availability):</u>**

| Milestone | Proposed Date |
|---|---|
| Deadline for Entry of the Bidding Procedures Order | July 17, 2019 |
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder | 4:00 p.m. (prevailing Eastern Time) on July 26, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on July 26, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on July 30, 2019 |
| Sale Hearing | July 31, 2019 |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidder | (may be raised at the Sale Hearing) |

---

[12]    The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary set forth herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

| Sale Closing (*i.e.*, the Outside Date) | August 1, 2019[13] |
|---|---|

- **Auction Qualification Process:** As set forth in further detail in the Bidding Procedures, a Qualified Bidder must, among other requirements, (a) deliver financial statements demonstrating the financial capability of the bidder to consummate the sale, (b) propose a purchase price for the Residents Program Assets, that in the Debtors' reasonable business judgment, has a value that equals or exceeds $7,725,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse LOI plus the Break-Up Fee); (c) provide a good faith deposit in the amount of ten percent (10%) of the purchase price; (d) provide an executed non-contingent sale agreement on the same or better terms as those contained in the Stalking Horse Sale Agreement to be filed with the Court; and (e) include a detailed proposal with regard to the treatment and protections proposed for Residents.

- **Auction and Sale Procedures:** If the Debtors receive more than one Qualified Bid by the Bid Deadline, the Debtors shall conduct an Auction at the offices of proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, or such other place and time as the Debtors shall notify in writing all Qualified Bidders that have submitted Qualified Bids. If the Debtors do not receive any Qualified Bid (other than the Stalking Horse Bid) on or prior to the Bid Deadline, the Debtors shall promptly cancel the Auction and seek approval of the Sale of the Residents Program Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement at the Sale Hearing.

## D. The Notice Procedures

35.     Within one (1) business day following entry of an order approving the Bidding Procedures, or as soon as practicable thereafter (the "**Mailing Date**"), in accordance with Bankruptcy Rule 2002(a) and (c), the Debtors (or their agents) shall serve the auction and sale notice (the "**Auction and Sale Notice**"), substantially in the form attached hereto as **Exhibit D**, by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets during the past six (6) months; (b) all entities known to have asserted any interest in or upon any of the Debtors' assets; (c) all

---

[13]     As noted above, under the terms of the Stalking Horse LOI, the Closing Date may be extended as required to obtain necessary governmental and regulatory approvals as the Stalking Horse Bidder and Seller shall mutually agree.

federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the Accreditation Council for Graduation Medical Education (the "**ACGME**"); and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

36.     The Auction and Sale Notice shall indicate that copies of the Motion, the Stalking Horse Sale Agreement, the Bidding Procedures Order, and all other documents filed with the Court can be obtained on the website of the Debtors' proposed claims and noticing agent, Omni Management Group.  The Auction and Sale Notice will also indicate the proposed deadline for objecting to the Sale to the Successful Bidder and the anticipated date and time of the Sale Hearing, subject to the Court's availability.  In addition, the Auction and Sale Notice shall provide notice that the Debtors will seek to assume and assign certain executory contracts to be identified in accordance with the Assumption and Assignment Procedures (as described further below) at the Sale Hearing.  The Debtors request that such notice be deemed to be sufficient and proper notice of the Sale with respect to known interested parties.

37.     The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1(E)(5), to publish the Auction and Sale Notice on the Mailing Date, or as soon thereafter as is practicable, in the *Philadelphia Inquirer* and an industry publication on one

occasion.  The Debtors request that such publication notice be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

38.     As soon as reasonably practicable after the conclusion of the Auction, if any, the Debtors shall file on the docket, but not serve, a notice identifying the Successful Bidder, (the "**Post-Auction Notice**").

**E.      The Assumption and Assignment Procedures**

39.     At the closing of the Sale, the Debtors anticipate that they will assume certain executory contracts designated by the Stalking Horse Bidder (or other Successful Bidder) ("**Designated Contracts**") pursuant to section 365(b) of the Bankruptcy Code and assign such Designated Contracts to the Stalking Horse Bidder (or other Successful Bidder).  The Debtors accordingly are seeking approval of proposed procedures to govern the assumption and assignment of all Designated Contracts (the "**Assumption and Assignment Procedures**"). Because the Assumption and Assignment Procedures are set forth in detail in the attached Bidding Procedures Order, they are not restated herein.  Generally speaking, however, the Assumption and Assignment Procedures: (a) outline the process by which the Debtors will serve notice, in substantially the form attached hereto as **Exhibit E** (the "**Assumption and Assignment Notice**"), to all counterparties to the Designated Contracts regarding the proposed assumption and assignment and related cure amounts, if any; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of Designated Contracts.

## BASIS FOR RELIEF

### A.     Approval of the Sale Is Appropriate Under Section 363 of the Bankruptcy Code

40.     The Sale should be approved as a sound exercise of the Debtors' business judgment.  Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ."  11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).  Once a court determines that a valid business justification exists for a sale outside of the ordinary course of business, the court must determine whether (a) adequate and reasonable notice of the sale was given to interested parties, (b) the sale will produce a fair and reasonable price for the property, and (c) the parties have acted in good faith.  *See In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).  As described below, the proposed Sale meets each of these requirements.

### 1.     The Sale Represents a Sound Exercise of the Debtors' Business Judgment

41.     Here, a strong business justification exists for the Sale.  As described above and in the First Day Declaration, the Debtors have concluded that Hahnemann must be closed.  Conducting a sale with respect to the Residents Program Assets not only preserves value for the Debtors' estates, but  represents the best, if not the <u>only</u>, opportunity for the Debtors to protect the interests of nearly 600 Residents who, without such a transaction, might suffer severe disruption to their professional development and family lives as a result of the closure.  As a

result, an expeditious sale of the Debtors' Residents Program Assets is a reasonable exercise of the Debtors' business judgment and is in the best interests of all of the Debtors' stakeholders, including both creditors and the Residents.

**2.      The Bidding Procedures are Fair and Designed to Maximize Value**

42.      The Debtors believe that the Bidding Procedures satisfy each of the remaining requirements for approval of a sale under section 363 of the Bankruptcy Code by (a) providing sufficient notice of each element of the proposed sale process, (b) facilitating a value-maximizing sale, and (c) ensuring an unbiased and good faith sale process.  The detailed Bidding Procedures outlined above and set forth in **<u>Exhibit B</u>** provide notice designed to fully inform all parties with a stake in the sale process regarding the portions of the sale process most relevant to their interests.  For example, the Bidding Procedures ensure that any entities asserting an interest in the Debtors' Residents Program Assets and parties to the Designated Contracts will receive notice of the proposed Sale, the procedures for objecting to the Sale, and the proposed assumption and assignment of their respective contracts.  Similarly, the Bidding Procedures outline all material aspects of the potential purchaser notification, bid qualification, due diligence, bid submission, bid selection, and auction process, including the timing for each.  Thus, the Bidding Procedures provide assurance to each entity potentially interested in purchasing the Debtors' Residents Program Assets that their respective rights will be protected and the Sale process will be fair and reasonable.

43.      Further, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, the highest and best offer for the Residents Program Assets.  Moreover, the Bidding Procedures provide the Debtors with the flexibility to modify the Bidding Procedures, if necessary, to maximize value

16

for the Debtors' estates. Accordingly, the Debtors believe the Court should approve the Bidding Procedures.

44.     Similar bidding procedures have been approved in the Third Circuit. *See, e.g.*, *In re Sungevity, Inc., et al.*, No. 17-10561 (KG) (Bankr. D. Del. Mar. 29, 2019), ECF No. 124; *In re DirectBuy Holdings, Inc., et al.,* No. 16-12435 (CSS) (Bankr. D. Del. Dec. 1, 2016), ECF No. 126; *In re BPS US Holdings, Inc., et al.,* No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233; *In re Emerald Oil, Inc., et al.*, No. 16-10704 (KG) (Bankr. D. Del. Aug. 31, 2016), ECF No. 664; *Savient Pharms., Inc.*, No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013, ECF No. 110.

### 3.     The Break-Up Fee is Necessary

45.     The Debtors believe that approval of the Break-Up Fee to the Stalking Horse Bidder will ensure the Debtors' ability to maximize the realizable value of the Debtors' Residents Program Assets for the benefit of the Debtors' estates, their creditors, and other parties in interest. The Stalking Horse Bidder conditioned its willingness to serve as a stalking horse bidder on the inclusion of the Break-Up Fee. If approved by the Court, the Debtors would be required to pay the Stalking Horse Bidder a Break-Up Fee of $225,000 only in the event that the Debtors sell the Residents Program Assets to a third-party buyer instead of the Stalking Horse Bidder, payable solely from the proceeds of such third-party transaction.

46.     The United States Court of Appeals for the Third Circuit has held that break-up fees and expense reimbursements must meet the standards applicable to the allowance of administrative expenses under section 503(b) of the Bankruptcy Code. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)). The Third

Circuit has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien*, 181 F.3d at 537. Second, "if the availability of break-up fees and expense [reimbursements] were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

47. The Break-Up Fee should be approved and afforded priority administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code because it provides a clear benefit to the Debtors' estates. By conducting due diligence, participating in negotiations for a potential transaction and ultimately signing the Stalking Horse Sale Agreement, the Stalking Horse Bidder has established a bid standard, including a price floor, and initiated a sales process that will serve as a catalyst for other bidders to submit higher and better bids. Further, the Stalking Horse LOI and Stalking Horse Sale Agreement should provide some degree of comfort to the Debtors' Residents regarding their future. The Debtors submit that the amount of the Break-Up Fee is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder, including conducting the legal and financial diligence necessary to negotiate and enter into the Stalking Horse Sale Agreement, which will serve as the baseline for other bids for the Residents Program Assets.

48.     Moreover, the Debtors believe that the execution of the Stalking Horse LOI, and ultimately the Stalking Horse Sale Agreement, provides an incentive for others to consider expending the time and effort to do so now.  To the extent that the Stalking Horse Sale Agreement entices other potentially interested purchasers to participate in the bidding and auction process, the Break-Up Fee will provide a material benefit to the Debtors' estates in the form of an increased sale price.  On the other hand, in the event that others are not encouraged by the Stalking Horse Bid to undertake additional efforts and participate in the Auction, the Break-Up Fee will not be paid and, thus, should not affect the value received by the Debtors for the Residents Program Assets.  As such, the Debtors submit that it is appropriate to enter into the Stalking Horse Sale Agreement containing the Break-Up Fee.

49.     Here, the Stalking Horse Bidder has conditioned its willingness to enter into the Stalking Horse Sale Agreement on the Court's approval of the Break-Up Fee.  The proposed Break-Up Fee was the result of arms'-length negotiations between representatives of the Debtors and the Stalking Horse Bidder, which is not an insider of the Debtors.  The Debtors submit that the Break-Up Fee is justified to induce the Stalking Horse Bidder to enter into the Stalking Horse Sale Agreement and to adequately compensate it for the risks it is taking.  The proposed transaction with the Stalking Horse Bidder ensures that the Debtors will have at least one substantial offer for the Residents Program Assets, which includes not only monetary value for the Debtors' estates but also a guarantee of placement for all of Hahnemann's nearly 600 Residents.

50.     The Break-Up fee of $225,000 is 3% of the proposed purchase price (before adjustments) of $7.5 million.  This falls within the range of bid protections regularly approved by bankruptcy courts in the Third Circuit.  *See, e.g.*, *In re American Apparel, LLC, et al.*, No. 16-

12551 (BLS) (Bankr. D. Del. Dec. 5, 2016), ECF No. 216 (approving break-up fee of 3.0% in connection with a $66 million sale of assets); *In re BPS US Holdings Inc., et al.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233 (approving break-up fee of 3.5% in connection with a $575 million sale of assets); *In re SynCardia Systems, Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Aug. 5, 2016), ECF No. 175 (approving break-up fee of 3.0% in connection with a $19 million sale of assets); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013), ECF No. 137 (approving break-up fee of 3.0% in connection with a $455 million sale of assets); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012), ECF No. 206 (approving break-up fee of 3.0% in connection with a $258 million sale of assets).

**B.       The Sale Satisfies the Requirements for a Sale Free and Clear of Interests**

48.       The Sale also meets the requirements to be a sale free and clear of Interests. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in *bona fide* dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

49.       The Debtors submit that the Sale will satisfy the requirements of section 363(f) of the Bankruptcy Code.  The Debtors will provide all parties asserting claims against the Residents

Program Assets, including, but not limited to, all creditors and interest holders of the Debtors, with notice of, and an opportunity to object to, the Sale. Absent objection, each such party will be deemed to have consented to the Sale. *See, e.g.*, *FutureSource LLC v. Reuters, Ltd.*, 312 F.3d 281 (7th Cir. 2002) (failure to object may constitute consent, if there was adequate notice; *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) ("Silence by affected claim holders may constitute consent for purposes of section 363(f)(2)"). In addition, the Debtors believe that certain of the parties asserting claims against the Residents Program Assets could be compelled to accept a monetary satisfaction of such Interests. Accordingly, approval of the sale of the Residents Program Assets free and clear of all Interests is warranted.

## C. A Successful Bidder Should be Afforded the Protections of Sections 363(m) and 363(n) of the Bankruptcy Code

50. Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd.* (*In re Mark Bell Furniture Warehouse, Inc.*), 992 F.2d 7, 8 (1st Cir. 1993).

51. As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the terms of the Sale and the assignment of the Designated Contracts related thereto. Moreover, at the Sale Hearing, the Debtors will present evidence that the terms of Sale were negotiated at arms'-length, with both parties represented by their own counsel. Accordingly, the Debtors request that the Sale Order include a provision concluding that the Successful Bidder is a "good faith" purchaser within the meaning of section 363(m) of

the Bankruptcy Code. The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors and that the sale will close promptly.

52. Moreover, neither the Debtors nor the Stalking Horse Bidder have engaged in any conduct that would cause or permit the Stalking Horse Sale Agreement to be avoided under section 363(n) of the Bankruptcy Code. If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, the Debtors will have negotiated an alternative asset purchase agreement with the Successful Bidder in good faith and at arms'-length. The Bidding Procedures are designed to prevent the Debtors or the Successful Bidder from engaging in any conduct that would cause or permit the Stalking Horse Sale Agreement or the Sale to be avoided under section 363(n) of the Bankruptcy Code.

53. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Stalking Horse Bidder or other Successful Bidder (a) is purchasing the Residents Program Assets in good faith, (b) is entitled to the full protections of section 363(m) of the Bankruptcy Code, and (c) has not entered into an agreement with other potential bidders or otherwise engaged in conduct that violates section 363(n) of the Bankruptcy Code.

**D.     Assumption and Assignment of the Designated Contracts Should be Authorized**

54. Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Further, section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance . . . is provided. . . ." 11 U.S.C.

§ 365(f)(2). Assumption and assignment of the Designated Contracts in connection with the Sale is appropriate.

> **1.** **Assumption of the Designated Contracts is a Reasonable Exercise of the Debtors' Business Judgment**

55. Assumption or rejection of a contract is a matter of the debtor's business judgment. *See Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom.*, *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test"); *In re Physiotherapy Holdings, Inc.*, 506 B.R. 619, 622 (Bankr. D. Del. 2014) (citing *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003)). A debtor's decision in this regard is "entitled to great deference from the Court." *See In re Armstrong World Indus.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006). In order to satisfy the business judgment test, a debtor must only show that assumption or rejection of an executory contract will benefit the estate. *See Bildisco*, 682 F.2d at 79; *see also In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("Under the business judgment standard, the sole issue is whether the rejection benefits the estate").

56. To facilitate the Sale and to maximize the value received for the Debtors' Residents Program Assets, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Designated Contracts to the Successful Bidder. Certain of the Debtors' executory contracts will be necessary for the Successful Bidder's continued operation of the Residents Program Assets.

57. The Debtors further request that the Sale Order provide that the Designated Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Designated Contracts, including those

described in sections 365(b)(2), 365(f)(1), and 365(f)(3) of the Bankruptcy Code that prohibit such assignment.

58.     The Debtors also request that the Sale Order provide that to the extent any provision in any Designated Contract assumed and assigned (a) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment (including, without limitation, any "change of control" provision), or (b) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of the Cases, (ii) the insolvency or financial condition of the Debtors at any time before the closing of the Cases, (iii) the Debtors' assumption and assignment of such Designated Contract, or (iv) the consummation of the Sale, then such provisions shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or condition such assumption or assignment, to modify, terminate or declare a breach or default under such Designated Contract, or to exercise any other default-related rights or remedies with respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture such Designated Contracts, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith. The Debtors request that all such provisions be deemed to constitute unenforceable anti-assignment provisions and are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

**2.      Any Defaults Under the Designated Contracts will be Cured and Evidence of Adequate Assurance of Future Performance Provided**

59.     Once an executory contract or unexpired lease is assumed, the trustee or debtor in possession may generally elect to assign such contract, so long as it cures any defaults and provides adequate assurance of future performance. *See* 11 U.S.C. § 365(f)(2)(B) (a debtor may

24

assign an executory contract or unexpired lease of nonresidential property if "adequate assurance of future performance by the assignee of such contract or lease is provided. . . ."). The requirements to show "adequate assurance of future performance" will depend on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001); *In re Decora Indus.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guaranty of payment"). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

60. The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any Designated Contracts because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale. The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder to perform under the Designated Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Designated Contracts, as required under section 365(f)(2)(B) of the Bankruptcy Code.

35587432.3 07/09/2019

61.     The Debtors submit that implementation of the Assumption and Assignment Procedures regarding assumption and assignment of the Designated Contracts is appropriate in this case.  The Court, therefore, will have a sufficient basis to authorize the Debtors to assume and assign the Designated Contracts to the Successful Bidder.

## SATISFACTION OF BANKRUPTCY RULE 6003

62.     Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ."  *See* Fed. R. Bankr. P. 6003.  As described herein, a rapid sale process is critical to the Debtors' ability to realize value with respect to the Residents Program Assets and minimize the negative impact of the closure of Hahnemann with respect to Residents, as well as the Debtors' academic affiliation partner, Drexel University.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)

63.     To implement the foregoing immediately, the Debtors seeks a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and the assumption and assignment of the Designated Contracts under Bankruptcy Rule 6006(d).

64.     Here, a waiver of the stay is appropriate because the Residents Program Assets were adequately marketed and notice of the Sale was and will be adequately provided to all parties in interest.  Likewise, the non-Debtor parties to the Designated Contracts will be provided with adequate notice of, and opportunity to object to, the assumption and assignment of the Designated Contracts.

35587432.3 07/09/2019

## NOTICE

The Debtors have provided notice of the filing of the Motion via facsimile and/or email or, if neither is available, by overnight mail to: (i) the Office of the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Human Services; (xi) the City of Philadelphia; (xii) the CMS; (xiii) the ACGME; and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

35587432.3 07/09/2019

Appx. 00027

**WHEREFORE**, the Debtors respectfully request entry of the Bidding Procedures Order and the Sale Order granting the relief requested herein and such other and further relief as the Court deems just and warranted.

Dated: July 9, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

       -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

**EXHIBIT A**

**Proposed Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) | |
| *al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | **Re: Docket No. __** |
| | ) | |

### ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND <u>(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE</u>

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures Order**"): (a) approving the proposed bidding procedures attached as **<u>Schedule 1</u>** to this Bidding Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets; (b) establishing procedures for the assumption and assignment of executory contracts, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

(c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**"), the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. __], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which will be filed on or earlier to the date that is one (1) day prior to the Sale Hearing, (x) authorizing the sale of the Residents Program Assets free and clear of liens, claims, interests, and encumbrances (collectively, the "**Interests**") with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and

having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D.      Notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy

Code, the Bankruptcy Rules, and the Local Rules. Notice of the Motion has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Accordingly, no further notice of the Motion or this Bidding Procedures Order is necessary or required.

E. The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation: (a) approval of the Bidding Procedures; (b) approval of the selection of Tower Health as the Stalking Horse Bidder; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein. Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by

Appx. 00033

reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.     Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

G.     The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.  The Break-Up Fee:  (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H.     The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale

Agreement.  The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely.  Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures).  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

I.      The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required.  The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.      The Auction and Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d)  identification of the assets to be sold;

(e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.      The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.[3]

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.      <u>Timeline for the Sale</u>**

3.      The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order.  The Debtors are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

---

[3]      Notwithstanding anything to the contrary herein, the consummation of the Sale is subject to entry of the Sale Order.

| Milestone | Proposed Date |
|---|---|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder | 4:00 p.m. (prevailing Eastern Time) on July 26, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on July 26, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on July 30, 2019 |
| Sale Hearing | July 31, 2019 |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidder | (may be raised at the Sale Hearing) |

4.      For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

## II.      **The Bidding Procedures**

5.      The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on July 26, 2019.

35587432.3 07/09/2019

Appx. 00037

Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.    The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8.    The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on July 30, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice).  The Auction will be conducted openly and all creditors will be permitted to attend.

9.    Any creditor with a valid and perfected lien on any assets of the Debtors' estates (each, a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of such Secured Creditor's allowed secured claims to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, and any such credit bid shall be deemed a Qualified Bid.

10.    Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include the full amount of the Break-Up Fee in lieu of cash and for purposes of evaluating the

overbid equal to cash in the same amount, subject to the limitations set forth in paragraph 9. Notwithstanding the preceding sentence, the inclusion in any overbid of the Break-Up Fee shall not be deemed to create a secured claim or constitute an offset against any such claim under section 363(k) of the Bankruptcy Code.

### III.  Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement

11.    The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction.  The Break-Up Fee contained in the Stalking Horse Sale Agreement is approved.  The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' consummation of the Sale with a purchaser other than the Stalking Horse Bidder.  If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code; and (b) shall be payable in accordance with the terms of the Stalking Horse Sale Agreement without further order of this Court.

### IV.  Notice Procedures

12.    The Auction and Sale Notice is approved.

*A.*    ***Notice of Sale, Auction, and Sale Hearing.***

13.    Within one (1) business day after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the Stalking Horse Sale Agreement, Bidding Procedures Order, and Bidding Procedures by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon the Notice Parties.

14.    Service of the Auction and Sale Notice as described in the Motion shall be sufficient and proper notice of the Sale with respect to known interested parties.  Publication of

the Auction and Sale Notice as described in the Motion shall be sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

### B. *Notice of Successful Bidder.*

15. As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice, which shall identify the Successful Bidder.

## V. <u>Assumption and Assignment Procedures</u>

16. The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

### A. *Notice of Assumption and Assignment.*

17. The Debtors previously filed with the Court, [D.I. ●], a list (the "**Designated Contracts List**") specifying: (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Designated Contract (the "**Cure Costs**").

18. A Designated Contract Counterparty listed on the Notice of Assumption and Assignment may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance. All

11

Appx. 00040

Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Debtors by the later of (i) 4:00 p.m. (prevailing Eastern Time) on July 26, 2019; and (ii) 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days following the Assumption and Assignment Service Date (the "**Contract Objection Deadline**"). Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

19. If a Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

*B.*      *Supplemental Notice of Assumption and Assignment.*

20. The Stalking Horse Bidder may modify the Designated Contracts List until the opening of business on the date of the Auction. Following the conclusion of the Auction, if any, and the selection of the Successful Bidder, the Debtors reserve the right, but only in accordance with the Stalking Horse Sale Agreement, or as otherwise agreed by the Debtors and the Successful Bidder, at any time after the Assumption and Assignment Service Date, before or after the closing of the Sale, to: (a) supplement the Designated Contracts List on the Notice of Assumption and Assignment with previously omitted Designated Contracts; (b) remove a Designated Contract from the Designated Contracts List; and/or (c) modify the previously-stated Cure Costs associated with any Designated Contract.

21. In the event that the Stalking Horse Bidder or Debtors exercise any of the rights reserved above to supplement the Designated Contracts List or modify previously-stated Cure Costs, the Debtors will promptly serve a supplemental notice of assumption and assignment by, first class mail, on the Designated Contract Counterparty, and its attorney, if known, to each impacted Designated Contract at the last known address available to the Debtors (a "**Supplemental Notice of Assumption and Assignment**"). Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed Designated Contracts as was included in the Notice of Assumption and Assignment.

22. Any Designated Contract Counterparty listed on a Supplemental Notice of Assumption and Assignment may file an objection with respect to the impacted Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs, if any, and (b) if such Designated Contract was not previously included on any Notice (or Supplemental Notice) of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance. All Supplemental Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

23.     If a Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts.  If there is no such objection (or such objection has been resolved), then the Debtors may submit an order (a "**Supplemental Designated Contract Order**") to this Court, including by filing a certification of counsel, fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

C.     *Additional Notice of Assumption and Assignment Procedures.*

24.     If the Designated Contract Counterparty does not file and serve a Contract Objection or Supplemental Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court in connection with such objection establishing alternative Cure Costs, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any  claim related to such Designated Contract for any default occurring or continuing prior to the Contract Objection Deadline against the Debtors or the Successful Bidder, or the property of any of them.

25.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take

14

Appx. 00043

assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract. Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

**VI.** **Sale Hearing.**

26.    A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at _____ (prevailing Eastern Time) on July [●], 2019, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder. The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

27.    Any and all objections, if any, to the Sale to the Stalking Horse Bidder and entry of the Sale Order (a "**Sale Objection**") must be filed and served on the Objection Recipients by 4:00 p.m. (prevailing Eastern Time) on July 26, 2019 (the "**Sale Objection Deadline**"). Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder

other than the Stalking Horse Bidder (an "**Auction Objection**") must be raised at or prior to the

Sale Hearing (the "**Auction Objection Deadline**").  Any party failing to timely file a Sale

Objection or raise an Auction Objection, as applicable, will be forever barred from objecting and

will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title

and interest in, to, and under the assets free and clear of any and all liens, claims, interests, and

encumbrances in accordance with the definitive agreement for the Sale.

**VII.**    **Miscellaneous.**

28.    The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Bidding Procedures Order in accordance with the Motion.

29.    This Bidding Procedures Order shall constitute the findings of fact and

conclusions of law and shall take immediate effect upon execution hereof.

30.    This Bidding Procedures Order shall be binding on the Debtors, including any

chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to

the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

31.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d),

7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions

of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

This Court shall retain jurisdiction with respect to all matters arising from or related to the

implementation or interpretation of this Bidding Procedures Order, including, but not limited to,

35587432.3 07/09/2019

Appx. 00045

any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking

Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

Appx. 00046

## **Exhibit B**


**Bidding Procedures**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) Jointly Administered |
| Debtors. | |

## BIDDING PROCEDURES

On July [●], 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**").  These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July [●], 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**").

## A.    Submissions to the Debtors.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

a. **Debtors**. Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

b. **Debtors' Counsel**. Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

c. **Debtors' Investment Banker**. SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com).

## B. <u>Potential Bidders</u>.

The Debtors and their financial advisors have identified, and may in the future identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction. To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**") must deliver or have previously delivered, if determined to be necessary by the Debtors:

a. an executed confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**"), to the extent not already executed; and

b. the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, (ii) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

## C. <u>Qualified Bidders</u>.

a. A "**Qualified Bidder**" is a Potential Bidder: (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined in the Debtors' sole discretion; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below). On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times. MidCap Funding IV Trust, solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times.

b. If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and

all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

c.   Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.   Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

d.   Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

## D.   Due Diligence.

### a.   Diligence Provided to Potential Bidders.

Only Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.   The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders other than the Stalking Horse Bidder, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any

competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to Wells Fargo and any committee appointed in the Debtors' chapter 11 cases.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

**b.** **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**E.** **Bid Requirements**.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors in their reasonable business judgment shall constitute a "**Qualified Bid**." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

a. **Assets**. Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

b.  **Purchase Price**.  Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**").  The Purchase Price must be in cash consideration and must equal or exceed $7,725,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) (a "**Minimum Bid**").

c.  **Deposit**.  With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**").

d.  **Residents**.  Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms.

e.  **Same or Better Terms**.  Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating the satisfaction of the Debtors that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f.  **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on (i) obtaining financing, (ii) shareholder, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment than those set forth in the Stalking Horse Sale Agreement.

g.  **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any

Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.   **Demonstrated Financial Capacity**.   A Qualified Bidder must have, in the Debtors' business judgment, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.  Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i.   **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

j.   **Binding and Irrevocable**.  A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k.   **Expenses; Disclaimer of Fees**.  Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.   **Authorization**.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m.   **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Potential Bidder:  (i) has had an opportunity to conduct any

and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

n. **Adherence to Bid Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o. **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p. **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q. **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 4:00 p.m. (prevailing Eastern Time) on July 26, 2019 (the "**Bid Deadline**").

The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

## F. <u>Right to Credit Bid</u>.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause. In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include the full amount of the Break-Up fee in lieu of cash and for purposes of evaluating the overbid equal to cash in the same amount. Notwithstanding the preceding sentence, the inclusion in any overbid of the Break-Up Fee shall not be deemed to create a secured claim or constitute an offset against any such claim under section 363(k) of the Bankruptcy Code.

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order.

### G.    <u>Auction</u>.

If the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. The Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids are received and the identity of the bidders making any such Qualified Bids. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement), the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) business day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' sole business judgment (the "**Baseline Bid**"), and provide copies of the applicable Qualified Bid Documents supporting the Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, which may include, among other things: (a) the number, type, and nature of any changes to the applicable Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on July 30, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

### a.    **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who

submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and all creditors will be permitted to attend. The Qualified Bidders and the Stalking Horse Bidder may appear at the Auction in person or through duly authorized representatives.

b. **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a) **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth herein.

(b) **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors.

(c) **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(d) **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified in the initial applicable Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid.

c.    **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment to adjourn the Auction one or more times to, among other things:  (i) facilitate discussions among the Debtors and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider how to value each Overbid.

d.    **Closing the Auction**.

(a)    The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, to be the highest or otherwise best Bid.  Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed.  The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

(b)    The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid; *provided*, *however*, that the Debtors, subject to approval by the Bankruptcy Court, may determine to accept such Bid if such Bid may otherwise be deemed the Successful Bid.

(c)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

e.    **No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that:  (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder.  All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

**H.**     <u>**Backup Bidder**</u>.

    a.      Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

    b.      The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

    c.      If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

**I.**     <u>**Reservation of Rights**</u>.

     Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

**J.**     <u>**Sale Hearing**</u>.

     A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on or before 10:00 a.m. (prevailing Eastern Time) on July [●], 2019, before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

## K.    Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions and in the amount set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

The Debtors have agreed that their obligations to pay the Break-Up fee, to the extent owed by the Debtors, will be an allowed administrative expense claim under sections 503(b) and 507 of the Bankruptcy.

## L.    Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

## M.    Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Debtors' board of managers determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided* that in the event of any such action, all rights and remedies of the Stalking Horse Bidder in these Bidding Procedures or the Stalking Horse Sale Agreement shall be preserved.

**Exhibit C**

**Stalking Horse LOI**

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E



TOWER HEALTH
Advancing Health. Transforming Lives.

July 9, 2019

Mr. Joel Freedman, President
Mr. Allen Wilen, Chief Restructuring Officer - Finance
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
230 N Broad Street
Philadelphia, PA 19102

**Re: Acquisition of Certain Assets of Hahnemann University Hospital**

Dear Messrs. Freedman and Wilen:

This letter ("Letter") evidences the intent of Tower Health or one of its subsidiary entities (the "Buyer") to acquire certain assets (the "Proposed Transaction" or "Transaction") of Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "Seller" or "Hahnemann") in the Hahnemann bankruptcy process on the essential terms and conditions as set forth herein.

Tower Health is uniquely positioned to facilitate this Transaction because, in its view, this Transaction offers the best opportunity for the continuity of programs for the medical residents and fellows who are currently training at Hahnemann (collectively, "Residents"). Tower Health has six hospitals, many of which are in close proximity to Hahnemann, and additional information about Tower Health is set forth in the attached Appendix A. Tower Health will provide housing to those Residents who are doing rotations at Reading Hospital, which is sixty miles from Hahnemann. Tower Health will also seek to hire the faculty who are currently training the Residents at Hahnemann to ensure continuity of the Hahnemann training programs ("Programs"). Tower Health recognizes that the Residents have a choice as to where to do their training and will agree to release, or if the release must occur prior to Closing, will agree that Seller may release, the related cap on Medicare reimbursement on a temporary basis for those current Residents who elect to complete their training elsewhere.

The essential terms of the Transaction include, but are not limited to:

1.    Purchase of Certain Assets/ Assumption and Assignment of Contracts.

At the Closing (as defined in Paragraph 16 below) Seller will sell and assign and Buyer will buy and assume all of Sellers' rights in the following assets owned or used in connection with the operation of Hahnemann (collectively, the "Purchased Assets"): (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) to the extent assignable or transferrable, the Programs so that one or more of Tower Health hospitals will become the principal training site for all

DocuSign Envelope ID: FB7C4A00-F007-40ED-A698-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019

Programs except for a limited number of Programs to be specified in the Purchase Agreement (defined in Paragraph 6 below) that will be closed by Hahnemann prior to the Closing.

2.  Excluded Assets and Liabilities.

(a)  The Purchased Assets will not include any assets other than those described in Paragraph 1 of this Letter and specifically exclude Seller's cash and accounts receivable.

(b)  Except as expressly set forth herein and in the Purchase Agreement, the Buyer will not acquire or assume any present or future obligation or liability of Seller, including, any obligation or liability associated with:

(i)  Seller's trade accounts payable;

(ii)  Seller's relationship with its employees (sick pay, paid time off, severance pay, vacation pay, etc.) except that Buyer shall give Residents credit for unused paid time off earned by the Residents prior to the Closing Date; provided that subject to Buyer's completion of due diligence, Buyer may elect to assume Seller's employment agreements with Continuing Residents;

(iii)  Seller's obligations under contracts not expressly assumed by Buyer;

(iv)  Seller's debt obligations regardless of the creditor;

(v)  Seller's obligations to any taxing authority;

(vi)  Seller's obligations under federal or state environmental laws; or

(vii)  any liability, obligation, contingency or duty of Seller for or relating to any period ending on or prior to the Closing Date to any governmental authority or third party payor (including, without limitation, Medicare, Medical Assistance or any other agency charged with the administration of payments on behalf of any other third party payor) or arising from any report or other filing made by or on behalf of Seller to any such governmental authority or third party payor.

3.  Residents.  Tower Health will assume responsibility for the continued training of all 583 Hahnemann residents and fellows and will give each Resident who desires to continue his or her training at Tower Health the right to be placed in one of Tower Health's six (6) hospitals (collectively, "Continuing Residents") or to accept a position elsewhere. Tower Health will agree to release, or if the release must occur prior to Closing, will agree that Seller may release, the related cap on Medicare reimbursement on a temporary basis for those current Residents who elect to complete their training elsewhere. In order to make the transition as easy as possible for the Residents, Tower Health will provide free housing (subject to the parameters to be defined in the Purchase Agreement) for the remainder of the academic year or during the term of a Resident's existing vacated lease if it is necessary for the Residents to relocate during the current academic year. Tower Health will also seek to transfer the faculty with whom the Residents have been training to ensure that the Residents' training cohort remains intact. The Residents will receive free meals while in any Tower Health hospital. Tower Health will provide additional amenities, to be described in the Purchase Agreement, to the Residents to assist them and their families with the transition. Seller and Buyer shall work cooperatively to determine clinical rotation assignments for Continuing Residents, with such

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019

assignments to commence as soon as practicable after the Purchase Agreement is entered into. For the avoidance of doubt, neither the existence of this Letter nor any provisions set forth herein shall be interpreted to restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those current Residents who elect to complete their training elsewhere.

4.      Purchase Price and Related Terms. The Purchase Price shall be Seven Million Five Hundred Thousand Dollars ($7,500,000) ("Base Purchase Price") and shall be paid in cash at Closing subject to the purchase price adjustment of Five Hundred Thousand Dollars ($500,000), which was paid by Buyer to Seller on June 28, 2019 as consideration for the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Seller and Buyer (the "Tower GME Affiliation Agreement"), that shall be subtracted from the Base Purchase Price. In addition, the amount of Three Million Dollars ($3,000,000) (the "Escrow Amount") will be withheld from the Base Purchase Price and placed into an escrow account with a third party financial institution mutually agreed to by Buyer and Seller (the "Escrow Account") to be released to Buyer, subject to the procedures to be agreed in the Purchase Agreement, to cover the following losses, damages and expenses (collectively, the "Permitted Escrow Withdrawals"): (a) the Tail Coverage Costs, (b) the CMS Discharge Amount, (c) the Cure Amounts (each as defined in Paragraph 7 below), and (d) the Indemnity Amounts (as defined in Paragraph 9 below). To the extent that there are any funds remaining in the Escrow Account on the date that is a one-year anniversary of the Closing Date after the Permitted Escrow Withdrawals, such remaining funds shall be returned to Seller.

5.      Break-Up Fee. The Purchase Agreement shall provide that, if it is not approved by the Bankruptcy Court and the offer of a third party for the Purchased Assets is approved by the Bankruptcy Court and closes instead of the Purchase Agreement, then Buyer will be entitled to receive solely from the proceeds of such transaction, a flat fee payment (not dependent on amounts actually expended or incurred by Buyer) in immediately available funds in the amount equal to Two Hundred Twenty Five Thousand Dollars ($225,000) (the "Break-Up Fee"), without any deduction or offset of any nature, which payment shall be made to Buyer concurrently with the consummation of such third-party sale. The Break-Up Fee shall be approved by the Bankruptcy Court prior to the commencement of any solicitation of competing bids and at least 5 days prior to the date set for a hearing on the Purchase Agreement pursuant to an order approving bid procedures with respect to the Transaction (the "Bid Procedures Order") in form and substance acceptable to Buyer.

6.      Definitive Purchase Agreement. The terms and conditions of the Transaction shall be set forth in a definitive asset purchase agreement (the "Purchase Agreement") between Seller and Buyer, which will contain the essential terms described in this letter, plus such other additional terms and provisions as are usual and customary in connection with transactions similar to those described herein and will be filed with the Bankruptcy Court prior to the hearing seeking approval of the bidding procedures. The final version of the Purchase Agreement will be subject to the approval of the Board of Directors of Tower Health and the Board of Managers of Philadelphia Academic Health Systems, LLC, the manager of the Seller.

7.      Contingencies. The consummation of the Transaction will be subject to the satisfaction of each of the following contingencies:

        (a)      A material portion of the Programs shall not have been transferred to other academic medical centers or hospitals, except as otherwise agreed to by Tower Health; it being understood that

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019

the foregoing does not prohibit Hahnemann from, on an individual basis, granting consent to the transfer of those current Residents who elected to continue their training elsewhere and the release of the related cap on Medicare reimbursement on a temporary basis for such Residents.

(b)     Buyer, at its sole cost and expense, shall have purchased a reporting endorsement (tail coverage) to insure against professional liabilities of Continuing Residents relating to the period of the Seller's ownership and operation of Hahnemann until the Closing Date. If the cost of such endorsement exceeds $100,000 in the aggregate, any and all amounts in excess of $100,000 shall be referred to herein the "Tail Coverage Costs".

(c)     The Bankruptcy Court shall have entered the Bid Procedures Order and an order (the "Sale/Assumption and Assignment Order") in form and substance satisfactory to Buyer (i) approving the assumption and assignment to Tower of the Purchased Assets which are executory contracts, (ii) approving the sale of all of the Purchased Assets (including executory contracts) to Tower free and clear of all claims and encumbrances, and (iii) setting forth any cure amounts related to assumed and assigned contracts that are part of the Purchased Assets (collectively, the "Cure Amounts").

(d)     The Centers for Medicare and Medicaid Services ("CMS"), the Pennsylvania Department of Health and Human Services ("DOH"), and the Accreditation Council for Graduate Medical Education ("ACGME") and any other applicable regulatory authority or governmental body, in each case, to the extent required, shall have consented to the Transaction, and with respect to the CMS only, the CMS shall have agreed to limit the amount of claims of offset or recoupment (the "CMS Discharge Amount") and to discharge Buyer from any liabilities, penalties and claims in excess of the CMS Discharge Amount for any period prior to the Closing Date with respect to the Purchased Assets over which the CMS exercises authority.

(e)     If the sum of the Tail Coverage Costs, the CMS Discharge Amount and the Cure Amounts exceeds Three Million Dollars ($3,000,000), each of Buyer and Seller shall have the right to terminate the Purchase Agreement, in its sole and absolute discretion.

(f)     Unless waived by Tower, the Sale/Assumption and Assignment Order shall have become a final order.

8.     Termination. This Letter may be canceled, terminated or voided as set forth immediately below:

(a)     By mutual consent of Buyer and Seller at any time; or

(b)     By Buyer or Seller in the event a Purchase Agreement is not executed by July 12, 2019, or for failure to obtain entry of the Bid Procedures Order by July 17, 2019.

9.     Indemnification. Seller will indemnify, hold harmless and defend the Buyer from all loss, damage, and expense (collectively, "Indemnity Amounts") arising out of third party claims for Seller's acts or omissions arising out of or related to the Purchased Assets, ownership of the Purchased Assets, or any liability or obligation of the Seller with respect to the Purchased Assets excluding any acts, omissions, liabilities or obligations arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Buyer of the Purchased Assets following the Closing Date. The indemnification period will be limited to claims made within one (1) year after the

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019

Closing Date with the exception of claims by a taxing authority or third party payors, which claims shall be subject to the applicable statute of limitations. Seller's indemnification obligations shall be subject to a de-minimis basket of $25,000 per claim and with respect to any breaches of representations and warranties, shall be subject to an aggregate non-tipping/deductible basket of $200,000. Notwithstanding anything to the contrary contained herein, Buyer's sole recourse under the indemnification provisions shall be to the Escrow Amount and subject to the escrow procedures to be agreed in the Purchase Agreement and shall not extend to Seller's any other assets or interests, including, without limitation, the Base Purchase Price (other than the Escrow Amount).

10.    Medicare GME Affiliation Agreements.

(a)    St. Christopher's Hospital for Children. For the period of 20 years after the Closing Date, Tower Health agrees to, and to cause any successor or assignee of any Purchased Assets to agree to: (i) enter into an agreement to continue participating in a "Medicare GME affiliated group," as that term is defined in 42 CFR § 413.75(b), with St. Christopher's Hospital for Children ("STC"), whereby Buyer will continue sharing full time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between STC and Seller (the "STC GME Affiliation Agreement") or enter into a new GME affiliation agreement substantially in the form of the STC GME Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation arrangement" each such academic year.

(b)    Other GME Affiliation Agreements. Seller is (i) party to the GME affiliation agreements identified on Schedule A attached hereto ("Current GME Affiliation Agreements"); it being understood that Schedule A does not include the Tower GME Affiliation Agreement or the STC GME Affiliation Agreement, and (ii) is the member of several "Medicare GME affiliated groups," as that term is defined in 42 CFR § 413.75(b), which share full time equivalent resident caps for direct graduate medical education and indirect medical education. Buyer shall (x) for the remainder of the current academic year, accept assignment of the Current GME Affiliation Agreements or enter into new GME affiliation agreements substantially in the form of the Current GME Affiliation Agreements; and (y) subject to Buyer's completion of due diligence, accept assignment of the agreements identified on Schedule B to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements. Any cure amounts with respect to any agreements assumed pursuant to this Paragraph 10(b) shall be reflected in the Cure Amounts and if not so reflected, shall be subject to Seller's indemnification obligations set forth in Paragraph 9.

11.    Noncompetition. The Purchase Agreement will provide that Seller shall not engage, directly or indirectly, in the ownership or operation of an acute care hospital for a three (3) year period within a ten (10) mile radius of Hahnemann following the Closing.

12.    Exclusive Negotiations. Hahnemann agrees that, for a period of time commencing on the date of this Letter and ending on the earlier of (a) entry of the Bid Procedures Order, and (b) the date of termination of this Letter pursuant to Paragraph 8 hereof, neither the Seller nor any of its affiliates, officers, employees or agents will negotiate or engage in any discussions with any other person or entity and will not sign any other agreement relating to: (A) except for collateral purposes with respect to any debtor-in-possession financing that contemplates an "all asset" collateral grant, an offer to sell or purchase or assume and assign the Purchased Assets, (B) the transfer of or other change in the

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019
9

ownership of Hahnemann, (C) the merger or affiliation of Hahnemann with or into any other entity, or (D) any other transaction involving a change in control or affiliation of Hahnemann. For the avoidance of doubt, the provisions set forth in this Paragraph 12 shall not restrict (i) Seller from soliciting offers for sale or purchase of any of the Purchased Assets after the date on which the motion for the Bid Procedures Order is filed; or (ii) Seller from extending its existing clinical rotation agreements.

13.    Public Announcements. Any and all public announcements or releases related to the Proposed Transaction by either party shall be approved by both parties prior to dissemination.

14.    Expenses. Each party will bear its own legal, consulting, accounting and other expenses connected with the Proposed Transaction (including any broker's or finder's fees and the expenses of its representatives).

15.    Government Approvals. Buyer and Seller will mutually agree on a methodology for contacting and obtaining necessary governmental and regulatory approvals regarding the Proposed Transaction.

16.    Closing Date. The Purchase Agreement shall provide that the closing thereunder (the "Closing") shall occur by August 1, 2019 or such later date (the "Closing Date") as is required to obtain necessary governmental and regulatory approvals as Buyer and Seller shall mutually agree.

17.    Binding Effect. This Letter is subject, in all respects, to the negotiation, execution and delivery of the Purchase Agreement. Except for the provisions of Paragraphs 5, 12, 13, 14, 19, 20 and 21, no party shall have any obligation regarding any matter herein until the Purchase Agreement is executed.

18.    Best Efforts. Seller shall use its best efforts to assist Buyer in obtaining and Buyer shall use its best efforts to obtain all necessary approvals by the CMS, DOH and ACGME, to the extent required, with respect to the Transaction.

19.    Counterparts. This Letter may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. This Letter may be executed by facsimile, electronically or by telecopy.

20.    Third-Party Beneficiary. None of the provisions contained in this Letter are intended by the parties hereto, nor shall they be deemed, to confer any benefit on any person that is not a party executing this Letter.

21.    Governing Law. This Letter shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania. In the event an action is brought by any party under this Letter to enforce any of its terms, it is agreed that the non-prevailing party shall bear the cost and expense of such proceeding and the prevailing party shall be entitled to reasonable attorney fees to be fixed by the court and shall be set forth in the award.

If this letter meets with your approval, please indicate your acceptance by signing a copy of it and returning it to me at your earliest convenience but not later than by the close of business on July 8, 2019.

Sincerely,
TOWER HEALTH

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 9, 2019

By: _____

Clint Matthews
President and Chief Executive Officer

Center City Healthcare, LLC d/b/a Hahnemann University Hospital accepts and agrees to the foregoing terms and conditions and approve and accept the foregoing letter of intent on this 9th day of July, 2019.

Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital

By: _____

Joel Freedman
President

By: _____

Allen Wilen
Chief Restructuring Officer - Finance

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 9, 2019

## **APPENDIX A**

### **Tower Health Overview**

[attached]



**TOWER HEALTH OVERVIEW**

JUNE 24, 2019





Appx. 00070

# TOWER HEALTH MISSION, VISION, AND VALUES

## MISSION

Tower Health is committed to providing compassionate, accessible, high quality, cost effective healthcare to the community without distinction as to race, color, age, creed, handicap, sex, national origin, or economic status; to promote health; to educate healthcare professionals and the public; and to participate in appropriate clinical research.

## VISION

Tower Health will be an innovative, leading health system dedicated to advancing the health and transforming the lives of the people we serve through excellent clinical quality; accessible, patient-centered, caring service; and unmatched physician and employee commitment.

## VALUES

- **Advancement**
  We're committed to setting ambitious goals to move healthcare and our communities forward.

- **Inclusiveness**
  Everyone working together collaboratively.

- **Respect**
  In our regard for, and actions toward, our communities, patients, and each other.

- **Responsibility**
  Acting in honest, forthright, and fiscally responsible ways.

- 3 -

Appx. 00071

# TOWER HEALTH OVERVIEW

## WHO WE ARE

Tower Health is an innovative, leading health system dedicated to advancing the health and transforming the lives of the people we serve through compassionate, accessible, high quality, cost-effective healthcare.

Together, our six hospitals and extensive network of outpatient facilities provides a full range of medical care – from prevention, screenings, and education; to the latest clinical services and surgeries available; to rehabilitation.

## ACADEMICS

Through a 20-year academic agreement, Tower Health is partnering with Drexel University to build a new regional campus of Drexel University College of Medicine less than a mile from Reading Hospital, creating a top-choice destination for physicians of the future. Students of this new regional campus will receive education in a brand new, state-of-the-art facility, and complete their clinical rotations and training at Reading Hospital, the flagship Magnet-recognized hospital of Tower Health.

Tower Health's Residency Program will be expanded to include more than 300 residents.

- 4 -

Appx. 00072

# A STRONG AND INTEGRATED
## HEALTH SYSTEM

Tower Health was formed in September 2017 when Reading Health System completed the acquisition of five community hospitals located in southeastern Pennsylvania. Today, the health system is comprised of:

- Brandywine Hospital in Coatesville (171 licensed beds*)
- Chestnut Hill Hospital in Philadelphia (148 licensed beds*)
- Jennersville Hospital in West Grove (63 licensed beds*)
- Phoenixville Hospital in Phoenixville (139 licensed beds*)
- Pottstown Hospital in Pottstown (232 licensed beds*)
- Reading Hospital, a teaching hospital in West Reading (714 licensed beds*, including 62 beds at a dedicated rehabilitation hospital)
- Several outpatient and ambulatory facilities, including ambulatory surgery centers, rehab, lab, and imaging
- Tower Health Behavioral Care Campus, a behavioral health facility slated to open in Berks County in 2020 in partnership with Acadia Healthcare
- Tower Health Medical Group, a network of more than 100 primary care and specialty care practices, that includes >500 physicians and >250 APPs
- Tower Health Urgent Care, a network of 21 urgent care locations with an expansion plan for 22 additional sites over 3 years
- Tower Health at Home, one of the nation's largest regional home health and hospice organizations
- Tower Health Partners, a clinically integrated physician network with more than 2,400 providers
- Tower Health – UPMC Health Plan, a joint venture with UPMC Health Plan that offers affordable health insurance coverage and access to high quality care in nine counties, with over 50,000 member lives in all lines of business including Medicare Advantage, Administrative Services Only (ASO) for self-insured employers, Individual (Exchange), as well as Commercial Group, Special Needs Plans (SNP), Managed Medical Assistance, and Children's Health Insurance Program (CHIP).

*Number of licensed beds, excludes nursery

- 5 -

Appx. 00073



Appx. 00074



## TOWER HEALTH AT A GLANCE

1. 2019 Environics Analytics Estimate based on Tower Health combined PSA
2. FY2018 market share based on Tower Health combined PSA
3. Excludes nursery beds; Includes 62 beds at Reading Hospital Rehabilitation at Wyomissing
4. Current as of June 30 2018; FTEs based on hours worked; Includes hospitals, THMG, THP, Clinics, and Foundation
5. Excludes normal newborns
6. >500 physicians and 255 APCs; source THMG; current as of June 30, 2018
7. Includes THMG, THP, Clinics and Foundation
8. Excludes anesthesia and radiology visits
9. Includes 13,808 inpatient and 23,297 outpatient surgeries

• *Reading Hospital ED is the largest in Commonwealth of PA; 8th largest in U.S.*
** *All data is CY2018 unless otherwise noted.*

Appx. 00075

**TOWER HEALTH**
**3rd LARGEST HEALTH SYSTEM IN PHILADELPHIA REGION**

THE LIST

# Largest Health Systems and Hospitals in the Philadelphia region

Ranked by Total licensed beds

| Rank | Name | Total Licensed Beds |
|------|------|---------------------|
| 1 | Thomas Jefferson University and Jefferson Health | 2,824 |
| 2 | Penn Medicine (University of Pennsylvania Health System) | 2,546 |
| 3 | Tower Health | 1,458 |

Appx. 00076

# TOWER HEALTH SERVICE AREA POPULATION

| YEAR | TOTAL POPULATION | |
| --- | --- | --- |
| | PENNSYLVANIA | TOWER HEALTH TSA |
| 2000 | 12,281,026 | 1,248,602 |
| 2010 | 12,702,379 | 1,374,555 |
| 2019 est. | 12,820,587 | 1,429,567 |
| 2024 proj. | 12,903,225 | 1,456,789 |
| CY19-CY24 POPULATION CHANGE | 0.6% | 1.9% |

*Environics Analytics (EA). Source: Claritas - Pop-Facts Premier 2019*

Appx. 00077

# FY2018 INPATIENT DISCHARGES
## IN THE TOWER HEALTH TOTAL SERVICE AREA

| TOWER HEALTH HOSPITAL | FY2018 DISCHARGES | FY2018 MARKET SHARE |
|---|---|---|
| Reading Hospital | 28,965 | 18.2% |
| Pottstown Hospital | 7,832 | 4.9% |
| Phoenixville Hospital | 6,193 | 3.9% |
| Chestnut Hill Hospital | 5,806 | 3.7% |
| Brandywine Hospital | 5,473 | 3.4% |
| Jennersville Hospital | 1,821 | 1.1% |
| Total Tower Health DSC in TSA | 56,090 | 35.3% |

*Source: PHC4*

Appx. 00078



# 9-COUNTY TOWER HEALTH – UPMC HEALTH PLAN
## SERVICE AREA

**Lines of Business**

- Medicare Advantage
- Special Needs Plans
- Managed Medical Assistance
- Children's Health Insurance Program (CHIP)
- Administrative Services Only (ASO)
- Individual (Exchange)
- Commercial Group

**Integrated Delivery and Financial System (IDFS)**

- 2018/2019 Membership is 45,000; goal of 200,000 in 2023
- Network development across the region
- Access Tower Health facilities at lowest available rate

- 11 -

## TOWER HEALTH AND DREXEL UNIVERSITY
## 20-YEAR ACADEMIC AGREEMENT

- Regional medical school campus of Drexel University College of Medicine located 0.6 miles from Reading Hospital
- Opening 2021-2022 academic year
- When fully operational, will have up to 200 medical students
- Enhances Tower Health's ongoing commitment to its academic mission to educate the physicians of tomorrow
- Enhances economic development within Berks County



- 12 -

Appx. 00080

## TOWER HEALTH
# AND INDEPENDENCE BLUE CROSS LOI

### Manage care, improve outcomes, and lower costs for patients across southeastern Pennsylvania

- Explore new programs that drive access to higher quality, more affordable care
- Participate in the Independence Facilitated Health Networks model
- Explore opportunities to engage with Tandigm Health and Tower Health Partners®
- Engage physicians in new ways to put patient, physician, and employer satisfaction at the center of care transformation




Appx. 00081



# READING HOSPITAL **AWARDS**

      

    



    

    

**Verras' Medical Value Index™:** One of 10 Best Value Hospitals in Pennsylvania

**Healthgrades**
- Distinguished Hospital for Clinical Excellence Award™ (2014-2019)
- America's 100 Best Hospitals

**US News & World Report:** 6th Best Hospital in PA (2018-19)

**Becker's Hospital Review:** One of 50 of the Greenest Hospitals in America

**Centers for Medicare & Medicaid Services:** 5-Star Rating for Overall Hospital Quality

**Leapfrog Hospital Safety Grade A** Spring 2019

- 15 -

Appx. 00083

## READING HOSPITAL
## SERVICE LINE HIGHLIGHTS

### CARDIAC, VASCULAR, AND THORACIC (CVT)
- Perform TransCarotid Artery Revascularization (TCAR), Transcatheter Valve Replacement (TAVR), and Endovascular Aortic Repair (TEVAR)
- Treat more patients with heart and vascular disorders than most regional hospitals
- First hospital in PA to offer Ex-Maze and CardioMEMS™
- Only hospital in Berks County to perform minimally invasive CABG procedures
- Specialized programs for heart failure, pulmonary hypertension, aortic aneurysms, electrophysiology device management, high-risk valve disorders, and aortic disease

### GENERAL SURGERY
- First in the region to have a hybrid operating room
- Comprehensive surgical and medical weight management program
- Adolescent weight management program coming October 2019
- Only hospital in Berks County to offer robotic bariatric surgery
- Only hospital-based Plastic Surgery and MedSpa practice in the region

### ORTHOPEDICS
- Robust inpatient and same-day joint replacement program
- Only facility in Berks County to receive the Joint Commission's Gold Seal in Disease-Specific Care Certification for Total Knee and Total Hip Replacement

Appx. 00084

# READING HOSPITAL
## SERVICE LINE HIGHLIGHTS

## ONCOLOGY

- Region's largest Infusion Center, providing treatment for 80 to 100 patients per day
- First in PA to have a MRI Linear Accelerator, coming October 2019
- Surgical program that is accredited by the American College of Surgeons' Commission on Cancer
- Arctic Cold Cap therapy available to patients

## WOMENS' SERVICES

- Only the Level III NICU in Berks County
- Region's only fellowship-trained minimally invasive gynecologic surgeon
- Urogynecology program that offers both medical and minimally invasive surgical treatment options
- Birthing Center and Obstetrical Urgent Care staffed by certified nurse midwives

Appx. 00085

# READING HOSPITAL
## SERVICE LINE HIGHLIGHTS

## NEUROSCIENCES

- Award-winning stroke program that has received the GOLD PLUS Achievement Award from the American Heart Association/American Stroke Association for 13 consecutive years (2007-2019) for compliance with evidence-based clinical practice and the Target Stroke Elite Plus award for two years (2018-2019) for reducing Door-to-Needle times for IV t-PA.
- Only certified electrodiagnostic lab in Berks County
- Dually trained endovascular and cerebral vascular surgeon
- Comprehensive subspecialty care for headaches, sleep disorders, neuromuscular conditions, epilepsy, Spine Clinic with surgical and non-surgical treatments
- Teleneurology services

## TRAUMA AND EMERGENCY MEDICINE

- Level I Trauma designation
- Busiest Emergency Department in Pennsylvania; 8th largest in U.S.

Appx. 00086



**<u>Exhibit D</u>**


**Auction and Sale Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 and July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale and Bidding Procedures Motion**")[2] seeking the entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of certain of the Debtors' assets to Tower Health (the "**Stalking Horse Bidder**") for $7.5 million plus the assumption of certain contracts and responsibilities of the Debtors with respect to Residents at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) the form and manner of notices related to the Sale; and (c) procedures for the assumption and assignment of contracts in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that on July [●], 2019, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety. To the extent that there are any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bidding Procedures Motion.

the Bidding Procedures shall control in all respects. The deadline by which all Bids must be *actually received* by the parties specified in the Bidding Procedures Order is July 26, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

**Contact Persons for Parties Interested in Submitting a Bid**

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Residents Program Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

| Proposed Investment Banker to Debtors | Proposed Counsel to Debtors |
|---|---|
| SSG Advisors, LLC<br>Five Tower Bridge, Suite 420<br>300 Barr Harbor Drive<br>West Conshohocken, PA 19428<br>J. Scott Victor (jsvictor@ssgca.com)<br>Teresa Kohl (tkohl@ssgca.com)<br>Craig Warznak (cwarznak@ssgca.com)<br>(610) 940-3615 | Saul Ewing Arnstein & Lehr LLP<br>1201 N. Market Street, Suite 2300<br>Wilmington, Delaware 19899<br>Mark Minuti (mark.minuti@saul.com),<br>Jeffrey C. Hampton (jeffrey.hampton@saul.com),<br>Adam H. Isenberg (adam.isenberg@saul.com)<br>(215) 972-7777 |

**Obtaining Additional Information**

Copies of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Purchase Agreement and all other documents filed with the Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

**Important Dates and Deadlines**

1. The deadline to submit a Qualified Bid is July 26, 2019 at 4:00 p.m. (prevailing Eastern time).

2. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "**Sale Order**") and all objections relating to the Stalking Horse Bidder (collectively, "**Sale Objections**") is July 26, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Sale Objection Deadline**").

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Residents Program Assets. The Auction, if one is necessary, will commence on July 30, 2019 at 10:00 a.m. (prevailing Eastern time), or such other date as determined by the Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

4. Objections to the conduct of the Auction and the terms of a sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "**Auction Objections**") may be raised at the Sale Hearing (as defined below).

5. A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Court <u>on [       ], 2019 at [  ] (ET)</u>, or such other date as determined by the Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

## Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (i) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 9, 2019                    **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE  19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

        -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

**Exhibit E**

**Assumption and Assignment Notice**

Appx. 00093

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE OF PROPOSED ASSUMPTION AND
## ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 and July 1, 2019 (the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion [D.I. ●] (the "**Sale Motion**") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets (the "**Residents Program Assets**") to Tower Health (the "**Stalking Horse Bidder**"), including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"), attached as <u>**Exhibit B**</u> to the Sale Motion; (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July [●], 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") [D.I. [●]] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herewith.

**PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder or any other Successful Bidder the Designated Contracts. A schedule listing the Designated Contracts (the "**Designated Contracts List**") is attached hereto and may also be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "**Cure Payments**") is set forth on the Designated Contracts List.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider approval of certain of the relief sought in the Sale Motion, including the Bidding Procedures and the Assumption and Assignment Procedures, will be held on **July [●] at [___] (ET)** before the Honorable Kevin Gross in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A POTENTIAL DESIGNATED CONTRACT**. Under the terms of the proposed Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Designated Contracts until the opening of business on the date of the Auction, and the Debtors reserve the right at any time after the proposed Assumption and Assignment Service Deadline and before the closing of a Sale, to: (a) supplement the list of Designated Contracts with previously omitted executory contracts or unexpired leases; (b) remove an executory contract or unexpired lease from the list of executory contracts and unexpired leases ultimately selected as Designated Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (c) modify the previously stated Cure Payment associated with any Designated Contract. The proposed Assumption and Assignment Procedures further provide that any counterparty impacted by such a modification will receive notice thereof (the "**Supplemental Assumption Notice**") and an opportunity to object to the proposed assumption and assignment of the Designated Contract, if applicable.

### Important Proposed Dates and Deadlines

1.  The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "**Sale Order**") and all objections related to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **July 26, 2019 at 4:00 p.m. (ET)** (the "Sale Objection Deadline").

2.  The Auction for the Residents Program Assets, if one is necessary, will commence **on July 30, 2019 at 10:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

3.     A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on [ ], 2019 at [ ] (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

## Filing Assumption and Assignment Objections

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("**Designated Contract Objections**"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **(i) fourteen days (14) after the date on which this notice was served, or (ii) for those counterparties that receive a Supplemental Assumption Notice, fourteen days (14) after service of such Supplemental Assumption Notice ("Supplemental Designated Contract Objection")**.

If a counterparty to a Designated Contract files a Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth in the Assumption and Assignment Procedures, and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts, unless the Successful Bidder elects not to assume the Designated Contract.

Failure to timely file a Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (i) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti.

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE PROPOSED BIDDING PROCEDURES ORDER AND THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES**

**SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

Dated: July 9, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

        -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

35587432.3 07/09/2019

Appx. 00097

# TAB 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*,[1] | Case No. 19-11466 (KG) |
|  | (Jointly Administered) |
| Debtors. | **Re: Docket No. 142** **Obj. Deadline: July 15, 2019 (4:00 p.m.)** |

**LIMITED OBJECTION OF THE UNITED STATES TO**
**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING**
**BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS'**
**RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE,**
**(B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION**
**AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING**
**NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND**
**MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A**
**HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE**
**OF THE DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL**
**LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING**
**THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS; AND (III) GRANTING RELATED RELIEF**

The United States of America (the "United States"), on behalf of the Department of Health

and Human Services ("HHS"), acting through its designated component, the Centers for Medicare

& Medicaid Services ("CMS"), hereby files this limited objection to the *Debtors' Motion for Entry*

*of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident*

*Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to*

*the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed*

---

[1] The Debtors in these jointly administered cases, along with the last four digits of each Debtor's federal tax identification number, are:  Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

1

*Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief* (Dkt. 142) (the "Bid Procedures Motion" or "Motion").[2]

While the United States does not oppose at this time the transition of the Hahnemann University Hospital ("Hahnemann") residents and fellows to alternative hospitals, the United States objects to the terms of the proposed sale as set forth in the Motion, which improperly attempt to "discharge" monies owed to HHS and seek to avoid the Successful Bidder's successor liability under the assumed and transferred Medicare Part A agreement. Bid Procedures Motion at 3 (sale includes "purchase of . . . Hahnemann's . . . Medicare provider number and agreement."). Moreover, the United States objects to the Bid Procedures Order (Dkt. 142-1) to the extent the Court, in entering the order, would deem the terms of the Stalking Horse Sale Agreement – that presumably will mirror the terms of the Stalking Horse LOI by including a CMS "discharge" (Stalking Horse LOI ¶ 7(d) – to be a "Qualified Bid." Bid Procedures Order at ¶ 7.[3]

The United States does not object generally to the establishment of procedures for bids on certain of Debtors' Hahnemann-related assets. However, bidding on proposed terms of sale that

---

[2] Any capitalized term not defined herein shall have the meaning ascribed to the term in the Bid Procedures Motion.

[3] The United States also reserves its rights to contest the sale to the extent that it transfers the Residents Program Assets, Hahnemann's Medicare provider number and agreement, and Hahnemann's programs for training Residents to the Successful Bidder when Debtors seek to close Hahnemann. The anticipated transfer of the residency program itself (separate from the provider agreement) would need to satisfy Medicare Program requirements and be approved by HHS. Additionally, Hahnemann's Provider Agreement may terminate with its closure, making it ineligible to be transferred.

Appx. 00099

improperly restrict HHS's rights is potentially a waste of the court's, the Debtors' and the Bidders' time and the estate's limited resources.

## REGULATORY BACKGROUND

1.      Certain of the Debtors are "providers" of hospital and skilled nursing services under the Social Security Act, 42 U.S.C. § 1395-1395lll and 42 C.F.R. Chapter IV and CMS policies and procedures (collectively, the "Medicare Program").  To be eligible to be reimbursed for services to Medicare beneficiaries, certain Debtors are party to separate Medicare Part A provider agreements ("Provider Agreements"). 42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider").  A Provider Agreement is defined as an agreement between CMS and a hospital, skilled nursing facility, home health agency, clinic, outpatient rehabilitation facility, hospice, or community mental health center.  42 C.F.R. §§ 489.2 and 489.3.

2.      To obtain a Provider Agreement, a new provider must apply for initial certification. *See* 42 C.F.R. §§ 488.1, 488.3, 489.1, 489.2 and 489.10.  The certification process enables HHS to determine, *inter alia*, that the provider is qualified to provide health care services to patients. *See* 42 C.F.R. §§ 489.10-.12 (grounds for denying a Provider Agreement); *see also* 42 C.F.R. Part 418 (health and safety requirements to qualify as a hospice).

3.      As a result, the transfer of a Provider Agreement is strictly limited.  Provider Agreements may be assigned only if there is a "change of ownership."  42 C.F.R. § 489.18.  When CMS determines that a valid "change of ownership" has occurred, the existing Provider Agreement is automatically assigned to the new owner.  *See* 42 C.F.R. § 489.18(c); *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994).  An assigned agreement is subject to all statutory and regulatory terms under which it originally was issued, including the adjustment of

3

payments to account for previously made overpayments. *Vernon*, 21 F.3d at 696 (*citing* 42 C.F.R. § 489.18(a), (d)).

4.    HHS contracts with Medicare Administrative Contractors ("MACs") to administer payment to providers for Medicare covered services.  MACs make interim payments to providers in accordance with the Medicare Program and perform the day-to-day administration of Medicare, *e.g.*, audit and reimbursement activities.  42 U.S.C. § 1395kk-1; 42 C.F.R.  §§ 421.400–.404.

5.    At their request, certain of Debtors' facilities receive Medicare Periodic Interim Payments ("PIP").  42 U.S.C. § 1395g(e)(2); 42 C.F.R. § 418.307, 42 C.F.R. § 413.64(h)(2)(v). The PIP is adjusted to make it consistent with current claim levels, and to determine overpayments for the current fiscal year.  Alternatively, the MAC may adjust payments to assure that total payments at the end of the fiscal year approximate, as closely as possible, the reimbursement determined to be due after review and audit of the provider's cost report.  42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(h)(6-7).

6.    Within five months after the end of the cost year, a provider must submit a report of its costs to verify the actual reimbursements owed to it for the past cost year.  42 C.F.R. §§ 413.1, 413.20, 413.24(f); *see* 42 U.S.C. §§ 1395g and 1395hh (giving the Secretary authority to require submission of cost reports).  Once the cost report is submitted, the MAC audits the cost report and determines the provider's actual, rather than estimated, reimbursement amount for the year, which can result in overpayment or underpayment claims.  42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 42 C.F.R. § 413.24.  Following an audit, providers have various appeal rights, including judicial review, with respect to the MAC's determination.  *See, e.g.*, 42 C.F.R. § 405.1807; 42 U.S.C. § 1395oo(f)(1).

4

7.      In addition, by motion of the MAC or the provider, or at the direction of CMS, final cost report determinations are subject to reopening for up to three years from their issuance in order to make corrections.  42 C.F.R. § 405.1885.

## FACTUAL AND PROCEDURAL BACKGROUND

8.      On July 1, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.      Since before the Petition Date, certain of the Debtors participated in the Medicare Program as Medicare Part A providers under their Provider Agreements.  For purposes of this objection, Center City Healthcare, LLC d/b/a Hahnemann University Hospital (Part A) has a Provider Agreement with the United States.

10.      In the ordinary course of business, the MACs may determine Medicare overpayments owed by the Debtors relating to prepetition service dates and postpetition service dates under the Medicare Program.

11.      Pursuant to the Bid Procedures Motion, Debtors seek approval of bid procedures and procedures for the assumption and assignment of certain executory contracts.  Debtors have identified Tower Health as a Stalking Horse Bidder and seek to transfer Hahnemann's "Medicare provider number and agreement" to Tower Health.  Bid Procedures Motion at 3.

12.      Presumably, in order for Debtors to assign the Provider Agreement as an executory contract, they must first assume it pursuant to section 365(b) of the Bankruptcy Code.  However, the Motion does not identify the executory contracts that Debtors will assume or reject, establishing a later notice date for Debtors to announce assumption or rejection of its executory contracts.  Bid Procedures Motion at 14.

Appx. 00102

13.     The Motion also does not provide that the Successful Bidder will be required to assume all liabilities relating to the Provider Agreement.  Furthermore, the Bid Procedures Order does not specify that any assumption and assignment of the Provider Agreement must comply with section 365 of the Bankruptcy Code and the Medicare Program.

14.     To the contrary, Debtors seek to limit HHS's rights in the sale by limiting HHS's potential recovery for Medicare overpayments to a portion of a $3 million Escrow Account by establishing a "CMS Discharge Amount."  Bid Procedures Motion at 4.  The motion indicates that CMS has "agreed" to this "limitation . . . to the amount of claims of offset or recoupment."   Bid Procedures Motion at 4 n.7.  HHS has *not* made any such agreement.

15.     The Stalking Horse LOI further asserts that HHS "shall have consented [to] discharge Buyer from any liabilities penalties and claims in excess of the CMS Discharge Amount for any period prior to the Closing Date with respect to the Purchased Assets over which the CMS exercises authority."  Stalking Horse LOI ¶ 7(d).  HHS has *not* consented to any discharge.

16.     The Bid Procedures Order states that "The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction."  Bid Procedures Order at ¶ 11.  Thus, if the Court enters the proposed order as written, that order will likely have the effect of approving the CMS discharge included in the Stalking Horse LOI (that presumably will be included in the Stalking Horse Sale Agreement).

## ARGUMENT

1.     The Motion should be denied and the Court should not enter the Bid Procedures Order as written.  As written, the Bid Procedures Order could be interpreted to authorize Debtors to market and transfer the Hahnemann Provider Agreement in a manner inconsistent with federal law.  The Bid Procedures Order fails to state that potential bidders must assume all liabilities,

Appx. 00103

including but not limited to the Overpayment Claims and any unliquidated pre-Closing overpayment claims, related to the transferred Provider Agreement. And, to the extent the Bid Procedure Order approves the Stalking Horse LOI, which includes a CMS "discharge," the order explicitly and improperly limits the Successful Bidder's assumption of liabilities. Moreover, the United States has not yet determined whether the Provider Agreement could be transferred or assigned from a closing facility to a separate entity operating different facilities.

2.     If the Debtors seek to transfer the Hahnemann Provider Agreement, they must do so consistent with applicable federal law, including the Medicare Program as well as the Bankruptcy Code.

3.     Specifically, the transfer of the Provider Agreement contemplated in the Stalking Horse LOI would violate the requirements of the Medicare Program for transfer of a provider agreement. The Debtors cannot sell, transfer, assume and/or assign the Hahnemann Provider Agreement to the Successful Bidder without providing that the purchaser will assume liability for any pre-Closing Medicare overpayments (including those determined after any closing) and any successor liability claims. *See United States v. Vernon Home Health, Inc*., 21 F.3d 693, 696 (5th Cir. 1994) (purchaser "accept[ed] the automatic assignment of the provider agreement," making it jointly and severally liable with seller for overpayments, pursuant to the Medicare Program, including at 42 C.F.R. § 489.18(d)). Therefore, the Successful Bidder must agree to assume liabilities for any pre-closing Medicare overpayments, including any previously determined and any determined in the future.

4.     Moreover, under binding precedent in the Third Circuit, the Provider Agreement is treated as an executory contract that may only assumed and assigned pursuant to section 365 of the Bankruptcy Code. *University Med. Ctr. v. Sullivan* (*In re University Med. Ctr.*), 973 F.2d

Appx. 00104

1065, 1075 (3d Cir. 1992). If the Debtors assume and assign the Provider Agreement to a purchaser, the Debtors must cure the defaults associated with the Provider Agreement, and the purchaser must assume all of the burdens along with the benefits arising from assignment of the Provider Agreement. *See* 11 U.S.C. § 365(a), (b); *University Med. Ctr.*, 973 F.2d at 1075 (holding that "[a]ssumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits," and specifically referring to a provider agreement); 42 C.F.R. § 489.18(d) ("An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued"); *Vernon Home Health, Inc*., 21 F.3d at 696 (new owner that accepted assignment of Medicare provider agreement was liable for overpayments of prior owner); *Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103 (8th Cir. 2000) (new owner of a skilled nursing facility was liable for penalties assessed on the basis of the former owner's actions); *Eagle Healthcare, Inc. v. Sebelius*, 969 F. Supp. 2d 38, 40 (D.D.C. 2013) ("An assigned Provider Agreement is subject to all of the terms and conditions under which it was originally issued."). *See also In re Charter Behavioral Health Sys., LLC*, 45 Fed. Appx. 150, 151, 2002 WL 2004651, *1 n.1 (3d Cir. June 3, 2002) (observing that "[i]f the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments *but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner*") (emphasis added) (*citing* 42 C.F.R. § 489.18(d); *Deerbrook Pavilion, LLC*, 235 F.3d at 1103-05; *Vernon*, 21 F.3d at 696).

5. Moreover, the Anti-Assignment Act, and thus section 365(c)(1) of the Bankruptcy Code, preclude the Debtors from assuming and/or assigning their Provider Agreement with the United States to the purchaser without the consent of the United States. *See, e.g.*, *In re West*

Appx. 00105

*Electronics, Inc.*, 852 F.2d 79, 83-84 (3d Cir. 1988) (Anti-Assignment act precludes debtors from obtaining a legally cognizable interest in executory contract where the other party to the contract, the United States, refused to consent to the assignment of the contract.). The United States will not consent to transfer of any Provider Agreement unless the purchaser would be subject to all the burdens of the Provider Agreement in compliance with the Medicare Program, and the Debtors should not be permitted to pursue a marketing process for assets that ultimately cannot be transferred without the United States' consent.

6.      It is also unclear whether the purchaser of the Provider Agreement would intend to provide services or just seeks to acquire the Provider Agreement in order to collect reimbursements earned by the Debtors before the transfer. If the latter, the purchase is not likely to satisfy the Assignment of Claims Act, 31 U.S.C. § 3727, which strictly limits assignment of the authorization to receive payment on claims against the United States. Even if a claim is successfully assigned consistent with Assignment of Claims Act, any payments made by the United States are subject to reduction or setoff (with the exception of certain unique circumstances inapplicable here). 31 U.S.C. § 3727(d)).

7.      The United States files this limited objection to prevent the bidding process from going forward with any bidders having the operating assumption that the Provider Agreement could be assigned or transferred "free and clear" of successor liability without compliance with the Medicare Program and the consent of the United States. The Debtors should amend the proposed Bidding Procedures to clarify that Qualified Bids need not include the conditions placed on the transaction by the terms of the Stalking Horse LOI with respect to transferability of the Provider Agreement and capping of successor liability thereunder.

Appx. 00106

8.      The United States has communicated with the Debtors regarding the Motion and has indicated our willingness to work together to promote a bidding procedure consistent with the Medicare Program and other relevant laws and regulations.  The United States has proposed that Debtors add the following language to the Bid Procedures Order:

> Notwithstanding anything in the Motion, the Bidding Procedures, and/or the July 9, 2019 Stalking Horse LOI to the contrary, nothing in this Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

> To the extent the Successful Bid or the Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" pursuant to section 363(f) of the Bankruptcy Code.

## CONCLUSION

For the foregoing reasons, the Bid Procedures Motion should be denied.

Appx. 00107

Dated:  July 15, 2019                Respectfully submitted


JOSEPH H. HUNT
Assistant Attorney General

DAVID C. WEISS
United States Attorney

ELLEN SLIGHTS
Assistant United States Attorney

<u>/s/ Marc S Sacks</u>
RUTH A. HARVEY
MARGARET M. NEWELL
MARC S. SACKS

Department of Justice
Commercial Litigation Branch,
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, DC 20044-0875
Tel. (202) 307-1104
Fax (202) 514-9163
marcus.s.sacks@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

Appx. 00108

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July 2019, I caused a true and correct copy of the foregoing objection to be served via electronic mail upon all parties receiving electronic notice under the Court's CM/ECF system.


s/ Marc S Sacks
MARC S. SACKS

Appx. 00109

# TAB 3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) **Re: Docket No. 142** |
| Debtors. | ) |

**CERTIFICATION OF COUNSEL REGARDING ASSET PURCHASE AGREEMENT
AND REVISED ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING
TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING
APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS,
INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM
AND MANNER OF NOTICE RELATING THERETO, AND
(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by

and through their proposed undersigned counsel, hereby certify as follows:

1. On July 1, 2019, the Debtors filed the *Debtors Motion for Entry of Orders (I)(A)*

*Establishing Bidding Procedures Relating to the Sale of the Debtors Residents Program Assets,*

*Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption*

*and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts,*

*and (C) Approving the Form and Manner of Notice Relating Thereto, and (D) Scheduling a*

*Hearing to Consider the Proposed Sale; and (II)(A) Approving the Sale of the Debtors Residents*

*Program Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (B)*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

*Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief* [Docket No. 142] (the "**Residents Program Assets Sale Motion**").

2.    Pursuant to the Order shortening time with respect to the Residents Program Assets Sale Motion [Docket No. 147], objections to the Residents Program Assets Sale Motion were to be filed by July 15, 2019 at 4:00 p.m. (prevailing Eastern Time), (the "**Objection Deadline**").

3.    Prior to the Objection Deadline, the Debtors received informal comments to the Residents Program Assets Sale Motion from the Office of the United States Trustee (the "**UST**") and the Official Committee of Unsecured Creditors (the "**Committee**"), and formal responses and objections were filed by the Commonwealth of Pennsylvania Department of Health [Docket No. 185], the Association of American Medical Colleges and the Educational Commission for Foreign Medical Graduates [Docket No. 186], the United States of America, through the Centers for Medicare and Medicaid Services [Docket No. 188], the Accreditation Council for Graduate Medical Education [Docket No. 191], MidCap Funding IV Trust and MidCap Financial Trust [Docket No. 199], and the Committee [Docket No 238] (collectively, the "**Responding Parties**") requested that certain changes be made to the original proposed bidding procedures order (the "**Proposed Bidding Procedures Order**") and to the proposed bidding procedures (the "Proposed Bidding Procedures") accompanying the Residents Program Assets Sale Motion.

4.    Attached hereto as **Exhibit "A"** is the proposed stalking horse asset purchase agreement with respect to the Residents Program Assets Sale Motion.

5.    Attached hereto as **Exhibit "B"** is a revised proposed bidding procedures order addressing certain of the concerns raised by the Responding Parties, including revised bidding

procedures (the "**Revised Bidding Procedures**") and other related exhibits (the "**Revised Bidding Procedures Order**").

6.  Attached hereto as **Exhibit "C"** is a redline of the Revised Bidding Procedures Order that reflects the changes made to the Proposed Bidding Procedures Order.

7.  Attached hereto as **Exhibit "D"** is a redline of the Revised Bidding Procedures that reflects the changes made to the Proposed Bidding Procedures.

Dated: July 19, 2019        **SAUL EWING ARNSTEIN & LEHR LLP**

By:    */s/ Aaron S. Applebaum*
        Mark Minuti (DE Bar No. 2659)
        Monique B. DiSabatino (DE Bar No. 6027)
        1201 N. Market Street, Suite 2300
        P.O. Box 1266
        Wilmington, DE  19899
        Telephone: (302) 421-6800
        Fax: (302) 421-5873
        mark.minuti@saul.com
        monique.disabatino@saul.com

           -and-

        Jeffrey C. Hampton
        Adam H. Isenberg
        Aaron S. Applebaum (DE Bar No. 5587)
        Centre Square West
        1500 Market Street, 38th Floor
        Philadelphia, PA 19102
        Telephone: (215) 972-7700
        Fax: (215) 972-7725
        jeffrey.hampton@saul.com
        adam.isenberg@saul.com
        aaron.applebaum@saul.com

        *Proposed Counsel for Debtors and*
        *Debtors in Possession*

# EXHIBIT A

## STALKING HORSE ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CENTER CITY HEALTHCARE, LLC,**

**as Seller,**

**AND**

**READING HOSPITAL**

**as Purchaser**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of July, 2019, by and between Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital (the "**Seller**" or "**Hahnemann**"), a Delaware limited liability company and Reading Hospital (the "**Purchaser**"), a Pennsylvania nonprofit corporation. The Seller and the Purchaser are sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties.**"

WHEREAS, Seller is engaged in the business of owning and operating an acute care hospital, including a graduate medical education program (the "**Business**"); and

WHEREAS, the Seller is the owner of the Purchased Assets; and

WHEREAS, on June 30, 2019 (the "**Petition Date**"), a voluntary petition for relief was filed by the Seller under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), under Case Number 19-11466 (the "**Bankruptcy Case**"); and

WHEREAS, Seller desires to sell and Purchaser desires to purchase the Purchased Assets all in accordance with, and subject to, the terms and conditions contained in this Agreement; and

WHEREAS, the Purchased Assets being transferred herein are intended to be sold, conveyed and transferred to Purchaser free and clear of all Liens and Encumbrances pursuant to Section 363 of the Bankruptcy Code, and subject to the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings indicated below, unless the context clearly requires otherwise:

"**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; provided that such Person shall be deemed an Affiliate for only so long as such control exists. For purposes of this definition and the definition of Related Person, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" shall mean all other agreements, documents and instruments to be executed and delivered by the Purchaser and/or the Seller pursuant to this Agreement.

2

Appx. 00115

"**Applicable Privacy and Security Law**" means any applicable Law relating to privacy, data protection, confidentiality, security, integrity and protection of personal information, including (i) health care and medical record applicable Laws, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and all implementing regulations (collectively, "**HIPAA**"); (ii) state data protection laws; (iii) state breach notification laws; and (iv) any comparable applicable state Laws and the regulations promulgated pursuant to all such applicable Laws.

"**Assigned Contracts**" shall mean, collectively, those Contracts included in the Purchased Assets, which shall consist solely of the Contracts identified on Schedule A-1 to **Exhibit A**. Purchaser may add or delete Contracts from Schedule A-1 pursuant to the applicable provisions of the Bid Procedures Order.

"**Assignment and Assumption Agreement**" shall mean the Assignment, Delegation and Assumption Agreement to be executed at the Closing between the Seller and the Purchaser in the form attached hereto as **Exhibit B**, pursuant to which, among other things, the Seller will assign and transfer to the Purchaser all of its right, title and interest under the Assigned Contracts, on the terms and conditions set forth therein.

"**Assumed Liabilities**" shall mean, collectively, (i) all liabilities arising after the Closing with respect to the Assigned Contracts, (ii) all liabilities arising with respect to the Purchased Assets arising on or after the Closing Date, (iii) all executory performance obligations of Seller to the extent arising or after the Closing, (iv) the Cure Costs (including Cure Costs asserted by CMS (including by offset) upon and/or after the Closing on account of the Participating Provider Agreement), (v) any and the Purchaser's portion of the Transfer Taxes pursuant to Section 10.4.

"**Assumption/Cure Notice**" means the Initial Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment delivered to counterparties to Contracts with the Seller pursuant to the Bidding Procedures Order.

"**Backup Bidder**" shall have the meaning stated in the Bidding Procedures Order.

"**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

"**Base Purchase Price**" is defined in Section 3.1.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Purchased Assets shall occur, which are attached to the Bidding Procedures Order as Exhibit I.

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court approving the Bid Procedures in the form attached hereto as Exhibit F and made part hereof.

35620482.4 07/17/2019

Appx. 00116

"**Bill of Sale**" shall mean the bill of sale to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **Exhibit C**.

"**Books and Records**" means, collectively, all documents, lists and files relating or pertaining to the Purchased Assets or the Assumed Liabilities.

"**Business**" is defined in the Recitals to this Agreement.

"**Business Day(s)**" shall mean calendar days other than Saturdays, Sundays and days on which banking institutions in Wilmington, Delaware are authorized by Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Claims Close Date**" is defined in Section 10.5.

"**Closing**" is defined in Section 8.1.

"**Closing Date**" is defined in Section 8.1.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**CMS Discharge Amount**" means a dollar amount agreed to by and between CMS and the Seller which amount shall be the maximum Cure Costs due on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement.

"**Continuing Residents**" means the Residents as of the Closing Date who agree to become residents training at a hospital operated by the Purchaser or an Affiliate of the Purchaser.

"**Contracts**" shall mean any agreement or contract, whether written or oral.

"**Cure Costs**" shall mean, with respect to any Assigned Contract, the amount due and owing to each non-debtor counterparty to such Assigned Contract to cure any defaults required to be cured as a condition of assumption of such Assigned Contract pursuant to Section 365(b)(1) of the Bankruptcy Code.

"**Escrow Agent**" shall mean a financial institution mutually acceptable to Seller and Purchaser.

"**Escrow Agreement**" shall mean the agreement substantially in the form attached hereto as Exhibit D.

"**Escrow Account**" is defined in Section 3.1

"**Escrow Amount**" is defined in Section 3.1

"**Excluded Assets**" shall mean all rights, benefits or property of Seller which are not Purchased Assets.

"**Excluded Liabilities**" shall mean, collectively, any and all liabilities of the Seller of any kind or description other than the Assumed Liabilities.

"**Final Order**" shall mean an order, judgment or other decree as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"**GAAP**" shall mean generally accepted accounting principles in the United States, consistently applied.

"**Governmental Authorization**" means any consent, license, permit, certificate of authority, registration, franchise, right, Order or notice, qualification or similar right issued, granted, given, or required by or under the authority of any Governmental Body or pursuant to any Law.

"**Governmental Body**" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including the FDA and its equivalent authority or body in any foreign jurisdiction.

"**Hahnemann Programs**" is defined in Section 6.2.

"**Interests**" shall have the meaning stated in the Sale Order.

"**Knowledge of the Seller**" **and** "**to the Seller's Knowledge**" shall mean the actual knowledge of Joel Freedman, the Seller's Chief Executive Officer, or Allen Wilen, the Seller's Chief Restructuring Officer - Finance.

"**Laws**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

"**Lien**" has the meaning given to such term in the Bankruptcy Code.

"**Liquidated Cure Costs**" means all Cure Costs relating to Assigned Contracts which are allowed in a Final Order of the Bankruptcy Court.

"**Losses**" is defined in Section 10.1.

"**Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchased Assets; provided, however, that any adverse change, event, development or effect arising from or relating to any of the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been, a Material Adverse Effect: (i) the United States economy, the global economy, in each case, as a whole, or the industry or markets in which the Seller operates; (ii) the filing of the Bankruptcy Case; (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (iv) financial, banking, or securities markets (including any disruption thereof and any decline in

the price of any security or any market index); (v) changes in GAAP; (vi) changes in Law or Orders; (vii) the taking of any action contemplated by this Agreement or any of the Ancillary Documents; (viii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes; (ix) changes resulting from the announcement of the execution of this Agreement or any of the transactions contemplated hereby; or (x) the termination of any Contract that is not an Assigned Contract, or the occurrence of any breach by any party of any Contract that does not relate to the Purchased Assets or the Assumed Liabilities; (xi) any adverse change to the Business prior to the date hereof;.

"**Non-Disclosure Agreement**" means any and all confidentiality agreements and/or non-disclosure agreements executed by the Purchaser as a condition to obtaining confidential and/or proprietary information from the Seller.

"**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body.

"**Ordinary Course of Business**" means the ordinary course of the Seller's Business consistent with past practice.

"**Outside Closing Date**" shall mean September 6, 2019 or such other date as Seller and Purchaser may agree.

"**Participating Provider Agreement**" means the Participating Provider Agreement with the Centers for Medicare and Medicaid Services between the Seller and CMS related to Hahnemann University Hospital.

"**Permitted Escrow Withdrawals**" is defined in Section 3.1.

"**Person**" shall mean any individual, corporation, Governmental Body, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

"**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"**Purchased Assets**" shall mean the assets of Seller identified on Exhibit A..

"**Purchaser Indemnified Party**" is defined in Section 10.1.

"**Purchaser Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchaser.

"**Related Person**" (i) with respect to a Person who is an individual, shall mean, (a) any other individual having a relationship with such specified individual (by blood, marriage or adoption) of grandparent, parent, child, grandchild, aunt, uncle, niece, nephew, sister, brother or

Appx. 00119

first cousin (collectively, "**Relatives**"), (b) any Person that is controlled by such individual or any one or more members of such individual's Relatives; and (c) any Person with respect to which such individual or one or more members of such individual's Relatives serves as a director, officer, partner, or trustee (or in a similar capacity); and (ii) with respect to a specified Person other than an individual, shall mean (a) any Affiliate of such specified Person; and (b) each Person that serves as a director, officer, partner, or trustee (or in a similar capacity) of such specified Person.

"**Representative**" shall mean, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Notification**" is defined in Section 6.3.

"**Residents**" means the medical residents and fellows training at Hahnemann University Hospital.

"**Sale Motion**" shall mean that certain motion filed by the Seller in the Bankruptcy Case on July 9, 2019 (D.I. 142) pursuant to which, among other things, the Seller requested an order (a) approving the Bid Procedures, (b) approving procedures relating to the assumption and assignment of executory contracts, including procedures for establishing Cure Costs, (c) establishing a date for an auction, and (d) scheduling a sale hearing.

"**Sale Order**" shall mean an Order of the Bankruptcy Court pursuant to the Bankruptcy Code approving this Agreement and the transactions contemplated hereby substantially in the form attached hereto as <u>Exhibit E</u> and made part hereof.

"**Seller Disclosure Letter**" is defined in Article IV.

"**Seller Indemnified Party**" is defined in Section 10.2.

"**SSG**" means SSG Capital Advisors, LLC.

"**Tail Coverage Endorsement**" shall mean a reporting endorsement to insure against professional liabilities of Continuing Residents relating to the period from the start of the Seller's ownership and operation of Hahnemann University Hospital to the Closing Date

"**Tail Coverage Costs**" shall mean shall mean the cost to Purchaser in excess of one hundred thousand dollars ($100,000) of purchasing the Tail Coverage Endorsement.

"**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

"**Tower GME Affiliation Agreement**" shall mean the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Seller and Purchaser (or an affiliate of Purchaser).

"**Transfer Taxes**" is defined in Section 10.14(a).

35620482.4 07/17/2019

Appx. 00120

## ARTICLE II.
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

**2.1  Agreement to Sell and Purchase Purchased Assets.**  On the Closing Date, subject to the performance by the Parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Purchased Assets, free and clear of all Interests other than Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**2.2  Assumed Liabilities/Excluded Liabilities**.  On the Closing Date, the Purchaser shall assume and become responsible for, and shall pay, perform, fulfill and discharge, all of the Assumed Liabilities.  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any of the Excluded Liabilities, all of which shall remain the sole responsibility and obligation of the Seller.

**2.3  Assigned Contracts.**  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any Contracts, all of which shall remain the sole responsibility and obligation of the Seller, except for the Assigned Contracts.  As to the Assigned Contracts:

(a)  At Closing, Seller shall assign to Purchaser, and Purchaser shall assume, all of the Assigned Contracts and Purchaser shall pay to the applicable counterparty the Cure Costs as and when such Cure Costs become Liquidated Cure Costs.

(b)  Purchaser shall provide promptly any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Purchaser's capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

**2.4  Competing Transactions; Bankruptcy Court Approval.**  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids pursuant to the Bidding Procedures Order and the Bid Procedures approved thereby (each, a "**Competing Bid**").  Until the transactions contemplated by this Agreement are consummated, Seller may perform any and all other acts related to seeking a Competing Bid as provided under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including but not limited to  supplying information relating to the Purchased Assets to prospective purchasers.

## ARTICLE III.
## PURCHASE PRICE

**3.1  Purchase Price.**  The Purchase Price shall be Seven Million Five Hundred Thousand Dollars ($7,500,000) ( the "Base Purchase Price") and subject to the following sentence, shall be paid in cash at Closing subject to the purchase price adjustment of Five Hundred Thousand Dollars ($500,000), which was paid by Purchaser to Seller on June 28, 2019 as consideration for the Tower GME Affiliation Agreement, that shall be credited against the Base Purchase Price. In addition, an amount (the "Escrow Amount") equal to Three Million Dollars ($3,000,000) minus Liquidated Cure Costs paid by Purchaser on the Closing Date will be withheld from the Base Purchase Price and placed into a non-interest bearing escrow account (the "Escrow

8

Account") held by the Escrow Agent pursuant to the Escrow Agreement. The Escrow Amount shall be distributed to Purchaser from time to time in accordance with the Escrow Agreement to cover the following losses, damages and expenses (collectively, the "Permitted Escrow Withdrawals"): (a) the Tail Coverage Costs, (b) the CMS Discharge Amount, as and when liquidated, (c) the Cure Costs not paid on the Closing Date and not included in the CMS Discharge Amount, and (d) the Losses payable to a Purchaser Indemnified Party. To the extent that there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, such remaining funds minus any then pending written claims asserted by Purchaser for Permitted Escrow Withdrawals (whether or not disputed) shall be distributed to Seller in accordance with the Escrow Agreement without any further action being required on the part of Purchaser. Upon resolution of any Permitted Escrow Withdrawals pending as of the one-year anniversary of the Closing Date, (x) any amounts determined to be owing to Purchaser shall be distributed to Purchaser, and (y) any amounts determined not to be owing to Purchaser shall be distributed to Seller.

**3.2  Payment of Base Purchase Price.** At Closing, the Base Purchase Price shall be payable by Purchaser as follows:

(a)  Purchaser shall deposit the Escrow Amount into the Escrow Account pursuant to and in accordance with the Escrow Agreement.

(b)  Purchaser shall pay Liquidated Cure Costs as of the Closing Date.

(c)  Purchaser shall pay to the Seller the Four Million Dollar ($4,000,000) balance of the Base Purchase Price by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller prior to the Closing.

**3.3  Tax Allocation of Base Purchase Price.**  The Base Purchase Price shall be allocated among the Purchased Assets in accordance with the IRS Form 8594, Asset Acquisition Statement Under Section 1060 as agreed by the respective accountants of Purchaser and Seller within a reasonable period of time after Closing in good faith consistent in all respects with applicable Laws.  The Seller and the Purchaser shall file their respective Tax returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Purchaser, as the case may be, reasonably determines (and notifies the other Party) that such allocation is contrary to applicable Law.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the disclosure letter delivered by the Seller to the Purchaser on the date hereof (the "**Seller Disclosure Letter**"), the Seller represents and warrants to the Purchaser as follows:

**4.1  Organization.**  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation and is in good standing in each other jurisdiction where the operation of the Business by the Seller requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Appx. 00122

**4.2  Power and Authority.**  Upon entry of and subject to the Sale Order, Seller shall have all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Seller.  Upon entry of and subject to the Sale Order, this Agreement shall constitute a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**4.3  Non-contravention.**  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery of this Agreement or any other Ancillary Document to which the Seller is a party, and the performance by the Seller of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of the Seller, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Assigned Contract, (iii) to Seller's Knowledge, violate in any material respect any Law or Order applicable to the Business or the Purchased Assets, or (iv) result in the imposition of any Lien on the Purchased Assets.

**4.4  Consents.**  Upon entry of the Sale Order and upon each regulatory approval to which Section 7.1(c) of this Agreement relates having been obtained, no approval, consent or authorization of, or declaration, filing or registration with or any notification to any Governmental Body or any other third Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

**4.**5  **Liabilities.**  The Seller has no Liabilities with respect to the Purchased Assets for which the Purchaser will be responsible after Closing except for any Assumed Liabilities assumed by the Purchaser.

**4.6  Title.**  The Seller has good and marketable title to all of the Purchased Assets, free and clear of all Interests other than Interests which will be divested from the Purchased Assets by the Sale Order.  Upon the completion of the transactions contemplated hereby, the Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Interests other than Assumed Liabilities.

**4.**7  **Litigation.**  There are no Proceedings pending, or to the Seller's Knowledge, threatened against the Purchased Assets or Business, at Law or in equity, or before any Governmental Body which will interfere with the ownership or use by the Purchaser of the Purchased Assets after the Closing.

**4.7  Proceedings.**  There is no Proceeding pending that challenges, or that is reasonably likely to have the effect of preventing, delaying or rendering illegal any of the transactions contemplated by this Agreement.

**4.8  Tax Matters.**  There are no Tax Liens or Encumbrances for Taxes upon the Purchased Assets and as of the end of the day on the Closing Date there will be no such Tax Liens or Encumbrances.  There is not and, as of the end of the day on the Closing Date there will not be, any liability for Taxes affecting the Purchased Assets for which the Purchaser will at any time have any liability for payment

Appx. 00123

**4.9  Brokers and Finders.**  Other than SSG, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller. Seller will be solely responsible for any fee, commission or other consideration of any kind due to SSG on account of the transactions contemplated by this Agreement.

**ARTICLE V.**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

The Purchaser represents and warrants to the Seller as follows.

**5.1  Organization.**  The Purchaser is a nonprofit corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to conduct its business and own and operate its properties.

**5.2  Power and Authority.**

(a)  The Purchaser has all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Purchaser.  This Agreement is a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(b)  To the extent that this Agreement or any of the Ancillary Documents provides that any Affiliate of the Purchaser makes any covenant or undertakes the payment or performance of any obligation in connection with the transactions contemplated hereunder or thereunder, such Affiliate has all requisite power and authority to enter into the transactions contemplated hereby and thereby.

**5.3  Non-contravention.**  Neither the execution and delivery of this Agreement or any other Ancillary Document to which the Purchaser is a party, will (i) violate any provision of the organizational documents of the Purchaser, or (ii) violate any Law or Order applicable to the Purchaser.

**5.4  No Proceedings.**  There are no actions, suits or proceedings pending, or to the actual knowledge of Purchaser, threatened, before or by any Governmental Body, against Purchaser which would affect Purchaser's ability to proceed with the transactions contemplated by this Agreement.

**5.5  Consents.**  No consent, waiver, authorization or approval of any person or declaration, filing or registration with any Governmental Body or other Person is required in connection with the execution and delivery by Purchaser of this Agreement or the performance by Purchaser or its Affiliates of its respective obligations hereunder or thereunder.

**5.6  Bankruptcy Matters**.  Purchaser is capable of satisfying the adequate assurance of future performance conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to each Assigned Contract.

11

**5.7 Financing.** Purchaser has readily-available cash on hand, availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Base Purchase Price at Closing.

**5.8 Purchaser's Hospital Facilities**. Purchaser owns and operates six Medicare-participating hospitals located within 60 miles of Hahnemann University Hospital's facility, all of which have the capacity to operate medical residency programs.

**5.9 Certain Relationships**. Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser is an officer or director of the Seller or a Related Person of any officer, director or key employee of the Seller. Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser has entered into any Contract with any officer, director or key employee of the Seller.

**5.10 Brokers and Finders.** No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE VI.

## COVENANTS OF THE PARTIES

**6.1 Access to Information**. Subject to all Applicable Privacy and Security Laws, the Seller shall permit the Purchaser's Representatives to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Business, to the personnel, books, records, Assigned Contracts, and documents of or pertaining to the Purchased Assets; provided, that the Seller may restrict the foregoing access to the extent that in the reasonable judgment of the Seller, any Law applicable to the Seller requires it to restrict access to any of its business, properties, information or personnel; and provided, further, that such access shall not unreasonably disrupt the operations of the Seller or the Business.

**6.2 Conduct of the Business**. From the date hereof until the Closing Date, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), and subject in all respects to the Bankruptcy Code and orders of the Bankruptcy Court (including, without limitation, the Sale Order), the Seller shall use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at Hahnemann University Hospital (the "**Hahnemann Programs**"). Seller and Purchaser shall work cooperatively to determine clinical rotation assignments for Residents, with such mutually-agreed assignments to commence as soon as practicable after the Purchase Agreement is entered into. For the avoidance of doubt, neither the existence of this Agreement nor any provisions set forth herein shall restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those Residents who elect not to become Continuing Residents.

**6.3 Notification of Certain Matters.** From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set

forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "**Required Notification**"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

**6.4  Cooperation**.  Subject in all respects to the Bankruptcy Code and the Bankruptcy Cases, the Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in **Article VII** and to consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

**6.5  Records Retention and Access**.  For a period of six (6) years following the Closing or such shorter period that records are required to be retained by applicable Law (but in no event less than three (3) years), Purchaser shall at Seller's expense furnish to the Seller, to the extent in Purchaser's possession and following receipt of a reasonable, written request therefor, information that is necessary for Seller to prepare for, prosecute or defend against any Proceeding related to the Business, to validate claims filed in the Bankruptcy Case and/ or to enable Seller and its Representatives to prepare, complete and file all required federal, state and local Tax returns in accordance with applicable Law.

**6.6  Cure Costs.** Seller shall not agree to the amount of any Liquidated Cure Costs without the written consent of Purchaser. From and after the Closing Date, Purchaser shall have the sole right to contest and settle any claims for Cure Costs and, to the extent necessary and permitted by the Bankruptcy Court, Seller shall cooperate in substituting Purchaser for Seller (at Purchaser's expense) in connection with any pending objections to Cure Costs.

**6.7  Bid Procedures.** Seller shall not modify the Bid Procedures without the consent of Purchaser.

**6.8  Covenants of Purchaser Regarding Transition and Accommodation of Residents**.

(a)  Purchaser will accommodate a maximum of 583 Continuing Residents to pursue continued medical residency training at Purchaser-owned hospitals.  If requested by Purchaser, Seller shall take all reasonable actions to reflect its consent to the transfer of Continuing Residents to Purchaser.  For any Resident who does not become a Continuing Resident and elects to pursue their training at hospitals that are not owned by Purchaser, Purchaser agrees to release the GME cap associated with Medicare reimbursement for such Residents on a temporary basis to the hospital where the Resident transfers until the Resident has completed training.

(b)  If the Continuing Residents are required to relocate their personal residence to continue their training with Purchaser, Purchaser shall provide reasonable private housing for such residents for the longer of the remainder of the current academic year or for the duration of a Resident's existing vacated lease.

(c)  Purchaser shall use reasonable efforts to transfer Seller's residency program faculty to its hospitals so that they can continue to provide education to Residents.

(d)  Purchaser shall provide Continuing Residents with free meals during the time that they are training at Purchaser hospitals.

(e)  Purchaser shall provide additional transition resources to Continuing Residents as may be requested by Seller from time to time.

(f)  The parties shall cooperate in determining the initial clinical rotation assignments for Continuing Residents for the period following the transfer.

**6.9  Covenants of Purchaser Regarding Continued Affiliation with St. Christopher's Hospital for Children**.  For the period of ten (10 years after the Closing with automatic renewals for periods of five (5) years, provided that at the time of each such renewal such resident caps are used for resident training at STC only, unless either party gives not less than one hundred eighty (180) days' notice, Purchaser agrees to, and to cause any successor or assignee of any Purchased Assets to agree to: (i) enter into an agreement to continue participating in a "Medicare GME affiliated group" as that term is defined in 42 C.F.R. 413.75(b), with St. Christopher's Hospital for Children ("**STC**"), whereby Purchaser will continue sharing full-time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between STC and Seller (the "**STC GME Affiliation Agreement**") or enter into a new GME affiliation agreement substantially in the form of the STC GME Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation agreement" each academic year..

**6.10  Covenants of Purchaser Regarding Other GME Affiliation Agreements**.

(a)  For the remainder of the academic year during which the Closing occurs, Purchaser shall accept assignment from Seller of the GME Affiliation Agreements identified listed as numbered items 1, 2, 4 and 5 (but not 3) under the heading Current GME Affiliation Agreements on Schedule A-1 to Exhibit A of this Agreement (the "**Current GME Affiliation Agreements**") (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(a) being included as "Cure Costs" for purposes of this Agreement) or enter into new GME affiliation agreements with those counterparties substantially in the form of the Current GME Affiliation Agreements; and

(b)  Purchaser shall, subject to Purchaser's completion of due diligence, accept assignment of the agreements identified under the heading GME Obligations on Schedule A-1 to Exhibit A of this Agreement to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(b) being included as "Cure Costs" for purposes of this Agreement).

Appx. 00127

## ARTICLE VII.
## CONDITIONS TO CLOSING

**7.1    Conditions to Obligations of Each Party.**  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a)  <u>Proceedings; Orders</u>.  No Governmental Body of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

(b)  <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order with such changes as are mutually agreed to by the Seller and Purchaser, each in the exercise of its respective sole discretion.

(c)  <u>Regulatory Approvals</u>.  CMS, the Pennsylvania Department of Health ("**DOH**") and the Accreditation Council for Graduate Medical Education ("**ACGME**") and any other applicable regulatory authority or Governmental Body, in each case to the extent required, shall have consented to the transactions contemplated by this Agreement.

**7.2    Additional Conditions to Obligations of the Purchaser.**  The obligations of the Purchaser to effect the transactions contemplated hereby are subject to satisfaction or waiver of the following additional conditions:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of the Seller set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    <u>Agreements and Covenants</u>.  The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)    <u>Documents</u>.  All of the documents, instruments and agreements required to be executed and/or delivered  by Seller on or prior to Closing pursuant to Section 8.2 of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

**7.3    Additional Conditions to Obligations of the Seller.**  The obligations of the Seller to effect the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

35620482.4 07/17/2019

(a)    _Representations and Warranties_.  The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Purchaser Material Adverse Effect.

(b)    _Agreements and Covenants_.  The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)    _Documents_.  All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to Section 8.3 of this Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

## ARTICLE VIII.
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

**8.1  Closing**.  The closing of the transactions contemplated hereby (the "**Closing**") shall take place at the offices of Stevens & Lee, P.C., 1818 Market St., 29th Floor, Philadelphia, PA., or such other place or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the Parties, as soon as practicable following the satisfaction or waiver of the conditions set forth in **Article VII** hereof and in any event within three (3) Business Days thereafter (the "**Closing Date**").  The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Standard Time, on the Closing Date.

**8.2  Deliveries by the Seller at the Closing.**  At the Closing, Seller shall furnish and deliver to the Purchaser the following:

(a)  the Bill of Sale, duly executed by the Seller;

(b)  the Assignment and Assumption Agreement, duly executed by the Seller;

(c)  a certificate, dated as of the Closing Date and signed the Seller, certifying that each of the conditions set forth in **Sections 7.2(a)** and **7.2(b)** have been satisfied;

(d)  a copy of the Sale Order; and

(e)  all other certificates, instruments and documents reasonably required to be delivered by the Seller pursuant to this Agreement or any of the Ancillary Documents.

**8.3  Deliveries by the Purchaser at the Closing.**  At the Closing, Purchaser shall furnish and deliver to Seller the following:

(a)  the Four Million Dollar ($4,000,000) portion of the Base Purchase Price in excess of the Escrow Amount and the Liquidated Cure Costs by wire transfer of immediately available funds to an account designated in writing by the Seller;

Appx. 00129

(b)  if purchased by Purchaser (which Purchaser shall have no obligation to do), the Tail Coverage Endorsement and evidence supporting the calculation of the Tail Coverage Costs;

(c)  the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)  a certificate, dated as of the Closing Date and signed the Purchaser, certifying that each of the conditions set forth in **Sections 7.3(a)** and **7.3(b)** have been satisfied; and

(e)  evidence of satisfaction of Section 6.9;

(f)  evidence of satisfaction of Section 6.10; and

(g)  all other certificates, instruments and documents required to be delivered by the Purchaser pursuant to this Agreement or any of the Ancillary Documents.

**8.4  Additional Actions Taken by the Purchaser at the Closing.**  At the Closing, Purchaser shall take the following actions:

(a)  Pay the Liquidated Cure Costs from the Base Purchase Price to the respective Persons entitled to receive them.

(b)  Fulfill its covenants under Sections 6.8, 6.9 and 6.10 of this Agreement.

## ARTICLE IX.
## TERMINATION

**9.1**      **Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)  By mutual written consent of the Seller and the Purchaser;

(b)  By (i) the Seller if, as of the day after the Outside Closing Date, any condition to the obligation of the Seller to close has not been satisfied, provided, however, that if the Closing has not occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Seller, then Seller may not terminate this Agreement pursuant to this Section 9.1(b), and (ii) the Purchaser if, as of the day after the Outside Closing Date, any condition to the obligation of the Purchaser to close has not been satisfied provided, however, that if the Closing has not occurred on or before the after the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then the Purchaser may not terminate this Agreement pursuant to this Section 9.1(b);

(c)  By Purchaser, in its sole and absolute discretion, if the sum of the (i) Tail Coverage Costs, (ii) CMS Discharge Amount, and (iii) without duplication of the CMS Discharge Amount, (A) the Liquidated Cure Costs, and (B) the good faith estimate by Purchaser of the amount of any Cure Costs related to Assigned Contracts which will become Liquidated Cure Costs after the Closing Date, exceeds Three Million Dollars ($3,000,000);

(d)  Automatically, and without further action by any Party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated

hereby, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(e)  Automatically, and without further action by any Party, if the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or is dismissed, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(f)  By the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, and if (i) the Seller fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Seller to close (other than conditions related to deliveries to be made at Closing by the Purchaser provided the Purchaser is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Seller herein become untrue or inaccurate such that the condition set forth Section 7.2(a) would not be satisfied or (iii) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.2(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Seller;

(g)  By the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (i)  the Purchaser fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Purchaser to close (other than conditions related to deliveries to be made at Closing by the Seller provided the Seller is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Purchaser herein become untrue or inaccurate such that the condition set forth in Section 7.3(a) would not be satisfied or (iii) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.3(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Purchaser;

(h)  Automatically, and without further action by any Party, if (i) the Purchaser is not the Successful Bidder or Backup Bidder (each as defined in the Bid Procedures), or (ii) if the Purchaser is the Backup Bidder, upon the earlier of (A) Closing with the Successful Bidder, and (B) the Outside Closing Date. The foregoing notwithstanding, the Purchaser shall serve as a Backup Bidder at the Auction only if (X) its bid pursuant to this Agreement is not determined to be the "Baseline Bid," as defined in the Bid Procedures, and (Y) it elects, at its sole discretion, to offer a higher and better bid at the Auction.  For avoidance of doubt, the Purchaser's offer described in this Agreement shall not be a Back-Up Bid absent the express consent of the Purchaser.

**9.2** .**Effect of Termination.**  Except as provided in this Section 9.2, in the event of the termination of this Agreement pursuant to Section 9.1, this Agreement (other than this Section 9.2, which shall survive such termination) will forthwith become void, and there will be no liability on the part of any Party to the other and all rights and obligations of any Party will cease, except that nothing herein shall relieve any Party from liability for any intentional and material breach of this Agreement.

35620482.4 07/17/2019

## ARTICLE X.
## INDEMNITY

**10.1 Indemnification by Seller**. Subject to this Article X and consummation of the Closing, Seller shall, indemnify, defend and hold harmless Purchaser and Purchaser's officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each, a "Purchaser Indemnified Party") against and in respect of any and all out-of-pocket losses, documented and reasonable costs and expenses (including, without limitation, documented and reasonable costs of investigation and defense and reasonable attorneys' fees), claims, damages, obligations, or liabilities, whether or not involving a third party claim, but only after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party in respect of any such claim (collectively, "Losses"), arising out of, based upon or otherwise in respect of:

(i) any inaccuracy in or breach of any representation or warranty of Seller made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Purchaser by Seller pursuant to this Agreement (determined in each case without regard to any qualification with respect to materiality, Material Adverse Effect or similar qualification); provided, that the Seller shall not have any liability under this clause (i) (other than with respect any intentional fraud on the part of Seller) unless the aggregate of all Losses asserted under this clause (i) for which Seller would, but for this proviso and but for the $25,000 per claim deductible described below, be liable exceeds on a cumulative basis an amount equal to Two Hundred Thousand Dollars ($200,000.00);

(ii) any nonfulfillment or breach of any covenant or agreement by Seller under this Agreement or any of the Schedules attached hereto;

(iii) any Liability or obligation of Seller which is an Excluded Liability; and

(iv) the ownership of any of the Excluded Assets by Seller after the Closing Date.

(b) Each Purchaser Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(c) **NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS TO THE CONTRARY, SELLER WILL NOT BE LIABLE FOR ANY LOSS ASSERTED UNDER SECTION 10.1(a)(i) UNLESS THE CUMULATIVE LOSSES EXCEED $25,000 IN WHICH CASE SELLER WILL, SUBJECT TO THE OTHER LIMITATIONS IN THIS ARTICLE X, BE LIABLE TO INDEMNIFY THE PURCHASER INDEMNIFIED PARTY ONLY FOR THE EXCESS OVER $25,000; AND THE SOLE REMEDY OF ANY PURCHASER INDEMNIFIED PARTY AGAINST SELLER UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS FOR MONETARY DAMAGES, INCLUDING, WITHOUT LIMITATION, COSTS OF INVESTIGATION AND DEFENSE AND**

35620482.4 07/17/2019

Appx. 00132

**ATTORNEYS' FEES, SHALL BE A TIMELY CLAIM BY PURCHASER PURSUANT TO THE ESCROW AGREEMENT, AND LIMITED TO THE ESCROW AMOUNT.**

**10.2    Indemnification by Purchaser**. Subject to this Article X and consummation of the Closing, Purchaser shall indemnify, defend and hold harmless Seller, Seller's present, former, and future officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each a, "**Seller Indemnified Party**"), against and in respect of any and all Losses arising out of, based upon or otherwise in respect of:

(a)  any inaccuracy in or breach of any representation or warranty of  Purchaser made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Seller by Purchaser pursuant to this Agreement; provided, that the Purchaser shall not have any liability under this clause (a) of Section 10.2 unless the  claims asserted under this clause (a) involves Losses in excess of Twenty-Five Thousand Dollars ($25,000), at which time Purchaser shall be liable for the full amount of all such Losses in excess of Twenty-Five Thousand Dollars ($25,000.00);

(b)  any nonfulfillment or breach of any covenant or agreement by Purchaser under this Agreement or any of the Schedules attached hereto; and

(c)  any of the Assumed Liabilities pursuant to this Agreement.

Each Seller Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

**10.3    Indemnification Procedures**.

(a)  Within forty five (45) days after receipt by an indemnified party of written notice of the commencement of any Proceeding against it to which the indemnification in this <u>Article X</u> relates, such indemnified party shall, if a claim is to be made against an indemnifying party under this <u>Article X</u>, give notice to the indemnifying party of the commencement of such Proceeding.

(b)  If any Proceeding referred to in paragraph (a) above is brought against a Seller Indemnified Party and it gives notice to Purchaser of the commencement of such Proceeding, Purchaser will be entitled to participate in such Proceeding and, to the extent that it wishes, assume the defense of such Proceeding with counsel reasonably satisfactory to such Seller Indemnified Party and, after notice from Purchaser to such Seller Indemnified Party of its election to assume the defense of such Proceeding, Purchaser will not, as long as it diligently conducts such defense, be liable to such Seller Indemnified Party under this Article X for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by such Seller Indemnified Party in connection with the defense of such Proceeding subject to the limitations contained in Section 10.1 hereof, other than reasonable costs of investigation.  If Purchaser assumes the defense of a Proceeding, (A) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (B) no compromise or settlement of such claims may be effected by Purchaser without such Seller Indemnified Party's

Appx. 00133

35620482.4 07/17/2019

consent unless (1) there is no finding or admission of any violation of law by such Seller Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other claims that may be made against such Seller Indemnified Party, and (2) the sole relief provided is monetary damages that are paid in full by Purchaser. Such Seller Indemnified Party will have no liability with respect to any compromise or settlement of the claims underlying such Proceeding effected without its consent. If notice is given to Purchaser by a Seller Indemnified Party of the commencement of any Proceeding for which such Seller Indemnified Party seeks indemnification hereunder and Purchaser does not, within ten (10) days after such notice is received, give notice to such Seller Indemnified Party of Purchaser's election to assume the defense of such Proceeding, Purchaser will be bound by any determination made in such Proceeding or any compromise or settlement effected by such Seller Indemnified Party.

(c) If any Proceeding referred to in paragraph (a) above is brought against a Purchaser Indemnified Party, Seller shall be entitled to participate in such Proceeding at its own expense. However, such Purchaser Indemnified Party shall, in all respects, control the defense and settlement of such Proceeding and Seller shall be liable for all fees and expenses incurred by such Purchaser Indemnified Party and for any liability established by any order of a Governmental Body of competent jurisdiction and for any liability established by any settlement or compromise agreed to by such Purchaser Indemnified Party, in the exercise of its reasonable discretion.

**10.4 Other Claims**. A claim for any matter not involving a third party claim may be asserted by written notice to the Party from whom indemnification is sought.

**10.5 Seller Indemnification Claim Period**. Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Seller, no claim for indemnification pursuant to Section 10.1 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 which reasonably describes the claim, the basis therefor, and if possible with the exercise of reasonable diligence, the Purchaser Indemnified Party's reasonably-supported estimate of the Losses being asserted, is delivered to Seller on or before the close of business on the day preceding the first (1st) anniversary of the Closing Date (the "**Claims Close Date**") in which case the indemnity with respect to that Loss shall survive the Claims Close Date (but continue to be limited to the funds held in the Escrow Account). For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.6 Purchaser Indemnification Claim Period**. Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Purchaser, no claim for indemnification pursuant to Section 10.2 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 is delivered to Purchaser on or before the Claims Close Date. For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Seller or any Seller Indemnified Party may be entitled.

**10.7 Payment from Indemnification Escrow**. If a Purchaser Indemnified Party becomes entitled to indemnification from Seller hereunder, such Purchaser Indemnified Party shall be entitled to receive the amount of Losses in cash from the Escrow Account in accordance with the Escrow Agreement, and the recovery of the Purchaser Indemnified Parties shall be

limited to such recoveries from the Escrow Account. For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.8  Miscellaneous Indemnification Provisions**.  Disclosures made after the date hereof and any knowledge that is acquired about the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or obligation set forth herein shall not in any manner affect rights to indemnification hereunder based on any such representation, warranty, covenant, or obligation.  The waiver of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or obligation, will not affect any right to indemnification based on such representations, warranties, covenants and obligations unless otherwise expressly agreed in writing by the party or parties entitled to the benefit thereto.

## MISCELLANEOUS

**11.1  Expiration of Representations, Warranties and Agreements.**  The representations and  warranties and covenants made by Seller and Purchaser in this Agreement and in any Ancillary Document delivered pursuant to this Agreement shall survive beyond the Closing Date.

**11.2  Assignment.**  Neither this Agreement nor any interest herein may be assigned or transferred by either Party to any other Person without the prior written consent of the other Party, which consent may be given or withheld in the sole discretion of such other Party provided, however, Purchaser may assign at Closing its rights, but not its obligations, hereunder to any Affiliate of Purchaser.

**11.3  Notices.**  All notices, requests and other communications under this Agreement shall be in writing and shall be either (a) delivered in person, (b) sent by certified mail, return-receipt requested, (c) delivered by a recognized delivery service or (d) sent by facsimile transmission and addressed as follows:

|  |  |
|---|---|
| If intended for Purchaser: | Clint Matthews, President and CEO<br>Tower Health<br>420 N. Fifth Avenue<br>West Reading, PA 19611 |
| With a copy to: | Robert Lapowsky, Esquire<br>Stevens & Lee, P.C.<br>620 Freedom Business Center, Suite 200<br>King of Prussia, PA 19406<br><br>and<br><br>Joanne Judge<br>Stevens & Lee, P.C.<br>111 North Sixth Street<br>Reading, PA 19601 |
| If intended for Seller: | Center City Healthcare, LLC |

22

With a copy to:                    Jeffrey Hampton
                                   Adam Isenberg
                                   Saul Ewing Arnstein & Lehr LLP
                                   Centre Square West
                                   1500 Market Street, 38th Floor
                                   Philadelphia, PA 19102-2186

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided. A notice, request and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 P.M. on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 A.M. on the first Business Day thereafter.

**11.4 Further Assurances.** Each of the Parties hereto shall execute such documents (including, without limitation, the Ancillary Documents) and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby or, at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement.

**11.5 Entire Agreement; Modifications; Waivers.** This Agreement (together with the Exhibits and Schedules hereto), the Ancillary Documents, and the Non-Disclosure Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior understandings of the Parties with respect to the subject matter hereof and thereof. No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each Party. No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver. No waiver will be binding unless executed in writing by the Party making the waiver.

**11.6 Applicable Law; Jurisdiction and Venue; Jury Trial Waiver.** THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE. The Parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; provided, however, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement shall be in the courts of the State of Delaware or U.S. District Court for the District of Delaware, and the Parties each hereby waive any objections they may have with respect thereto (including any objections based upon

23

*forum non conveniens*). **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

**11.7  Headings and Captions.**  The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent or otherwise affect the interpretation of, this Agreement or any of the provisions hereof.

**11.8  Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**11.9  Time is of the Essence.**  With respect to all provisions of this Agreement, time is of the essence.  However, if the first date or last date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then, in such event, the time of such period shall be extended to the next day which is a Business Day.

**11.10  Remedies Cumulative.**  Except as herein expressly set forth, no remedy conferred upon a Party by this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law, in equity or by statute.

**11.11  Interpretation and Construction.**

(a)  As used herein the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".

(b)  As used herein, the words "**herein,**" "**hereof,**" "**hereunder**" and similar terms shall refer to this Agreement unless the context requires otherwise.

(c)  For purposes of this Agreement, whenever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural and vice versa.

**11.12  Estoppel.**  Each Party confirms and agrees that (a) it has read and understood all of the provisions of this Agreement; (b) it is familiar with major sophisticated transactions such as those contemplated by this Agreement; (c) it has negotiated with the other Party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**11.13  Joint Preparation.**  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Appx. 00137

**11.14  Expenses; Transfer Taxes.**

(a)  Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

(b)  The Purchaser and Seller shall each pay fifty (50%) percent of all sales, use, transfer, real property transfer, documentary, recording and similar Taxes and fees, and any deficiency, interest or penalty asserted with respect thereof arising out of or in connection with the transactions contemplated hereby ("**Transfer Taxes**").

**11.15  Counterparts.**  This Agreement may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

**11.16  Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above.

SELLER:

**CENTER CITY HEALTHCARE, LLC**


By: _____
     Joel Freedman
     President




PURCHASER:

**READING HOSPITAL**


By: _____
     Clint Matthews
     President and CEO
     Sole Member of Tower Health


*[Signature page to Asset Purchase Agreement]*

## EXHIBIT A

### Purchased Assets

The Purchased Assets to be purchased by the Purchaser and sold, conveyed, assigned, transferred and delivered on the Closing Date to the Purchaser by the Seller shall include all of the Seller's right, title and interest in and to all of the following assets, but specifically excluding, however, the Excluded Assets:

1. <u>Assigned Contracts</u>.  All of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on <u>Schedule A-1</u> to this **Exhibit A**.

2. <u>Books and Records</u>.  All Books and Records related to the Purchased Assets, but specifically excluded any Corporate Documents.

3. <u>Governmental Authorizations</u>.  All transferable Governmental Authorizations identified on <u>Schedule A-2</u> to this **Exhibit A**.

4. <u>Rights; Warranty Claims</u>.  All of Seller's rights, claims, counterclaims, credits, causes of action or rights of set-off against third parties that relate to warranties, indemnities, and all similar rights to the extent related to any Purchased Assets.

5. <u>Other Assets</u>.  Those other assets of the Seller identified on <u>Schedule A-3</u> to this **Exhibit A**.

# Schedule A-1

**I.**     **Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health**

**II.**     **Current GME Affiliation Agreements**

1. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between the Trustees of the University of Pennsylvania, as the owner and operator of the Hospital of the University of Pennsylvania, and Seller.
2. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Prime Healthcare Services Roxborough, LLC, the owner and operator of Roxborough Memorial Hospital, and Seller.
3. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 among Temple University Hospital, Seller and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.
4. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Friends Behavioral Health System and Seller.
5. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Abington Memorial Hospital and Seller.

**III.**     **GME Obligations**

**Graduate Hospital/Penn**
- Agreement Regarding Medicare FTE Resident Caps, between the Trustees of the University of Pennsylvania and Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007

**Roxborough and Warminster/Solis**
- Agreement Regarding Medicare FTE Resident Caps between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007
- Agreement Concerning Family Medicine Training among Abington Memorial Hospital, Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 23, 2008
- Second Amendment to Agreement Regarding Medicare FTE Resident Caps; between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 29, 2010

**St. Christopher's Hospital for Children/Temple**
- Academic Affiliation Agreement among Temple and affiliates and Tenet HealthSystem St. Christopher's Hospital For Children, LLC and affiliates dated October 19, 2007

**Hahnemann/Friends**
- Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP dated June 2008
- Memorandum of Understanding for Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP

**Hahnemann/Abington**
    Master Agreement for Shared Rotational Arrangements between Hahnemann University Hospital and Abington Memorial Hospital dated June 29, 2007

**IV.**     **The Participating Provider Agreement**

**V.**     **The Tower GME Affiliation Agreement**

**Schedule A-2**

**Governmental Authorizations**

*[Schedule A-2 to include NPIs, license, training programs]*

**Schedule A-3**

**Other Assets**

*[to be populated if needed]*

**Exhibit B**

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT ("Agreement") dated as of [_____] by and between Center City Healthcare, LLC, a Delaware limited liability company ("Assignor"), and Reading Hospital, a Pennsylvania nonprofit corporation ("Assignee").

BACKGROUND

A.  ASSIGNEE AND ASSIGNOR HAVE ENTERED INTO AN ASSET PURCHASE AGREEMENT DATED AS OF [_____] (TOGETHER WITH THE EXHIBITS AND SCHEDULES THERETO, THE "PURCHASE AGREEMENT") PROVIDING FOR, AMONG OTHER THINGS, THE SALE, TRANSFER, CONVEYANCE, ASSIGNMENT, AND DELIVERY BY ASSIGNOR TO ASSIGNEE OF CERTAIN ASSETS OF ASSIGNOR (COLLECTIVELY, THE "PURCHASED ASSETS") THAT ARE OWNED OR USED BY ASSIGNOR IN CONNECTION WITH THE BUSINESS.

B.  IN CONNECTION WITH THE SALE AND PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THE PURCHASE AGREEMENT, ASSIGNOR IS TO ASSIGN AND DELEGATE, AND ASSIGNEE IS TO ASSUME, THE ASSIGNED CONTRACTS.  CLOSING IS BEING HELD ON THE DATE HEREOF UNDER THE PURCHASE AGREEMENT.

NOW, THEREFORE, pursuant to and in consideration of the Purchase Agreement and the mutual covenants and agreements set forth therein and herein, Assignor and Assignee, each intending to be legally bound, agree as follows:

1.  Incorporation of Background; Defined Terms.  The Background provisions set forth above (including, without limitation, all of the defined terms set forth therein) are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety in this Section 1.  Capitalized terms used herein which are not otherwise defined shall have the respective meanings assigned to them in the Purchase Agreement.

2.  Assignment of Rights.  Assignor hereby sells, transfers, conveys, and assigns to Assignee all of Assignor's right, title and interest in, to and under all of the Assigned Contracts, each of which are identified on Schedule 2 attached hereto.

3.  Delegation of Duties.  Assignor hereby delegates to Assignee all of Assignor's duties and liabilities under the Assigned Contracts.

4.  Assumption of Liabilities.  In partial consideration for the sale of the Purchased Assets by Assignor pursuant to the Purchase Agreement, Assignee hereby undertakes and agrees to assume, discharge, or perform as the case may be, all duties, obligations, and liabilities of Assignor under the Assigned Contracts which are to be performed after, and relate to the period after, the date hereof or which are otherwise assigned to and assumed by the Purchaser under or pursuant to the Purchase Agreement or the Sale Order.

5. <u>Assignment of Governmental Authorizations; Etc</u>.  Assignor hereby assigns, sells, transfers, and sets over to Assignee all of Assignor's right, title and interest in, to, and under all of the Governmental Authorizations which are listed on <u>Schedule 5</u> attached hereto, but only to the extent that any of the foregoing may be legally sold, transferred, conveyed, assigned and delivered by Assignor to Assignee without any action by any such applicable federal, state, or local government or regulatory body.

6. <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7. <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the domestic, internal laws of the State of Delaware, without regard to its rules pertaining to the conflict of laws.

8. <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  Any party to this Agreement may deliver an executed counterpart hereof by facsimile transmission or electronic mail (as a Portable Document Format (PDF) file) to the other party hereto and any such delivery shall have the same force and effect as the manual delivery of an original executed counterpart of this Agreement.

*Remainder of Page Intentionally Left Blank*
*Signature Page Follows*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers the day and year first above written.

CENTER CITY HEALTHCARE, LLC

By _____

Joel Freedman
President
"Assignor"

READING HOSPITAL

By _____

Clint Matthews
President and CEO of Tower Health
Sole Member of Reading Hospital

"Assignee"

# EXHIBIT C

## BILL OF SALE

_____ __, 2019

KNOW ALL BY THESE PRESENTS that CENTER CITY  HEALTHCARE, LLC, a Delaware limited liability company (the "Seller"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, has granted, bargained, sold, conveyed, transferred, assigned and delivered, and by this Bill of Sale hereby grants, bargains, sells, conveys, transfers, assigns and delivers, to Reading Hospital, a Pennsylvania nonprofit corporation ("Purchaser"), its successors and assigns, all of the Seller's right, title and interest in and to the Purchased Assets.  As used herein, the term "Purchased Assets" has the meaning given to such term in that certain Asset Purchase Agreement, dated as of -_____ __, 2019, by and between the Seller and Purchaser (together with the Exhibits and Schedules thereto, the "Purchase Agreement"), which Purchase Agreement is incorporated herein by this reference.

EXCLUDING, HOWEVER, the "Excluded Assets" (as such term is defined in the Purchase Agreement).

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, forever.

This Bill of Sale is being executed and delivered by the Seller to the Purchaser under and pursuant to Section 8.2(a) of the Purchase Agreement and is subject to the terms and conditions of the Purchase Agreement in all respects.

*Remainder of Page Intentionally Left Blank*

*Signature Page Follows*

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the date and year first set forth above.

CENTER CITY HEALTHCARE, LLC

By _____

Joel Freedman
President

# EXHIBIT D

# ESCROW AGREEMENT

*[PURCHASER TO DRAFT]*

# EXHIBIT E

# SALE ORDER

Appx. 00150

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) **Re: Docket No. __** |
|  | ) |

## ORDER UNDER 11 U.S.C. § 105, 363, 365, 503 AND 507 (A) APPROVING ASSET PURCHASE AGREEMENT WITH READING HOSPITAL (B) AUTHORIZING SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF INTERESTS, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY CONTRACTS, AND (D) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[2] of Center City Healthcare, LLC, d/b/a Hahnemann

University Hospital (the "Debtor"), for, *inter alia*, entry of an order, pursuant to sections 105,

363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"): (i)

approving the sale by the Debtor to Reading Hospital or its permitted assignee (the "Purchaser")

of the certain assets, (the "Purchased Assets") as defined in and pursuant to that certain Asset

Purchase Agreement attached hereto as **Exhibit A** (the "Agreement") free and clear of all

Interests (defined below) (except those expressly assumed by the Purchaser), and (ii) authorizing

the assumption by the Debtor and assignment to the Purchaser of certain executory contracts free

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Agreement (defined below) as applicable.

and clear of all Interests (except those expressly assumed by the Purchaser), and (iii) granting certain related relief; and the Court having held a hearing on August __, 2019 (the "Sale Hearing") to approve the Sale Motion; and the Court having reviewed and considered (a) the Sale Motion, (b) the objections to the Sale Motion, if any, and (c) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate and creditors and other parties in interest; and upon the record of the Sale Hearing and after due deliberation thereon; and good cause appearing therefore,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (M), (N) and (O). The statutory predicates for the relief requested in this Sale Motion are Sections 105, 363, 365, 503 and 507 of the Bankruptcy Code.

B.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

C.     Proper, timely, adequate and sufficient notice of the Sale Motion, the hearing on the Sale Motion and the Debtor's assumption and assignment of the contracts listed on **Exhibit B** hereto (the "Assigned Contracts") to the Purchaser has been provided in accordance with sections 102(1), 363, 365, 503 and 507 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006, 9008 and 9014 and the order of this Court dated July ___, 2019 (the "Bidding Procedures Order"), and no other or

35642374.2 07/19/2019
35642374.4 07/19/2019

further notice of the Sale Motion, the hearing on the Sale Motion, or of the entry of this Order is required.

D.    A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Purchased Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Purchased Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Purchased Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions and pension funds; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; (p) all Residents, (q) all known creditors of Center City, including Known Patient Creditors (as defined in the Bidding Procedures Order); (r) the Pension Benefit Guaranty Corporation (the "PBGC"); and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.

E.    The Debtor also caused notice of the Sale Motion to be published in the *Philadelphia Inquirer* and *USA Today*, which notice by publication is reasonable and sufficient to bind holders of claims against the Debtor whose identity was not known to the Debtor as of

the day before the Mailing Date, including Unknown Patients (as defined in the Bidding Procedures Order).

F. The Debtor has full corporate power and authority to execute the Agreement and all other documents contemplated thereby and consummate the transactions contemplated therein and the sale of the Purchased Assets and assumption and assignment to the Purchaser of the Assigned Contracts (defined below) (collectively, the "Sale") has been duly and validly authorized by all necessary corporate action of the Debtor and no consents or approvals, other than the approval of this Court, are required for the Debtor to consummate such transactions.

G. The Purchaser is not a successor to or mere continuation of the Debtor or its estate.

H. The bidding procedures established pursuant to the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets and Assigned Contracts and no higher or better offer has been made.

I. The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts and sell the Purchased Assets to the Purchaser in connection with the consummation of the Agreement, and that approval of the Agreement and the Sale pursuant thereto is in the best interests of the Debtor, its estates, and its creditors.

J. The Sale must be completed immediately in order to preserve the value of the Purchased Assets and to provide certainty to Residents who will be displaced by reason of the closing of Hahnemann University Hospital and, as a result, good and sufficient business

justification exists for the immediate sale of the Purchased Assets and assumption and assignment of the Assigned Contracts to the Purchaser outside of a plan of reorganization.

K.      The Purchaser is not an insider, as that term is defined in the Bankruptcy Code, of the Debtor.  Furthermore, no insiders of the Debtor are receiving or retaining any benefit, property or payments in connection with the Sale except to the extent such insiders have allowed claims against or equity interests in the Debtor and, as a result, may participate in a distribution of Sale proceeds.

L.      The Agreement was negotiated, proposed and entered into by the Debtor and Purchaser without collusion, in good faith, and as a result of arm's-length bargaining.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby.  Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code.

M.      In the absence of a stay pending appeal, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Agreement at any time after the entry of this Order, provided the Purchaser shall not be obligated to close until all applicable conditions to closing under such Agreement have been satisfied or waived as provided in such Agreement.

N.      The consideration provided by the Purchaser for the Purchased Assets being purchased, including the Assigned Contracts, pursuant to the Agreement constitutes the best and highest offer for the Purchased Assets and the Assigned Contracts and reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, and the District of Columbia.

O.      The Debtor may sell the Purchased Assets and Assigned Contracts free and clear of all Interests (including, without limitation, (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtor's or the Purchaser's interest in the Purchased Assets and/or Assigned Contracts and, (ii) in respect of Taxes), because each entity with an Interest in any of the Purchased Assets and/or Assigned Contracts has consented to the Sale, is deemed to have consented to the Sale, has a claim which is subject to a bona fide dispute, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such Interest.

P.      The Debtor has good title to the Purchased Assets and Assigned Contracts and, accordingly, the transfer of the Purchased Assets and assignment of the Assigned Contracts to the Purchaser pursuant to the Agreement will be a legal, valid, and effective transfer of the Purchased Assets and assignment of the Assigned Contracts.

Q.      Neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts pursuant to the Agreement will subject the Purchaser to any liability (except those expressly assumed by the Purchaser pursuant to the Agreement (the "Assumed Liabilities") for claims against the Debtor or the Debtor's predecessors or affiliates of any kind or character, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent, based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor, vicarious or transferee liability. Without limiting the general nature of the foregoing, neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts will subject the Purchaser to any liability on account of any employee benefit plan maintained by the Debtor, including any liability related to benefits, underfunding, termination and/or termination premiums, regardless when such claims are deemed to have

accrued and regardless whether such would be considered "claims" as such term is defined in the Bankruptcy Code, to (i) the PBGC, or (ii) to any plan participant or beneficiary (collectively, the "PBGC Claims").

R.      The Purchaser has provided adequate assurance of future performance under the Assigned Contracts, as required by Section 365(b)(1)(C) of the Bankruptcy Code.

S.      Upon the assumption and assignment of the Assigned Contracts, as provided herein, the Purchaser shall succeed to all of the right, title and interest of the Debtor under the Assigned Contracts including, without limitation, the right to exercise renewal options which, pursuant to the terms of the applicable Assigned Contract, are not exercisable by assignees of the Debtor, the Court having found that such provisions, as they relate to the assumption and assignment to the Purchaser of the Assigned Contracts, constitute unenforceable restrictions on assignment pursuant to Section 365(f)(3) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED THAT:

1.      The Sale Motion, and the relief sought therein (including approval of the Sale) is GRANTED, in all respects as set forth herein.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.      The Agreement, and all of the terms and conditions thereof, is hereby approved.

35642374.2 07/19/2019
35642374.4 07/19/2019

Appx. 00157

4. Pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code, the Debtor is authorized and directed to take all actions necessary to consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement.

5. As of the date of closing under the Agreement (the "Closing Date"), the Assigned Contracts shall be deemed to have been assumed by the Debtor and assigned to the Purchaser pursuant to Section 365(f) of the Bankruptcy Code. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor and the Debtor's estate shall be relieved from any liability for any breach of an Assigned Contract occurring after the effective date of the Closing Date.

6. On the Closing Date, from the Purchase Price, the Purchaser shall, (i) pay to the non-debtor party to each Assigned Contract as to which a liquidated cure amount (the "Liquidated Cure Amount") is stated on **Exhibit B**, the amount of such Liquidated Cure Amount, and (ii) pay to the Escrow Agent the Escrow Amount, which shall be deemed to include an amount equal to the maximum cure amounts (the "Maximum Unliquidated Cure Amounts") claimed by the non-debtor party to each other Assigned Contract, as such Maximum Unliquidated Cure Amounts are stated on **Exhibit B**. For the avoidance of doubt, the Maximum Unliquidated Cure Amounts stated on **Exhibit B** shall be the maximum amount of any subsequently allowed claim to which any non-debtor party to an Assigned Contract shall be entitled pursuant to Section 365(b)(1)(A) of the Bankruptcy Code. The amounts paid by the Purchaser to the Escrow Agent are hereafter referred to as the "Disputed Cure Amounts." To the extent a Maximum Unliquidated Cure Amount is stated on Exhibit B for the Participating Provider Agreement, such Maximum Unliquidated Cure Amount shall be deemed to be the CMS Discharge Amount for purposes of the Agreement.

35642374.2 07/19/2019
35642374.4 07/19/2019

Appx. 00158

7.      Upon payment of the Liquidated Cure Amounts to the applicable non-debtor parties, (i) all defaults under the related Assigned Contracts required to be cured pursuant to Section 365(b)(1)(A) of the Bankruptcy Code shall be deemed cured and all amounts due to the non-debtor parties to such Assigned Contracts pursuant to Section 365(b)(1)(B) on account of any pecuniary loss resulting from such defaults shall be deemed paid in full, and (ii) each non-debtor party to such Assigned Contracts shall be forever bound by such Liquidated Cure Amounts and enjoined from seeking to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on account of defaults by the Debtor, including defaults as to which, pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.

8.      Upon payment by the Purchaser of the Escrow Amount to the Escrow Agent, the non-debtor parties to such Assigned Contracts shall be (i) forever bound by the Maximum Unliquidated Cure Amounts, and (ii) enjoined from seeking (A) recourse against the Purchaser on account of any defaults by the Debtor under the related Assigned Contracts required to be cured pursuant to Section 365(b)(1)(A) of the Bankruptcy Code and/or any pecuniary loss resulting from such defaults due to such non-debtor party pursuant to Section 365(b)(1)(B) of the Bankruptcy Code (including on account of overpayments under the Participating Provider Agreement) in excess of the related Maximum Unliquidated Cure Amount, and/or (B) to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on account of defaults by the Debtor, including defaults as to which, pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, cure is not required. The foregoing notwithstanding, CMS shall be entitled to offset overpayments of amounts under the Participating Provider Agreement which occurred prior to the Closing Date

35642374.2 07/19/2019
35642374.4 07/19/2019

against amounts due to the Purchaser under the Participating Provider Agreement for periods on and after the Closing Date in amounts up to, but not exceeding, the CMS Discharge Amount.

9.     On and after the Closing Date, the Purchaser shall have the sole authority to contest and settle any Disputed Cure Amounts.  The Purchaser may settle any Disputed Cure Amount without further order of this Court. Upon liquidation of any Disputed Cure Amount, (i) such liquidated amount shall become a Liquidated Cure Amount and, upon payment (including by way of offset) the provisions of paragraph 7 above shall apply to such Assigned Contract and the applicable counterparty, and (ii) the Purchaser shall be entitled to a distribution from the Escrow Amount in an amount equal to the amounts paid (including by way of offset) on account of such Liquidated Cure Amount.

10.     Any provision in any Assigned Contract that purports to declare a breach, default or payment right as result of an assignment or a change of control in respect of the Debtor as relates to the assumption of any Assigned Contract by the Debtor and assignment of such Assigned Contract to the Purchaser is unenforceable, and all such Assigned Contracts shall remain in full force and effect, notwithstanding any such provision.  No sections or provisions of any Assigned Contract that purports to provide for additional payments, rent accelerations, assignment fees, increases, payments, charges or any other fees charged to the Purchaser or the Debtor as a result of the assumption and the assignment of the Assigned Contracts to the Purchaser shall have any force and effect with respect to the transactions contemplated by the Agreement and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under Section 363(f) of the Bankruptcy Code.  The Purchaser shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise,

Appx. 00160

to provide any additional deposit or security with respect to any Assigned Contract to the extent not previously provided by the Debtor.

11.     Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing under the Agreement, the Purchased Assets and the Assigned Contracts shall be free and clear of all (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Debtor's or Purchaser's interest in the Assigned Contracts and/or Purchased Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) PBGC Claims, (iv) claims in respect of Taxes (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code (collectively, items (i) to (v) above are referred to as "Interests"), with all such Interests to attach to the Net Proceeds of Sale (defined below) in the order of its respective priority, with the same validity, force and effect (if any) which it now has against the Purchased Assets and Assigned Contracts, subject to any claims and defenses the Debtor may possess with respect thereto. The "Net Proceeds of Sale" is the Base Purchase Price, as adjusted pursuant to the Agreement, minus amounts paid to the Escrow Agent at Closing, minus other costs of sale, and plus any amounts distributed by the Escrow Agent to the Debtor after Closing. For the avoidance of doubt, the Escrow Amount shall not be property of the

35642374.2 07/19/2019
35642374.4 07/19/2019

Appx. 00161

Debtor's estate and no Interests shall attach to the Escrow Amount unless and until such funds are distributed to the Debtor pursuant to the terms of the Agreement and the Escrow Agreement.

12.     All claims of the Purchaser or any other Purchaser Indemnified Party for indemnification under the terms of the Agreement or for distributions from the Escrow Funds on account of Tail Coverage Costs or Cure Amounts shall be treated as administrative claims pursuant to Section 503 and 507 of the Bankruptcy Code solely to the extent necessary to permit a claim against the Escrow Amount, provided, however, except as otherwise stated in the Agreement, the sole remedy for claims by the Purchaser or any other Purchaser Indemnified Party for indemnification for monetary damages shall be to and against the Escrow Amount and shall be determined and paid pursuant to the terms of the Agreement and the Escrow Agreement. To the extent of any conflict between the terms of the Agreement or the Escrow Agreement relating to such determination and payment of indemnity claims and the Bankruptcy Code or Bankruptcy Rules, the terms of the Agreement and the Escrow Agreement shall control.

13.     All persons are hereby enjoined from asserting, prosecuting or otherwise pursuing any claim against the Purchaser to recover on any claims (regardless of when accrued and regardless whether meeting the definition of "claim" under the Bankruptcy Code) such person had, has or may have (other than an Assumed Liability) against (x) the Debtor, its estate, officers, directors, shareholders, the Purchased Assets or the Assigned Contracts, or (y) the Purchaser in connection with the negotiation of, and any agreements contained in, related to or conditioned upon, the Agreement.

14.     As of the Closing Date, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its

Appx. 00162

Interests in or claims against the Purchased Assets and Assigned Contracts, if any, as such Interests or claims may have been recorded or may otherwise exist.

15.     Each and every federal, state and local governmental agency or department be, and hereby is, directed to accept (i) this Sale Order as sufficient evidence of the transfers of all right, title, and interest in, to, and under the Purchased Assets and the Assigned Contracts, and are authorized to rely on this Sale Order in consummating, or facilitating the consummation of, the transactions contemplated by the Agreement, and (ii) any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

16.     Upon the occurrence of the Closing, all Interests in, against, or upon the Purchased Assets or the Assigned Contracts shall be unconditionally released, terminated, and discharged without the need for any further action.  Notwithstanding the foregoing, at the Closing, or as soon as practicable thereafter, (x) the Debtor and the Purchaser are hereby authorized to execute and file such termination statements, instruments of satisfaction, releases, or other documents to reflect the unconditional release, termination, and discharge of such Interests on behalf of such person or entity with respect to the Purchased Assets and the Assigned Contracts, and (y) the Purchaser is hereby authorized on behalf of each holder of a purported Interest to file, register, or otherwise record a copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the unconditional release, termination, and discharge of all Interests in, against, or upon the Purchased Assets or the Assigned Contracts.  The provisions of this Order authorizing the sale of the Purchased Assets free and clear of all Interests are self-executing and, notwithstanding the failure of the Debtor, the Purchaser or any other party to execute, file or obtain termination statements,

instruments of satisfaction, releases, or other documents to reflect the release, termination, and discharge of any such Interests, all such Interests shall be deemed divested immediately upon Closing.

17. All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date.

18. As of the Closing Date, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the transactions contemplated by the Agreement.

19. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets or the Assigned Contracts on account of the filing or pendency of the Bankruptcy Cases or the consummation of the Sale.

20. To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date and upon the occurrence of Closing, to operate under any transferred license, permit, registration and governmental authorization or approval of the Debtor with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.

21. No law of any state or other jurisdiction relating to bulk sales or similar laws shall apply in any way to the transaction contemplated by the Agreement, the Sale Motion, and this Order.

35642374.2 07/19/2019
35642374.4 07/19/2019

Appx. 00164

22.     For the avoidance of doubt, any privileges, protections or immunities of the Debtor for communications, documents, materials or matters arising at any time, whether before or after the Petition Date, including but not limited to any attorney-client privilege, work product doctrine, common interest or joint defense privilege, relating to any matter whatsoever, including without limitation any matter relating to the negotiation and implementation of the Agreement and any of the transactions contemplated thereby or entered into in connection therewith (collectively, "Privilege") shall not be Purchased Assets under the Agreement, and any such Privilege is owned and will continue to be owned by the Debtor, and notwithstanding anything to the contrary herein or in the Agreement, the Purchaser shall have no interest in or rights with respect to the Privilege, whether pursuant to this Order, the Agreement, or otherwise. The Privilege shall remain within the sole control of the Debtor and may not be waived by any other person or entity.

23.     The Agreement and the Escrow Agreement, as well as other agreements related thereto, may be modified, amended, or supplemented by the Debtor and the Purchaser without further order of the Court, provided that any such modification, amendment, or supplement either is (a) not material or (b) not less favorable to the Debtor than the existing applicable provisions.

24.     This Court shall retain jurisdiction (a) to enforce and implement the terms and provisions of the Agreement, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith, (b) to compel delivery of the Purchased Assets and Assigned Contracts to the Purchaser, (c) to resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, and (d) to interpret, implement and enforce the provisions of this Order.

35642374.2 07/19/2019
35642374.4 07/19/2019

Appx. 00165

25.      Nothing contained in any plan confirmed in this case or the order confirming any plan shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan or converting the Debtor's case from chapter 11 to a case under chapter 7 of the Bankruptcy Code.

26.      The terms and provisions of the Agreement, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its creditors, the Purchaser and its affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting a claim against or Interest in the Debtor's estate or any of the Assigned Contracts and the Purchased Assets and any trustee appointed for the Debtor under any chapter of the Bankruptcy Code.

27.      The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

28.      The Purchaser is a party in interest and shall have standing to appear and be heard on all issues related to or otherwise connected with this Order, the Sale or the Agreement.

29.      Notwithstanding the provisions of Fed. R. Bankr. P. 6004 (h), 6006(d), and 7062, this Order shall be effective and enforceable immediately upon entry.

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

# EXHIBIT B

# ASSIGNED CONTRACTS

| CONTRACT DESCRIPTION | LIQUIDATED CURE AMOUNT | MAXIMUM UNLIQUIDATED CURE AMOUNT (IF APPLICABLE) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**EXHIBIT F**

**BIDDING PROCEDURES ORDER**

# EXHIBIT B

## PROPOSED REVISED BIDDING PROCEDURES ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) |
|  | ) Jointly Administered |
|  | ) |
| Debtors. | ) **Re: Docket No. 142** |
|  | ) |

**ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO
THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING
APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS,
INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM
AND MANNER OF NOTICE RELATING THERETO, AND
(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures Order**"): (a) approving the proposed bidding procedures attached as **Schedule 1** to this Bidding Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets; (b) establishing procedures for the assumption and assignment of executory contracts, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

(c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**")[3], the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. __], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which is attached as Exhibit E to the Stalking Horse Sale Agreement: (x) authorizing the sale of the Residents Program Assets free and clear of Interests as defined in footnote 4, below (the "**Interests**")[4], with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding

---

[3]      The Court has been advised that Reading Hospital, a subsidiary of Tower Health, will actually serve as the Stalking Horse Bidder and, as a result, all references herein to the Stalking Horse Bidder shall be deemed to include Reading Hospital.

[4]      Interests shall include: (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or purchaser's interest in the Assigned Contracts and/or Residents Program Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the Pension Benefit Guaranty Corporation or any plan participant or beneficiary, (iv) tax claims (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code.

pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and

the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court

having found that the relief requested in the Motion is in the best interests of the Debtors' estates,

their creditors, and other parties in interest; and the Court having found that the Debtors provided

appropriate notice of the Motion and the opportunity for a hearing on the Motion under the

circumstances; and the Court having reviewed the Motion and having heard the statements in

support of the relief requested therein at a hearing, if any, before the Court; and the Court having

determined that the legal and factual bases set forth in the Motion and at the hearing establish

just cause for the relief granted herein; and upon all of the proceedings had before the Court; and

after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS**

**THAT**:

     A.     The findings of fact and conclusions of law herein constitute the Court's findings

of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable

pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law,

they are adopted as such. To the extent any conclusions of law are findings of fact, they are

adopted as such.

     B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this Court is proper

pursuant to 28 U.S.C. §§ 1408 and 1409.

     C.     The statutory bases for the relief requested in the Motion are sections 105, 363,

365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and

9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The legal and factual

bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D. Notice of the Motion, as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order, was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Residents Program Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Residents Program Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Residents Program Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Accordingly, no further notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order is necessary or required.

E.     The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion as relates to the entry of this Bidding Procedures Order, including, without limitation:  (a) approval of the Bidding Procedures; (b) approval of the selection of the Stalking Horse Bidder and approval of the Break-Up Fee to be paid to the Stalking Horse Bidder under the circumstances described in the Motion; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.     Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

G.     The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.  The Break-Up Fee:  (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b)

Appx. 00176

and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H.      The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale Agreement. The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely. Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures). The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

I.      The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required. The

Appx. 00177

Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.      The Auction and Sale Notice attached hereto as **Schedule 5** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of all Interests, with all Interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.      All current and former patients of Debtor Center City Healthcare, LLC ("Center City") who have, as of the date of this order, asserted claims against Center City, including but not limited to claims formally asserted by the filing of suit or a proof of claim in these Bankruptcy Cases and claims informally asserted by letter or by a request for medical records from a lawyer or otherwise (the "Known Patient Creditors") shall be treated as known creditors of the Debtors for purposes of notice requirements related to the Sale.

L.      All current and former patients of Center City who, as of the date of this order, are not Known Patient Creditors (including current and former patients who are not, as of the date of

this order, aware that they have or may have claims against the Debtors including such patients as to whom personal injury has not manifested as of the date of this order) (the "<u>Unknown Patient Creditors</u>") shall be treated as unknown creditors of the Debtors for purposes of the notice requirements related to the Sale.

M.      The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.[5]

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.      <u>Timeline for the Sale</u>**

3.      The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order.  The Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), as indicated herein and in the Bidding Procedures, are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

---

[5]      Notwithstanding anything to the contrary herein, or in the Bidding Procedures, the acceptance of a Bid and Sale Agreement by the Debtors and the consummation of a Sale are subject to entry of the Sale Order.

| Milestone | Proposed Date |
|---|---|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 |
| Sale Hearing | August ___, 2019 |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder (Other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) | (may be raised at the Sale Hearing) |

4.     For the avoidance of doubt, the Debtors, in consultation with the Committee, reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

**II.     The Bidding Procedures**

5.     The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.     The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on August 5, 2019. Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.     The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8.     The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice).  The Auction will be conducted openly and all creditors and the Committee will be permitted to attend.

9.     Any creditor with a valid and perfected lien on all of the Residents Program Assets (each, a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object to or challenge such creditor's lien thereunder (a "**Challenge**")), to credit bid all or any portion of such Secured Creditor's allowed secured claims to purchase the Residents

-10-

Program Assets to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, unless otherwise ordered by the Bankruptcy Court for cause. The foregoing notwithstanding, any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee. In the event that the Committee, or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. In the event that such a creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash at the closing of the Sale.

10. Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up Fee in lieu of cash and have the Break-Up Fee be treated as equal to cash in the same amount for the purposes of evaluating the overbid.

**III.  Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement**

11. The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction. The Break-Up Fee described in the Bidding Procedures is approved. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' closing of the Sale with a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**"). If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; and (b) shall be payable in at closing on the Alternative Transaction without further order of this Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction. No Interests shall

attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

**IV.**     **Notice Procedures**

       12.      The Auction and Sale Notice is approved.

       *A.*      ***Notice of Sale, Auction, and Sale Hearing.***

       13.      Within two (2) business days after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the Auction and Sale Notice by first-class mail, electronic mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (a) the Notice Parties, (b) all Residents, and (c) all known creditors of Center City, including any Known Patient Creditors. In addition, on or before the Mailing Date, the Debtors shall serve the *Notice to Residents and Fellows Regarding Proposed Sale of Residency Program Assets* (the "**Residents' Notice**"), in substantially the form attached hereto as **Schedule 2**, on all Residents by first class mail or electronic mail.

       14.      Service of the Auction and Sale Notice and the Residents' Notice as described in paragraph 13 above shall be sufficient and proper notice of the and satisfies all due process requirements.

       15.      Within ten (10) days of the date of this Bidding Procedures Order, the Debtors shall cause the notice (the "**Publication Notice**") substantially in the form attached hereto as **Schedule 3** to be published once in the National Edition of *USA Today* and once in the *Philadelphia Inquirer*. The Publication Notice shall be sufficient and proper notice of the Sale to all creditors whose identities are unknown to the Debtors, including all of the Unknown Patient Creditors.

Appx. 00183

B.    *Notice of Successful Bidder.*

16.    As soon as reasonably practicable after the Bid Deadline, if no Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, or conclusion of the Auction, if a Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, the Debtors shall file on the docket, but not serve, a notice which shall identify the Successful Bidder.

## V.    <u>Assumption and Assignment Procedures</u>

17.    The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

A.    *Notice of Assumption and Assignment.*

18.    The Debtors previously filed with the Court, [D.I. ●], a list (the "**Initial Designated Contracts List**") specifying:  (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Initial Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Initial Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Initial Designated Contract (the "**Cure Costs**").

19.    On the Mailing Date, the Debtors shall serve the Notice of Proposed Assumption and Assignment of Executory Contracts attached hereto as <u>**Schedule 4**</u> (the "**Initial Notice of Assumption and Assignment**") on all Initial Designated Contract Counterparties by first-class

35602324.9 07/19/2019

mail, email or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF.

20. Any Initial Designated Contract Counterparty may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Initial Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance. All Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com) and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania, 19102, Attn: Jeffrey C. Hampton (jeffrey.hampton@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder (the "**Contract Notice Parties**") by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Initial Designated Contract Objection Deadline**"). Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

-14-

Appx. 00185

21.     If an Initial Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such Contract Objection will be determined at the Sale Hearing.

> B.      ***Modification of Initial Designated Contracts List and Supplemental Notice of Assumption and Assignment.***

22.     Prior to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Stalking Horse Bidder. Subsequent to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Successful Bidder (who may be the Stalking Horse Bidder).

23.     Until the opening of business on the date of the Auction, if another Qualified Bid is received by the Bid Deadline, or the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline, at the request of the Stalking Horse Bidder, the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs. Following the conclusion of the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs, *provided*, *however*, that such deletion of any contracts shall not result in any reduction in the Purchase Price (as defined in the Stalking Horse Sale Agreement"), and any contracts added after the Auction will not be considered in connection with the right of termination in Article 9.1(c) of the Stalking Horse Sale Agreement. For the avoidance of doubt, the Initial Designated Contracts List may be modified more than

Appx. 00186

once. The contracts listed on the Initial Designated Contracts List, as modified from time to time, are hereafter referred to as the "**Designated Contracts**").

24. In the event that the Initial Designated Contracts List is modified, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") on the affected counterparty in the same manner as the Initial Notice of Assumption and Assignment was served. Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed contracts as was included in the Notice of Assumption and Assignment.

25. Any counterparty to an executory contract listed on a Supplemental Notice of Assumption and Assignment (each a "**Supplemental Designated Contract Counterparty**") may file an objection with respect to the applicable Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs (but only to the extent reduced as to contracts included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment), and (b) if such Designated Contract was not included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance. All Supplemental Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the

Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

26.     If a Supplemental Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute, (a) if the Supplemental Contract Objection Deadline is on or before the date of the Sale Hearing, such Supplemental Contract Objection will be determined at the Sale Hearing, and (b) if the Supplemental Contract Objection Deadline is after the date of the Sale Hearing the Debtors will seek an expedited hearing before the Court to determine the Supplemental Contract Objection.  If there is no such Supplemental Contract Objection (or such objection has been resolved), then the Debtors may submit an order to this Court, including by filing a certification of counsel, fixing the applicable Cure Costs and approving the assumption of the contract listed on a Supplemental Notice of Assumption and Assignment.

C.     *Additional Notice of Assumption and Assignment Procedures.*

27.     If the counterparty to any Designated Contract does not file and serve a Contract Objection or Supplemental Contract Objection, as applicable, in a manner that is consistent with the requirements set forth above, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling with respect to the applicable Designated Contract, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any claim related to such Designated Contract for any default occurring or continuing prior to the date of the assumption

and assignment of such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

28.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.   Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

## VI.     <u>Sale Hearing.</u>

29.     A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at _____ (prevailing Eastern Time) on August [●], 2019, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket.   At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder.   The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale.   In the event that the Successful Bidder cannot or refuses to consummate the Sale after the Sale has been approved by the Court, the Debtors may, in consultation with the Committee, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors, in consultation with the Committee, shall be

authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

30.     Any and all objections, if any, to (a) the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement and (b) entry of the Sale Order approving such Sale (a "**Sale Objection**") must be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pa. 19406 Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Sale Objection Deadline**").  Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder (other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) (an "**Auction Objection**") must be raised at or prior to the Sale Hearing (the "**Auction Objection Deadline**").  Any party failing to timely file a Sale Objection or raise an Auction Objection, as applicable, will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the assets free and clear of any and all Interests. For the avoidance of doubt, if the Stalking Horse Bidder is selected as the Successful Bidder, but its successful Bid is not the Stalking Horse Bid or an increased bid based on an agreement substantially similar to the Stalking Horse Sale Agreement, objections to a Sale

to the Stalking Horse Bidder, limited to the changed terms (excluding any increase in price) may be raised by the Auction Objection Deadline.

**VII.** **Miscellaneous.**

31.     Notwithstanding anything to the contrary in any asset purchase agreement or document relating to the Sale, the purchased assets (including the Residents Program Assets) shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action. The provisions of this paragraphs shall not apply to the Stalking Horse Sale Agreement, as the same may be modified other than any modifications to the defined term "Purchased Assets."

32.     This order and the Bidding Procedures shall be interpreted so as to afford the Debtors, in consultation with the Committee, the greatest opportunity to maximize the value of the Residents Program Assets for the benefit of the Debtors' estates *provided, however,* the provisions of this paragraph shall not apply to any matters affecting the Stalking Horse Bidder without the consent of the Stalking Horse Bidder.

33.     The Debtors, in consultation with the Committee as applicable, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

34.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

35.     This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors. Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

36.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

# SCHEDULE 1

## BIDDING PROCEDURES

Appx. 00193

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## BIDDING PROCEDURES

On July [●], 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") as set forth herein, are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July [●], 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**"), or in accordance with the terms of such higher and better offer as determined by the Debtors, in consultation with the Committee, to be the Successful Bidder (defined below).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

A.      Submissions to the Debtors and the Committee.

All submissions to the Debtors and the Committee required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

a.      **Debtors**.  Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

b.      **Debtors' Counsel**.  Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

c.      **Debtors' Investment Banker**.  SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com);  Teresa Kohl (tkohl@ssgca.com);  and Craig Warznak (cwarznak@ssgca.com).

d.      **Committee's Counsel**.  Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

B.      Potential Bidders.

The Debtors and their financial advisors have identified, and may in the future, in consultation with the Committee, identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**"), other than the Stalking Horse Bidder, must deliver or have previously delivered, if determined to be necessary by the Debtors:

a.      an executed confidentiality agreement on terms acceptable to the Debtors, in consultation with the Committee (a "**Confidentiality Agreement**"), to the extent not already executed; and

b.      the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

-2-

C.   Qualified Bidders.

a.   A "**Qualified Bidder**" is a Potential Bidder:  (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined by the Debtors, in consultation with the Committee; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below).  On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times.  MidCap Funding IV Trust ("**Midcap**"), solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times; *provided* that MidCap Funding IV Trust's right to credit bid shall be subject to the provisions set forth in the Bidding Procedures Order and these Bidding Procedures.

b.   If any Potential Bidder is determined by the Debtors, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

c.   Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, in consultation with the Committee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

d.   Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

D.   Due Diligence.

a.   **Diligence Provided to Potential Bidders**.

Only (a) the Stalking Horse Bidder, and (b) Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders other than the Stalking Horse Bidder, the due

diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors, in consultation with the Committee, may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors, in consultation with the Committee, determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors, in consultation with the Committee, determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors, in consultation with the Committee, as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to MidCap and the Committee.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

b.      **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Committee, to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

E.      Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors, in consultation with the Committee, in their reasonable business judgment, shall constitute a "**Qualified Bid**." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

    a.      **Assets**. Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

    b.      **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"). The Purchase Price must be in cash consideration and must equal or exceed $7,825,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) and (iii) a $100,000 incremental amount (a "**Minimum Bid**").

    c.      **Deposit**. With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**"). Within three (3) business days after the conclusion of any Auction, the Successful Bidder and Backup Bidder shall submit by wire transfer of immediately available funds, a supplemental cash deposit in an amount that, when added to the amount of the Deposit, is equal to ten (10) percent of the aggregate cash Purchase Price set forth in their respective Successful Bid and Backup Bid. The foregoing notwithstanding, the Stalking Horse Bidder shall not be required to submit any Deposit.

    d.      **Residents**. Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms. Each Bid must further provide a description of the Potential Bidder's accreditation status with the Accreditation Council on Graduate Medical Education, including a description of accredited residency and fellowship programs currently offered by the Potential Bidder and/or expected to be offered in the future.

e.     **Same or Better Terms**.   Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors, in consultation with the Committee.   Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors, in consultation with the Committee, that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f.     **Contingencies; No Financing or Diligence Outs**.   A Bid shall not be conditioned on (i) the Potential Bidder obtaining financing, (ii) approval of the Potential Bidder's shareholders, board of directors or other internal approval, or (iii) the outcome or completion of due diligence by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment, in consultation with the Committee, than those set forth in the Stalking Horse Sale Agreement.

g.     **Identity**.   Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.   Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.   Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.     **Demonstrated Financial Capacity**.   A Qualified Bidder must have, in the Debtors' business judgment, as determined in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.   Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i. **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Committee,.

j. **Binding and Irrevocable**. A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k. **Expenses; Disclaimer of Fees**. Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l. **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Committee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m. **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

n.      **Adherence to Bid Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o.      **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p.      **Consent to Jurisdiction**.  Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q.      **Bid Deadline**.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Bid Deadline**").

The Debtors reserve the right, in consultation with the Committee, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

F.      Right to Credit Bid.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on all of the Resident Program Assets (a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object or challenge such creditor's lien thereunder (a "**Challenge**")) to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause.   In the event that the Committee or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected.  If such creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash as the closing of the Sale.

In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up fee in lieu of cash..

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order.

Any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee.

G.    Auction.

If, prior to the Bid Deadline, the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. By 6:00 p.m. on the date of the Bid Deadline, the Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids were received prior to the Bid Deadline.  If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement) prior to the Bid Deadline, the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Committee (the "**Baseline Bid**"), and provide copies of all Qualified Bid Documents supporting the Baseline Bid and each other Qualified Bid to each Qualified Bidder.  The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Committee, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, and may include, among other things: (a) the number, type, and nature of any changes to the Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction.  At least one (1) day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on August 7, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors.  The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

    a.    **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction, in consultation with the Committee as applicable.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of

each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and the Committee and all creditors will be permitted to attend. The Qualified Bidders, including the Stalking Horse Bidder, may appear at the Auction in person or through duly authorized representatives.

b. **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a)    **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth in the Bidding Procedures Order or these Bidding Procedures (including the requirement of a cash component sufficient to pay all costs of sale including the Break-Up Fee).

(b)    **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may, in consultation with the Committee, announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors and the Committee.

(c)    **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(d)    **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have (i)in the initial Overbid round, identified an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or (ii) in subsequent rounds, identified an Overbid as

being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors, in consultation with the Committee, as the Prevailing Highest Bid as well as the value attributable by the Debtors, in consultation with the Committee, to such Prevailing Highest Bid.

c. **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Committee, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors, the Committee, and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with the Committee, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider, in consultation with the Committee, how to value each Overbid.

d. **Closing the Auction**.

(a) The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Committee, to be the highest or otherwise best Bid in accordance with the Bid Assessment Criteria. Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed. The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

(b) The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely.

(c) As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

####     e.    **No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that:  (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder.  All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors, the Committee, and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

H.     Backup Bidder.

   a.     Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Committee (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.  The Stalking Horse Bidder shall serve as a Backup Bidder only if (X) the Bid set forth in the Stalking Horse Agreement is not determined to be the Baseline Bid (as defined herein), and (Y) the Stalking Horse Bidder elects, in its sole discretion, to offer a higher and better bid at the Auction.  The Stalking Horse Bidder's Bid described in the Stalking Horse Agreement shall not be a Backup Bid absent the express consent of the Stalking Horse Bidder.

   b.     The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder.  The foregoing notwithstanding, if the Stalking Horse Bidder serves as the Backup Bidder, its Backup Bid shall expire on the earlier of closing on an Alternative Transaction (defined below) or September 6, 2019.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

   c.     If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Committee, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

I.     Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights, in consultation with the Committee, to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

J.     Sale Hearing.

A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on or before 10:00 a.m. (prevailing Eastern Time) on August  [●], 2019, before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Committee, by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder). The foregoing notwithstanding, if the Sale Hearing is continued without the consent of the Stalking Horse, the Stalking Horse may terminate the Stalking Horse Agreement.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

K.     Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

The Break-Up fee, to the extent owed by the Debtors, (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; (b) shall be payable at closing on of a Sale to a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**")without further order of the Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

35612177.6 07/19/2019

Appx. 00206

L.     Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors, in consultation with the Committee, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction. The Stalking Horse Bidder shall not be required to provide a Deposit.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

M.     Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures prior to the commencement of the Auction if the Debtors' board of managers determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as the case may be, is required to comply with applicable law or the board's fiduciary obligations thereunder; *provided* that, in the event  the Debtors' board of managers determines to take any action, or refrain from taking any action, pursuant to this paragraph, without the consent of the Stalking Horse Bidder, the Stalking Horse Bidder may, but shall not be required to, terminate the Stalking Horse Agreement if taking such action or refraining from taking such action, as the case may be, would otherwise be grounds for termination under the Stalking Horse Agreement, it being understood that any material modification to the Bid Procedures without the consent of the Stalking Horse would be a breach of the Stalking Horse Agreement pursuant to which the Stalking Horse would have the right to terminate the Stalking Horse Agreement.

**SCHEDULE 2**

**RESIDENT'S NOTICE**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE TO RESIDENTS AND FELLOWS
## REGARDING PROPOSED SALE OF RESIDENCY PROGRAM ASSETS

**TO: ALL RESIDENTS AND FELLOWS AT HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Tower Health ("**Tower**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to Tower: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors file a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August ___, 2019** (the "**Sale Hearing**"). A copy of the Agreement, the Bidding Procedures Order and the Bidding Procedures is enclosed herewith.

## THE PROPOSED SALE

If approved by the Court, the Agreement will enable residents and fellows (collectively herein, the "**Residents**") at Hahnemann to continue their training at one of six hospitals operated by Tower - Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania. **Residents have a choice, and are not required to continue their training with Tower**. For any Resident who elects to complete their training elsewhere, Tower or the Debtors, as applicable, will release the related cap on Medicare reimbursement on a temporary basis to accommodate that choice.

For Residents who elect to stay with Tower, Tower will provide housing for those residents doing rotations at Reading Hospital, which is sixty miles from Hahnemann. Tower has also agreed to seek to hire the faculty who are currently training Residents at Hahnemann to ensure continuity of the Hahnemann training programs. Tower will also provide free housing (subject to parameters set forth in the Agreement) for the remainder of the academic year or during the term of a resident's existing vacated lease if it is necessary for the Resident to relocate during the current academic year. Residents will receive free meals while in any Tower hospital, and Tower will also provide additional amenities to assist Residents and their families with the transition.

If the Sale is approved by the Court to someone other than Tower, the terms of the Sale, and the impact upon Residents, may be different than those under the Agreement.

The Debtors recognize the unique difficulties and challenges facing Residents in light of the bankruptcy filing and expected closure of Hahnemann. The Debtors believe that the proposed Sale is in the best interests of Residents because it provides Residents with the option to continue their training and, to minimize, to the greatest extent possible, the impact of Hahnemann's closure on Residents, their professional training and education, and their families.

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys,

Appx. 00210

whose contact information is in the signature block below, for more information.  In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; and (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Appx. 00211

Dated: July 19, 2019         **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Proposed Counsel for Debtors and
Debtors in Possession*

# SCHEDULE 3

# PUBLICATION NOTICE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| | |
| CENTER CITY HEALTHCARE, LLC d/b/a | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | |
| *al.*,[1] | Jointly Administered |
| | |
| Debtors. | |

## NOTICE REGARDING PROPOSED SALE OF RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL INTERESTS, INCLUDING PERSONAL INJURY CLAIMS

**TO:**  **ALL PERSONS WITH CLAIMS AGAINST THE DEBTORS IN THE ABOVE CAPTIONED CASES, INCLUDING CLAIMS AGAINST HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Reading Hospital (the "**Purchaser**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to the Purchaser: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

**PLEASE TAKE FURTHER NOTICE** that the Sale, if approved, will be free and clear of all Interests, including claims of successor liability.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

**PLEASE TAKE FURTHER NOTICE THAT, IF THE SALE IS APPROVED, THE PURCHASER WILL NOT BE LIABLE ON ACCOUNT OF ANY CLAIMS AGAINST ANY OF THE DEBTORS (OTHER THAN CLAIMS AFFIRMATIVELY ASSUMED BY THE PURCHASER), INCLUDING CLAIMS OF PATIENTS TREATED AT HAHNEMANN, INCLUDING CLAIMS OF WHICH THE HOLDER MAY NOT BE PRESENTLY AWARE.**

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors file a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July __, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August __, 2019** (the "**Sale Hearing**").

### Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys, whose contact information is below, for more information. In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower, and (d) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:*/s/ Mark Minuti*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

        -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

# SCHEDULE 4

## INITIAL NOTICE OF ASSUMPTION AND ASSIGNMENT

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE OF PROPOSED ASSUMPTION AND
## ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 and July 1, 2019 (the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion [D.I. 142] (the "**Sale Motion**") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets (the "**Residents Program Assets**") to Tower Health (the "**Stalking Horse Bidder**"), including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"), attached as **Exhibit B** to the Sale Motion; (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July [●], 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") [D.I. [●]] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herewith.

**PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder, or any other Successful Bidder, the Designated Contracts. A schedule listing the Designated Contracts (the "**Designated Contracts List**") is attached hereto and may also be accessed free of charge on the **website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/**. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "**Cure Payments**") is set forth on the Designated Contracts List.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO AN INITIAL DESIGNATED CONTRACT IN THE INITIAL DESIGNATED CONTRACTS LIST**. Under the terms of the proposed Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Designated Contracts until the opening of business on the date of the Auction, or until the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline. Following the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Payments. If the Initial Designated Contracts List is modified, the Debtors will serve a supplemental notice of assumption and assignment on the affected counterparty, which shall identify the deadline for filing an objection with respect to the applicable Designated Contract.

### IMPORTANT PROPOSED DATES AND DEADLINES

1. The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "**Sale Order**") and all objections related to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m. (ET)** (the "**Sale Objection Deadline**").

2. The Auction for the Residents Program Assets, if one is necessary, will commence on **August 7, 2019 at 10:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

3. A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on August [●], 2019 at [_____] (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

## FILING ASSUMPTION AND ASSIGNMENT OBJECTIONS

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("**Designated Contract Objections**"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on August 5, 2019**. Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

Failure to timely file a timely Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE A TIMELY OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE PROPOSED BIDDING PROCEDURES ORDER AND THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

Dated: July __, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:/s/ Aaron S. Applebaum
     Mark Minuti (DE Bar No. 2659)
     Monique B. DiSabatino (DE Bar No. 6027)
     1201 N. Market Street, Suite 2300
     P.O. Box 1266
     Wilmington, DE  19899
     Telephone: (302) 421-6800
     Fax: (302) 421-5873
     mark.minuti@saul.com
     monique.disabatino@saul.com

       -and-

     Jeffrey C. Hampton
     Adam H. Isenberg
     Aaron S. Applebaum (DE Bar No. 5587)
     Centre Square West
     1500 Market Street, 38th Floor
     Philadelphia, PA 19102
     Telephone: (215) 972-7700
     Fax: (215) 972-7725
     jeffrey.hampton@saul.com
     adam.isenberg@saul.com
     aaron.applebaum@saul.com

     *Proposed Counsel for Debtors and*
     *Debtors in Possession*

**Designated Contracts List**

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Master Agreement for Shared Rotational Arrangements with Hahnemann University Hospital dated June 29, 2007 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $0.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Temple University Hospital | Academic Affiliation Agreement with Tenet HealthSystem St. Christopher's Hospital for Children, LLC, dated October 19, 2007 | $0.00 |
| 15 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 17 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |
| 18-X | [INDIVIDUAL RESIDENTS] (to be provided and/or filed under seal) | Resident Employment Contract | $0.00 |

# SCHEDULE 5

# AUCTION AND SALE NOTICE

Appx. 00224

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) | |
| *al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

### NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 and July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale and Bidding Procedures Motion**")[2] seeking the entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of certain of the Debtors' assets to Tower Health (the "**Stalking Horse Bidder**") for $7.5 million plus the assumption of certain contracts and responsibilities of the Debtors with respect to Residents at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) the form and manner of notices related to the Sale; and (c) procedures for the assumption and assignment of contracts in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that on July [●], 2019, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety. To the extent that there are any inconsistencies between the Bidding

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bidding Procedures Motion.

Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects. The deadline by which all Bids must be *actually received* by the parties specified in the Bidding Procedures Order is July 26, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Residents Program Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

| Proposed Investment Banker to Debtors | Proposed Counsel to Debtors |
|---|---|
| SSG Advisors, LLC<br>Five Tower Bridge, Suite 420<br>300 Barr Harbor Drive<br>West Conshohocken, PA 19428<br>J. Scott Victor (jsvictor@ssgca.com)<br>Teresa Kohl (tkohl@ssgca.com)<br>Craig Warznak (cwarznak@ssgca.com)<br>(610) 940-3615 | Saul Ewing Arnstein & Lehr LLP<br>1201 N. Market Street, Suite 2300<br>Wilmington, Delaware 19899<br>Mark Minuti (mark.minuti@saul.com),<br>Jeffrey C. Hampton (jeffrey.hampton@saul.com),<br>Aaron S. Applebaum (aaron.applebaum@saul.com)<br>(215) 972-7777 |

## Obtaining Additional Information

Copies of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Purchase Agreement and all other documents filed with the Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

## Important Dates and Deadlines

1. The deadline to submit a Qualified Bid is August 5, 2019 at 4:00 p.m. (prevailing Eastern time).

2. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "**Sale Order**") and all objections relating to the Stalking Horse Bidder (collectively, "**Sale Objections**") is August 5, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Sale Objection Deadline**").

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Residents Program Assets. The Auction, if one is necessary, will commence on August 7, 2019 at 10:00 a.m. (prevailing Eastern time), or such other date as determined by the Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre

Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

4. Objections to the conduct of the Auction and the terms of a sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "**Auction Objections**") may be raised at the Sale Hearing (as defined below).

5. A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Court <u>on [          ], 2019 at [    ] (ET)</u>, or such other date as determined by the Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

<u>Filing Objections</u>

Sale Objections, if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

<u>**CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION**</u>

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE  19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

       -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

-4-

Appx. 00228

**EXHIBIT C**

**REDLINE – REVISED BIDDING PROCEDURES ORDER**

Appx. 00229

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al*.,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) **Re: Docket No. —142** |
|  | ) |

**ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO
THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING
APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS,
INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM
AND MANNER OF NOTICE RELATING THERETO, AND
(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and

debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures**

**Order**"):  (a) approving the proposed bidding procedures attached as **Schedule 1** to this Bidding

Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the

highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets;

(b) establishing procedures for the assumption and assignment of executory contracts, including

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St.
Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of
PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care
Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast
Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C.
(5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is
230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the
Motion or the Bidding Procedures, as applicable.

notice of proposed cure amounts (the "**Assumption and Assignment Procedures**"); (c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**")[3], the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. __], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which ~~will be filed on or earlier to the date that is one (1) day prior to the Sale Hearing,~~ is attached as Exhibit E to the Stalking Horse Sale Agreement: (x) authorizing the sale of the Residents Program Assets free and clear of ~~liens, claims, interests, and encumbrances (collectively, the "Interests")~~ Interests as defined in footnote 4, below (the "Interests")[4], with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain

---

[3]    The Court has been advised that Reading Hospital, a subsidiary of Tower Health, will actually serve as the Stalking Horse Bidder and, as a result, all references herein to the Stalking Horse Bidder shall be deemed to include Reading Hospital.

[4]    Interests shall include: (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or purchaser's interest in the Assigned Contracts and/or Residents Program Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the Pension Benefit Guaranty Corporation or any plan participant or beneficiary, (iv) tax claims (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code.

35602324.1 07/10/2019
35602324.9 07/19/2019

executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.     The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and

35602324.1 07/10/2019
35602324.9 07/19/2019

9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D.    Notice of the Motion, as relates to the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order, was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets Residents Program Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' assets Residents Program Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Residents Program Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Accordingly, no

-4-

further notice of the Motion ~~or~~ as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order is necessary or required.

E.     The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion as relates to the entry of this Bidding Procedures Order, including, without limitation:   (a) approval of the Bidding Procedures; (b) approval of the selection of ~~Tower Health as~~ the Stalking Horse Bidder and approval of the Break-Up Fee to be paid to the Stalking Horse Bidder under the circumstances described in the Motion; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein.   Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.     Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.   The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

G.     The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair,

35602324.1 07/10/2019
35602324.9 07/19/2019

reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.  The Break-Up Fee:  (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H.     The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale Agreement.  The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely.  Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures).  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

35602324.1 07/10/2019
35602324.9 07/19/2019

Appx. 00235

I.     The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required.  The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.     The Auction and Sale Notice attached hereto as **Schedule 5** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d)  identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of ~~liens~~all Interests, ~~claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests~~ with all Interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.     All current and former patients of Debtor Center City Healthcare, LLC ("Center City") who have, as of the date of this order, asserted claims against Center City, including but

-7-

not limited to claims formally asserted by the filing of suit or a proof of claim in these Bankruptcy Cases and claims informally asserted by letter or by a request for medical records from a lawyer or otherwise (the "Known Patient Creditors") shall be treated as known creditors of the Debtors for purposes of notice requirements related to the Sale.

  L.  All current and former patients of Center City who, as of the date of this order, are not Known Patient Creditors (including current and former patients who are not, as of the date of this order, aware that they have or may have claims against the Debtors including such patients as to whom personal injury has not manifested as of the date of this order) (the "Unknown Patient Creditors") shall be treated as unknown creditors of the Debtors for purposes of the notice requirements related to the Sale.

  M.  ~~K.~~ The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

  1. The Motion is granted as provided herein.[35]

  2. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.**  **Timeline for the Sale**

  3. The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order. The Debtors , in consultation with the Official Committee of Unsecured

---

[35]  Notwithstanding anything to the contrary herein, or in the Bidding Procedures, the acceptance of a Bid and Sale Agreement by the Debtors and the consummation of ~~the~~ a Sale ~~is~~ are subject to entry of the Sale Order.

Creditors (the "**Committee**"), as indicated herein and in the Bidding Procedures, are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Milestone | Proposed Date |
|---|---|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement | 4:00 p.m. (prevailing Eastern Time) on ~~July 26~~August 5, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on ~~July 26~~August 5, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on ~~July 30~~August 7, 2019 |
| Sale Hearing | ~~July 31~~August 8, 2019 |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder (Other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) | (may be raised at the Sale Hearing) |

4.    For the avoidance of doubt, the Debtors, in consultation with the Committee, reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

II.    **The Bidding Procedures**

5.    The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement.  The failure to specifically include or reference a particular

35602324.1 07/10/2019
35602324.9 07/19/2019

provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.    The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on ~~July 26~~August 5, 2019.  Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.    The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8.    The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.   The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on ~~July 30~~August 7, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice).   The Auction will be conducted openly and all creditors and the Committee will be permitted to attend.

9.    Any creditor with a valid and perfected lien on ~~any assets~~ all of the ~~Debtors' estates~~ Residents Program Assets (each, a "**Secured Creditor**") shall have the right, subject in all

respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object to or challenge such creditor's lien thereunder (a "**Challenge**")), to credit bid all or any portion of such Secured Creditor's allowed secured claims to purchase the Residents Program Assets to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, and any such credit bid shall be deemed a Qualified Bid unless otherwise ordered by the Bankruptcy Court for cause. The foregoing notwithstanding, any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee. In the event that the Committee, or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected.  In the event that such a creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash at the closing of the Sale.

10. Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include the full amount all or any portion of the Break-Up Fee in lieu of cash and for have the Break-Up Fee be treated as equal to cash in the same amount for the purposes of evaluating the overbid equal to cash in the same amount, subject to the limitations set forth in paragraph 9. Notwithstanding the preceding sentence, the inclusion in any overbid of the Break-Up Fee shall not be deemed to create a secured claim or constitute an offset against any such claim under section 363(k) of the Bankruptcy Code.

## III.  Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement

11. The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction.  The Break-Up Fee contained in the Stalking

-11-

~~Horse Sale Agreement~~ described in the Bidding Procedures is approved. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' ~~consummation~~ closing of the Sale with a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**"). If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; and (b) shall be payable in ~~accordance with the terms of~~ ~~the Stalking Horse Sale Agreement~~ at closing on the Alternative Transaction without further order of this Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction. No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

## IV. **Notice Procedures**

12. The Auction and Sale Notice is approved.

### A. *Notice of Sale, Auction, and Sale Hearing.*

13. Within ~~one~~ two (~~1~~2) business ~~day~~ days after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the ~~Stalking Horse Sale Agreement, Bidding Procedures Order, and Bidding Procedures by~~ ~~first-class~~ Auction and Sale Notice by first-class mail, electronic mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon ~~the~~ ~~Notice Parties~~(a) the Notice Parties, (b) all Residents, and (c) all known creditors of Center City, including any Known Patient Creditors. In addition, on or before the Mailing Date, the Debtors shall serve the *Notice to Residents and Fellows Regarding Proposed Sale of Residency Program Assets* (the "**Residents' Notice**"), in substantially the form attached hereto as **Schedule 2**, on all Residents by first class mail or electronic mail.

-12-

14. Service of the Auction and Sale Notice ~~and the Residents' Notice~~ as described in ~~the Motion~~ paragraph 13 above shall be sufficient and proper notice of the ~~Sale with respect to known interested parties.  Publication of the Auction and Sale Notice as described in the Motion shall be sufficient and proper notice of the Sale to~~ any other interested parties whose identities are unknown to the Debtors. and satisfies all due process requirements.

15. Within ten (10) days of the date of this Bidding Procedures Order, the Debtors shall cause the notice (the "**Publication Notice**") substantially in the form attached hereto as **Schedule 3** to be published once in the National Edition of *USA Today* and once in the *Philadelphia Inquirer*. The Publication Notice shall be sufficient and proper notice of the Sale to all creditors whose identities are unknown to the Debtors, including all of the Unknown Patient Creditors.

B.      *Notice of Successful Bidder.*

16. ~~13.~~As soon as reasonably practicable after the Bid Deadline, if no Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, or conclusion of the Auction, if a Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, the Debtors shall file on the docket, but not serve, ~~the Post-Auction Notice,~~ a notice which shall identify the Successful Bidder.

V.      **Assumption and Assignment Procedures**

17. ~~14.~~The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

-13-

A. *Notice of Assumption and Assignment.*

18. ~~15.~~The Debtors previously filed with the Court, [D.I. ●], a list (the "**Initial Designated Contracts List**") specifying: (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Initial Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Initial Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Initial Designated Contract (the "**Cure Costs**").

19. On the Mailing Date, the Debtors shall serve the Notice of Proposed Assumption and Assignment of Executory Contracts attached hereto as **Schedule 4** (the "**Initial Notice of Assumption and Assignment**") on all Initial Designated Contract Counterparties by first-class mail, email or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF.

20. ~~16.A Designated Contract Counterparty listed on the Notice of Assumption and Assignment~~ Any Initial Designated Contract Counterparty may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Initial Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance. All Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on ~~the Debtors by the later of~~ (i) ~~4:00 p.m~~Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (~~prevailing Eastern Time~~mark.minuti@saul.com) ~~on July 26, 2019; and~~ and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania, 19102,

-14-

Attn: Jeffrey C. Hampton (jeffrey.hampton@saul.com), proposed counsel to the Debtors, (ii) 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days following the Assumption and Assignment Service Date Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder (the "**Contract Notice Parties**") by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Initial Designated** Contract Objection Deadline").  Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

21. 17. If a an Initial Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection such Contract Objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

B. ***Modification of Initial Designated Contracts List and*** *Supplemental Notice of Assumption and Assignment.*

18. The Stalking Horse Bidder may modify the Designated Contracts List until the opening of business on the date of the Auction.  Following the conclusion of the Auction, if any, and the selection of the Successful Bidder, the Debtors reserve the right, but only in accordance with the Stalking Horse Sale Agreement, or as otherwise agreed by the Debtors and the Successful Bidder, at any time after the Assumption and Assignment Service Date, before or

-15-

after the closing of the Sale, to: (a) supplement the Designated Contracts List on the Notice of Assumption and Assignment with previously omitted Designated Contracts; (b) remove a Designated Contract from the Designated Contracts List; and/or (c) modify the previously-stated Cure Costs associated with any Designated Contract.

22. Prior to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Stalking Horse Bidder. Subsequent to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Successful Bidder (who may be the Stalking Horse Bidder).

23. Until the opening of business on the date of the Auction, if another Qualified Bid is received by the Bid Deadline, or the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline, at the request of the Stalking Horse Bidder, the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs. Following the conclusion of the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs, *provided, however,* that such deletion of any contracts shall not result in any reduction in the Purchase Price (as defined in the Stalking Horse Sale Agreement"), and any contracts added after the Auction will not be considered in connection with the right of termination in Article 9.1(c) of the Stalking Horse Sale Agreement. For the avoidance of doubt, the Initial Designated Contracts List may be modified more than once. The contracts listed on the Initial Designated Contracts List, as modified from time to time, are hereafter referred to as the "**Designated Contracts**").

24. ~~19.~~~~In the event that the Stalking Horse Bidder or Debtors exercise any of the rights reserved above to supplement the Designated Contracts List or modify previously stated Cure Costs~~In the event that the Initial Designated Contracts List is modified, the Debtors will promptly serve a supplemental notice of assumption and assignment ~~by, first class mail, on the Designated Contract Counterparty, and its attorney, if known, to each impacted Designated Contract at the last known address available to the Debtors~~ (a "**Supplemental Notice of Assumption and Assignment**") on the affected counterparty in the same manner as the Initial Notice of Assumption and Assignment was served.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed ~~Designated Contracts~~ contracts as was included in the Notice of Assumption and Assignment.

25. ~~20.~~Any ~~Designated Contract Counterparty~~ counterparty to an executory contract listed on a Supplemental Notice of Assumption and Assignment (each a "**Supplemental Designated Contract Counterparty**") may file an objection with respect to the ~~impacted~~ applicable Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs~~, if any~~ (but only to the extent reduced  as to contracts included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment), and (b) if such Designated Contract was not ~~previously~~ included on ~~any~~ the Initial Notice ~~(or~~ of Assumption and Assignment or any prior Supplemental Notice~~)~~ of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance.  All Supplemental Contract Objections must:  (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply

-17-

with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than ~~fourteen (14~~seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

26. ~~21.~~If a Supplemental Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above~~, ~~ and the parties are unable to consensually resolve the dispute, (a) if the Supplemental Contract Objection Deadline is on or before the date of the Sale Hearing, such Supplemental Contract Objection will be determined at the Sale Hearing, and (b) if the Supplemental Contract Objection Deadline is after the date of the Sale Hearing the Debtors will seek an expedited hearing before the Court ~~(a "**Supplemental Designated Contract Hearing**")~~ to determine the ~~Cure Costs, if any, and approve the assumption of the relevant Designated Contracts~~Supplemental Contract Objection. If there is no such ~~objection ~~Supplemental Contract Objection (or such objection has been resolved), then the Debtors may submit an order ~~(a "**Supplemental Designated Contract Order")~~ to this Court, including by filing a certification of counsel, fixing the applicable Cure Costs and approving the assumption of ~~any Designated Contract ~~the contract listed on a Supplemental Notice of Assumption and Assignment.

*C.*      ***Additional Notice of Assumption and Assignment Procedures.***

27. ~~22.~~If the counterparty to any Designated Contract ~~Counterparty ~~does not file and serve a Contract Objection or Supplemental Contract Objection, as applicable, in a manner that is consistent with the requirements set forth above~~, and absent a subsequent order of the Court in connection with such objection establishing alternative Cure Costs~~, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and

-18-

Assignment) shall be controlling with respect to the applicable Designated Contract, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any claim related to such Designated Contract for any default occurring or continuing prior to the date of the assumption and assignment of such Designated Contract Objection Deadline against the Debtors or the Successful Bidder, or the property of any of them.

28. 23. The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not: (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract. Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

**VI.    Sale Hearing.**

29. 24. A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at _____ (prevailing Eastern Time) on July August [●], 2019, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder. The Sale Hearing

-19-

shall be an evidentiary hearing on matters relating to the Sale ~~and there will be no further bidding at the Sale Hearing~~.  In the event that the Successful Bidder cannot or refuses to consummate the Sale <u>after the Sale has been approved by the Court</u>, the Debtors may<u>, in consultation with the Committee</u>, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors~~,~~ <u>in consultation with the Committee,</u> shall be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

<u>30.</u> ~~25.~~ Any and all objections, if any, to <u>(a)</u> the Sale to the Stalking Horse Bidder ~~and~~ <u>on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement and (b)</u> entry of the Sale Order <u>approving such Sale</u> (a "**Sale Objection**") must be filed and served on ~~the Objection Recipients~~ <u>(i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pa. 19406 Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder</u> by ~~by 4:00 p.m. (prevailing Eastern Time) on July 26~~<u>4:00 p.m. (prevailing Eastern Time) on August 5</u>, 2019 (the "**Sale Objection Deadline**").  Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder (other than <u>a Sale to</u> the Stalking Horse Bidder <u>on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement)</u> (an "**Auction Objection**") must be raised at or prior to the Sale Hearing (the "**Auction Objection Deadline**").  Any party failing to timely file a Sale Objection or raise an Auction Objection, as applicable, will

-20-

be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the assets free and clear of any and all ~~liens, claims, interests, and encumbrances in accordance with the definitive agreement for the Sale.~~Interests. For the avoidance of doubt, if the Stalking Horse Bidder is selected as the Successful Bidder, but its successful Bid is not the Stalking Horse Bid or an increased bid based on an agreement substantially similar to the Stalking Horse Sale Agreement, objections to a Sale to the Stalking Horse Bidder, limited to the changed terms (excluding any increase in price) may be raised by the Auction Objection Deadline.

**VII.**   **Miscellaneous.**

31. Notwithstanding anything to the contrary in any asset purchase agreement or document relating to the Sale, the purchased assets (including the Residents Program Assets) shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action. The provisions of this paragraphs shall not apply to the Stalking Horse Sale Agreement, as the same may be modified other than any modifications to the defined term "Purchased Assets."

32. This order and the Bidding Procedures shall be interpreted so as to afford the Debtors, in consultation with the Committee, the greatest opportunity to maximize the value of the

Residents Program Assets for the benefit of the Debtors' estates *provided, however*, the provisions of this paragraph shall not apply to any matters affecting the Stalking Horse Bidder without the consent of the Stalking Horse Bidder.

33. 26. The Debtors The Debtors, in consultation with the Committee as applicable, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

34. 27. This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

35. 28. This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors. Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

36. 29. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

35602324.1 07/10/2019
35602324.9 07/19/2019

# EXHIBIT D

## REDLINE – REVISED BIDDING PROCEDURES

Appx. 00252

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## BIDDING PROCEDURES

On July [●], 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") as set forth herein, are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July [●], 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**"), or in accordance with the terms of such higher and better offer as determined by the Debtors, in consultation with the Committee, to be the Successful Bidder (defined below).

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

A. **Submissions to the Debtors and the Committee.**

All submissions to the Debtors and the Committee required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

    a.     **Debtors**. Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

    b.     **Debtors' Counsel**. Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

    c.     **Debtors' Investment Banker**. SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com).

    d.     **Committee's Counsel**. Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

B. Potential Bidders.

The Debtors and their financial advisors have identified, and may in the future, in consultation with the Committee, identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate a competing transaction. To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**"), other than the Stalking Horse Bidder, must deliver or have previously delivered, if determined to be necessary by the Debtors:

    a.     an executed confidentiality agreement on terms acceptable to the Debtors, in consultation with the Committee (a "**Confidentiality Agreement**"), to the extent not already executed; and

    b.     the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

C. Qualified Bidders.

    a. A "**Qualified Bidder**" is a Potential Bidder: (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined ~~in~~ by the Debtors~~' sole discretion~~, in consultation with the Committee; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below). On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times. MidCap Funding IV Trust ("**Midcap**"), solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times; *provided* that MidCap Funding IV Trust's right to credit bid shall be subject to the provisions set forth in the Bidding Procedures Order and these Bidding Procedures.

    b. If any Potential Bidder is determined by the Debtors~~-~~, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

    c. Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtors, in consultation with the Committee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided*~~-~~, *however,* that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

    d. Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

D. Due Diligence.

    **a. Diligence Provided to Potential Bidders**.

    Only (a) the Stalking Horse Bidder, and (b) Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**. The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request. For all Potential Bidders other than the Stalking Horse Bidder, the due

diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors, in consultation with the Committee, may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors, in consultation with the Committee, determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors, in consultation with the Committee, determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors, in consultation with the Committee, as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to ~~Wells Fargo and any committee appointed in the Debtors' chapter 11 cases~~MidCap and the Committee.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

b.  **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Committee, to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of

-4-

Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

E.      Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors , in consultation with the Committee, in their reasonable business judgment , shall constitute a "**Qualified Bid**." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

a.      **Assets**. Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

b.      **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"). The Purchase Price must be in cash consideration and must equal or exceed $7,725,000 7,825,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) and (iii) a $100,000 incremental amount (a "**Minimum Bid**").

c.      **Deposit**. With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**"). Within three (3) business days after the conclusion of any Auction, the Successful Bidder and Backup Bidder shall submit by wire transfer of immediately available funds, a supplemental cash deposit in an amount that, when added to the amount of the Deposit, is equal to ten (10) percent of the aggregate cash Purchase Price set forth in their respective Successful Bid and Backup Bid. The foregoing notwithstanding, the Stalking Horse Bidder shall not be required to submit any Deposit.

d.      **Residents**. Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms. Each Bid must further provide a description of the Potential Bidder's accreditation status with the Accreditation Council on Graduate Medical Education, including a description of

-5-

accredited residency and fellowship programs currently offered by the Potential Bidder and/or expected to be offered in the future.

e.  **Same or Better Terms**.  Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors, in consultation with the Committee.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors, in consultation with the Committee, that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f.  **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on (i) the Potential Bidder obtaining financing, (ii) shareholder approval of the Potential Bidder's shareholders, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment, in consultation with the Committee, than those set forth in the Stalking Horse Sale Agreement.

g.  **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.  **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment, as determined in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.  Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-

-6-

Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i.    **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Committee,.

j.    **Binding and Irrevocable**.  A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k.    **Expenses; Disclaimer of Fees**.  Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.    **Authorization**.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Committee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m.    **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

35612177.1 07/11/2019
35612177.6 07/19/2019

n. **Adherence to Bid Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o. **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p. **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q. **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 4:00 p.m. (prevailing Eastern Time) on ~~July 26~~August 5, 2019 (the "**Bid Deadline**").

The Debtors reserve the right , in consultation with the Committee, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

F. Right to Credit Bid.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on ~~any assets~~ all of the ~~Debtors' estates~~ Resident Program Assets (a "**Secured Creditor**") shall have the right , subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object or challenge such creditor's lien thereunder (a "**Challenge**")) to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause. In the event that the Committee or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. If such creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash as the closing of the Sale.

In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include ~~the full amount~~ all or any portion of the Break-Up fee in lieu of cash ~~and for purposes of evaluating the overbid equal to cash in the same amount. Notwithstanding the preceding sentence, the inclusion in any overbid of the Break-Up Fee shall not be deemed to create a secured claim or constitute an offset against any such claim under section 363(k) of the Bankruptcy Code~~.

-8-

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order. Any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee.

G.     Auction.

If, prior to the Bid Deadline, the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. The By 6:00 p.m. on the date of the Bid Deadline, the Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids are were received and the identity of the bidders making any such Qualified Bids prior to the Bid Deadline. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement) prior to the Bid Deadline, the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) business day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' sole business judgment, in consultation with the Committee (the "**Baseline Bid**"), and provide copies of the applicable all Qualified Bid Documents supporting the Baseline Bid and each other Qualified Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Committee, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, which and may include, among other things: (a) the number, type, and nature of any changes to the applicable Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on July 30, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

a.     **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction, in consultation with the Committee as applicable. At the start of the Auction, the Debtors shall

35612177.1 07/11/2019
35612177.6 07/19/2019

describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and the Committee and all creditors will be permitted to attend. The Qualified Bidders and, including the Stalking Horse Bidder, may appear at the Auction in person or through duly authorized representatives.

b. **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a) <u>Minimum Overbid Increment</u>. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth herein in the Bidding Procedures Order or these Bidding Procedures (including the requirement of a cash component sufficient to pay all costs of sale including the Break-Up Fee).

(b) <u>Conclusion of Each Overbid Round</u>. Upon the solicitation of each round of applicable Overbids, the Debtors may, in consultation with the Committee, announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors and the Committee.

(c) <u>Overbid Alterations</u>. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(d) <u>Announcing Highest Bid</u>. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have identified (i)in the initial applicable Overbid round,

-10-

identified an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or (ii) in subsequent rounds, identified an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors—, in consultation with the Committee, as the Prevailing Highest Bid as well as the value attributable by the Debtors—, in consultation with the Committee, to such Prevailing Highest Bid.

    c.    **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment—, and in consultation with the Committee, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors—, the Committee, and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with the Committee, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider—, in consultation with the Committee, how to value each Overbid.

    d.    **Closing the Auction**.

    (a)    The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Committee, to be the highest or otherwise best Bid in accordance tih the Bid Assessment Criteria.  Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed.  The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

    (b)    The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid; *provided*, *however*, that the Debtors, subject to approval by the Bankruptcy Court, may determine to accept such Bid if such Bid may otherwise be deemed the Successful Bid.

35612177.1 07/11/2019
35612177.6 07/19/2019

      (c)      As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

**e.**      **No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder. All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors—, the Committee, and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

H.     Backup Bidder.

      a.      Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment—, in consultation with the Committee (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors. The Stalking Horse Bidder shall serve as a Backup Bidder only if (X) the Bid set forth in the Stalking Horse Agreement is not determined to be the Baseline Bid (as defined herein), and (Y) the Stalking Horse Bidder elects, in its sole discretion, to offer a higher and better bid at the Auction. The Stalking Horse Bidder's Bid described in the Stalking Horse Agreement shall not be a Backup Bid absent the express consent of the Stalking Horse Bidder.

      b.      The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder. The foregoing notwithstanding, if the Stalking Horse Bidder serves as the Backup Bidder, its Backup Bid shall expire on the earlier of closing on an Alternative Transaction (defined below) or September 6, 2019. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

      c.      If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors—, in consultation with the Committee, may select the applicable Backup Bidder as the Successful Bidder,

and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

I.      Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights, in consultation with the Committee, to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

J.      Sale Hearing.

A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on or before 10:00 a.m. (prevailing Eastern Time) on ~~July~~ August [●], 2019, before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Committee, by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder). The foregoing notwithstanding, if the Sale Hearing is continued without the consent of the Stalking Horse, the Stalking Horse may terminate the Stalking Horse Agreement.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

K.      Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions ~~and in the amount~~ set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

3561217.1 07/11/2019
3561217.6 07/19/2019

The ~~Debtors have agreed that their obligations to pay the~~ Break-Up fee, to the extent owed by the Debtors, ~~will~~ (a) shall be an allowed administrative expense claim under ~~sections~~ section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; (b) shall be payable at closing on of a Sale to a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**") without further order of the Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction. No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

L.      Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors ~~in their sole discretion~~, in consultation with the Committee, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction. The Stalking Horse Bidder shall not be required to provide a Deposit.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

M.      Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, prior to the ~~extent~~ commencement of the Auction if the Debtors' board of managers determines, ~~or~~ based on the advice of counsel, that taking such action, or refraining from taking such action, as ~~applicable~~ the case may be, is required to comply with applicable law or ~~its~~ the board's fiduciary obligations ~~under applicable law~~ thereunder; *provided* that ~~in the event of any such action, all rights and remedies~~, in the event the Debtors' board of managers determines to take any action, or refrain from taking any action, pursuant to this paragraph, without the consent of the Stalking Horse Bidder ~~in these Bidding Procedures or the Stalking Horse Sale Agreement shall be preserved~~, the Stalking Horse Bidder may, but shall not be required to, terminate the Stalking Horse Agreement if taking such action or refraining from taking such action, as the case may be, would otherwise be grounds for termination under the Stalking Horse Agreement, it being understood that any material modification to the Bid Procedures without the consent of the Stalking Horse would be a breach of the Stalking Horse Agreement pursuant to which the Stalking Horse would have the right to terminate the Stalking Horse Agreement.

-14-

# TAB 4

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Re: Docket No. 142** |
|  | ) |  |

## ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND <u>(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE</u>

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures Order**"): (a) approving the proposed bidding procedures attached as **<u>Schedule 1</u>** to this Bidding Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets; (b) establishing procedures for the assumption and assignment of executory contracts, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

(c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**")[3], the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. 246], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which is attached as Exhibit E to the Stalking Horse Sale Agreement: (x) authorizing the sale of the Residents Program Assets free and clear of Interests as defined in footnote 4, below (the "**Interests**")[4], with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter

---

[3]    The Court has been advised that Reading Hospital, a subsidiary of Tower Health, will actually serve as the Stalking Horse Bidder and, as a result, all references herein to the Stalking Horse Bidder shall be deemed to include Reading Hospital.

[4]    Interests shall include: (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or purchaser's interest in the Assigned Contracts and/or Residents Program Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the Pension Benefit Guaranty Corporation or any plan participant or beneficiary, (iv) tax claims (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, and with respect to the rights described in this sub-clause (v) only as they relate to the Resident Program Assets that are the subject of the Stalking Horse Bidder's Stalking Horse Sale Agreement.

35602324.10 07/19/2019

Appx. 00268

pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

Appx. 00269

States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D.      Notice of the Motion, as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order, was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Residents Program Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Residents Program Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Residents Program Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Health; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Accordingly, no further

notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order is necessary or required.

E.       The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion as relates to the entry of this Bidding Procedures Order, including, without limitation:   (a) approval of the Bidding Procedures; (b) approval of the selection of the Stalking Horse Bidder and approval of the Break-Up Fee to be paid to the Stalking Horse Bidder under the circumstances described in the Motion; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein.   Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.       Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.   The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

G.       The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair,

35602324.10 07/19/2019

Appx. 00271

reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates. The Break-Up Fee: (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H.     The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale Agreement. The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely. Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures). The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

I.      The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required.  The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.      The Auction and Sale Notice attached hereto as **Schedule 5** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d)  identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of all Interests, with all Interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.      All current and former patients of Debtor Center City Healthcare, LLC ("Center City") who have, as of the date of this order, asserted claims against Center City, including but not limited to claims formally asserted by the filing of suit or a proof of claim in these Bankruptcy Cases and claims informally asserted by letter or by a request for medical records

from a lawyer or otherwise (the "<u>Known Patient Creditors</u>") shall be treated as known creditors of the Debtors for purposes of notice requirements related to the Sale.

L. All current and former patients of Center City who, as of the date of this order, are not Known Patient Creditors (including current and former patients who are not, as of the date of this order, aware that they have or may have claims against the Debtors including such patients as to whom personal injury has not manifested as of the date of this order) (the "<u>Unknown Patient Creditors</u>") shall be treated as unknown creditors of the Debtors for purposes of the notice requirements related to the Sale.

M. The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1. The Motion is granted as provided herein.[5]

2. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I. <u>Timeline for the Sale</u>**

3. The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order. The Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), as indicated herein and in the Bidding Procedures, are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take

---

[5] Notwithstanding anything to the contrary herein, or in the Bidding Procedures, the acceptance of a Bid and Sale Agreement by the Debtors and the consummation of a Sale are subject to entry of the Sale Order.

any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Milestone | Proposed Date |
|---|---|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 |
| Sale Hearing | August 9, 2019 at 11:00 a.m. (prevailing Eastern Time) |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder (Other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) | (may be raised at the Sale Hearing) |

4.     For the avoidance of doubt, the Debtors, in consultation with the Committee, reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

II.     **The Bidding Procedures**

5.     The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on August 5, 2019. Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.      The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice).  The Auction will be conducted openly and all creditors and the Committee will be permitted to attend.

9.      Any creditor with a valid and perfected lien on all of the Residents Program Assets (each, a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in

interest to object to or challenge such creditor's lien thereunder (a "**Challenge**")), to credit bid all or any portion of such Secured Creditor's allowed secured claims to purchase the Residents Program Assets to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, unless otherwise ordered by the Bankruptcy Court for cause. The foregoing notwithstanding, any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee. In the event that the Committee, or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. In the event that such a creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash at the closing of the Sale.

10.     Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up Fee in lieu of cash and have the Break-Up Fee be treated as equal to cash in the same amount for the purposes of evaluating the overbid.

**III.     Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement**

11.     The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction. The Break-Up Fee described in the Bidding Procedures is approved. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' closing of the Sale with a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**"). If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; and (b) shall be payable in at closing on the Alternative Transaction without further order of this Court; and

Appx. 00277

(c) shall be payable solely from the proceeds of such Alternative Transaction. No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

**IV.** **Notice Procedures**

12. The Auction and Sale Notice is approved.

*A.* ***Notice of Sale, Auction, and Sale Hearing.***

13. Within two (2) business days after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the Auction and Sale Notice by first-class mail, electronic mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (a) the Notice Parties, (b) all Residents, and (c) all known creditors of Center City, including any Known Patient Creditors. In addition, on or before the Mailing Date, the Debtors shall serve the *Notice to Residents and Fellows Regarding Proposed Sale of Residency Program Assets* (the "**Residents' Notice**"), in substantially the form attached hereto as **Schedule 2**, on all Residents by first class mail or electronic mail.

14. Service of the Auction and Sale Notice and the Residents' Notice as described in paragraph 13 above shall be sufficient and proper notice of the and satisfies all due process requirements.

15. Within ten (10) days of the date of this Bidding Procedures Order, the Debtors shall cause the notice (the "**Publication Notice**") substantially in the form attached hereto as **Schedule 3** to be published once in the National Edition of *USA Today* and once in the *Philadelphia Inquirer*. The Publication Notice shall be sufficient and proper notice of the Sale to all creditors whose identities are unknown to the Debtors, including all of the Unknown Patient Creditors.

-12-

Appx. 00278

B. *Notice of Successful Bidder.*

16. As soon as reasonably practicable after the Bid Deadline, if no Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, or conclusion of the Auction, if a Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, the Debtors shall file on the docket, but not serve, a notice which shall identify the Successful Bidder.

## V.  Assumption and Assignment Procedures

17. The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

A. *Notice of Assumption and Assignment.*

18. The Debtors previously filed with the Court, [D.I. 246], a list (the "**Initial Designated Contracts List**") specifying:  (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Initial Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Initial Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Initial Designated Contract (the "**Cure Costs**").

19. On the Mailing Date, the Debtors shall serve the Notice of Proposed Assumption and Assignment of Executory Contracts attached hereto as **Schedule 4** (the "**Initial Notice of Assumption and Assignment**") on all Initial Designated Contract Counterparties by first-class

mail, email or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF.

20.     Any Initial Designated Contract Counterparty may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Initial Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance.  All Contract Objections must:  (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com) and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania, 19102, Attn: Jeffrey C. Hampton (jeffrey.hampton@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder (the "**Contract Notice Parties**") by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Initial Designated Contract Objection Deadline**").  Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

21.     If an Initial Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such Contract Objection will be determined at the Sale Hearing.

B.     ***Modification of Initial Designated Contracts List and Supplemental Notice of Assumption and Assignment.***

22.     Prior to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Stalking Horse Bidder. Subsequent to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Successful Bidder (who may be the Stalking Horse Bidder).

23.     Until the opening of business on the date of the Auction, if another Qualified Bid is received by the Bid Deadline, or the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline, at the request of the Stalking Horse Bidder, the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs. Following the conclusion of the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs, *provided*, *however*, that such deletion of any contracts shall not result in any reduction in the Purchase Price (as defined in the Stalking Horse Sale Agreement"), and any contracts added after the Auction will not be considered in connection with the right of termination in Article 9.1(c) of the Stalking Horse Sale Agreement. For the avoidance of doubt, the Initial Designated Contracts List may be modified more than

once. The contracts listed on the Initial Designated Contracts List, as modified from time to time, are hereafter referred to as the "**Designated Contracts**").

24.     In the event that the Initial Designated Contracts List is modified, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") on the affected counterparty in the same manner as the Initial Notice of Assumption and Assignment was served.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed contracts as was included in the Notice of Assumption and Assignment.

25.     Any counterparty to an executory contract listed on a Supplemental Notice of Assumption and Assignment (each a "**Supplemental Designated Contract Counterparty**") may file an objection with respect to the applicable Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs (but only to the extent reduced  as to contracts included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment), and (b) if such Designated Contract was not included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance.  All Supplemental Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the

35602324.10 07/19/2019

Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

26.     If a Supplemental Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute, (a) if the Supplemental Contract Objection Deadline is on or before the date of the Sale Hearing, such Supplemental Contract Objection will be determined at the Sale Hearing, and (b) if the Supplemental Contract Objection Deadline is after the date of the Sale Hearing the Debtors will seek an expedited hearing before the Court to determine the Supplemental Contract Objection.  If there is no such Supplemental Contract Objection (or such objection has been resolved), then the Debtors may submit an order to this Court, including by filing a certification of counsel, fixing the applicable Cure Costs and approving the assumption of the contract listed on a Supplemental Notice of Assumption and Assignment.

C.     *Additional Notice of Assumption and Assignment Procedures.*

27.     If the counterparty to any Designated Contract does not file and serve a Contract Objection or Supplemental Contract Objection, as applicable, in a manner that is consistent with the requirements set forth above, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling with respect to the applicable Designated Contract, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any claim related to such Designated Contract for any default occurring or continuing prior to the date of the assumption

and assignment of such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

28.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.  Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

## VI.     Sale Hearing.

29.     A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at **11:00 a.m. (prevailing Eastern Time) on August 9, 2019**, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder.  The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale.  In the event that the Successful Bidder cannot or refuses to consummate the Sale after the Sale has been approved by the Court, the Debtors may, in consultation with the Committee, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors, in consultation with the Committee, shall be

-18-

authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

30.　　Any and all objections, if any, to (a) the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement and (b) entry of the Sale Order approving such Sale (a "**Sale Objection**") must be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pa. 19406 Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Sale Objection Deadline**"). Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder (other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) (an "**Auction Objection**") must be raised at or prior to the Sale Hearing (the "**Auction Objection Deadline**"). Any party failing to timely file a Sale Objection or raise an Auction Objection, as applicable, will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the assets free and clear of any and all Interests. For the avoidance of doubt, if the Stalking Horse Bidder is selected as the Successful Bidder, but its successful Bid is not the Stalking Horse Bid or an increased bid based on an agreement substantially similar to the Stalking Horse Sale Agreement, objections to a Sale

to the Stalking Horse Bidder, limited to the changed terms (excluding any increase in price) may be raised by the Auction Objection Deadline.

## VII. <u>Miscellaneous.</u>

31.     Notwithstanding anything to the contrary in any asset purchase agreement or document relating to the Sale, the purchased assets (including the Residents Program Assets) shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action. The provisions of this paragraphs shall not apply to the Stalking Horse Sale Agreement, as the same may be modified other than any modifications to the defined term "Purchased Assets."

32.     This order and the Bidding Procedures shall be interpreted so as to afford the Debtors, in consultation with the Committee, the greatest opportunity to maximize the value of the Residents Program Assets for the benefit of the Debtors' estates *provided*, *however*, the provisions of this paragraph shall not apply to any matters affecting the Stalking Horse Bidder without the consent of the Stalking Horse Bidder.

33.     The Debtors, in consultation with the Committee as applicable, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

34.     Notwithstanding anything in the Motion, the Bidding Procedures, and/or the July 9, 2019 Stalking Horse LOI to the contrary, nothing in this Bidding Procedures Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability to the United States arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

35.     To the extent the Successful Bid or the Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" of successor liability for any liability to the United States arising from such provider agreement pursuant to section 363(f) of the Bankruptcy Code.

36.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

37.     This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors. Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

38.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions

of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

**Dated: July 19th, 2019**
**Wilmington, Delaware**

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**

# SCHEDULE 1

## BIDDING PROCEDURES

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## BIDDING PROCEDURES

On July 19, 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") as set forth herein, are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July 19, 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**"), or in accordance with the terms of such higher and better offer as determined by the Debtors, in consultation with the Committee, to be the Successful Bidder (defined below).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

A.     Submissions to the Debtors and the Committee.

All submissions to the Debtors and the Committee required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

a.     **Debtors**.  Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

b.     **Debtors' Counsel**.  Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

c.     **Debtors' Investment Banker**.  SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com).

d.     **Committee's Counsel**.  Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

B.     Potential Bidders.

The Debtors and their financial advisors have identified, and may in the future, in consultation with the Committee, identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**"), other than the Stalking Horse Bidder, must deliver or have previously delivered, if determined to be necessary by the Debtors:

a.     an executed confidentiality agreement on terms acceptable to the Debtors, in consultation with the Committee (a "**Confidentiality Agreement**"), to the extent not already executed; and

b.     the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

C.    Qualified Bidders.

    a.    A "**Qualified Bidder**" is a Potential Bidder:  (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined by the Debtors, in consultation with the Committee; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below).  On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times.  MidCap Funding IV Trust ("**Midcap**"), solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times; *provided* that MidCap Funding IV Trust's right to credit bid shall be subject to the provisions set forth in the Bidding Procedures Order and these Bidding Procedures.

    b.    If any Potential Bidder is determined by the Debtors, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

    c.    Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, in consultation with the Committee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

    d.    Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

D.    Due Diligence.

    **a.**    **Diligence Provided to Potential Bidders**.

Only (a) the Stalking Horse Bidder, and (b) Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders other than the Stalking Horse Bidder, the due

diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors, in consultation with the Committee, may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors, in consultation with the Committee, determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors, in consultation with the Committee, determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors, in consultation with the Committee, as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to MidCap and the Committee.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

**b.      Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Committee, to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

-4-

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

E.      Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors, in consultation with the Committee, in their reasonable business judgment, shall constitute a "**Qualified Bid**." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

a.    **Assets**. Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

b.    **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"). The Purchase Price must be in cash consideration and must equal or exceed $7,825,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) and (iii) a $100,000 incremental amount (a "**Minimum Bid**").

c.    **Deposit**. With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**"). Within three (3) business days after the conclusion of any Auction, the Successful Bidder and Backup Bidder shall submit by wire transfer of immediately available funds, a supplemental cash deposit in an amount that, when added to the amount of the Deposit, is equal to ten (10) percent of the aggregate cash Purchase Price set forth in their respective Successful Bid and Backup Bid. The foregoing notwithstanding, the Stalking Horse Bidder shall not be required to submit any Deposit.

d.    **Residents**. Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms. Each Bid must further provide a description of the Potential Bidder's accreditation status with the Accreditation Council on Graduate Medical Education, including a description of accredited residency and fellowship programs currently offered by the Potential Bidder and/or expected to be offered in the future.

e.      **Same or Better Terms**.   Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors, in consultation with the Committee.   Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors, in consultation with the Committee, that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f.      **Contingencies; No Financing or Diligence Outs**.   A Bid shall not be conditioned on (i) the Potential Bidder obtaining financing, (ii) approval of the Potential Bidder's shareholders, board of directors or other internal approval, or (iii) the outcome or completion of due diligence by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment, in consultation with the Committee, than those set forth in the Stalking Horse Sale Agreement.

g.      **Identity**.   Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.   Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.   Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.      **Demonstrated Financial Capacity**.   A Qualified Bidder must have, in the Debtors' business judgment, as determined in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.   Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i. **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Committee,.

j. **Binding and Irrevocable**. A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k. **Expenses; Disclaimer of Fees**. Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l. **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Committee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m. **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

n. **Adherence to Bid Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o. **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p. **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q. **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Bid Deadline**").

The Debtors reserve the right, in consultation with the Committee, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

F. Right to Credit Bid.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on all of the Resident Program Assets (a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object or challenge such creditor's lien thereunder (a "**Challenge**")) to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause. In the event that the Committee or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. If such creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash as the closing of the Sale.

In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up fee in lieu of cash.

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order.

Any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee.

G.    Auction.

If, prior to the Bid Deadline, the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. By 6:00 p.m. on the date of the Bid Deadline, the Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids were received prior to the Bid Deadline. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement) prior to the Bid Deadline, the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Committee (the "**Baseline Bid**"), and provide copies of all Qualified Bid Documents supporting the Baseline Bid and each other Qualified Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Committee, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, and may include, among other things: (a) the number, type, and nature of any changes to the Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on August 7, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

a.    **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction, in consultation with the Committee as applicable. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of

each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and the Committee and all creditors will be permitted to attend. The Qualified Bidders, including the Stalking Horse Bidder, may appear at the Auction in person or through duly authorized representatives.

b. **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a) **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth in the Bidding Procedures Order or these Bidding Procedures (including the requirement of a cash component sufficient to pay all costs of sale including the Break-Up Fee).

(b) **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may, in consultation with the Committee, announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors and the Committee.

(c) **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(d) **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have (i) in the initial Overbid round, identified an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or (ii) in subsequent rounds, identified an Overbid as

-10-

being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors, in consultation with the Committee, as the Prevailing Highest Bid as well as the value attributable by the Debtors, in consultation with the Committee, to such Prevailing Highest Bid.

    c.    **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Committee, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors, the Committee, and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with the Committee, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider, in consultation with the Committee, how to value each Overbid.

    d.    **Closing the Auction**.

    (a)    The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Committee, to be the highest or otherwise best Bid in accordance with the Bid Assessment Criteria. Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed. The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

    (b)    The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely.

    (c)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

**e.**     **No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that:  (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder.  All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors, the Committee, and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

H.     Backup Bidder.

a.     Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Committee (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.  The Stalking Horse Bidder shall serve as a Backup Bidder only if (X) the Bid set forth in the Stalking Horse Agreement is not determined to be the Baseline Bid (as defined herein), and (Y) the Stalking Horse Bidder elects, in its sole discretion, to offer a higher and better bid at the Auction.  The Stalking Horse Bidder's Bid described in the Stalking Horse Agreement shall not be a Backup Bid absent the express consent of the Stalking Horse Bidder.

b.     The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder.  The foregoing notwithstanding, if the Stalking Horse Bidder serves as the Backup Bidder, its Backup Bid shall expire on the earlier of closing on an Alternative Transaction (defined below) or September 6, 2019.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

c.     If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Committee, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

-12-

I.      Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights, in consultation with the Committee, to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

J.      Sale Hearing.

A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on **August 9, 2019, at 11:00 a.m. (ET)** before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Committee, by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder). The foregoing notwithstanding, if the Sale Hearing is continued without the consent of the Stalking Horse, the Stalking Horse may terminate the Stalking Horse Agreement.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

K.      Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

The Break-Up fee, to the extent owed by the Debtors, (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; (b) shall be payable at closing on of a Sale to a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**")without further order of the Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

L.      Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors, in consultation with the Committee, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction. The Stalking Horse Bidder shall not be required to provide a Deposit.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

M.      Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures prior to the commencement of the Auction if the Debtors' board of managers determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as the case may be, is required to comply with applicable law or the board's fiduciary obligations thereunder; *provided* that, in the event  the Debtors' board of managers determines to take any action, or refrain from taking any action, pursuant to this paragraph, without the consent of the Stalking Horse Bidder, the Stalking Horse Bidder may, but shall not be required to, terminate the Stalking Horse Agreement if taking such action or refraining from taking such action, as the case may be, would otherwise be grounds for termination under the Stalking Horse Agreement, it being understood that any material modification to the Bid Procedures without the consent of the Stalking Horse would be a breach of the Stalking Horse Agreement pursuant to which the Stalking Horse would have the right to terminate the Stalking Horse Agreement.

**SCHEDULE 2**

**RESIDENT'S NOTICE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## NOTICE TO RESIDENTS AND FELLOWS
## REGARDING PROPOSED SALE OF RESIDENCY PROGRAM ASSETS

## TO: ALL RESIDENTS AND FELLOWS AT HAHNEMANN UNIVERSITY HOSPITAL:

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Tower Health ("**Tower**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to Tower: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors file a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**"). A copy of the Agreement, the Bidding Procedures Order and the Bidding Procedures is enclosed herewith.

**THE PROPOSED SALE**

If approved by the Court, the Agreement will enable residents and fellows (collectively herein, the "**Residents**") at Hahnemann to continue their training at one of six hospitals operated by Tower - Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania. **Residents have a choice, and are not required to continue their training with Tower**. For any Resident who elects to complete their training elsewhere, Tower or the Debtors, as applicable, will release the related cap on Medicare reimbursement on a temporary basis to accommodate that choice.

For Residents who elect to stay with Tower, Tower will provide housing for those residents doing rotations at Reading Hospital, which is sixty miles from Hahnemann. Tower has also agreed to seek to hire the faculty who are currently training Residents at Hahnemann to ensure continuity of the Hahnemann training programs. Tower will also provide free housing (subject to parameters set forth in the Agreement) for the remainder of the academic year or during the term of a resident's existing vacated lease if it is necessary for the Resident to relocate during the current academic year. Residents will receive free meals while in any Tower hospital, and Tower will also provide additional amenities to assist Residents and their families with the transition.

If the Sale is approved by the Court to someone other than Tower, the terms of the Sale, and the impact upon Residents, may be different than those under the Agreement.

The Debtors recognize the unique difficulties and challenges facing Residents in light of the bankruptcy filing and expected closure of Hahnemann. The Debtors believe that the proposed Sale is in the best interests of Residents because it provides Residents with the option to continue their training and, to minimize, to the greatest extent possible, the impact of Hahnemann's closure on Residents, their professional training and education, and their families.

**Obtaining Additional Information**

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys,

whose contact information is in the signature block below, for more information. In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; and (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:*/s/ Aaron S. Applebaum*
 Mark Minuti (DE Bar No. 2659)
 Monique B. DiSabatino (DE Bar No. 6027)
 1201 N. Market Street, Suite 2300
 P.O. Box 1266
 Wilmington, DE  19899
 Telephone: (302) 421-6800
 Fax: (302) 421-5873
 mark.minuti@saul.com
 monique.disabatino@saul.com

  -and-

 Jeffrey C. Hampton
 Adam H. Isenberg
 Aaron S. Applebaum (DE Bar No. 5587)
 Centre Square West
 1500 Market Street, 38th Floor
 Philadelphia, PA 19102
 Telephone: (215) 972-7700
 Fax: (215) 972-7725
 jeffrey.hampton@saul.com
 adam.isenberg@saul.com
 aaron.applebaum@saul.com

 *Proposed Counsel for Debtors and*
 *Debtors in Possession*

**SCHEDULE 3**

**PUBLICATION NOTICE**

Appx. 00309

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) |
|  | ) |

## NOTICE REGARDING PROPOSED SALE OF RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL INTERESTS, INCLUDING PERSONAL INJURY CLAIMS

**TO: ALL PERSONS WITH CLAIMS AGAINST THE DEBTORS IN THE ABOVE CAPTIONED CASES, INCLUDING CLAIMS AGAINST HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Reading Hospital (the "**Purchaser**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to the Purchaser: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

**PLEASE TAKE FURTHER NOTICE** that the Sale, if approved, will be free and clear of all Interests, including claims of successor liability.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Appx. 00310

**PLEASE TAKE FURTHER NOTICE THAT, IF THE SALE IS APPROVED, THE PURCHASER WILL NOT BE LIABLE ON ACCOUNT OF ANY CLAIMS AGAINST ANY OF THE DEBTORS (OTHER THAN CLAIMS AFFIRMATIVELY ASSUMED BY THE PURCHASER), INCLUDING CLAIMS OF PATIENTS TREATED AT HAHNEMANN, INCLUDING CLAIMS OF WHICH THE HOLDER MAY NOT BE PRESENTLY AWARE.**

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors filed a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**").

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys, whose contact information is below, for more information. In addition, Residents should contact their Program Director with questions specific to their situation.

## Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower, and (d) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019           **SAUL EWING ARNSTEIN & LEHR LLP**

By:*/s/ Mark Minuti*
      Mark Minuti (DE Bar No. 2659)
      Monique B. DiSabatino (DE Bar No. 6027)
      1201 N. Market Street, Suite 2300
      P.O. Box 1266
      Wilmington, DE 19899
      Telephone: (302) 421-6800
      Fax: (302) 421-5873
      mark.minuti@saul.com
      monique.disabatino@saul.com

         -and-

      Jeffrey C. Hampton
      Adam H. Isenberg
      Aaron S. Applebaum (DE Bar No. 5587)
      1500 Market Street, 38th Floor
      Philadelphia, PA 19102
      Telephone: (215) 972-7700
      Fax: (215) 972-7725
      jeffrey.hampton@saul.com
      adam.isenberg@saul.com
      aaron.applebaum@saul.com

      *Proposed Counsel for Debtors and*
      *Debtors in Possession*

# SCHEDULE 4

## INITIAL NOTICE OF ASSUMPTION AND ASSIGNMENT

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## NOTICE OF PROPOSED ASSUMPTION AND
## ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 and July 1, 2019 (the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion [D.I. 142] (the "**Sale Motion**") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets (the "**Residents Program Assets**") to Tower Health (the "**Stalking Horse Bidder**"), including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"), attached as **Exhibit B** to the Sale Motion; (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July 19, 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") [D.I. [●]] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herewith.

**PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder, or any other Successful Bidder, the Designated Contracts. A schedule listing the Designated Contracts (the "**Designated Contracts List**") is attached hereto and may also be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "**Cure Payments**") is set forth on the Designated Contracts List.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO AN INITIAL DESIGNATED CONTRACT IN THE INITIAL DESIGNATED CONTRACTS LIST**. Under the terms of the proposed Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Designated Contracts until the opening of business on the date of the Auction, or until the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline. Following the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Payments. If the Initial Designated Contracts List is modified, the Debtors will serve a supplemental notice of assumption and assignment on the affected counterparty, which shall identify the deadline for filing an objection with respect to the applicable Designated Contract.

### IMPORTANT PROPOSED DATES AND DEADLINES

1.  The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "**Sale Order**") and all objections related to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m. (ET)** (the "**Sale Objection Deadline**").

2.  The Auction for the Residents Program Assets, if one is necessary, will commence on **August 7, 2019 at 10:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

3.  A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

35599108.3 07/19/2019

Appx. 00315

## FILING ASSUMPTION AND ASSIGNMENT OBJECTIONS

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("**Designated Contract Objections**"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on August 5, 2019**. Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

Failure to timely file a timely Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE A TIMELY OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE PROPOSED BIDDING PROCEDURES ORDER AND THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

35599108.3 07/19/2019

Appx. 00316

Dated: July 19, 2019          **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
     Mark Minuti (DE Bar No. 2659)
     Monique B. DiSabatino (DE Bar No. 6027)
     1201 N. Market Street, Suite 2300
     P.O. Box 1266
     Wilmington, DE 19899
     Telephone: (302) 421-6800
     Fax: (302) 421-5873
     mark.minuti@saul.com
     monique.disabatino@saul.com

         -and-

     Jeffrey C. Hampton
     Adam H. Isenberg
     Aaron S. Applebaum (DE Bar No. 5587)
     Centre Square West
     1500 Market Street, 38th Floor
     Philadelphia, PA 19102
     Telephone: (215) 972-7700
     Fax: (215) 972-7725
     jeffrey.hampton@saul.com
     adam.isenberg@saul.com
     aaron.applebaum@saul.com

     *Proposed Counsel for Debtors and*
     *Debtors in Possession*

**Designated Contracts List**

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Master Agreement for Shared Rotational Arrangements with Hahnemann University Hospital dated June 29, 2007 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $0.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Temple University Hospital | Academic Affiliation Agreement with Tenet HealthSystem St. Christopher's Hospital for Children, LLC, dated October 19, 2007 | $0.00 |
| 15 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |

35599108.3 07/19/2019

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 17 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |
| 18-X | [INDIVIDUAL RESIDENTS] (to be provided and/or filed under seal) | Resident Employment Contract | $0.00 |

35599108.3 07/19/2019

Appx. 00319

# SCHEDULE 5

## AUCTION AND SALE NOTICE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) |
|  | ) |

### NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 and July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale and Bidding Procedures Motion**")[2] seeking the entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of certain of the Debtors' assets to Tower Health (the "**Stalking Horse Bidder**") for $7.5 million plus the assumption of certain contracts and responsibilities of the Debtors with respect to Residents at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) the form and manner of notices related to the Sale; and (c) procedures for the assumption and assignment of contracts in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that on July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety. To the extent that there are any inconsistencies between the Bidding Procedures and the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bidding Procedures Motion.

summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects. The deadline by which all Bids must be *actually received* by the parties specified in the Bidding Procedures Order is August 5, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Residents Program Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

| Proposed Investment Banker to Debtors | Proposed Counsel to Debtors |
|---|---|
| SSG Advisors, LLC<br>Five Tower Bridge, Suite 420<br>300 Barr Harbor Drive<br>West Conshohocken, PA 19428<br>J. Scott Victor (jsvictor@ssgca.com)<br>Teresa Kohl (tkohl@ssgca.com)<br>Craig Warznak (cwarznak@ssgca.com)<br>(610) 940-3615 | Saul Ewing Arnstein & Lehr LLP<br>1201 N. Market Street,  Suite 2300<br>Wilmington, Delaware 19899<br>Mark Minuti (mark.minuti@saul.com),<br>Jeffrey C. Hampton (jeffrey.hampton@saul.com),<br>Aaron S. Applebaum (aaron.applebaum@saul.com)<br>(215) 972-7777 |

## Obtaining Additional Information

Copies of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Purchase Agreement and all other documents filed with the Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

## Important Dates and Deadlines

1. The deadline to submit a Qualified Bid is August 5, 2019 at 4:00 p.m. (prevailing Eastern time).

2. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "**Sale Order**") and all objections relating to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m.** (prevailing Eastern time) (the "**Sale Objection Deadline**").

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Residents Program Assets. The Auction, if one is necessary, will commence on August 7, 2019 at 10:00 a.m. (prevailing Eastern time), or such other date as determined by the Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre

Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

4. Objections to the conduct of the Auction and the terms of a sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "**Auction Objections**") may be raised at the Sale Hearing (as defined below).

5. A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Court on **August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

### Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Appx. 00323

Dated: July 19, 2019     **SAUL EWING ARNSTEIN & LEHR LLP**

By:*/s/ Aaron S. Applebaum*
  Mark Minuti (DE Bar No. 2659)
  Monique B. DiSabatino (DE Bar No. 6027)
  1201 N. Market Street, Suite 2300
  P.O. Box 1266
  Wilmington, DE 19899
  Telephone: (302) 421-6800
  Fax: (302) 421-5873
  mark.minuti@saul.com
  monique.disabatino@saul.com

    -and-

  Jeffrey C. Hampton
  Adam H. Isenberg
  Aaron S. Applebaum (DE Bar No. 5587)
  Centre Square West
  1500 Market Street, 38th Floor
  Philadelphia, PA 19102
  Telephone: (215) 972-7700
  Fax: (215) 972-7725
  jeffrey.hampton@saul.com
  adam.isenberg@saul.com
  aaron.applebaum@saul.com

  *Proposed Counsel for Debtors and*
  *Debtors in Possession*

-4-

Appx. 00324

# TAB 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*,[1] | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket No. 142, 246, 249**<br>**Obj. Deadline: August 5, 2019 (4:00 p.m.)** |

OBJECTION OF THE UNITED STATES
TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING THE SALE OF THE
DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS TO THE STALKING HORSE
BIDDER ON THE TERMS OF THE STALKING HORSE BID AS SET FORTH IN THE
STALKING HORSE SALE AGREEMENT

The United States of America (the "United States"), on behalf of the Department of Health

and Human Services ("HHS"), acting through its designated component, the Centers for Medicare

& Medicaid Services ("CMS"), hereby files this objection to the *Debtors' Motion for Entry of*

*Order Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens,*

*Claims, Encumbrances, and Interests to the Stalking Horse Bidder on the terms of the Stalking*

*Horse Bid as set forth in the Stalking Horse Sale Agreement*. Because the Stalking Horse Sale

---

[1] The Debtors in these jointly administered cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

1

Appx. 00325

Agreement, Dkt. 246-1, is contrary to law and contravenes CMS regulations, the Court should not approve the sale.[2]

While the United States does not oppose the transition of the Hahnemann University Hospital ("Hahnemann") residents and fellows to alternative hospitals, the United States objects to the terms of the proposed sale of "resident program assets" as set forth in the Stalking Horse Sale Agreement, which improperly attempts to "discharge" monies owed to CMS and seeks to avoid the successor liability of the Stalking Horse purchaser ("Reading Hospital" or "Tower") under the assumed and assigned Medicare Part A Provider Agreement.

The United States also objects to the sale to the extent that it transfers the resident program assets, Hahnemann's Medicare Provider Agreement, and Hahnemann's programs for training residents to Reading Hospital when Debtors seek to close Hahnemann. Hahnemann's Provider Agreement terminates with its closure, making it ineligible to be transferred. The anticipated transfer of the residency program itself (separate from the provider agreement) must also satisfy Medicare Program requirements and be approved by HHS.

## REGULATORY BACKGROUND

1.      Certain of the Debtors are "providers" of hospital and skilled nursing services under the Social Security Act, 42 U.S.C. § 1395-1395lll and 42 C.F.R. Chapter IV and CMS policies and procedures (collectively, the "Medicare Program"). To be eligible to be reimbursed for services to Medicare beneficiaries, certain Debtors are party to separate Medicare Part A provider agreements ("Provider Agreements"). 42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider"). A Provider Agreement is defined as an agreement between CMS and a hospital,

---

[2] Any capitalized term not defined herein shall have the meaning ascribed to the term in the Bid Procedures Motion.

Appx. 00326

skilled nursing facility, home health agency, clinic, outpatient rehabilitation facility, hospice, or community mental health center. 42 C.F.R. §§ 489.2 and 489.3.

2.       To obtain a Provider Agreement, a new provider must apply for initial certification. *See* 42 C.F.R. §§ 488.1, 488.3, 489.1, 489.2 and 489.10. The certification process enables HHS to determine, *inter alia*, that the provider is qualified to provide health care services to patients. *See* 42 C.F.R. §§ 489.10-.12 (grounds for denying a Provider Agreement); *see also* 42 C.F.R. Part 418 (health and safety requirements to qualify as a hospice).

3.       As a result, the transfer of a Provider Agreement is strictly limited. Provider Agreements may be assigned only if there is a "change of ownership." 42 C.F.R. § 489.18. When CMS determines that a valid "change of ownership" has occurred, the existing Provider Agreement is automatically assigned to the new owner. *See* 42 C.F.R. § 489.18(c); *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994). An assigned agreement is subject to all statutory and regulatory terms under which it originally was issued, including the adjustment of payments to account for previously made overpayments. *Vernon*, 21 F.3d at 696 (*citing* 42 C.F.R. § 489.18(a), (d)).

4.       HHS contracts with Medicare Administrative Contractors ("MACs") to administer payment to providers for Medicare covered services. MACs make interim payments to providers in accordance with the Medicare Program and perform the day-to-day administration of Medicare, *e.g.*, audit and reimbursement activities. 42 U.S.C. § 1395kk-1; 42 C.F.R. §§ 421.400–.404.

5.       At their request, certain of Debtors' facilities receive Medicare Periodic Interim Payments ("PIP"). 42 U.S.C. § 1395g(e)(2); 42 C.F.R. § 418.307, 42 C.F.R. § 413.64(h)(2)(v). The PIP is adjusted to make it consistent with current claim levels, and to determine overpayments for the current fiscal year. Alternatively, the MAC may adjust payments to assure that total

3

payments at the end of the fiscal year approximate, as closely as possible, the reimbursement determined to be due after review and audit of the provider's cost report.  42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(h)(6-7).

6.      Within five months after the end of the cost year, a provider must submit a report of its costs to verify the actual reimbursements owed to it for the past cost year.  42 C.F.R. §§ 413.1, 413.20, 413.24(f); *see* 42 U.S.C. §§ 1395g and 1395hh (giving the Secretary authority to require submission of cost reports).  Once the cost report is submitted, the MAC audits the cost report and determines the provider's actual, rather than estimated, reimbursement amount for the year, which can result in overpayment or underpayment claims.  42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 42 C.F.R. § 413.24.  Following an audit, providers have various appeal rights, including judicial review, with respect to the MAC's determination.  *See, e.g.*, 42 C.F.R. § 405.1807; 42 U.S.C. § 1395oo(f)(1).

7.      In addition, by motion of the MAC or the provider, or at the direction of CMS, final cost report determinations are subject to reopening for up to three years from their issuance in order to make corrections.  42 C.F.R. § 405.1885.

## FACTUAL AND PROCEDURAL BACKGROUND

8.      On July 1, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.      Since before the Petition Date, certain of the Debtors participated in the Medicare Program as Medicare Part A providers under their Provider Agreements.  For purposes of this objection, Center City Healthcare, LLC d/b/a Hahnemann University Hospital (Part A) has a Provider Agreement with the United States.

Appx. 00328

10. In the ordinary course of business, the MACs may determine Medicare overpayments owed by the Debtors relating to prepetition service dates and postpetition service dates under the Medicare Program.

11. On July 19, 2019, Debtors filed the Stalking Horse Sale Agreement (Asset Purchase Agreement). Dkt. 246-1.

12. Later that same day, the Court issued an Order establishing bidding procedures for the potential sale of Hahnemann resident program assets. Dkt. 249.

13. The Stalking Horse Sale Agreement indicates that Hahnemann's Medicare Provider Agreement will be assumed and transferred to Reading Hospital. Stalking Horse Sale Agreement, Sched. A-1 (IV); *see id.* at Sched A (defining "Excluded Assets" as including "Assigned Contracts . . . identified on Schedule A-1").

14. The Stalking Horse Sale Agreement does not provide that Reading Hospital will be required to assume all liabilities relating to the Provider Agreement. Furthermore, the Stalking Horse Sale Agreement does not specify that any assumption and assignment of the Provider Agreement must comply with section 365 of the Bankruptcy Code and the Medicare Program.

15. Instead, as set forth in the Stalking Horse Sale Agreement, Debtors are *not* assuming and assigning all liabilities associated with the Medicare provider agreement. The Stalking Horse Sale Agreement establishes a $3,000,000 Escrow Amount to "cover [certain] following losses, damages and expenses," including a "CMS Discharge Amount." Stalking Horse Sale Agreement, Art. III (3.1).

16. The Stalking Horse Sale Agreement defines the "CMS Discharge Amount" as "a dollar amount agreed to by and between CMS and the Seller which amount shall be the

Appx. 00329

maximum Cure Costs due on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement." Stalking Horse Sale Agreement, Art. I (page 4).

17.     CMS has not agreed to any discharge amount or maximum Cure Costs due. Neither Debtors nor Reading Hospital has contacted the Department of Justice to discuss any "discharge."

18.     The Stalking Horse Sale Agreement also states that the Debtors and Reading Hospital will obtain "Regulatory Approvals," including from CMS. Stalking Horse Sale Agreement, Art. VII (7.1(c)). The Agreement states that CMS "shall have consented to the transactions contemplated by this Agreement." *Id.* Neither Debtors nor Reading Hospital has contacted the Department of Justice to discuss any such regulatory approvals.

19.     The Stalking Horse Sale Agreement also contemplates the assumption of Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health. Stalking Horse Sale Agreement, Sched. A-1 (I).

## ARGUMENT

20.     The Court should not approve the Stalking Horse Sale Agreement. Under the Agreement, Debtors improperly seek to transfer the Hahnemann Medicare Provider Agreement in a manner inconsistent with federal law.

21.     Because Debtors are closing Hahnemann, Hahnemann's Provider Agreement will terminate when its business shuts down. 42 C.F.R §§ 489.52(b)(3); 413.79(h). Thus, Debtors may not assume and assign the Provider Agreement.

Appx. 00330

22.     Even if Debtors could assign the Provider Agreement, under the Stalking Horse Sale Agreement, Debtors improperly seek to transfer the Hahnemann Provider Agreement in a manner inconsistent with federal law. A Medicare Provider agreement may only be assumed under 42 C.F.R. § 489.18. The Stalking Horse Sale Agreement does not, however, set forth a valid change of ownership (CHOW) under section 489.18 because Reading Hospital is not purchasing all or substantially all of the assets necessary to actually operate Hahnemann. The CMS Discharge Amount is also contrary to the provision that "the existing provider agreement will automatically be assigned to the new owner." 42 C.F.R. § 489.18(c). In particular, the CMS Discharge Amount limits Reading Hospital's successor liability and is contrary to CMS's right to recoup.

23.     The Stalking Horse Sale Agreement fails to state that Reading Hospital assumes all liabilities, including but not limited to the Overpayment Claims and any unliquidated pre-Closing overpayment claims, related to the transferred Provider Agreement. Instead, and contrary to law, the Stalking Horse Sale Agreement includes a CMS Discharge Amount, explicitly and improperly limiting Reading Hospital's assumption of liabilities.

24.     If the Debtors seek to transfer the Hahnemann Provider Agreement, they must do so consistent with applicable federal law, including the Medicare Program as well as the Bankruptcy Code. As indicated in the Bidding Procedures, "Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act." Dkt. 249 at ¶ 34.

25.     Specifically, the transfer of the Provider Agreement contemplated in the Stalking Horse Sale Agreement would violate the requirements of the Medicare Program for transfer of a provider agreement. The Debtors cannot sell, transfer, assume and/or assign the Hahnemann Provider Agreement to the Successful Bidder without providing that the purchaser will assume

7

liability for any pre-Closing Medicare overpayments (including those determined after any closing) and any successor liability claims. *See United States v. Vernon Home Health, Inc*., 21 F.3d 693, 696 (5th Cir. 1994) (purchaser "accept[ed] the automatic assignment of the provider agreement," making it jointly and severally liable with seller for overpayments, pursuant to the Medicare Program, including at 42 C.F.R. § 489.18(d)). Therefore, Reading Hospital must agree to assume liabilities for any pre-closing Medicare overpayments, including any previously determined and any determined in the future. Under the terms of the Stalking Horse Sale Agreement, Reading Hospital is not fully assuming those liabilities.

26. Moreover, under binding precedent in the Third Circuit, the Provider Agreement is treated as an executory contract that may only assumed and assigned pursuant to section 365 of the Bankruptcy Code. *University Med. Ctr. v. Sullivan* (*In re University Med. Ctr.*), 973 F.2d 1065, 1075 (3d Cir. 1992). If the Debtors assume and assign the Provider Agreement to Reading Hospital, the Debtors must fully cure the defaults associated with the Provider Agreement, and Reading Hospital must assume all of the burdens along with the benefits arising from assignment of the Provider Agreement. *See* 11 U.S.C. § 365(a), (b); *University Med. Ctr.*, 973 F.2d at 1075 (holding that "[a]ssumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits," and specifically referring to a provider agreement); 42 C.F.R. § 489.18(d) ("An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued"); *Vernon Home Health, Inc*., 21 F.3d at 696 (new owner that accepted assignment of Medicare provider agreement was liable for overpayments of prior owner); *Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103 (8th Cir. 2000) (new owner of a skilled nursing facility was liable for penalties assessed on the basis of the former owner's actions); *Eagle Healthcare, Inc. v. Sebelius*, 969 F.

8

Supp. 2d 38, 40 (D.D.C. 2013) ("An assigned Provider Agreement is subject to all of the terms and conditions under which it was originally issued."). *See also In re Charter Behavioral Health Sys., LLC*, 45 Fed. Appx. 150, 151, 2002 WL 2004651, *1 n.1 (3d Cir. June 3, 2002) (observing that "[i]f the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments *but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner*") (emphasis added) (*citing* 42 C.F.R. § 489.18(d); *Deerbrook Pavilion, LLC*, 235 F.3d at 1103-05; *Vernon*, 21 F.3d at 696).

27. Moreover, the Anti-Assignment Act, and thus section 365(c)(1) of the Bankruptcy Code, preclude the Debtors from assuming and/or assigning their Provider Agreement with the United States to the purchaser without the consent of the United States. *See, e.g.*, *In re West Electronics, Inc.*, 852 F.2d 79, 83-84 (3d Cir. 1988) (Anti-Assignment act precludes debtors from obtaining a legally cognizable interest in executory contract where the other party to the contract, the United States, refused to consent to the assignment of the contract.). The United States will not consent to transfer of any Provider Agreement unless Reading Hospital would be subject to all the burdens of the Provider Agreement in compliance with the Medicare Program.

28. Because the Stalking Horse Sale Agreement suggests that Reading Hospital is not acquiring the Provider Agreement in order to provide services, but merely in order to collect reimbursements earned by the Debtors before the transfer, the purchase is not likely to satisfy the Assignment of Claims Act, 31 U.S.C. § 3727, which strictly limits assignment of the authorization to receive payment on claims against the United States. Even if a claim is successfully assigned consistent with Assignment of Claims Act, any payments made by the United States are subject to

reduction or setoff (with the exception of certain unique circumstances inapplicable here).  31 U.S.C. § 3727(d)).

29.     In addition, the CMS Discharge Amount is one of several types of costs or liabilities that the Stalking Horse Sale Agreement limits to the $3 million cap for the Escrow Amount. Stalking Horse Sale Agreement, Art. III (3.1) (identifying "Permitted Escrow Withdrawals" as "(a) the Tail Coverage Costs, (b) the CMS Discharge Amount, as and when liquidated, (c) the Cure Costs not paid on the Closing Date and not included in the CMS Discharge Amount, and (d) the Losses payable to a Purchaser Indemnified Party.").  Depending on the amount of those costs or liabilities, if the sale to Reading Hospital is approved, CMS may only recover a fraction of Hahnemann's overpayments from the Escrow Amount.

30.     The Stalking Horse Sale Agreement is also contrary to law in contemplating that Debtors may assume and assign Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health.  *See* Stalking Horse Sale Agreement, Sched. A-1 (I). The applicable statute (42 USC § 1395ww(h)(4)(H)) and regulation (42 CFR § 413.79(h)) do not contemplate that a hospital chain can absorb one hospital's residency slots and distribute those slots amongst its affiliated hospitals.  Instead, only a "preference" is given to hospitals that are members of the same affiliated group for purposes of receiving temporary funding.  *Id.*  The fact that Debtors and Tower apparently entered into an affiliation agreement as of July 1, 2019, Stalking Horse Sale Agreement, Sched. A-1 (V), does not alter that conclusion.  Under § 413.79(f)(2), "[e]ach hospital in the Medicare GME affiliated group must have a shared rotational arrangement . . . with at least one other hospital within the Medicare GME affiliated group, and all of the hospitals within the Medicare GME affiliated group must be connected by a series of such shared rotational arrangements."  *See also* § 413.79(f)(5) ("If the Medicare GME affiliation agreement

10

terminates for any reason, the FTE cap of each hospital in the Medicare GME affiliated group will revert to the individual hospital's pre-affiliation FTE cap that is determined under the provisions of paragraph (c) of this section.").  If Hahnemann closes, it will not have a shared rotational arrangement with Tower.

31.     In communications with counsel for Debtors and for Tower, and at the July 19, 2019 hearing on the bid procedures for this potential sale, the United States has expressed its concerns with and objection to the sale as contemplated.  However, counsel for Debtors and/or Tower have not subsequently communicated with the undersigned regarding the potential sale.

## CONCLUSION

For the foregoing reasons, the Court should not approve the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement.

Appx. 00335

Dated:  August 5, 2019     Respectfully submitted


         JOSEPH H. HUNT
         Assistant Attorney General

         DAVID C. WEISS
         United States Attorney

         ELLEN SLIGHTS
         Assistant United States Attorney

         /s/ Marc S Sacks
         RUTH A. HARVEY
         MARGARET M. NEWELL
         MARC S. SACKS

         Department of Justice
         Commercial Litigation Branch,
         Civil Division
         P.O. Box 875, Ben Franklin Station
         Washington, DC 20044-0875
         Tel. (202) 307-1104
         Fax (202) 514-9163
         marcus.s.sacks@usdoj.gov

         ATTORNEYS FOR THE UNITED STATES

Appx. 00336

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of August 2019, I caused a true and correct copy of the foregoing objection to be served via electronic mail upon all parties receiving electronic notice under the Court's CM/ECF system.


s/ Marc S Sacks
MARC S. SACKS

Appx. 00337

# TAB 6

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) **Re: Docket Nos. 142 and 249** |
| Debtors. | ) |

### CERTIFICATION OF COUNSEL REGARDING AUCTION RELATING
### TO THE SALE OF THE DEBTORS' RESIDENTS PROGRAM ASSETS

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by

and through their proposed undersigned counsel, hereby certify as follows:

1.        On July 1, 2019, the Debtors filed the *Debtors Motion for Entry of Orders (I)(A)*

*Establishing Bidding Procedures Relating to the Sale of the Debtors Residents Program Assets,*

*Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption*

*and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts,*

*and (C) Approving the Form and Manner of Notice Relating Thereto, and (D) Scheduling a*

*Hearing to Consider the Proposed Sale; and (II)(A) Approving the Sale of the Debtors Residents*

*Program Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and*

*(B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and*

*(III) Granting Related Relief* [Docket No. 142] (the "**Residents Program Assets Sale**

**Motion**").

---

[1]        The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St.
Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of
PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care
Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast
Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C.
(5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is
230 North Broad Street, Philadelphia, Pennsylvania 19102.

2.      On July 19, 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**")[2] [D.I. 249] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures.

3.      On July 23, 2019, the Debtors served the Initial Notice of Assumption and Assignment on all counterparties to the Initial Designated Contracts.  The Bidding Procedures Order authorizes the Debtors to modify the Initial Designated Contracts, and to serve a supplemental notice on each affected counterparty.

4.      On August 7, 2019, the Debtors caused a Supplemental Notice of Proposed Assumption and Assignment of Executory Contracts (the "**First Supplemental Notice**"), with a modified list of Designated Contracts, to be served on each affected counterparty.

5.      On August 8, 2019, the Debtors conducted an Auction pursuant to the Bidding Procedures with respect to the proposed Sale of the Residents Program Assets.  At the conclusion of the Auction, Thomas Jefferson University Hospitals, Inc. was determined by the Debtors, in consultation with the Committee, to have submitted the Successful Bid and was designated the Successful Bidder.  The Stalking Horse Bidder was determined to have submitted the Backup Bid and was thus designated the Backup Bidder.

6.      Attached hereto as **Exhibit A** is a copy of the asset purchase agreement submitted by the Successful Bidder representing the Successful Bid.  A redline reflecting all changes from the Stalking Horse Bid to the Successful Bid is attached hereto as **Exhibit B**.

7.      On August 22, 2019, the Debtors caused a Second Supplemental Notice of Proposed Assumption and Assignment of Executory Contracts (the "**Second Supplemental**

---

[2]      Capitalized terms used but not defined herein have the meaning stated in the Bidding Procedures Order.

Notice"), identifying the Successful Bidder and including a modified list of Designated Contracts, to be served on each affected counterparty. A true and correct copy of the Second Supplemental Notice is attached hereto as **Exhibit C**.

Dated: August 29, 2019            **SAUL EWING ARNSTEIN & LEHR LLP**

                  By:     */s/ Aaron S. Applebaum*
                            Mark Minuti (DE Bar No. 2659)
                            Monique B. DiSabatino (DE Bar No. 6027)
                            1201 N. Market Street, Suite 2300
                            P.O. Box 1266
                            Wilmington, DE 19899
                            Telephone: (302) 421-6800
                            Fax: (302) 421-5873
                            mark.minuti@saul.com
                            monique.disabatino@saul.com

                                    -and-

                            Jeffrey C. Hampton
                            Adam H. Isenberg
                            Aaron S. Applebaum (DE Bar No. 5587)
                            Centre Square West
                            1500 Market Street, 38th Floor
                            Philadelphia, PA 19102
                            Telephone: (215) 972-7700
                            Fax: (215) 972-7725
                            jeffrey.hampton@saul.com
                            adam.isenberg@saul.com
                            aaron.applebaum@saul.com

                            *Counsel for Debtors and Debtors in Possession*

# EXHIBIT A

**Asset Purchase Agreement – Successful Bid**

Appx. 00341

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CENTER CITY HEALTHCARE, LLC,**

**as Seller,**

**AND**

**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.**

**as Purchaser**

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of August, 2019, by and between Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital (the "**Seller**" or "**Hahnemann**"), a Delaware limited liability company and Thomas Jefferson University Hospitals, Inc. (the "**Purchaser**"), a Pennsylvania nonprofit corporation.  The Seller and the Purchaser are sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Seller is engaged in the business of owning and operating an acute care hospital, including a graduate medical education program (the "**Business**"); and

WHEREAS, the Seller is the owner of the Purchased Assets; and

WHEREAS, the Purchaser and the Consortium (defined below) operate acute care hospitals and graduate medical education programs; and

WHEREAS, the Purchaser has formed or intends to form a consortium including itself, (i) Temple University Health System; (ii) Albert Einstein Health Network; (iii) Main Line Health, Inc.; (iv) Christiana Care Health System; and (v) The Cooper Health Systems, A New Jersey Non-Profit Corporation (collectively, and together with the Purchaser, the "**Consortium**"), for purposes of operating a GME network as a qualified Medicare GME affiliated group;

WHEREAS, Purchaser, directly or through the Consortium members, STC, and other third parties currently under contract with the Purchaser or Consortium Members (collectively, the "**GME Network Affiliates**"), shall assume placement of the Continuing Residents in furtherance of continuing quality medical education in the Delaware Valley region; and

WHEREAS, on June 30, 2019 (the "**Petition Date**"), a voluntary petition for relief was filed by the Seller under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), under Case Number 19-11466 (the "**Bankruptcy Case**"); and

WHEREAS, in support of the Consortium's continuation of GME programs in the Delaware Valley region, and the effective transition of the Seller's predecessor GME programs, Seller desires to sell and Purchaser desires to purchase the Purchased Assets all in accordance with, and subject to, the terms and conditions contained in this Agreement; and

WHEREAS, the Purchased Assets being transferred herein are intended to be sold, conveyed and transferred to Purchaser free and clear of all Liens and Encumbrances pursuant to Section 363 of the Bankruptcy Code, and subject to the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings indicated below, unless the context clearly requires otherwise:

"**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; provided that such Person shall be deemed an Affiliate for only so long as such control exists.  For purposes of this definition and the definition of Related Person, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" shall mean all other agreements, documents and instruments to be executed and delivered by the Purchaser and/or the Seller pursuant to this Agreement.

"**Applicable Privacy and Security Law**" means any applicable Law relating to privacy, data protection, confidentiality, security, integrity and protection of personal information, including (i) health care and medical record applicable Laws, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and all implementing regulations (collectively, "**HIPAA**"); (ii) state data protection laws; (iii) state breach notification laws; and (iv) any comparable applicable state Laws and the regulations promulgated pursuant to all such applicable Laws.

"**Assigned Contracts**" shall mean, collectively, those Contracts included in the Purchased Assets, which shall consist solely of the Contracts identified on Schedule A-1 to **Exhibit A**.  Purchaser may add or delete Contracts from Schedule A-1 pursuant to the applicable provisions of the Bidding Procedures Order.

"**Assignment and Assumption Agreement**" shall mean the Assignment, Delegation and Assumption Agreement to be executed at the Closing between the Seller and the Purchaser in the form attached hereto as **Exhibit B**, pursuant to which, among other things, the Seller will assign and transfer to the Purchaser all of its right, title and interest under the Assigned Contracts, on the terms and conditions set forth therein.

"**Assumed Liabilities**" shall mean, collectively, (i) all liabilities and performance obligations of the Seller arising upon or after the Closing under the Assigned Contracts, (ii) all liabilities arising with respect to the Purchased Assets arising on or after the Closing Date, (iii) liability for amounts due to CMS on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement, up to (but not to exceed) the CMS Pre-Closing Amount, (iv) the Cure Costs, (v) and the Purchaser's portion of the Transfer Taxes pursuant to Section 10.4.

"**Assumption/Cure Notice**" means the Initial Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment delivered to counterparties to Contracts with the Seller pursuant to the Bidding Procedures Order.

"**Backup Bidder**" shall have the meaning stated in the Bidding Procedures Order.

"**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

"**Base Purchase Price**" is defined in Section 3.1.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Purchased Assets shall occur, which are attached to the Bidding Procedures Order as Exhibit I.

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court approving the Bid Procedures in the form attached hereto as **Exhibit F** and made part hereof.

"**Bill of Sale**" shall mean the bill of sale to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **Exhibit C**.

"**Books and Records**" means, collectively, all documents, lists and files relating or pertaining to the Purchased Assets or the Assumed Liabilities.

"**Business**" is defined in the Recitals to this Agreement.

"**Business Day(s)**" shall mean calendar days other than Saturdays, Sundays and days on which banking institutions in Wilmington, Delaware are authorized by Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Claims Close Date**" is defined in Section 10.5.

"**Closing**" is defined in Section 8.1.

"**Closing Date**" is defined in Section 8.1.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**CMS Pre-Closing Amount**" means a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as final, which amount shall be the maximum amount due to CMS on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement.

"**Continuing Residents**" means the Residents as of the Closing Date who have agreed to become residents training at a hospital operated by Purchaser or a GME Network Affiliate.

"**Contracts**" shall mean any agreement or contract, whether written or oral.

"**Cure Costs**" shall mean, with respect to any Assigned Contract, the amount due and owing to each non-debtor counterparty to such Assigned Contract to cure any defaults required to be cured as a condition of assumption of such Assigned Contract pursuant to Section 365(b)(1) of the Bankruptcy Code, to the extent applicable.

"**Escrow Agent**" shall mean a financial institution mutually acceptable to Seller and Purchaser.

"**Escrow Agreement**" shall mean the agreement substantially in the form attached hereto as **Exhibit D**.

"**Escrow Account**" is defined in Section 3.1.

"**Escrow Amount**" is defined in Section 3.1.

"**Excluded Assets**" shall mean all rights, benefits or property of Seller which are not Purchased Assets.

"**Excluded Liabilities**" shall mean, collectively, any and all liabilities of the Seller of any kind or description other than the Assumed Liabilities.

"**Final Order**" shall mean an order, judgment or other decree as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"**GAAP**" shall mean generally accepted accounting principles in the United States, consistently applied.

"**GME Network Affiliate**" shall have the meaning given to it in the Recitals to this Agreement.

"**Governmental Authorization**" means any consent, license, permit, certificate of authority, registration, franchise, right, Order or notice, qualification or similar right issued, granted, given, or required by or under the authority of any Governmental Body or pursuant to any Law.

"**Governmental Body**" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including the FDA and its equivalent authority or body in any foreign jurisdiction.

"**Hahnemann Programs**" is defined in Section 6.2.

"**IME**" shall mean Indirect Medical Education.

4

Appx. 00346

"**Interests**" shall have the meaning stated in the Sale Order.

"**Knowledge of the Seller**" and "**to the Seller's Knowledge**" shall mean the actual knowledge of Joel Freedman, the Seller's Chief Executive Officer and Allen Wilen, the Seller's Chief Restructuring Officer – Finance.

"**Laws**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

"**Lien**" has the meaning given to such term in the Bankruptcy Code.

"**Liquidated Cure Costs**" means all Cure Costs relating to Assigned Contracts which are allowed in a Final Order of the Bankruptcy Court.

"**Losses**" is defined in <u>Section 10.1</u>.

"**Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchased Assets; provided, however, that any adverse change, event, development or effect arising from or relating to any of the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been, a Material Adverse Effect:  (i) the United States economy, the global economy, in each case, as a whole, or the industry or markets in which the Seller operates; (ii) the filing of the Bankruptcy Case; (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (iv) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (v) changes in GAAP; (vi) changes in Law or Orders; (vii) the taking of any action contemplated by this Agreement or any of the Ancillary Documents; (viii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes; (ix) changes resulting from the announcement of the execution of this Agreement or any of the transactions contemplated hereby; or (x) the termination of any Contract that is not an Assigned Contract, or the occurrence of any breach by any party of any Contract that does not relate to the Purchased Assets or the Assumed Liabilities; (xi) any adverse change to the Business prior to the date hereof.

"**Non-Disclosure Agreement**" means any and all confidentiality agreements and/or non-disclosure agreements executed by the Purchaser as a condition to obtaining confidential and/or proprietary information from the Seller.

"**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body.

"**Outside Closing Date**" shall mean September 6, 2019 or such other date as Seller and Purchaser may agree.

"**Participating Provider Agreement**" means the Participating Provider Agreement with the Centers for Medicare and Medicaid Services between the Seller and CMS related to Hahnemann University Hospital.

"**Permitted Escrow Withdrawals**" is defined in <u>Section 3.1</u>.

"**Person**" shall mean any individual, corporation, Governmental Body, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

"**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"**Purchased Assets**" shall mean the assets of Seller identified on **Exhibit A**.

"**Purchaser Indemnified Party**" is defined in <u>Section 10.1</u>.

"**Purchaser Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchaser.

"**Related Person**" (i) with respect to a Person who is an individual, shall mean, (a) any other individual having a relationship with such specified individual (by blood, marriage or adoption) of grandparent, parent, child, grandchild, aunt, uncle, niece, nephew, sister, brother or first cousin (collectively, "**Relatives**"), (b) any Person that is controlled by such individual or any one or more members of such individual's Relatives; and (c) any Person with respect to which such individual or one or more members of such individual's Relatives serves as a director, officer, partner, or trustee (or in a similar capacity); and (ii) with respect to a specified Person other than an individual, shall mean (a) any Affiliate of such specified Person; and (b) each Person that serves as a director, officer, partner, or trustee (or in a similar capacity) of such specified Person.

"**Representative**" shall mean, with respect to a particular Person, any director, officer, trustee, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Notification**" is defined in <u>Section 6.3</u>.

"**Residents**" means the medical residents and fellows training at, or through a residency program sponsored by or in affiliation with, Hahnemann University Hospital. Unless otherwise specified, all references to the number of Residents shall be in terms of full time equivalents ("**FTEs**").

"**Sale Motion**" shall mean that certain motion filed by the Seller in the Bankruptcy Case on July 9, 2019 (D.I. 142) pursuant to which, among other things, the Seller requested an order (a) approving the Bid Procedures, (b) approving procedures relating to the assumption and

assignment of executory contracts, including procedures for establishing Cure Costs, (a) establishing a date for an auction, and (d) scheduling a sale hearing.

"**Sale Order**" shall mean an Order of the Bankruptcy Court pursuant to the Bankruptcy Code approving this Agreement and the transactions contemplated hereby substantially in the form attached hereto as **Exhibit E** and made part hereof.

"**Seller Disclosure Letter**" is defined in **Article IV**.

"**Seller Indemnified Party**" is defined in Section 10.2.

"**SSG**" means SSG Capital Advisors, LLC.

"**STC**" shall have the meaning set forth in Section 6.9.

"**Tail Coverage Costs**" shall mean the cost to Seller of purchasing and maintaining the Tail Coverage Endorsement.

"**Tail Coverage Endorsement**" shall mean a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital. Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars ($1,500,000) annual aggregate for each MCARE eligible Resident only.

"**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

"**Transfer Taxes**" is defined in Section 10.14(a).

## ARTICLE II.
### AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

**2.1    Agreement to Sell and Purchase Purchased Assets.**  On the Closing Date, subject to the performance by the Parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Purchased Assets, free and clear of all Interests other than Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**2.2    Assumed Liabilities/Excluded Liabilities.**  On the Closing Date, the Purchaser shall assume and become responsible for, and shall pay, perform, fulfill and discharge, all of the Assumed Liabilities.  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any of the Excluded Liabilities, all of which shall remain the sole responsibility and obligation of the Seller.

**2.3     Assigned Contracts.**  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any Contracts, all of which shall remain the sole responsibility and obligation of the Seller, except for the Assigned Contracts.  As to the Assigned Contracts:

(a)     At Closing, Seller shall assign to Purchaser, and Purchaser shall assume, all of the Assigned Contracts and Purchaser shall pay to the applicable counterparty the Cure Costs as and when such Cure Costs become Liquidated Cure Costs.

(b)     Purchaser shall provide promptly any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Purchaser's capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts, to the extent applicable.

**2.4     Competing Transactions; Bankruptcy Court Approval.**  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids pursuant to the Bidding Procedures Order and the Bid Procedures approved thereby (each, a "**Competing Bid**").  Until the transactions contemplated by this Agreement are consummated, Seller may perform any and all other acts related to seeking a Competing Bid as provided under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including but not limited to supplying information relating to the Purchased Assets to prospective purchasers.

**ARTICLE III.**
**PURCHASE PRICE**

**3.1     Purchase Price.**  The Purchase Price shall be Fifty-Four Million Dollars ($54,000,000), subject to upward adjustment pursuant to Section 3.2(d) hereof (the "**Base Purchase Price**") and, subject to the following sentence, shall be paid in cash at Closing.  In addition, an amount (the "**Escrow Amount**") equal to Three Million Dollars ($3,000,000) minus Liquidated Cure Costs paid by Purchaser on the Closing Date will be withheld from the Base Purchase Price and placed into a non-interest bearing escrow account (the "**Escrow Account**") held by the Escrow Agent pursuant to the Escrow Agreement.  The Escrow Amount shall be distributed to Purchaser from time to time in accordance with the Escrow Agreement to cover the following losses, damages and expenses (collectively, the "**Permitted Escrow Withdrawals**"):  (a) the CMS Pre-Closing Amount, as and when liquidated, (b) the Cure Costs not paid on the Closing Date and not included in the CMS Pre-Closing Amount, and (c) the Losses payable to a Purchaser Indemnified Party.  To the extent that there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, such remaining funds minus any then pending written claims asserted by Purchaser for Permitted Escrow Withdrawals (whether or not disputed) shall be distributed to Seller in accordance with the Escrow Agreement without any further action being required on the part of Purchaser.  Upon resolution of any Permitted Escrow Withdrawals pending as of the one-year anniversary of the Closing Date, (x) any amounts determined to be owing to Purchaser shall be distributed to Purchaser, and (y) any amounts determined not to be owing to Purchaser shall be distributed to Seller.

**3.2     Payment of Base Purchase Price.**  At Closing, the Base Purchase Price shall be payable by Purchaser as follows:

8

(a)  Purchaser shall deposit the Escrow Amount into the Escrow Account pursuant to and in accordance with the Escrow Agreement.

(b)  Purchaser shall pay Liquidated Cure Costs as of the Closing Date.

(c)  Purchaser shall pay to the Seller the Fifty-One Million Dollars ($51,000,000) balance of the Base Purchase Price by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller prior to the Closing.

(d)  Purchaser shall reimburse Seller for the Tail Coverage Cost actually paid by Seller to purchase the Tail Coverage Endorsement, up to a maximum of One Million Dollars ($1,000,000).

**3.3  Tax Allocation of Base Purchase Price.**  The Base Purchase Price shall be allocated among the Purchased Assets in accordance with the IRS Form 8594, Asset Acquisition Statement Under Section 1060 as agreed by the respective accountants of Purchaser and Seller within a reasonable period of time after Closing in good faith consistent in all respects with applicable Laws.  The Seller and the Purchaser shall file their respective Tax returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Purchaser, as the case may be, reasonably determines (and notifies the other Party) that such allocation is contrary to applicable Law.

**ARTICLE IV.**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

Except as set forth in the disclosure letter delivered by the Seller to the Purchaser on the date hereof (the "**Seller Disclosure Letter**"), the Seller represents and warrants to the Purchaser as follows:

**4.1  Organization.**  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation and is in good standing in each other jurisdiction where the operation of the Business by the Seller requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.2  Power and Authority.**  Upon entry of and subject to the Sale Order, Seller shall have all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Seller.  Upon entry of and subject to the Sale Order, this Agreement shall constitute a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**4.3  Non-contravention.**  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery of this Agreement or any other Ancillary Document to which the Seller is a party, and the performance by the Seller of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of the Seller, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or

9

both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Assigned Contract, (iii) to Seller's Knowledge, violate in any material respect any Law or Order applicable to the Business or the Purchased Assets, or (iv) result in the imposition of any Lien on the Purchased Assets.

     **4.4**    **Consents.**  Upon entry of the Sale Order and upon each regulatory approval to which Section 7.1(c) of this Agreement relates having been obtained, no approval, consent or authorization of, or declaration, filing or registration with or any notification to any Governmental Body or any other third Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

     **4.5**    **Liabilities.**  The Seller has no Liabilities with respect to the Purchased Assets for which the Purchaser will be responsible after Closing except for any Assumed Liabilities assumed by the Purchaser.

     **4.6**    **Title.**  The Seller has good and marketable title to all of the Purchased Assets, free and clear of all Interests other than Interests which will be divested from the Purchased Assets by the Sale Order.  Upon the completion of the transactions contemplated hereby, the Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Interests other than Assumed Liabilities.

     **4.7**    **Litigation.**  There are no Proceedings pending, or to the Seller's Knowledge, threatened against the Purchased Assets or Business, at Law or in equity, or before any Governmental Body which will interfere with the ownership or use by the Purchaser of the Purchased Assets after the Closing.

     **4.8**    **Proceedings.**  There is no Proceeding pending that challenges, or that is reasonably likely to have the effect of preventing, delaying or rendering illegal any of the transactions contemplated by this Agreement.

     **4.9**    **Tax Matters.**  There are no Tax Liens or Encumbrances for Taxes upon the Purchased Assets and as of the end of the day on the Closing Date there will be no such Tax Liens or Encumbrances.  There is not and, as of the end of the day on the Closing Date there will not be, any liability for Taxes affecting the Purchased Assets for which the Purchaser will at any time have any liability for payment.

     **4.10**    **Brokers and Finders.**  Other than SSG, no broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller.  Seller will be solely responsible for any fee, commission or other consideration of any kind due to SSG on account of the transactions contemplated by this Agreement.

     **4.11**    **Tail Coverage**.  Seller shall be solely responsible for purchasing and maintaining the Tail Coverage Endorsement and shall incur all costs associated with the same, except as provided in Section 3.2(d).

**4.12    Funding and Disputes**.  Seller represents and warrants that no Medicare GME funding for the Residents is currently owed to Seller and outstanding except as in the normal course, and that Seller has not received notice of any disputes and, to Seller's Knowledge there are no facts or circumstances that may result in a dispute with regard the payment of Medicare GME funding for the Residents in the amount of Fifty Thousand Dollars ($50,000) or more in the aggregate.

**ARTICLE V.**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

The Purchaser represents and warrants to the Seller as follows.

**5.1    Organization.**  The Purchaser is a nonprofit corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to conduct its business and own and operate its properties.

**5.2    Power and Authority.**

(a)    The Purchaser has all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Purchaser. This Agreement is a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(b)    To the extent that this Agreement or any of the Ancillary Documents provides that any Affiliate of the Purchaser makes any covenant or undertakes the payment or performance of any obligation in connection with the transactions contemplated hereunder or thereunder, such Affiliate has all requisite power and authority to enter into the transactions contemplated hereby and thereby.

**5.3    Non-contravention.**  Neither the execution and delivery of this Agreement or any other Ancillary Document to which the Purchaser is a party, will (i) violate any provision of the organizational documents of the Purchaser, or (ii) violate any Law or Order applicable to the Purchaser.

**5.4    No Proceedings.**  There are no actions, suits or proceedings pending, or to the actual knowledge of Purchaser, threatened, before or by any Governmental Body, against Purchaser which would affect Purchaser's ability to proceed with the transactions contemplated by this Agreement.

**5.5    Consents.**  No consent, waiver, authorization or approval of any person or declaration, filing or registration with any Governmental Body or other Person is required in connection with the execution and delivery by Purchaser of this Agreement or the performance by Purchaser or its Affiliates of its respective obligations hereunder or thereunder.

**5.6    Bankruptcy Matters.**  Purchaser is capable of satisfying the adequate assurance of future performance conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to each Assigned Contract, to the extent applicable.

11

Appx. 00353

**5.7 Financing.** Purchaser has readily-available cash on hand, availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Base Purchase Price at Closing.

**5.8 Hospital Facilities.** Purchaser, directly or through Affiliates, owns and operates a total of seven (7) Medicare-participating hospitals located within fifteen (15) miles of Hahnemann University Hospital's facility, all of which have the capacity to operate medical residency programs.

**5.9 Certain Relationships.** Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser is an officer or director of the Seller or a Related Person of any officer, director or key employee of the Seller. Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser has entered into any Contract with any officer, director or key employee of the Seller.

**5.10 Brokers and Finders.** No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE VI.
## COVENANTS OF THE PARTIES

**6.1 Access to Information.** Subject to all Applicable Privacy and Security Laws, the Seller shall permit the Purchaser's Representatives to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Business, to the personnel, books, records, Assigned Contracts, and documents of or pertaining to the Purchased Assets; provided, that the Seller may restrict the foregoing access to the extent that in the reasonable judgment of the Seller, any Law applicable to the Seller requires it to restrict access to any of its business, properties, information or personnel; and provided, further, that such access shall not unreasonably disrupt the operations of the Seller or the Business.

**6.2 Conduct of the Business.** From the date hereof until the Closing Date, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), and subject in all respects to the Bankruptcy Code and orders of the Bankruptcy Court (including, without limitation, the Sale Order), the Seller shall use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at Hahnemann University Hospital (the "**Hahnemann Programs**"). Seller and Purchaser shall work cooperatively to determine clinical rotation assignments for Residents, with such mutually-agreed assignments to commence as soon as practicable after the Purchase Agreement is entered into. For the avoidance of doubt, neither the existence of this Agreement nor any provisions set forth herein shall restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those Residents who elect not to become Continuing Residents.

**6.3      Notification of Certain Matters.**  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "**Required Notification**"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

**6.4      Cooperation.**  Subject in all respects to the Bankruptcy Code and the Bankruptcy Cases, the Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in **Article VII** and to consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

**6.5      Records Retention and Access.**  For a period of six (6) years following the Closing or such shorter period that records are required to be retained by applicable Law (but in no event less than three (3) years), Purchaser shall at Seller's expense furnish to the Seller, to the extent in Purchaser's possession and following receipt of a reasonable, written request therefor, information that is necessary for Seller to prepare for, prosecute or defend against any Proceeding related to the Business, to validate claims filed in the Bankruptcy Case and/or to enable Seller and its Representatives to prepare, complete and file all required federal, state and local Tax returns in accordance with applicable Law.

**6.6      Cure Costs.**  Seller shall not agree to the amount of any Liquidated Cure Costs without the written consent of Purchaser.  From and after the Closing Date, Purchaser shall have the sole right to contest and settle any claims for Cure Costs and, to the extent necessary and permitted by the Bankruptcy Court, Seller shall cooperate in substituting Purchaser for Seller (at Purchaser's expense) in connection with any pending objections to Cure Costs.

**6.7      Bid Procedures.**  Seller shall not modify the Bid Procedures without the consent of Purchaser.

**6.8      Covenants of Purchaser Regarding Transition and Accommodation of Residents**.

(a)      Purchaser, directly or through a GME Network Affiliate, will accommodate a maximum of 583 Continuing Residents to pursue continued medical residency training at Purchaser-owned hospitals or GME Network Affiliate-owned hospitals, as applicable. If requested by Purchaser, Seller shall take all reasonable actions to reflect its consent to the transfer of Continuing Residents to Purchaser or a GME Network Affiliate.  For any Resident who does not become a Continuing Resident and elects to pursue their training at hospitals that are not owned by Purchaser or a GME Network Affiliate, Purchaser agrees, in compliance with applicable regulation, to release the GME cap associated with Medicare reimbursement for such

13

Appx. 00355

Residents on a temporary basis to the hospital where the Resident transfers until the Resident has completed training.

(b)      If the Continuing Residents are required to relocate their personal residence to continue their training with Purchaser or a GME Network Affiliate, Purchaser shall provide, or cause such GME Network Affiliate to provide, reasonable private housing for such residents for the longer of the remainder of the current academic year or for the duration of a Resident's existing vacated lease. The provision of reasonable private housing shall not extend beyond the Resident's completion of his or her residency training with Purchaser or such GME Network Affiliate.

(c)      To the extent necessary to provide for continued residency training, Purchaser shall use reasonable efforts to transfer Seller's residency program faculty to a Purchaser or GME Network Affiliate hospital so that they can continue to provide education to Residents.

(d)      Unless inconsistent with Purchaser or GME Network Affiliate's standard practice for residents, Purchaser shall provide, or cause the applicable GME Network Affiliate to provide, Continuing Residents with free meals during the time that they are training at Purchaser or such GME Network Affiliate hospitals.

(e)      To the extent necessary for Continuing Residents to fulfill residency training requirements, Purchaser shall provide, or cause a GME Network Affiliate to provide, additional transition resources to Continuing Residents as may be requested by Seller from time to time.

(f)      The parties shall cooperate in determining the initial clinical rotation assignments for Continuing Residents for the period following the transfer.

(g)      Purchaser shall use reasonable efforts to ensure that each Continuing Resident's terms of employment (e.g., compensation and benefits) with Purchaser or a GME Network Affiliate are substantially equivalent or better than the Continuing Resident's current terms of employment with the Seller.

**6.9      Covenants of Purchaser Regarding Continued Affiliation with St**. **Christopher's Hospital for Children.**  For the period of ten (10) years after the Closing with automatic renewals for periods of five (5) years, provided that at the time of each such renewal such resident caps are used for resident training at STC only, unless either party gives not less than one hundred eighty (180) days' notice, Purchaser agrees to, and to cause any successor or assignee of any Purchased Assets to agree to:  (i) enter into an agreement to continue participating in a "**Medicare GME affiliated group**" as that term is defined in 42 C.F.R. 413.75(b), with St. Christopher's Hospital for Children ("**STC**"), whereby Purchaser will continue sharing full-time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between STC and Seller (the "**STC GME Affiliation Agreement**") or enter into a new GME affiliation agreement substantially in the form of the STC GME

Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation agreement" each academic year.

**6.10    Covenants of Purchaser Regarding Other GME Affiliation Agreements.**

(a)    For the remainder of the academic year during which the Closing occurs, and to the extent permitted and required by CMS, Purchaser shall accept assignment from Seller of the GME Affiliation Agreements identified listed as numbered items 1, 2, 3, 4 and 5 under the heading <u>Current GME Affiliation  Agreements</u> on <u>Schedule A-1</u> to **<u>Exhibit A</u>** of this Agreement (the "**Current GME Affiliation Agreements**") (with any cure amounts with respect to any agreements assumed pursuant to this <u>Section 6.10(a)</u> being included as "Cure Costs" for purposes of this Agreement), or shall enter into new GME affiliation agreements with those counterparties substantially in the form of the Current GME Affiliation Agreements; and

(b)    Purchaser, subject to Purchaser's completion of due diligence, shall accept assignment of the agreements identified under the heading <u>GME Obligations</u> on <u>Schedule A-1</u> to **<u>Exhibit A</u>** of this Agreement to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements (with any cure amounts with respect to any agreements assumed pursuant to this <u>Section 6.10(b)</u> being included as "Cure Costs" for purposes of this Agreement).

**6.11    Covenant of Seller Regarding Tail Coverage Endorsement for Residents.**  At or prior to Closing, Seller shall obtain the Tail Coverage Endorsement.

**6.12    Covenant of Seller Regarding Medical Records.**  Seller acknowledges that Purchaser, GME Affiliates, and clinicians affiliated with each of them collectively have undertaken to provide clinical care to patients who historically have received care from Seller. To facilitate such care on an ongoing basis, and otherwise to satisfy obligations of Seller, Seller will undertake to assure the ongoing availability of medical records of Seller's patients to Purchaser, GME Affiliates, clinicians affiliated with each of them, other providers to the extent applicable, and patient themselves.  To further facilitate such availability, with acknowledgment that Seller continues to be finalizing its own arrangements in this regard as of the date of this Agreement, Seller will consider in good faith any request by Purchaser for assignment to Purchaser of agreements with any third-party vendor or vendors with respect to ongoing medical records availability, storage, or maintenance.

**6.13    Covenant of Seller Regarding Medicare Cost Reports.**  Within 45 days of the Closing Date, or such longer period as CMS may permit, Seller shall prepare and file any final Medicare cost reports related to Hahnemann's operations for the period prior to the Closing Date and, thereafter, Seller shall provide such information and assistance as may reasonably be requested by Purchaser with respect to Seller's filing of Medicare cost reports.

**ARTICLE VII.**
**CONDITIONS TO CLOSING**

**7.1    Conditions to Obligations of Each Party.**  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a) <u>Proceedings; Orders</u>. No Governmental Body of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

(b) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order with such changes as are mutually agreed to by the Seller and Purchaser, each in the exercise of its respective sole discretion.

(c) <u>Regulatory Approvals</u>. CMS, the Pennsylvania Department of Health ("**DOH**") and the Accreditation Council for Graduate Medical Education ("**ACGME**") and any other applicable regulatory authority or Governmental Body, in each case to the extent required, shall have consented to the transactions contemplated by this Agreement and, solely with respect to CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated hereby will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap, shared, pursuant to generally applicable regulations, by GME Network Affiliates who qualify as members of one or more applicable Medicare GME affiliated group.

**7.2** **Additional Conditions to Obligations of the Purchaser.** The obligations of the Purchaser to effect the transactions contemplated hereby are subject to satisfaction or waiver of the following additional conditions:

(a) <u>Representations and Warranties</u>. The representations and warranties of the Seller set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b) <u>Agreements and Covenants</u>. The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c) <u>Documents</u>. All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to <u>Section 8.2</u> of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

(d) <u>Successor Liability</u>. Entry of an Order of the Bankruptcy Court, which may be the Sale Order, which precludes the assertion of any successor, vicarious, or transferee liability (by piercing the corporate veil or otherwise) against the Purchaser, its Affiliates, or the Consortium or its members, relating to claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party relating to the

16

operation of the Business prior to Closing.  For the avoidance of doubt, nothing in this paragraph is intended, nor shall it be construed, to preclude the collection of the CMS Pre-Closing Amount from the Escrow Account as provided herein.

      **7.3**    **Additional Conditions to Obligations of the Seller.**  The obligations of the Seller to effect the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

      (a)    <u>Representations and Warranties</u>.  The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Purchaser Material Adverse Effect.

      (b)    <u>Agreements and Covenants</u>.  The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

      (c)    <u>Documents</u>.  All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to <u>Section 8.3</u> of this Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

**ARTICLE VIII.**
**CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING**

      **8.1**    **Closing.**  The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Drinker Biddle & Reath LLP, One Logan Square, 18th and Cherry Streets, Philadelphia, PA 19103-6996, or such other place as agreed by the parties or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the Parties, as soon as practicable following the satisfaction or waiver of the conditions set forth in **Article VII** hereof and in any event within three (3) Business Days thereafter (the "**Closing Date**").  The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Time, on the Closing Date.

      **8.2**    **Deliveries by the Seller at the Closing.**  At the Closing, Seller shall furnish and deliver to the Purchaser the following:

      (a)    the Bill of Sale, duly executed by the Seller;

      (b)    the Assignment and Assumption Agreement, duly executed by the Seller;

      (c)    a certificate, dated as of the Closing Date and signed by the Seller, certifying that each of the conditions set forth in <u>Sections 7.2(a)</u> and <u>7.2(b)</u> have been satisfied;

17

(d)     a copy of the Sale Order;

(e)     evidence of satisfaction of Section 6.11; and

(f)     all other certificates, instruments and documents reasonably required to be delivered by the Seller pursuant to this Agreement or any of the Ancillary Documents.

**8.3     Deliveries by the Purchaser at the Closing.**  At the Closing, Purchaser shall furnish and deliver to Seller the following:

(a)     the Fifty-One Million Dollar ($51,000,000) portion of the Base Purchase Price in excess of the Escrow Amount and the Liquidated Cure Costs by wire transfer of immediately available funds to an account designated in writing by the Seller;

(b)     reimbursement of up to One Million Dollars ($1,000,000) of Tail Coverage Costs as provided in Section 3.2(d);

(c)     the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)     a certificate, dated as of the Closing Date and signed the Purchaser, certifying that each of the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(e)     evidence of satisfaction of Section 6.9;

(f)     evidence of satisfaction of Section 6.10; and

(g)     all other certificates, instruments and documents required to be delivered by the Purchaser pursuant to this Agreement or any of the Ancillary Documents.

**8.4     Additional Actions Taken by the Purchaser at the Closing.**  At the Closing, Purchaser shall take the following actions:

(a)     Pay the Liquidated Cure Costs from the Base Purchase Price to the respective Persons entitled to receive them.

(b)     Fulfill its covenants under Sections 6.8, 6.9 and 6.10 of this Agreement.

**ARTICLE IX.**
**TERMINATION**

**9.1     Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)     By mutual written consent of the Seller and the Purchaser;

(b)     By (i) the Seller if, as of the day after the Outside Closing Date, any condition to the obligation of the Seller to close has not been satisfied, provided, however, that if

18

Appx. 00360

the Closing has not occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Seller, then Seller may not terminate this Agreement pursuant to this <u>Section 9.1(b)</u>, and (ii) the Purchaser if, as of the day after the Outside Closing Date, any condition to the obligation of the Purchaser to close has not been satisfied; <u>provided</u>, <u>however</u>, that if the Closing has not occurred on or before the after the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then the Purchaser may not terminate this Agreement pursuant to this <u>Section 9.1(b)</u>;

(c)     By Purchaser, in its sole and absolute discretion, if the sum of the (i) CMS Pre-Closing Amount, and (ii) without duplication of the CMS Pre-Closing Amount, (A) the Liquidated Cure Costs, and (B) the good faith estimate by Purchaser of the amount of any Cure Costs related to Assigned Contracts which will become Liquidated Cure Costs after the Closing Date, exceeds Three Million Dollars ($3,000,000);

(d)     Automatically, and without further action by any Party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated hereby, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(e)     Automatically, and without further action by any Party, if the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or is dismissed, provided that neither the Seller nor the Purchaser shall take any action to support entry of an order providing for such conversion or dismissal;

(f)     By the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, and if (i) the Seller fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Seller to close (other than conditions related to deliveries to be made at Closing by the Purchaser provided the Purchaser is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Seller herein become untrue or inaccurate such that the condition set forth in <u>Section 7.2(a)</u> would not be satisfied or (iii) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 7.2(b)</u> would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Seller;

(g)     By the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (i) the Purchaser fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Purchaser to close (other than conditions related to deliveries to be made at Closing by the Seller provided the Seller is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Purchaser herein become untrue or inaccurate such that the condition set forth in <u>Section 7.3(a)</u> would not be satisfied or (iii) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 7.3(b)</u> would not be satisfied, and, in the case of clauses (ii) and

(iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Purchaser;

(h)     Automatically, and without further action by any Party, if (i) the Purchaser is not the Successful Bidder or Backup Bidder (each as defined in the Bid Procedures), or (ii) if the Purchaser is the Backup Bidder, upon the earlier of (A) Closing with the Successful Bidder, and (B) the Outside Closing Date.  The foregoing notwithstanding, the Purchaser shall serve as a Backup Bidder at the Auction only if (X) its bid pursuant to this Agreement is not determined to be the "Baseline Bid," as defined in the Bid Procedures, and (Y) it elects, at its sole discretion, to offer a higher and better bid at the Auction.  For avoidance of doubt, the Purchaser's offer described in this Agreement shall not be a Back-Up Bid absent the express consent of the Purchaser; or

(i)     By the Purchaser if (i) any applicable regulatory authority or Governmental Body has not granted any necessary consents to the transfer of the Purchased Assets to Purchaser or a GME Network Affiliate, including without limitation, the Participating Provider Agreement and Seller's IME and direct GME resident cap slots appurtenant thereto; or (ii) prior to Closing, any fact or circumstance arises relating to Medicare change of ownership, Medicare IME or direct GME funding of one or more Continuing Residents that may lead to an aggregate reduction in Medicare IME or direct GME funding for the Continuing Residents in the amount of Three Million Dollars ($3,000,000) or more.

**9.2     Effect of Termination.**  Except as provided in this Section 9.2, in the event of the termination of this Agreement pursuant to Section 9.1, this Agreement (other than this Section 9.2, which shall survive such termination) will forthwith become void, and there will be no liability on the part of any Party to the other and all rights and obligations of any Party will cease, except that nothing herein shall relieve any Party from liability for any intentional and material breach of this Agreement.

# ARTICLE X.
# INDEMNITY

**10.1     Indemnification by Seller.**  Subject to this **Article X** and consummation of the Closing, Seller shall, indemnify, defend and hold harmless Purchaser, Purchaser's Affiliates, the Consortium, the members of the Consortium, and the Representatives of each (each, a "**Purchaser Indemnified Party**") against and in respect of any and all out-of-pocket losses, documented and reasonable costs and expenses (including, without limitation, documented and reasonable costs of investigation and defense and reasonable attorneys' fees), claims, damages, obligations, or liabilities, whether or not involving a third party claim, but only after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Purchaser Indemnified Party in respect of any such claim (collectively, "**Losses**"), arising out of, based upon or otherwise in respect of:

(i)     any inaccuracy in or breach of any representation or warranty of Seller made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Purchaser by Seller pursuant to this Agreement (determined in each case without regard to any qualification with respect to

materiality, Material Adverse Effect or similar qualification); provided, that the Seller shall not have any liability under this clause (i) (other than with respect any intentional fraud on the part of Seller) unless the aggregate of all Losses asserted under this clause (i) for which Seller would, but for this proviso and but for the $25,000-per-claim deductible described below, be liable exceeds on a cumulative basis an amount equal to Two Hundred Thousand Dollars ($200,000.00);

(ii)     any nonfulfillment or breach of any covenant or agreement by Seller under this Agreement or any of the Schedules attached hereto;

(iii)     any Liability or obligation of Seller which is an Excluded Liability; and

(iv)     the ownership of any of the Excluded Assets by Seller after the Closing Date.

(b)     Each Purchaser Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(c)     NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS TO THE CONTRARY, SELLER WILL NOT BE LIABLE FOR ANY LOSS ASSERTED UNDER SECTION 10.1(a)(i) UNLESS THE CUMULATIVE LOSSES EXCEED $25,000 IN WHICH CASE SELLER WILL, SUBJECT TO THE OTHER LIMITATIONS IN THIS **ARTICLE X**, BE LIABLE TO INDEMNIFY THE PURCHASER INDEMNIFIED PARTY ONLY FOR THE EXCESS OVER $25,000; AND THE SOLE REMEDY OF ANY PURCHASER INDEMNIFIED PARTY AGAINST SELLER UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS FOR MONETARY DAMAGES, INCLUDING, WITHOUT LIMITATION, COSTS OF INVESTIGATION AND DEFENSE AND ATTORNEYS' FEES, SHALL BE A TIMELY CLAIM BY PURCHASER PURSUANT TO THE ESCROW AGREEMENT, AND LIMITED TO THE ESCROW AMOUNT.

**10.2     Indemnification by Purchaser.**  Subject to this **Article X** and consummation of the Closing, Purchaser shall indemnify, defend and hold harmless Seller, Seller's present, former, and future officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each a, "**Seller Indemnified Party**"), against and in respect of any and all Losses arising out of, based upon or otherwise in respect of:

(a)     any inaccuracy in or breach of any representation or warranty of Purchaser made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Seller by Purchaser pursuant to this Agreement; provided, that the Purchaser shall not have any liability under this clause (a) of Section 10.2 unless the claims asserted under this clause (a) involves Losses in excess of Twenty-Five Thousand Dollars ($25,000.00), at which time Purchaser shall be liable for the full amount of all such Losses in excess of Twenty-Five Thousand Dollars ($25,000.00);

Appx. 00363

(b)     any nonfulfillment or breach of any covenant or agreement by Purchaser under this Agreement or any of the Schedules attached hereto; and

(c)     any of the Assumed Liabilities pursuant to this Agreement.

Each Seller Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

**10.3     Indemnification Procedures**.

(a)     Within forty-five (45) days after receipt by an indemnified party of written notice of the commencement of any Proceeding against it to which the indemnification in this **Article X** relates, such indemnified party shall, if a claim is to be made against an indemnifying party under this **Article X**, give notice to the indemnifying party of the commencement of such Proceeding.

(b)     If any Proceeding referred to in paragraph (a) above is brought against a Seller Indemnified Party and it gives notice to Purchaser of the commencement of such Proceeding, Purchaser will be entitled to participate in such Proceeding and, to the extent that it wishes, assume the defense of such Proceeding with counsel reasonably satisfactory to such Seller Indemnified Party and, after notice from Purchaser to such Seller Indemnified Party of its election to assume the defense of such Proceeding, Purchaser will not, as long as it diligently conducts such defense, be liable to such Seller Indemnified Party under this **Article X** for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by such Seller Indemnified Party in connection with the defense of such Proceeding subject to the limitations contained in Section 10.1 hereof, other than reasonable costs of investigation.  If Purchaser assumes the defense of a Proceeding, (A) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (B) no compromise or settlement of such claims may be effected by Purchaser without such Seller Indemnified Party's consent unless (1) there is no finding or admission of any violation of law by such Seller Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other claims that may be made against such Seller Indemnified Party, and (2) the sole relief provided is monetary damages that are paid in full by Purchaser.  Such Seller Indemnified Party will have no liability with respect to any compromise or settlement of the claims underlying such Proceeding effected without its consent.  If notice is given to Purchaser by a Seller Indemnified Party of the commencement of any Proceeding for which such Seller Indemnified Party seeks indemnification hereunder and Purchaser does not, within ten (10) days after such notice is received, give notice to such Seller Indemnified Party of Purchaser's election to assume the defense of such Proceeding, Purchaser will be bound by any determination made in such Proceeding or any compromise or settlement effected by such Seller Indemnified Party.

(c)     If any Proceeding referred to in paragraph (a) above is brought against a Purchaser Indemnified Party, Seller shall be entitled to participate in such Proceeding at its own expense.  However, such Purchaser Indemnified Party shall, in all respects, control the defense

and settlement of such Proceeding and Seller shall be liable for all fees and expenses incurred by such Purchaser Indemnified Party and for any liability established by any order of a Governmental Body of competent jurisdiction and for any liability established by any settlement or compromise agreed to by such Purchaser Indemnified Party, in the exercise of its reasonable discretion.

**10.4    Other Claims.**  A claim for any matter not involving a third party claim may be asserted by written notice to the Party from whom indemnification is sought.

**10.5    Seller Indemnification Claim Period.**  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Seller, no claim for indemnification pursuant to Section 10.1 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 which reasonably describes the claim, the basis therefor, and if possible with the exercise of reasonable diligence, the Purchaser Indemnified Party's reasonably-supported estimate of the Losses being asserted, is delivered to Seller on or before the close of business on the day preceding the first (1st) anniversary of the Closing Date (the "**Claims Close Date**") in which case the indemnity with respect to that Loss shall survive the Claims Close Date (but continue to be limited to the funds held in the Escrow Account).  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.6    Purchaser Indemnification Claim Period.**  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Purchaser, no claim for indemnification pursuant to Section 10.2 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 is delivered to Purchaser on or before the Claims Close Date.  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Seller or any Seller Indemnified Party may be entitled.

**10.7    Payment from Indemnification Escrow.**  If a Purchaser Indemnified Party becomes entitled to indemnification from Seller hereunder, such Purchaser Indemnified Party shall be entitled to receive the amount of Losses in cash from the Escrow Account in accordance with the Escrow Agreement, and the recovery of the Purchaser Indemnified Parties shall be limited to such recoveries from the Escrow Account.  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.8    Miscellaneous Indemnification Provisions.**  Disclosures made after the date hereof and any knowledge that is acquired about the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or obligation set forth herein shall not in any manner affect rights to indemnification hereunder based on any such representation, warranty, covenant, or obligation.  The waiver of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or obligation, will not affect any right to indemnification based on such representations, warranties, covenants and obligations unless otherwise expressly agreed in writing by the party or parties entitled to the benefit thereto.

Appx. 00365

# ARTICLE XI.
## MISCELLANEOUS

**11.1    Expiration of Representations, Warranties and Agreements.**  The representations and warranties and covenants made by Seller and Purchaser in this Agreement and in any Ancillary Document delivered pursuant to this Agreement shall survive beyond the Closing Date.

**11.2    Assignment.**  Neither this Agreement nor any interest herein may be assigned or transferred by either Party to any other Person without the prior written consent of the other Party, which consent may be given or withheld in the sole discretion of such other Party; provided, however, Purchaser may assign at Closing its rights, but not its obligations, hereunder to any Affiliate of Purchaser.

**11.3    Notices.**  All notices, requests and other communications under this Agreement shall be in writing and shall be either (a) delivered in person, (b) sent by certified mail, return-receipt requested, (c) delivered by a recognized delivery service or (d) sent by facsimile transmission and addressed as follows:

If intended for Purchaser:
Thomas Jefferson University Hospitals, Inc.
925 Chestnut Street, Suite 110
Philadelphia, Pennsylvania 19107
Attention: Stephen K. Klasko, MD,
MBA, President & CEO

With a copies to:
Thomas Jefferson University Hospitals, Inc.
1020 Walnuts Street, 6th Floor, Scott Bldg.
Philadelphia, Pennsylvania 19107
Attention: Cristina G. Cavalieri, Esq., Senior
Vice President, Chief Legal and Governance
Officer and Secretary

Neil S. Olderman, Esquire
Drinker Biddle & Reath LLP
191 N. Wacker Drive
Suite 3700
Chicago, IL 60606-1698

And

Andrew C. Kassner, Esquire
Drinker Biddle & Reath LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996

If intended for Seller:

Center City Healthcare, LLC
Centre Square West
1500 Market Street, Suite 2400
Philadelphia, PA 19102
Attention: Allen Wilen, CRO-Finance

With a copy to:

Jeffrey Hampton
Adam Isenberg
Saul Ewing Arnstein & Lehr LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided.  A notice, request and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 P.M. on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 A.M. on the first Business Day thereafter.

**11.4    Further Assurances.**  Each of the Parties hereto shall execute such documents (including, without limitation, the Ancillary Documents) and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby or, at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement.

**11.5    Entire Agreement; Modifications; Waivers.**  This Agreement (together with the Exhibits and Schedules hereto), the Ancillary Documents, and the Non-Disclosure Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior understandings of the Parties with respect to the subject matter hereof and thereof.  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each Party.  No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Party making the waiver.

**11.6    Applicable Law; Jurisdiction and Venue; Jury Trial Waiver.**  THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.  The Parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; provided, however, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement shall be in the courts of the

State of Delaware or U.S. District Court for the District of Delaware, and the Parties each hereby waive any objections they may have with respect thereto (including any objections based upon *forum non conveniens*).  **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY**.

**11.7    Headings and Captions.**  The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent or otherwise affect the interpretation of, this Agreement or any of the provisions hereof.

**11.8    Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**11.9    Time is of the Essence.**  With respect to all provisions of this Agreement, time is of the essence.  However, if the first date or last date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then, in such event, the time of such period shall be extended to the next day which is a Business Day.

**11.10    Remedies Cumulative.**  Except as herein expressly set forth, no remedy conferred upon a Party by this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law, in equity or by statute.

**11.11    Interpretation and Construction.**

(a)    As used herein the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".

(b)    As used herein, the words "**herein**," "**hereof**," "**hereunder**" and similar terms shall refer to this Agreement unless the context requires otherwise.

(c)    For purposes of this Agreement, whenever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural and vice versa.

**11.12    Estoppel**.  Each Party confirms and agrees that (a) it has read and understood all of the provisions of this Agreement; (b) it is familiar with major sophisticated transactions such as those contemplated by this Agreement; (c) it has negotiated with the other Party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**11.13    Joint Preparation.**  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**11.14   Expenses; Transfer Taxes.**

(a)      Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

(b)      The Purchaser and Seller shall each pay fifty (50%) percent of all sales, use, transfer, real property transfer, documentary, recording and similar Taxes and fees, and any deficiency, interest or penalty asserted with respect thereof arising out of or in connection with the transactions contemplated hereby ("**Transfer Taxes**").

**11.15   Counterparts.**  This Agreement may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

**11.16   Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

*[Signature page follows.]*

35751625.8 08/29/2019

Appx. 00369

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above.

SELLER:

**CENTER CITY HEALTHCARE, LLC**

By:_____
     Allen Wilen
     Chief Restructuring Officer - Finance


PURCHASER:

**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.**

By:_____
     Laurence M. Merlis
     Executive Vice President


*[Signature page to Asset Purchase Agreement]*

35751625.8 08/29/2019

Appx. 00370

## EXHIBIT A

### Purchased Assets

The Purchased Assets to be purchased by the Purchaser and sold, conveyed, assigned, transferred and delivered on the Closing Date to the Purchaser by the Seller shall include all of the Seller's right, title and interest in and to all of the following assets, but specifically excluding, however, the Excluded Assets:

1.      <u>Assigned Contracts</u>.  All of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on <u>Schedule A-1</u> to this **Exhibit A**.

2.      <u>Books and Records</u>.  All Books and Records related to the Purchased Assets, but specifically excluded any Corporate Documents.

3.      <u>Governmental Authorizations</u>.  All transferable Governmental Authorizations identified on <u>Schedule A-2</u> to this **Exhibit A**.

4.      <u>Rights; Warranty Claims</u>.  All of Seller's rights, claims, counterclaims, credits, causes of action or rights of set-off against third parties that relate to warranties, indemnities, and all similar rights to the extent related to any Purchased Assets.

5.      <u>Other Assets</u>.  Those other assets of the Seller identified on <u>Schedule A-3</u> to this **Exhibit A**.

**Schedule A-1**

I.      **Current GME Affiliation Agreements**

1.      Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between the Trustees of the University of Pennsylvania, as the owner and operator of the Hospital of the University of Pennsylvania, and Seller.

2.      Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Prime Healthcare Services Roxborough, LLC, the owner and operator of Roxborough Memorial Hospital, and Seller.

3.      Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 among Temple University Hospital, Seller and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.

4.      Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Friends Behavioral Health System and Seller.

5.      Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Abington Memorial Hospital and Seller.

II.     **GME Obligations**

**Graduate Hospital/Penn**

•       Agreement Regarding Medicare FTE Resident Caps, between the Trustees of the University of Pennsylvania and Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007

**Roxborough and Warminster/Solis**

•       Agreement Regarding Medicare FTE Resident Caps between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007

•       Agreement Concerning Family Medicine Training among Abington Memorial Hospital, Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 23, 2008

•       Second Amendment to Agreement Regarding Medicare FTE Resident Caps; between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 29, 2010

Appx. 00372

**Hahnemann/Friends**

- Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP dated June 2008

- Memorandum of Understanding for Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP

**Hahnemann/Abington**

Master Agreement for Shared Rotational Arrangements between Hahnemann University Hospital and Abington Memorial Hospital dated June 29, 2007

**III.** **The Participating Provider Agreement**

**IV.** **Tower Health GME Affiliation Agreement**

Appx. 00373

**Schedule A-2**

**Governmental Authorizations**

The Participating Provider Agreement

Appx. 00374

**Schedule A-3**

**Other Assets**

[None]

**EXHIBIT B**

**ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT**

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT ("Agreement") dated as of [_____] by and between Center City Healthcare, LLC, a Delaware limited liability company ("Assignor"), and Thomas Jefferson University Hospitals, Inc., a Pennsylvania nonprofit corporation ("Assignee").

BACKGROUND

A.     ASSIGNEE AND ASSIGNOR HAVE ENTERED INTO AN ASSET PURCHASE AGREEMENT DATED AS OF [_____] (TOGETHER WITH THE EXHIBITS AND SCHEDULES THERETO, THE "PURCHASE AGREEMENT") PROVIDING FOR, AMONG OTHER THINGS, THE SALE, TRANSFER, CONVEYANCE, ASSIGNMENT, AND DELIVERY BY ASSIGNOR TO ASSIGNEE OF CERTAIN ASSETS OF ASSIGNOR (COLLECTIVELY, THE "PURCHASED ASSETS") THAT ARE OWNED OR USED BY ASSIGNOR IN CONNECTION WITH THE BUSINESS.

B.     IN CONNECTION WITH THE SALE AND PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THE PURCHASE AGREEMENT, ASSIGNOR IS TO ASSIGN AND DELEGATE, AND ASSIGNEE IS TO ASSUME, THE ASSIGNED CONTRACTS.  CLOSING IS BEING HELD ON THE DATE HEREOF UNDER THE PURCHASE AGREEMENT.

NOW, THEREFORE, pursuant to and in consideration of the Purchase Agreement and the mutual covenants and agreements set forth therein and herein, Assignor and Assignee, each intending to be legally bound, agree as follows:

1.     Incorporation of Background; Defined Terms.  The Background provisions set forth above (including, without limitation, all of the defined terms set forth therein) are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety in this Section 1.  Capitalized terms used herein which are not otherwise defined shall have the respective meanings assigned to them in the Purchase Agreement.

2.     Assignment of Rights.  Assignor hereby sells, transfers, conveys, and assigns to Assignee all of Assignor's right, title and interest in, to and under all of the Assigned Contracts, each of which are identified on Schedule 2 attached hereto.

3.     Delegation of Duties.  Assignor hereby delegates to Assignee all of Assignor's duties and liabilities under the Assigned Contracts.

4.     Assumption of Liabilities.  In partial consideration for the sale of the Purchased Assets by Assignor pursuant to the Purchase Agreement, Assignee hereby undertakes and agrees to assume, discharge, or perform as the case may be, all duties, obligations, and liabilities of Assignor under the Assigned Contracts which are to be performed after, and relate to the period after, the date hereof or which are otherwise assigned to and assumed by the Purchaser under or pursuant to the Purchase Agreement or the Sale Order.

5. <u>Assignment of Governmental Authorizations; Etc</u>. Assignor hereby assigns, sells, transfers, and sets over to Assignee all of Assignor's right, title and interest in, to, and under all of the Governmental Authorizations which are listed on <u>Schedule 5</u> attached hereto, but only to the extent that any of the foregoing may be legally sold, transferred, conveyed, assigned and delivered by Assignor to Assignee without any action by any such applicable federal, state, or local government or regulatory body.

6. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the domestic, internal laws of the State of Delaware, without regard to its rules pertaining to the conflict of laws.

8. <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Any party to this Agreement may deliver an executed counterpart hereof by facsimile transmission or electronic mail (as a Portable Document Format (PDF) file) to the other party hereto and any such delivery shall have the same force and effect as the manual delivery of an original executed counterpart of this Agreement.

*Remainder of Page Intentionally Left Blank*

*Signature Page Follows*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers the day and year first above written.

CENTER CITY HEALTHCARE, LLC

By_____

Allen Wilen
Chief Restructuring Officer - Finance
"<u>Assignor</u>"

THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.

By_____

Laurence M. Merlis
Executive Vice President
"<u>Assignee</u>"

## EXHIBIT C

## BILL OF SALE

_____, 2019

      KNOW ALL BY THESE PRESENTS that CENTER CITY HEALTHCARE, LLC, a Delaware limited liability company (the "Seller"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, has granted, bargained, sold, conveyed, transferred, assigned and delivered, and by this Bill of Sale hereby grants, bargains, sells, conveys, transfers, assigns and delivers, to Thomas Jefferson University Hospitals, Inc., a Pennsylvania nonprofit corporation ("Purchaser"), its successors and assigns, all of the Seller's right, title and interest in and to the Purchased Assets.  As used herein, the term "Purchased Assets" has the meaning given to such term in that certain Asset Purchase Agreement, dated as of - _____, 2019, by and between the Seller and Purchaser (together with the Exhibits and Schedules thereto, the "Purchase Agreement"), which Purchase Agreement is incorporated herein by this reference.

      EXCLUDING, HOWEVER, the "Excluded Assets" (as such term is defined in the Purchase Agreement).

      TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, forever.

      This Bill of Sale is being executed and delivered by the Seller to the Purchaser under and pursuant to Section 8.2(a) of the Purchase Agreement and is subject to the terms and conditions of the Purchase Agreement in all respects.

*Remainder of Page Intentionally Left Blank*

*Signature Page Follows*

 

 

 

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the date and year first set forth above.

CENTER CITY HEALTHCARE, LLC

By_____
     Allen Wilen
     Chief Restructuring Officer - Finance

35751625.8 08/29/2019

Appx. 00380

# **EXHIBIT D**

# **ESCROW AGREEMENT**

[To be provided]

Appx. 00381

# EXHIBIT E

# SALE ORDER

**[To be provided]**

Appx. 00382

**EXHIBIT F**

**BIDDING PROCEDURES ORDER**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Re: Docket No. 142** |
|  | ) |  |

### ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND <u>(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE</u>

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures Order**"): (a) approving the proposed bidding procedures attached as **<u>Schedule 1</u>** to this Bidding Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets; (b) establishing procedures for the assumption and assignment of executory contracts, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

Appx. 00384

(c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**") [3], the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. 246], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which is attached as Exhibit E to the Stalking Horse Sale Agreement: (x) authorizing the sale of the Residents Program Assets free and clear of Interests as defined in footnote 4, below (the "**Interests**")[4], with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter

---

[3]     The Court has been advised that Reading Hospital, a subsidiary of Tower Health, will actually serve as the Stalking Horse Bidder and, as a result, all references herein to the Stalking Horse Bidder shall be deemed to include Reading Hospital.

[4]     Interests shall include: (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or purchaser's interest in the Assigned Contracts and/or Residents Program Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the Pension Benefit Guaranty Corporation or any plan participant or beneficiary, (iv) tax claims (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, and with respect to the rights described in this sub-clause (v) only as they relate to the Resident Program Assets that are the subject of the Stalking Horse Bidder's Stalking Horse Sale Agreement.

-2-

Appx. 00385

pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.       The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.       The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D.         Notice of the Motion, as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order, was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Residents Program Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Residents Program Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Residents Program Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Health; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Accordingly, no further

notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order is necessary or required.

E.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion as relates to the entry of this Bidding Procedures Order, including, without limitation:   (a) approval of the Bidding Procedures; (b) approval of the selection of the Stalking Horse Bidder and approval of the Break-Up Fee to be paid to the Stalking Horse Bidder under the circumstances described in the Motion; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.      Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

G.      The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair,

Appx. 00388

reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates. The Break-Up Fee: (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H.      The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale Agreement. The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely. Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures). The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

I.      The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required.  The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.      The Auction and Sale Notice attached hereto as **Schedule 5** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d)  identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of all Interests, with all Interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.      All current and former patients of Debtor Center City Healthcare, LLC ("Center City") who have, as of the date of this order, asserted claims against Center City, including but not limited to claims formally asserted by the filing of suit or a proof of claim in these Bankruptcy Cases and claims informally asserted by letter or by a request for medical records

from a lawyer or otherwise (the "Known Patient Creditors") shall be treated as known creditors of the Debtors for purposes of notice requirements related to the Sale.

L. All current and former patients of Center City who, as of the date of this order, are not Known Patient Creditors (including current and former patients who are not, as of the date of this order, aware that they have or may have claims against the Debtors including such patients as to whom personal injury has not manifested as of the date of this order) (the "Unknown Patient Creditors") shall be treated as unknown creditors of the Debtors for purposes of the notice requirements related to the Sale.

M. The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1. The Motion is granted as provided herein.[5]

2. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.** **Timeline for the Sale**

3. The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order. The Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), as indicated herein and in the Bidding Procedures, are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take

---

[5] Notwithstanding anything to the contrary herein, or in the Bidding Procedures, the acceptance of a Bid and Sale Agreement by the Debtors and the consummation of a Sale are subject to entry of the Sale Order.

any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Milestone | Proposed Date |
|---|---|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 |
| Sale Hearing | August 9, 2019 at 11:00 a.m. (prevailing Eastern Time) |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder (Other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) | (may be raised at the Sale Hearing) |

4.      For the avoidance of doubt, the Debtors, in consultation with the Committee, reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

**II.**      **The Bidding Procedures**

5.      The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6. The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on August 5, 2019.  Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7. The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8. The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice).  The Auction will be conducted openly and all creditors and the Committee will be permitted to attend.

9. Any creditor with a valid and perfected lien on all of the Residents Program Assets (each, a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in

Appx. 00393

interest to object to or challenge such creditor's lien thereunder (a "**Challenge**")), to credit bid all or any portion of such Secured Creditor's allowed secured claims to purchase the Residents Program Assets to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, unless otherwise ordered by the Bankruptcy Court for cause. The foregoing notwithstanding, any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee. In the event that the Committee, or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. In the event that such a creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash at the closing of the Sale.

10.     Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up Fee in lieu of cash and have the Break-Up Fee be treated as equal to cash in the same amount for the purposes of evaluating the overbid.

## III.    Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement

11.     The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction. The Break-Up Fee described in the Bidding Procedures is approved. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' closing of the Sale with a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**"). If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; and (b) shall be payable in at closing on the Alternative Transaction without further order of this Court; and

(c) shall be payable solely from the proceeds of such Alternative Transaction. No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

## IV. Notice Procedures

12. The Auction and Sale Notice is approved.

### A. *Notice of Sale, Auction, and Sale Hearing.*

13. Within two (2) business days after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the Auction and Sale Notice by first-class mail, electronic mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (a) the Notice Parties, (b) all Residents, and (c) all known creditors of Center City, including any Known Patient Creditors. In addition, on or before the Mailing Date, the Debtors shall serve the *Notice to Residents and Fellows Regarding Proposed Sale of Residency Program Assets* (the "**Residents' Notice**"), in substantially the form attached hereto as **Schedule 2**, on all Residents by first class mail or electronic mail.

14. Service of the Auction and Sale Notice and the Residents' Notice as described in paragraph 13 above shall be sufficient and proper notice of the and satisfies all due process requirements.

15. Within ten (10) days of the date of this Bidding Procedures Order, the Debtors shall cause the notice (the "**Publication Notice**") substantially in the form attached hereto as **Schedule 3** to be published once in the National Edition of *USA Today* and once in the *Philadelphia Inquirer*. The Publication Notice shall be sufficient and proper notice of the Sale to all creditors whose identities are unknown to the Debtors, including all of the Unknown Patient Creditors.

-12-

### B. *Notice of Successful Bidder.*

16.     As soon as reasonably practicable after the Bid Deadline, if no Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, or conclusion of the Auction, if a Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, the Debtors shall file on the docket, but not serve, a notice which shall identify the Successful Bidder.

## V.     Assumption and Assignment Procedures

17.     The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

### A. *Notice of Assumption and Assignment.*

18.     The Debtors previously filed with the Court, [D.I. 246], a list (the "**Initial Designated Contracts List**") specifying:  (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Initial Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Initial Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Initial Designated Contract (the "**Cure Costs**").

19.     On the Mailing Date, the Debtors shall serve the Notice of Proposed Assumption and Assignment of Executory Contracts attached hereto as **Schedule 4** (the "**Initial Notice of Assumption and Assignment**") on all Initial Designated Contract Counterparties by first-class

mail, email or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF.

20.     Any Initial Designated Contract Counterparty may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Initial Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance.  All Contract Objections must:  (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com) and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania, 19102, Attn: Jeffrey C. Hampton (jeffrey.hampton@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder (the "**Contract Notice Parties**") by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Initial Designated Contract Objection Deadline**").  Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

21.     If an Initial Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such Contract Objection will be determined at the Sale Hearing.

B.      ***Modification of Initial Designated Contracts List and Supplemental Notice of Assumption and Assignment.***

22.     Prior to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Stalking Horse Bidder. Subsequent to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Successful Bidder (who may be the Stalking Horse Bidder).

23.     Until the opening of business on the date of the Auction, if another Qualified Bid is received by the Bid Deadline, or the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline, at the request of the Stalking Horse Bidder, the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs. Following the conclusion of the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs, *provided*, *however*, that such deletion of any contracts shall not result in any reduction in the Purchase Price (as defined in the Stalking Horse Sale Agreement"), and any contracts added after the Auction will not be considered in connection with the right of termination in Article 9.1(c) of the Stalking Horse Sale Agreement. For the avoidance of doubt, the Initial Designated Contracts List may be modified more than

once. The contracts listed on the Initial Designated Contracts List, as modified from time to time, are hereafter referred to as the "**Designated Contracts**").

24.     In the event that the Initial Designated Contracts List is modified, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") on the affected counterparty in the same manner as the Initial Notice of Assumption and Assignment was served.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed contracts as was included in the Notice of Assumption and Assignment.

25.     Any counterparty to an executory contract listed on a Supplemental Notice of Assumption and Assignment (each a "**Supplemental Designated Contract Counterparty**") may file an objection with respect to the applicable Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs (but only to the extent reduced  as to contracts included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment), and (b) if such Designated Contract was not included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance.  All Supplemental Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the

Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

26.     If a Supplemental Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute, (a) if the Supplemental Contract Objection Deadline is on or before the date of the Sale Hearing, such Supplemental Contract Objection will be determined at the Sale Hearing, and (b) if the Supplemental Contract Objection Deadline is after the date of the Sale Hearing the Debtors will seek an expedited hearing before the Court to determine the Supplemental Contract Objection.  If there is no such Supplemental Contract Objection (or such objection has been resolved), then the Debtors may submit an order to this Court, including by filing a certification of counsel, fixing the applicable Cure Costs and approving the assumption of the contract listed on a Supplemental Notice of Assumption and Assignment.

   C.     *Additional Notice of Assumption and Assignment Procedures.*

27.     If the counterparty to any Designated Contract does not file and serve a Contract Objection or Supplemental Contract Objection, as applicable, in a manner that is consistent with the requirements set forth above, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling with respect to the applicable Designated Contract, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any claim related to such Designated Contract for any default occurring or continuing prior to the date of the assumption

and assignment of such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

28.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.  Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

## VI.     Sale Hearing.

29.     A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at **11:00 a.m. (prevailing Eastern Time) on August 9, 2019**, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder.  The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale.  In the event that the Successful Bidder cannot or refuses to consummate the Sale after the Sale has been approved by the Court, the Debtors may, in consultation with the Committee, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors, in consultation with the Committee, shall be

-18-

authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

30.     Any and all objections, if any, to (a) the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement and (b) entry of the Sale Order approving such Sale (a "**Sale Objection**") must be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pa. 19406 Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Sale Objection Deadline**").  Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder (other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) (an "**Auction Objection**") must be raised at or prior to the Sale Hearing (the "**Auction Objection Deadline**").  Any party failing to timely file a Sale Objection or raise an Auction Objection, as applicable, will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the assets free and clear of any and all Interests. For the avoidance of doubt, if the Stalking Horse Bidder is selected as the Successful Bidder, but its successful Bid is not the Stalking Horse Bid or an increased bid based on an agreement substantially similar to the Stalking Horse Sale Agreement, objections to a Sale

to the Stalking Horse Bidder, limited to the changed terms (excluding any increase in price) may be raised by the Auction Objection Deadline.

## VII.  **Miscellaneous.**

31.  Notwithstanding anything to the contrary in any asset purchase agreement or document relating to the Sale, the purchased assets (including the Residents Program Assets) shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action. The provisions of this paragraphs shall not apply to the Stalking Horse Sale Agreement, as the same may be modified other than any modifications to the defined term "Purchased Assets."

32.  This order and the Bidding Procedures shall be interpreted so as to afford the Debtors, in consultation with the Committee, the greatest opportunity to maximize the value of the Residents Program Assets for the benefit of the Debtors' estates *provided*, *however*, the provisions of this paragraph shall not apply to any matters affecting the Stalking Horse Bidder without the consent of the Stalking Horse Bidder.

33.  The Debtors, in consultation with the Committee as applicable, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

-20-

Appx. 00403

34.     Notwithstanding anything in the Motion, the Bidding Procedures, and/or the July 9, 2019 Stalking Horse LOI to the contrary, nothing in this Bidding Procedures Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability to the United States arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

35.     To the extent the Successful Bid or the Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" of successor liability for any liability to the United States arising from such provider agreement pursuant to section 363(f) of the Bankruptcy Code.

36.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

37.     This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors. Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

38.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions

of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

**Dated: July 19th, 2019**
**Wilmington, Delaware**

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**

**SCHEDULE 1**

**BIDDING PROCEDURES**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) | |
| *al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## BIDDING PROCEDURES

On July 19, 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") as set forth herein, are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July 19, 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**"), or in accordance with the terms of such higher and better offer as determined by the Debtors, in consultation with the Committee, to be the Successful Bidder (defined below).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

A.    Submissions to the Debtors and the Committee.

All submissions to the Debtors and the Committee required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

a.    **Debtors**.  Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

b.    **Debtors' Counsel**.  Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

c.    **Debtors' Investment Banker**.  SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com).

d.    **Committee's Counsel**.  Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

B.    Potential Bidders.

The Debtors and their financial advisors have identified, and may in the future, in consultation with the Committee, identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**"), other than the Stalking Horse Bidder, must deliver or have previously delivered, if determined to be necessary by the Debtors:

a.    an executed confidentiality agreement on terms acceptable to the Debtors, in consultation with the Committee (a "**Confidentiality Agreement**"), to the extent not already executed; and

b.    the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

C.      Qualified Bidders.

      a.      A "**Qualified Bidder**" is a Potential Bidder:  (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined by the Debtors, in consultation with the Committee; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below).  On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times.  MidCap Funding IV Trust ("**Midcap**"), solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times; *provided* that MidCap Funding IV Trust's right to credit bid shall be subject to the provisions set forth in the Bidding Procedures Order and these Bidding Procedures.

      b.      If any Potential Bidder is determined by the Debtors, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

      c.      Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, in consultation with the Committee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

      d.      Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

D.      Due Diligence.

      **a.      Diligence Provided to Potential Bidders**.

      Only (a) the Stalking Horse Bidder, and (b) Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders other than the Stalking Horse Bidder, the due

-3-

diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors, in consultation with the Committee, may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors, in consultation with the Committee, determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors, in consultation with the Committee, determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors, in consultation with the Committee, as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to MidCap and the Committee.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

**b.**     **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Committee, to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

E.      Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors, in consultation with the Committee, in their reasonable business judgment, shall constitute a "**Qualified Bid**." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

a.      **Assets**. Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

b.      **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"). The Purchase Price must be in cash consideration and must equal or exceed $7,825,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) and (iii) a $100,000 incremental amount (a "**Minimum Bid**").

c.      **Deposit**. With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**"). Within three (3) business days after the conclusion of any Auction, the Successful Bidder and Backup Bidder shall submit by wire transfer of immediately available funds, a supplemental cash deposit in an amount that, when added to the amount of the Deposit, is equal to ten (10) percent of the aggregate cash Purchase Price set forth in their respective Successful Bid and Backup Bid. The foregoing notwithstanding, the Stalking Horse Bidder shall not be required to submit any Deposit.

d.      **Residents**. Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms. Each Bid must further provide a description of the Potential Bidder's accreditation status with the Accreditation Council on Graduate Medical Education, including a description of accredited residency and fellowship programs currently offered by the Potential Bidder and/or expected to be offered in the future.

-5-

e.   **Same or Better Terms**.   Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors, in consultation with the Committee.   Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors, in consultation with the Committee, that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f.   **Contingencies; No Financing or Diligence Outs**.   A Bid shall not be conditioned on (i) the Potential Bidder obtaining financing, (ii) approval of the Potential Bidder's shareholders, board of directors or other internal approval, or (iii) the outcome or completion of due diligence by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment, in consultation with the Committee, than those set forth in the Stalking Horse Sale Agreement.

g.   **Identity**.   Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.   Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.   Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.   **Demonstrated Financial Capacity**.   A Qualified Bidder must have, in the Debtors' business judgment, as determined in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.   Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

-6-

i. **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Committee,.

j. **Binding and Irrevocable**. A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k. **Expenses; Disclaimer of Fees**. Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l. **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Committee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m. **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

n. **Adherence to Bid Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o. **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p. **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q. **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually** **received** on or before 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Bid Deadline**").

The Debtors reserve the right, in consultation with the Committee, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

F. Right to Credit Bid.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on all of the Resident Program Assets (a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object or challenge such creditor's lien thereunder (a "**Challenge**")) to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause. In the event that the Committee or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. If such creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash as the closing of the Sale.

In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up fee in lieu of cash.

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order.

Any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee.

G.     Auction.

If, prior to the Bid Deadline, the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. By 6:00 p.m. on the date of the Bid Deadline, the Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids were received prior to the Bid Deadline. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement) prior to the Bid Deadline, the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Committee (the "**Baseline Bid**"), and provide copies of all Qualified Bid Documents supporting the Baseline Bid and each other Qualified Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Committee, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, and may include, among other things: (a) the number, type, and nature of any changes to the Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on August 7, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

**a.     The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction, in consultation with the Committee as applicable. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of

each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and the Committee and all creditors will be permitted to attend. The Qualified Bidders, including the Stalking Horse Bidder, may appear at the Auction in person or through duly authorized representatives.

b.    **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a)    **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth in the Bidding Procedures Order or these Bidding Procedures (including the requirement of a cash component sufficient to pay all costs of sale including the Break-Up Fee).

(b)    **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may, in consultation with the Committee, announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors and the Committee.

(c)    **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(d)    **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have (i) in the initial Overbid round, identified an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or (ii) in subsequent rounds, identified an Overbid as

being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors, in consultation with the Committee, as the Prevailing Highest Bid as well as the value attributable by the Debtors, in consultation with the Committee, to such Prevailing Highest Bid.

c. **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Committee, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors, the Committee, and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with the Committee, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider, in consultation with the Committee, how to value each Overbid.

d. **Closing the Auction**.

(a) The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Committee, to be the highest or otherwise best Bid in accordance with the Bid Assessment Criteria. Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed. The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

(b) The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely.

(c) As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

**e.** **No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder. All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors, the Committee, and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

H.   Backup Bidder.

   a.   Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Committee (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors. The Stalking Horse Bidder shall serve as a Backup Bidder only if (X) the Bid set forth in the Stalking Horse Agreement is not determined to be the Baseline Bid (as defined herein), and (Y) the Stalking Horse Bidder elects, in its sole discretion, to offer a higher and better bid at the Auction. The Stalking Horse Bidder's Bid described in the Stalking Horse Agreement shall not be a Backup Bid absent the express consent of the Stalking Horse Bidder.

   b.   The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder. The foregoing notwithstanding, if the Stalking Horse Bidder serves as the Backup Bidder, its Backup Bid shall expire on the earlier of closing on an Alternative Transaction (defined below) or September 6, 2019. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

   c.   If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Committee, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

I.    Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights, in consultation with the Committee, to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

J.    Sale Hearing.

A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on **August 9, 2019, at 11:00 a.m. (ET)** before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Committee, by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder). The foregoing notwithstanding, if the Sale Hearing is continued without the consent of the Stalking Horse, the Stalking Horse may terminate the Stalking Horse Agreement.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

K.    Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

The Break-Up fee, to the extent owed by the Debtors, (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; (b) shall be payable at closing on of a Sale to a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**")without further order of the Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction. No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

L.       Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors, in consultation with the Committee, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction. The Stalking Horse Bidder shall not be required to provide a Deposit.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

M.       Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures prior to the commencement of the Auction if the Debtors' board of managers determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as the case may be, is required to comply with applicable law or the board's fiduciary obligations thereunder; *provided* that, in the event  the Debtors' board of managers determines to take any action, or refrain from taking any action, pursuant to this paragraph, without the consent of the Stalking Horse Bidder, the Stalking Horse Bidder may, but shall not be required to, terminate the Stalking Horse Agreement if taking such action or refraining from taking such action, as the case may be, would otherwise be grounds for termination under the Stalking Horse Agreement, it being understood that any material modification to the Bid Procedures without the consent of the Stalking Horse would be a breach of the Stalking Horse Agreement pursuant to which the Stalking Horse would have the right to terminate the Stalking Horse Agreement.

35612177.6 07/19/2019

**SCHEDULE 2**

**RESIDENT'S NOTICE**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE TO RESIDENTS AND FELLOWS
## REGARDING PROPOSED SALE OF RESIDENCY PROGRAM ASSETS

**TO: ALL RESIDENTS AND FELLOWS AT HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Tower Health ("**Tower**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to Tower: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors file a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**"). A copy of the Agreement, the Bidding Procedures Order and the Bidding Procedures is enclosed herewith.

## THE PROPOSED SALE

If approved by the Court, the Agreement will enable residents and fellows (collectively herein, the "**Residents**") at Hahnemann to continue their training at one of six hospitals operated by Tower - Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania. **Residents have a choice, and are not required to continue their training with Tower**. For any Resident who elects to complete their training elsewhere, Tower or the Debtors, as applicable, will release the related cap on Medicare reimbursement on a temporary basis to accommodate that choice.

For Residents who elect to stay with Tower, Tower will provide housing for those residents doing rotations at Reading Hospital, which is sixty miles from Hahnemann. Tower has also agreed to seek to hire the faculty who are currently training Residents at Hahnemann to ensure continuity of the Hahnemann training programs. Tower will also provide free housing (subject to parameters set forth in the Agreement) for the remainder of the academic year or during the term of a resident's existing vacated lease if it is necessary for the Resident to relocate during the current academic year. Residents will receive free meals while in any Tower hospital, and Tower will also provide additional amenities to assist Residents and their families with the transition.

If the Sale is approved by the Court to someone other than Tower, the terms of the Sale, and the impact upon Residents, may be different than those under the Agreement.

The Debtors recognize the unique difficulties and challenges facing Residents in light of the bankruptcy filing and expected closure of Hahnemann. The Debtors believe that the proposed Sale is in the best interests of Residents because it provides Residents with the option to continue their training and, to minimize, to the greatest extent possible, the impact of Hahnemann's closure on Residents, their professional training and education, and their families.

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys,

whose contact information is in the signature block below, for more information.  In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; and (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:*/s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE  19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

         -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and
    Debtors in Possession*

# SCHEDULE 3

# PUBLICATION NOTICE

Appx. 00426

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE REGARDING PROPOSED SALE OF RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL INTERESTS, INCLUDING PERSONAL INJURY CLAIMS

**TO: ALL PERSONS WITH CLAIMS AGAINST THE DEBTORS IN THE ABOVE CAPTIONED CASES, INCLUDING CLAIMS AGAINST HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Reading Hospital (the "**Purchaser**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to the Purchaser: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

**PLEASE TAKE FURTHER NOTICE** that the Sale, if approved, will be free and clear of all Interests, including claims of successor liability.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

**PLEASE TAKE FURTHER NOTICE THAT, IF THE SALE IS APPROVED, THE PURCHASER WILL NOT BE LIABLE ON ACCOUNT OF ANY CLAIMS AGAINST ANY OF THE DEBTORS (OTHER THAN CLAIMS AFFIRMATIVELY ASSUMED BY THE PURCHASER), INCLUDING CLAIMS OF PATIENTS TREATED AT HAHNEMANN, INCLUDING CLAIMS OF WHICH THE HOLDER MAY NOT BE PRESENTLY AWARE.**

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors filed a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**").

### Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys, whose contact information is below, for more information. In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower, and (d) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.

Dated: July 19, 2019         **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Mark Minuti*
     Mark Minuti (DE Bar No. 2659)
     Monique B. DiSabatino (DE Bar No. 6027)
     1201 N. Market Street, Suite 2300
     P.O. Box 1266
     Wilmington, DE 19899
     Telephone: (302) 421-6800
     Fax: (302) 421-5873
     mark.minuti@saul.com
     monique.disabatino@saul.com

         -and-

     Jeffrey C. Hampton
     Adam H. Isenberg
     Aaron S. Applebaum (DE Bar No. 5587)
     1500 Market Street, 38th Floor
     Philadelphia, PA 19102
     Telephone: (215) 972-7700
     Fax: (215) 972-7725
     jeffrey.hampton@saul.com
     adam.isenberg@saul.com
     aaron.applebaum@saul.com

     *Proposed Counsel for Debtors and*
     *Debtors in Possession*

# SCHEDULE 4

## INITIAL NOTICE OF ASSUMPTION AND ASSIGNMENT

Appx. 00430

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) | |
| *al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## NOTICE OF PROPOSED ASSUMPTION AND
## ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 and July 1, 2019 (the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion [D.I. 142] (the "**Sale Motion**") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets (the "**Residents Program Assets**") to Tower Health (the "**Stalking Horse Bidder**"), including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"), attached as **Exhibit B** to the Sale Motion; (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July 19, 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") [D.I. [●]] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herewith.

**PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder, or any other Successful Bidder, the Designated Contracts. A schedule listing the Designated Contracts (the "**Designated Contracts List**") is attached hereto and may also be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "**Cure Payments**") is set forth on the Designated Contracts List.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO AN INITIAL DESIGNATED CONTRACT IN THE INITIAL DESIGNATED CONTRACTS LIST**. Under the terms of the proposed Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Designated Contracts until the opening of business on the date of the Auction, or until the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline. Following the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Payments. If the Initial Designated Contracts List is modified, the Debtors will serve a supplemental notice of assumption and assignment on the affected counterparty, which shall identify the deadline for filing an objection with respect to the applicable Designated Contract.

### IMPORTANT PROPOSED DATES AND DEADLINES

1.   The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "**Sale Order**") and all objections related to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m. (ET)** (the "**Sale Objection Deadline**").

2.   The Auction for the Residents Program Assets, if one is necessary, will commence on **August 7, 2019 at 10:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

3.   A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

## FILING ASSUMPTION AND ASSIGNMENT OBJECTIONS

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("**Designated Contract Objections**"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on August 5, 2019**. Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

Failure to timely file a timely Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

## <u>CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:</u>

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE A TIMELY OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE PROPOSED BIDDING PROCEDURES ORDER AND THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

Appx. 00433

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

       -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

35599108.3 07/19/2019

Appx. 00434

**Designated Contracts List**

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Master Agreement for Shared Rotational Arrangements with Hahnemann University Hospital dated June 29, 2007 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $0.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Temple University Hospital | Academic Affiliation Agreement with Tenet HealthSystem St. Christopher's Hospital for Children, LLC, dated October 19, 2007 | $0.00 |
| 15 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |

35599108.3 07/19/2019

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|-----|------------------------------|-------------------------------|-------------|
| 17 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |
| 18-X | [INDIVIDUAL RESIDENTS] (to be provided and/or filed under seal) | Resident Employment Contract | $0.00 |

35599108.3 07/19/2019

Appx. 00436

# SCHEDULE 5

## AUCTION AND SALE NOTICE

Appx. 00437

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) | |
| *al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 and July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale and Bidding Procedures Motion**")[2] seeking the entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of certain of the Debtors' assets to Tower Health (the "**Stalking Horse Bidder**") for $7.5 million plus the assumption of certain contracts and responsibilities of the Debtors with respect to Residents at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) the form and manner of notices related to the Sale; and (c) procedures for the assumption and assignment of contracts in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that on July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety. To the extent that there are any inconsistencies between the Bidding Procedures and the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bidding Procedures Motion.

summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects. The deadline by which all Bids must be *actually received* by the parties specified in the Bidding Procedures Order is August 5, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Residents Program Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

| Proposed Investment Banker to Debtors | Proposed Counsel to Debtors |
|---|---|
| SSG Advisors, LLC<br>Five Tower Bridge, Suite 420<br>300 Barr Harbor Drive<br>West Conshohocken, PA 19428<br>J. Scott Victor (jsvictor@ssgca.com)<br>Teresa Kohl (tkohl@ssgca.com)<br>Craig Warznak (cwarznak@ssgca.com)<br>(610) 940-3615 | Saul Ewing Arnstein & Lehr LLP<br>1201 N. Market Street,  Suite 2300<br>Wilmington, Delaware 19899<br>Mark Minuti (mark.minuti@saul.com),<br>Jeffrey C. Hampton (jeffrey.hampton@saul.com),<br>Aaron S. Applebaum (aaron.applebaum@saul.com)<br>(215) 972-7777 |

## Obtaining Additional Information

Copies of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Purchase Agreement and all other documents filed with the Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

## Important Dates and Deadlines

1. The deadline to submit a Qualified Bid is August 5, 2019 at 4:00 p.m. (prevailing Eastern time).

2. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "**Sale Order**") and all objections relating to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m.** (prevailing Eastern time) (the "**Sale Objection Deadline**").

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Residents Program Assets. The Auction, if one is necessary, will commence on August 7, 2019 at 10:00 a.m. (prevailing Eastern time), or such other date as determined by the Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre

Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

4.  Objections to the conduct of the Auction and the terms of a sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "**Auction Objections**") may be raised at the Sale Hearing (as defined below).

5.  A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Court on **August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

### Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE  19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

       -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and
    Debtors in Possession*

Appx. 00441

**EXHIBIT B**

**Redline Asset Purchase Agreement – Successful Bid**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CENTER CITY HEALTHCARE, LLC,**

**as Seller,**

**AND**

**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.**

~~READING HOSPITAL~~

**as Purchaser**

## **ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of ~~July~~August, 2019, by and between Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital (the "**Seller**" or "**Hahnemann**"), a Delaware limited liability company and ~~Reading Hospital~~ Thomas Jefferson University Hospitals, Inc. (the "**Purchaser**"), a Pennsylvania nonprofit corporation.  The Seller and the Purchaser are sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Seller is engaged in the business of owning and operating an acute care hospital, including a graduate medical education program (the "**Business**"); and

WHEREAS, the Seller is the owner of the Purchased Assets; and

WHEREAS, the Purchaser and the Consortium (defined below) operate acute care hospitals and graduate medical education programs; and

WHEREAS, the Purchaser has formed or intends to form a consortium including itself, (i) Temple University Health System; (ii) Albert Einstein Health Network; (iii) Main Line Health, Inc.; (iv) Christiana Care Health System; and (v) The Cooper Health Systems, A New Jersey Non-Profit Corporation (collectively, and together with the Purchaser, the "**Consortium**"), for purposes of operating a GME network as a qualified Medicare GME affiliated group;

WHEREAS, Purchaser, directly or through the Consortium members, STC, and other third parties currently under contract with the Purchaser or Consortium Members (collectively, the "**GME Network Affiliates**"), shall assume placement of the Continuing Residents in furtherance of continuing quality medical education in the Delaware Valley region; and

WHEREAS, on June 30, 2019 (the "**Petition Date**"), a voluntary petition for relief was filed by the Seller under Chapter 11 of Title 11 of the United States ~~Bankruptcy~~ Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), under Case Number 19-11466 (the "**Bankruptcy Case**"); and

WHEREAS, in support of the Consortium's continuation of GME programs in the Delaware Valley region, and the effective transition of the Seller's predecessor GME programs, Seller desires to sell and Purchaser desires to purchase the Purchased Assets all in accordance with, and subject to, the terms and conditions contained in this Agreement; and

WHEREAS, the Purchased Assets being transferred herein are intended to be sold, conveyed and transferred to Purchaser free and clear of all Liens and Encumbrances pursuant to Section 363 of the Bankruptcy Code, and subject to the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

EXECUTION VERSION

# ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings indicated below, unless the context clearly requires otherwise:

"**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; provided that such Person shall be deemed an Affiliate for only so long as such control exists. For purposes of this definition and the definition of Related Person, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" shall mean all other agreements, documents and instruments to be executed and delivered by the Purchaser and/or the Seller pursuant to this Agreement.

"**Applicable Privacy and Security Law**" means any applicable Law relating to privacy, data protection, confidentiality, security, integrity and protection of personal information, including (i) health care and medical record applicable Laws, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and all implementing regulations (collectively, "**HIPAA**"); (ii) state data protection laws; (iii) state breach notification laws; and (iv) any comparable applicable state Laws and the regulations promulgated pursuant to all such applicable Laws.

"**Assigned Contracts**" shall mean, collectively, those Contracts included in the Purchased Assets, which shall consist solely of the Contracts identified on <u>Schedule A-1</u> to **<u>Exhibit A</u>**. Purchaser may add or delete Contracts from <u>Schedule A-1</u> pursuant to the applicable provisions of the ~~Bid~~ <u>Bidding</u> Procedures Order.

"**Assignment and Assumption Agreement**" shall mean the Assignment, Delegation and Assumption Agreement to be executed at the Closing between the Seller and the Purchaser in the form attached hereto as **<u>Exhibit B</u>**, pursuant to which, among other things, the Seller will assign and transfer to the Purchaser all of its right, title and interest under the Assigned Contracts, on the terms and conditions set forth therein.

"**Assumed Liabilities**" shall mean, collectively, (i) all liabilities <u>and performance obligations of the Seller</u> arising <u>upon or</u> after the Closing ~~with respect to~~ <u>under</u> the Assigned Contracts, (ii) all liabilities arising with respect to the Purchased Assets arising on or after the Closing Date, (iii) ~~all executory performance obligations of Seller to the extent arising or after the Closing, (iv) the Cure Costs (including Cure Costs asserted by CMS (including by offset) upon and/or after the Closing on account of~~ <u>liability for amounts due to CMS on account of services rendered or amounts previously paid to Seller under</u> the Participating Provider

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

Agreement), (v) any, up to (but not to exceed) the CMS Pre-Closing Amount, (iv) the Cure Costs, (v) and the Purchaser's portion of the Transfer Taxes pursuant to Section 10.4.

"**Assumption/Cure Notice**" means the Initial Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment delivered to counterparties to Contracts with the Seller pursuant to the Bidding Procedures Order.

"**Backup Bidder**" shall have the meaning stated in the Bidding Procedures Order.

"**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

"**Base Purchase Price**" is defined in Section 3.1.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Purchased Assets shall occur, which are attached to the Bidding Procedures Order as Exhibit I.

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court approving the Bid Procedures in the form attached hereto as **Exhibit F** and made part hereof.

"**Bill of Sale**" shall mean the bill of sale to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **Exhibit C**.

"**Books and Records**" means, collectively, all documents, lists and files relating or pertaining to the Purchased Assets or the Assumed Liabilities.

"**Business**" is defined in the Recitals to this Agreement.

"**Business Day(s)**" shall mean calendar days other than Saturdays, Sundays and days on which banking institutions in Wilmington, Delaware are authorized by Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Claims Close Date**" is defined in Section 10.5.

"**Closing**" is defined in Section 8.1.

"**Closing Date**" is defined in Section 8.1.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**CMS Discharge Pre-Closing Amount**" means a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as

3

EXECUTION VERSION

final, which amount shall be the maximum ~~Cure Costs~~ amount due to CMS on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement.

"**Continuing Residents**" means the Residents as of the Closing Date who ~~agree~~ have agreed to become residents training at a hospital operated by ~~the~~ Purchaser or ~~an~~ a GME Network Affiliate ~~of the Purchaser~~.

"**Contracts**" shall mean any agreement or contract, whether written or oral.

"**Cure Costs**" shall mean, with respect to any Assigned Contract, the amount due and owing to each non-debtor counterparty to such Assigned Contract to cure any defaults required to be cured as a condition of assumption of such Assigned Contract pursuant to Section 365(b)(1) of the Bankruptcy Code, to the extent applicable.

~~–~~"**Escrow Agent**" shall mean a financial institution mutually acceptable to Seller and Purchaser.

"**Escrow Agreement**" shall mean the agreement substantially in the form attached hereto as **Exhibit D**.

"**Escrow Account**" is defined in Section 3.1~~.~~.

"**Escrow Amount**" is defined in Section 3.1~~.~~.

"**Excluded Assets**" shall mean all rights, benefits or property of Seller which are not Purchased Assets.

"**Excluded Liabilities**" shall mean, collectively, any and all liabilities of the Seller of any kind or description other than the Assumed Liabilities.

"**Final Order**" shall mean an order, judgment or other decree as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"**GAAP**" shall mean generally accepted accounting principles in the United States, consistently applied.

"**GME Network Affiliate**" shall have the meaning given to it in the Recitals to this Agreement.

"**Governmental Authorization**" means any consent, license, permit, certificate of authority, registration, franchise, right, Order or notice, qualification or similar right issued, granted, given, or required by or under the authority of any Governmental Body or pursuant to any Law.

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

"**Governmental Body**" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including the FDA and its equivalent authority or body in any foreign jurisdiction.

"**Hahnemann Programs**" is defined in Section 6.2.

"**IME**" shall mean Indirect Medical Education.

"**Interests**" shall have the meaning stated in the Sale Order.

"**Knowledge of the Seller**" and "**to the Seller's Knowledge**" shall mean the actual knowledge of Joel Freedman, the Seller's Chief Executive Officer, or and Allen Wilen, the Seller's Chief Restructuring Officer — Finance.

"**Laws**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

"**Lien**" has the meaning given to such term in the Bankruptcy Code.

"**Liquidated Cure Costs**" means all Cure Costs relating to Assigned Contracts which are allowed in a Final Order of the Bankruptcy Court.

"**Losses**" is defined in Section 10.1.

"**Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchased Assets; provided, however, that any adverse change, event, development or effect arising from or relating to any of the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been, a Material Adverse Effect: (i) the United States economy, the global economy, in each case, as a whole, or the industry or markets in which the Seller operates; (ii) the filing of the Bankruptcy Case; (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (iv) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (v) changes in GAAP; (vi) changes in Law or Orders; (vii) the taking of any action contemplated by this Agreement or any of the Ancillary Documents; (viii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes; (ix) changes resulting from the announcement of the execution of this Agreement or any of the transactions contemplated hereby; or (x) the termination of any Contract that is not an Assigned Contract, or the occurrence of any breach by any party of any Contract that does not relate to the Purchased Assets or the Assumed Liabilities; (xi) any adverse change to the Business prior to the date hereof.

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

"**Non-Disclosure Agreement**" means any and all confidentiality agreements and/or non-disclosure agreements executed by the Purchaser as a condition to obtaining confidential and/or proprietary information from the Seller.

"**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body.

~~"**Ordinary Course of Business**" means the ordinary course of the Seller's Business consistent with past practice.~~

"**Outside Closing Date**" shall mean September 6, 2019 or such other date as Seller and Purchaser may agree.

"**Participating Provider Agreement**" means the Participating Provider Agreement with the Centers for Medicare and Medicaid Services between the Seller and CMS related to Hahnemann University Hospital.

"**Permitted Escrow Withdrawals**" is defined in Section 3.1.

"**Person**" shall mean any individual, corporation, Governmental Body, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

"**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"**Purchased Assets**" shall mean the assets of Seller identified on **Exhibit A**.~~.~~

"**Purchaser Indemnified Party**" is defined in Section 10.1.

"**Purchaser Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchaser.

"**Related Person**" (i) with respect to a Person who is an individual, shall mean, (a) any other individual having a relationship with such specified individual (by blood, marriage or adoption) of grandparent, parent, child, grandchild, aunt, uncle, niece, nephew, sister, brother or first cousin (collectively, "**Relatives**"), (b) any Person that is controlled by such individual or any one or more members of such individual's Relatives; and (c) any Person with respect to which such individual or one or more members of such individual's Relatives serves as a director, officer, partner, or trustee (or in a similar capacity); and (ii) with respect to a specified Person other than an individual, shall mean (a) any Affiliate of such specified Person; and (b) each Person that serves as a director, officer, partner, or trustee (or in a similar capacity) of such specified Person.

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

Appx. 00449

EXECUTION VERSION

"**Representative**" shall mean, with respect to a particular Person, any director, officer, trustee, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Notification**" is defined in Section 6.3.

"**Residents**" means the medical residents and fellows training at, or through a residency program sponsored by or in affiliation with, Hahnemann University Hospital. Unless otherwise specified, all references to the number of Residents shall be in terms of full time equivalents ("**FTEs**").

"**Sale Motion**" shall mean that certain motion filed by the Seller in the Bankruptcy Case on July 9, 2019 (D.I. 142) pursuant to which, among other things, the Seller requested an order (a) approving the Bid Procedures, (b) approving procedures relating to the assumption and assignment of executory contracts, including procedures for establishing Cure Costs, (ea) establishing a date for an auction, and (d) scheduling a sale hearing.

"**Sale Order**" shall mean an Order of the Bankruptcy Court pursuant to the Bankruptcy Code approving this Agreement and the transactions contemplated hereby substantially in the form attached hereto as **Exhibit E** and made part hereof.

"**Seller Disclosure Letter**" is defined in **Article IV**.

"**Seller Indemnified Party**" is defined in Section 10.2.

"**SSG**" means SSG Capital Advisors, LLC.

"**STC**" shall have the meaning set forth in Section 6.9.

"**Tail Coverage Costs**" shall mean the cost to Seller of purchasing and maintaining the Tail Coverage Endorsement.

"**Tail Coverage Endorsement**" shall mean a reporting endorsement to insure against professional liabilities of Continuing Residents relating to the period from the start of the Seller's ownership and operation of resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital to the Closing Date. Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars ($1,500,000) annual aggregate for each MCARE eligible Resident only.

"**Tail Coverage Costs**" shall mean shall mean the cost to Purchaser in excess of one hundred thousand dollars ($100,000) of purchasing the Tail Coverage Endorsement.

"**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

7

EXECUTION VERSION

"**Tower GME Affiliation Agreement**" shall mean the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Seller and Purchaser (or an affiliate of Purchaser).

"**Transfer Taxes**" is defined in <u>Section 10.14(a)</u>.

## ARTICLE II.
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

**2.1**     2.1 **Agreement to Sell and Purchase Purchased Assets.**  On the Closing Date, subject to the performance by the Parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Purchased Assets, free and clear of all Interests other than Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**2.2**     2.2 **Assumed Liabilities/Excluded Liabilities.**  On the Closing Date, the Purchaser shall assume and become responsible for, and shall pay, perform, fulfill and discharge, all of the Assumed Liabilities.  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any of the Excluded Liabilities, all of which shall remain the sole responsibility and obligation of the Seller.

**2.3**     2.3 **Assigned Contracts.**  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any Contracts, all of which shall remain the sole responsibility and obligation of the Seller, except for the Assigned Contracts.  As to the Assigned Contracts:

(a)     (a) At Closing, Seller shall assign to Purchaser, and Purchaser shall assume, all of the Assigned Contracts and Purchaser shall pay to the applicable counterparty the Cure Costs as and when such Cure Costs become Liquidated Cure Costs.

(b)     (b) Purchaser shall provide promptly any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Purchaser's capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts, to the extent applicable.

**2.4**     2.4 **Competing Transactions; Bankruptcy Court Approval.**  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids pursuant to the Bidding Procedures Order and the Bid Procedures approved thereby (each, a "**Competing Bid**").  Until the transactions contemplated by this Agreement are consummated, Seller may perform any and all other acts related to seeking a Competing Bid as provided under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including but not limited to supplying information relating to the Purchased Assets to prospective purchasers.

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

Appx. 00451

# ARTICLE III.
## PURCHASE PRICE

**3.1** ~~3.1~~ **Purchase Price.** The Purchase Price shall be ~~Seven Million Five Hundred Thousand Dollars ($7,500,000)~~Fifty-Four Million Dollars ($54,000,000), subject to upward adjustment pursuant to Section 3.2(d) hereof (~~the~~ (the "**Base Purchase Price**") and~~,~~ subject to the following sentence, shall be paid in cash at Closing ~~subject to the purchase price adjustment of Five Hundred Thousand Dollars ($500,000), which was paid by Purchaser to Seller on June 28, 2019 as consideration for the Tower GME Affiliation Agreement, that shall be credited against the Base Purchase Price~~. In addition, an amount (the "**Escrow Amount**") equal to Three Million Dollars ($3,000,000) minus Liquidated Cure Costs paid by Purchaser on the Closing Date will be withheld from the Base Purchase Price and placed into a non-interest bearing escrow account (the "**Escrow Account**") held by the Escrow Agent pursuant to the Escrow Agreement. The Escrow Amount shall be distributed to Purchaser from time to time in accordance with the Escrow Agreement to cover the following losses, damages and expenses (collectively, the "**Permitted Escrow Withdrawals**"): (a the ~~Tail Coverage Costs, (b) the CMS Discharge~~ CMS Pre-Closing Amount, as and when liquidated, (~~c~~b) the Cure Costs not paid on the Closing Date and not included in the CMS ~~Discharge~~ Pre-Closing Amount, and (~~d~~c) the Losses payable to a Purchaser Indemnified Party. To the extent that there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, such remaining funds minus any then pending written claims asserted by Purchaser for Permitted Escrow Withdrawals (whether or not disputed) shall be distributed to Seller in accordance with the Escrow Agreement without any further action being required on the part of Purchaser. Upon resolution of any Permitted Escrow Withdrawals pending as of the one-year anniversary of the Closing Date, (x) any amounts determined to be owing to Purchaser shall be distributed to Purchaser, and (y) any amounts determined not to be owing to Purchaser shall be distributed to Seller.

**3.2** ~~3.2~~ **Payment of Base Purchase Price.** At Closing, the Base Purchase Price shall be payable by Purchaser as follows:

(a) ~~(a)~~ Purchaser shall deposit the Escrow Amount into the Escrow Account pursuant to and in accordance with the Escrow Agreement.

(b) ~~(b)~~ Purchaser shall pay Liquidated Cure Costs as of the Closing Date.

(c) ~~(c)~~ Purchaser shall pay to the Seller the ~~Four~~ Fifty-One Million ~~Dollar ($4,000,000~~Dollars ($51,000,000) balance of the Base Purchase Price by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller prior to the Closing.

(d) Purchaser shall reimburse Seller for the Tail Coverage Cost actually paid by Seller to purchase the Tail Coverage Endorsement, up to a maximum of One Million Dollars ($1,000,000).

**3.3** ~~3.3~~ **Tax Allocation of Base Purchase Price.** The Base Purchase Price shall be allocated among the Purchased Assets in accordance with the IRS Form 8594, Asset Acquisition Statement Under Section 1060 as agreed by the respective accountants of Purchaser and Seller

9

EXECUTION VERSION

within a reasonable period of time after Closing in good faith consistent in all respects with applicable Laws.  The Seller and the Purchaser shall file their respective Tax returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Purchaser, as the case may be, reasonably determines (and notifies the other Party) that such allocation is contrary to applicable Law.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the disclosure letter delivered by the Seller to the Purchaser on the date hereof (the "**Seller Disclosure Letter**"), the Seller represents and warrants to the Purchaser as follows:

**4.1** ~~4.1~~ **Organization.**  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation and is in good standing in each other jurisdiction where the operation of the Business by the Seller requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.2** ~~4.2~~ **Power and Authority.**  Upon entry of and subject to the Sale Order, Seller shall have all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Seller.  Upon entry of and subject to the Sale Order, this Agreement shall constitute a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**4.3** ~~4.3~~ **Non-contravention.**  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery of this Agreement or any other Ancillary Document to which the Seller is a party, and the performance by the Seller of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of the Seller, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Assigned Contract, (iii) to Seller's Knowledge, violate in any material respect any Law or Order applicable to the Business or the Purchased Assets, or (iv) result in the imposition of any Lien on the Purchased Assets.

**4.4** ~~4.4~~ **Consents.**  Upon entry of the Sale Order and upon each regulatory approval to which Section 7.1(c) of this Agreement relates having been obtained, no approval, consent or authorization of, or declaration, filing or registration with or any notification to any Governmental Body or any other third Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

**4.5** ~~4.5~~ **Liabilities.**  The Seller has no Liabilities with respect to the Purchased Assets for which the Purchaser will be responsible after Closing except for any Assumed Liabilities assumed by the Purchaser.

EXECUTION VERSION

4.6     **Title.**  The Seller has good and marketable title to all of the Purchased Assets, free and clear of all Interests other than Interests which will be divested from the Purchased Assets by the Sale Order.  Upon the completion of the transactions contemplated hereby, the Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Interests other than Assumed Liabilities.

4.7     4.7 **Litigation.**  There are no Proceedings pending, or to the Seller's Knowledge, threatened against the Purchased Assets or Business, at Law or in equity, or before any Governmental Body which will interfere with the ownership or use by the Purchaser of the Purchased Assets after the Closing.

4.8     1.7 **Proceedings.**  There is no Proceeding pending that challenges, or that is reasonably likely to have the effect of preventing, delaying or rendering illegal any of the transactions contemplated by this Agreement.

4.9     1.8 **Tax Matters.**  There are no Tax Liens or Encumbrances for Taxes upon the Purchased Assets and as of the end of the day on the Closing Date there will be no such Tax Liens or Encumbrances.  There is not and, as of the end of the day on the Closing Date there will not be, any liability for Taxes affecting the Purchased Assets for which the Purchaser will at any time have any liability for payment.

4.10    1.9 **Brokers and Finders.**  Other than SSG, no broker, finder or investment banker is entitled to any brokerage, finder's finders or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller.  Seller will be solely responsible for any fee, commission or other consideration of any kind due to SSG on account of the transactions contemplated by this Agreement.

4.11    **Tail Coverage.**  Seller shall be solely responsible for purchasing and maintaining the Tail Coverage Endorsement and shall incur all costs associated with the same, except as provided in Section 3.2(d).

4.12    **Funding and Disputes.**  Seller represents and warrants that no Medicare GME funding for the Residents is currently owed to Seller and outstanding except as in the normal course, and that Seller has not received notice of any disputes and, to Seller's Knowledge there are no facts or circumstances that may result in a dispute with regard the payment of Medicare GME funding for the Residents in the amount of Fifty Thousand Dollars ($50,000) or more in the aggregate.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER.

The Purchaser represents and warrants to the Seller as follows.

5.1     5.1 **Organization.**  The Purchaser is a nonprofit corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to conduct its business and own and operate its properties.

11

EXECUTION VERSION

**5.2** ~~5.2~~ **Power and Authority.**

(a) ~~(a)~~ The Purchaser has all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by the Purchaser. This Agreement is a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(b) ~~(b)~~ To the extent that this Agreement or any of the Ancillary Documents provides that any Affiliate of the Purchaser makes any covenant or undertakes the payment or performance of any obligation in connection with the transactions contemplated hereunder or thereunder, such Affiliate has all requisite power and authority to enter into the transactions contemplated hereby and thereby.

**5.3** ~~5.3~~ **Non-contravention.** Neither the execution and delivery of this Agreement or any other Ancillary Document to which the Purchaser is a party, will (i) violate any provision of the organizational documents of the Purchaser, or (ii) violate any Law or Order applicable to the Purchaser.

**5.4** ~~5.4~~ **No Proceedings.** There are no actions, suits or proceedings pending, or to the actual knowledge of Purchaser, threatened, before or by any Governmental Body, against Purchaser which would affect Purchaser's ability to proceed with the transactions contemplated by this Agreement.

**5.5** ~~5.5~~ **Consents.** No consent, waiver, authorization or approval of any person or declaration, filing or registration with any Governmental Body or other Person is required in connection with the execution and delivery by Purchaser of this Agreement or the performance by Purchaser or its Affiliates of its respective obligations hereunder or thereunder.

**5.6** ~~5.6~~ **Bankruptcy Matters.** Purchaser is capable of satisfying the adequate assurance of future performance conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to each Assigned Contract, to the extent applicable.

**5.7** ~~5.7~~ **Financing.** Purchaser has readily-available cash on hand, availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Base Purchase Price at Closing.

**5.8** ~~5.8  Purchaser's~~ **Hospital Facilities.** Purchaser~~-~~, directly or through Affiliates, owns and operates ~~six~~ a total of seven (7) Medicare-participating hospitals located within ~~60~~ fifteen (15) miles of Hahnemann University Hospital's facility, all of which have the capacity to operate medical residency programs.

**5.9** ~~5.9~~ **Certain Relationships.** Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser is an officer or director of the Seller or a Related Person of any officer, director or key employee of the Seller. Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser has entered into any Contract with any officer, director or key employee of the Seller.

EXECUTION VERSION

**5.10**   5.10 **Brokers and Finders.**  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof.

~~ARTICLE VI.~~

**ARTICLE VI.**
**COVENANTS OF THE PARTIES**

**6.1**   6.1 **Access to Information.**  Subject to all Applicable Privacy and Security Laws, the Seller shall permit the Purchaser's Representatives to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Business, to the personnel, books, records, Assigned Contracts, and documents of or pertaining to the Purchased Assets; provided, that the Seller may restrict the foregoing access to the extent that in the reasonable judgment of the Seller, any Law applicable to the Seller requires it to restrict access to any of its business, properties, information or personnel; and provided, further, that such access shall not unreasonably disrupt the operations of the Seller or the Business.

**6.2**   6.2 **Conduct of the Business.**  From the date hereof until the Closing Date, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), and subject in all respects to the Bankruptcy Code and orders of the Bankruptcy Court (including, without limitation, the Sale Order), the Seller shall use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at Hahnemann University Hospital (the "**Hahnemann Programs**").  Seller and Purchaser shall work cooperatively to determine clinical rotation assignments for Residents, with such mutually-agreed assignments to commence as soon as practicable after the Purchase Agreement is entered into.  For the avoidance of doubt, neither the existence of this Agreement nor any provisions set forth herein shall restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those Residents who elect not to become Continuing Residents.

**6.3**   6.3 **Notification of Certain Matters.**  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "**Required Notification**"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

**6.4**   6.4 **Cooperation.**  Subject in all respects to the Bankruptcy Code and the Bankruptcy Cases, the Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in **Article VII** and to

13

EXECUTION VERSION

consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

**6.5**    ~~6.5~~  **Records Retention and Access.**  For a period of six (6) years following the Closing or such shorter period that records are required to be retained by applicable Law (but in no event less than three (3) years), Purchaser shall at Seller's expense furnish to the Seller, to the extent in Purchaser's possession and following receipt of a reasonable, written request therefor, information that is necessary for Seller to prepare for, prosecute or defend against any Proceeding related to the Business, to validate claims filed in the Bankruptcy Case ~~and/~~ and/or to enable Seller and its Representatives to prepare, complete and file all required federal, state and local Tax returns in accordance with applicable Law.

**6.6**    ~~6.6~~  **Cure Costs.**  Seller shall not agree to the amount of any Liquidated Cure Costs without the written consent of Purchaser.  From and after the Closing Date, Purchaser shall have the sole right to contest and settle any claims for Cure Costs and, to the extent necessary and permitted by the Bankruptcy Court, Seller shall cooperate in substituting Purchaser for Seller (at Purchaser's expense) in connection with any pending objections to Cure Costs.

**6.7**    ~~6.7~~  **Bid Procedures.**  Seller shall not modify the Bid Procedures without the consent of Purchaser.

**6.8**    ~~6.8~~  **Covenants of Purchaser Regarding Transition and Accommodation of Residents**.

    **(a)**    ~~(a)~~  Purchaser , directly or through a GME Network Affiliate, will accommodate a maximum of 583 Continuing Residents to pursue continued medical residency training at Purchaser-owned hospitals or GME Network Affiliate-owned hospitals, as applicable. If requested by Purchaser, Seller shall take all reasonable actions to reflect its consent to the transfer of Continuing Residents to Purchaser or a GME Network Affiliate.  For any Resident who does not become a Continuing Resident and elects to pursue their training at hospitals that are not owned by Purchaser or a GME Network Affiliate, Purchaser agrees , in compliance with applicable regulation, to release the GME cap associated with Medicare reimbursement for such Residents on a temporary basis to the hospital where the Resident transfers until the Resident has completed training.

    **(b)**    ~~(b)~~  If the Continuing Residents are required to relocate their personal residence to continue their training with Purchaser or a GME Network Affiliate, Purchaser shall provide , or cause such GME Network Affiliate to provide, reasonable private housing for such residents for the longer of the remainder of the current academic year or for the duration of a Resident's existing vacated lease. The provision of reasonable private housing shall not extend beyond the Resident's completion of his or her residency training with Purchaser or such GME Network Affiliate.

    **(c)**    To the extent necessary to provide for continued residency training, Purchaser shall use reasonable efforts to transfer Seller's residency program faculty to ~~its~~

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

hospitals a Purchaser or GME Network Affiliate hospital so that they can continue to provide education to Residents.

(d) (d) Unless inconsistent with Purchaser or GME Network Affiliate's standard practice for residents, Purchaser shall provide, or cause the applicable GME Network Affiliate to provide, Continuing Residents with free meals during the time that they are training at Purchaser or such GME Network Affiliate hospitals.

(e) (e) To the extent necessary for Continuing Residents to fulfill residency training requirements, Purchaser shall provide, or cause a GME Network Affiliate to provide, additional transition resources to Continuing Residents as may be requested by Seller from time to time.

(f) (f) The parties shall cooperate in determining the initial clinical rotation assignments for Continuing Residents for the period following the transfer.

(g) Purchaser shall use reasonable efforts to ensure that each Continuing Resident's terms of employment (e.g., compensation and benefits) with Purchaser or a GME Network Affiliate are substantially equivalent or better than the Continuing Resident's current terms of employment with the Seller.

**6.9** *6.9* **Covenants of Purchaser Regarding Continued Affiliation with St**. **Christopher's Hospital for Children.** For the period of ten (10 ) years after the Closing with automatic renewals for periods of five (5) years, provided that at the time of each such renewal such resident caps are used for resident training at STC only, unless either party gives not less than one hundred eighty (180) days' notice, Purchaser agrees to, and to cause any successor or assignee of any Purchased Assets to agree to: (i) enter into an agreement to continue participating in a "**Medicare GME affiliated group**" as that term is defined in 42 C.F.R. 413.75(b), with St. Christopher's Hospital for Children ("**STC**"), whereby Purchaser will continue sharing full-time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between STC and Seller (the "**STC GME Affiliation Agreement**") or enter into a new GME affiliation agreement substantially in the form of the STC GME Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation agreement" each academic year.

**6.10** *6.10* **Covenants of Purchaser Regarding Other GME Affiliation Agreements.**

(a) (a) For the remainder of the academic year during which the Closing occurs, and to the extent permitted and required by CMS, Purchaser shall accept assignment from Seller of the GME Affiliation Agreements identified listed as numbered items 1, 2, 3, 4 and 5 (but not 3) under the heading Current GME Affiliation Agreements on Schedule A-1 to **Exhibit A** of this Agreement (the "**Current GME Affiliation Agreements**") (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(a) being included as "Cure Costs" for purposes of this Agreement) or, or shall enter into new GME affiliation agreements with those counterparties substantially in the form of the Current GME Affiliation Agreements; and

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

Appx. 00458

EXECUTION VERSION

(b)      (b)  Purchaser shall, subject to Purchaser's completion of due diligence, shall accept assignment of the agreements identified under the heading GME Obligations on Schedule A-1 to **Exhibit A** of this Agreement to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(b) being included as "Cure Costs" for purposes of this Agreement).

**6.11    Covenant of Seller Regarding Tail Coverage Endorsement for Residents.**  At or prior to Closing, Seller shall obtain the Tail Coverage Endorsement.

**6.12    Covenant of Seller Regarding Medical Records.**  Seller acknowledges that Purchaser, GME Affiliates, and clinicians affiliated with each of them collectively have undertaken to provide clinical care to patients who historically have received care from Seller.  To facilitate such care on an ongoing basis, and otherwise to satisfy obligations of Seller, Seller will undertake to assure the ongoing availability of medical records of Seller's patients to Purchaser, GME Affiliates, clinicians affiliated with each of them, other providers to the extent applicable, and patient themselves.  To further facilitate such availability, with acknowledgment that Seller continues to be finalizing its own arrangements in this regard as of the date of this Agreement, Seller will consider in good faith any request by Purchaser for assignment to Purchaser of agreements with any third-party vendor or vendors with respect to ongoing medical records availability, storage, or maintenance.

**6.13    Covenant of Seller Regarding Medicare Cost Reports.**  Within 45 days of the Closing Date, or such longer period as CMS may permit, Seller shall prepare and file any final Medicare cost reports related to Hahnemann's operations for the period prior to the Closing Date and, thereafter, Seller shall provide such information and assistance as may reasonably be requested by Purchaser with respect to Seller's filing of Medicare cost reports.

**ARTICLE VII.**
**CONDITIONS TO CLOSING**

**7.1**    ~~7.1~~Conditions to Obligations of Each Party.  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)      (a)  Proceedings; Orders.  No Governmental Body of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

(b)      (b)  Sale Order.  The Bankruptcy Court shall have entered the Sale Order with such changes as are mutually agreed to by the Seller and Purchaser, each in the exercise of its respective sole discretion.

(c)      (c)  Regulatory Approvals.  CMS, the Pennsylvania Department of Health ("**DOH**") and the Accreditation Council for Graduate Medical Education ("**ACGME**") and any other applicable regulatory authority or Governmental Body, in each case to the extent required,

16

shall have consented to the transactions contemplated by this Agreement and, solely with respect to CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated hereby will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap, shared, pursuant to generally applicable regulations, by GME Network Affiliates who qualify as members of one or more applicable Medicare GME affiliated group.

**7.2** ~~7.2~~**Additional Conditions to Obligations of the Purchaser.** The obligations of the Purchaser to effect the transactions contemplated hereby are subject to satisfaction or waiver of the following additional conditions:

(a) ~~(a)~~Representations and Warranties. The representations and warranties of the Seller set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b) ~~(b)~~Agreements and Covenants. The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c) ~~(c)~~Documents. All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to Section 8.2 of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

(d) Successor Liability. Entry of an Order of the Bankruptcy Court, which may be the Sale Order, which precludes the assertion of any successor, vicarious, or transferee liability (by piercing the corporate veil or otherwise) against the Purchaser, its Affiliates, or the Consortium or its members, relating to claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party relating to the operation of the Business prior to Closing. For the avoidance of doubt, nothing in this paragraph is intended, nor shall it be construed, to preclude the collection of the CMS Pre-Closing Amount from the Escrow Account as provided herein.

**7.3** ~~7.3~~**Additional Conditions to Obligations of the Seller.** The obligations of the Seller to effect the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

(a) ~~(a)~~Representations and Warranties. The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of

17

EXECUTION VERSION

another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Purchaser Material Adverse Effect.

(b)     (b)Agreements and Covenants.  The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     (c)Documents.  All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to Section 8.3 of this Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

## ARTICLE VIII.
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

**8.1**     **8.1  Closing.**  The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Stevens Drinker Biddle & LeeReath LLP, P.C., 1818 Market St., 29th FloorOne Logan Square, 18th and Cherry Streets, Philadelphia, PA 19103-6996, or such other place as agreed by the parties or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the Parties, as soon as practicable following the satisfaction or waiver of the conditions set forth in **Article VII** hereof and in any event within three (3) Business Days thereafter (the "**Closing Date**").  The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Standard Time, on the Closing Date.

**8.2**     **8.2  Deliveries by the Seller at the Closing.**  At the Closing, Seller shall furnish and deliver to the Purchaser the following:

(a)     (a) the Bill of Sale, duly executed by the Seller;

(b)     (b) the Assignment and Assumption Agreement, duly executed by the Seller;

(c)     (c) a certificate, dated as of the Closing Date and signed by the Seller, certifying that each of the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied;

(d)     (d) a copy of the Sale Order; and

(e)     evidence of satisfaction of Section 6.11; and

(f)     (e) all other certificates, instruments and documents reasonably required to be delivered by the Seller pursuant to this Agreement or any of the Ancillary Documents.

**8.3**     **8.3  Deliveries by the Purchaser at the Closing.**  At the Closing, Purchaser shall furnish and deliver to Seller the following:

(a)     (a) the Four Fifty-One Million Dollar ($4,000,00051,000,000) portion of the Base Purchase Price in excess of the Escrow Amount and the Liquidated Cure Costs by wire transfer of immediately available funds to an account designated in writing by the Seller;

EXECUTION VERSION

(b) if purchased by Purchaser (which Purchaser shall have no obligation to do), the Tail Coverage Endorsement and evidence supporting the calculation of the Tail Coverage Costs;

(b)     reimbursement of up to One Million Dollars ($1,000,000) of Tail Coverage Costs as provided in Section 3.2(d);

(c)     (c) the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)     (d) a certificate, dated as of the Closing Date and signed the Purchaser, certifying that each of the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(e)     (e) evidence of satisfaction of Section 6.9;

(f)     (f) evidence of satisfaction of Section 6.10; and

(g)     (g) all other certificates, instruments and documents required to be delivered by the Purchaser pursuant to this Agreement or any of the Ancillary Documents.

**8.4     8.4 Additional Actions Taken by the Purchaser at the Closing.** At the Closing, Purchaser shall take the following actions:

(a)     (a) Pay the Liquidated Cure Costs from the Base Purchase Price to the respective Persons entitled to receive them.

(b)     (b) Fulfill its covenants under Sections 6.8, 6.9 and 6.10 of this Agreement.

## ARTICLE IX.
## TERMINATION

**9.1     9.1 Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)     (a) By mutual written consent of the Seller and the Purchaser;

(b)     (b) By (i) the Seller if, as of the day after the Outside Closing Date, any condition to the obligation of the Seller to close has not been satisfied, provided, however, that if the Closing has not occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Seller, then Seller may not terminate this Agreement pursuant to this Section 9.1(b), and (ii) the Purchaser if, as of the day after the Outside Closing Date, any condition to the obligation of the Purchaser to close has not been satisfied; provided, however, that if the Closing has not occurred on or before the after the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then the Purchaser may not terminate this Agreement pursuant to this Section 9.1(b);

19

(c) (c) By Purchaser, in its sole and absolute discretion, if the sum of the (i) Tail Coverage Costs, (ii) CMS Discharge CMS Pre-Closing Amount, and (iii)ii) without duplication of the CMS Discharge Pre-Closing Amount, (A) the Liquidated Cure Costs, and (B) the good faith estimate by Purchaser of the amount of any Cure Costs related to Assigned Contracts which will become Liquidated Cure Costs after the Closing Date, exceeds Three Million Dollars ($3,000,000);

(d) (d) Automatically, and without further action by any Party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated hereby, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(e) (e) Automatically, and without further action by any Party, if the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or is dismissed, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order providing for such conversion or dismissal;

(f) (f) By the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, and if (i) the Seller fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Seller to close (other than conditions related to deliveries to be made at Closing by the Purchaser provided the Purchaser is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Seller herein become untrue or inaccurate such that the condition set forth in Section 7.2(a) would not be satisfied or (iii) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.2(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Seller;

(g) (g) By the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (i) the Purchaser fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Purchaser to close (other than conditions related to deliveries to be made at Closing by the Seller provided the Seller is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Purchaser herein become untrue or inaccurate such that the condition set forth in Section 7.3(a) would not be satisfied or (iii) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.3(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Purchaser;

(h) (h) Automatically, and without further action by any Party, if (i) the Purchaser is not the Successful Bidder or Backup Bidder (each as defined in the Bid Procedures), or (ii) if the Purchaser is the Backup Bidder, upon the earlier of (A) Closing with the Successful Bidder, and (B) the Outside Closing Date. The foregoing notwithstanding, the Purchaser shall serve as a Backup Bidder at the Auction only if (X) its bid pursuant to this Agreement is not determined to be the "Baseline Bid," as defined in the Bid Procedures, and (Y) it elects, at its

sole discretion, to offer a higher and better bid at the Auction. For avoidance of doubt, the Purchaser's offer described in this Agreement shall not be a Back-Up Bid absent the express consent of the Purchaser.; or

(i)     By the Purchaser if (i) any applicable regulatory authority or Governmental Body has not granted any necessary consents to the transfer of the Purchased Assets to Purchaser or a GME Network Affiliate, including without limitation, the Participating Provider Agreement and Seller's IME and direct GME resident cap slots appurtenant thereto; or (ii) prior to Closing, any fact or circumstance arises relating to Medicare change of ownership, Medicare IME or direct GME funding of one or more Continuing Residents that may lead to an aggregate reduction in Medicare IME or direct GME funding for the Continuing Residents in the amount of Three Million Dollars ($3,000,000) or more.

**9.2**     9.2    **Effect of Termination.** Except as provided in this Section 9.2, in the event of the termination of this Agreement pursuant to Section 9.1, this Agreement (other than this Section 9.2, which shall survive such termination) will forthwith become void, and there will be no liability on the part of any Party to the other and all rights and obligations of any Party will cease, except that nothing herein shall relieve any Party from liability for any intentional or material breach of this Agreement.

## ARTICLE X.
## INDEMNITY

**10.1     Indemnification by Seller.** Subject to this **Article X** and consummation of the Closing, Seller shall, indemnify, defend and hold harmless Purchaser and , Purchaser's officers, directorsAffiliates, trustees, members, employees the Consortium, agentsthe members of the Consortium, and the Representatives and Affiliates of each (each, a "**Purchaser Indemnified Party**") against and in respect of any and all out-of-pocket losses, documented and reasonable costs and expenses (including, without limitation, documented and reasonable costs of investigation and defense and reasonable attorneys' fees), claims, damages, obligations, or liabilities, whether or not involving a third party claim, but only after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Purchaser Indemnified Party in respect of any such claim (collectively, "**Losses**"), arising out of, based upon or otherwise in respect of:

(i)     (i) any inaccuracy in or breach of any representation or warranty of Seller made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Purchaser by Seller pursuant to this Agreement (determined in each case without regard to any qualification with respect to materiality, Material Adverse Effect or similar qualification); provided, that the Seller shall not have any liability under this clause (i) (other than with respect any intentional fraud on the part of Seller) unless the aggregate of all Losses asserted under this clause (i) for which Seller would, but for this proviso and but for the $25,000 per per-claim deductible described below, be liable exceeds on a cumulative basis an amount equal to Two Hundred Thousand Dollars ($200,000.00);

21

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION



(ii)    (ii) any nonfulfillment or breach of any covenant or agreement by Seller under this Agreement or any of the Schedules attached hereto;

(iii)    (iii) any Liability or obligation of Seller which is an Excluded Liability; and

(iv)    (iv) the ownership of any of the Excluded Assets by Seller after the Closing Date.

(b)    (b) Each Purchaser Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(c)    (c) NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS TO THE CONTRARY, SELLER WILL NOT BE LIABLE FOR ANY LOSS ASSERTED UNDER <u>SECTION 10.1(a)(i)</u> UNLESS THE CUMULATIVE LOSSES EXCEED $25,000 IN WHICH CASE SELLER WILL, SUBJECT TO THE OTHER LIMITATIONS IN THIS **ARTICLE X**, BE LIABLE TO INDEMNIFY THE PURCHASER INDEMNIFIED PARTY ONLY FOR THE EXCESS OVER $25,000; AND THE SOLE REMEDY OF ANY PURCHASER INDEMNIFIED PARTY AGAINST SELLER UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS FOR MONETARY DAMAGES, INCLUDING, WITHOUT LIMITATION, COSTS OF INVESTIGATION AND DEFENSE AND ATTORNEYS' FEES, SHALL BE A TIMELY CLAIM BY PURCHASER PURSUANT TO THE ESCROW AGREEMENT, AND LIMITED TO THE ESCROW AMOUNT.

**10.2**    **10.2** **Indemnification by Purchaser.**  Subject to this **Article X** and consummation of the Closing, Purchaser shall indemnify, defend and hold harmless Seller, Seller's present, former, and future officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each a, "**Seller Indemnified Party**"), against and in respect of any and all Losses arising out of, based upon or otherwise in respect of:

(a)    (a) any inaccuracy in or breach of any representation or warranty of Purchaser made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Seller by Purchaser pursuant to this Agreement; provided, that the Purchaser shall not have any liability under this clause (a) of Section 10.2 unless the claims asserted under this clause (a) involves Losses in excess of Twenty-Five Thousand Dollars ($25,000.00), at which time Purchaser shall be liable for the full amount of all such Losses in excess of Twenty-Five Thousand Dollars ($25,000.00);

(b)    (b) any nonfulfillment or breach of any covenant or agreement by Purchaser under this Agreement or any of the Schedules attached hereto; and

(c)    (c) any of the Assumed Liabilities pursuant to this Agreement.

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

Each Seller Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

**10.3** ~~10.3~~ **Indemnification Procedures**.

(a) ~~(a)~~ Within forty--five (45) days after receipt by an indemnified party of written notice of the commencement of any Proceeding against it to which the indemnification in this **Article X** relates, such indemnified party shall, if a claim is to be made against an indemnifying party under this **Article X**, give notice to the indemnifying party of the commencement of such Proceeding.

(b) ~~(b)~~ If any Proceeding referred to in paragraph (a) above is brought against a Seller Indemnified Party and it gives notice to Purchaser of the commencement of such Proceeding, Purchaser will be entitled to participate in such Proceeding and, to the extent that it wishes, assume the defense of such Proceeding with counsel reasonably satisfactory to such Seller Indemnified Party and, after notice from Purchaser to such Seller Indemnified Party of its election to assume the defense of such Proceeding, Purchaser will not, as long as it diligently conducts such defense, be liable to such Seller Indemnified Party under this **Article X** for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by such Seller Indemnified Party in connection with the defense of such Proceeding subject to the limitations contained in Section 10.1 hereof, other than reasonable costs of investigation. If Purchaser assumes the defense of a Proceeding, (A) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (B) no compromise or settlement of such claims may be effected by Purchaser without such Seller Indemnified Party's consent unless (1) there is no finding or admission of any violation of law by such Seller Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other claims that may be made against such Seller Indemnified Party, and (2) the sole relief provided is monetary damages that are paid in full by Purchaser. Such Seller Indemnified Party will have no liability with respect to any compromise or settlement of the claims underlying such Proceeding effected without its consent. If notice is given to Purchaser by a Seller Indemnified Party of the commencement of any Proceeding for which such Seller Indemnified Party seeks indemnification hereunder and Purchaser does not, within ten (10) days after such notice is received, give notice to such Seller Indemnified Party of Purchaser's election to assume the defense of such Proceeding, Purchaser will be bound by any determination made in such Proceeding or any compromise or settlement effected by such Seller Indemnified Party.

(c) ~~(c)~~ If any Proceeding referred to in paragraph (a) above is brought against a Purchaser Indemnified Party, Seller shall be entitled to participate in such Proceeding at its own expense. However, such Purchaser Indemnified Party shall, in all respects, control the defense and settlement of such Proceeding and Seller shall be liable for all fees and expenses incurred by such Purchaser Indemnified Party and for any liability established by any order of a Governmental Body of competent jurisdiction and for any liability established by any settlement or compromise agreed to by such Purchaser Indemnified Party, in the exercise of its reasonable discretion.

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

**10.4**    ~~10.4~~  **Other Claims.**  A claim for any matter not involving a third party claim may be asserted by written notice to the Party from whom indemnification is sought.

**10.5**    ~~10.5~~  **Seller Indemnification Claim Period.**  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Seller, no claim for indemnification pursuant to Section 10.1 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 which reasonably describes the claim, the basis therefor, and if possible with the exercise of reasonable diligence, the Purchaser Indemnified Party's reasonably-supported estimate of the Losses being asserted, is delivered to Seller on or before the close of business on the day preceding the first (1st) anniversary of the Closing Date (the "**Claims Close Date**") in which case the indemnity with respect to that Loss shall survive the Claims Close Date (but continue to be limited to the funds held in the Escrow Account).  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.6**    ~~10.6~~  **Purchaser Indemnification Claim Period.**  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Purchaser, no claim for indemnification pursuant to Section 10.2 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 is delivered to Purchaser on or before the Claims Close Date.  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Seller or any Seller Indemnified Party may be entitled.

**10.7**    ~~10.7~~  **Payment from Indemnification Escrow.**  If a Purchaser Indemnified Party becomes entitled to indemnification from Seller hereunder, such Purchaser Indemnified Party shall be entitled to receive the amount of Losses in cash from the Escrow Account in accordance with the Escrow Agreement, and the recovery of the Purchaser Indemnified Parties shall be limited to such recoveries from the Escrow Account.  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.8**    **Miscellaneous Indemnification Provisions.**  Disclosures made after the date hereof and any knowledge that is acquired about the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or obligation set forth herein shall not in any manner affect rights to indemnification hereunder based on any such representation, warranty, covenant, or obligation.  The waiver of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or obligation, will not affect any right to indemnification based on such representations, warranties, covenants and obligations unless otherwise expressly agreed in writing by the party or parties entitled to the benefit thereto.

**ARTICLE XI.**
**MISCELLANEOUS**

**11.1**    ~~11.1~~  **Expiration of Representations, Warranties and Agreements.**  The representations and warranties and covenants made by Seller and Purchaser in this Agreement

24

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

and in any Ancillary Document delivered pursuant to this Agreement shall survive beyond the Closing Date.

**11.2** ~~11.2~~ **Assignment.** Neither this Agreement nor any interest herein may be assigned or transferred by either Party to any other Person without the prior written consent of the other Party, which consent may be given or withheld in the sole discretion of such other Party ; provided, however, Purchaser may assign at Closing its rights, but not its obligations, hereunder to any Affiliate of Purchaser.

**11.3** ~~11.3~~ **Notices.** All notices, requests and other communications under this Agreement shall be in writing and shall be either (a) delivered in person, (b) sent by certified mail, return-receipt requested, (c) delivered by a recognized delivery service or (d) sent by facsimile transmission and addressed as follows:

~~If intended for Purchaser:~~      ~~Clint Matthews, President and CEO~~
~~Tower Health~~
~~420 N. Fifth Avenue~~
~~West Reading, PA 19611~~

~~With a copy to:~~      ~~Robert Lapowsky, Esquire~~
~~Stevens & Lee, P.C.~~
~~620 Freedom Business Center, Suite 200~~
~~King of Prussia, PA 19406~~

     ~~and~~

     ~~Joanne Judge~~
~~Stevens & Lee, P.C.~~
~~111 North Sixth Street Reading, PA 19601~~

~~If intended for Seller:~~      ~~Center City Healthcare, LLC~~

~~With a copy to:~~      ~~Jeffrey Hampton~~
~~Adam Isenberg~~
~~Saul Ewing Arnstein & Lehr LLP~~
~~Centre Square West~~
~~1500 Market Street, 38th Floor~~
~~Philadelphia, PA 19102-2186~~

If intended for Purchaser:      Thomas Jefferson University Hospitals, Inc.

EXECUTION VERSION

|  | 925 Chestnut Street, Suite 110 |
|--|--|
|  | Philadelphia, Pennsylvania 19107 |
|  | Attention: Stephen K. Klasko, MD, |
|  | MBA, President & CEO |
| With a copies to: | Thomas Jefferson University Hospitals, Inc. |
|  | 1020 Walnuts Street, 6th Floor, Scott Bldg. |
|  | Philadelphia, Pennsylvania 19107 |
|  | Attention: Cristina G. Cavalieri, Esq., Senior |
|  | Vice President, Chief Legal and Governance |
|  | Officer and Secretary |
|  | Neil S. Olderman, Esquire |
|  | Drinker Biddle & Reath LLP |
|  | 191 N. Wacker Drive |
|  | Suite 3700 |
|  | Chicago, IL 60606-1698 |
|  | And |
|  | Andrew C. Kassner, Esquire |
|  | Drinker Biddle & Reath LLP |
|  | One Logan Square |
|  | 18th and Cherry Streets |
|  | Philadelphia, PA 19103-6996 |
| If intended for Seller: | Center City Healthcare, LLC |
|  | Centre Square West |
|  | 1500 Market Street, Suite 2400 |
|  | Philadelphia, PA 19102 |
|  | Attention: Allen Wilen, CRO-Finance |
| With a copy to: | Jeffrey Hampton |
|  | Adam Isenberg |
|  | Saul Ewing Arnstein & Lehr LLP |
|  | Centre Square West |
|  | 1500 Market Street, 38th Floor |
|  | Philadelphia, PA  19102-2186 |

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided.  A notice, request and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 P.M. on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 A.M. on the first Business Day thereafter.

**11.4**    ~~11.4~~ **Further Assurances.**  Each of the Parties hereto shall execute such documents (including, without limitation, the Ancillary Documents) and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby or, at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement.

**11.5**    ~~11.5~~ **Entire Agreement; Modifications; Waivers.**  This Agreement (together with the Exhibits and Schedules hereto), the Ancillary Documents, and the Non-Disclosure Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior understandings of the Parties with respect to the subject matter hereof and thereof.  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each Party.  No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Party making the waiver.

**11.6**    ~~11.6~~ **Applicable Law; Jurisdiction and Venue; Jury Trial Waiver.**  THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.  The Parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; provided, however, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement shall be in the courts of the State of Delaware or U.S. District Court for the District of Delaware, and the Parties each hereby waive any objections they may have with respect thereto (including any objections based upon *forum non conveniens*).  **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY**.

**11.7**    ~~11.7~~ **Headings and Captions.**  The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent or otherwise affect the interpretation of, this Agreement or any of the provisions hereof.

**11.8**    ~~11.8~~ **Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**11.9**    ~~11.9~~ **Time is of the Essence.**  With respect to all provisions of this Agreement, time is of the essence.  However, if the first date or last date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then, in such event, the time of such period shall be extended to the next day which is a Business Day.

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

Appx. 00470

**11.10** **11.10** **Remedies Cumulative.** Except as herein expressly set forth, no remedy conferred upon a Party by this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law, in equity or by statute.

**11.11** **11.11** **Interpretation and Construction.**

(a) (a) As used herein the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".

(b) (b) As used herein, the words "**herein**," "**hereof**," "**hereunder**" and similar terms shall refer to this Agreement unless the context requires otherwise.

(c) (c) For purposes of this Agreement, whenever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural and vice versa.

**11.12** **11.12** **Estoppel.** Each Party confirms and agrees that (a) it has read and understood all of the provisions of this Agreement; (b) it is familiar with major sophisticated transactions such as those contemplated by this Agreement; (c) it has negotiated with the other Party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**11.13** **11.13** **Joint Preparation.** The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**11.14** **11.14** **Expenses; Transfer Taxes.**

(a) (a) Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

(b) (b) The Purchaser and Seller shall each pay fifty (50%) percent of all sales, use, transfer, real property transfer, documentary, recording and similar Taxes and fees, and any deficiency, interest or penalty asserted with respect thereof arising out of or in connection with the transactions contemplated hereby ("**Transfer Taxes**").

**11.15** **11.15** **Counterparts.** This Agreement may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

**11.16** ~~11.16~~ **Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

*[Signature page follows.]*

35620482.4 07/17/2019
35751625.1 08/12/2019
35751625.8 08/29/2019

EXECUTION VERSION

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above.

SELLER:

**CENTER CITY HEALTHCARE, LLC**

By:_____

    Allen Wilen
    Chief Restructuring Officer - Finance

PURCHASER:

**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.**

**READING HOSPITAL**

By:_____

    Clint Matthews
    Laurence M. Merlis
    Executive Vice President and CEO
    Sole Member of Tower Health

*[Signature page to Asset Purchase Agreement]*

30

EXECUTION VERSION

## EXHIBIT A

### Purchased Assets

The Purchased Assets to be purchased by the Purchaser and sold, conveyed, assigned, transferred and delivered on the Closing Date to the Purchaser by the Seller shall include all of the Seller's right, title and interest in and to all of the following assets, but specifically excluding, however, the Excluded Assets:

1. 1. <u>Assigned Contracts</u>. All of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on <u>Schedule A-1</u> to this **Exhibit A**.

2. 2. <u>Books and Records</u>. All Books and Records related to the Purchased Assets, but specifically excluded any Corporate Documents.

3. <u>Governmental Authorizations</u>. All transferable Governmental Authorizations identified on <u>Schedule A-2</u> to this **Exhibit A**.

3. *4.* 4. <u>Rights; Warranty Claims</u>. All of Seller's rights, claims, counterclaims, credits, causes of action or rights of set-off against third parties that relate to warranties, indemnities, and all similar rights to the extent related to any Purchased Assets.

5. 5. <u>Other Assets</u>. Those other assets of the Seller identified on <u>Schedule A-3</u> to this **Exhibit A**.

**Schedule A-1**

I.    ~~Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health~~

**~~II.~~I.    Current GME Affiliation Agreements**

    ~~1.~~1.    Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between the Trustees of the University of Pennsylvania, as the owner and operator of the Hospital of the University of Pennsylvania, and Seller.

    2.    Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Prime Healthcare Services Roxborough, LLC, the owner and operator of Roxborough Memorial Hospital, and Seller.

    ~~2.3.~~3.    Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 among Temple University Hospital, Seller and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.

    ~~4.~~4.    Medicare GME Affiliation Agreement for July 1, 2019 ~~Through~~ through June 30, 2020 between Friends Behavioral Health System and Seller.

    ~~5.~~5.    Medicare GME Affiliation Agreement for July 1, 2019 ~~Through~~ through June 30, 2020 between Abington Memorial Hospital and Seller.

**II.    GME Obligations**

**Graduate Hospital/Penn**

- Agreement Regarding Medicare FTE Resident Caps, between the Trustees of the University of Pennsylvania and Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007

**Roxborough and Warminster/Solis**

- Agreement Regarding Medicare FTE Resident Caps between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007

- Agreement Concerning Family Medicine Training among Abington Memorial Hospital, Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 23, 2008

- Second Amendment to Agreement Regarding Medicare FTE Resident Caps; between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 29, 2010

**St. Christopher's Hospital for Children/Temple**

- Academic Affiliation Agreement among Temple and affiliates and Tenet HealthSystem St. Christopher's Hospital For Children, LLC and affiliates dated October 19, 2007

**Hahnemann/Friends**

- Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP dated June 2008

- Memorandum of Understanding for Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP

**Hahnemann/Abington**

Master Agreement for Shared Rotational Arrangements between Hahnemann University Hospital and Abington Memorial Hospital dated June 29, 2007

**IV. III. The Participating Provider Agreement**

**V. The IV. Tower Health GME Affiliation Agreement**

EXECUTION VERSION

## Schedule A-2

## Governmental Authorizations

*[Schedule A-2 to include NPIs, license, training programs]*

EXECUTION VERSION

The Participating Provider Agreement

EXECUTION VERSION

**Schedule A-3**

**Other Assets**

*[to be populated if needed]*

EXECUTION VERSION

[None]

35620482.7 08/12/2019
35751625.1
35751625.8 08/29/2019

**EXHIBIT B**

~~Exhibit B~~
**ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT**

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT ("Agreement") dated as of [_____] by and between Center City Healthcare, LLC, a Delaware limited liability company ("Assignor"), and ~~Reading Hospital~~Thomas Jefferson University Hospitals, Inc., a Pennsylvania nonprofit corporation ("Assignee").

BACKGROUND

A. A. ASSIGNEE AND ASSIGNOR HAVE ENTERED INTO AN ASSET PURCHASE AGREEMENT DATED AS OF [_____] (TOGETHER WITH THE EXHIBITS AND SCHEDULES THERETO, THE "PURCHASE AGREEMENT") PROVIDING FOR, AMONG OTHER THINGS, THE SALE, TRANSFER, CONVEYANCE, ASSIGNMENT, AND DELIVERY BY ASSIGNOR TO ASSIGNEE OF CERTAIN ASSETS OF ASSIGNOR (COLLECTIVELY, THE "PURCHASED ASSETS") THAT ARE OWNED OR USED BY ASSIGNOR IN CONNECTION WITH THE BUSINESS.

B. B. IN CONNECTION WITH THE SALE AND PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THE PURCHASE AGREEMENT, ASSIGNOR IS TO ASSIGN AND DELEGATE, AND ASSIGNEE IS TO ASSUME, THE ASSIGNED CONTRACTS.  CLOSING IS BEING HELD ON THE DATE HEREOF UNDER THE PURCHASE AGREEMENT.

NOW, THEREFORE, pursuant to and in consideration of the Purchase Agreement and the mutual covenants and agreements set forth therein and herein, Assignor and Assignee, each intending to be legally bound, agree as follows:

1. 1. Incorporation of Background; Defined Terms.  The Background provisions set forth above (including, without limitation, all of the defined terms set forth therein) are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety in this Section 1.  Capitalized terms used herein which are not otherwise defined shall have the respective meanings assigned to them in the Purchase Agreement.

2. 2. Assignment of Rights.  Assignor hereby sells, transfers, conveys, and assigns to Assignee all of Assignor's right, title and interest in, to and under all of the Assigned Contracts, each of which are identified on Schedule 2 attached hereto.

3. Delegation of Duties.  Assignor hereby delegates to Assignee all of Assignor's duties and liabilities under the Assigned Contracts.

3. 4. 4. Assumption of Liabilities.  In partial consideration for the sale of the Purchased Assets by Assignor pursuant to the Purchase Agreement, Assignee hereby undertakes and agrees to assume, discharge, or perform as the case may be, all duties, obligations, and liabilities of Assignor under the Assigned Contracts which are to be performed

EXECUTION VERSION

after, and relate to the period after, the date hereof or which are otherwise assigned to and assumed by the Purchaser under or pursuant to the Purchase Agreement or the Sale Order.

> 5.  ~~5.~~  5.   Assignment of Governmental Authorizations; Etc.  Assignor hereby assigns, sells, transfers, and sets over to Assignee all of Assignor's right, title and interest in, to, and under all of the Governmental Authorizations which are listed on Schedule 5 attached hereto, but only to the extent that any of the foregoing may be legally sold, transferred, conveyed, assigned and delivered by Assignor to Assignee without any action by any such applicable federal, state, or local government or regulatory body.

> ~~6.~~  6.   Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns~~.~~.

> ~~7.~~  7.   Governing Law.  This Agreement shall be governed by, and construed in accordance with, the domestic, internal laws of the State of Delaware, without regard to its rules pertaining to the conflict of laws.

> ~~8.~~  8.   Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  Any party to this Agreement may deliver an executed counterpart hereof by facsimile transmission or electronic mail (as a Portable Document Format (PDF) file) to the other party hereto and any such delivery shall have the same force and effect as the manual delivery of an original executed counterpart of this Agreement.

*Remainder of Page Intentionally Left Blank*

*Signature Page Follows*

35751625.8 08/29/2019

Appx. 00482

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers the day and year first above written.

CENTER CITY HEALTHCARE, LLC

By _____

By _____

  Allen Wilen
  Chief Restructuring Officer - Finance
  "Assignor"

READING HOSPITAL

THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.

By _____

  Laurence M. Merlis

By _____

  Clint Matthews

  Executive Vice President and CEO of Tower Health

  Sole Member of Reading Hospital

  "Assignee"

**EXHIBIT C**

**BILL OF SALE**

**_____-_____, 2019**

KNOW ALL BY THESE PRESENTS that CENTER CITY HEALTHCARE, LLC, a Delaware limited liability company (the "Seller"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, has granted, bargained, sold, conveyed, transferred, assigned and delivered, and by this Bill of Sale hereby grants, bargains, sells, conveys, transfers, assigns and delivers, to ~~Reading Hospital~~Thomas Jefferson University Hospitals, Inc., a Pennsylvania nonprofit corporation ("Purchaser"), its successors and assigns, all of the Seller's right, title and interest in and to the Purchased Assets.  As used herein, the term "Purchased Assets" has the meaning given to such term in that certain Asset Purchase Agreement, dated as of _____ _____, 2019, by and between the Seller and Purchaser (together with the Exhibits and Schedules thereto, the "Purchase Agreement"), which Purchase Agreement is incorporated herein by this reference.

EXCLUDING, HOWEVER, the "Excluded Assets" (as such term is defined in the Purchase Agreement).

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, forever.

This Bill of Sale is being executed and delivered by the Seller to the Purchaser under and pursuant to Section 8.2(a) of the Purchase Agreement and is subject to the terms and conditions of the Purchase Agreement in all respects.

_**Remainder of Page Intentionally Left Blank**_

_**Signature Page Follows**_

EXECUTION VERSION

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the date and year first set forth above.

CENTER CITY HEALTHCARE, LLC

By _____

~~By~~ _____

Allen Wilen
Chief Restructuring Officer - Finance

EXECUTION VERSION

## EXHIBIT D

## ESCROW AGREEMENT

*[PURCHASER TO DRAFT*[To be provided]]

EXECUTION VERSION

## EXHIBIT E

## SALE ORDER

**[To be provided]**

EXECUTION VERSION

# EXHIBIT F

## BIDDING PROCEDURES ORDER

# EXHIBIT C

**Second Supplemental Notice**

Appx. 00489

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## SECOND SUPPLEMENTAL NOTICE OF PROPOSED
## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30 and July 1, 2019 (collectively, the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale Motion**") [D.I. 142] with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets, including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"); (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July 19, 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**")[2] [D.I. 249] granting certain of the relief sought in the Sale Motion, approving, among other things, the Bidding Procedures and the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which sets

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not defined herein have the meaning stated in the Bidding Procedures Order.

forth the Assumption and Assignment Procedures), the Bidding Procedures and all other documents filed in the Debtors' chapter 11 cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

**PLEASE TAKE FURTHER NOTICE** that the Debtors conducted the Auction on August 8, 2019. At the conclusion of the Auction, the Debtors designated Thomas Jefferson University Hospitals, Inc. as the Successful Bidder and Reading Hospital (the Stalking Horse Bidder) as the Backup Bidder.

**PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign the Designated Contracts to the Successful Bidder. On July 23, 2019 and August 7, 2019, the Debtors served the Initial Notice of Assumption and Assignment and the Supplemental Notice of Assumption and Assignment, respectively, on all affected counterparties. The Bidding Procedures Order authorizes the Debtors to modify the Designated Contracts, and to serve a supplemental notice on each affected counterparty. Attached hereto is a further modified list of Designated Contracts (the "**Second Modified Designated Contracts List**"). In addition, the cure payments, if any, necessary for the assumption and assignment of the contracts on the Second Modified Designated Contracts List (the "**Cure Payments**") is set forth on the Second Modified Designated Contracts List.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A DESIGNATED CONTRACT IN THE SECOND MODIFIED DESIGNATED CONTRACTS LIST OR BECAUSE YOU ARE COUNTERPARTY TO A CONTRACT THAT HAS BEEN DELETED FROM THE INITIAL DESIGNATED CONTRACTS LIST.**

**PLEASE TAKE FURTHER NOTICE** that the deadline for objecting to assumption and assignment of Designated Contracts or to Cure Payments was August 5, 2019 (the "**Objection Deadline**"). The Bidding Procedures Order permits counterparties to contracts included on the Second Modified Designated Contracts List to file objections to assumption and assignment of the applicable Designated Contract or Cure Payment after the Objection Deadline, but only if the (a) such contract was not on the Initial Designated Contract List; or (b) if the Cure Payment for any contract that was on the Initial Designated Contract List was reduced. Because each contract on the Second Modified Designated Contract List was also on the Initial Designated Contact List and because no Cure Payments have been reduced, no counterparty to any contract on the Second Modified Designated Contract List is entitled to file an objection after the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that under the terms of the Assumption and Assignment Procedures, the Debtors may further modify the Designated Contracts List, if requested by the Successful Bidder. If the Designated Contracts List is further modified, the Debtors will serve a supplemental notice of assumption and assignment on the affected counterparty, which shall, if applicable, identify the deadline for filing an objection with respect to the applicable Designated Contract.

Appx. 00491

A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on September 4, 2019 at 2:00 p.m. (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801. Objections to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to the Designated Contracts must be raised at or prior to the Sale Hearing.

Dated: August 22, 2019            **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
           Mark Minuti (DE Bar No. 2659)
           Monique B. DiSabatino (DE Bar No. 6027)
           1201 N. Market Street, Suite 2300
           P.O. Box 1266
           Wilmington, DE 19899
           Telephone: (302) 421-6800
           Fax: (302) 421-5873
           mark.minuti@saul.com
           monique.disabatino@saul.com

               -and-

           Jeffrey C. Hampton
           Adam H. Isenberg
           Aaron S. Applebaum (DE Bar No. 5587)
           Centre Square West
           1500 Market Street, 38th Floor
           Philadelphia, PA 19102
           Telephone: (215) 972-7700
           Fax: (215) 972-7725
           jeffrey.hampton@saul.com
           adam.isenberg@saul.com
           aaron.applebaum@saul.com

           *Counsel for Debtors and*
           *Debtors in Possession*

### Second Modified Designated Contracts List

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Agreement for Clinical Rotations with Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, dated September 14, 2018 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $0.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 15 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |

# TAB 7

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*, | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket No. 142, 249, 590, 591, 631 Obj. Deadline: Sept. 4, 2019 (10:00 a.m.)** |

## OBJECTION OF THE UNITED STATES
## TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS TO JEFFERSON AS SET FORTH IN THE ASSET PURCHASE AGREEMENT

Dated: September 4, 2019

JOSEPH H. HUNT
Assistant Attorney General

DAVID C. WEISS
United States Attorney

ELLEN SLIGHTS
Assistant United States Attorney

/s/ Marc S Sacks
RUTH A. HARVEY
MARGARET M. NEWELL
MARC S. SACKS
Department of Justice
Commercial Litigation Branch,
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, DC 20044-0875
Tel. (202) 307-1104
Fax (202) 514-9163
marcus.s.sacks@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATUTORY AND REGULATORY BACKGROUND ............................................................4

    A.    Enrollment in Medicare ................................................................4

    B.    Residency Program Slots and Redistributions in the
          event of Hospital Closures ..........................................................7

FACTUAL AND PROCEDURAL BACKGROUND ....................................................9

ARGUMENT ............................................................................12

I.      Debtors Have No Authority to Sell Medicare-Funded Residency Slots............................12

    A.    Congress Has Vested the Secretary with Exclusive Authority
          to Redistribute Residency Slots from a Closed Hospital ........................12

    B.    The Residency Slots are Not Debtors' "Property" and Cannot be
          Sold or Transferred Between Private Parties ..........................................16

II.     Debtors' Proposed Sale Violates Medicare Law and Regulations .....................17

    A.    The Sale violates 42 C.F.R § 489.52 ...................................................19

    B.    The Sale violates 42 C.F.R § 489.18 ...................................................20

          1.    A CHOW is the Exclusive Vehicle for Continuous
                Enrollment in Medicare in the Sale Context................................21

          2.    The Court Has no Subject Matter Jurisdiction to Declare
                the Sale of the Residency Slots a CHOW ..................................21

          3.    The Sale of the Residency Slots is Not a CHOW .....................24

    C.    The Sale violates 42 C.F.R § 489.18(d) and is contrary to
          binding Third Circuit law..........................................................26

    D.    The Sale violates the Anti-Assignment Act..........................................29

III.    Under Binding Third Circuit Precedent, a Medicare Provider Agreement
      Must Be Assumed and Assigned Pursuant to Section 365 ................................31

i

A.     Medicare Provider Agreements are properly addressed under section 365 ............................................................................................ 31

B.     Section 363 does not apply to the transfer of Medicare provider agreements or Medicare-funded residency slots ..................................................... 36

       1.     Medicare provider agreements are not property of the estate transferrable under section 363 ......................................................... 36

       2.     Medicare provider agreements or Medicare-funded residency slots cannot be sold "free and clear" under section 363(f) ....................... 39

C.     HHS is not estopped from arguing that Medicare Provider Agreements are executory contracts .................................................... 45

CONCLUSION............................................................................................................. 46

Appx. 00496

**OBJECTION OF THE UNITED STATES
TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING THE SALE OF THE
DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS TO JEFFERSON AS SET FORTH IN
THE ASSET PURCHASE AGREEMENT**

The United States of America (the "United States"), on behalf of the Department of

Health and Human Services ("HHS"), acting through its designated component, the Centers for

Medicare & Medicaid Services ("CMS"), hereby files this objection to the *Debtors' Motion for*

*Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors'*

*Residents Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures*

*Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of*

*Proposed Cure Amounts, and (C) Approving the Form and Manner of Notice Relating Thereto,*

*and (D) Scheduling a Hearing to Consider the Proposed Sale; and (II)(A) Approving the Sale of*

*the Debtors' Residents Program Assets Free and Clear of Liens, Claims, Encumbrances and*

*Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts;*

*and (III) Granting Related Relief* (the "Jefferson Sale Motion"). Dkt. 142. Because the

Jefferson Sale Asset Purchase Agreement ("Jefferson APA"), Dkt. 590-1, is contrary to law and

contravenes Medicare Program law regulations, the Court should not approve the sale.

Debtors assert that the Court should approve the proposed sale of Hahnemann University

Hospital ("Hahnemann") "resident program assets" as set forth in the Jefferson APA for

equitable reasons. Debtors, however, have identified no authority for the proposition that

residency slots can be sold by private contract, while ignoring the statutes and regulations that

clearly prohibit such a transaction.[1] Accordingly, on that basis and the others described below,

---

[1] Debtors previously told the Court that "CMS has a veto power over this transaction. They're going to have to agree to it which is I think a compelling reason why we should get past this bid procedure stage and let us start engaging with CMS." Transcript of July 19, 2019; 56:13-17; *see*

Appx. 00497

the United States objects to the terms of the proposed sale on multiple grounds and respectfully

asks the Court to deny the Jefferson Sale Motion.

First, the residency slots are not property of the Debtors' estate. The Secretary of HHS

(the "Secretary") is solely authorized by law to allocate residency slots, approve new residency

slots, and redistribute existing residency slots. 42 U.S.C. § 1395ww(h). Private parties do not

have the authority to contract for the sale of permanent Medicare-funded residency slots from a

closed hospital when Congress has given the power to redistribute those slots *exclusively* to the

Secretary. 42 U.S.C. § 1395ww(h)(4)(H)(vi). If the Court were to order the sale, it would raise

Separation of Powers concerns.

Second, the same Medicare Program laws that apply to Debtors' efforts to transfer

Hahnemann's Medicare provider agreements out of bankruptcy apply in bankruptcy. As the

Supreme Court recently confirmed, "The estate cannot possess anything more than the debtor

itself did outside bankruptcy." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct.

1652, 1663 (2019) (citation omitted). Until August 29, 2019, Debtors have consistently and

correctly maintained that this Court may only allow assumption and assignment of a Medicare

provider agreement consistent with 11 U.S.C. § 365. But even under Debtors' eleventh-hour,

and unsupported, theory that the Medicare provider agreement is an asset that can be transferred

under section 363, federal laws and regulations still govern the sale. Based on those relevant

laws and regulations, the proposed Jefferson Sale is contrary to law for at least four additional

reasons:

> A. Hahnemann has stopped providing medical services to the community and will be
> permanently closed on September 6, 2019. Thus, its Medicare Provider
> Agreement, which authorizes Medicare reimbursement for the provision of

---

*id.* at 67:14-17 ("[CMS counsel] stood up here and said, you know, look, you need our approval
for this transaction to happen. And we agree with that, Your Honor. We agree with that.")

2

medical services at Hahnemann's location, terminates pursuant to 42 C.F.R §§ 489.52(b)(3) and 413.79(h), and may not be sold in (or out of) bankruptcy.

B.     Even if Hahnemann's Medicare Provider Agreement is deemed not to have been terminated, the proposed sale is not a change of ownership ("CHOW") consistent with 42 C.F.R § 489.18.

C.     Even if Debtors could assume and assign Hahnemann's Medicare Provider Agreement, the assumption and assignment must be made with full successor liability. 42 C.F.R § 489.18; *University Med. Ctr. v. Sullivan* (*In re University Med. Ctr.*), 973 F.2d 1065, 1075 (3d Cir. 1992). Here, though, Debtors improperly attempt to "discharge" monies owed to CMS and seek to avoid Jefferson's successor liability by forcing CMS to recover potential overpayments from a fixed one-year "Escrow Amount" shared among claimants. APA at 3.1 (page 8).

D.     The Anti-Assignment Act applies here, and the United States does not consent to any assignment of Hahnemann's Medicare Provider Agreement under section 365(c)(1).

The United States previously filed objections to the Bidding Procedures for the sale of Hahnemann assets, Dkt. 188 (July 15, 2019), and to the proposed sale of Hahnemann assets to the then-Stalking Horse Bidder, Dkt. 363 (August 5, 2019). Those objections, like this one, explain that Debtors' efforts to sell the Hahnemann Medicare Provider Agreement when Hahnemann has stopped providing medical services to the community, and the residency slots tied to that agreement, are contrary to Medicare Program law. Despite being fully aware of the United States' position for more than one month and one half, Debtors have made no significant alterations to the proposed sale and have entirely failed to address the United States' objections. Debtors did file a Reply to the United States' objection to the proposed sale of Hahnemann assets to the then-Stalking Horse Bidder on August 29, 2019. Dkt. 591. This objection addresses arguments raised in that Reply.

Appx. 00499

## STATUTORY AND REGULATORY BACKGROUND

### A. Enrollment in Medicare

1.       Certain of the Debtors are "providers" of hospital and skilled nursing services

under the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* and 42 C.F.R. Chapter IV and CMS

policies and procedures (collectively, the "Medicare Program").  To be eligible to be reimbursed

for services to Medicare beneficiaries, certain Debtors are party to separate Medicare Part A

provider agreements ("Provider Agreements").  42 U.S.C. § 1395cc; 42 C.F.R. § 400.202

(defining "provider").  A Provider Agreement is defined as an agreement between CMS and a

hospital, skilled nursing facility, home health agency, clinic, outpatient rehabilitation facility,

hospice, or community mental health center.  42 C.F.R. §§ 489.2 and 489.3.

2.       To obtain a Provider Agreement, a new provider must apply for initial

certification.  *See* 42 C.F.R. §§ 488.1, 488.3, 489.1, 489.2 and 489.10.  The certification process

enables HHS to determine, *inter alia*, that the provider is qualified to provide health care services

to patients.  *See* 42 C.F.R. §§ 489.10-.12 (grounds for denying a Provider Agreement); *see also*

42 C.F.R. Part 418 (health and safety requirements to qualify as a hospice).

3.       As a result, the transfer of a Provider Agreement is strictly limited and must be

approved by CMS before the transfer is effective.  Provider Agreements may only be assigned

upon CMS' determination that there is a valid "change of ownership."  42 C.F.R. § 489.18.

When CMS determines that a valid "change of ownership" has occurred, the existing Medicare

Provider Agreement is automatically assigned to the new owner.  *See* 42 C.F.R. § 489.18(c);

*United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994).  An assigned

agreement is subject to all statutory and regulatory terms under which it originally was issued,

Appx. 00500

including the adjustment of payments to account for previously made overpayments.[2]  *Vernon*, 21 F.3d at 696 (citing 42 C.F.R. § 489.18(a), (d)).[3]  *See also In re Charter Behavioral Health Systems, LLC*, 45 F. Appx. 150, 151 n.1 (3d Cir. 2002) ("If the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner.") (citing 42 C.F.R. § 489.18(d); *Deerbrook Pavilion, LLC v. Shalala,* 235 F.3d 1100, 1103-05 (8th Cir.2000); *Vernon*, 21 F.3d at 696).

4.      By contrast, if a new provider opts not to accept assignment of the Medicare Provider Agreement, the Medicare Provider Agreement is voluntarily terminated.  42 C.F.R. § 489.13(c); CMS Publ. 100-08, Chapter 15 § 15.7.7.1.5.  In that case, the new provider is treated as a new applicant to the Medicare program and cannot receive payments for covered services until after CMS determines that the new provider meets Medicare enrollment and certification standards.  42 C.F.R. § 489.13(c); CMS Publ. 100-08, Chapter 15 § 15.7.7.1.5.  If that occurs, there is no retroactive payment for covered services for the period before CMS determines that the new provider is qualified to participate in the Medicare Program. 42 C.F.R. § 489.13(c); CMS Publ. 100-08, Chapter 15 § 15.7.7.1.5 ("If the Buyer rejects assignment of the provider

---

[2] Debtors attached one of the documents that make up their Medicare Provider Agreement for Hahnemann to their Reply.  Dkt. 591-2.  That agreement, signed by Mr. Freedman, states:  "In the event of a transfer of ownership, this agreement is automatically assigned to the new owner subject to the conditions specified in this agreement and 42 CFR 489."  *Id.*.

[3] Debtors assert that *Vernon* is not applicable here because it addresses preemption of state law.  Reply at 15 (¶ 45).  But, the Ninth Circuit, citing to *Vernon* with approval, explained that "[i]t is equally true that private parties have no power to alter their legal obligations with Medicare under their provider agreements."  *Mission Hosp. Regional Medical Center v. Burwell*, 819 F.3d 1112, 1117 (9th Cir. 2016).

Appx. 00501

agreement, the Buyer must file an initial application to participate in the Medicare program. In this situation, Medicare will never pay the applicant for services the prospective buyer provides before the date on which the provider qualifies for Medicare participation as an initial applicant."). *See In re University Med. Ctr.*, 973 F.2d at 1075 ("Assumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits. . . . Through executing a provider agreement, a hospital accepts the "burden" of allowing HHS to recover the amount of prior overpayments from Medicare reimbursement currently due. Rejection, on the other hand, both cuts off any right of the contracting creditor to require the estate to perform the remaining executory portions of the contract and limits the creditor's claim to breach of contract.").

5.      Additionally, Medicare regulations specifically prohibit the sale or transfer of billing privileges or a Medicare billing number, except pursuant to a valid change of ownership. 42 C.F.R. § 424.550; *see also* 42 C.F.R. § 424.535(a)(7) (revocation of Medicare enrollment for knowingly selling Medicare billing number unless in the event of a CHOW). To obtain CMS approval of a change of ownership of a provider number, the applicant must submit CMS form 855A.

6.      HHS contracts with Medicare Administrative Contractors ("MACs") to administer payment to providers for Medicare covered services. MACs make interim payments to providers in accordance with the Medicare Program and perform the day-to-day administration of Medicare, *e.g.*, audit and reimbursement activities. 42 U.S.C. § 1395kk-1; 42 C.F.R. §§ 421.400-.404.

7.      At their request, certain of Debtors' facilities receive Medicare Periodic Interim Payments ("PIP"). 42 U.S.C. § 1395g(e)(2); 42 C.F.R. § 418.307, 42 C.F.R. § 413.64(h)(2)(v).

6

The PIP is adjusted to make it consistent with current claim levels, and to determine overpayments for the current fiscal year. Alternatively, the MAC may adjust payments to assure that total payments at the end of the fiscal year approximate, as closely as possible, the reimbursement determined to be due after review and audit of the provider's cost report. 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(h)(6-7).

8. Within five months after the end of the cost year, a provider must submit a report of its costs to verify the actual reimbursements owed to it for the past cost year. 42 C.F.R. §§ 413.1, 413.20, 413.24(f); *see* 42 U.S.C. §§ 1395g and 1395hh (giving the Secretary authority to require submission of cost reports). Once the cost report is submitted, the MAC audits the cost report and determines the provider's actual, rather than estimated, reimbursement amount for the year, which can result in overpayment or underpayment claims. 42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 42 C.F.R. § 413.24. Following an audit, providers have various appeal rights, including judicial review, with respect to the MAC's determination. *See, e.g.*, 42 C.F.R. § 405.1807; 42 U.S.C. § 1395oo(f)(1).

9. In addition, by motion of the MAC or the provider, or at the direction of CMS, final cost report determinations are subject to reopening for up to three years from their issuance in order to make corrections. 42 C.F.R. § 405.1885.

**B. Residency Program Slots and Redistributions in the event of Hospital Closures**

10. Section 1886(h) of the Social Security Act, as added by section 9202 of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985 (Pub. L. 99-272) and implemented in regulations at existing §§ 413.75 through 413.83, establish a methodology for determining payments to hospitals for the costs of approved graduate medical education (GME) programs.

7

11.     Section 1886(h)(4)(F) of the Act established limits on the number of allopathic and osteopathic residents that hospitals may count for purposes of calculating direct GME payments.  For most hospitals, the limits were the number of allopathic and osteopathic FTE residents training in the hospital's most recent cost reporting period ending on or before December 31, 1996.  42 U.S.C. § 1395ww(h)(4)(F); 75 Fed Reg. 71800, 72212 (Nov. 24, 2010) ("[E]ach teaching hospital's [full-time equivalent] FTE resident cap is unique to the number of FTE residents that it trained in the hospital's most recent cost reporting period ending on or before December 31, 1996.").

12.     Prior to the passage of the Affordable Care Act (2010) ("ACA"), generally, if a teaching hospital closed, its direct GME and Indirect Medical Education ("IME") FTE resident cap slots would be "lost," because those slots are associated with a specific hospital's Medicare Provider Agreement that has terminated.  Section 5506 of the ACA addresses this situation by instructing the Secretary to establish a process by regulation that would redistribute slots from teaching hospitals that close to hospitals that meet certain criteria, with priority given to hospitals located in the same Core Based Statistical Area ("CBSA") or in a contiguous CBSA to the closed hospital.  42 U.S.C. § 1395ww(h)(4)(H)(vi).  By statute, there is no "administrative or judicial review" with respect to the Secretary's redistribution of residency slots following a hospital closure.  *See* ACA § 5506(e); 42 U.S.C. § 1395ww(h)(7)(E).[4]

---

[4] Note that this process applies to *permanent* resident slots.  This Court was previously extremely concerned with how the now-former Hahnemann residents would be able to complete their residencies.   The law allows temporary resident cap adjustments for the completion of training, and it appears that all the now-former Hahnemann residents have left for other institutions, presumably utilizing temporary funding to do so.  "The Medicare regulations at 42 CFR 413.79(h) provide for temporary resident cap adjustments to hospitals that take in residents displaced by program or hospital closure."  https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/Downloads/Fact-sheet-displaced-residents.pdf.

Appx. 00504

13.     In addition, Section 5503 of the ACA provides for reductions in the direct GME and IME FTE resident caps for certain hospitals, and authorizes a "redistribution" to certain hospitals of the estimated number of FTE resident slots resulting from the reductions.  Effective for portions of cost reporting periods occurring on or after July 1, 2011 for direct GME and IME, a hospital's FTE resident caps will be reduced by 65 percent of the "excess" resident slots if its "reference resident level" is less than its "otherwise applicable resident limit."  The Secretary is authorized to increase the otherwise applicable FTE resident cap for each qualifying hospital that submits a timely application by a number that the Secretary may approve, effective for portions of cost reporting periods occurring on or after July 1, 2011.  42 U.S.C. § 1395ww(h)(8).

## FACTUAL AND PROCEDURAL BACKGROUND

14.     Since before the Petition Date, certain of the Debtors participated in the Medicare Program as Medicare Part A providers under their Provider Agreements.  For purposes of this objection, Center City Healthcare, LLC d/b/a Hahnemann University Hospital (Part A) has a Provider Agreement with the United States.

15.     On December 2017, Debtors filed an electronic CHOW application in connection with the sale of Hahnemann Hospital from Tenet Healthsystem Hahnemann, LLC to Debtors. Ex. 1 at 1 ("Reason for Submission:  A Medicare Part A provider is undergoing a CHOW and this application is to inform Medicare as the buyer/new owner.").

16.     In the ordinary course of business, the MACs may determine Medicare overpayments owed by the Debtors relating to prepetition service dates and postpetition service dates under the Medicare Program.

17.     On July 1, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9

18. On July 19, 2019, Debtors filed the Stalking Horse Sale Agreement (Asset Purchase Agreement). Dkt. 246-1.

19. Later that same day, the Court issued an Order establishing bidding procedures for the potential sale of Hahnemann resident program assets. Dkt. 249.

20. After an auction in early August 2019, Debtors selected Jefferson University Hosptial as the Successful Bidder. Jefferson is part of a consortium of six hospitals, but Jefferson is the sole Purchaser.

21. On August 29, 2019, Debtors filed the Asset Purchase Agreement for the sale to Jefferson. Dkt. 590-1.

22. The Jefferson APA indicates that Hahnemann's Medicare Provider Agreement will be assumed and assigned to Jefferson. Jefferson APA, Sched. A-1 (III); *see id.* at Exhibit A (defining "Excluded Assets" as including "Assigned Contracts . . . identified on Schedule A-1").

23. The Jefferson APA does not provide that Jefferson will be required to assume all liabilities relating to the Provider Agreement. *See* Jefferson APA, Art. 3.1. Furthermore, the Jefferson APA does not specify that any assumption and assignment of the Provider Agreement must comply with section 365 of the Bankruptcy Code and the Medicare Program.

24. Instead, as set forth in the Jefferson APA, Debtors are *not* assuming and assigning all liabilities associated with the Medicare provider agreement. The Jefferson APA establishes a $3,000,000 Escrow Amount to "cover [certain] following losses, damages and expenses," including a "CMS Pre-Closing Amount."[5] Jefferson APA, Art. 3.1. The Escrow expires after one-year. *Id.*

---

[5] Note that the Stalking Horse Sale Agreement (Asset Purchase Agreement), Dkt. 246-1, contained a virtually identical escrow provision, but used the term "CMS Discharge Amount." Dkt. 246-1, Art. 3.1. Apparently, Debtors believe that by altering semantics, but not substance,

Appx. 00506

25.     The Jefferson APA defines the "CMS Pre-Closing Amount" as "a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as final, which amount shall be the maximum amount due to CMS on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement."  Jefferson APA, Art. I (page 3).

26.     CMS has not agreed to any discharge (or "Pre-Closing") amount or maximum Cure Costs due.

27.     The Jefferson APA also states that the Debtors and Jefferson will obtain "Regulatory Approvals," including from CMS.  Jefferson APA, Art. VII (7.1(c)).  The Agreement states that CMS "shall have consented to the transactions contemplated by this Agreement."  *Id.*  CMS does not consent to the transaction(s) set forth in the Jefferson APA. That same provision states that "CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated hereby will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap."

28.     As demonstrated by the United States' objections, CMS does not, cannot and will not provide such confirmation.  The "full amount of Seller's residency slot cap" will be distributed publically consistent with 42 U.S.C. § 1395ww(h)(4)(H)(vi).

---

the Court may be less likely to identify the escrow for what it is:  an outright rejection of full successor liability as required by Medicare Program law and section 365.

Appx. 00507

29. Hahnemann has stopped providing medical services to the community.

https://www.hahnemannhospital.com/SitePages/Closure%20FAQs%20for%20the%20Community.aspx. "The last patient left the inpatient hospital unit on July 25, 2019 and the ED doors were closed on August 16, 2019." Dkt. 632 at 11. Every department has closed, with the possible exception of the Drexel outpatient oncology suite located in Hahnemann, which has either ceased operations or will do so by September 6. Hahnemann will permanently close on or about September 6.

30. Hahnemann's residency program is closed. All Hahnemann residents have transferred to other hospitals. Dkt. 632 at 6. Effective August 26, 2019, the Federation of State Medical Boards is now the custodian of Hahnemann University physician training records. https://www.fsmb.org/closed-programs/hahnemann-training-records/

## ARGUMENT

### I. Debtors Have No Authority to Sell Medicare-Funded Residency Slots

#### A. Congress Has Vested the Secretary with Exclusive Authority to Redistribute Residency Slots from a Closed Hospital

Private parties do not have the authority to contract for the sale of permanent Medicare-funded residency slots from a closed hospital when Congress has mandated that the Secretary redistribute those slots according to a statutory order of priority. 42 U.S.C. § 1395ww(h)(4)(H)(vi); 42 C.F.R. § 413.79(o). The Secretary's redistribution of residency program slots is not reviewable by any administrative or judicial body. 42 U.S.C. § 1395ww(h)(7)(E).

The total number of Medicare-funded resident slots nationwide was fixed by the Balanced Budget Act of 1997. Recognizing that the resident slots of hospitals that closed after 1997 were effectively extinguished, decreasing the nationwide total, Congress, in the ACA,

12

included a provision to require redistribution of residency slots from closed hospitals. Section 5506 of the ACA (1395ww(h)(4)(H)(vi)) requires the Secretary, "in the case where a hospital . . . with an approved medical residency program closes," to redistribute the closed hospital's permanent residency slots by "establish[ing] a process" to "increase the otherwise applicable resident limit . . . for other hospitals." Pursuant to Section 5506, this is a mandatory process for hospitals with a residency program that closes, like Hahnemann.

In Section 5506, Congress instructed HHS to redistribute the slots in a "priority order," beginning with:

> (1) hospitals located in the same core-based statistical area as, or a core-based statistical area contiguous to, the hospital that closed.
> (2) hospitals located in the same State as the hospital that closed.
> (3) hospitals located in the same region of the country as the hospital that closed.

§ 1395ww(h)(4)(H)(vi)(II)(aa-cc).

Debtors' Reply *entirely fails to address Section 5506*, perhaps because Debtors have no counter to the unequivocal direction of Congress in Section 5506. *See* Dkt. 591. Hahnemann has stopped providing medical services to the community (or will do so imminently) and Congress has mandated that the only means of transferring Hahnemann's permanent resident slots is through the Section 5506 process.

HHS has completed thirteen successful rounds of Section 5506 cap redistributions since the ACA was enacted.[6] Notably, when hospitals in the Philadelphia area have closed, several members of the Jefferson-led Consortium have applied through the Section 5506 process and some have received slots:

---

[6] https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/DGME.html.

13

- Round 5 – Closure of Montgomery Hospital in Norristown, PA. Ninety-six hospitals applied for slots, including eighteen from Pennsylvania.[7] Six hospitals received slots. Albert Einstein and Abington Memorial Hospital (now Jefferson) received slots.

- Round 10 – Closure of St. Joseph's Hospital in Philadelphia: Thirty-three hospitals applied for slots, including nine from Pennsylvania. Two hospitals received slots, including Abington Memorial Hospital received slots. Cooper Union and Temple applied but did not receive slots.

Thus, Jefferson and other members of the Consortium have abided by the Section 5506 redistribution in the past when area hospitals have closed. While, based on the Congressionally-mandated priority order, the Jefferson-led Consortium will likely receive a significant number of residency slots when Hahnemann goes through the Section 5506 redistribution, there is likely, based on these two prior redistributions, to be significant demand and many other hospitals will seek and receive Hahnemann residency slots. Of course, the Jefferson-led Consortium seeks to subvert this public process with a private sale.

If this Court permits the sale, it would be acting contrary to Congress's unequivocal direction for distribution of a closed hospital's residency slots, particularly in the case of a closure of a large academic teaching hospital:

> The closure of a teaching hospital, *particularly if it is a large academic medical center*, could mean not only the displacement of hundreds of residents, but also the permanent loss of hundreds of Medicare-funded residency training slots and a sophisticated GME infrastructure that could take many years to rebuild, threatening the availability of health care services in a community. Section 5506 of the Affordable Care Act addresses this situation by amending section 1886(h)(4)(H) of the Act to add a new clause (vi) that instructs the Secretary to establish a process by regulation under which, in the event a teaching hospital closes, the Secretary will permanently increase the FTE resident caps for hospitals that meet certain criteria by the number of FTE resident positions in the closed hospital's training programs.

75 Fed Reg. 71800, 72212 (Nov. 24, 2010) (emphasis added).

---

[7] This round also involved a hospital in Alabama.

14

Moreover, the Court would be condoning an exclusive, private transfer of residency slots, when Congress had mandated that those slots may only be distributed through a nationwide public process administered by HHS. "[W]hen contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity." *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, (1986). "If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions." *Id.* It is not within the power of the parties to a contract, subject to valid governmental regulation, to frustrate the will of Congress and to ignore pro tanto its legislative fiat." *5050 Tuxedo, LLC v. Neal*, 2017 WL 935877, at *6 (D. Md. 2017) (quoting *United States v. Murlaugh*, 190 F.2d 407, 409 (4th Cir. 1951)); *cf. American Airlines, Inc. v. Austin*, 75 F.3d 1535, 1538 (Fed. Cir. 1996) ("Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void.").

These blackletter principles apply squarely to Medicare Program law. "Federal law fixes the relationships and responsibilities of Medicare with beneficiaries and providers. These relationships and responsibilities are beyond the reach of private parties . . . to alter. The liabilities of a Medicare provider are as different from the liabilities in a typical assets-only purchase, as chalk is from cheese." *Mission Hosp.*, 819 F.3d at 1117.

Because the Jefferson APA purports to sell residency slots that the Secretary is required to redistribute, it is void as a matter of law and cannot be approved. It follows that should a court approve a contract (such as issuing a sale order for the proposed transaction between Debtors and Jefferson), the court would violate the Separation of Powers by intruding into an area on which Congress has spoken unequivocally. Such an intrusion would be particularly overreaching

15

because Congress specifically exempted the Secretary's redistribution of residency slots from review by any administrative or judicial body.

> B.     The Residency Slots are Not Debtors' "Property" and Cannot be Sold or Transferred Between Private Parties

No statute or regulation authorizes private parties to sell or otherwise transfer residency slots, because residency slots are not "property" that can be bought and sold. Indeed, residency slots bear none of the hallmarks of a private property interest and remain in the *exclusive* control of the Secretary. First, residency slots exist only within the context of Medicare participation. If a hospital does not enroll in Medicare, it cannot receive Medicare funding for its residency program. If a hospital ceases its participation in Medicare or closes, its allocated residency slots are forfeited and then redistributed. 42 U.S.C. § 1395ww(h)(4)(H)(vi).

Second, a hospital cannot dictate how many residency slots it has. Instead, the Secretary determines caps on a hospital-by-hospital basis and may award additional residency slots under certain circumstances. *Id.* § 1395ww(h)(4)(F), (H)(i). Indeed, if a hospital opens a new residency training program, its cap is not calculated and implemented until the teaching program's *fifth* year of existence. 42 C.F.R. § 413.19(e)(1). Third, the Secretary is authorized to redistribute residency slots while hospitals remain enrolled, such as when they go unused. *Id.* § 1395ww(h)(8). Fourth, CMS has expressed its concern with hospitals attempting to circumvent their respective caps and passed a regulation aimed at preventing affiliated groups (like the Jefferson-led Consortium) from doing so:

> [W]e were concerned that hospitals with existing medical residency training programs could otherwise, with the cooperation of new teaching hospitals, circumvent the statutory FTE caps by establishing new medical residency programs in the new teaching hospitals solely for the purpose of affiliating with the new teaching hospitals to receive an upward adjustment to their FTE caps under an affiliation agreement. This would effectively allow existing teaching hospitals to achieve an increase in their FTE resident caps beyond the number

16

allowed by their statutory caps (70 FR 47452). Accordingly, we adopted the restriction under § 413.79(e)(1)(iv).

83 Fed Reg 41144, 41492 (Aug. 17, 2018). In sum, a residency slot simply authorizes a hospital to receive certain forms of Medicare reimbursement (namely "Direct Graduate Medical Education" (GME) and "Indirect Medical Education" (IME) payments), while custody and control over the slots themselves exclusively belong to the Secretary. *Id.* § 1395ww(h)(3). Quite simply, Debtors are trying to sell residency slots that they don't own, and authorizing the sale of those slots violates the laws that vest *exclusive* control over residency slots in the hands of the Secretary.

## II.  Debtors' Proposed Sale Violates Medicare Law and Regulations

Debtors have conceded, and the Third Circuit has recognized, that transfer of the Medicare Provider Agreement is accomplished through assumption and assignment under section 365. *See In re Charter*, 45 F. Appx. 150, 151 n.1; *In re University Med Ctr.*, 972 F.3d at 275. The Bidding Procedures approved by the Court states: "Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act." Dkt. 249 at ¶ 34. Moreover, the APA lists the Hahnemann Provider Agreement as an executory contract to be assumed and assigned. Exhibit 1 to the APA identifies "Assigned Contracts" for which "[a]ll of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on Schedule A-1 to this Exhibit A." Schedule A-1 lists the "Participating Provider Agreement." Despite its assurances to the Court to obtain an order for the Bidding Procedures and its APA with the Purchasers, Debtors, in their Reply, raise, for the first time, a contrary argument not accepted by any court in the past 20 years, and only acknowledged in one

Appx. 00513

unreported case prior – the Medicare provider agreement is an asset that may sold free and clear under section 363(f).[8]

However, whether this Court considers the proposed transfer of the Hahnemann Provider Agreement to Jefferson under section 365 or section 363, the Medicare Program laws apply. "Section 365 reflects a general bankruptcy rule: The estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Product*, 139 S. Ct. at 1663 (citing *Board of Trade of Chicago v. Johnson*, 264 U. S. 1, 15 (1924)); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("whatever rights a debtor has in property at the commencement of the case continue in bankruptcy – no more, no less."); *see PBGC v. Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 942 (5th Cir. 1983) (lease of airport terminal space not transferable under section 363 without compliance with applicable non-bankruptcy law requiring federal agency approval); *FAA v. Gull Air, Inc. (In re Gull Air, Inc.)*, 890 F.2d 1255, 1262 (1st Cir. 1989) (recognizing debtor's limited property interest in airline landing slots under current applicable non-bankruptcy law, but holding that Bankruptcy Code did not enhance those rights). As we explain below, the proposed Jefferson Sale violates the statutes and regulations that govern Medicare Provider Agreements, as well as the federal Anti-Assignment Act.

---

[8] Demonstrating little shame after their 180 degree pivot from section 365 to 363, Debtors assert in their Reply that the United States should be judicially estopped from contending that bankruptcy courts should analyze the transfer of Medicare provider agreement under section 365 when, in other non-bankruptcy cases involving different issues, the United States has asserted that granting a provider agreement does not grant contract rights. *See* Dkt. 591 at 10-11. Here, of course, Debtors consistently maintained that the Hahnemann Medicare Provider Agreement may only be transferred under section 365 until Debtors' eleventh-hour Reply. In any event, the doctrine of nonmutual offensive collateral estoppel does not apply against the United States. *See Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990); *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984)

Appx. 00514

A.  The Sale violates 42 C.F.R § 489.52

Hahnemann has stopped providing medical services to the community and will be permanently closed on September 6, 2019.  Thus, its Medicare Provider Agreement, which is tied to the provision of services at Hahnemann's location, has terminated pursuant to 42 C.F.R §§ 489.52(b)(3) and 413.79(h), and may not be sold in (or out of) bankruptcy.

Under 42 U.S.C. § 489.52(b)(3), " [a] cessation of business is deemed to be a termination by the provider, effective with the date on which it stopped providing services to the community."  As described above, Hahnemann has stopped providing medical services to the community.  It has no patients, its emergency room has long been closed, and all of its residents have left to finish their training elsewhere.  *See* Dkt. 632 at 6.  During a hearing in this case on August 20, 2019, the Court suggested that Hahnemann has no employees and Debtors did not challenge that conclusion.  While there may still be a Drexel outpatient oncology suite "located in Hahnemann" – but apparently not part of the hospital itself – that office will cease operations on or before September 6, 2019.  Because of these facts regarding the current state of the provision of medical services by Hahnemann, its Medicare Provider Agreement has terminated (or will imminently), making that agreement ineligible for transfer.

Debtors, in their Reply to the United States' objection to the sale to the Stalking Horse Bidder, also entirely fail to address section 489.52(b)(3) (as they did for ACA Section 5506).  Again, perhaps because the Debtors recognize that the regulation unequivocally renders is Hahnemann Medicare Provider Agreement terminated.  Hahnemann has stopped providing medical services to the community (or will do so imminently), and HHS has mandated that when a hospital stops providing services, its provider agreement (which was specifically granted by

Appx. 00515

CMS for the provision of medical services at Hahnemann, *see* Dkt. 591-2) terminates.  A terminated provider agreement cannot be transferred.  42 C.F.R § 489.52.

Debtors assert that the fact that Hahnemann has stopped providing medical services to the community is irrelevant because, although they provide the Court with no evidence, they allege that the Jefferson-led Consortium is treating all of Hahnemann's former patients:  "The fact that such operations are being conducted from the Consortium's locations, rather than buildings historically operated by Hahnemann, does not materially alter this determination."  Reply at 21.  However, either the purchasers will continue to operate Hahnemann or Hahnemann has stopped providing medical services to the community.  If the latter, which is the case, then there is no continued operation of Hahnemann "from the Consortium's locations" – there is no operation of Hahnemann at all.  Debtors cannot provide the Court with an example of a change of ownership where CMS approved the transfer of a provider agreement from a hospital that stopped providing medical services to the community to another hospital that allegedly absorbed its patients.

B.     The Sale violates 42 C.F.R § 489.18

Even if Hahnemann's Medicare Provider Agreement is deemed not to have been terminated, the proposed sale is not a change of ownership ("CHOW") consistent with 42 C.F.R § 489.18.  Because that regulation provides the only means to transfer a Medicare Provider Agreement, this Court must reject the proposed sale.

While Debtors now suggest that they may privately transfer Hahnemann's permanent residency slots without submitting a CHOW application or obtaining CMS approval, that baseless assertion is belied by the CHOW application Debtors submitted when they purchased all Hahnemann-related assets to continue to operate the hospital less than two years ago.  *See* Ex. 1 at 1.  Outside of bankruptcy, Debtors have recognized that they must follow CMS's regulations.

20

Now, after filing bankruptcy, Debtors assert that section 489.18 is not exclusive and that there are ways to transfer a provider agreement outside of the bounds of the regulation. Debtors mislead here – and do so badly.

      1.    A CHOW is the Exclusive Vehicle for Continuous Enrollment in Medicare in the Sale Context

Medicare Provider Agreements may not be sold apart from a change of ownership under section 489.18. 42 C.F.R. § 424.535(7) explains that CMS may revoke enrollment in the Medicare program for a "provider or supplier [that] knowingly sells to or allows another individual or entity to use its billing number." The only exception to an impermissible sale (apart from the reassignment of benefits, which is not a transfer of the provider agreement itself) is "a change of ownership as outlined in § 489.18 . . . ." Thus, the *only* regulatory means for transferring a provider agreement is by a CHOW consistent with § 489.18. Because Debtors' proposed transaction is not a CHOW, and it purports to allow Jefferson to use Hahnemann's provider agreement in order to transfer its permanent residency slots, it is patently illegal. While Debtors claim that section 489.18 is not exclusive, Debtors identify no other statute or regulation authorizing them to sell Hahnemann's provider agreement, and section 424.535(7) makes clear that any vehicle other than a CHOW is illegal.

      2.    The Court Has no Subject Matter Jurisdiction to Declare the Sale of the Residency Slots a CHOW

Debtors concede that the structure of their transaction does not satisfy section 498.18, *see* Dkt. 591 at 15, which does not address the sale of permanent residency slots. Even if Debtors are correct that CMS has discretion in recognizing certain transactions not specified in the regulation as CHOWs, then the proper course would be to present their CHOW application to

Appx. 00517

CMS for its consideration. Instead, Debtors seek to bypass CMS consideration of their CHOW application and to have their transaction declared a CHOW in bankruptcy court. Dkt. 631-1 at ¶ 30. Granting Debtors' request would violate HHS' sovereignty as an executive branch agency, and prevent HHS from rendering a final agency decision regarding the proposed Hahnemann Medicare Provider Agreement transfer, which is a prerequisite to review in federal court. It is black letter law that a court should not substitute its judgment for the determination of the agency charged with applying its statutes and regulations, much less when no administrative record has even been developed. *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984) ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").

Debtors' attempt to circumvent CMS' decision-making process is also prohibited under the jurisdictional bar of the Social Security Act. Except for conducting judicial review of the Secretary's final decision, a court is barred from jurisdiction over any Medicare Program determination. The applicable provision on this point is found at 42 U.S.C. § 1395ii, which incorporates the Social Security Act's jurisdictional bar, 42 U.S.C. § 405(h) ("No action . . . shall be brought under section 1331 or 1346 of Title 28 . . ." "except as herein provided"). The Supreme Court has characterized section 405(h) as "sweeping and direct" in its prohibition of pre-exhaustion lawsuits. *See Weinberger v. Salfi*, 422 U.S. 749, 757 (1975); *Bayou Shores SNF, LLC v. Burwell*, 2014 WL 4059900, at *5 (M.D. Fla. 2014); *Parkview Adventist Medical Center v. United States*, 842 F.3d 757, 760 (1st Cir. 2016) ("the majority of circuits have adopted the view—based on previous versions of the statute and its legislative history—that even though § 405(h) specifically mentions a bar to jurisdiction under only 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (jurisdiction when the United States is a defendant), its jurisdictional bar

Appx. 00518

'applies to other grants of jurisdiction under Title 28, including bankruptcy jurisdiction under § 1334.').

The Supreme Court first discussed the application of this jurisdictional bar to a Medicare dispute in *Heckler v. Ringer*, 466 U.S. 602 (1984). There, the Court ruled that the preclusive effect of section 405(h) barred a court's review of any challenge that is "inextricably intertwined" with a Medicare determination. The terms of the Medicare statute provide the sole avenue of review for any claim "arising under" the Medicare Act. *Id.* at 614-15. The Court made clear that the jurisdictional bar of section 405(h) applies, without regard to whether the complainant's claim is "substantive" or "procedural." *Id.* The Court also stated that it is "of no importance" that a complainant may be seeking "only declaratory or injunctive relief" rather than actual Medicare funds. *Id.* at 615. The jurisdictional bar applies.

In 2000, the Supreme Court reiterated these principles in *Illinois Council on Long Term Care*, 529 U.S. 1. (2000), a case that involved challenges to many elements of the federal nursing home inspection and enforcement scheme, *see id.* at 6-7. In *Illinois Council*, the Court emphasized that Medicare jurisdictional law requires that "virtually all legal challenges" be channeled through the administrative agency, in order to avoid any sort of premature interference by the courts. *Id.* at 13.

Likewise, in *Nichole Med. Equip. & Supply,* 694 F.3d 340 (3d Cir. 2012), the Third Circuit held that an action that a party is "entitled to payments under the Medicare program" arises under the Medicare Act. *Id.* at 348. Because the essence of this dispute is Jefferson's purported entitlement to Medicare reimbursements for the permanent residency slots, the proposed sale of the Hahnemann Medicare Provider Agreement clearly arises under the Medicare Act. Notably, the Third Circuit also held that section 405(h) "continues to bar virtually

23

all grants of jurisdiction under Title 28." In particular, the court held that "Congress clearly prohibited federal courts from exercising subject matter jurisdiction or diversity jurisdiction over claims arising under the Act." *Id.* at 347. Accordingly, there is no subject matter jurisdiction for the Court to enter a sale order that overrides CMS' discretionary decision-making authority. If Debtors wish to transfer the Hahnemann Medicare Provider Agreement to Jefferson, it must seek CMS approval of the transaction.

### 3. The Sale of the Residency Slots is Not a CHOW

It is a logical fallacy for Debtors to assert that because CMS has exercised its discretion to recognize a CHOW in other cases, it must also do so here, much less that the Court should approve a transaction that circumvents CMS's review of Debtors' CHOW application. Section 489.18(a) describes the form of four transactions that may constitute a change of ownership. Although the regulation does not address asset purchases in the context of corporations, CMS has considered the purchase of substantially all the assets of a provider used for patient care to constitute a CHOW. *See* Provider Reimbursement Manual, Part I, §1500.7 (noting that a CHOW may include "[d]isposition of all or some portion of a provider's facility or assets (used to render patient care) through sale . . . if the disposition affects licensure or certification of the provider entity."). This position has been upheld by the Fifth Circuit in *Vernon* and is consistent with the structure of the enumerated transactions in section 489.18(a). 42 C.F.R. §489.18(a) ("*Unincorporated sole proprietorship.* Transfer of title and property to another party constitutes change of ownership. . . . *Leasing*. The lease of all or part of a provider facility constitutes change of ownership of the leased portion."); *Vernon*, 21 F.3d at 696.

Debtors cannot meet the substance of a CHOW. A CHOW involves the sale of substantially all of the assets of a hospital used to render patient care, such as facilities, staff,

24

equipment, patient records, electronic medical record ("EMR") systems, or any of the other basic elements of operating a hospital.  Because the purpose of a CHOW is for transfer of the Medicare provider agreement such that the new owner can provide medical services and continue to obtain reimbursement under the transferred provider agreement, it should be obvious that the hospital assets necessary to provide medical services are transferred in a CHOW.

The Ninth Circuit has addressed why continuity of operation is essential to section 489.18.  "The regulation [42 U.S.C. § 489.18], which Mission tried to circumvent, provides continuity of obligations, continuity which is essential to the functioning of Medicare's Prospective Payment System. The regulation talks about an assignment, not a new beginning with a clean slate on new terms." *Mission Hosp.*, 819 F.3d at 1116.  The Ninth Circuit further explained that it was not limiting or restricting "assets-only purchases of medical providers, or Medicare reimbursements to assets-only purchases, *so long as the assets-only purchase makes an exception for Medicare reimbursement of overpayments*." *Id.* at 1115 (emphasis added).

Here, though, Jefferson is not buying facilities, staff, equipment, patient records, EMR, or any of the other basic elements of operating a hospital.  Rather, Jefferson wants to purchase *only* the provider agreement, and only because of the 580+ residency slots associated with it.  Debtors cannot identify any case where CMS has authorized the sale of residency slots, whether or not in the bankruptcy context.  A bankruptcy court has no jurisdiction to modify the terms of Debtors' enrollment agreement in Medicare or force CMS to enter into a contractual relationship with Jefferson upon different terms.  *See In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004) ("the equitable powers of the bankruptcy court do not accord it 'a roving commission to do equity,' . . . nor 'authorize courts to create substantive rights that are otherwise unavailable under the Code, or to expand the contractual obligations of parties.'") (citation omitted).

25

In their Reply, Debtors do not identify one transaction in which a hospital closed but sold its provider agreement (much less permanent resident slots). If a CHOW under section 489.18 is not the exclusive means to transfer a Provider Agreement, where are the examples of when CMS approved non-CHOW transfers? Where is the citation to cases where courts approved non-CHOW transfers? There are none, because non-CHOW transfers do not exist.

Debtors also assert that "CMS' argument is belied by its own sub-regulatory guidance and practice." Reply at 19-20. To be blunt, Debtors again mislead the Court. A Medicare Manual states that a "provider may undergo a financial or administrative change" that may be a CHOW, which is irrelevant here. Hahnemann is not undergoing a "financial or administrative change" – it is attempting to sell its residency slots in a private transaction in contravention of ACA Section 5506. Notably, the same manual provides that a CHOW constitutes automatic assignment, and that a buyer who rejects assignment must file as a new applicant. Medicare Provider Integrity Manual, § 15.7.7.1.5. No statute or regulation allows the private sale of Medicare-funded residency slots, and Debtors' contention that "sub-regulatory guidance" does so is wrong.[9]

C. The Sale violates 42 C.F.R § 489.18(d) and is contrary to binding Third Circuit law

When a buyer wishes to purchase a hospital, the buyer has a binary choice. It can either assume the seller's provider agreement under section 489.18(d), in which case it steps into the shoes of the previous owner, is able to bill Medicare continuously, and accepts full successor

---

[9] In any event, Debtors' arguments as a whole are irrelevant, because, at heart, they allege that the Bankruptcy Code eviscerates Medicare Program law and CMS's right (and obligation) to approve a CHOW. But, as the Court is well aware, Debtors may not use bankruptcy to avoid federal regulation. Again, as the Supreme Court recently reiterated, "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Product*, 139 S. Ct. at 1663.

26

liability.  Or, a buyer can reject the seller's provider agreement and apply to Medicare as a new applicant.  In that case, the buyer has no successor liability, but also cannot bill Medicare until its enrollment application is approved.  Here, Jefferson attempts to "assume" Hahnemann's Provider Agreement, but only wants the benefits (continuous billing and the permanent residency slots) without any of the burdens (full successor liability).

Even if Debtors could assume and assign Hahnemann's Medicare Provider Agreement (and we've explained why doing so is contrary law), the assumption and assignment must be made with full successor liability. 42 C.F.R §§ 489.18; *In re University Med. Ctr.*, 973 F.2d at 1075.  As a CHOW is the only means of transferring a provider agreement, the assignment of the provider agreement must be "subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued."  § 489.18(d); *see* Dkt. 591-2 ("In the event of a transfer of ownership, this agreement is automatically assigned to the new owner subject to the conditions specified in this agreement and 42 CFR 489.")  *Id.*  In other words, as the Third Circuit has made clear, when assuming a provider agreement, "a hospital accepts the 'burden' of allowing HHS to recover the amount of prior overpayments from Medicare reimbursement currently due."  *In re University Med. Ctr.*, 973 F.2d at 1075; *see also In re Charter*, 45 F. Appx. 150, 151 n.1; *Vernon,* 21 F.3d at 696 ("The operative effect of section 498.18(d) is that all assigned provider agreements are subject to the rules and regulations of the Social Security Act."); *Mission Hosp.*, 819 F.3d at 1116 ("The regulation [section 489.18] which Mission tried to circumvent, provides continuity of obligations, continuity which is essential to the functioning of Medicare's Prospective Payment System. The regulation talks about an assignment, not a new beginning with a clean slate on new terms.").

Appx. 00523

Neither Congress, HHS nor the Third Circuit has limited successor liability. But, Debtors and the Jefferson-led Consortium do exactly that here. They seek to transfer the Hahnemann provider agreement while limiting HHS's liability to a share of a $3 million escrow account that will expire a year from closing. Dkt. 590-1, Art. 3.1. That effort to limit HHS's liability is another reason that the proposed sale cannot qualify as a CHOW and, thus, cannot be approved by CMS.[10]

The Medicare Program's regulations and procedures manuals explain that if an acquiring entity refuses automatic assignment of a provider agreement, that refusal results in the existing provider agreement terminating effective with the date ownership changes. 42 C.F.R. §§ 412.84(i)(3)(i) (defining a "new hospital" as "an entity that has not accepted assignment of an existing hospital's provider agreement in accordance with § 489.18 of this chapter."), 489.13(c); SOM § 3210.5A, 75 Fed. Reg. 50,042, 50,401 (Aug. 16, 2010 CMS Publ. 100-08, Chapter 15 § 15.7.7.1.5 ("If a Part A provider agreement is not assumed and assigned to a purchaser, the agreement terminates, and the purchaser is not eligible for payments for any services it provides."); *see, e.g.*, *Mission Hosp.*, 819 F.3d at 1116 ("Mission extinguished South Coast's provider agreement and voluntarily refused to assume South Coast's contractual liability to return overpayments to Medicare. Consequently, Mission did not and could not take assignment of South Coast's provider agreement."); *Eagle Healthcare, Inc. v. Sebelius*, 969 F. Supp. 2d 38, 40

---

[10] Debtors apparently assert that because CMS has, where the specific circumstances warranted it, reached agreement with transferees receiving a Medicare Provider Agreement regarding the scope of that party's liability, CMS is obligated to do so here (or the Court is obligated to force CMS to do so here). *See* Reply at ¶ 26. That's an incorrect proposition, without any basis in law. A party may settle in one matter for any number of reasons – but doing so does not mandate settlement in other matters. More importantly, settlement in those cases was *consensual* and the product of CMS's *choice*. Debtor has not identified any similar attempt to buy a provider agreement from a closing hospital solely to acquire the affiliated residency slots, much less one that CMS agreed to.

28

(D.D.C. 2013) ("If, however, the new owner rejects the assignment, the prior owner's Provider

Agreement terminates and the new owner must seek to enter the Medicare program as a new

applicant. 42 C.F.R. § 489.10.").

Accordingly, under the present structure of the transaction, Hahnemann's enrollment in

Medicare has either terminated because it has stopped providing medical services to the

community, or upon Jefferson's rejection of assumption of Hahnemann's Medicare Provider

Agreement (the outcome if Jefferson refuses to assume full successor liability). In either case,

Hahnemann has ceased to participate in the Medicare Program *before* the transfer of its

permanent residency slots could purportedly be accomplished. Because a hospital that is not

enrolled in Medicare forfeits its residency slots, Debtors' proposed transaction (even if legal,

which it is not) is impossible under the regulations. *See* 42 C.F.R. §§ 413.79(o) ("in the instance

of a hospital closure . . . , as defined at paragraph (h)(1)(i) of this section, the FTE resident cap of

the closed hospital would be redistributed"), 413.79(h)(1)(i) ("Closure of a hospital means the

hospital terminates its Medicare agreement under the provisions of § 489.52 of this chapter.").

> D. The Sale violates the Anti-Assignment Act

The Federal Anti-Assignment Act, 41 U.S.C. § 6305, also prohibits Debtors' transfer

and/or assumption and assignment of the Hahnemann Medicare Provider Agreement without the

consent of the United States. The United States does not consent to the transfer of the

Hahnemann provider agreement as set forth in the proposed sale, because, as described above,

such a transfer is contrary to law.

The Federal Anti-Assignment Act provides:

> The party to whom the Federal Government gives a contract or order may not
> transfer the contract or order, or any interest in the contract or order, to another
> party. A purported transfer in violation of this subjection annuls that contract or

Appx. 00525

> order so far as the Federal Government is concerned, except that all rights of action for breach of contract are reserved to the Federal Government.

41 U.S.C. § 6305(a).

The Anti-Assignment Act precludes Debtors from transferring and/or assuming and assigning the Medicare Provider Agreement to Jefferson without the consent of the United States. *See, e.g.*, *Matter of West Elecs.*, *Inc.*, 852 F.2d 79, 83-84 (3d Cir. 1988) (no assignment of an executory contract with a federal agency under the Bankruptcy Code without the United States' consent); *see also In re Access Beyond Techs.*, 237 B.R. 32 (Bankr. D. Del. 1999) ("Like the language of the statute, the decision in *West Electronics* is clear and unequivocal. We are bound by Third Circuit law on this point."). The United States has not provided its consent. Accordingly, the Jefferson Sale Motion should be denied for this reason alone. *See In re Catapult Entm't, Inc.*, 165 F.3d 747, 750 (9th Cir. 1999) (debtor-in-possession may not assume executory contract over non-debtor's objection if applicable non-bankruptcy law would bar assignment to hypothetical third-party); *see also In re CFLC, Inc.*, 89 F.3d 673, 680 (9th Cir. 1996) (patent licenses are non-assignable under federal common law).

In their Reply, the Debtors elide the Anti-Assignment Act's absolute requirement of federal government consent, relying only upon *In re ANC Rental Corp.*, 277 B.R. 226, 235-36 (Bankr. D. Del. 2002). But *ANC Rental*, which did not involve the federal government and did not discuss the Anti-Assignment Act, has no relevance here. In that case, the question was whether an airport authority was required to approve the assignment of an airport concession assignment. The Court explained that "[n]one of the statutes expressly prohibit assignment of concession agreements and none expressly excuse the airport authority from accepting performance from an assignee of a concessionaire." *Id.* at 235. Here, there is no dispute that CMS must approve CHOWs. Moreover, in analyzing whether assignment required approval, the

30

Appx. 00526

*ANC Rental* Court distinguished the facts before it from "the kind of law that regulates important public rights, such as the public air safety in *Braniff*, or the regulation of government contracts for production of military equipment, as in *West Electronics*." *Id.* at 236 (quoting *In re Federated Dep't Stores, Inc.*, 126 B.R. 516, 518-19 (Bankr. S.D. Ohio 1990).  There is no question here that CMS's oversight of the provision of Medicare services nationwide is the regulation of important public rights.

### III.  Under Binding Third Circuit Precedent, a Medicare Provider Agreement Must Be Assumed and Assigned Pursuant to Section 365

   A.  <u>Medicare Provider Agreements are properly addressed under section 365</u>

Under binding precedent in the Third Circuit, the Provider Agreement is treated as an executory contract that may only assumed and assigned pursuant to section 365 of the Bankruptcy Code.  *In re University Med. Ctr.*, 973 F.2d at 1075; *see In re Bayou Shores SNF, LLC*, 525 B.R. 160, 168 (Bankr. M.D. Fla. 2014) (quotation omitted) ("Under the . . . 'functional approach,' courts abandon the traditional focus on the 'executoriness' of contracts in bankruptcy in favor of a more practical, functional approach.  . . . [T]he majority of courts have concluded that Medicare provider agreements are executory contracts.").

If the Debtors assume and assign the Hahnemann Medicare Provider Agreement to Jefferson, Jefferson must assume all of the burdens along with the benefits arising from assignment of the Provider Agreement.  *See* 11 U.S.C. § 365(a), (b); *In re University Med. Ctr.*, 973 F.2d at 1075 (holding that "[a]ssumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits," and specifically referring to a provider agreement); 42 C.F.R. § 489.18(d) ("An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued").

31

Those burdens include the obligation to comply with the Medicare Program regulations governing the agreement. *See, e.g.*, *In re EES Lambert Associates*, 62 B.R. 328, 336 (Bankr. N.D. Ill. 1986) (explaining that debtor could not "assume [a] note and mortgage . . . and then simply reject [an accompanying] regulatory Agreement."). "A debtor cannot retain those aspects of the contract to his benefit while rejecting the burdensome aspects thereof." *Id.* Here, those Medicare Program statutes and regulations include 42 C.F.R. § 489.52 and 42 U.S.C. § 1395ww, which terminate a closed hospital's provider agreement and redistributes its residency slots, and 42 C.F.R. § 489.18, which requires CMS approval of a CHOW. Thus, the Court cannot permit Debtors to assume and assign the Hahnemann Medicare Provider Agreement because doing so would immediately conflict with Medicare Program law, such that Debtors cannot assume the burdens of the Medicare Provider Agreement. That insurmountable burden makes section 365 assumption and assignment impossible here.

Assuming for the sake of argument that Hahnemann had not stopped providing medical services to the community and Jefferson would continue to operate the hospital, to satisfy both section 365 and Medicare Program law, Debtors could not "sell" the Medicare Provider Agreement, but must assume and assign it, cure all existing defaults associated with it, and provide adequate assurance that Jefferson will assume all of the burdens along with the benefits of future performance arising from the assignment, including successor liability. 11 U.S.C. § 365(a), (b); 42 C.F.R. § 489.18(d) (upon a change of ownership, the existing provider agreement is automatically assigned to the new owner, subject to all applicable statutes and regulations and terms and conditions under which it was originally issued); *see Vernon*, 21 F.3d at 696 (new owner that accepted assignment of Medicare provider agreement was liable for overpayments of prior owner); *Deerbrook Pavilion*, 235 F.3d at 1103 (new owner of a skilled nursing facility was

32

liable for penalties assessed on the basis of the former owner's actions); *Eagle Healthcare*, 969 F. Supp. 2d at 40 ("An assigned Provider Agreement is subject to all of the terms and conditions under which it was originally issued."). *See also In re Charter*, 45 Fed. Appx. 150, 151 n.1 (observing that "[i]f the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments *but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner*") (emphasis added) (citing 42 C.F.R. § 489.18(d); *Deerbrook Pavilion*, 235 F.3d at 1103-05; *Vernon*, 21 F.3d at 696).[11]

Indeed, in *In re Heffernan Mem'l Hosp. Dist.*, 192 B.R. 228, 231 n.4 (Bankr. S.D. Cal. 1996), the Bankruptcy Court for the Southern District of California held that the Medicare provider agreement is an executory contract providing for advance payments based on estimates and expressly permitting the withholding of overpayments from future advances. Further, in *In re Vitalsigns Homecare, Inc.,* 396 B.R. 232, 240-41 (Bankr. D. Mass. 2008), the court treated Medicare provider numbers as executory contracts based on a rationale that applying section 365 to the provider numbers is an appropriate harmonization of the statutory schemes of the Bankruptcy Code and the Medicare Statute. The court reasoned that "the provider number and the provider agreement are part and parcel of a complicated statutory scheme. It appears that the

---

[11] In their Reply, Debtors assert that the Third Circuit in *In re University Medical Center* did not actually conclude that Medicare Provider Agreements must be treated as executory contracts under Section 365. Reply at ¶ 35. That is, frankly, an absurd argument, because the Third Circuit specifically made that finding. *See id.* at 1075 ("Assumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits. Consequently, if UMC assumed its provider agreement, there is no question that HHS could withhold UMC's post-petition reimbursement in order to recover pre-petition overpayments."); *id.* n.13 ("A Medicare provider agreement easily fits within [the] definition" of "executory contract"). Even if the parties did not contest the issue, the Third Circuit's conclusions were not mere *dicta*, but formed an integral part of the Court's decision.

Appx. 00529

provider agreement, the statute, and the regulations form an arrangement that imposes both benefits and burdens on the provider. It cannot accept the benefits without the attendant burdens." *Id.* at 240; *see also In re Raintree Healthcare Corp.*, 431 F.3d 685 (9th Cir. 2005) (Debtor cannot assign to the purchaser greater rights than it had in the Medicare provider agreement); *In re Diamond Head Emporium*, 69 B.R. 487, 494 (Bankr. D. Hawaii 1987) ("A debtor may not pick and choose those portions that it wishes to enforce and reject those that it does not deem desirable. That is black letter law engraved in stone.").

Moreover, because the Medicare Program payment mechanism involves upfront payments subject to adjustment through cost report auditing before actual reimbursements are determined, assumption and assignment of a Provider Agreement requires not just cure of overpayments determined as of the date of the assumption and assignment under section 365(b)(1)(A), but also adequate assurance of future performance under section 365(b)(1)(C), including assumption of liability for later determined overpayments, regardless of whether they relate to requested reimbursements for services provided before the assumption and assignment. *Vernon*, 21 F.3d at 6964 (purchaser "accept[ed] the automatic assignment of the provider agreement," making it jointly and severally liable with seller for overpayments, pursuant to Medicare regulations at 42 C.F.R. § 489.18(d)).

Applying Bankruptcy Code section 365 to Medicare Provider Agreements is also consistent with the Medicare statute because it does not strip off the Medicare overpayment liabilities from the provider agreement that a section 363(f) sale would allegedly do. A section 363(f) sale would also arguably, yet improperly, extinguish HHS's rights of recoupment and setoff and impair the Medicare scheme adopted by Congress. It would thwart a fundamental principle and purpose of the Medicare statute, namely providing healthcare to the elderly while

Appx. 00530

protecting the public fisc. *Vitalsigns*, 396 B.R. at 240-41. Requiring the provider agreement to be assumed pursuant to 11 U.S.C. § 365 prior to the assignment of that agreement to a third party assignee harmonizes both the Medicare and bankruptcy statutes.[12]

In contending that successor liability is not required by law, Debtors use slippery language, and this Court should examine it carefully. For example, Debtors claim that the United States' position that a provider agreement is assumed and assigned with full successor liability, as mandated by 42 U.S.C. § 489.18 and *University Medical Center*, "runs afoul of applicable provisions of the Bankruptcy Code and CMS' own past practice in negotiating capped overpayment liabilities in bankruptcy cases." Reply at ¶ 26. But Section 365 requires cure and adequate assurance of future performance (not limited cure and limited assurance). And Debtors well know that the fact that CMS may have resolved a limited number of cases through agreement as to the scope of its liability does not bind or obligate CMS to do so in any or every case. In any event, though, assignment of a Medicare Provider Agreement must be consistent with Medicare Program law – and Medicare law mandates full successor liability upon assumption and assignment of a provider agreement.

Moreover, because CMS cost reports identifying overpayments that may be recouped or offset take multiple years to be resolved, including the potential for appeal of initial determinations, the *only* way that an assignee of a Medicare Provider Agreement can provide adequate assurance of future performance is to assume full successor liability for any such

---

[12] "'[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. The courts are not at liberty to pick and choose among congressional enactments.'" *Id.* at 240 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

Appx. 00531

overpayments.[13]  That is exactly what 489.18 requires.  Moreover, CMS did not identify a cure amount here, *see* Reply at 15-16, because the *only* valid means of transfer of the Hahnemann provider agreement would be with the assumption and assignment of full successor liability.

B.  <u>Section 363 does not apply to the transfer of Medicare provider agreements or Medicare-funded residency slots</u>

1.  Medicare provider agreements are not property of the estate transferrable under section 363

As noted above, for the first time in their August 29, 2019 Reply to the United States' objection, the Debtors assert that the Hahnemann Medicare Provider Agreement may be transferred "free and clear" under section 363.  Dkt. 591 at PP 5, 27-40.  Debtors' argument is flawed on multiple levels.  First, a Medicare Provider Agreement and/or Medicare-funded resident slots are not "property" of the estate.  Second, even if the Medicare Provider Agreement was deemed property of the state, Debtors cannot meet any elements of the statutory test set out in section 363(f) in order to sell the agreement "free and clear" of successor liability.

"[H]ealth care providers . . . . do not have a property interest in continued participation or reimbursement.'" *Shah v. Azar*, 920 F.3d 987, 997-98 (5th Cir. 2019) (explaining that they "are not the intended beneficiaries of the federal health care programs").   Moreover, clauses that treat the Medicare Provider Agreement as property do not bind CMS.  The CMS manual clearly states that the provider agreement and CCN, also called the "provider number," are not the "property" of the owner which can be sold.  SOM § 3210.1E.  Although the definition of property of the

---

[13] "This case deals only with the continuity of provider agreement contractual liability for Medicare overpayments, which are not ascertainable until Medicare accounting, calculating, and reconciliation, and which might not occur until years after initial billing." *Mission Hosp.*, 819 F.3d at 1115. "How complicated is this process [by which overpayments and underpayments are calculated], and how long does it take? . . . This daunting regulation [42 C.F.R. § 412.84] demonstrates why continuity is contemplated by the Medicare system." *Id.* at 1114.

Appx. 00532

estate under section 541 includes all legal or equitable interest of the debtor in property, the

Debtors' alleged rights (if any) in the Medicare Provider Agreement do not fit that broad

definition.

A debtor's property interests are defined under applicable non-bankruptcy law "to reduce

uncertainty, to discourage forum-shopping, and to prevent a party from receiving a 'windfall

merely by reason of the happenstance of bankruptcy.'" *Butner v. U.S.*, 440 U.S. 48, 55 (1979)

(citing *Lewis Manufacturers National Bank*, 364 U.S. 603, 609 (1961)). A solid majority of

courts of appeals that have considered the issue outside the bankruptcy context have ruled that

Medicare providers have *no property interest* in their participation in the Medicare program,

whether that be through provider agreements or provider numbers. *Erickson v. U.S. ex rel. Dept.*

*of Health and Human Services*, 67 F.3d 858, 862 (9th Cir. 1995) (Medicare provider had no

takings claim against the government for exclusion from Medicare program because he had no

property interest in participation in the Medicare program); *see Parrino v. Price*, 869 F.3d 392,

397-98 (6th Cir. 2017); *Koerpel v. Heckler*, 797 F.2d 858, 863-65 (10th Cir. 1986); *Cervoni v.*

*Sec'y of Health, Educ. And Welfare*, 581 F.2d 1010, 1019 (1st Cir. 1978). With no property

interest at all in the Hahnemann Medicare Provider Agreements, Debtors have no right to sell it.

Moreover, to the extent that Debtors have any rights at all in connection with the Provider

Agreement, those rights are defined and strictly limited by the Medicare Program and were not

enhanced upon the Debtors' bankruptcy filing to transform into freely alienable property rights.

*Mission Product*, 139 S. Ct. 1652, 1663 (2019) (acknowledging "general bankruptcy rule" that

"[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy.");

*Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("whatever rights a debtor has in

property at the commencement of the case continue in bankruptcy – no more, no less.")*; see*

37

*PBGC v. Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 942 (5th Cir. 1983) (lease of airport terminal space not transferable under section 363 without compliance with applicable non-bankruptcy law requiring federal agency approval); *FAA v. Gull Air, Inc. (In re Gull Air, Inc.)*, 890 F.2d 1255, 1262 (1st Cir. 1989) (recognizing debtor's limited property interest in airline landing slots under current applicable non-bankruptcy law, but holding that Bankruptcy Code did not enhance those rights).[14]

In support of their position that the Medicare Provider Agreements can be assigned to a purchaser without any obligation on the part of the purchaser to comply with the statutory and regulatory requirements for assignment, Debtors, *see* Reply at ¶¶ 31, 33, rely primarily on cases holding or stating in dicta that, outside of a bankruptcy case, a Medicare provider agreement is not a contract. *See, e.g., Hollander v. Brezenoff*, 787 F.2d 834 (2d Cir. 1986); *PAMC, Ltd. v. Sebelius*, 747 F.3d 1214, 1221 (9th Cir. 2014) (quoting *Mem'l Hosp. v. Heckler*, 706 F.2d 1130 (11th Cir. 1983)). It is true that courts outside the bankruptcy context have ruled that Medicare provider agreements do not give rise to contract rights that exceed the rights accorded by Medicare Program statutes and their implementing regulations. Nevertheless, the vast majority of bankruptcy courts treat Medicare provider agreements as "executory contracts" within a bankruptcy case. Debtors misplace their reliance on the extreme minority view in *BDK Health*

---

[14] Even considering a Medicare Provider Agreement as a "statutory entitlement," *see* Reply at 10, there is nothing about that entitlement that grants Debtors a property right such that the Medicare Provider Agreement is an "asset" they can transfer under section 363. While Debtors may identify cases (*not* in bankruptcy) where courts have concluded that the Medicare provider agreement is not a contract, there is only one case, more than 20 years old, where a court considered (without analyzing) that a Medicare provider agreement could fall under section 363. In contrast, we identify numerous cases, much more recent in time, and, with *University Medical Center*, binding on this Court, where bankruptcy courts have analyzed the transfer of a Medicare provider agreement under section 365.

Appx. 00534

*Management*, an unreported bankruptcy court decision from 1998, which involved Medicare provider numbers and did not analyze any provider agreements. Moreover, the court did not hold that the provider numbers were licenses, as the Debtors propose here, *see* Reply at ¶ 38, but merely assets that could be sold under section 363. Accordingly, the *BDK* outlier minority view should be given no weight.

> 2. Medicare provider agreements or Medicare-funded residency slots cannot be sold "free and clear" under section 363(f)

Even if the Court were to deem Medicare provider agreements and associated Medicare-funded residency slots as "property" of the estate potentially eligible for treatment under section 363, Debtors still could not "sell" the provider agreement and the slots "free and clear" under section 363(f). Section 363(f) authorizes certain sales of property "free and clear of any interest in such property." A sale may be authorized under Section 363(f) "only if" one of five stated criteria is satisfied. In the present case, not only are Debtors incapable of selling the Hahnemann Medicare Provider Agreement and the Medicare-funded residency slots under section 363, they cannot meet any of the five section 363(f) criteria. Accordingly, the bankruptcy court cannot lawfully approve a sale of the Provider Agreements pursuant to section 363(f).

Section 363(f) provides:

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

Appx. 00535

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

As a *critical* threshold consideration, the statutory provision ("necessary adjustments," 42 U.S.C. § 1395g(a)) that authorizes recoupment under a Provider Agreement, is not an "interest in property" that could be stripped under section 363(f). The term "interest in property" generally refers to liens and security interests that have attached to the property. *See, e.g., In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio. 1993); *Jandel v. Precision Colors, Inc.* 19 B.R. 415, 419-20 (Bankr. S.D. Ohio 1982). Recoupment does not constitute a lien or a security interest. It is not a charge on property. *See, e.g., Newberry v. Fireman's Fund Insurance Co.*, 95 F.3d 1392 (9th Cir. 1996). To the contrary, the "necessary adjustments" language at 42 U.S.C. § 1395g(a) defines the proper payment due the provider. *United States v. Consumer Health Servs. of America, Inc.*, 108 F.3d 390, 394 (D.C. Cir. 1997). Put another way, it defines Debtors' claims against CMS. Thus, it cannot be an interest that attaches to the independently existing property; it is part of the fundamental process by which the payment owed is actually determined.

Recoupment, "the setting off against asserted liabilities of a counterclaim arising out of the same transaction," is also the principle which allows a creditor to adjust the amounts it owes a debtor. *See Reiter v. Cooper*, 507 U.S. 258, 264, 265 n.2 (1993). It carries with it no right to payment and hence, it is not a claim under the Bankruptcy Code. *See Sims v. U.S. Dep't of Health & Human Servs. (In re TLC Hosp., Inc.)*, 224 F.3d 1008, 1011 (9th Cir. 2000); *Heffernan Mem'l Hosp. Dist.*, 192 B.R. at 230-31; *Brown v. General Motors Corp.*, 152 B.R. 935, 938 (W.D. Wis. 1993). Recoupment is not a claim, it is a defense to payment. *See Kosadnar v. Metro. Life Ins. Co. (Matter of Kosadnar)*, 157 F.3d 1011, 1013-14 (5th Cir. 1998); *Chicago Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.)*, 156 F.3d 1005, 1008-9 (9th Cir. 1997);

40

*Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996); *Lee v. Schwieker*, 739 F.2d 870, 875 (3d Cir. 1984). Because recoupment is not a claim, it "does not even fall under the broadest interpretation of an "interest in property." *In re Lawrence United Corp.*, 221 B.R. 661, 669 (Bankr. N.D.N.Y. 1998). Indeed, the Third Circuit addressed this precise issue in a general bankruptcy context independent of Medicare considerations and unequivocally held that recoupment does not "constitute an 'interest' for purposes of section 363(f)" and, therefore, may not be extinguished by a bankruptcy sale. *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 254-64 (3d Cir. 2000).

Furthermore, any attempted sale by Debtors of the Hahnemann Medicare Provider Agreement under section 363 should also be denied because the United States' regulatory interests in administering the Medicare Program for the benefit of Medicare patients are not an "interest in property" of the Debtors that can be extinguished under 11 U.S.C. § 363(f). *See, e.g., Folger Adam Sec. Inc.*, 209 F.3d at 260; *In re Wolverine Radio*, 930 F.2d 1132, 1146 (6th Cir. 1991) (state assigned credit rating used to determine chapter 11 debtor's payments to the state unemployment fund was not an interest in property that could be extinguished under 11 U.S.C. § 363(f)); *In re Eveleth Mines, LLC*, 312 B.R. 634, 655 (Bankr. D. Minn. 2004) (state taxing authority's use of debtor's pre-sale iron ore production to compute production tax for which purchaser was partially liable held not to be an "interest in property" subject to § 363(f)). *See also In re White Crane Trading Co.*, 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994) (bankruptcy court could not authorize sale that would be inconsistent with consumer protection laws); *In re Welker*, 163 B.R. 488, 489 (Bankr. N.D. Texas 1994) (trustee could not escape regulatory agreement between HUD and the Debtor).

41

As for the enumerated requirements of section 363(f), Debtors have not and cannot establish the proper applicability of *any* of the five subparts of § 363(f) as required for a "free and clear" transfer. Under 11 U.S.C. § 363(f)(1), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* applicable nonbankruptcy law permits the sale of such property free and clear of such interest. As explained in detail above, a Medicare provider agreement may be assigned to a purchaser only as part of a valid change in ownership of an ongoing health care business as determined by CMS. 42 C.F.R. § 489.18(d). As recognized by the Fifth Circuit in *Vernon*, applicable non-bankruptcy law does not permit sale of a Provider Agreement unless it continues to be subject to the Medicare Program, including the requirement that any payments made are subject to adjustments, or recoupment, pursuant to 42 U.S.C. § 1395g(a). And under the Medicare Program, any purchaser/assignee of a Provider Agreement must accept that provider agreement as is, with full successor liability. Hence, the Debtors' requested relief, which could be interpreted to eviscerate the burdens of the Debtors' Medicare Provider Agreement, cannot satisfy 11 U.S.C. § 363(f)(1).

Under 11 U.S.C. § 363(f)(2), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* the party holding such interest consents to the sale on those terms. Here, CMS does not consent to any sale which violates section 365 of the Bankruptcy Code, the Anti-Assignment Act, Medicare Program Law and eviscerates the Provider Agreement of any of its governing terms.

Under 11 U.S.C. § 363(f)(3), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* such interest is a lien. As already noted, the Secretary's statutory obligation to make "necessary adjustments" to payment is neither an "interest" in the Debtors' property nor a lien.

Appx. 00538

Under 11 U.S.C. § 363(f)(4), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* the interest is in bona fide dispute. A debtor has the burden of showing that a bona fide dispute exists. 2 Lawrence P. King, Collier on Bankruptcy ¶ 363.06[5] (15th ed. 1998). This requires a debtor to show that "there is an objective basis for either a factual or legal dispute as to the validity of the debt." *Id*. Thus, whether a dispute is bona fide does not turn on the amount of the debt, but on the validity of the underlying liability.

For instance, in *In re Taylor*, 198 B.R. 142 (Bankr. D. S.C. 1996), the court denied the debtor's motion to sell its nursing homes free and clear of leasehold interests. The debtor argued that the leases were subject to a bona fide dispute because the lessees were in default on their rent and taxes. *Id*. at 163. The court held that the debtor could not sell free of the leasehold unless it proved that the default retroactively terminated the lease entirely. *Id*. Short of that, the lessees' alleged default did not raise a bona fide dispute as to the existence of the "interest" in the lease. *Id*.

Similarly, in the present case, Debtors may or may not dispute the dollar amount of any specific overpayment that the Secretary may seek to recoup or offset, but overpayment amounts are *not* the so-called "interest" at stake. What Debtors are actually seeking to avoid altogether is CMS's rights and authority under the Medicare Program, including the statutory directive and authority to make "necessary adjustments" when it calculates a provider's proper payment: *that statutory term* is the relevant focus for a § 363(f)(4) analysis.

Finally, under 11 U.S.C. § 363(f)(5), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* the holder of that interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. No legal or equitable proceeding may compel the Secretary to accept money to disregard or abrogate the

43

statute by which Congress has directed his actions in running the Medicare program. *See Maryland Dep't of Human Resources v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1480 (4th Cir. 1992) ("An injunction may not strip a federal agency of its power to exercise lawful authority conferred by Congress through statute.").

In summary, the Secretary's statutory directive to make "necessary adjustments" to a provider's current payment when it is determined by the Secretary that an overpayment was previously made and all the other requirements for a change of control of a provider agreement do not fall within the "interest in property" consideration of 11 U.S.C. § 363(f) in the first place. Furthermore, none of the five sub-criteria of § 363(f) can be met. Accordingly, Debtors fail to satisfy any portion of 11 U.S.C. § 363(f), and their demand for a "free and clear" transfer of the Hahnemann Medicare Provider Agreement should be denied.

    C.    <u>HHS is not estopped from arguing that Medicare Provider Agreements are executory contracts</u>

Contrary to Debtors' argument, the United States is not estopped from taking the position – consistent with the vast majority of bankruptcy courts – that the Hahnemann Medicare Provider Agreement is subject to the requirements of section 365 of the Bankruptcy Code. *See* Reply at ¶ 32. Debtors ask the court to apply judicial estoppel broadly to bar the United States from taking a position allegedly inconsistent with its position taken in cases involving other litigants. This broad application of judicial estoppel, also known as nonmutual offensive collateral estoppel, "simply does not apply against the government." *United States v. Mendoza*, 464 U.S. 154, 162 (1984). This rule could not be fairly applied to the United States because it may discretionarily forego appeal in certain cases, despite a likelihood of prevailing, based on government-specific factors, such as limited resources and crowded dockets of the courts, with the expectation of relitigating the issue in an appropriate case with different parties. *Id.* at 161.

44

In essence, the Supreme Court recognized that government litigation in federal courts is sufficiently different from litigation by private litigants, so that "what might otherwise be economy interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the government."[15] *Id*. at 162-63.

Even if judicial estoppel could be stretched to apply here, Debtors conveniently neglect to acknowledge that they would have to carry a "heavy burden" to estop the United States. *United States v. Omdahl*, 104 F.3d 1143, 1146 (9th Cir. 1997) (citing *United States v. Shampang*, 987 F.2d 1439, 1443-44 (9th Cir. 1993) (citing *Yerger v. Robertson*, 981 F.2d 460, 466 (9th Cir. 1992))). Specifically, "[i]n addition to the traditional elements of estoppel, the party must also prove that the United States engaged in affirmative conduct beyond mere negligence, that the party would suffer a severe injustice if estoppel is not applied, and that the public would not be burdened by its application." *Id*. at 1146. Debtors did not even attempt to meet their heavy burden to establish grounds for estoppel against the United States. For instance, they did not and could not establish that they would suffer a "severe injustice" if the Hahnemann Medicare Provider Agreement is governed by section 365. Provider Agreements across the country have

---

[15] Debtors reliance on the arguments made by the United States in *United States v. Tenet Healthcare Corp.*, 2005 WL 3784642 (C.D. Cal. Dec. 22, 2005) is misplaced. *See* Reply at ¶ 32. In its brief in *Tenet*, the United States first acknowledged that "a majority of bankruptcy courts treat Provider Agreements as 'executory contracts,'" and explained that this treatment is not inconsistent with the law outside the bankruptcy context because the bankruptcy arena "is a court of special jurisdiction and practice governed by a particular code that is designed to fulfill certain purposes . . . unique to bankruptcy proceedings – i.e., to determine if the debtor, at the sole option of the debtor, has assumed or rejected the Provider Agreement." The United States then acknowledged that HHS cannot force a debtor to assume or reject a provider agreement in bankruptcy, and Provider Agreements are thus not fully "enforceable as contracts" by HHS against the debtor absent assumption under section 365 of the Bankruptcy Code. This argument put forward by the United States' in *Tenet Healthcare* clearly acknowledges and distinguishes the bankruptcy-specific characterization of Medicare Provider Agreements.

Appx. 00541

been treated as executory contracts in bankruptcy by courts across the nation for decades.  A determination that the Hahnemann Medicare Provider Agreement is subject to section 365 would not upset any expectations of Debtors, the Purchaser, lenders, other creditors of the estate and the Medicare beneficiaries, because they have been treated as such by the vast majority of bankruptcy courts.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the Jefferson Sale Motion and refuse to order the illegal sale of the Hahnemann permanent Medicare-funded residency slots.

46

Dated:  September 4, 2019                        Respectfully submitted


JOSEPH H. HUNT
Assistant Attorney General

DAVID C. WEISS
United States Attorney

ELLEN SLIGHTS
Assistant United States Attorney

/s/ Marc S Sacks
RUTH A. HARVEY
MARGARET M. NEWELL
MARC S. SACKS
Department of Justice
Commercial Litigation Branch,
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, DC 20044-0875
Tel. (202) 307-1104
Fax (202) 514-9163
marcus.s.sacks@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

Appx. 00543

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September 2019, I caused a true and correct copy of the foregoing objection to be served via electronic mail upon all parties receiving electronic notice under the Court's CM/ECF system.


s/ Marc S Sacks
MARC S. SACKS

Appx. 00544

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*, | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket No. 142, 249, 590, 591, 631 Obj. Deadline: Sept. 4, 2019 (10:00 a.m.)** |

**OBJECTION OF THE UNITED STATES
TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING THE SALE OF THE
DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS TO JEFFERSON AS SET FORTH IN
THE ASSET PURCHASE AGREEMENT**

# Exhibit 1

| APPLICATION DATA REPORT |
| --- |

**Report Print Date:** 01/19/2018

## Section 1: Basic Information Summary

### L&T Information

**Name:** Center City Healthcare, Llc
**TIN:** 82-2813341 (EIN)
**NPI:** 1467967943
**Provider/Supplier Type:** HOSPITAL

**L&T ID:** 20171211007337
**Tracking ID:** T121120170000445
**Enrollment ID:**
**Enrollment State:** Pennsylvania

**Reason for Submission**
A Medicare Part A provider is undergoing a CHOW and this application is to inform Medicare as the buyer / new owner.

### Contractor Information

**Contractor Name:** NOVITAS SOLUTIONS, INC.
**Contractor ID:** 04911

### Payment Information

**Medicare Application Fee Required:** No

**Medicare Application Fee Paid External Systems:** No

### Submission History for the Application

**Date**
**Details**
12/11/2017
RECEIVED
01/11/2018
CORRECTIONS RECEIVED

## APPLICATION SIGNATURE(s)    Signature Status: All Signatures Complete

### AUTHORIZED SIGNER: Joel Freedman                                          Status: Complete

**Document:** AUTHORIZED OFFICIAL CERTIFICATION STATEMENT FOR INSTITUTIONAL PROVIDERS

**Role:** AUTHORIZED OFFICIAL

**TIN:** ▮▮▮▮▮(SSN)

**Phone Number:** (310) 414-▮▮▮

**E-mail Address:** jf▮▮▮▮▮@pldn.com

**Date Signed:** 01/11/2018

**Signature Type:** Electronic

**IP Address:** 69.195.▮▮▮

### AUTHORIZED SIGNER: Joel Freedman                                          Status: Complete

**Document:** ELECTRONIC FUNDS TRANSFER (EFT) AUTHORIZATION AGREEMENT

**Role:** AUTHORIZED OFFICIAL

**TIN:** ▮▮▮▮▮ (SSN)

**Phone Number:** (310) 414-▮▮▮

**Date Signed:** 12/11/2017

**Signature Type:** Electronic

**IP Address:** 69.195.▮▮▮

Appx. 00546

**E-mail Address:** jfreedman@pldn.com

| **AUTHORIZED SIGNER: Stella Freedman** | Status: Complete |
|---|---|

**Document:** DELEGATED OFFICIAL CERTIFICATION STATEMENT FOR INSTITUTIONAL PROVIDERS

**Role:** DELEGATED OFFICIAL

**TIN:** ▮▮▮▮ (SSN)

**Phone Number:** (310) 414-▮▮

**E-mail Address:** s▮▮▮▮@pldn.com

**Date Signed:** 01/12/2018

**Signature Type:** Electronic

**IP Address:** 10.35.▮▮▮

---

## Section 2: Identifying Information

### ORGANIZATION INFORMATION: CENTER CITY HEALTHCARE, LLC

**Legal Business Name**
Center City Healthcare, Llc

**TIN:** 82-2813341 (EIN)

**Year End Cost Report Date**
12/31/2017

**Organization Structure**
Limited Liability Company

**Type of Other Name**
Doing Business As Name

**Other Name**
Hahnemann University Hospital

**IRS Proprietary/Non-Profit Status**
Proprietary

**Incorporation Date:** 08/28/2017

**State Where Incorporated:** DE

---

### Additional Hospital Information

**Hospital has compliance plan to check against exclusion/debarment lists:** Yes

**Provider is a physician-owned hospital:** No

**Hospital Subgroups/Units**
PSYCHIATRIC UNIT

### License Information

**License Number**

**State/Territory Where Issued**

**Effective Date**

**Expiration/Renewal Date**

081701
PENNSYLVANIA
04/30/2017
04/30/2020

---

| Certification Information | **No Data Provided** |
|---|---|

No Data Provided

### CORRESPONDENCE ADDRESS

**Telephone Number**
(310) 414-2700

**USPS Verified Address (Vacant Address)**

Appx. 00547

**Fax Number**

222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670
US

**User's reason for why a non-deliverable address is being used**
Address is receiving mail delivery.

**E-mail Address:**
sa███████@pldn.com

## ACCREDITATION

### Accreditation: THE JOINT COMMISSION

**Accrediting Body Name**
THE JOINT COMMISSION

**Effective Date:** 11/16/2016
**Current Expiration Date:** 11/16/2019

**Accreditation Program Type**
Hospital accreditation program

## CHANGE OF OWNERSHIP (CHOW) INFORMATION

### Seller/Former Owner Information

**Effective date of Transfer:** 01/11/2018

**Old Owner's NPI:** 1194755892

**Sellers Legal Business Name Reported to IRS**
Tenet HealthSystem Hahnemann, LLC

**TIN:** 75-2784869 (EIN)

**"Doing Business As" Name of Seller/Former Owner**
Hahnemann University Hospital

**Name of Fee-for-Service Contrator of Seller/Former Owner**
NOVITAS SOLUTIONS, INC.

**"Provider Agreement" Accepted by New Owner:** Yes

| Practice Location | No Data Provided |
|---|---|

**Address**

US

## Section 3: Final Adverse Legal Actions

**Has a final adverse action ever been imposed against an applicant under any current or former name or business entity?**
No

## Section 4: PRACTICE LOCATION INFORMATION

### PRACTICE LOCATIONS

#### #1: Hahnemann University Hospital

##### Practice Location Information

**Location Name**
Hahnemann University Hospital

**Practice Location Type**
Hospital Psychiatric Unit

**Telephone**
(215) 762-7000

**Location Type**
PRACTICE LOCATION

**USPS Verified Address (Exact Match)**
230 N BROAD ST
PHILADELPHIA, PA 19102-1121
US

**Fax**
(215) 762-8109

**Effective Date:** 01/11/2018

**E-mail Address**

**FDA Certification Number**

**CLIA Number**
39D0198114

| Payment Address Information |
|---|

**Effective Date:** 01/11/2018

**User Entered Address (Unconfirmed Address)**
PO BOX 781036
PHILADELPHIA, PA 19178-1036
US

**User's Reason For Why USPS Verified Address Is Not Used**
Unique ZIP code for business receiving large amount of mail.

| Claims Information |
|---|

### • Claims Detail

**Medicare ID:**

**NPI:** 1467967943

**CP-575 indicator:** Yes

**Effective Date of Location:**
01/11/2018

**Primary billing information and practice location:** Yes

**TIN:** 82-2813341 (EIN)

| Medical Records Storage Information |
|---|
| Physical Medical Records Storage Information |
| •   Medical Records Storage Location |

**Effective Date:** 01/11/2018

**USPS Verified Address (Exact Match)**
1000 CAMPUS DR
COLLEGEVILLE, PA 19426-4908
US

## MOBILE SERVICES INFORMATION

| Vehicle Information |
|---|

**Does the applicant have vehicle information?**
No

| Geographic Location (Mobile/Portable Services) | No Data Provided |
|---|---|

No Data Provided

## Section 5: OWNERSHIP INTEREST & MANAGING CONTROL INFO (ORGANIZATIONS)

| ORGANIZATION CONTROL INFORMATION: American Academic Health System, LLC |
|---|
| Identifying Information |

**Legal Business Name**
American Academic Health System, LLC

**Doing Business As Name**

**TIN:** 82-2929393 (EIN)

**USPS Verified Address (Vacant Address)**
222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670
US

**User's reason for why a non-deliverable address is being used**

Appx. 00549

**Type of Organization:** Limited Liability Company, For-profit

Address is receiving mail delivery.

**NPI:**

---

| Ownership/Managing Control Information | | | | |
|---|---|---|---|---|
| **Role** | **Exact Percent** | **Effective Date** | **Created Solely to acquire/buy provider and/or provider's assets** | **Types of Services Furnished** |
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 100 | 08/28/2017 | No | |

---

**Final Adverse Actions**

• **Adverse Action**

**Has this organization, under any current or former name or business entity, ever had a final adverse action imposed against it?**
No

---

**ORGANIZATION CONTROL INFORMATION: MBNF Investments, LLC**

**Identifying Information**

**Legal Business Name**
MBNF Investments, LLC

**Doing Business As Name**

**TIN:** 82-2894029 (EIN)

**Type of Organization:** Limited Liability Company, Holding Company, For-profit

**USPS Verified Address (Vacant Address)**
222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670
US

**User's reason for why a non-deliverable address is being used**
Address is receiving mail delivery.

**NPI:**

---

| Ownership/Managing Control Information | | | | |
|---|---|---|---|---|
| **Role** | **Exact Percent** | **Effective Date** | **Created Solely to acquire/buy provider and/or provider's assets** | **Types of Services Furnished** |
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 100 | 08/28/2017 | No | |

---

**Final Adverse Actions**

• **Adverse Action**

**Has this organization, under any current or former name or business entity, ever had a final adverse action imposed against it?**
No

Appx. 00550

**ORGANIZATION CONTROL INFORMATION: Philadelphia Academic Health Holdings, LLC**

### Identifying Information

| | |
|---|---|
| **Legal Business Name**<br>Philadelphia Academic Health Holdings, LLC<br>**Doing Business As Name** | **USPS Verified Address (Vacant Address)**<br>222 N SEPULVEDA BLVD, STE 900<br>EL SEGUNDO, CA 90245-5670<br>US |
| **TIN:** 82-2908894 (EIN) | **User's reason for why a non-deliverable address is being used**<br>Address is receiving mail delivery. |
| **Type of Organization:** Limited Liability Company, For-profit | **NPI:** |

### Ownership/Managing Control Information

| Role | Exact Percent | Effective Date | Created Solely to acquire/buy provider and/or provider's assets | Types of Services Furnished |
|---|---|---|---|---|
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 100 | 08/28/2017 | No | |

### Final Adverse Actions

- **Adverse Action**

**Has this organization, under any current or former name or business entity, ever had a final adverse action imposed against it?**
No

**ORGANIZATION CONTROL INFORMATION: Philadelphia Academic Health System, LLC**

### Identifying Information

| | |
|---|---|
| **Legal Business Name**<br>Philadelphia Academic Health System, LLC<br>**Doing Business As Name** | **USPS Verified Address (Vacant Address)**<br>222 N SEPULVEDA BLVD, STE 900<br>EL SEGUNDO, CA 90245-5670<br>US |
| **TIN:** 82-2918681 (EIN) | **User's reason for why a non-deliverable address is being used**<br>Address is receiving mail delivery. |
| **Type of Organization:** Limited Liability Company, For-profit | **NPI:** |

### Ownership/Managing Control Information

| Role | Exact Percent | Effective Date | Created Solely to acquire/buy provider and/or provider's assets | Types of Services Furnished |
|---|---|---|---|---|

Appx. 00551

| Role | Exact Percent | Effective Date | Created Solely to acquire/buy provider and/or provider's assets | Types of Services Furnished |
|---|---|---|---|---|
| 5% OR GREATER DIRECT OWNERSHIP INTEREST | 100 | 08/28/2017 | No | |
| OPERATIONAL /MANAGERIAL CONTROL | 100 | 08/28/2017 | | This entity is the manager of Center City Healthcare, LLC. |

| **Final Adverse Actions** |
|---|
| • Adverse Action |

**Has this organization, under any current or former name or business entity, ever had a final adverse action imposed against it?**
No

## Section 6: OWNERSHIP INTEREST & MANAGING CONTROL INFO (INDIVIDUALS)

**INDIVIDUAL: Freedman, Joel**

### Identifying Information

**Name:**
Joel  Freedman

**Date of Birth:** ▮▮▮▮

**Country of Birth:** United States
**State of Birth:** ▮

**TIN:** ▮▮▮▮▮ (SSN)

**NPI:**

### Ownership/Managing Control Information

| Role | Exact Percent | Effective Date | Title | Types of Services Furnished |
|---|---|---|---|---|
| AUTHORIZED OFFICIAL | | 01/11/2018 | | |
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 52.8 | 08/28/2017 | CEO and President | |
| OFFICER | 100 | 08/30/2017 | CEO and President | |
| OPERATIONAL/MANAGERIAL CONTROL | 100 | 08/28/2017 | CEO and President | |

| **Indicate if individual is Authorized or Delegated official** | **Telephone** | **Is the delegated official a W-2 employee?** |
|---|---|---|
| AUTHORIZED OFFICIAL | (310) 414-▮▮▮ | No |

| **Final Adverse Actions** |
|---|
| • Adverse Action |

Appx. 00552

**Has this individual, under any current or former name or business entity, ever had a final adverse action imposed against him/her?**
No

**INDIVIDUAL: Freedman, Stella**

| Identifying Information |
| --- |

**Name:**
Stella  Freedman

**Date of Birth:** ▮▮▮▮▮

**Country of Birth:** Russian Federation
**State of Birth:** ▮▮▮▮▮

**TIN:** ▮▮▮▮▮ (SSN)

**NPI:**

| Ownership/Managing Control Information |
| --- |

| Role | Exact Percent | Effective Date | Title | Types of Services Furnished |
| --- | --- | --- | --- | --- |
| DELEGATED OFFICIAL | | 01/11/2018 | | |
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 35.2 | 08/28/2017 | Secretary and Treasurer | |
| OFFICER | 0 | 08/30/2001 | Secretary and Treasurer | |

| Indicate if individual is Authorized or Delegated official | Telephone | Is the delegated official a W-2 employee? |
| --- | --- | --- |
| DELEGATED OFFICIAL | (310) 414-▮▮▮ | No |

| Final Adverse Actions |
| --- |

- **Adverse Action**

**Has this individual, under any current or former name or business entity, ever had a final adverse action imposed against him/her?**
No

## Section 8: Billing Agency Information

**Billing Agency: Conifer Revenue Cycle Solutions, LLC**

**Legal Business Name**
Conifer Revenue Cycle Solutions, LLC

**USPS Verified Address (Exact Match)**
3560 DALLAS PKWY
FRISCO, TX 75034-8635
US

**Effective Date:** 01/11/2018

**"Doing Business As" Name**

**TIN:** 75-2965456 (EIN)

**Telephone Number:** (877) 266-4337

**Fax Number:**

**Email**
No Data Provided

## Section 7: Chain Home Office Information

**Does the applicant have a chain home office for this application?**
No

## CMS 855 POH - Physician Owned Hospital Information

## Organization Ownership

**Does the applicant have any organizations having ownership or investment interest to report?**
No

### Individual Ownership

**Does the applicant have any individuals having ownership or investment interest to report?**
No

| Physician Owned Hospital - Contact Person Information | No Data Provided |
|---|---|

No Data Provided

## Section 13: Enrollment Application Contact Person

### Contact Person: Troy Barsky

| **Name** | **Relationship/Affiliation to Provider/Supplier** | **Telephone Number** |
|---|---|---|
| Troy Barsky | Third Party Company | (202) 624-██████ |

**User Entered Address (Unconfirmed Address)**
1001 PENNSYLVANIA AVE NW
WASHINGTON, DC, 20004-2505

**Fax Number**

**User's Reason For Why USPS Verified Address Is Not Used**
Address is receiving mail delivery.

**Email**
tbarsky@crowell.com

## Electronic Required/Supporting Documentation

### Electronic Required/Supporting Documents

**Date Uploaded**

**Document ID**

**Document Type**

**File Name**

01/11/2018
PPECOS000CA1801111615200346E120H1888T463
Bill of Sale/Sale Agreement
Bill of Sale Assignment and Assumption Agreement (Executed).pdf

12/11/2017
PPECOS000CA1712111739540107E120H1888T35674
Document not in List
ATTACHMENT B - HUH MANDATORY SUPPORTING DOCUMENTS.pdf

12/11/2017
PPECOS000CA1712111354090742E120H1892T140
CLIA Certificate
CLIA.pdf

12/11/2017
PPECOS000CA1712111353520011E120H1888T587
FDA/Mammography certificates
FDA.pdf

Appx. 00554

**Date Uploaded**

**Document ID**

**Document Type**

**File Name**

12/11/2017

PPECOS000CA1712111043580876E120H1888T186

Medical License/Certification/Registration

4.k. PA Medicaid enrollment HUH.pdf

12/11/2017

PPECOS000CA1712111043400407E120H1892T703

Voided Check/Account Verification

4.j. Bank Confirmation.pdf

12/11/2017

PPECOS000CA1712111043300312E120H1888T186

Official IRS document confirming TIN and LBN

4.i. IRS Letter.PDF

12/11/2017

PPECOS000CA1712111043210304E120H1892T705

Organization Diagram

4.h. Center City Healthcare LLC Org Diagram.pdf

12/11/2017

PPECOS000CA1712111043080749E120H1888T587

Business License/Certification/Registration

4.g. Delaware Certificate of Formation.PDF

12/11/2017

PPECOS000CA1712111043000238E120H1892T705

Business License/Certification/Registration

4.f. Pennsylvania LLC license.PDF

12/11/2017

PPECOS000CA1712111042500486E120H1884T120

Bill of Sale/Sale Agreement

4.e. Bill of Sale.pdf

12/11/2017

PPECOS000CA1712111042400607E120H1884T13608

Medical License/Certification/Registration

4.d. Current Hospital License.pdf

12/11/2017

PPECOS000CA1712111042170084E120H1892T711

Document not in List

4.a. Attachment A.pdf

| Required/Supporting Documents List with the PI User Checklist Information |
| --- |
| Document |
| Delivery |
| Comment |

Appx. 00555

Copy(s) of Bills of Sale or Sales Agreements

☐ Mail ☑ Upload

A voided check or letter from bank confirming account information

☐ Mail ☑ Upload

Copy of IRS Form CP 575 or other official IRS communication confirming Tax Identification Number and Legal Business Name

☐ Mail ☑ Upload

Copy(s) of Licenses, Certifications and Registrations

☐ Mail ☑ Upload

Organizational Diagram(s)

☐ Mail ☑ Upload

Copy of current CLIA and FDA certification

☐ Mail ☑ Upload

Copy of Business Licenses, Certifications and/or Registrations

☐ Mail ☑ Upload

Notarized Certificate of Good Standing from State licensing/certification board or other medical association

☐ Mail ☐ Upload

Other Documentation requested by your Medicare Contractor(s)

☐ Mail ☐ Upload

Authorized Official Certification Statement for Institutional Providers [PDF]

Form CMS-588, Electronic Funds Transfer (EFT) Authorization Agreement

Delegated Official Certification Statement for Institutional Providers

## CMS-588: Electronic Funds Transfer (EFT) Agreement

**Will the EFT payment be made to the Home Office of Chain?**
No

### EFT AGREEMENT DETAILS

### Account Holder Information

**Legal Business Name**
CENTER CITY HEALTHCARE, LLC
**TIN:** 82-2813341 (EIN)

**NPI:** 1467967943

**Medicare ID:**

**USPS Verified Address (Vacant Address)**
222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670

**User's reason for why a non-deliverable address is being used**
Address is receiving mail delivery.

### Financial Institution Information

**Name**
Wells Fargo

**User Entered Address (Unconfirmed Address)**

**Financial Institution Contact Person**

**Routing Transit Number:**
████████

Appx. 00556

420 MONTGOMERY ST
SAN FRANCISCO, CA 94104-1207

**Depositor Account Number:**

██████████

**User's Reason For Why USPS
Verified Address Is Not Used**

Financial institution's corporate
address.

**Type of Account:** Checking

**Telephone Number:** (800) 869-
3557

| **EFT Contact Person** |
|---|
| **Name** |
| **Title** |
| **Telephone Number** |
| **E-mail Address** |

Svetlana Attestatova

General Counsel

(310) 414-███

sa██████@pldn.com

Appx. 00557

# TAB 8

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*,[1] | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket No. 669** |

## LIMITED OBJECTION TO PROPOSED SALE ORDER

The United States of America (the "United States"), on behalf of the Department of Health and Human Services ("HHS"), acting through its designated component, the Centers for Medicare & Medicaid Services ("CMS"), objects to the proposed sale order, Dkt. 669-1, because it improperly purports to strip CMS of its offset rights related to the Participating Provider Agreement. ¶12(i).

As an initial matter, Debtors have not demonstrated that "offset rights" are interests in property that may be stripped in a free and clear sale. While Debtors may rely upon *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252 (2000), that case did not involve the government, and the Court did not consider a free and clear sale of a Medicare Provider Agreement. At a minimum, the Assignment of Claims Act, 31 U.S.C. § 3727, demonstrates that

---

[1] The Debtors in these jointly administered cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Appx. 00558

transfer of a Medicare Provider Agreement, which includes assignment of the right to be paid by CMS, "is not subject to reduction or setoff."

We explained our position to the Debtors and proposed that they add a new paragraph after paragraph 12 that states as follows:

> For the avoidance of doubt, and notwithstanding any other provision of this order, including Paragraph 12, the transfer of the Purchased Assets shall not be free and clear of CMS's offset and recoupment rights related to the Participating Provider Agreement. Moreover, with regard to any funds frozen by CMS prior to the Closing Date consistent with *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995), any offset or recoupment by CMS against those funds will not constitute a claim against the CMS Pre-Closing Amount or otherwise reduce the $3,000,000 Escrow Amount.

Debtors contend that "CMS raised an objection with respect to paragraph 12 at the hearing on September 5, 2019, which the Court overruled." Dkt. 660, ¶ 10. The United States did not, however, raise the issue of the improper stripping of CMS's right to offset and the Court did not issue a ruling on the issue. To the extent that the Court has concerns about the timeliness of this objection, we remind the Court that Debtors only changed their position and asserted that section 363 should govern the sale on August 29, 2019, and they only filed the proposed order at 11:35 p.m. on September 3, 2019.

Alternatively, because the United States did not receive sufficient notice that its offset rights would be potentially extinguished by transfer of the Participating Provider Agreement in a section 363 free and clear sale to previously seek relief from the stay, the United States requests that the Court grant emergency relief from the stay to allow CMS to execute offset, to the extent the funds cannot be fully recouped, on any funds frozen by CMS prior to the Closing Date consistent with *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995).

2

Dated:  September 6, 2019             Respectfully submitted,


                                                   JOSEPH H. HUNT
                                                   Assistant Attorney General

                                                   DAVID C. WEISS
                                                   United States Attorney

                                                   ELLEN SLIGHTS
                                                   Assistant United States Attorney

                                                   <u>/s/ Marc S Sacks</u>
                                                   RUTH A. HARVEY
                                                   MARGARET M. NEWELL
                                                   MARC S. SACKS

                                                   Department of Justice
                                                   Commercial Litigation Branch,
                                                   Civil Division
                                                   P.O. Box 875, Ben Franklin Station
                                                   Washington, DC 20044-0875
                                                   Tel. (202) 307-1104
                                                   Fax (202) 514-9163
                                                   marcus.s.sacks@usdoj.gov

                                                   ATTORNEYS FOR THE UNITED STATES

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September 2019, I caused a true and correct copy of the foregoing objection to be served via electronic mail upon all parties receiving electronic notice under the Court's CM/ECF system.


s/ Marc S Sacks
MARC S. SACKS

4

Appx. 00561

# TAB 9

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
| | Jointly Administered |
| Debtors. | **Re: Docket Nos. 142, 246, 249 & 590** |

## ORDER UNDER 11 U.S.C. § 105, 106, 363, 365, 503, 507, AND 525 (A) APPROVING ASSET PURCHASE AGREEMENT WITH THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC., (B) AUTHORIZING SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF INTERESTS, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY CONTRACTS, AND (D) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[2] of Center City Healthcare, LLC, d/b/a Hahnemann University Hospital (the "Debtor"), for, *inter alia*, entry of an order, pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"): (i) approving the sale by the Debtor to Thomas Jefferson University Hospitals, Inc. or its permitted assignee (the "Purchaser") of the certain assets (the "Purchased Assets"), as defined in and pursuant to that certain Asset Purchase Agreement attached hereto as **Exhibit A** (the "Agreement") free and clear of all Interests (defined below) (except those expressly assumed by the Purchaser), and (ii) authorizing the assumption by the Debtor and assignment to the Purchaser of certain executory contracts free and clear of all Interests (except those expressly

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Agreement (defined below) as applicable.

Appx. 00562

assumed by the Purchaser), and (iii) granting certain related relief; and the Court having held a hearing on September 4, 2019 (the "Sale Hearing") to approve the Sale Motion; and the Court having reviewed and considered (a) the Sale Motion, (b) the objections to the Sale Motion, if any, and (c) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate and creditors and other parties in interest; and upon the record of the Sale Hearing and after due deliberation thereon; and good cause appearing therefore,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* dated February 29, 2012, from the United States District Court for the District of Delaware.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O), and the Court may enter a final order consistent with Article III of the United States Constitution.  The statutory predicates for the relief granted herein are Sections 105, 106, 363, 365, 503, 507, and 525 of the Bankruptcy Code.

B.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

C.    Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing and the Debtor's potential assumption and assignment (or assignment, as applicable) of the contracts listed on **Exhibit B** hereto (the "Assigned Contracts") to the Purchaser has been provided in accordance with sections 102(1), 363, 365, 503, and 507 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006, 9008 and

Appx. 00563

9014 and the order of this Court dated July 19, 2019 (the "Bidding Procedures Order"), and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this Order is required.

D. A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Purchased Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Purchased Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Purchased Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtor's and its debtor-affiliates' unions and pension funds; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; (p) all Residents, (q) all known creditors of the Debtor, including Known Patient Creditors (as defined in the Bidding Procedures Order); (r) the Pension Benefit Guaranty Corporation (the "PBGC"); and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.

E. The Debtor also caused notice of the Sale Motion to be published in *The Philadelphia Inquirer* and *USA Today*, which notice by publication is reasonable and sufficient to bind holders of claims against the Debtor whose identity was not known to the Debtor as of

the day before the Mailing Date, including Unknown Patients (as defined in the Bidding Procedures Order).

F.      The Debtor has full corporate power and authority to execute the Agreement and all other documents contemplated thereby and consummate the transactions contemplated therein and the sale of the Purchased Assets and assumption and assignment (or assignment, as applicable) to the Purchaser of any Assigned Contracts as provided in the Agreement (defined below) (collectively, the "Sale") has been duly and validly authorized by all necessary corporate action of the Debtor and no consents or approvals, other than the approval of this Court, are required for the Debtor to consummate such transactions.

G.      The Purchaser is not a successor to or mere continuation of the Debtor or its estate.

H.      The bidding procedures established pursuant to the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets and Assigned Contracts and no higher or better offer has been made.

I.      The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts and sell the Purchased Assets to the Purchaser in connection with the consummation of the Agreement, and that approval of the Agreement and the Sale pursuant thereto is in the best interests of the Debtor, its estate, and its creditors.

J.      The Sale must be completed immediately in order to preserve the value of the Purchased Assets and to provide certainty to former Hahnemann University Hospital Residents regarding the status of their tail insurance coverage and, as a result, good and

4

Appx. 00565

sufficient business justification exists for the immediate sale of the Purchased Assets and assumption and assignment (or assignment, as applicable) of the Assigned Contracts to the Purchaser outside of a plan of reorganization.

K.     The Purchaser is not an insider, as that term is defined in the Bankruptcy Code, of the Debtor.  Furthermore, no insiders of the Debtor are receiving or retaining any benefit, property or payments in connection with the Sale except to the extent such insiders have allowed claims against or equity interests in the Debtor and, as a result, may participate in a distribution of Sale proceeds.

L.     The Agreement was negotiated, proposed and entered into by the Debtor and Purchaser without collusion, in good faith, and as a result of arm's-length bargaining.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby with respect to the transactions authorized by this Order (including specifically, but without limitation, any assumption and assignment of executory contracts under section 365 of the Bankruptcy Code).  Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code.

M.     In the absence of a stay pending appeal, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Agreement at any time after the entry of this Order, provided the Purchaser shall not be obligated to close until all applicable conditions to closing under such Agreement have been satisfied or waived as provided in such Agreement.  In closing the transactions contemplated by the Agreement absent satisfaction of the condition of CMS consent, the Purchaser shall be deemed to have materially relied on the findings and decrees in

Appx. 00566

this Order, including specifically, but without limitation, (i) the finding that there has not been, and will not be, a cessation of business of Hahnemann University Hospital at any time prior to the Closing, and the Participating Provider Agreement therefore is in full force and effect; (ii) the finding and decrees that legacy Hahnemann University Hospital residency slots temporarily following displaced Residents shall revert to the Purchaser upon conclusion of each such Resident's participation in their programs, and, subject only to the temporary displacement described in the preceding clause, the Purchaser shall be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts; and (iii) the findings and decrees capping the Purchaser's liability to CMS for claims arising prior to the Closing to the CMS Pre-Closing Amount. The aggregation of the legacy Hahnemann University Hospital residency slots with the Thomas Jefferson University Hospital residency slots and the limitation of "successor liability" for pre-Closing amounts were integral components of the bargain struck by the Purchaser for the purchase of the Purchased Assets, without which it would not have entered into the Agreement.

N.    The consideration provided by the Purchaser for the Purchased Assets being purchased, including the Assigned Contracts, pursuant to the Agreement constitutes the best and highest offer for the Purchased Assets and the Assigned Contracts and reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, and the District of Columbia.

O.    The Debtor may sell the Purchased Assets and Assigned Contracts free and clear of all Interests (including, without limitation, those (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtor's or the Purchaser's interest in the Purchased Assets and/or Assigned Contracts and, (ii) in respect of

6

Appx. 00567

Taxes), because each entity with an Interest in any of the Purchased Assets and/or Assigned Contracts, including but not limited to CMS or any Governmental Body, accrediting body, or other third party, as applicable, has consented to the Sale, is deemed to have consented to the Sale, has a claim which is subject to a bona fide dispute, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such Interest. For the avoidance of doubt, HHS and CMS (as defined below) have not, and are not deemed to have, consented to the Sale.

P.     The Debtor has good and transferable title to the Purchased Assets and Assigned Contracts (including specifically, but without limitation, the Participating Provider Agreement) and, accordingly, the transfer of the Purchased Assets and assignment of the Assigned Contracts to the Purchaser pursuant to the Agreement will be a legal, valid, and effective transfer of the Purchased Assets and assignment of the Assigned Contracts.

Q.     Neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts pursuant to the Agreement will subject the Purchaser, its Affiliates, the Consortium or an of its members to any liability (except those expressly assumed by the Purchaser pursuant to the Agreement (the "Assumed Liabilities")) for claims against the Debtor or the Debtor's predecessors or affiliates of any kind or character, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent, based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor, vicarious or transferee liability. Without limiting the general nature of the foregoing, neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts will subject the Purchaser, its Affiliates, or the Consortium or its members, to any (1) liability on account of any employee benefit plan maintained by the Debtor, or the Debtor's predecessors or affiliates, including but not limited to any liability related to benefits, underfunding, termination

7

and/or termination premiums, regardless when such claims are deemed to have accrued and regardless whether such would be considered "claims" as such term is defined in the Bankruptcy Code, to (i) the PBGC, or (ii) to any plan participant or beneficiary (collectively, the "PBGC Claims"); (2) claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party relating to the operation of the Business prior to Closing, subject only to collection of an amount not exceeding, in the aggregate with collections therefrom pursuant to the immediately following clause, the CMS Pre-Closing Amount from the Escrow Account; (3) claims relating to the Participating Provider Agreement for services rendered or amounts paid to Seller prior to the Closing in any amount in excess, together with other collections therefrom pursuant to the immediately preceding clause, of the CMS Pre-Closing Amount; and/or (4) claims or actions or proceedings brought under or related to Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations.

R. The Purchaser has provided adequate assurance of future performance under the Assigned Contracts, to the extent required by Section 365(b)(1)(C) of the Bankruptcy Code.

S. Upon the assumption and assignment (or assignment, as applicable) of the Assigned Contracts, as provided herein, the Purchaser shall succeed to all of the right, title and interest of the Debtor under the Assigned Contracts including, without limitation, the right to exercise renewal options which, pursuant to any provision of the applicable Assigned Contract or applicable nonbankruptcy law, are not exercisable by assignees of the Debtor, the Court having found that such provisions, as they relate to the assumption and assignment (or assignment, as

applicable) to the Purchaser of the Assigned Contracts, are unenforceable pursuant to Section 363(*l*), 365(e)(1), or 365(f)(3) of the Bankruptcy Code, as applicable.

T.     As to the Participating Provider Agreement and the objection of the United States of America ("United States"), on behalf of the Department of Health and Human Services ("HHS"), acting through its designated component, the Centers for Medicare & Medicaid Services ("CMS"), specifically, and without limiting the generality of any of the foregoing paragraphs that are otherwise applicable:

(i)     the Participating Provider Agreement is not an executory contract within the meaning of section 365 of the Bankruptcy Code because the parties thereto do not have any material performance obligations under such agreement, as distinct from their obligations under the applicable Medicare statutes and regulations, *see In re B.D.K. Health Management, Inc.*, No. 98-00609-6B1, 1998 WL 34188241, *6-7 (Bankr. M.D. Fla. Nov. 16, 1988); accordingly, the Debtors need not satisfy the requirements of section 365 in order to assign the Participating Provider Agreement to the Purchaser in accordance with the Agreement;

(ii)     the transfer of the Participating Provider Agreement does not violate the federal Anti-Assignment Act;

(iii)     the transaction contemplated by the Agreement (the "Transaction") constitutes a "change of ownership" within the meaning of 42 C.F.R. § 489.18(a) (a "CHOW"), as a result of which the legacy Hahnemann University Hospital residency slots temporarily following each displaced Resident shall revert to the Purchaser upon conclusion of each such Resident's participation in their respective program, and, subject only to temporary displacements referred to in the preceding clause, the Purchaser shall

Appx. 00570

be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts;

(iv)    any so-called "successor liability" under C.F.R. § 489.18(d) as a result of the CHOW is subject to limitation by operation of applicable provisions of the Bankruptcy Code, as set forth in this Order;

(v)    the Participating Provider Agreement may be assigned to the Purchaser free and clear of any alleged claim of CMS arising prior to the Closing (A) for amounts in excess of $3,000,000 (the "CMS Pre-Closing Amount") or (B) brought or made following distribution of funds in the Escrow Account to the Debtor pursuant to the terms of the Agreement and the Escrow Agreement, because (X) a debtor's rights under a contract are property that may be sold pursuant to section 363 of the Bankruptcy Code, (Y) any alleged claims in excess of the CMS Pre-Closing Amount are the subject of a *bona fide* dispute, and (Z) CMS could be compelled in a legal or equitable proceeding to accept a money satisfaction of such claims; accordingly, sale of the Participating Provider Agreement free and clear of any alleged claim of CMS for amounts in excess of the Pre-Closing Amount is permitted by sections 363(f)(4) and (f)(5) of the Bankruptcy Code;

(vi)    as of the date of entry of this order, there has been no cessation of business of Hahnemann University Hospital; accordingly, 42 C.F.R §§ 489.52(b)(3) and 413.79(h) do not apply and have not resulted in the termination of the Participating Provider Agreement, which is in full force and effect, and not subject to pending actions of termination;

(vii)    as of the Closing, there shall be deemed not to have been any cessation of business of Hahnemann University Hospital; accordingly, 42 C.F.R

§§ 489.52(b)(3) and 413.79(h) shall be deemed not to apply and not to have resulted in the termination of the Participating Provider Agreement, which shall be deemed in full force and effect, and not subject to pending actions of termination;

NOW, THEREFORE, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED THAT:

1.    The Sale Motion, and the relief sought therein (including approval of the Sale) is GRANTED, in all respects as set forth herein.

2.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.    The Agreement, and all of the terms and conditions thereof, is hereby approved.

4.    Pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code, the Debtor is authorized and directed to take all actions necessary to consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement.

5.    In the event Purchaser fails to consummate the Sale on the terms and conditions of the Agreement, the Debtors, in consultation with the Committee, may designate Reading Hospital (the "Backup Bidder") as the Successful Bidder for all purposes herein pursuant to the terms of its backup bid attached hereto as **Exhibit C** (the "Backup Bid").  Upon such designation, the Debtors shall be authorized, but not required, to submit, in consultation with the Committee and under certification of counsel, an alternative form of proposed sale order, substantially in the form previously submitted with the Court [D.I. 246], modified to conform to the terms of the Backup Bid, authorizing the Debtors to consummate all transactions

contemplated by the Backup Bid. In such case, the Purchaser's deposit shall be forfeited to the Debtors as set forth in the Bidding Procedures.

6.      As of the date of closing under the Agreement (the "Closing Date"), the Assigned Contracts that are executory contracts or unexpired leases shall be deemed to have been assumed by the Debtor and assigned to the Purchaser pursuant to Section 365(f) of the Bankruptcy Code. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor and the Debtor's estate shall be relieved from any liability for any breach of such an Assigned Contract occurring after the effective date of the Closing Date. As of the Closing Date, the Assigned Contracts that are not executory contracts or unexpired leases shall be deemed to have been assigned to the Purchaser pursuant to section 363(b) of the Bankruptcy Code.

7.      On the Closing Date, from the Purchase Price, the Purchaser shall pay to the Escrow Agent the Escrow Amount, which shall be deemed to include an amount equal to the maximum cure amounts (the "Maximum Cure Amounts") that would be assertable by the non-debtor party to each other Assigned Contract that is an executory contract, as such Maximum Cure Amounts are stated on **Exhibit B**. For the avoidance of doubt, the Maximum Cure Amounts stated on **Exhibit B** shall be the maximum amount of any subsequently allowed claim to which any non-debtor party to an Assigned Contract that is an executory contract shall be entitled pursuant to Section 365(b)(1)(A) of the Bankruptcy Code. To the extent a Maximum Cure Amount is stated on **Exhibit B** for the Participating Provider Agreement, such Maximum Cure Amount shall be deemed to be the CMS Pre-Closing Amount for purposes of the Agreement.

8.      Upon the Closing (i) all defaults under the related Assigned Contracts required to be cured pursuant to Section 365(b)(1)(A) of the Bankruptcy Code shall be deemed

cured and all amounts due to the non-debtor parties to such Assigned Contracts pursuant to Section 365(b)(1)(B) on account of any pecuniary loss resulting from such defaults shall be deemed paid in full, and (ii) each non-debtor party to such Assigned Contracts that is an executory contract shall be forever bound by such Maximum Cure Amounts and enjoined from seeking to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on account of defaults by the Debtor, including defaults as to which, pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.

9.       Upon payment by the Purchaser of the Escrow Amount to the Escrow Agent, the non-debtor parties to, and beneficiaries of, Assigned Contracts that are executory contracts, including any Governmental Body, accrediting body, or other third party, shall be (i) forever bound by the Maximum Cure Amounts, and (ii) enjoined from seeking (A) recourse against the Purchaser, its Affiliates, or the Consortium or its members, on account of any defaults by the Debtor under the related Assigned Contracts required to be cured pursuant to Section 365(b)(1)(A) of the Bankruptcy Code and/or any pecuniary loss resulting from such defaults due to such non-debtor party pursuant to Section 365(b)(1)(B) of the Bankruptcy Code in excess of the related Maximum Cure Amount, (B) recourse against the Purchaser, its Affiliates, or the Consortium or its members for successor, vicarious, or transferee, relating to claims, administrative proceedings or actions relating to the operation of the Business prior to Closing, and/or (C) to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on account of defaults by the Debtor, including defaults as to which, pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.

10.      [RESERVED]

35856989.10 09/09/2019

Appx. 00574

11.     Any provision in any Assigned Contract that purports to declare a breach, default or payment right as result of an assignment or a change of control in respect of the Debtor as relates to the assumption of any Assigned Contract by the Debtor and assignment of such Assigned Contract to the Purchaser is unenforceable, and all such Assigned Contracts shall remain in full force and effect, notwithstanding any such provision.  No sections or provisions of any Assigned Contract that purports to provide for additional payments, rent accelerations, assignment fees, increases, payments, deposits, security, charges or any other fees charged to the Purchaser or the Debtor as a result of the assumption and the assignment (or assignment, as applicable) of the Assigned Contracts to the Purchaser shall have any force and effect with respect to the transactions contemplated by the Agreement and assignments authorized by this Order, and such provisions are unenforceable under Section 363(*l*), 365(e)(1), 365(f), or 541(c)(1) of the Bankruptcy Code, as applicable.

12.     Except for the Assumed Liabilities, pursuant to (and to the maximum extent permitted by) sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing under the Agreement, the Purchased Assets and the Assigned Contracts shall be free and clear of all interests of any entity other than the estate (collectively, "Interests"), including, without limitation, any (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code); (ii) successor, vicarious, or transferee liability against the Purchaser, its Affiliates, or the Consortium or its members, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent, based, in whole or in part, directly or indirectly, on any theory of law, relating to claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party

14

relating to the operation of the Business prior to Closing; (iii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Debtor's or Purchaser's interest in the Assigned Contracts and/or Purchased Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iv) PBGC Claims, (v) claims in respect of Taxes (including taxes as to which applicable returns have not yet been filed, whether or not overdue); (vii) claims relating to the Participating Provider Agreement in excess of the CMS Pre-Closing Amount or brought or made following distribution of funds in the Escrow Account to the Debtor pursuant to the terms of the Agreement and the Escrow Agreement; (viii) claims or actions or proceedings brought under Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations; and (ix) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, with all such Interests to attach to the Net Proceeds of Sale (defined below) in the order of their respective priorities, with the same validity, force and effect (if any) which they now have against the Purchased Assets and Assigned Contracts, subject to any claims and defenses the Debtor may possess with respect thereto. The "Net Proceeds of Sale" is the Base Purchase Price, plus the adjustment pursuant to the section 3.2(d) of the Agreement, minus the Escrow Amount, minus Tail Coverage Costs paid from the Base Purchase Price, minus the $225,000 break-up fee payable to Reading Hospital, plus any amounts distributed by the Escrow Agent to the Debtor after Closing. For the avoidance of doubt: (i) the Debtors may use a portion of the Base Purchase Price, not to exceed the Tail Coverage Costs, to purchase the Tail Coverage

15

Appx. 00576

Endorsement in accordance with the Agreement; and (ii) the Escrow Amount shall not be property of the Debtor's estate and no Interests shall attach to the Escrow Amount unless and until such funds are distributed to the Debtor pursuant to the terms of the Agreement and the Escrow Agreement. The Net Proceeds of Sale and any amounts reimbursed to the Debtors from the Purchaser with respect to its Tail Coverage Costs shall be deposited into the disbursements account maintained by the Debtors at Wells Fargo Bank, N.A., and shall not be swept by MidCap Funding IV Trust or any of its affiliates (collectively "MidCap"), and shall not otherwise be disbursed except: (a) as to operating disbursements, by agreement of the Debtors and MidCap in consultation with the Committee, and otherwise by agreement of the Debtors, MidCap and the Committee; or (b) pursuant to further Court order. All rights of the Debtors, MidCap and the Committee are expressly reserved with regard to the extent, priority and validity of any lien asserted by MidCap with respect to the Purchased Assets and the Net Proceeds of Sale. Upon entry of a final order ruling that MidCap has a valid, perfected lien against the Net Proceeds of Sale, the remaining Net Proceeds of Sale shall be disbursed to MidCap up to the aggregate amount of MidCap's claims against the Debtors. Any fees payable, or costs reimbursable, to SSG Advisors, LLC on account of or related to the Sale shall be paid from the Net Proceeds of Sale, upon allowance thereof by Court order.

13. All claims of the Purchaser or any other Purchaser Indemnified Party for indemnification under the terms of the Agreement or for distributions from the Escrow Funds on account of Cure Amounts shall be treated as administrative claims pursuant to Section 503 and 507 of the Bankruptcy Code solely to the extent necessary to permit a claim against the Escrow Amount; provided, however, except as otherwise stated in the Agreement, the sole remedy for claims by the Purchaser or any other Purchaser Indemnified Party for indemnification for

monetary damages shall be to and against the Escrow Amount and shall be determined and paid pursuant to the terms of the Agreement and the Escrow Agreement. To the extent of any conflict between the terms of the Agreement or the Escrow Agreement relating to such determination and payment of indemnity claims and the Bankruptcy Code or Bankruptcy Rules, the terms of the Agreement and the Escrow Agreement shall control.

14.     All persons (including, for the avoidance of doubt, governmental agencies and departments) are hereby enjoined from asserting, prosecuting or otherwise pursuing any claim against the Purchaser or any member of the Purchaser to recover on any claims (regardless of when accrued and regardless whether meeting the definition of "claim" under the Bankruptcy Code) such person had, has or may have (other than an Assumed Liability) against (x) the Debtor, its estate, officers, directors, shareholders, the Purchased Assets or the Assigned Contracts, or (y) the Purchaser in connection with the negotiation of, and any agreements contained in, related to or conditioned upon, the Agreement.

15.     As of the Closing Date, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in or claims against the Purchased Assets and Assigned Contracts, if any, as such Interests or claims may have been recorded or may otherwise exist.

16.     Each and every federal, state and local governmental agency or department, together with its agents, contractors, and designees, shall be, and hereby is, (i) authorized and directed to accept (A) this Sale Order as sufficient evidence of the transfers of all right, title, and interest in, to, and under the Purchased Assets and the Assigned Contracts, and (B) any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement; and (ii) authorized to rely on this Sale Order in

Appx. 00578

consummating, or facilitating the consummation of, the transactions contemplated by the Agreement.

17.     Upon the occurrence of the Closing, all Interests in, against, or upon the Purchased Assets or the Assigned Contracts shall be unconditionally released, terminated, and discharged without the need for any further action.  Notwithstanding the foregoing, at the Closing, or as soon as practicable thereafter, (x) the Debtor and the Purchaser are hereby authorized to execute and file such termination statements, instruments of satisfaction, releases, or other documents to reflect the unconditional release, termination, and discharge of such Interests on behalf of such person or entity with respect to the Purchased Assets and the Assigned Contracts, and (y) the Purchaser is hereby authorized on behalf of each holder of a purported Interest to file, register, or otherwise record a copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the unconditional release, termination, and discharge of all Interests in, against, or upon the Purchased Assets or the Assigned Contracts.  The provisions of this Order authorizing the sale of the Purchased Assets free and clear of all Interests are self-executing and, notwithstanding the failure of the Debtor, the Purchaser or any other party to execute, file or obtain termination statements, instruments of satisfaction, releases, or other documents to reflect the release, termination, and discharge of any such Interests, all such Interests shall be deemed divested immediately upon Closing.

18.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date.

19.     As of the Closing Date, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the transactions contemplated by the Agreement.

20.     Pursuant to, and to the fullest extent permitted by, Sections 105(a) and 525 of the Bankruptcy Code, all governmental units are hereby prohibited from denying, revoking, suspending, or refusing to renew any permit, license, or similar grant relating to the operation of the Purchased Assets or the Assigned Contracts on account of the filing or pendency of the Bankruptcy Cases, the consummation of the Sale, or the Debtor's or the Purchaser's failure to pay a debt that is dischargeable in the Bankruptcy Cases or was discharged under the Bankruptcy Code.

21.     To the fullest extent permitted by applicable law, the Purchaser shall be authorized, as of the Closing Date and upon the occurrence of Closing, to operate under any transferred license, permit, registration and governmental authorization or approval of the Debtor with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.

22.     Subject to paragraph 34 of this Order, nothing in this Order is intended to abrogate or limit the authority or discretion of the Pennsylvania Department of Health over regulatory matters such as closure and licensing of health care facilities; provided, that if CMS or its agents, contractors, or designees seek any administrative action or processing by the Pennsylvania Department of Health in its capacity as a state survey agency to process the CHOW and transfer of the Participating Provider Agreement hereby, the Pennsylvania

35856989.10 09/09/2019

Appx. 00580

Department of Health, if it acts in such capacity, shall perform such action or processing to give effect to this Transaction. For the avoidance of doubt, nothing herein shall affect any right of the Pennsylvania Department of Health to elect or not elect, under applicable law, to serve as state survey agency.

23.     No law of any state or other jurisdiction relating to bulk sales or similar laws shall apply in any way to the Transaction, the Sale Motion, and this Order.

24.     For the avoidance of doubt, any privileges, protections or immunities of the Debtor for communications, documents, materials or matters arising at any time, whether before or after the Petition Date, including but not limited to any attorney-client privilege, work product doctrine, common interest or joint defense privilege, relating to any matter whatsoever, including without limitation any matter relating to the negotiation and implementation of the Agreement and any of the transactions contemplated thereby or entered into in connection therewith (collectively, "Privilege") shall not be Purchased Assets under the Agreement, and any such Privilege is owned and will continue to be owned by the Debtor, and notwithstanding anything to the contrary herein or in the Agreement, the Purchaser shall have no interest in or rights with respect to the Privilege, whether pursuant to this Order, the Agreement, or otherwise. The Privilege shall remain within the sole control of the Debtor and may not be waived by any other person or entity.

25.     The Agreement and the Escrow Agreement, as well as other agreements related thereto, may be modified, amended, or supplemented by the Debtor and the Purchaser without further order of the Court, provided that any such modification, amendment, or supplement either is (a) not material or (b) not less favorable to the Debtor than the existing applicable provisions.

26.     This Court shall retain jurisdiction (a) to enforce and implement the terms and provisions of the Agreement, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith, (b) to compel delivery of the Purchased Assets and Assigned Contracts to the Purchaser, (c) to resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, and (d) to interpret, implement and enforce the provisions of this Order.

27.     Nothing contained in any plan confirmed in these Bankruptcy Cases or the order confirming any such plan shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan, converting the Debtor's bankruptcy case from chapter 11 to a case under chapter 7 of the Bankruptcy Code, or providing for dismissal of the Debtor's bankruptcy case.

28.     The terms and provisions of the Agreement, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its creditors, the Purchaser and its affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting a claim against or Interest in the Debtor's estate or any of the Assigned Contracts and the Purchased Assets and any trustee appointed for the Debtor under any chapter of the Bankruptcy Code.

29.     The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

30.     The Purchaser is a party in interest and shall have standing to appear and be heard on all issues related to or otherwise connected with this Order, the Sale or the Agreement.

31.     Participating Provider Agreement and Residency Slots.   CMS, its applicable Regional Office ("RO"), its Medicare Administrative Contractors ("MACs"), and their respective agents, contractors, and designees, shall treat, and shall be deemed to have treated, the Transaction as a CHOW for all Medicare purposes, including merging provider agreements and graduate medical education ("GME") caps.  Legacy Hahnemann University Hospital residency slots temporarily following displaced Residents shall revert to the Purchaser upon conclusion of each such Resident's participation in their respective programs, and, subject only to temporary displacement pursuant to the preceding clause, the Purchaser shall be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts.  CMS, RO, MACs, and their respective agents, contractors, and designees shall give effect to the Transaction in all regards, including specifically, but without limitation, the aggregation of the legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts under the participating provider agreement of Thomas Jefferson University Hospital, and shall take all steps necessary and convenient to so effecting the Transaction, including, without limitation, the process as follows:

(a)     RO shall issue, and prior to such issuance shall be deemed to have issued, a tie-in notice, effective as of the Closing Date of the Transaction, confirming the merger of provider numbers for Hahnemann University Hospital and Thomas Jefferson University Hospital;

(b)      As a result of the merger of provider numbers described in the immediately preceding paragraph, RO shall retire, and prior to such retirement the RO shall be deemed to have retired, the separate provider number of Hahnemann University Hospital;

(c)      RO shall instruct the MAC promptly to, and prior to such instruction and performance, the RO shall be deemed to have instructed and the MAC shall be deemed to have performed, such tasks as are necessary to, (i) update systems to change Hahnemann University Hospital's name, location, electronic funds transfer (EFT) account, and payment address to that of the Thomas Jefferson University Hospital; (ii) make other updates necessary to effect the merger of provider numbers; (iii) notify Thomas Jefferson University Hospital it may begin submitting under its provider number claims associated with the former Hahnemann University Hospital provider number (for GME purposes);

(d)      CMS shall adjust, and prior to such adjustment, shall be deemed to have adjusted, all indirect and direct GME payments to reflect the aggregation of residency slots;

(e)      if and to the extent that CMS, the RO, MACs, or their agents, contractors, or designees may require any agreement, certification, consent, instruction, recommendation, or other action of any of CMS, the RO, MACs, or their agents, contractors, or designees in order to perform such functions as are required hereunder, such agreement, certification, consent, instruction, recommendation, or other action shall be deemed to have been made, given, or taken, as applicable; and

35856989.10 09/09/2019

Appx. 00584

(f) CMS, the RO, MACs, and their agents, contractors, and designees, are precluded from taking any action prior to the Closing to seek to terminate the Participating Provider Agreement for any reason related to any alleged cessation of business of Hahnemann University Hospital.

32. Notwithstanding anything to the contrary in this Order, nothing set forth herein shall be deemed to limit, impair or affect in any way (i) Seller's right, title and interest in Seller's cash and patient accounts receivable, payor/contractor accounts receivable, Medicare reimbursements or adjustments and all other accounts receivable (collectively, "Accounts Receivable") for services rendered or goods sold prior to the Closing Date, which cash and Accounts Receivable remain the property of Seller as Excluded Assets and shall be reimbursed to Seller if received by Purchaser nor (ii) Seller's ability to complete any remaining billing for services rendered or goods sold prior to the Closing Date under Seller's Medicare provider number. Purchaser agrees that it will provide Seller (or Seller's billing agent) with reasonable access to the Participating Provider Agreement, Books and Records and Governmental Authorizations as may be necessary in order for Seller to facilitate billing and collecting for services furnished to Medicare beneficiaries by Seller.

33. Notwithstanding anything to the contrary in the Agreement or any document relating to the Sale, the Purchased Assets shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the

24

Appx. 00585

Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action.

34.     Notwithstanding the provisions of Fed. R. Bankr. P. 6004(h), 6006(d), and 7062, this Order shall be effective and enforceable (i) immediately upon its entry, with respect to the relief granted in this paragraph and (ii) seven calendar days following the time of its entry, as to all other relief.  Prior to the earlier of (i) the Closing or (ii) seven calendar days following the full effectiveness and enforceability of this Order, no person (including, for the avoidance of doubt, any governmental agency or department), other than the Debtor and its affiliated debtors-in-possession, may take or cause any other person to take any action with respect to or affecting the Purchased Assets, including the Participating Provider Agreement, that in any way would affect the ownership, transferability, validity, enforceability, or effectiveness of the Purchased Assets, or the performance or consummation of the Transaction or any of the decrees herein.  For the avoidance of doubt, the foregoing sentence is not intended, nor shall it be construed, to preclude (i) CMS from appealing or seeking a stay pending appeal of this Order or (ii) the Purchaser from exercising any right to terminate the Agreement pursuant to the terms thereof. With respect to the Pennsylvania Department of Health ("DOH"), the provisions of this paragraph 34 shall only apply to stay DOH (1) in its capacity as a state survey agency and/or (2) from taking any further steps in connection with the Debtor's closure process, or otherwise seeking the revocation, surrender and/or termination of the Debtor's hospital license, prior to September 30, 2019, unless otherwise ordered by the Court, it being understood that any party

Appx. 00586

may request a hearing on shortened notice to seek relief from, or revisions to, the provisions of this paragraph 34.

35.     Provided that the Closing occurs within seven calendar days following the effectiveness and enforceability of this Order, the findings of fact and conclusions of law set forth in this Order shall, for all purposes related to the Order and the Transaction, be deemed to have been made as of the Closing.

**Dated: September 10th, 2019**
**Wilmington, Delaware**

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**

35856989.10 09/09/2019

**EXHIBIT A**

**ASSET PURCHASE AGREEMENT**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CENTER CITY HEALTHCARE, LLC,**

**as Seller,**

**AND**

**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.**

**as Purchaser**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of August, 2019, by and between Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital (the "**Seller**" or "**Hahnemann**"), a Delaware limited liability company and Thomas Jefferson University Hospitals, Inc. (the "**Purchaser**"), a Pennsylvania nonprofit corporation. The Seller and the Purchaser are sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Seller is engaged in the business of owning and operating an acute care hospital, including a graduate medical education program (the "**Business**"); and

WHEREAS, the Seller is the owner of the Purchased Assets; and

WHEREAS, the Purchaser and the Consortium (defined below) operate acute care hospitals and graduate medical education programs; and

WHEREAS, the Purchaser has formed or intends to form a consortium including itself, (i) Temple University Health System; (ii) Albert Einstein Health Network; (iii) Main Line Health, Inc.; (iv) Christiana Care Health System; and (v) The Cooper Health Systems, A New Jersey Non-Profit Corporation (collectively, and together with the Purchaser, the "**Consortium**"), for purposes of operating a GME network as a qualified Medicare GME affiliated group;

WHEREAS, Purchaser, directly or through the Consortium members, STC, and other third parties currently under contract with the Purchaser or Consortium Members (collectively, the "**GME Network Affiliates**"), shall assume placement of the Continuing Residents in furtherance of continuing quality medical education in the Delaware Valley region; and

WHEREAS, on June 30, 2019 (the "**Petition Date**"), a voluntary petition for relief was filed by the Seller under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), under Case Number 19-11466 (the "**Bankruptcy Case**"); and

WHEREAS, in support of the Consortium's continuation of GME programs in the Delaware Valley region, and the effective transition of the Seller's predecessor GME programs, Seller desires to sell and Purchaser desires to purchase the Purchased Assets all in accordance with, and subject to, the terms and conditions contained in this Agreement; and

WHEREAS, the Purchased Assets being transferred herein are intended to be sold, conveyed and transferred to Purchaser free and clear of all Liens and Encumbrances pursuant to Section 363 of the Bankruptcy Code, and subject to the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings indicated below, unless the context clearly requires otherwise:

"**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; provided that such Person shall be deemed an Affiliate for only so long as such control exists. For purposes of this definition and the definition of Related Person, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" shall mean all other agreements, documents and instruments to be executed and delivered by the Purchaser and/or the Seller pursuant to this Agreement.

"**Applicable Privacy and Security Law**" means any applicable Law relating to privacy, data protection, confidentiality, security, integrity and protection of personal information, including (i) health care and medical record applicable Laws, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and all implementing regulations (collectively, "**HIPAA**"); (ii) state data protection laws; (iii) state breach notification laws; and (iv) any comparable applicable state Laws and the regulations promulgated pursuant to all such applicable Laws.

"**Assigned Contracts**" shall mean, collectively, those Contracts included in the Purchased Assets, which shall consist solely of the Contracts identified on Schedule A-1 to **Exhibit A**. Purchaser may add or delete Contracts from Schedule A-1 pursuant to the applicable provisions of the Bidding Procedures Order.

"**Assignment and Assumption Agreement**" shall mean the Assignment, Delegation and Assumption Agreement to be executed at the Closing between the Seller and the Purchaser in the form attached hereto as **Exhibit B**, pursuant to which, among other things, the Seller will assign and transfer to the Purchaser all of its right, title and interest under the Assigned Contracts, on the terms and conditions set forth therein.

"**Assumed Liabilities**" shall mean, collectively, (i) all liabilities and performance obligations of the Seller arising upon or after the Closing under the Assigned Contracts, (ii) all liabilities arising with respect to the Purchased Assets arising on or after the Closing Date, (iii) liability for amounts due to CMS on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement, up to (but not to exceed) the CMS Pre-Closing Amount, (iv) the Cure Costs, (v) and the Purchaser's portion of the Transfer Taxes pursuant to Section 10.4.

Appx. 00591

"**Assumption/Cure Notice**" means the Initial Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment delivered to counterparties to Contracts with the Seller pursuant to the Bidding Procedures Order.

"**Backup Bidder**" shall have the meaning stated in the Bidding Procedures Order.

"**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

"**Base Purchase Price**" is defined in <u>Section 3.1</u>.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Purchased Assets shall occur, which are attached to the Bidding Procedures Order as <u>Exhibit I</u>.

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court approving the Bid Procedures in the form attached hereto as **<u>Exhibit F</u>** and made part hereof.

"**Bill of Sale**" shall mean the bill of sale to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **<u>Exhibit C</u>**.

"**Books and Records**" means, collectively, all documents, lists and files relating or pertaining to the Purchased Assets or the Assumed Liabilities.

"**Business**" is defined in the Recitals to this Agreement.

"**Business Day(s)**" shall mean calendar days other than Saturdays, Sundays and days on which banking institutions in Wilmington, Delaware are authorized by Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Claims Close Date**" is defined in <u>Section 10.5</u>.

"**Closing**" is defined in <u>Section 8.1</u>.

"**Closing Date**" is defined in <u>Section 8.1</u>.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**CMS Pre-Closing Amount**" means a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as final, which amount shall be the maximum amount due to CMS on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement.

Appx. 00592

"**Continuing Residents**" means the Residents as of the Closing Date who have agreed to become residents training at a hospital operated by Purchaser or a GME Network Affiliate.

"**Contracts**" shall mean any agreement or contract, whether written or oral.

"**Cure Costs**" shall mean, with respect to any Assigned Contract, the amount due and owing to each non-debtor counterparty to such Assigned Contract to cure any defaults required to be cured as a condition of assumption of such Assigned Contract pursuant to Section 365(b)(1) of the Bankruptcy Code, to the extent applicable.

"**Escrow Agent**" shall mean a financial institution mutually acceptable to Seller and Purchaser.

"**Escrow Agreement**" shall mean the agreement substantially in the form attached hereto as **Exhibit D**.

"**Escrow Account**" is defined in Section 3.1.

"**Escrow Amount**" is defined in Section 3.1.

"**Excluded Assets**" shall mean all rights, benefits or property of Seller which are not Purchased Assets.

"**Excluded Liabilities**" shall mean, collectively, any and all liabilities of the Seller of any kind or description other than the Assumed Liabilities.

"**Final Order**" shall mean an order, judgment or other decree as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"**GAAP**" shall mean generally accepted accounting principles in the United States, consistently applied.

"**GME Network Affiliate**" shall have the meaning given to it in the Recitals to this Agreement.

"**Governmental Authorization**" means any consent, license, permit, certificate of authority, registration, franchise, right, Order or notice, qualification or similar right issued, granted, given, or required by or under the authority of any Governmental Body or pursuant to any Law.

"**Governmental Body**" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including the FDA and its equivalent authority or body in any foreign jurisdiction.

"**Hahnemann Programs**" is defined in Section 6.2.

"**IME**" shall mean Indirect Medical Education.

"**Interests**" shall have the meaning stated in the Sale Order.

"**Knowledge of the Seller**" and "**to the Seller's Knowledge**" shall mean the actual knowledge of Joel Freedman, the Seller's Chief Executive Officer and Allen Wilen, the Seller's Chief Restructuring Officer – Finance.

"**Laws**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

"**Lien**" has the meaning given to such term in the Bankruptcy Code.

"**Liquidated Cure Costs**" means all Cure Costs relating to Assigned Contracts which are allowed in a Final Order of the Bankruptcy Court.

"**Losses**" is defined in <u>Section 10.1</u>.

"**Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchased Assets; provided, however, that any adverse change, event, development or effect arising from or relating to any of the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been, a Material Adverse Effect:  (i) the United States economy, the global economy, in each case, as a whole, or the industry or markets in which the Seller operates; (ii) the filing of the Bankruptcy Case; (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (iv) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (v) changes in GAAP; (vi) changes in Law or Orders; (vii) the taking of any action contemplated by this Agreement or any of the Ancillary Documents; (viii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes; (ix) changes resulting from the announcement of the execution of this Agreement or any of the transactions contemplated hereby; or (x) the termination of any Contract that is not an Assigned Contract, or the occurrence of any breach by any party of any Contract that does not relate to the Purchased Assets or the Assumed Liabilities; (xi) any adverse change to the Business prior to the date hereof.

"**Non-Disclosure Agreement**" means any and all confidentiality agreements and/or non-disclosure agreements executed by the Purchaser as a condition to obtaining confidential and/or proprietary information from the Seller.

"**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body.

"**Outside Closing Date**" shall mean September 6, 2019 or such other date as Seller and Purchaser may agree.

"**Participating Provider Agreement**" means the Participating Provider Agreement with the Centers for Medicare and Medicaid Services between the Seller and CMS related to Hahnemann University Hospital.

"**Permitted Escrow Withdrawals**" is defined in <u>Section 3.1</u>.

"**Person**" shall mean any individual, corporation, Governmental Body, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

"**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"**Purchased Assets**" shall mean the assets of Seller identified on **<u>Exhibit A</u>**.

"**Purchaser Indemnified Party**" is defined in <u>Section 10.1</u>.

"**Purchaser Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchaser.

"**Related Person**" (i) with respect to a Person who is an individual, shall mean, (a) any other individual having a relationship with such specified individual (by blood, marriage or adoption) of grandparent, parent, child, grandchild, aunt, uncle, niece, nephew, sister, brother or first cousin (collectively, "**Relatives**"), (b) any Person that is controlled by such individual or any one or more members of such individual's Relatives; and (c) any Person with respect to which such individual or one or more members of such individual's Relatives serves as a director, officer, partner, or trustee (or in a similar capacity); and (ii) with respect to a specified Person other than an individual, shall mean (a) any Affiliate of such specified Person; and (b) each Person that serves as a director, officer, partner, or trustee (or in a similar capacity) of such specified Person.

"**Representative**" shall mean, with respect to a particular Person, any director, officer, trustee, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Notification**" is defined in <u>Section 6.3</u>.

"**Residents**" means the medical residents and fellows training at, or through a residency program sponsored by or in affiliation with, Hahnemann University Hospital. Unless otherwise specified, all references to the number of Residents shall be in terms of full time equivalents ("**FTEs**").

"**Sale Motion**" shall mean that certain motion filed by the Seller in the Bankruptcy Case on July 9, 2019 (D.I. 142) pursuant to which, among other things, the Seller requested an order (a) approving the Bid Procedures, (b) approving procedures relating to the assumption and

assignment of executory contracts, including procedures for establishing Cure Costs, (a) establishing a date for an auction, and (d) scheduling a sale hearing.

"**Sale Order**" shall mean an Order of the Bankruptcy Court pursuant to the Bankruptcy Code approving this Agreement and the transactions contemplated hereby substantially in the form attached hereto as **Exhibit E** and made part hereof.

"**Seller Disclosure Letter**" is defined in **Article IV**.

"**Seller Indemnified Party**" is defined in <u>Section 10.2</u>.

"**SSG**" means SSG Capital Advisors, LLC.

"**STC**" shall have the meaning set forth in Section 6.9.

"**Tail Coverage Costs**" shall mean the cost to Seller of purchasing and maintaining the Tail Coverage Endorsement.

"**Tail Coverage Endorsement**" shall mean a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital. Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars ($1,500,000) annual aggregate for each MCARE eligible Resident only.

"**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

"**Transfer Taxes**" is defined in <u>Section 10.14(a)</u>.

## ARTICLE II.
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

**2.1    Agreement to Sell and Purchase Purchased Assets.**  On the Closing Date, subject to the performance by the Parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Purchased Assets, free and clear of all Interests other than Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**2.2    Assumed Liabilities/Excluded Liabilities.**  On the Closing Date, the Purchaser shall assume and become responsible for, and shall pay, perform, fulfill and discharge, all of the Assumed Liabilities.  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any of the Excluded Liabilities, all of which shall remain the sole responsibility and obligation of the Seller.

7

Appx. 00596

**2.3** **Assigned Contracts.** The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any Contracts, all of which shall remain the sole responsibility and obligation of the Seller, except for the Assigned Contracts. As to the Assigned Contracts:

(a) At Closing, Seller shall assign to Purchaser, and Purchaser shall assume, all of the Assigned Contracts and Purchaser shall pay to the applicable counterparty the Cure Costs as and when such Cure Costs become Liquidated Cure Costs.

(b) Purchaser shall provide promptly any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Purchaser's capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts, to the extent applicable.

**2.4** **Competing Transactions; Bankruptcy Court Approval.** This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids pursuant to the Bidding Procedures Order and the Bid Procedures approved thereby (each, a "**Competing Bid**"). Until the transactions contemplated by this Agreement are consummated, Seller may perform any and all other acts related to seeking a Competing Bid as provided under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including but not limited to supplying information relating to the Purchased Assets to prospective purchasers.

**ARTICLE III.**
**PURCHASE PRICE**

**3.1** **Purchase Price.** The Purchase Price shall be Fifty-Four Million Dollars ($54,000,000), subject to upward adjustment pursuant to Section 3.2(d) hereof (the "**Base Purchase Price**") and, subject to the following sentence, shall be paid in cash at Closing. In addition, an amount (the "**Escrow Amount**") equal to Three Million Dollars ($3,000,000) minus Liquidated Cure Costs paid by Purchaser on the Closing Date will be withheld from the Base Purchase Price and placed into a non-interest bearing escrow account (the "**Escrow Account**") held by the Escrow Agent pursuant to the Escrow Agreement. The Escrow Amount shall be distributed to Purchaser from time to time in accordance with the Escrow Agreement to cover the following losses, damages and expenses (collectively, the "**Permitted Escrow Withdrawals**"): (a) the CMS Pre-Closing Amount, as and when liquidated, (b) the Cure Costs not paid on the Closing Date and not included in the CMS Pre-Closing Amount, and (c) the Losses payable to a Purchaser Indemnified Party. To the extent that there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, such remaining funds minus any then pending written claims asserted by Purchaser for Permitted Escrow Withdrawals (whether or not disputed) shall be distributed to Seller in accordance with the Escrow Agreement without any further action being required on the part of Purchaser. Upon resolution of any Permitted Escrow Withdrawals pending as of the one-year anniversary of the Closing Date, (x) any amounts determined to be owing to Purchaser shall be distributed to Purchaser, and (y) any amounts determined not to be owing to Purchaser shall be distributed to Seller.

**3.2** **Payment of Base Purchase Price.** At Closing, the Base Purchase Price shall be payable by Purchaser as follows:

8

(a)     Purchaser shall deposit the Escrow Amount into the Escrow Account pursuant to and in accordance with the Escrow Agreement.

(b)     Purchaser shall pay Liquidated Cure Costs as of the Closing Date.

(c)     Purchaser shall pay to the Seller the Fifty-One Million Dollars ($51,000,000) balance of the Base Purchase Price by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller prior to the Closing.

(d)     Purchaser shall reimburse Seller for the Tail Coverage Cost actually paid by Seller to purchase the Tail Coverage Endorsement, up to a maximum of One Million Dollars ($1,000,000).

**3.3     Tax Allocation of Base Purchase Price.**  The Base Purchase Price shall be allocated among the Purchased Assets in accordance with the IRS Form 8594, Asset Acquisition Statement Under Section 1060 as agreed by the respective accountants of Purchaser and Seller within a reasonable period of time after Closing in good faith consistent in all respects with applicable Laws.  The Seller and the Purchaser shall file their respective Tax returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Purchaser, as the case may be, reasonably determines (and notifies the other Party) that such allocation is contrary to applicable Law.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the disclosure letter delivered by the Seller to the Purchaser on the date hereof (the "**Seller Disclosure Letter**"), the Seller represents and warrants to the Purchaser as follows:

**4.1     Organization.**  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation and is in good standing in each other jurisdiction where the operation of the Business by the Seller requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.2     Power and Authority.**  Upon entry of and subject to the Sale Order, Seller shall have all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Seller.  Upon entry of and subject to the Sale Order, this Agreement shall constitute a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**4.3     Non-contravention.**  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery of this Agreement or any other Ancillary Document to which the Seller is a party, and the performance by the Seller of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of the Seller, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or

both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Assigned Contract, (iii) to Seller's Knowledge, violate in any material respect any Law or Order applicable to the Business or the Purchased Assets, or (iv) result in the imposition of any Lien on the Purchased Assets.

**4.4 Consents.** Upon entry of the Sale Order and upon each regulatory approval to which Section 7.1(c) of this Agreement relates having been obtained, no approval, consent or authorization of, or declaration, filing or registration with or any notification to any Governmental Body or any other third Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

**4.5 Liabilities.** The Seller has no Liabilities with respect to the Purchased Assets for which the Purchaser will be responsible after Closing except for any Assumed Liabilities assumed by the Purchaser.

**4.6 Title.** The Seller has good and marketable title to all of the Purchased Assets, free and clear of all Interests other than Interests which will be divested from the Purchased Assets by the Sale Order. Upon the completion of the transactions contemplated hereby, the Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Interests other than Assumed Liabilities.

**4.7 Litigation.** There are no Proceedings pending, or to the Seller's Knowledge, threatened against the Purchased Assets or Business, at Law or in equity, or before any Governmental Body which will interfere with the ownership or use by the Purchaser of the Purchased Assets after the Closing.

**4.8 Proceedings.** There is no Proceeding pending that challenges, or that is reasonably likely to have the effect of preventing, delaying or rendering illegal any of the transactions contemplated by this Agreement.

**4.9 Tax Matters.** There are no Tax Liens or Encumbrances for Taxes upon the Purchased Assets and as of the end of the day on the Closing Date there will be no such Tax Liens or Encumbrances. There is not and, as of the end of the day on the Closing Date there will not be, any liability for Taxes affecting the Purchased Assets for which the Purchaser will at any time have any liability for payment.

**4.10 Brokers and Finders.** Other than SSG, no broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller. Seller will be solely responsible for any fee, commission or other consideration of any kind due to SSG on account of the transactions contemplated by this Agreement.

**4.11 Tail Coverage**. Seller shall be solely responsible for purchasing and maintaining the Tail Coverage Endorsement and shall incur all costs associated with the same, except as provided in Section 3.2(d).

**4.12     Funding and Disputes**.  Seller represents and warrants that no Medicare GME funding for the Residents is currently owed to Seller and outstanding except as in the normal course, and that Seller has not received notice of any disputes and, to Seller's Knowledge there are no facts or circumstances that may result in a dispute with regard the payment of Medicare GME funding for the Residents in the amount of Fifty Thousand Dollars ($50,000) or more in the aggregate.

**ARTICLE V.**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

The Purchaser represents and warrants to the Seller as follows.

**5.1     Organization.**  The Purchaser is a nonprofit corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to conduct its business and own and operate its properties.

**5.2     Power and Authority.**

(a)     The Purchaser has all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Purchaser. This Agreement is a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(b)     To the extent that this Agreement or any of the Ancillary Documents provides that any Affiliate of the Purchaser makes any covenant or undertakes the payment or performance of any obligation in connection with the transactions contemplated hereunder or thereunder, such Affiliate has all requisite power and authority to enter into the transactions contemplated hereby and thereby.

**5.3     Non-contravention.**  Neither the execution and delivery of this Agreement or any other Ancillary Document to which the Purchaser is a party, will (i) violate any provision of the organizational documents of the Purchaser, or (ii) violate any Law or Order applicable to the Purchaser.

**5.4     No Proceedings.**  There are no actions, suits or proceedings pending, or to the actual knowledge of Purchaser, threatened, before or by any Governmental Body, against Purchaser which would affect Purchaser's ability to proceed with the transactions contemplated by this Agreement.

**5.5     Consents.**  No consent, waiver, authorization or approval of any person or declaration, filing or registration with any Governmental Body or other Person is required in connection with the execution and delivery by Purchaser of this Agreement or the performance by Purchaser or its Affiliates of its respective obligations hereunder or thereunder.

**5.6     Bankruptcy Matters.**  Purchaser is capable of satisfying the adequate assurance of future performance conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to each Assigned Contract, to the extent applicable.

11

**5.7    Financing.**  Purchaser has readily-available cash on hand, availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Base Purchase Price at Closing.

**5.8    Hospital Facilities.**  Purchaser, directly or through Affiliates, owns and operates a total of seven (7) Medicare-participating hospitals located within fifteen (15) miles of Hahnemann University Hospital's facility, all of which have the capacity to operate medical residency programs.

**5.9    Certain Relationships.**  Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser is an officer or director of the Seller or a Related Person of any officer, director or key employee of the Seller.  Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser has entered into any Contract with any officer, director or key employee of the Seller.

**5.10    Brokers and Finders.**  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE VI.
## COVENANTS OF THE PARTIES

**6.1    Access to Information.**  Subject to all Applicable Privacy and Security Laws, the Seller shall permit the Purchaser's Representatives to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Business, to the personnel, books, records, Assigned Contracts, and documents of or pertaining to the Purchased Assets; provided, that the Seller may restrict the foregoing access to the extent that in the reasonable judgment of the Seller, any Law applicable to the Seller requires it to restrict access to any of its business, properties, information or personnel; and provided, further, that such access shall not unreasonably disrupt the operations of the Seller or the Business.

**6.2    Conduct of the Business.**  From the date hereof until the Closing Date, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), and subject in all respects to the Bankruptcy Code and orders of the Bankruptcy Court (including, without limitation, the Sale Order), the Seller shall use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at Hahnemann University Hospital (the "**Hahnemann Programs**").  Seller and Purchaser shall work cooperatively to determine clinical rotation assignments for Residents, with such mutually-agreed assignments to commence as soon as practicable after the Purchase Agreement is entered into.  For the avoidance of doubt, neither the existence of this Agreement nor any provisions set forth herein shall restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those Residents who elect not to become Continuing Residents.

Appx. 00601

**6.3    Notification of Certain Matters.**  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "**Required Notification**"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

**6.4    Cooperation.**  Subject in all respects to the Bankruptcy Code and the Bankruptcy Cases, the Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in **Article VII** and to consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

**6.5    Records Retention and Access.**  For a period of six (6) years following the Closing or such shorter period that records are required to be retained by applicable Law (but in no event less than three (3) years), Purchaser shall at Seller's expense furnish to the Seller, to the extent in Purchaser's possession and following receipt of a reasonable, written request therefor, information that is necessary for Seller to prepare for, prosecute or defend against any Proceeding related to the Business, to validate claims filed in the Bankruptcy Case and/or to enable Seller and its Representatives to prepare, complete and file all required federal, state and local Tax returns in accordance with applicable Law.

**6.6    Cure Costs.**  Seller shall not agree to the amount of any Liquidated Cure Costs without the written consent of Purchaser.  From and after the Closing Date, Purchaser shall have the sole right to contest and settle any claims for Cure Costs and, to the extent necessary and permitted by the Bankruptcy Court, Seller shall cooperate in substituting Purchaser for Seller (at Purchaser's expense) in connection with any pending objections to Cure Costs.

**6.7    Bid Procedures.**  Seller shall not modify the Bid Procedures without the consent of Purchaser.

**6.8    Covenants of Purchaser Regarding Transition and Accommodation of Residents**.

(a)    Purchaser, directly or through a GME Network Affiliate, will accommodate a maximum of 583 Continuing Residents to pursue continued medical residency training at Purchaser-owned hospitals or GME Network Affiliate-owned hospitals, as applicable. If requested by Purchaser, Seller shall take all reasonable actions to reflect its consent to the transfer of Continuing Residents to Purchaser or a GME Network Affiliate.  For any Resident who does not become a Continuing Resident and elects to pursue their training at hospitals that are not owned by Purchaser or a GME Network Affiliate, Purchaser agrees, in compliance with applicable regulation, to release the GME cap associated with Medicare reimbursement for such

13

Residents on a temporary basis to the hospital where the Resident transfers until the Resident has completed training.

(b)       If the Continuing Residents are required to relocate their personal residence to continue their training with Purchaser or a GME Network Affiliate, Purchaser shall provide, or cause such GME Network Affiliate to provide, reasonable private housing for such residents for the longer of the remainder of the current academic year or for the duration of a Resident's existing vacated lease. The provision of reasonable private housing shall not extend beyond the Resident's completion of his or her residency training with Purchaser or such GME Network Affiliate.

(c)       To the extent necessary to provide for continued residency training, Purchaser shall use reasonable efforts to transfer Seller's residency program faculty to a Purchaser or GME Network Affiliate hospital so that they can continue to provide education to Residents.

(d)       Unless inconsistent with Purchaser or GME Network Affiliate's standard practice for residents, Purchaser shall provide, or cause the applicable GME Network Affiliate to provide, Continuing Residents with free meals during the time that they are training at Purchaser or such GME Network Affiliate hospitals.

(e)       To the extent necessary for Continuing Residents to fulfill residency training requirements, Purchaser shall provide, or cause a GME Network Affiliate to provide, additional transition resources to Continuing Residents as may be requested by Seller from time to time.

(f)       The parties shall cooperate in determining the initial clinical rotation assignments for Continuing Residents for the period following the transfer.

(g)       Purchaser shall use reasonable efforts to ensure that each Continuing Resident's terms of employment (e.g., compensation and benefits) with Purchaser or a GME Network Affiliate are substantially equivalent or better than the Continuing Resident's current terms of employment with the Seller.

**6.9       Covenants of Purchaser Regarding Continued Affiliation with St. Christopher's Hospital for Children.**  For the period of ten (10) years after the Closing with automatic renewals for periods of five (5) years, provided that at the time of each such renewal such resident caps are used for resident training at STC only, unless either party gives not less than one hundred eighty (180) days' notice, Purchaser agrees to, and to cause any successor or assignee of any Purchased Assets to agree to:  (i) enter into an agreement to continue participating in a "**Medicare GME affiliated group**" as that term is defined in 42 C.F.R. 413.75(b), with St. Christopher's Hospital for Children ("**STC**"), whereby Purchaser will continue sharing full-time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between STC and Seller (the "**STC GME Affiliation Agreement**") or enter into a new GME affiliation agreement substantially in the form of the STC GME

Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation agreement" each academic year.

**6.10    Covenants of Purchaser Regarding Other GME Affiliation Agreements.**

(a)    For the remainder of the academic year during which the Closing occurs, and to the extent permitted and required by CMS, Purchaser shall accept assignment from Seller of the GME Affiliation Agreements identified listed as numbered items 1, 2, 3, 4 and 5 under the heading Current GME Affiliation  Agreements on Schedule A-1 to **Exhibit A** of this Agreement (the "**Current GME Affiliation Agreements**") (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(a) being included as "Cure Costs" for purposes of this Agreement), or shall enter into new GME affiliation agreements with those counterparties substantially in the form of the Current GME Affiliation Agreements; and

(b)    Purchaser, subject to Purchaser's completion of due diligence, shall accept assignment of the agreements identified under the heading GME Obligations on Schedule A-1 to **Exhibit A** of this Agreement to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(b) being included as "Cure Costs" for purposes of this Agreement).

**6.11    Covenant of Seller Regarding Tail Coverage Endorsement for Residents.**  At or prior to Closing, Seller shall obtain the Tail Coverage Endorsement.

**6.12    Covenant of Seller Regarding Medical Records.**  Seller acknowledges that Purchaser, GME Affiliates, and clinicians affiliated with each of them collectively have undertaken to provide clinical care to patients who historically have received care from Seller. To facilitate such care on an ongoing basis, and otherwise to satisfy obligations of Seller, Seller will undertake to assure the ongoing availability of medical records of Seller's patients to Purchaser, GME Affiliates, clinicians affiliated with each of them, other providers to the extent applicable, and patient themselves.  To further facilitate such availability, with acknowledgment that Seller continues to be finalizing its own arrangements in this regard as of the date of this Agreement, Seller will consider in good faith any request by Purchaser for assignment to Purchaser of agreements with any third-party vendor or vendors with respect to ongoing medical records availability, storage, or maintenance.

**6.13    Covenant of Seller Regarding Medicare Cost Reports.**  Within 45 days of the Closing Date, or such longer period as CMS may permit, Seller shall prepare and file any final Medicare cost reports related to Hahnemann's operations for the period prior to the Closing Date and, thereafter, Seller shall provide such information and assistance as may reasonably be requested by Purchaser with respect to Seller's filing of Medicare cost reports.

**ARTICLE VII.**
**CONDITIONS TO CLOSING**

**7.1    Conditions to Obligations of Each Party.**  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)     <u>Proceedings; Orders</u>.  No Governmental Body of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

(b)     <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order with such changes as are mutually agreed to by the Seller and Purchaser, each in the exercise of its respective sole discretion.

(c)     <u>Regulatory Approvals</u>.  CMS, the Pennsylvania Department of Health ("**DOH**") and the Accreditation Council for Graduate Medical Education ("**ACGME**") and any other applicable regulatory authority or Governmental Body, in each case to the extent required, shall have consented to the transactions contemplated by this Agreement and, solely with respect to CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated hereby will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap, shared, pursuant to generally applicable regulations, by GME Network Affiliates who qualify as members of one or more applicable Medicare GME affiliated group.

**7.2     Additional Conditions to Obligations of the Purchaser.**  The obligations of the Purchaser to effect the transactions contemplated hereby are subject to satisfaction or waiver of the following additional conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of the Seller set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>.  The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     <u>Documents</u>.  All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to <u>Section 8.2</u> of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

(d)     <u>Successor Liability</u>.  Entry of an Order of the Bankruptcy Court, which may be the Sale Order, which precludes the assertion of any successor, vicarious, or transferee liability (by piercing the corporate veil or otherwise) against the Purchaser, its Affiliates, or the Consortium or its members, relating to claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party relating to the

operation of the Business prior to Closing. For the avoidance of doubt, nothing in this paragraph is intended, nor shall it be construed, to preclude the collection of the CMS Pre-Closing Amount from the Escrow Account as provided herein.

**7.3** **Additional Conditions to Obligations of the Seller.** The obligations of the Seller to effect the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

(a) <u>Representations and Warranties</u>. The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Purchaser Material Adverse Effect.

(b) <u>Agreements and Covenants</u>. The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c) <u>Documents</u>. All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to <u>Section 8.3</u> of this Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

## ARTICLE VIII.
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

**8.1** **Closing.** The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Drinker Biddle & Reath LLP, One Logan Square, 18th and Cherry Streets, Philadelphia, PA 19103-6996, or such other place as agreed by the parties or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the Parties, as soon as practicable following the satisfaction or waiver of the conditions set forth in **Article VII** hereof and in any event within three (3) Business Days thereafter (the "**Closing Date**"). The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Time, on the Closing Date.

**8.2** **Deliveries by the Seller at the Closing.** At the Closing, Seller shall furnish and deliver to the Purchaser the following:

(a) the Bill of Sale, duly executed by the Seller;

(b) the Assignment and Assumption Agreement, duly executed by the Seller;

(c) a certificate, dated as of the Closing Date and signed by the Seller, certifying that each of the conditions set forth in <u>Sections 7.2(a)</u> and <u>7.2(b)</u> have been satisfied;

35751625.8 09/06/2019

Appx. 00606

(d)      a copy of the Sale Order;

(e)      evidence of satisfaction of Section 6.11; and

(f)      all other certificates, instruments and documents reasonably required to be delivered by the Seller pursuant to this Agreement or any of the Ancillary Documents.

**8.3     Deliveries by the Purchaser at the Closing.**  At the Closing, Purchaser shall furnish and deliver to Seller the following:

(a)      the Fifty-One Million Dollar ($51,000,000) portion of the Base Purchase Price in excess of the Escrow Amount and the Liquidated Cure Costs by wire transfer of immediately available funds to an account designated in writing by the Seller;

(b)      reimbursement of up to One Million Dollars ($1,000,000) of Tail Coverage Costs as provided in Section 3.2(d);

(c)      the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)      a certificate, dated as of the Closing Date and signed the Purchaser, certifying that each of the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(e)      evidence of satisfaction of Section 6.9;

(f)      evidence of satisfaction of Section 6.10; and

(g)      all other certificates, instruments and documents required to be delivered by the Purchaser pursuant to this Agreement or any of the Ancillary Documents.

**8.4     Additional Actions Taken by the Purchaser at the Closing.**  At the Closing, Purchaser shall take the following actions:

(a)      Pay the Liquidated Cure Costs from the Base Purchase Price to the respective Persons entitled to receive them.

(b)      Fulfill its covenants under Sections 6.8, 6.9 and 6.10 of this Agreement.

**ARTICLE IX.
TERMINATION**

**9.1     Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)      By mutual written consent of the Seller and the Purchaser;

(b)      By (i) the Seller if, as of the day after the Outside Closing Date, any condition to the obligation of the Seller to close has not been satisfied, provided, however, that if

18

the Closing has not occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Seller, then Seller may not terminate this Agreement pursuant to this <u>Section 9.1(b)</u>, and (ii) the Purchaser if, as of the day after the Outside Closing Date, any condition to the obligation of the Purchaser to close has not been satisfied; <u>provided</u>, <u>however</u>, that if the Closing has not occurred on or before the after the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then the Purchaser may not terminate this Agreement pursuant to this <u>Section 9.1(b)</u>;

(c)     By Purchaser, in its sole and absolute discretion, if the sum of the (i) CMS Pre-Closing Amount, and (ii) without duplication of the CMS Pre-Closing Amount, (A) the Liquidated Cure Costs, and (B) the good faith estimate by Purchaser of the amount of any Cure Costs related to Assigned Contracts which will become Liquidated Cure Costs after the Closing Date, exceeds Three Million Dollars ($3,000,000);

(d)     Automatically, and without further action by any Party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated hereby, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(e)     Automatically, and without further action by any Party, if the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or is dismissed, provided that neither the Seller nor the Purchaser shall take any action to support entry of an order providing for such conversion or dismissal;

(f)     By the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, and if (i) the Seller fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Seller to close (other than conditions related to deliveries to be made at Closing by the Purchaser provided the Purchaser is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Seller herein become untrue or inaccurate such that the condition set forth in <u>Section 7.2(a)</u> would not be satisfied or (iii) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 7.2(b)</u> would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Seller;

(g)     By the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (i) the Purchaser fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Purchaser to close (other than conditions related to deliveries to be made at Closing by the Seller provided the Seller is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Purchaser herein become untrue or inaccurate such that the condition set forth in <u>Section 7.3(a)</u> would not be satisfied or (iii) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 7.3(b)</u> would not be satisfied, and, in the case of clauses (ii) and

(iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Purchaser;

(h)     Automatically, and without further action by any Party, if (i) the Purchaser is not the Successful Bidder or Backup Bidder (each as defined in the Bid Procedures), or (ii) if the Purchaser is the Backup Bidder, upon the earlier of (A) Closing with the Successful Bidder, and (B) the Outside Closing Date.  The foregoing notwithstanding, the Purchaser shall serve as a Backup Bidder at the Auction only if (X) its bid pursuant to this Agreement is not determined to be the "Baseline Bid," as defined in the Bid Procedures, and (Y) it elects, at its sole discretion, to offer a higher and better bid at the Auction.  For avoidance of doubt, the Purchaser's offer described in this Agreement shall not be a Back-Up Bid absent the express consent of the Purchaser; or

(i)     By the Purchaser if (i) any applicable regulatory authority or Governmental Body has not granted any necessary consents to the transfer of the Purchased Assets to Purchaser or a GME Network Affiliate, including without limitation, the Participating Provider Agreement and Seller's IME and direct GME resident cap slots appurtenant thereto; or (ii) prior to Closing, any fact or circumstance arises relating to Medicare change of ownership, Medicare IME or direct GME funding of one or more Continuing Residents that may lead to an aggregate reduction in Medicare IME or direct GME funding for the Continuing Residents in the amount of Three Million Dollars ($3,000,000) or more.

**9.2     Effect of Termination.**  Except as provided in this <u>Section 9.2</u>, in the event of the termination of this Agreement pursuant to <u>Section 9.1</u>, this Agreement (other than this <u>Section 9.2</u>, which shall survive such termination) will forthwith become void, and there will be no liability on the part of any Party to the other and all rights and obligations of any Party will cease, except that nothing herein shall relieve any Party from liability for any intentional and material breach of this Agreement.

**ARTICLE X.
INDEMNITY**

**10.1     Indemnification by Seller.**  Subject to this **<u>Article X</u>** and consummation of the Closing, Seller shall, indemnify, defend and hold harmless Purchaser, Purchaser's Affiliates, the Consortium, the members of the Consortium, and the Representatives of each (each, a "**Purchaser Indemnified Party**") against and in respect of any and all out-of-pocket losses, documented and reasonable costs and expenses (including, without limitation, documented and reasonable costs of investigation and defense and reasonable attorneys' fees), claims, damages, obligations, or liabilities, whether or not involving a third party claim, but only after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Purchaser Indemnified Party in respect of any such claim (collectively, "**Losses**"), arising out of, based upon or otherwise in respect of:

(i)     any inaccuracy in or breach of any representation or warranty of Seller made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Purchaser by Seller pursuant to this Agreement (determined in each case without regard to any qualification with respect to

20

Appx. 00609

materiality, Material Adverse Effect or similar qualification); provided, that the Seller shall not have any liability under this clause (i) (other than with respect any intentional fraud on the part of Seller) unless the aggregate of all Losses asserted under this clause (i) for which Seller would, but for this proviso and but for the $25,000-per-claim deductible described below, be liable exceeds on a cumulative basis an amount equal to Two Hundred Thousand Dollars ($200,000.00);

(ii)     any nonfulfillment or breach of any covenant or agreement by Seller under this Agreement or any of the Schedules attached hereto;

(iii)    any Liability or obligation of Seller which is an Excluded Liability; and

(iv)    the ownership of any of the Excluded Assets by Seller after the Closing Date.

(b)     Each Purchaser Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(c)     NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS TO THE CONTRARY, SELLER WILL NOT BE LIABLE FOR ANY LOSS ASSERTED UNDER SECTION 10.1(a)(i) UNLESS THE CUMULATIVE LOSSES EXCEED $25,000 IN WHICH CASE SELLER WILL, SUBJECT TO THE OTHER LIMITATIONS IN THIS **ARTICLE X**, BE LIABLE TO INDEMNIFY THE PURCHASER INDEMNIFIED PARTY ONLY FOR THE EXCESS OVER $25,000; AND THE SOLE REMEDY OF ANY PURCHASER INDEMNIFIED PARTY AGAINST SELLER UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS FOR MONETARY DAMAGES, INCLUDING, WITHOUT LIMITATION, COSTS OF INVESTIGATION AND DEFENSE AND ATTORNEYS' FEES, SHALL BE A TIMELY CLAIM BY PURCHASER PURSUANT TO THE ESCROW AGREEMENT, AND LIMITED TO THE ESCROW AMOUNT.

**10.2    Indemnification by Purchaser.**  Subject to this **Article X** and consummation of the Closing, Purchaser shall indemnify, defend and hold harmless Seller, Seller's present, former, and future officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each a, "**Seller Indemnified Party**"), against and in respect of any and all Losses arising out of, based upon or otherwise in respect of:

(a)     any inaccuracy in or breach of any representation or warranty of Purchaser made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Seller by Purchaser pursuant to this Agreement; provided, that the Purchaser shall not have any liability under this clause (a) of Section 10.2 unless the claims asserted under this clause (a) involves Losses in excess of Twenty-Five Thousand Dollars ($25,000.00), at which time Purchaser shall be liable for the full amount of all such Losses in excess of Twenty-Five Thousand Dollars ($25,000.00);

Appx. 00610

(b)    any nonfulfillment or breach of any covenant or agreement by Purchaser under this Agreement or any of the Schedules attached hereto; and

(c)    any of the Assumed Liabilities pursuant to this Agreement.

Each Seller Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

**10.3    Indemnification Procedures**.

(a)    Within forty-five (45) days after receipt by an indemnified party of written notice of the commencement of any Proceeding against it to which the indemnification in this **Article X** relates, such indemnified party shall, if a claim is to be made against an indemnifying party under this **Article X**, give notice to the indemnifying party of the commencement of such Proceeding.

(b)    If any Proceeding referred to in paragraph (a) above is brought against a Seller Indemnified Party and it gives notice to Purchaser of the commencement of such Proceeding, Purchaser will be entitled to participate in such Proceeding and, to the extent that it wishes, assume the defense of such Proceeding with counsel reasonably satisfactory to such Seller Indemnified Party and, after notice from Purchaser to such Seller Indemnified Party of its election to assume the defense of such Proceeding, Purchaser will not, as long as it diligently conducts such defense, be liable to such Seller Indemnified Party under this **Article X** for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by such Seller Indemnified Party in connection with the defense of such Proceeding subject to the limitations contained in Section 10.1 hereof, other than reasonable costs of investigation.  If Purchaser assumes the defense of a Proceeding, (A) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (B) no compromise or settlement of such claims may be effected by Purchaser without such Seller Indemnified Party's consent unless (1) there is no finding or admission of any violation of law by such Seller Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other claims that may be made against such Seller Indemnified Party, and (2) the sole relief provided is monetary damages that are paid in full by Purchaser.  Such Seller Indemnified Party will have no liability with respect to any compromise or settlement of the claims underlying such Proceeding effected without its consent.  If notice is given to Purchaser by a Seller Indemnified Party of the commencement of any Proceeding for which such Seller Indemnified Party seeks indemnification hereunder and Purchaser does not, within ten (10) days after such notice is received, give notice to such Seller Indemnified Party of Purchaser's election to assume the defense of such Proceeding, Purchaser will be bound by any determination made in such Proceeding or any compromise or settlement effected by such Seller Indemnified Party.

(c)    If any Proceeding referred to in paragraph (a) above is brought against a Purchaser Indemnified Party, Seller shall be entitled to participate in such Proceeding at its own expense.  However, such Purchaser Indemnified Party shall, in all respects, control the defense

and settlement of such Proceeding and Seller shall be liable for all fees and expenses incurred by such Purchaser Indemnified Party and for any liability established by any order of a Governmental Body of competent jurisdiction and for any liability established by any settlement or compromise agreed to by such Purchaser Indemnified Party, in the exercise of its reasonable discretion.

**10.4    Other Claims.**  A claim for any matter not involving a third party claim may be asserted by written notice to the Party from whom indemnification is sought.

**10.5    Seller Indemnification Claim Period.**  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Seller, no claim for indemnification pursuant to <u>Section 10.1</u> shall be made unless a claim arises and written notice pursuant to <u>Section 10.3</u> or <u>Section 10.4</u> which reasonably describes the claim, the basis therefor, and if possible with the exercise of reasonable diligence, the Purchaser Indemnified Party's reasonably-supported estimate of the Losses being asserted, is delivered to Seller on or before the close of business on the day preceding the first (1st) anniversary of the Closing Date (the "**Claims Close Date**") in which case the indemnity with respect to that Loss shall survive the Claims Close Date (but continue to be limited to the funds held in the Escrow Account).  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.6    Purchaser Indemnification Claim Period.**  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Purchaser, no claim for indemnification pursuant to <u>Section 10.2</u> shall be made unless a claim arises and written notice pursuant to <u>Section 10.3</u> or <u>Section 10.4</u> is delivered to Purchaser on or before the Claims Close Date.  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Seller or any Seller Indemnified Party may be entitled.

**10.7    Payment from Indemnification Escrow.**  If a Purchaser Indemnified Party becomes entitled to indemnification from Seller hereunder, such Purchaser Indemnified Party shall be entitled to receive the amount of Losses in cash from the Escrow Account in accordance with the Escrow Agreement, and the recovery of the Purchaser Indemnified Parties shall be limited to such recoveries from the Escrow Account.  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.8    Miscellaneous Indemnification Provisions.**  Disclosures made after the date hereof and any knowledge that is acquired about the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or obligation set forth herein shall not in any manner affect rights to indemnification hereunder based on any such representation, warranty, covenant, or obligation.  The waiver of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or obligation, will not affect any right to indemnification based on such representations, warranties, covenants and obligations unless otherwise expressly agreed in writing by the party or parties entitled to the benefit thereto.

# ARTICLE XI.
# MISCELLANEOUS

**11.1    Expiration of Representations, Warranties and Agreements.**  The representations and warranties and covenants made by Seller and Purchaser in this Agreement and in any Ancillary Document delivered pursuant to this Agreement shall survive beyond the Closing Date.

**11.2    Assignment.**  Neither this Agreement nor any interest herein may be assigned or transferred by either Party to any other Person without the prior written consent of the other Party, which consent may be given or withheld in the sole discretion of such other Party; provided, however, Purchaser may assign at Closing its rights, but not its obligations, hereunder to any Affiliate of Purchaser.

**11.3    Notices.**  All notices, requests and other communications under this Agreement shall be in writing and shall be either (a) delivered in person, (b) sent by certified mail, return-receipt requested, (c) delivered by a recognized delivery service or (d) sent by facsimile transmission and addressed as follows:

If intended for Purchaser:

> Thomas Jefferson University Hospitals, Inc.
> 925 Chestnut Street, Suite 110
> Philadelphia, Pennsylvania 19107
> Attention: Stephen K. Klasko, MD,
> MBA, President & CEO

With a copies to:

> Thomas Jefferson University Hospitals, Inc.
> 1020 Walnuts Street, 6th Floor, Scott Bldg.
> Philadelphia, Pennsylvania 19107
> Attention: Cristina G. Cavalieri, Esq., Senior
> Vice President, Chief Legal and Governance
> Officer and Secretary
>
> Neil S. Olderman, Esquire
> Drinker Biddle & Reath LLP
> 191 N. Wacker Drive
> Suite 3700
> Chicago, IL 60606-1698
>
> And
>
> Andrew C. Kassner, Esquire
> Drinker Biddle & Reath LLP
> One Logan Square
> 18th and Cherry Streets
> Philadelphia, PA 19103-6996

35751625.8 09/06/2019

Appx. 00613

If intended for Seller:     Center City Healthcare, LLC
             Centre Square West
             1500 Market Street, Suite 2400
             Philadelphia, PA 19102
             Attention: Allen Wilen, CRO-Finance

With a copy to:       Jeffrey Hampton
             Adam Isenberg
             Saul Ewing Arnstein & Lehr LLP
             Centre Square West
             1500 Market Street, 38th Floor
             Philadelphia, PA  19102-2186

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided.  A notice, request and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 P.M. on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 A.M. on the first Business Day thereafter.

   **11.4  Further Assurances.**  Each of the Parties hereto shall execute such documents (including, without limitation, the Ancillary Documents) and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby or, at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement.

   **11.5  Entire Agreement; Modifications; Waivers.**  This Agreement (together with the Exhibits and Schedules hereto), the Ancillary Documents, and the Non-Disclosure Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior understandings of the Parties with respect to the subject matter hereof and thereof.  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each Party.  No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Party making the waiver.

   **11.6  Applicable Law; Jurisdiction and Venue; Jury Trial Waiver.**  THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.  The Parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; provided, however, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement shall be in the courts of the

State of Delaware or U.S. District Court for the District of Delaware, and the Parties each hereby waive any objections they may have with respect thereto (including any objections based upon *forum non conveniens*).  **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY**.

**11.7    Headings and Captions.**  The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent or otherwise affect the interpretation of, this Agreement or any of the provisions hereof.

**11.8    Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**11.9    Time is of the Essence.**  With respect to all provisions of this Agreement, time is of the essence.  However, if the first date or last date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then, in such event, the time of such period shall be extended to the next day which is a Business Day.

**11.10    Remedies Cumulative.**  Except as herein expressly set forth, no remedy conferred upon a Party by this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law, in equity or by statute.

**11.11    Interpretation and Construction.**

(a)    As used herein the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".

(b)    As used herein, the words "**herein**," "**hereof**," "**hereunder**" and similar terms shall refer to this Agreement unless the context requires otherwise.

(c)    For purposes of this Agreement, whenever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural and vice versa.

**11.12    Estoppel**.  Each Party confirms and agrees that (a) it has read and understood all of the provisions of this Agreement; (b) it is familiar with major sophisticated transactions such as those contemplated by this Agreement; (c) it has negotiated with the other Party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**11.13    Joint Preparation.**  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Appx. 00615

**11.14   Expenses; Transfer Taxes.**

(a)     Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

(b)     The Purchaser and Seller shall each pay fifty (50%) percent of all sales, use, transfer, real property transfer, documentary, recording and similar Taxes and fees, and any deficiency, interest or penalty asserted with respect thereof arising out of or in connection with the transactions contemplated hereby ("**Transfer Taxes**").

**11.15   Counterparts.**  This Agreement may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

**11.16   Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

*[Signature page follows.]*

Appx. 00616

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above.

SELLER:

**CENTER CITY HEALTHCARE, LLC**

By: _____
    Allen Wilen
    Chief Restructuring Officer - Finance

PURCHASER:

**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.**

By: _____
    Laurence M. Merlis
    Executive Vice President

*[Signature page to Asset Purchase Agreement]*

28

Appx. 00617

# EXHIBIT A

## Purchased Assets

The Purchased Assets to be purchased by the Purchaser and sold, conveyed, assigned, transferred and delivered on the Closing Date to the Purchaser by the Seller shall include all of the Seller's right, title and interest in and to all of the following assets, but specifically excluding, however, the Excluded Assets:

1.     <u>Assigned Contracts</u>.  All of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on <u>Schedule A-1</u> to this **Exhibit A**.

2.     <u>Books and Records</u>.  All Books and Records related to the Purchased Assets, but specifically excluded any Corporate Documents.

3.     <u>Governmental Authorizations</u>.  All transferable Governmental Authorizations identified on <u>Schedule A-2</u> to this **Exhibit A**.

4.     <u>Rights; Warranty Claims</u>.  All of Seller's rights, claims, counterclaims, credits, causes of action or rights of set-off against third parties that relate to warranties, indemnities, and all similar rights to the extent related to any Purchased Assets.

5.     <u>Other Assets</u>.  Those other assets of the Seller identified on <u>Schedule A-3</u> to this **Exhibit A**.

**Schedule A-1**

### I.  <u>Current GME Affiliation Agreements</u>

1.  Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between the Trustees of the University of Pennsylvania, as the owner and operator of the Hospital of the University of Pennsylvania, and Seller.

2.  Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Prime Healthcare Services Roxborough, LLC, the owner and operator of Roxborough Memorial Hospital, and Seller.

3.  Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 among Temple University Hospital, Seller and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.

4.  Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Friends Behavioral Health System and Seller.

5.  Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Abington Memorial Hospital and Seller.

### II.  <u>GME Obligations</u>

**Graduate Hospital/Penn**

- Agreement Regarding Medicare FTE Resident Caps, between the Trustees of the University of Pennsylvania and Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007

**Roxborough and Warminster/Solis**

- Agreement Regarding Medicare FTE Resident Caps between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007

- Agreement Concerning Family Medicine Training among Abington Memorial Hospital, Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 23, 2008

- Second Amendment to Agreement Regarding Medicare FTE Resident Caps; between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 29, 2010

**Hahnemann/Friends**

- Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP dated June 2008

- Memorandum of Understanding for Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP

**Hahnemann/Abington**

Master Agreement for Shared Rotational Arrangements between Hahnemann University Hospital and Abington Memorial Hospital dated June 29, 2007

**III.    The Participating Provider Agreement**

**IV.    Tower Health GME Affiliation Agreement**

**Schedule A-2**

**Governmental Authorizations**

The Participating Provider Agreement

**Schedule A-3**

**Other Assets**

[None]

**EXHIBIT B**

**ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT**

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT ("Agreement") dated as of [_____] by and between Center City Healthcare, LLC, a Delaware limited liability company ("Assignor"), and Thomas Jefferson University Hospitals, Inc., a Pennsylvania nonprofit corporation ("Assignee").

BACKGROUND

A.    ASSIGNEE AND ASSIGNOR HAVE ENTERED INTO AN ASSET PURCHASE AGREEMENT DATED AS OF [_____] (TOGETHER WITH THE EXHIBITS AND SCHEDULES THERETO, THE "PURCHASE AGREEMENT") PROVIDING FOR, AMONG OTHER THINGS, THE SALE, TRANSFER, CONVEYANCE, ASSIGNMENT, AND DELIVERY BY ASSIGNOR TO ASSIGNEE OF CERTAIN ASSETS OF ASSIGNOR (COLLECTIVELY, THE "PURCHASED ASSETS") THAT ARE OWNED OR USED BY ASSIGNOR IN CONNECTION WITH THE BUSINESS.

B.    IN CONNECTION WITH THE SALE AND PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THE PURCHASE AGREEMENT, ASSIGNOR IS TO ASSIGN AND DELEGATE, AND ASSIGNEE IS TO ASSUME, THE ASSIGNED CONTRACTS.  CLOSING IS BEING HELD ON THE DATE HEREOF UNDER THE PURCHASE AGREEMENT.

NOW, THEREFORE, pursuant to and in consideration of the Purchase Agreement and the mutual covenants and agreements set forth therein and herein, Assignor and Assignee, each intending to be legally bound, agree as follows:

1.    Incorporation of Background; Defined Terms.  The Background provisions set forth above (including, without limitation, all of the defined terms set forth therein) are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety in this Section 1.  Capitalized terms used herein which are not otherwise defined shall have the respective meanings assigned to them in the Purchase Agreement.

2.    Assignment of Rights.  Assignor hereby sells, transfers, conveys, and assigns to Assignee all of Assignor's right, title and interest in, to and under all of the Assigned Contracts, each of which are identified on Schedule 2 attached hereto.

3.    Delegation of Duties.  Assignor hereby delegates to Assignee all of Assignor's duties and liabilities under the Assigned Contracts.

4.    Assumption of Liabilities.  In partial consideration for the sale of the Purchased Assets by Assignor pursuant to the Purchase Agreement, Assignee hereby undertakes and agrees to assume, discharge, or perform as the case may be, all duties, obligations, and liabilities of Assignor under the Assigned Contracts which are to be performed after, and relate to the period after, the date hereof or which are otherwise assigned to and assumed by the Purchaser under or pursuant to the Purchase Agreement or the Sale Order.

5. **Assignment of Governmental Authorizations; Etc**. Assignor hereby assigns, sells, transfers, and sets over to Assignee all of Assignor's right, title and interest in, to, and under all of the Governmental Authorizations which are listed on Schedule 5 attached hereto, but only to the extent that any of the foregoing may be legally sold, transferred, conveyed, assigned and delivered by Assignor to Assignee without any action by any such applicable federal, state, or local government or regulatory body.

6. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7. **Governing Law**. This Agreement shall be governed by, and construed in accordance with, the domestic, internal laws of the State of Delaware, without regard to its rules pertaining to the conflict of laws.

8. **Counterparts**. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Any party to this Agreement may deliver an executed counterpart hereof by facsimile transmission or electronic mail (as a Portable Document Format (PDF) file) to the other party hereto and any such delivery shall have the same force and effect as the manual delivery of an original executed counterpart of this Agreement.

*Remainder of Page Intentionally Left Blank*

*Signature Page Follows*

Appx. 00624

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers the day and year first above written.

CENTER CITY HEALTHCARE, LLC

By_____

    Allen Wilen

    Chief Restructuring Officer - Finance

"<u>Assignor</u>"


THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.

By_____

    Laurence M. Merlis

    Executive Vice President

"<u>Assignee</u>"

35751625.8 09/06/2019

Appx. 00625

## EXHIBIT C

## BILL OF SALE

_____, 2019

   KNOW ALL BY THESE PRESENTS that CENTER CITY HEALTHCARE, LLC, a Delaware limited liability company (the "Seller"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, has granted, bargained, sold, conveyed, transferred, assigned and delivered, and by this Bill of Sale hereby grants, bargains, sells, conveys, transfers, assigns and delivers, to Thomas Jefferson University Hospitals, Inc., a Pennsylvania nonprofit corporation ("Purchaser"), its successors and assigns, all of the Seller's right, title and interest in and to the Purchased Assets. As used herein, the term "Purchased Assets" has the meaning given to such term in that certain Asset Purchase Agreement, dated as of - _____, 2019, by and between the Seller and Purchaser (together with the Exhibits and Schedules thereto, the "Purchase Agreement"), which Purchase Agreement is incorporated herein by this reference.

   EXCLUDING, HOWEVER, the "Excluded Assets" (as such term is defined in the Purchase Agreement).

   TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, forever.

   This Bill of Sale is being executed and delivered by the Seller to the Purchaser under and pursuant to Section 8.2(a) of the Purchase Agreement and is subject to the terms and conditions of the Purchase Agreement in all respects.

### *Remainder of Page Intentionally Left Blank*

### *Signature Page Follows*

Appx. 00626

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the date and year first set forth above.

CENTER CITY HEALTHCARE, LLC

By_____

Allen Wilen
Chief Restructuring Officer - Finance

**EXHIBIT D**

**ESCROW AGREEMENT**

[To be provided]

Appx. 00628

**EXHIBIT E**

**SALE ORDER**

[To be provided]

Appx. 00629

**EXHIBIT F**

**BIDDING PROCEDURES ORDER**

Appx. 00630

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Re: Docket No. 142** |
|  | ) |  |

ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO
THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING
APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS,
INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM
AND MANNER OF NOTICE RELATING THERETO, AND
<u>(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE</u>

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and

debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures**

**Order**"): (a) approving the proposed bidding procedures attached as <u>**Schedule 1**</u> to this Bidding

Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the

highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets;

(b) establishing procedures for the assumption and assignment of executory contracts, including

notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]    Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

Appx. 00631

(c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**")³, the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. 246], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which is attached as Exhibit E to the Stalking Horse Sale Agreement: (x) authorizing the sale of the Residents Program Assets free and clear of Interests as defined in footnote 4, below (the "**Interests**")⁴, with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter

---

³ The Court has been advised that Reading Hospital, a subsidiary of Tower Health, will actually serve as the Stalking Horse Bidder and, as a result, all references herein to the Stalking Horse Bidder shall be deemed to include Reading Hospital.

⁴ Interests shall include: (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or purchaser's interest in the Assigned Contracts and/or Residents Program Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the Pension Benefit Guaranty Corporation or any plan participant or beneficiary, (iv) tax claims (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, and with respect to the rights described in this sub-clause (v) only as they relate to the Resident Program Assets that are the subject of the Stalking Horse Bidder's Stalking Horse Sale Agreement.

pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D.     Notice of the Motion, as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order, was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Residents Program Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Residents Program Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Residents Program Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Health; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Accordingly, no further

Appx. 00634

notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order is necessary or required.

      E.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion as relates to the entry of this Bidding Procedures Order, including, without limitation: (a) approval of the Bidding Procedures; (b) approval of the selection of the Stalking Horse Bidder and approval of the Break-Up Fee to be paid to the Stalking Horse Bidder under the circumstances described in the Motion; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein. Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

      F.      Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment. The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

      G.      The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair,

reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates. The Break-Up Fee: (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H. The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale Agreement. The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely. Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures). The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

I.      The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required.  The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.      The Auction and Sale Notice attached hereto as **Schedule 5** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d)  identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of all Interests, with all Interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.      All current and former patients of Debtor Center City Healthcare, LLC ("Center City") who have, as of the date of this order, asserted claims against Center City, including but not limited to claims formally asserted by the filing of suit or a proof of claim in these Bankruptcy Cases and claims informally asserted by letter or by a request for medical records

from a lawyer or otherwise (the "Known Patient Creditors") shall be treated as known creditors of the Debtors for purposes of notice requirements related to the Sale.

L.    All current and former patients of Center City who, as of the date of this order, are not Known Patient Creditors (including current and former patients who are not, as of the date of this order, aware that they have or may have claims against the Debtors including such patients as to whom personal injury has not manifested as of the date of this order) (the "Unknown Patient Creditors") shall be treated as unknown creditors of the Debtors for purposes of the notice requirements related to the Sale.

M.    The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted as provided herein.[5]

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.    Timeline for the Sale**

3.    The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order.  The Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), as indicated herein and in the Bidding Procedures, are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take

---

[5]    Notwithstanding anything to the contrary herein, or in the Bidding Procedures, the acceptance of a Bid and Sale Agreement by the Debtors and the consummation of a Sale are subject to entry of the Sale Order.

any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Milestone | Proposed Date |
|---|---|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 |
| Sale Hearing | August 9, 2019 at 11:00 a.m. (prevailing Eastern Time) |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder (Other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) | (may be raised at the Sale Hearing) |

4. For the avoidance of doubt, the Debtors, in consultation with the Committee, reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

## II. **The Bidding Procedures**

5. The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety. The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement. The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.     The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on August 5, 2019. Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.     The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8.     The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice).  The Auction will be conducted openly and all creditors and the Committee will be permitted to attend.

9.     Any creditor with a valid and perfected lien on all of the Residents Program Assets (each, a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in

interest to object to or challenge such creditor's lien thereunder (a "**Challenge**")), to credit bid all or any portion of such Secured Creditor's allowed secured claims to purchase the Residents Program Assets to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, unless otherwise ordered by the Bankruptcy Court for cause. The foregoing notwithstanding, any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee. In the event that the Committee, or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. In the event that such a creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash at the closing of the Sale.

10. Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up Fee in lieu of cash and have the Break-Up Fee be treated as equal to cash in the same amount for the purposes of evaluating the overbid.

**III.**     **Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement**

11. The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction. The Break-Up Fee described in the Bidding Procedures is approved. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' closing of the Sale with a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**"). If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; and (b) shall be payable in at closing on the Alternative Transaction without further order of this Court; and

-11-

(c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

## IV.  Notice Procedures

12.    The Auction and Sale Notice is approved.

*A.    **Notice of Sale, Auction, and Sale Hearing.***

13.    Within two (2) business days after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the Auction and Sale Notice by first-class mail, electronic mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (a) the Notice Parties, (b) all Residents, and (c) all known creditors of Center City, including any Known Patient Creditors. In addition, on or before the Mailing Date, the Debtors shall serve the *Notice to Residents and Fellows Regarding Proposed Sale of Residency Program Assets* (the "**Residents' Notice**"), in substantially the form attached hereto as **Schedule 2**, on all Residents by first class mail or electronic mail.

14.    Service of the Auction and Sale Notice and the Residents' Notice as described in paragraph 13 above shall be sufficient and proper notice of the and satisfies all due process requirements.

15.    Within ten (10) days of the date of this Bidding Procedures Order, the Debtors shall cause the notice (the "**Publication Notice**") substantially in the form attached hereto as **Schedule 3** to be published once in the National Edition of *USA Today* and once in the *Philadelphia Inquirer*. The Publication Notice shall be sufficient and proper notice of the Sale to all creditors whose identities are unknown to the Debtors, including all of the Unknown Patient Creditors.

-12-

Appx. 00642

B.    *Notice of Successful Bidder.*

16.    As soon as reasonably practicable after the Bid Deadline, if no Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, or conclusion of the Auction, if a Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, the Debtors shall file on the docket, but not serve, a notice which shall identify the Successful Bidder.

## V.    Assumption and Assignment Procedures

17.    The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

A.    *Notice of Assumption and Assignment.*

18.    The Debtors previously filed with the Court, [D.I. 246], a list (the "**Initial Designated Contracts List**") specifying: (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Initial Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Initial Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Initial Designated Contract (the "**Cure Costs**").

19.    On the Mailing Date, the Debtors shall serve the Notice of Proposed Assumption and Assignment of Executory Contracts attached hereto as **<u>Schedule 4</u>** (the "**Initial Notice of Assumption and Assignment**") on all Initial Designated Contract Counterparties by first-class

-13-

mail, email or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF.

20.     Any Initial Designated Contract Counterparty may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Initial Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance.  All Contract Objections must:  (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com) and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania, 19102, Attn: Jeffrey C. Hampton (jeffrey.hampton@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder (the "**Contract Notice Parties**") by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Initial Designated Contract Objection Deadline**").  Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

21.     If an Initial Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such Contract Objection will be determined at the Sale Hearing.

B.     ***Modification of Initial Designated Contracts List and Supplemental Notice of Assumption and Assignment.***

22.     Prior to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Stalking Horse Bidder. Subsequent to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Successful Bidder (who may be the Stalking Horse Bidder).

23.     Until the opening of business on the date of the Auction, if another Qualified Bid is received by the Bid Deadline, or the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline, at the request of the Stalking Horse Bidder, the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs. Following the conclusion of the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs, *provided*, *however*, that such deletion of any contracts shall not result in any reduction in the Purchase Price (as defined in the Stalking Horse Sale Agreement"), and any contracts added after the Auction will not be considered in connection with the right of termination in Article 9.1(c) of the Stalking Horse Sale Agreement. For the avoidance of doubt, the Initial Designated Contracts List may be modified more than

Appx. 00645

once. The contracts listed on the Initial Designated Contracts List, as modified from time to time, are hereafter referred to as the "**Designated Contracts**").

24.     In the event that the Initial Designated Contracts List is modified, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") on the affected counterparty in the same manner as the Initial Notice of Assumption and Assignment was served.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed contracts as was included in the Notice of Assumption and Assignment.

25.     Any counterparty to an executory contract listed on a Supplemental Notice of Assumption and Assignment (each a "**Supplemental Designated Contract Counterparty**") may file an objection with respect to the applicable Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs (but only to the extent reduced  as to contracts included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment), and (b) if such Designated Contract was not included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance.  All Supplemental Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the

Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

26.     If a Supplemental Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute, (a) if the Supplemental Contract Objection Deadline is on or before the date of the Sale Hearing, such Supplemental Contract Objection will be determined at the Sale Hearing, and (b) if the Supplemental Contract Objection Deadline is after the date of the Sale Hearing the Debtors will seek an expedited hearing before the Court to determine the Supplemental Contract Objection.  If there is no such Supplemental Contract Objection (or such objection has been resolved), then the Debtors may submit an order to this Court, including by filing a certification of counsel, fixing the applicable Cure Costs and approving the assumption of the contract listed on a Supplemental Notice of Assumption and Assignment.

C.     *Additional Notice of Assumption and Assignment Procedures.*

27.     If the counterparty to any Designated Contract does not file and serve a Contract Objection or Supplemental Contract Objection, as applicable, in a manner that is consistent with the requirements set forth above, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling with respect to the applicable Designated Contract, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any claim related to such Designated Contract for any default occurring or continuing prior to the date of the assumption

and assignment of such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

28.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.   Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

## VI.     **Sale Hearing.**

29.     A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at **11:00 a.m. (prevailing Eastern Time) on August 9, 2019**, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder.  The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale.  In the event that the Successful Bidder cannot or refuses to consummate the Sale after the Sale has been approved by the Court, the Debtors may, in consultation with the Committee, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors, in consultation with the Committee, shall be

Appx. 00648

authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

30.     Any and all objections, if any, to (a) the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement and (b) entry of the Sale Order approving such Sale (a "**Sale Objection**") must be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pa. 19406 Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Sale Objection Deadline**").  Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder (other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) (an "**Auction Objection**") must be raised at or prior to the Sale Hearing (the "**Auction Objection Deadline**").  Any party failing to timely file a Sale Objection or raise an Auction Objection, as applicable, will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the assets free and clear of any and all Interests. For the avoidance of doubt, if the Stalking Horse Bidder is selected as the Successful Bidder, but its successful Bid is not the Stalking Horse Bid or an increased bid based on an agreement substantially similar to the Stalking Horse Sale Agreement, objections to a Sale

to the Stalking Horse Bidder, limited to the changed terms (excluding any increase in price) may be raised by the Auction Objection Deadline.

**VII.**    <u>**Miscellaneous.**</u>

31.    Notwithstanding anything to the contrary in any asset purchase agreement or document relating to the Sale, the purchased assets (including the Residents Program Assets) shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action. The provisions of this paragraphs shall not apply to the Stalking Horse Sale Agreement, as the same may be modified other than any modifications to the defined term "Purchased Assets."

32.    This order and the Bidding Procedures shall be interpreted so as to afford the Debtors, in consultation with the Committee, the greatest opportunity to maximize the value of the Residents Program Assets for the benefit of the Debtors' estates *provided*, *however*, the provisions of this paragraph shall not apply to any matters affecting the Stalking Horse Bidder without the consent of the Stalking Horse Bidder.

33.    The Debtors, in consultation with the Committee as applicable, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

-20-

34.     Notwithstanding anything in the Motion, the Bidding Procedures, and/or the July 9, 2019 Stalking Horse LOI to the contrary, nothing in this Bidding Procedures Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability to the United States arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

35.     To the extent the Successful Bid or the Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" of successor liability for any liability to the United States arising from such provider agreement pursuant to section 363(f) of the Bankruptcy Code.

36.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

37.     This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors. Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

38.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions

of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

This Court shall retain jurisdiction with respect to all matters arising from or related to the

implementation or interpretation of this Bidding Procedures Order, including, but not limited to,

any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking

Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**

**Dated: July 19th, 2019**
**Wilmington, Delaware**

35602324.10 07/19/2019

# SCHEDULE 1

# BIDDING PROCEDURES

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) |
|  | ) |

## BIDDING PROCEDURES

On July 19, 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") as set forth herein, are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July 19, 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**"), or in accordance with the terms of such higher and better offer as determined by the Debtors, in consultation with the Committee, to be the Successful Bidder (defined below).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

A.      Submissions to the Debtors and the Committee.

All submissions to the Debtors and the Committee required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

a.      **Debtors**.  Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

b.      **Debtors' Counsel**.  Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

c.      **Debtors' Investment Banker**.  SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com).

d.      **Committee's Counsel**.  Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

B.      Potential Bidders.

The Debtors and their financial advisors have identified, and may in the future, in consultation with the Committee, identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**"), other than the Stalking Horse Bidder, must deliver or have previously delivered, if determined to be necessary by the Debtors:

a.      an executed confidentiality agreement on terms acceptable to the Debtors, in consultation with the Committee (a "**Confidentiality Agreement**"), to the extent not already executed; and

b.      the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

C.  Qualified Bidders.

   a.  A "**Qualified Bidder**" is a Potential Bidder:  (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined by the Debtors, in consultation with the Committee; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below).  On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times.  MidCap Funding IV Trust ("**Midcap**"), solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times; *provided* that MidCap Funding IV Trust's right to credit bid shall be subject to the provisions set forth in the Bidding Procedures Order and these Bidding Procedures.

   b.  If any Potential Bidder is determined by the Debtors, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

   c.  Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, in consultation with the Committee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

   d.  Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

D.  Due Diligence.

   a.  **Diligence Provided to Potential Bidders**.

   Only (a) the Stalking Horse Bidder, and (b) Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders other than the Stalking Horse Bidder, the due

diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors, in consultation with the Committee, may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors, in consultation with the Committee, determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors, in consultation with the Committee, determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors, in consultation with the Committee, as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to MidCap and the Committee.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

b.     **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Committee, to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

E.     Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors, in consultation with the Committee, in their reasonable business judgment, shall constitute a "**Qualified Bid**." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

a.     **Assets**. Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

b.     **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"). The Purchase Price must be in cash consideration and must equal or exceed $7,825,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) and (iii) a $100,000 incremental amount (a "**Minimum Bid**").

c.     **Deposit**. With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**"). Within three (3) business days after the conclusion of any Auction, the Successful Bidder and Backup Bidder shall submit by wire transfer of immediately available funds, a supplemental cash deposit in an amount that, when added to the amount of the Deposit, is equal to ten (10) percent of the aggregate cash Purchase Price set forth in their respective Successful Bid and Backup Bid. The foregoing notwithstanding, the Stalking Horse Bidder shall not be required to submit any Deposit.

d.     **Residents**. Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms. Each Bid must further provide a description of the Potential Bidder's accreditation status with the Accreditation Council on Graduate Medical Education, including a description of accredited residency and fellowship programs currently offered by the Potential Bidder and/or expected to be offered in the future.

e.    **Same or Better Terms**.  Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors, in consultation with the Committee.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors, in consultation with the Committee, that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f.    **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on (i) the Potential Bidder obtaining financing, (ii) approval of the Potential Bidder's shareholders, board of directors or other internal approval, or (iii) the outcome or completion of due diligence by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment, in consultation with the Committee, than those set forth in the Stalking Horse Sale Agreement.

g.    **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.    **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment, as determined in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.  Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i. **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Committee,.

j. **Binding and Irrevocable**. A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k. **Expenses; Disclaimer of Fees**. Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l. **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Committee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m. **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

n. **Adherence to Bid Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o. **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p. **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q. **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Bid Deadline**").

The Debtors reserve the right, in consultation with the Committee, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

F. Right to Credit Bid.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on all of the Resident Program Assets (a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object or challenge such creditor's lien thereunder (a "**Challenge**")) to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause. In the event that the Committee or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. If such creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash as the closing of the Sale.

In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up fee in lieu of cash.

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order.

Appx. 00661

Any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee.

G.      Auction.

If, prior to the Bid Deadline, the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. By 6:00 p.m. on the date of the Bid Deadline, the Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids were received prior to the Bid Deadline. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement) prior to the Bid Deadline, the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Committee (the "**Baseline Bid**"), and provide copies of all Qualified Bid Documents supporting the Baseline Bid and each other Qualified Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Committee, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, and may include, among other things: (a) the number, type, and nature of any changes to the Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on August 7, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

a.      **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction, in consultation with the Committee as applicable. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of

each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and the Committee and all creditors will be permitted to attend. The Qualified Bidders, including the Stalking Horse Bidder, may appear at the Auction in person or through duly authorized representatives.

b.    **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a)    **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth in the Bidding Procedures Order or these Bidding Procedures (including the requirement of a cash component sufficient to pay all costs of sale including the Break-Up Fee).

(b)    **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may, in consultation with the Committee, announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors and the Committee.

(c)    **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(d)    **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have (i)in the initial Overbid round, identified an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or (ii) in subsequent rounds, identified an Overbid as

being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors, in consultation with the Committee, as the Prevailing Highest Bid as well as the value attributable by the Debtors, in consultation with the Committee, to such Prevailing Highest Bid.

    c.    **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Committee, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors, the Committee, and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with the Committee, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider, in consultation with the Committee, how to value each Overbid.

    d.    **Closing the Auction**.

    (a)    The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Committee, to be the highest or otherwise best Bid in accordance with the Bid Assessment Criteria.  Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed.  The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

    (b)    The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely.

    (c)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

35612177.6 07/19/2019

**e.      No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that:  (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder.  All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors, the Committee, and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

H.      Backup Bidder.

      a.      Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Committee (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.  The Stalking Horse Bidder shall serve as a Backup Bidder only if (X) the Bid set forth in the Stalking Horse Agreement is not determined to be the Baseline Bid (as defined herein), and (Y) the Stalking Horse Bidder elects, in its sole discretion, to offer a higher and better bid at the Auction.  The Stalking Horse Bidder's Bid described in the Stalking Horse Agreement shall not be a Backup Bid absent the express consent of the Stalking Horse Bidder.

      b.      The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder.  The foregoing notwithstanding, if the Stalking Horse Bidder serves as the Backup Bidder, its Backup Bid shall expire on the earlier of closing on an Alternative Transaction (defined below) or September 6, 2019.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

      c.      If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Committee, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

I.      Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights, in consultation with the Committee, to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

J.      Sale Hearing.

A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on **August 9, 2019, at 11:00 a.m. (ET)** before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Committee, by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder). The foregoing notwithstanding, if the Sale Hearing is continued without the consent of the Stalking Horse, the Stalking Horse may terminate the Stalking Horse Agreement.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

K.      Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

The Break-Up fee, to the extent owed by the Debtors, (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; (b) shall be payable at closing on of a Sale to a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**")without further order of the Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

L.     Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors, in consultation with the Committee, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction. The Stalking Horse Bidder shall not be required to provide a Deposit.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

M.     Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures prior to the commencement of the Auction if the Debtors' board of managers determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as the case may be, is required to comply with applicable law or the board's fiduciary obligations thereunder; *provided* that, in the event  the Debtors' board of managers determines to take any action, or refrain from taking any action, pursuant to this paragraph, without the consent of the Stalking Horse Bidder, the Stalking Horse Bidder may, but shall not be required to, terminate the Stalking Horse Agreement if taking such action or refraining from taking such action, as the case may be, would otherwise be grounds for termination under the Stalking Horse Agreement, it being understood that any material modification to the Bid Procedures without the consent of the Stalking Horse would be a breach of the Stalking Horse Agreement pursuant to which the Stalking Horse would have the right to terminate the Stalking Horse Agreement.

# SCHEDULE 2

## RESIDENT'S NOTICE

Appx. 00668

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## NOTICE TO RESIDENTS AND FELLOWS
## REGARDING PROPOSED SALE OF RESIDENCY PROGRAM ASSETS

## TO: ALL RESIDENTS AND FELLOWS AT HAHNEMANN UNIVERSITY HOSPITAL:

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Tower Health ("**Tower**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to Tower: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors file a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**"). A copy of the Agreement, the Bidding Procedures Order and the Bidding Procedures is enclosed herewith.

## THE PROPOSED SALE

If approved by the Court, the Agreement will enable residents and fellows (collectively herein, the "**Residents**") at Hahnemann to continue their training at one of six hospitals operated by Tower - Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania. **Residents have a choice, and are not required to continue their training with Tower**. For any Resident who elects to complete their training elsewhere, Tower or the Debtors, as applicable, will release the related cap on Medicare reimbursement on a temporary basis to accommodate that choice.

For Residents who elect to stay with Tower, Tower will provide housing for those residents doing rotations at Reading Hospital, which is sixty miles from Hahnemann. Tower has also agreed to seek to hire the faculty who are currently training Residents at Hahnemann to ensure continuity of the Hahnemann training programs. Tower will also provide free housing (subject to parameters set forth in the Agreement) for the remainder of the academic year or during the term of a resident's existing vacated lease if it is necessary for the Resident to relocate during the current academic year. Residents will receive free meals while in any Tower hospital, and Tower will also provide additional amenities to assist Residents and their families with the transition.

If the Sale is approved by the Court to someone other than Tower, the terms of the Sale, and the impact upon Residents, may be different than those under the Agreement.

The Debtors recognize the unique difficulties and challenges facing Residents in light of the bankruptcy filing and expected closure of Hahnemann. The Debtors believe that the proposed Sale is in the best interests of Residents because it provides Residents with the option to continue their training and, to minimize, to the greatest extent possible, the impact of Hahnemann's closure on Residents, their professional training and education, and their families.

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys,

-2-

Appx. 00670

whose contact information is in the signature block below, for more information. In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; and (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Proposed Counsel for Debtors and
Debtors in Possession*

# SCHEDULE 3

## PUBLICATION NOTICE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
|  | Jointly Administered |
| Debtors. |  |

## NOTICE REGARDING PROPOSED SALE OF RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL INTERESTS, INCLUDING PERSONAL INJURY CLAIMS

**TO:    ALL PERSONS WITH CLAIMS AGAINST THE DEBTORS IN THE ABOVE CAPTIONED CASES, INCLUDING CLAIMS AGAINST HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Reading Hospital (the "**Purchaser**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to the Purchaser: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

**PLEASE TAKE FURTHER NOTICE** that the Sale, if approved, will be free and clear of all Interests, including claims of successor liability.

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Appx. 00674

**PLEASE TAKE FURTHER NOTICE THAT, IF THE SALE IS APPROVED, THE
PURCHASER WILL NOT BE LIABLE ON ACCOUNT OF ANY CLAIMS AGAINST
ANY OF THE DEBTORS (OTHER THAN CLAIMS AFFIRMATIVELY ASSUMED BY
THE PURCHASER), INCLUDING CLAIMS OF PATIENTS TREATED AT
HAHNEMANN, INCLUDING CLAIMS OF WHICH THE HOLDER MAY NOT BE
PRESENTLY AWARE.**

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from
other qualified bidders.  On July 9, 2019, the Debtors filed a motion (the "**Sale Motion**") seeking
the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the
Sale.  On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which
sets forth certain key dates and deadlines in connection with the proposed Sale.  In particular, the
Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the
Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing
bids.  A final hearing to seek Court approval of the Sale (either to Tower or another party
submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale
Hearing**").

### Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy
cases are available free of charge on the website of the Court-appointed claims and noticing
agent for the Debtors' chapter 11 cases, Omni Management Group,
https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys,
whose contact information is below, for more information.  In addition, Residents should contact
their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the
basis of such objection with specificity and (c) be filed with the Court and served upon, so as to
be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City
Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia,
Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the
Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300,
Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street,
38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; (c) Stevens & Lee, P.C., 620 Freedom
Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower, and
(d) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn:
Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy
(BMankoverskiy@sillscummis.com), proposed counsel to the Committee.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Mark Minuti*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Proposed Counsel for Debtors and Debtors in Possession*

## SCHEDULE 4

## INITIAL NOTICE OF ASSUMPTION AND ASSIGNMENT

Appx. 00677

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## NOTICE OF PROPOSED ASSUMPTION AND
## ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 and July 1, 2019 (the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion [D.I. 142] (the "**Sale Motion**") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets (the "**Residents Program Assets**") to Tower Health (the "**Stalking Horse Bidder**"), including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"), attached as **Exhibit B** to the Sale Motion; (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July 19, 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") [D.I. [●]] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Appx. 00678

sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herewith.

**PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder, or any other Successful Bidder, the Designated Contracts. A schedule listing the Designated Contracts (the "**Designated Contracts List**") is attached hereto and may also be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "**Cure Payments**") is set forth on the Designated Contracts List.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO AN INITIAL DESIGNATED CONTRACT IN THE INITIAL DESIGNATED CONTRACTS LIST**. Under the terms of the proposed Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Designated Contracts until the opening of business on the date of the Auction, or until the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline. Following the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Payments. If the Initial Designated Contracts List is modified, the Debtors will serve a supplemental notice of assumption and assignment on the affected counterparty, which shall identify the deadline for filing an objection with respect to the applicable Designated Contract.

### IMPORTANT PROPOSED DATES AND DEADLINES

1.  The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "**Sale Order**") and all objections related to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m. (ET)** (the "**Sale Objection Deadline**").

2.  The Auction for the Residents Program Assets, if one is necessary, will commence on **August 7, 2019 at 10:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

3.  A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

35599108.3 07/19/2019

Appx. 00679

## FILING ASSUMPTION AND ASSIGNMENT OBJECTIONS

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("**Designated Contract Objections**"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on August 5, 2019**. Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

Failure to timely file a timely Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE A TIMELY OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE PROPOSED BIDDING PROCEDURES ORDER AND THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

35599108.3 07/19/2019

Appx. 00680

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

-and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

Appx. 00681

**Designated Contracts List**

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Master Agreement for Shared Rotational Arrangements with Hahnemann University Hospital dated June 29, 2007 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $0.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 1, 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Temple University Hospital | Academic Affiliation Agreement with Tenet HealthSystem St. Christopher's Hospital for Children, LLC, dated October 19, 2007 | $0.00 |
| 15 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |

35599108.3 07/19/2019

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|-----|-----------------------------|-------------------------------|-------------|
| 17 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |
| 18-X | [INDIVIDUAL RESIDENTS] (to be provided and/or filed under seal) | Resident Employment Contract | $0.00 |

Appx. 00683

# SCHEDULE 5

## AUCTION AND SALE NOTICE

Appx. 00684

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

### NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

      **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 and July 1, 2019.

      **PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale and Bidding Procedures Motion**")[2] seeking the entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of certain of the Debtors' assets to Tower Health (the "**Stalking Horse Bidder**") for $7.5 million plus the assumption of certain contracts and responsibilities of the Debtors with respect to Residents at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) the form and manner of notices related to the Sale; and (c) procedures for the assumption and assignment of contracts in connection with the Sale.

      **PLEASE TAKE FURTHER NOTICE** that on July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety. To the extent that there are any inconsistencies between the Bidding Procedures and the

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bidding Procedures Motion.

summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects. The deadline by which all Bids must be *actually received* by the parties specified in the Bidding Procedures Order is August 5, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Residents Program Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

| Proposed Investment Banker to Debtors | Proposed Counsel to Debtors |
|---|---|
| SSG Advisors, LLC<br>Five Tower Bridge, Suite 420<br>300 Barr Harbor Drive<br>West Conshohocken, PA 19428<br>J. Scott Victor (jsvictor@ssgca.com)<br>Teresa Kohl (tkohl@ssgca.com)<br>Craig Warznak (cwarznak@ssgca.com)<br>(610) 940-3615 | Saul Ewing Arnstein & Lehr LLP<br>1201 N. Market Street, Suite 2300<br>Wilmington, Delaware 19899<br>Mark Minuti (mark.minuti@saul.com),<br>Jeffrey C. Hampton (jeffrey.hampton@saul.com),<br>Aaron S. Applebaum (aaron.applebaum@saul.com)<br>(215) 972-7777 |

## Obtaining Additional Information

Copies of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Purchase Agreement and all other documents filed with the Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

## Important Dates and Deadlines

1. The deadline to submit a Qualified Bid is August 5, 2019 at 4:00 p.m. (prevailing Eastern time).

2. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "**Sale Order**") and all objections relating to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m.** (prevailing Eastern time) (the "**Sale Objection Deadline**").

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Residents Program Assets. The Auction, if one is necessary, will commence on August 7, 2019 at 10:00 a.m. (prevailing Eastern time), or such other date as determined by the Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre

Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

4. Objections to the conduct of the Auction and the terms of a sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "**Auction Objections**") may be raised at the Sale Hearing (as defined below).

5. A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Court on **August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

### Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:*/s/ Aaron S. Applebaum*

    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

        -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

Appx. 00688

**EXHIBIT B**

**ASSIGNED CONTRACTS**

| No. | Counterparty/Counterparties | Contract Type and Description | Maximum Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Agreement for Clinical Rotations with Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, dated September 14, 2018 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $3,000,000.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 7 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 8 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 9 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 10 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 11 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 12 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |

# EXHIBIT C

## BACKUP BID ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CENTER CITY HEALTHCARE, LLC,**

**as Seller,**

**AND**

**READING HOSPITAL**

**as Purchaser**

Appx. 00692

## <u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of September , 2019, by and between Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital (the "**Seller**" or "**Hahnemann**"), a Delaware limited liability company and Reading Hospital (the "**Purchaser**"), a Pennsylvania nonprofit corporation. The Seller and the Purchaser are sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties.**"

WHEREAS, Seller is engaged in the business of owning and operating an acute care hospital, including a graduate medical education program (the "**Business**"); and

WHEREAS, the Seller is the owner of the Purchased Assets; and

WHEREAS, on June 30, 2019 (the "**Petition Date**"), a voluntary petition for relief was filed by the Seller under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), under Case Number 19-11466 (the "**Bankruptcy Case**"); and

WHEREAS, Seller desires to sell and Purchaser desires to purchase the Purchased Assets all in accordance with, and subject to, the terms and conditions contained in this Agreement; and

WHEREAS, the Purchased Assets being transferred herein are intended to be sold, conveyed and transferred to Purchaser free and clear of all Liens and Encumbrances pursuant to Section 363 of the Bankruptcy Code, and subject to the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings indicated below, unless the context clearly requires otherwise:

"**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; <u>provided</u> that such Person shall be deemed an Affiliate for only so long as such control exists. For purposes of this definition and the definition of Related Person, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" shall mean all other agreements, documents and instruments to be executed and delivered by the Purchaser and/or the Seller pursuant to this Agreement.

Appx. 00693

"**Applicable Privacy and Security Law**" means any applicable Law relating to privacy, data protection, confidentiality, security, integrity and protection of personal information, including (i) health care and medical record applicable Laws, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and all implementing regulations (collectively, "**HIPAA**"); (ii) state data protection laws; (iii) state breach notification laws; and (iv) any comparable applicable state Laws and the regulations promulgated pursuant to all such applicable Laws.

"**Assigned Contracts**" shall mean, collectively, those Contracts included in the Purchased Assets, which shall consist solely of the Contracts identified on Schedule A-1 to **Exhibit A**. Purchaser may add or delete Contracts from Schedule A-1 pursuant to the applicable provisions of the Bidding Procedures Order.

"**Assignment and Assumption Agreement**" shall mean the Assignment, Delegation and Assumption Agreement to be executed at the Closing between the Seller and the Purchaser in the form attached hereto as **Exhibit B**, pursuant to which, among other things, the Seller will assign and transfer to the Purchaser all of its right, title and interest under the Assigned Contracts, on the terms and conditions set forth therein.

"**Assumed Liabilities**" shall mean, collectively, (i) all liabilities arising after the Closing with respect to the Assigned Contracts, (ii) all liabilities arising with respect to the Purchased Assets arising on or after the Closing Date, (iii) all executory performance obligations of Seller to the extent arising or after the Closing, (iv) the Cure Costs (including Cure Costs asserted by CMS (including by offset) upon and/or after the Closing on account of the Participating Provider Agreement), (v) any and the Purchaser's portion of the Transfer Taxes pursuant to Section 10.4.

"**Assumption/Cure Notice**" means the Initial Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment delivered to counterparties to Contracts with the Seller pursuant to the Bidding Procedures Order.

"**Backup Bidder**" shall have the meaning stated in the Bidding Procedures Order.

"**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

"**Base Purchase Price**" is defined in Section 3.1.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Purchased Assets shall occur, which are attached to the Bidding Procedures Order as Exhibit I.

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court approving the Bid Procedures in the form attached hereto as Exhibit F and made part hereof.

"**Bill of Sale**" shall mean the bill of sale to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **Exhibit C**.

"**Books and Records**" means, collectively, all documents, lists and files relating or pertaining to the Purchased Assets or the Assumed Liabilities.

"**Business**" is defined in the Recitals to this Agreement.

"**Business Day(s)**" shall mean calendar days other than Saturdays, Sundays and days on which banking institutions in Wilmington, Delaware are authorized by Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Claims Close Date**" is defined in Section 10.5.

"**Closing**" is defined in Section 8.1.

"**Closing Date**" is defined in Section 8.1.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**CMS Discharge Amount**" means a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as final which amount shall be the maximum Cure Costs due on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement.

"**Continuing Residents**" means the Residents as of the Closing Date who agree to become residents training at a hospital operated by the Purchaser or an Affiliate of the Purchaser.

"**Contracts**" shall mean any agreement or contract, whether written or oral.

"**Cure Costs**" shall mean, with respect to any Assigned Contract, the amount due and owing to each non-debtor counterparty to such Assigned Contract to cure any defaults required to be cured as a condition of assumption of such Assigned Contract pursuant to Section 365(b)(1) of the Bankruptcy Code.

"**Escrow Agent**" shall mean a financial institution mutually acceptable to Seller and Purchaser.

"**Escrow Agreement**" shall mean the agreement substantially in the form attached hereto as Exhibit D.

"**Escrow Account**" is defined in Section 3.1

"**Escrow Amount**" is defined in Section 3.1

"**Excluded Assets**" shall mean all rights, benefits or property of Seller which are not Purchased Assets.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00695

"**Excluded Liabilities**" shall mean, collectively, any and all liabilities of the Seller of any kind or description other than the Assumed Liabilities.

"**Final Order**"  shall mean an order, judgment or other decree as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"**GAAP**" shall mean generally accepted accounting principles in the United States, consistently applied.

"**Governmental Authorization**" means any consent, license, permit, certificate of authority, registration, franchise, right, Order or notice, qualification or similar right issued, granted, given, or required by or under the authority of any Governmental Body or pursuant to any Law.

"**Governmental Body**" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including the FDA and its equivalent authority or body in any foreign jurisdiction.

"**Hahnemann Programs**" is defined in Section 6.2.

"**Interests**" shall have the meaning stated in the Sale Order.

"**Knowledge of the Seller**" **and** "**to the Seller's Knowledge**" shall mean the actual knowledge of Joel Freedman, the Seller's Chief Executive Officer, or Allen Wilen, the Seller's Chief Restructuring Officer - Finance.

"**Laws**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

"**Lien**" has the meaning given to such term in the Bankruptcy Code.

"**Liquidated Cure Costs**" means all Cure Costs relating to Assigned Contracts which are allowed in a Final Order of the Bankruptcy Court.

"**Losses**" is defined in Section 10.1.

"**Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchased Assets; provided, however, that any adverse change, event, development or effect arising from or relating to any of the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been, a Material Adverse Effect: (i) the United States economy, the global economy, in each case, as a whole, or the industry or markets in which the Seller operates; (ii) the filing of the Bankruptcy Case; (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (iv) financial, banking, or securities markets (including any disruption thereof and any decline in

the price of any security or any market index); (v) changes in GAAP; (vi) changes in Law or Orders; (vii) the taking of any action contemplated by this Agreement or any of the Ancillary Documents; (viii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes; (ix) changes resulting from the announcement of the execution of this Agreement or any of the transactions contemplated hereby; or (x) the termination of any Contract that is not an Assigned Contract, or the occurrence of any breach by any party of any Contract that does not relate to the Purchased Assets or the Assumed Liabilities; (xi) any adverse change to the Business prior to the date hereof;.

"**Non-Disclosure Agreement**" means any and all confidentiality agreements and/or non-disclosure agreements executed by the Purchaser as a condition to obtaining confidential and/or proprietary information from the Seller.

"**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body.

"**Ordinary Course of Business**" means the ordinary course of the Seller's Business consistent with past practice.

"**Outside Closing Date**" shall mean September 6, 2019 or such other date as Seller and Purchaser may agree.

"**Participating Provider Agreement**" means the Participating Provider Agreement with the Centers for Medicare and Medicaid Services between the Seller and CMS related to Hahnemann University Hospital.

"**Permitted Escrow Withdrawals**" is defined in Section 3.1.

"**Person**" shall mean any individual, corporation, Governmental Body, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

"**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"**Purchased Assets**" shall mean the assets of Seller identified on Exhibit A..

"**Purchaser Indemnified Party**" is defined in Section 10.1.

"**Purchaser Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchaser.

"**Related Person**" (i) with respect to a Person who is an individual, shall mean, (a) any other individual having a relationship with such specified individual (by blood, marriage or adoption) of grandparent, parent, child, grandchild, aunt, uncle, niece, nephew, sister, brother or

first cousin (collectively, "**Relatives**"), (b) any Person that is controlled by such individual or any one or more members of such individual's Relatives; and (c) any Person with respect to which such individual or one or more members of such individual's Relatives serves as a director, officer, partner, or trustee (or in a similar capacity); and (ii) with respect to a specified Person other than an individual, shall mean (a) any Affiliate of such specified Person; and (b) each Person that serves as a director, officer, partner, or trustee (or in a similar capacity) of such specified Person.

"**Representative**" shall mean, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Notification**" is defined in Section 6.3.

"**Residents**" means the medical residents and fellows training at Hahnemann University Hospital.

"**Sale Motion**" shall mean that certain motion filed by the Seller in the Bankruptcy Case on July 9, 2019 (D.I. 142) pursuant to which, among other things, the Seller requested an order (a) approving the Bid Procedures, (b) approving procedures relating to the assumption and assignment of executory contracts, including procedures for establishing Cure Costs, (c) establishing a date for an auction, and (d) scheduling a sale hearing.

"**Sale Order**" shall mean an Order of the Bankruptcy Court pursuant to the Bankruptcy Code approving this Agreement and the transactions contemplated hereby substantially in the form attached hereto as <u>Exhibit E</u> and made part hereof.

"**Seller Disclosure Letter**" is defined in Article IV.

"**Seller Indemnified Party**" is defined in Section 10.2.

"**SSG**" means SSG Capital Advisors, LLC.

"**Tail Coverage Costs**" shall mean shall mean the cost to Seller of purchasing and maintaining the Tail Coverage Endorsement.

"**Tail Coverage Endorsement**" shall mean a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital. Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars $1,500,000) annual aggregate for each MCARE eligible Resident only.

"**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00698

"**Tower GME Affiliation Agreement**" shall mean the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Seller and Purchaser (or an affiliate of Purchaser).

"**Transfer Taxes**" is defined in Section 10.14(a).

## ARTICLE II.
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

**2.1  Agreement to Sell and Purchase Purchased Assets.**  On the Closing Date, subject to the performance by the Parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Purchased Assets, free and clear of all Interests other than Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**2.2  Assumed Liabilities/Excluded Liabilities**.  On the Closing Date, the Purchaser shall assume and become responsible for, and shall pay, perform, fulfill and discharge, all of the Assumed Liabilities.  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any of the Excluded Liabilities, all of which shall remain the sole responsibility and obligation of the Seller.

**2.3  Assigned Contracts.**  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any Contracts, all of which shall remain the sole responsibility and obligation of the Seller, except for the Assigned Contracts.  As to the Assigned Contracts:

(a)  At Closing, Seller shall assign to Purchaser, and Purchaser shall assume, all of the Assigned Contracts and Purchaser shall pay to the applicable counterparty the Cure Costs as and when such Cure Costs become Liquidated Cure Costs.

(b)  Purchaser shall provide promptly any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Purchaser's capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

**2.4  Competing Transactions; Bankruptcy Court Approval.**  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids pursuant to the Bidding Procedures Order and the Bid Procedures approved thereby (each, a "**Competing Bid**").  Until the transactions contemplated by this Agreement are consummated, Seller may perform any and all other acts related to seeking a Competing Bid as provided under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including but not limited to  supplying information relating to the Purchased Assets to prospective purchasers.

## ARTICLE III.
## PURCHASE PRICE

**3.1  Purchase Price.**  The Purchase Price shall be Fifty Million Dollars ($50,000,000), subject to upward adjustment pursuant to Section 3.2(d) hereof ( the "<u>Base Purchase Price</u>") and

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00699

subject to the following sentence, shall be paid in cash at Closing subject to the purchase price adjustments of (a) Five Hundred Thousand Dollars ($500,000), which was paid by Purchaser to Seller on June 28, 2019 as consideration for the Tower GME Affiliation Agreement, that shall be credited against the Base Purchase Price and (b) Two Hundred Twenty-Five Thousand Dollars ($225,000) for the break-up fee.  In addition, an amount (the "Escrow Amount") equal to Three Million Dollars ($3,000,000) minus Liquidated Cure Costs paid by Purchaser on the Closing Date will be withheld from the Base Purchase Price and placed into a non-interest bearing escrow account (the "Escrow Account") held by the Escrow Agent pursuant to the Escrow Agreement. The Escrow Amount shall be distributed to Purchaser from time to time in accordance with the Escrow Agreement to cover the following losses, damages and expenses (collectively, the "Permitted Escrow Withdrawals"): (a) the CMS Discharge Amount, as and when liquidated, (b) the Cure Costs not paid on the Closing Date and not included in the CMS Discharge Amount, and (c) the Losses payable to a Purchaser Indemnified Party.  To the extent that there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, such remaining funds minus any then pending written claims asserted by Purchaser for Permitted Escrow Withdrawals (whether or not disputed) shall be distributed to Seller in accordance with the Escrow Agreement without any further action being required on the part of Purchaser. Upon resolution of any Permitted Escrow Withdrawals pending as of the one-year anniversary of the Closing Date, (x) any amounts determined to be owing to Purchaser shall be distributed to Purchaser, and (y) any amounts determined not to be owing to Purchaser shall be distributed to Seller.

**3.2  Payment of Base Purchase Price.** At Closing, the Base Purchase Price shall be payable by Purchaser as follows:

(a)  Purchaser shall deposit the Escrow Amount into the Escrow Account pursuant to and in accordance with the Escrow Agreement.

(b)  Purchaser shall pay Liquidated Cure Costs as of the Closing Date.

(c)  Purchaser shall pay to the Seller the Forty-Six Million, Two Hundred Seventy-Five Thousand Dollars ($46,275,000) balance of the Base Purchase Price by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller prior to the Closing.

(d)  Purchaser shall reimburse Seller for the Tail Coverage Cost actually paid by Seller to purchase the Tail Coverage Endorsement, up to a maximum of One Million Dollars ($1,000,000).

**3.3  Tax Allocation of Base Purchase Price.**  The Base Purchase Price shall be allocated among the Purchased Assets in accordance with the IRS Form 8594, Asset Acquisition Statement Under Section 1060 as agreed by the respective accountants of Purchaser and Seller within a reasonable period of time after Closing in good faith consistent in all respects with applicable Laws.  The Seller and the Purchaser shall file their respective Tax returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Purchaser, as the case may be, reasonably determines (and notifies the other Party) that such allocation is contrary to applicable Law.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00700

# ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the disclosure letter delivered by the Seller to the Purchaser on the date hereof (the "**Seller Disclosure Letter**"), the Seller represents and warrants to the Purchaser as follows:

**4.1  Organization.**  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation and is in good standing in each other jurisdiction where the operation of the Business by the Seller requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.2  Power and Authority.**  Upon entry of and subject to the Sale Order, Seller shall have all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Seller.  Upon entry of and subject to the Sale Order, this Agreement shall constitute a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**4.3  Non-contravention.**  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery of this Agreement or any other Ancillary Document to which the Seller is a party, and the performance by the Seller of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of the Seller, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Assigned Contract, (iii) to Seller's Knowledge, violate in any material respect any Law or Order applicable to the Business or the Purchased Assets, or (iv) result in the imposition of any Lien on the Purchased Assets.

**4.4  Consents.**  Upon entry of the Sale Order and upon each regulatory approval to which Section 7.1(c) of this Agreement relates having been obtained, no approval, consent or authorization of, or declaration, filing or registration with or any notification to any Governmental Body or any other third Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

**4.5  Liabilities.**  The Seller has no Liabilities with respect to the Purchased Assets for which the Purchaser will be responsible after Closing except for any Assumed Liabilities assumed by the Purchaser.

**4.6  Title.**  The Seller has good and marketable title to all of the Purchased Assets, free and clear of all Interests other than Interests which will be divested from the Purchased Assets by the Sale Order.  Upon the completion of the transactions contemplated hereby, the Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Interests other than Assumed Liabilities.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00701

**4.7 Litigation.** There are no Proceedings pending, or to the Seller's Knowledge, threatened against the Purchased Assets or Business, at Law or in equity, or before any Governmental Body which will interfere with the ownership or use by the Purchaser of the Purchased Assets after the Closing.

**4.8 Proceedings.** There is no Proceeding pending that challenges, or that is reasonably likely to have the effect of preventing, delaying or rendering illegal any of the transactions contemplated by this Agreement.

**4.9 Tax Matters.** There are no Tax Liens or Encumbrances for Taxes upon the Purchased Assets and as of the end of the day on the Closing Date there will be no such Tax Liens or Encumbrances. There is not and, as of the end of the day on the Closing Date there will not be, any liability for Taxes affecting the Purchased Assets for which the Purchaser will at any time have any liability for payment

**4.10 Brokers and Finders.** Other than SSG, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller. Seller will be solely responsible for any fee, commission or other consideration of any kind due to SSG on account of the transactions contemplated by this Agreement.

**4.11 Tail Coverage**. Seller shall be solely responsible for purchasing and maintaining the Tail Coverage Endorsement and shall incur all costs associated with the same, except as provided in Section 3.2(d).

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER.

The Purchaser represents and warrants to the Seller as follows.

**5.1 Organization.** The Purchaser is a nonprofit corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to conduct its business and own and operate its properties.

**5.2 Power and Authority.**

(a) The Purchaser has all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by the Purchaser. This Agreement is a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(b) To the extent that this Agreement or any of the Ancillary Documents provides that any Affiliate of the Purchaser makes any covenant or undertakes the payment or performance of any obligation in connection with the transactions contemplated hereunder or thereunder, such Affiliate has all requisite power and authority to enter into the transactions contemplated hereby and thereby.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00702

**5.3 Non-contravention.** Neither the execution and delivery of this Agreement or any other Ancillary Document to which the Purchaser is a party, will (i) violate any provision of the organizational documents of the Purchaser, or (ii) violate any Law or Order applicable to the Purchaser.

**5.4 No Proceedings.** There are no actions, suits or proceedings pending, or to the actual knowledge of Purchaser, threatened, before or by any Governmental Body, against Purchaser which would affect Purchaser's ability to proceed with the transactions contemplated by this Agreement.

**5.5 Consents.** No consent, waiver, authorization or approval of any person or declaration, filing or registration with any Governmental Body or other Person is required in connection with the execution and delivery by Purchaser of this Agreement or the performance by Purchaser or its Affiliates of its respective obligations hereunder or thereunder.

**5.6 Bankruptcy Matters**. Purchaser is capable of satisfying the adequate assurance of future performance conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to each Assigned Contract.

**5.7 Financing.** Purchaser has readily-available cash on hand, availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Base Purchase Price at Closing.

**5.8 Purchaser's Hospital Facilities**. Purchaser owns and operates six Medicare-participating hospitals located within 60 miles of Hahnemann University Hospital's facility, all of which have the capacity to operate medical residency programs.

**5.9 Certain Relationships**. Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser is an officer or director of the Seller or a Related Person of any officer, director or key employee of the Seller. Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser has entered into any Contract with any officer, director or key employee of the Seller.

**5.10 Brokers and Finders.** No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE VI.

## COVENANTS OF THE PARTIES

**6.1 Access to Information**. Subject to all Applicable Privacy and Security Laws, the Seller shall permit the Purchaser's Representatives to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Business, to the personnel, books, records, Assigned Contracts, and documents of or pertaining to the Purchased Assets; provided, that the Seller may restrict the foregoing access to the extent that in the reasonable judgment of the Seller, any Law applicable to the Seller requires it to restrict access to any of its business,

12

Appx. 00703

properties, information or personnel; and provided, further, that such access shall not unreasonably disrupt the operations of the Seller or the Business.

**6.2  Conduct of the Business**.  From the date hereof until the Closing Date, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), and subject in all respects to the Bankruptcy Code and orders of the Bankruptcy Court (including, without limitation, the Sale Order), the Seller shall use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at Hahnemann University Hospital (the "**Hahnemann Programs**"). Seller and Purchaser shall work cooperatively to determine clinical rotation assignments for Residents, with such mutually-agreed assignments to commence as soon as practicable after the Purchase Agreement is entered into. For the avoidance of doubt, neither the existence of this Agreement nor any provisions set forth herein shall restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those Residents who elect not to become Continuing Residents.

**6.3  Notification of Certain Matters.**  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "**Required Notification**"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

**6.4  Cooperation**.  Subject in all respects to the Bankruptcy Code and the Bankruptcy Cases, the Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in **Article VII** and to consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

**6.5  Records Retention and Access**.  For a period of six (6) years following the Closing or such shorter period that records are required to be retained by applicable Law (but in no event less than three (3) years), Purchaser shall at Seller's  expense furnish to the Seller, to the extent in Purchaser's possession and following receipt of a reasonable, written request therefor, information that is necessary for Seller to prepare for, prosecute or defend against any Proceeding related to the Business, to validate claims filed in the Bankruptcy Case and/ or to enable Seller and its Representatives to prepare, complete and file all required federal, state and local Tax returns in accordance with applicable Law.

**6.6  Cure Costs.** Seller shall not agree to the amount of any Liquidated Cure Costs without the written consent of Purchaser.  From and after the Closing Date, Purchaser shall have the sole right to contest and settle any claims for Cure Costs and, to the extent necessary and

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00704

permitted by the Bankruptcy Court, Seller shall cooperate in substituting Purchaser for Seller (at Purchaser's expense) in connection with any pending objections to Cure Costs.

**6.7 Bid Procedures.** Seller shall not modify the Bid Procedures without the consent of Purchaser.

**6.8 Covenants of Purchaser Regarding Transition and Accommodation of Residents**.

(a) Purchaser will accommodate a maximum of 583 Continuing Residents to pursue continued medical residency training at Purchaser-owned hospitals. If requested by Purchaser, Seller shall take all reasonable actions to reflect its consent to the transfer of Continuing Residents to Purchaser. For any Resident who does not become a Continuing Resident and elects to pursue their training at hospitals that are not owned by Purchaser, Purchaser agrees to release the GME cap associated with Medicare reimbursement for such Residents on a temporary basis to the hospital where the Resident transfers until the Resident has completed training.

(b) If the Continuing Residents are required to relocate their personal residence to continue their training with Purchaser, Purchaser shall provide reasonable private housing for such residents for the longer of the remainder of the current academic year or for the duration of a Resident's existing vacated lease. The provision of reasonable private housing shall not extend beyond the Resident's completion of his or her residency training with Purchaser

(c) Purchaser shall use reasonable efforts to transfer Seller's residency program faculty to its hospitals so that they can continue to provide education to Residents.

(d) Purchaser shall provide Continuing Residents with free meals during the time that they are training at Purchaser hospitals.

(e) Purchaser shall provide additional transition resources to Continuing Residents as may be requested by Seller from time to time.

(f) The parties shall cooperate in determining the initial clinical rotation assignments for Continuing Residents for the period following the transfer.

**6.9 Covenants of Purchaser Regarding Continued Affiliation with St. Christopher's Hospital for Children**. For the period of ten (10 years after the Closing with automatic renewals for periods of five (5) years, provided that at the time of each such renewal such resident caps are used for resident training at STC only, unless either party gives not less than one hundred eighty (180) days' notice, Purchaser agrees to, and to cause any successor or assignee of any Purchased Assets to agree to: (i) enter into an agreement to continue participating in a "Medicare GME affiliated group" as that term is defined in 42 C.F.R. 413.75(b), with St. Christopher's Hospital for Children ("**STC**"), whereby Purchaser will continue sharing full-time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between STC and Seller (the "**STC GME Affiliation Agreement**") or enter into a new GME affiliation agreement substantially in the form of the STC GME Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation agreement" each academic year..

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00705

**6.10  Covenants of Purchaser Regarding Other GME Affiliation Agreements**.

(a)  For the remainder of the academic year during which the Closing occurs, Purchaser shall accept assignment from Seller of the GME Affiliation Agreements identified listed as numbered items 1, 2 and 4 (but not 3) under the heading Current GME Affiliation Agreements on Schedule A-1 to Exhibit A of this Agreement (the "**Current GME Affiliation Agreements**") (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(a) being included as "Cure Costs" for purposes of this Agreement) or enter into new GME affiliation agreements with those counterparties substantially in the form of the Current GME Affiliation Agreements; and

(b)  Purchaser shall, subject to Purchaser's completion of due diligence, accept assignment of the agreements identified under the heading GME Obligations on Schedule A-1 to Exhibit A of this Agreement to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(b) being included as "Cure Costs" for purposes of this Agreement).

**6.11  Covenant of Seller Regarding Tail Coverage Endorsement for Residents**.  At or prior to Closing, Seller shall obtain the Tail Coverage Endorsement.

## ARTICLE VII.
## CONDITIONS TO CLOSING

**7.1     Conditions to Obligations of Each Party.**  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)  Proceedings; Orders.  No Governmental Body of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

(b)  Sale Order.  The Bankruptcy Court shall have entered the Sale Order with such changes as are mutually agreed to by the Seller and Purchaser, each in the exercise of its respective sole discretion.

(c)  Regulatory Approvals.  CMS, the Pennsylvania Department of Health ("**DOH**") and the Accreditation Council for Graduate Medical Education ("**ACGME**") and any other applicable regulatory authority or Governmental Body, in each case to the extent required, shall have consented to the transactions contemplated by this Agreement and, solely with respect to CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated herein will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap.

(d)  CMS Discharge Amount. Any order setting the CMS Discharge Amount shall have become a Final Order.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00706

**7.2     Additional Conditions to Obligations of the Purchaser.**  The obligations of the Purchaser to effect the transactions contemplated hereby are subject to satisfaction or waiver of the following additional conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of the Seller set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>.  The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     <u>Documents</u>.  All of the documents, instruments and agreements required to be executed and/or delivered  by Seller on or prior to Closing pursuant to Section 8.2 of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

(d)     <u>Successor Liability</u>.  Entry of an Order of the Bankruptcy Court, which may be the Sale Order, which precludes the assertion of any successor, vicarious, or transferee liability (by piercing the corporate veil or otherwise) against the Purchaser, relating to claims, administrative proceedings or actions brought by or on behalf of any Government Body, accrediting body, or other third party relating to the operation of the Business prior to Closing. For avoidance of doubt, nothing in this paragraph is intended, nor shall it be construed, to preclude the collection of the CMS Discharge Amount from the Escrow Account as provided herein.

**7.3     Additional Conditions to Obligations of the Seller.**  The obligations of the Seller to effect the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Purchaser Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>.  The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     <u>Documents</u>.  All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to Section 8.3 of this

Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

## ARTICLE VIII.
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

**8.1  Closing**.  The closing of the transactions contemplated hereby (the "**Closing**") shall take place at the offices of Stevens & Lee, P.C., 1818 Market St., 29th Floor, Philadelphia, PA., or such other place or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the Parties, as soon as practicable following the satisfaction or waiver of the conditions set forth in **Article VII** hereof and in any event within three (3) Business Days thereafter (the "**Closing Date**").  The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Standard Time, on the Closing Date.

**8.2  Deliveries by the Seller at the Closing.**  At the Closing, Seller shall furnish and deliver to the Purchaser the following:

(a)  the Bill of Sale, duly executed by the Seller;

(b)  the Assignment and Assumption Agreement, duly executed by the Seller;

(c)  a certificate, dated as of the Closing Date and signed the Seller, certifying that each of the conditions set forth in **Sections 7.2(a)** and **7.2(b)** have been satisfied;

(d)  a copy of the Sale Order;

(e)  evidence of satisfaction of Section 6.11; and;

(f)  all other certificates, instruments and documents reasonably required to be delivered by the Seller pursuant to this Agreement or any of the Ancillary Documents.

**8.3  Deliveries by the Purchaser at the Closing.**  At the Closing, Purchaser shall furnish and deliver to Seller the following:

(a)  the Forty-Six Million, Two Hundred Seventy-Five Thousand Dollar ($46,275,000) portion of the Base Purchase Price in excess of the Escrow Amount and the Liquidated Cure Costs by wire transfer of immediately available funds to an account designated in writing by the Seller;

(b)  reimbursement of up to One Million Dollars ($1,000,000) of Tail Coverage Costs as provided in Section 3.2(d);

(c)  the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)  a certificate, dated as of the Closing Date and signed the Purchaser, certifying that each of the conditions set forth in **Sections 7.3(a)** and **7.3(b)** have been satisfied; and

(e)  evidence of satisfaction of Section 6.9;

(f)  evidence of satisfaction of Section 6.10; and

(g)  all other certificates, instruments and documents required to be delivered by the Purchaser pursuant to this Agreement or any of the Ancillary Documents.

**8.4  Additional Actions Taken by the Purchaser at the Closing.**  At the Closing, Purchaser shall take the following actions:

(a)  Pay the Liquidated Cure Costs from the Base Purchase Price to the respective Persons entitled to receive them.

(b)  Fulfill its covenants under Sections 6.8, 6.9 and 6.10 of this Agreement.

**ARTICLE IX.**
**TERMINATION**

**9.1  Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)  By mutual written consent of the Seller and the Purchaser;

(b)  By (i) the Seller if, as of the day after the Outside Closing Date, any condition to the obligation of the Seller to close has not been satisfied, provided, however, that if the Closing has not occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Seller, then Seller may not terminate this Agreement pursuant to this Section 9.1(b), and (ii) the Purchaser if, as of the day after the Outside Closing Date, any condition to the obligation of the Purchaser to close has not been satisfied provided, however, that if the Closing has not occurred on or before the after the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then the Purchaser may not terminate this Agreement pursuant to this Section 9.1(b);

(c)  By Purchaser, in its sole and absolute discretion, if the sum of the (i) CMS Discharge Amount, and (ii) without duplication of the CMS Discharge Amount, (A) the Liquidated Cure Costs, and (B) the good faith estimate by Purchaser of the amount of any Cure Costs related to Assigned Contracts which will become Liquidated Cure Costs after the Closing Date, exceeds Three Million Dollars ($3,000,000);

(d)  Automatically, and without further action by any Party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated hereby, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(e)  Automatically, and without further action by any Party, if the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or is dismissed, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(f)  By the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, and if (i) the Seller fails to close on the Closing Date notwithstanding the

18

satisfaction of all conditions to the obligation of the Seller to close (other than conditions related to deliveries to be made at Closing by the Purchaser provided the Purchaser is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Seller herein become untrue or inaccurate such that the condition set forth Section 7.2(a) would not be satisfied or (iii) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.2(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Seller;

(g)  By the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (i)  the Purchaser fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Purchaser to close (other than conditions related to deliveries to be made at Closing by the Seller provided the Seller is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Purchaser herein become untrue or inaccurate such that the condition set forth in Section 7.3(a) would not be satisfied or (iii) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.3(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Purchaser;

(h)  Automatically, and without further action by any Party, upon the earlier of (A) Closing with the Successful Bidder, and (B) the Outside Closing Date.

**9.2** .**Effect of Termination.**  Except as provided in this Section 9.2, in the event of the termination of this Agreement pursuant to Section 9.1, this Agreement (other than this Section 9.2, which shall survive such termination) will forthwith become void, and there will be no liability on the part of any Party to the other and all rights and obligations of any Party will cease, except that nothing herein shall relieve any Party from liability for any intentional and material breach of this Agreement.

## ARTICLE X.
## INDEMNITY

**10.1  Indemnification by Seller**.

(a)  Subject to this Article X and consummation of the Closing, Seller shall, indemnify, defend and hold harmless Purchaser and Purchaser's officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each, a "Purchaser Indemnified Party") against and in respect of any and all out-of-pocket losses, documented and reasonable costs and expenses (including, without limitation, documented and reasonable costs of investigation and defense and reasonable attorneys' fees), claims, damages, obligations, or liabilities, whether or not involving a third party claim, but only after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Purchaser Indemnified Party in respect of any such claim (collectively, "Losses"), arising out of, based upon or otherwise in respect of:

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00710

(i)  any inaccuracy in or breach of any representation or warranty of Seller made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Purchaser by Seller pursuant to this Agreement (determined in each case without regard to any qualification with respect to materiality, Material Adverse Effect or similar qualification); provided, that the Seller shall not have any liability under this clause (i) (other than with respect any intentional fraud on the part of Seller) unless the aggregate of all Losses asserted under this clause (i) for which Seller would, but for this proviso and but for the $25,000 per claim deductible described below, be liable exceeds on a cumulative basis an amount equal to Two Hundred Thousand Dollars ($200,000.00);

(ii)  any nonfulfillment or breach of any covenant or agreement by Seller under this Agreement or any of the Schedules attached hereto;

(iii)  any Liability or obligation of Seller which is an Excluded Liability; and

(iv)  the ownership of any of the Excluded Assets by Seller after the Closing Date.

(b)  Each Purchaser Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(c)  **NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS TO THE CONTRARY, SELLER WILL NOT BE LIABLE FOR ANY LOSS ASSERTED UNDER  SECTION 10.1(a)(i) UNLESS THE CUMULATIVE LOSSES EXCEED $25,000 IN WHICH CASE SELLER WILL, SUBJECT TO THE OTHER LIMITATIONS IN THIS ARTICLE X, BE LIABLE TO INDEMNIFY THE PURCHASER INDEMNIFIED PARTY ONLY FOR THE EXCESS OVER $25,000; AND THE SOLE REMEDY OF ANY PURCHASER INDEMNIFIED PARTY AGAINST SELLER UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS FOR MONETARY DAMAGES, INCLUDING, WITHOUT LIMITATION, COSTS OF INVESTIGATION AND DEFENSE AND ATTORNEYS' FEES, SHALL BE A TIMELY CLAIM BY PURCHASER PURSUANT TO THE ESCROW AGREEMENT, AND LIMITED TO THE ESCROW AMOUNT.**

**10.2  Indemnification by Purchaser**. Subject to this Article X and consummation of the Closing, Purchaser shall indemnify, defend and hold harmless Seller, Seller's present, former, and future officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each a, "**Seller Indemnified Party**"), against and in respect of any and all Losses arising out of, based upon or otherwise in respect of:

(a)  any inaccuracy in or breach of any representation or warranty of  Purchaser made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Seller by Purchaser pursuant to this Agreement; provided, that the Purchaser shall not have any liability under this clause (a) of Section 10.2 unless the  claims asserted under this clause (a) involves Losses in excess of Twenty-Five

Thousand Dollars ($25,000), at which time Purchaser shall be liable for the full amount of all such Losses in excess of Twenty-Five Thousand Dollars ($25,000.00);

(b) any nonfulfillment or breach of any covenant or agreement by Purchaser under this Agreement or any of the Schedules attached hereto; and

(c) any of the Assumed Liabilities pursuant to this Agreement.

Each Seller Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

**10.3 Indemnification Procedures**.

(a) Within forty five (45) days after receipt by an indemnified party of written notice of the commencement of any Proceeding against it to which the indemnification in this <u>Article X</u> relates, such indemnified party shall, if a claim is to be made against an indemnifying party under this <u>Article X</u>, give notice to the indemnifying party of the commencement of such Proceeding.

(b) If any Proceeding referred to in paragraph (a) above is brought against a Seller Indemnified Party and it gives notice to Purchaser of the commencement of such Proceeding, Purchaser will be entitled to participate in such Proceeding and, to the extent that it wishes, assume the defense of such Proceeding with counsel reasonably satisfactory to such Seller Indemnified Party and, after notice from Purchaser to such Seller Indemnified Party of its election to assume the defense of such Proceeding, Purchaser will not, as long as it diligently conducts such defense, be liable to such Seller Indemnified Party under this Article X for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by such Seller Indemnified Party in connection with the defense of such Proceeding subject to the limitations contained in Section 10.1 hereof, other than reasonable costs of investigation. If Purchaser assumes the defense of a Proceeding, (A) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (B) no compromise or settlement of such claims may be effected by Purchaser without such Seller Indemnified Party's consent unless (1) there is no finding or admission of any violation of law by such Seller Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other claims that may be made against such Seller Indemnified Party, and (2) the sole relief provided is monetary damages that are paid in full by Purchaser. Such Seller Indemnified Party will have no liability with respect to any compromise or settlement of the claims underlying such Proceeding effected without its consent. If notice is given to Purchaser by a Seller Indemnified Party of the commencement of any Proceeding for which such Seller Indemnified Party seeks indemnification hereunder and Purchaser does not, within ten (10) days after such notice is received, give notice to such Seller Indemnified Party of Purchaser's election to assume the defense of such Proceeding, Purchaser will be bound by any determination made in such Proceeding or any compromise or settlement effected by such Seller Indemnified Party.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00712

(c)  If any Proceeding referred to in paragraph (a) above is brought against a Purchaser Indemnified Party, Seller shall be entitled to participate in such Proceeding at its own expense.  However, such Purchaser Indemnified Party shall, in all respects, control the defense and settlement of such Proceeding and Seller shall be liable for all fees and expenses incurred by such Purchaser Indemnified Party and for any liability established by any order of a Governmental Body of competent jurisdiction and for any liability established by any settlement or compromise agreed to by such Purchaser Indemnified Party, in the exercise of its reasonable discretion.

**10.4  Other Claims**.  A claim for any matter not involving a third party claim may be asserted by written notice to the Party from whom indemnification is sought.

**10.5  Seller Indemnification Claim Period**.  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Seller, no claim for indemnification pursuant to Section 10.1 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 which reasonably describes the claim, the basis therefor, and if possible with the exercise of reasonable diligence, the Purchaser Indemnified Party's reasonably-supported estimate of the Losses being asserted, is delivered to Seller on or before the close of business on the day preceding the first (1st) anniversary of the Closing Date (the "**Claims Close Date**") in which case the indemnity with respect to that Loss shall survive the Claims Close Date (but continue to be limited to the funds held in the Escrow Account).  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.6  Purchaser Indemnification Claim Period**.  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Purchaser, no claim for indemnification pursuant to Section 10.2 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 is delivered to Purchaser on or before the Claims Close Date. For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Seller or any Seller Indemnified Party may be entitled.

**10.7  Payment from Indemnification Escrow**.  If a Purchaser Indemnified Party becomes entitled to indemnification from Seller hereunder, such Purchaser Indemnified Party shall be entitled to receive the amount of Losses in cash from the Escrow Account in accordance with the Escrow Agreement, and the recovery of the Purchaser Indemnified Parties shall be limited to such recoveries from the Escrow Account. For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.8  Miscellaneous Indemnification Provisions**.  Disclosures made after the date hereof and any knowledge that is acquired about the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or obligation set forth herein shall not in any manner affect rights to indemnification hereunder based on any such representation, warranty, covenant, or obligation.  The waiver of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or obligation, will not affect any right to

indemnification based on such representations, warranties, covenants and obligations unless otherwise expressly agreed in writing by the party or parties entitled to the benefit thereto.

## ARTICLE XI.
## MISCELLANEOUS

**11.1 Expiration of Representations, Warranties and Agreements.** The representations and warranties and covenants made by Seller and Purchaser in this Agreement and in any Ancillary Document delivered pursuant to this Agreement shall survive beyond the Closing Date.

**11.2 Assignment.** Neither this Agreement nor any interest herein may be assigned or transferred by either Party to any other Person without the prior written consent of the other Party, which consent may be given or withheld in the sole discretion of such other Party provided, however, Purchaser may assign at Closing its rights, but not its obligations, hereunder to any Affiliate of Purchaser.

**11.3 Notices.** All notices, requests and other communications under this Agreement shall be in writing and shall be either (a) delivered in person, (b) sent by certified mail, return-receipt requested, (c) delivered by a recognized delivery service or (d) sent by facsimile transmission and addressed as follows:

| | |
|---|---|
| If intended for Purchaser: | Clint Matthews, President and CEO<br>Tower Health<br>420 N. Fifth Avenue<br>West Reading, PA 19611 |
| With a copy to: | Robert Lapowsky, Esquire<br>Stevens & Lee, P.C.<br>620 Freedom Business Center, Suite 200<br>King of Prussia, PA 19406<br><br>and<br><br>Joanne Judge<br>Stevens & Lee, P.C.<br>111 North Sixth Street<br>Reading, PA 19601 |
| If intended for Seller: | Center City Healthcare, LLC |
| With a copy to: | Jeffrey Hampton<br>Adam Isenberg<br>Saul Ewing Arnstein & Lehr LLP |

23

Appx. 00714

Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided. A notice, request and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 P.M. on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 A.M. on the first Business Day thereafter.

**11.4 Further Assurances.** Each of the Parties hereto shall execute such documents (including, without limitation, the Ancillary Documents) and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby or, at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement.

**11.5 Entire Agreement; Modifications; Waivers.** This Agreement (together with the Exhibits and Schedules hereto), the Ancillary Documents, and the Non-Disclosure Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior understandings of the Parties with respect to the subject matter hereof and thereof. No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each Party. No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver. No waiver will be binding unless executed in writing by the Party making the waiver.

**11.6 Applicable Law; Jurisdiction and Venue; Jury Trial Waiver.** THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE. The Parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; provided, however, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement shall be in the courts of the State of Delaware or U.S. District Court for the District of Delaware, and the Parties each hereby waive any objections they may have with respect thereto (including any objections based upon *forum non conveniens*). **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00715

**11.7  Headings and Captions.**  The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent or otherwise affect the interpretation of, this Agreement or any of the provisions hereof.

**11.8  Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**11.9  Time is of the Essence.**  With respect to all provisions of this Agreement, time is of the essence.  However, if the first date or last date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then, in such event, the time of such period shall be extended to the next day which is a Business Day.

**11.10  Remedies Cumulative.**  Except as herein expressly set forth, no remedy conferred upon a Party by this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law, in equity or by statute.

**11.11  Interpretation and Construction.**

(a)  As used herein the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".

(b)  As used herein, the words "**herein,**" "**hereof,**" "**hereunder**" and similar terms shall refer to this Agreement unless the context requires otherwise.

(c)  For purposes of this Agreement, whenever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural and vice versa.

**11.12  Estoppel.**  Each Party confirms and agrees that (a) it has read and understood all of the provisions of this Agreement; (b) it is familiar with major sophisticated transactions such as those contemplated by this Agreement; (c) it has negotiated with the other Party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**11.13  Joint Preparation.**  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**11.14  Expenses; Transfer Taxes.**

(a)  Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00716

(b)  The Purchaser and Seller shall each pay fifty (50%) percent of all sales, use, transfer, real property transfer, documentary, recording and similar Taxes and fees, and any deficiency, interest or penalty asserted with respect thereof arising out of or in connection with the transactions contemplated hereby ("**Transfer Taxes**").

**11.15  Counterparts.**  This Agreement may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

**11.16  Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

*[Signature page follows.]*

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00717

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above.

SELLER:

**CENTER CITY HEALTHCARE, LLC**

By: _____
　　　Allen Wilen
　　　Chief Restructuring Officer - Finance

PURCHASER:

**READING HOSPITAL**

By: _____
　　　Clint Matthews
　　　President and CEO
　　　Sole Member of Tower Health

*[Signature page to Asset Purchase Agreement]*

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

Appx. 00718

## EXHIBIT A

**Purchased Assets**

The Purchased Assets to be purchased by the Purchaser and sold, conveyed, assigned, transferred and delivered on the Closing Date to the Purchaser by the Seller shall include all of the Seller's right, title and interest in and to all of the following assets, but specifically excluding, however, the Excluded Assets:

1. <u>Assigned Contracts</u>.  All of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on <u>Schedule A-1</u> to this **Exhibit A**.

2. <u>Books and Records</u>.  All Books and Records related to the Purchased Assets, but specifically excluded any Corporate Documents.

3. <u>Governmental Authorizations</u>.  All transferable Governmental Authorizations identified on <u>Schedule A-2</u> to this **Exhibit A**.

4. <u>Rights; Warranty Claims</u>.  All of Seller's rights, claims, counterclaims, credits, causes of action or rights of set-off against third parties that relate to warranties, indemnities, and all similar rights to the extent related to any Purchased Assets.

5. <u>Other Assets</u>.  Those other assets of the Seller identified on <u>Schedule A-3</u> to this **Exhibit A**.

# Schedule A-1

**I.**   **Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health**

**II.**   **Current GME Affiliation Agreements**

1.  Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between the Trustees of the University of Pennsylvania, as the owner and operator of the Hospital of the University of Pennsylvania, and Seller.
2.  Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Prime Healthcare Services Roxborough, LLC, the owner and operator of Roxborough Memorial Hospital, and Seller.
3.  Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 among Temple University Hospital, Seller and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.
4.  Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Friends Behavioral Health System and Seller.

**III.**   **GME Obligations**

**Graduate Hospital/Penn**
- Agreement Regarding Medicare FTE Resident Caps, between the Trustees of the University of Pennsylvania and Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007

**Roxborough and Warminster/Solis**
- Agreement Regarding Medicare FTE Resident Caps between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007
- Second Amendment to Agreement Regarding Medicare FTE Resident Caps; between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 29, 2010

**St. Christopher's Hospital for Children/Temple**
- Academic Affiliation Agreement among Temple and affiliates and Tenet HealthSystem St. Christopher's Hospital For Children, LLC and affiliates dated October 19, 2007

**Hahnemann/Friends**
- Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP dated June 2008
- Memorandum of Understanding for Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP

**IV.**   **The Participating Provider Agreement**

**V.**   **The Tower GME Affiliation Agreement**

Appx. 00720

**Schedule A-2**

**Governmental Authorizations**

- **Acute Care General Hospital License for Hahnemann University Hospital ("HUH") issued by the Pennsylvania Department of Health**
- **Medicare Participation Agreement and associated Medicare Provider Number 390290 issued by the Centers for Medicare & Medicaid Services to HUH. The residents associated with the [36] ACGME-approved Graduate Medical Education Programs at HUH**

**Schedule A-3**

**Other Assets**

**<u>None</u>**

## Exhibit B

### ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT ("Agreement") dated as of [_____] by and between Center City Healthcare, LLC, a Delaware limited liability company ("Assignor"), and Reading Hospital, a Pennsylvania nonprofit corporation ("Assignee").

### BACKGROUND

A. ASSIGNEE AND ASSIGNOR HAVE ENTERED INTO AN ASSET PURCHASE AGREEMENT DATED AS OF [_____] (TOGETHER WITH THE EXHIBITS AND SCHEDULES THERETO, THE "PURCHASE AGREEMENT") PROVIDING FOR, AMONG OTHER THINGS, THE SALE, TRANSFER, CONVEYANCE, ASSIGNMENT, AND DELIVERY BY ASSIGNOR TO ASSIGNEE OF CERTAIN ASSETS OF ASSIGNOR (COLLECTIVELY, THE "PURCHASED ASSETS") THAT ARE OWNED OR USED BY ASSIGNOR IN CONNECTION WITH THE BUSINESS.

B. IN CONNECTION WITH THE SALE AND PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THE PURCHASE AGREEMENT, ASSIGNOR IS TO ASSIGN AND DELEGATE, AND ASSIGNEE IS TO ASSUME, THE ASSIGNED CONTRACTS. CLOSING IS BEING HELD ON THE DATE HEREOF UNDER THE PURCHASE AGREEMENT.

NOW, THEREFORE, pursuant to and in consideration of the Purchase Agreement and the mutual covenants and agreements set forth therein and herein, Assignor and Assignee, each intending to be legally bound, agree as follows:

1. Incorporation of Background; Defined Terms. The Background provisions set forth above (including, without limitation, all of the defined terms set forth therein) are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety in this Section 1. Capitalized terms used herein which are not otherwise defined shall have the respective meanings assigned to them in the Purchase Agreement.

2. Assignment of Rights. Assignor hereby sells, transfers, conveys, and assigns to Assignee all of Assignor's right, title and interest in, to and under all of the Assigned Contracts, each of which are identified on Schedule 1 attached hereto.

3. Delegation of Duties. Assignor hereby delegates to Assignee all of Assignor's duties and liabilities under the Assigned Contracts.

4. Assumption of Liabilities. In partial consideration for the sale of the Purchased Assets by Assignor pursuant to the Purchase Agreement, Assignee hereby undertakes and agrees to assume, discharge, or perform as the case may be, all duties, obligations, and liabilities of Assignor under the Assigned Contracts which are to be performed after, and relate to the period after, the date hereof or which are otherwise assigned to and assumed by the Purchaser under or pursuant to the Purchase Agreement or the Sale Order.

Appx. 00723

5. <u>Assignment of Governmental Authorizations; Etc</u>.  Assignor hereby assigns, sells, transfers, and sets over to Assignee all of Assignor's right, title and interest in, to, and under all of the Governmental Authorizations which are listed on <u>Schedule 2</u> attached hereto, but only to the extent that any of the foregoing may be legally sold, transferred, conveyed, assigned and delivered by Assignor to Assignee without any action by any such applicable federal, state, or local government or regulatory body.

6. <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7. <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the domestic, internal laws of the State of Delaware, without regard to its rules pertaining to the conflict of laws.

8. <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  Any party to this Agreement may deliver an executed counterpart hereof by facsimile transmission or electronic mail (as a Portable Document Format (PDF) file) to the other party hereto and any such delivery shall have the same force and effect as the manual delivery of an original executed counterpart of this Agreement.

*Remainder of Page Intentionally Left Blank*
*Signature Page Follows*

Appx. 00724

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers the day and year first above written.

CENTER CITY HEALTHCARE, LLC

By _____

      Allen Wilen
      Chief Restructuring Officer - Finance
     "Assignor"

READING HOSPITAL

By _____

      Clint Matthews
      President and CEO of Tower Health
      Sole Member of Reading Hospital

      "Assignee"

SCHEDULE 1

ASSIGNED CONTRACTS

Appx. 00726

## SCHEDULE 2

## ASSIGNED GOVERNMENTAL AUTHORIZATIONS

Appx. 00727

## EXHIBIT C

## BILL OF SALE

_____ __, 2019

KNOW ALL BY THESE PRESENTS that CENTER CITY HEALTHCARE, LLC, a Delaware limited liability company (the "Seller"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, has granted, bargained, sold, conveyed, transferred, assigned and delivered, and by this Bill of Sale hereby grants, bargains, sells, conveys, transfers, assigns and delivers, to Reading Hospital, a Pennsylvania nonprofit corporation ("Purchaser"), its successors and assigns, all of the Seller's right, title and interest in and to the Purchased Assets. As used herein, the term "Purchased Assets" has the meaning given to such term in that certain Asset Purchase Agreement, dated as of -_____ __, 2019, by and between the Seller and Purchaser (together with the Exhibits and Schedules thereto, the "Purchase Agreement"), which Purchase Agreement is incorporated herein by this reference.

EXCLUDING, HOWEVER, the "Excluded Assets" (as such term is defined in the Purchase Agreement).

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, forever.

This Bill of Sale is being executed and delivered by the Seller to the Purchaser under and pursuant to Section 8.2(a) of the Purchase Agreement and is subject to the terms and conditions of the Purchase Agreement in all respects.

*Remainder of Page Intentionally Left Blank*

*Signature Page Follows*

35723081.6 09/06/2019

Appx. 00728

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the date and year first set forth above.

CENTER CITY HEALTHCARE, LLC

By _____
      Allen Wilen
      Chief Restructuring Officer - Finance

# EXHIBIT D

## ESCROW AGREEMENT

*[SELLER TO DRAFT USING TEMPLATE FROM JEFFERSON BUT SUBJECT TO TOWER REVIEW]*

**EXHIBIT E**

**SALE ORDER**

**EXHIBIT F**

**BIDDING PROCEDURES ORDER**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Re: Docket No. 142** |
|  | ) |  |

### ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures Order**"): (a) approving the proposed bidding procedures attached as **Schedule 1** to this Bidding Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets; (b) establishing procedures for the assumption and assignment of executory contracts, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

(c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**")[3], the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. 246], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which is attached as Exhibit E to the Stalking Horse Sale Agreement: (x) authorizing the sale of the Residents Program Assets free and clear of Interests as defined in footnote 4, below (the "**Interests**")[4], with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter

---

[3]   The Court has been advised that Reading Hospital, a subsidiary of Tower Health, will actually serve as the Stalking Horse Bidder and, as a result, all references herein to the Stalking Horse Bidder shall be deemed to include Reading Hospital.

[4]   Interests shall include: (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or purchaser's interest in the Assigned Contracts and/or Residents Program Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the Pension Benefit Guaranty Corporation or any plan participant or beneficiary, (iv) tax claims (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, and with respect to the rights described in this sub-clause (v) only as they relate to the Resident Program Assets that are the subject of the Stalking Horse Bidder's Stalking Horse Sale Agreement.

Appx. 00734

pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.     The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D.      Notice of the Motion, as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order, was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Residents Program Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Residents Program Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Residents Program Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Health; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Accordingly, no further

notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order is necessary or required.

E.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion as relates to the entry of this Bidding Procedures Order, including, without limitation:   (a) approval of the Bidding Procedures; (b) approval of the selection of the Stalking Horse Bidder and approval of the Break-Up Fee to be paid to the Stalking Horse Bidder under the circumstances described in the Motion; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.      Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

G.      The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair,

Appx. 00737

reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates. The Break-Up Fee: (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H.     The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale Agreement. The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely. Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures). The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

I.     The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required.  The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.     The Auction and Sale Notice attached hereto as **Schedule 5** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d)  identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of all Interests, with all Interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.     All current and former patients of Debtor Center City Healthcare, LLC ("Center City") who have, as of the date of this order, asserted claims against Center City, including but not limited to claims formally asserted by the filing of suit or a proof of claim in these Bankruptcy Cases and claims informally asserted by letter or by a request for medical records

from a lawyer or otherwise (the "Known Patient Creditors") shall be treated as known creditors of the Debtors for purposes of notice requirements related to the Sale.

L.      All current and former patients of Center City who, as of the date of this order, are not Known Patient Creditors (including current and former patients who are not, as of the date of this order, aware that they have or may have claims against the Debtors including such patients as to whom personal injury has not manifested as of the date of this order) (the "Unknown Patient Creditors") shall be treated as unknown creditors of the Debtors for purposes of the notice requirements related to the Sale.

M.      The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.[5]

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.      Timeline for the Sale**

3.      The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order.  The Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), as indicated herein and in the Bidding Procedures, are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take

---

[5]      Notwithstanding anything to the contrary herein, or in the Bidding Procedures, the acceptance of a Bid and Sale Agreement by the Debtors and the consummation of a Sale are subject to entry of the Sale Order.

any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Milestone | Proposed Date |
|---|---|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 |
| Sale Hearing | August 9, 2019 at 11:00 a.m. (prevailing Eastern Time) |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder (Other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) | (may be raised at the Sale Hearing) |

4.     For the avoidance of doubt, the Debtors, in consultation with the Committee, reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

**II.     The Bidding Procedures**

5.     The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety. The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement. The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or

35602324.10 07/19/2019

Appx. 00741

impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest. As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on August 5, 2019. Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.      The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures. The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice). The Auction will be conducted openly and all creditors and the Committee will be permitted to attend.

9.      Any creditor with a valid and perfected lien on all of the Residents Program Assets (each, a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in

-10-

interest to object to or challenge such creditor's lien thereunder (a "**Challenge**")), to credit bid all or any portion of such Secured Creditor's allowed secured claims to purchase the Residents Program Assets to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, unless otherwise ordered by the Bankruptcy Court for cause. The foregoing notwithstanding, any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee. In the event that the Committee, or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected. In the event that such a creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash at the closing of the Sale.

10.     Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up Fee in lieu of cash and have the Break-Up Fee be treated as equal to cash in the same amount for the purposes of evaluating the overbid.

### III.     Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement

11.     The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction. The Break-Up Fee described in the Bidding Procedures is approved. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' closing of the Sale with a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**"). If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; and (b) shall be payable in at closing on the Alternative Transaction without further order of this Court; and

-11-

(c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

## IV.    Notice Procedures

12.    The Auction and Sale Notice is approved.

*A.    Notice of Sale, Auction, and Sale Hearing.*

13.    Within two (2) business days after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the Auction and Sale Notice by first-class mail, electronic mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (a) the Notice Parties, (b) all Residents, and (c) all known creditors of Center City, including any Known Patient Creditors. In addition, on or before the Mailing Date, the Debtors shall serve the *Notice to Residents and Fellows Regarding Proposed Sale of Residency Program Assets* (the "**Residents' Notice**"), in substantially the form attached hereto as  **Schedule 2**, on all Residents by first class mail or electronic mail.

14.    Service of the Auction and Sale Notice and the Residents' Notice as described in paragraph 13 above shall be sufficient and proper notice of the and satisfies all due process requirements.

15.    Within ten (10) days of the date of this Bidding Procedures Order, the Debtors shall cause the notice (the "**Publication Notice**") substantially in the form attached hereto as **Schedule 3** to be published once in the National Edition of *USA Today* and once in the *Philadelphia Inquirer*. The Publication Notice shall be sufficient and proper notice of the Sale to all creditors whose identities are unknown to the Debtors, including all of the Unknown Patient Creditors.

-12-

Appx. 00744

### B. *Notice of Successful Bidder.*

16.　　As soon as reasonably practicable after the Bid Deadline, if no Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, or conclusion of the Auction, if a Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, the Debtors shall file on the docket, but not serve, a notice which shall identify the Successful Bidder.

## V.　<u>Assumption and Assignment Procedures</u>

17.　　The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

### A. *Notice of Assumption and Assignment.*

18.　　The Debtors previously filed with the Court, [D.I. 246], a list (the "**Initial Designated Contracts List**") specifying: (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Initial Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Initial Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Initial Designated Contract (the "**Cure Costs**").

19.　　On the Mailing Date, the Debtors shall serve the Notice of Proposed Assumption and Assignment of Executory Contracts attached hereto as **<u>Schedule 4</u>** (the "**Initial Notice of Assumption and Assignment**") on all Initial Designated Contract Counterparties by first-class

-13-

mail, email or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF.

20.     Any Initial Designated Contract Counterparty may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Initial Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance.  All Contract Objections must:  (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com) and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania, 19102, Attn: Jeffrey C. Hampton (jeffrey.hampton@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder (the "**Contract Notice Parties**") by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Initial Designated Contract Objection Deadline**").  Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

-14-

Appx. 00746

21.     If an Initial Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such Contract Objection will be determined at the Sale Hearing.

> B.     *Modification of Initial Designated Contracts List and Supplemental Notice of Assumption and Assignment.*

22.     Prior to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Stalking Horse Bidder. Subsequent to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Successful Bidder (who may be the Stalking Horse Bidder).

23.     Until the opening of business on the date of the Auction, if another Qualified Bid is received by the Bid Deadline, or the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline, at the request of the Stalking Horse Bidder, the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs. Following the conclusion of the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs, *provided*, *however*, that such deletion of any contracts shall not result in any reduction in the Purchase Price (as defined in the Stalking Horse Sale Agreement"), and any contracts added after the Auction will not be considered in connection with the right of termination in Article 9.1(c) of the Stalking Horse Sale Agreement. For the avoidance of doubt, the Initial Designated Contracts List may be modified more than

once. The contracts listed on the Initial Designated Contracts List, as modified from time to time, are hereafter referred to as the "**Designated Contracts**").

24.     In the event that the Initial Designated Contracts List is modified, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") on the affected counterparty in the same manner as the Initial Notice of Assumption and Assignment was served.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed contracts as was included in the Notice of Assumption and Assignment.

25.     Any counterparty to an executory contract listed on a Supplemental Notice of Assumption and Assignment (each a "**Supplemental Designated Contract Counterparty**") may file an objection with respect to the applicable Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs (but only to the extent reduced  as to contracts included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment), and (b) if such Designated Contract was not included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance.  All Supplemental Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the

Appx. 00748

Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

26.     If a Supplemental Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute, (a) if the Supplemental Contract Objection Deadline is on or before the date of the Sale Hearing, such Supplemental Contract Objection will be determined at the Sale Hearing, and (b) if the Supplemental Contract Objection Deadline is after the date of the Sale Hearing the Debtors will seek an expedited hearing before the Court to determine the Supplemental Contract Objection.  If there is no such Supplemental Contract Objection (or such objection has been resolved), then the Debtors may submit an order to this Court, including by filing a certification of counsel, fixing the applicable Cure Costs and approving the assumption of the contract listed on a Supplemental Notice of Assumption and Assignment.

   C.     *Additional Notice of Assumption and Assignment Procedures.*

27.     If the counterparty to any Designated Contract does not file and serve a Contract Objection or Supplemental Contract Objection, as applicable, in a manner that is consistent with the requirements set forth above, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling with respect to the applicable Designated Contract, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any claim related to such Designated Contract for any default occurring or continuing prior to the date of the assumption

and assignment of such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

28.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.   Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

## VI.     <u>Sale Hearing.</u>

29.     A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at **11:00 a.m. (prevailing Eastern Time) on August 9, 2019**, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder.  The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale.  In the event that the Successful Bidder cannot or refuses to consummate the Sale after the Sale has been approved by the Court, the Debtors may, in consultation with the Committee, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors, in consultation with the Committee, shall be

-18-

authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

30.    Any and all objections, if any, to (a) the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement and (b) entry of the Sale Order approving such Sale (a "**Sale Objection**") must be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pa. 19406 Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Sale Objection Deadline**"). Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder (other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) (an "**Auction Objection**") must be raised at or prior to the Sale Hearing (the "**Auction Objection Deadline**"). Any party failing to timely file a Sale Objection or raise an Auction Objection, as applicable, will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the assets free and clear of any and all Interests. For the avoidance of doubt, if the Stalking Horse Bidder is selected as the Successful Bidder, but its successful Bid is not the Stalking Horse Bid or an increased bid based on an agreement substantially similar to the Stalking Horse Sale Agreement, objections to a Sale

-19-

Appx. 00751

to the Stalking Horse Bidder, limited to the changed terms (excluding any increase in price) may be raised by the Auction Objection Deadline.

**VII.** **Miscellaneous.**

31.     Notwithstanding anything to the contrary in any asset purchase agreement or document relating to the Sale, the purchased assets (including the Residents Program Assets) shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action. The provisions of this paragraphs shall not apply to the Stalking Horse Sale Agreement, as the same may be modified other than any modifications to the defined term "Purchased Assets."

32.     This order and the Bidding Procedures shall be interpreted so as to afford the Debtors, in consultation with the Committee, the greatest opportunity to maximize the value of the Residents Program Assets for the benefit of the Debtors' estates *provided*, *however*, the provisions of this paragraph shall not apply to any matters affecting the Stalking Horse Bidder without the consent of the Stalking Horse Bidder.

33.     The Debtors, in consultation with the Committee as applicable, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

-20-

Appx. 00752

34.     Notwithstanding anything in the Motion, the Bidding Procedures, and/or the July 9, 2019 Stalking Horse LOI to the contrary, nothing in this Bidding Procedures Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability to the United States arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

35.     To the extent the Successful Bid or the Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" of successor liability for any liability to the United States arising from such provider agreement pursuant to section 363(f) of the Bankruptcy Code.

36.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

37.     This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors. Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

38.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions

of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

**Dated: July 19th, 2019**
**Wilmington, Delaware**

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**

# SCHEDULE 1

## BIDDING PROCEDURES

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## BIDDING PROCEDURES

On July 19, 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**").  These Bidding Procedures set forth the process by which the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") as set forth herein, are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July 19, 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**"), or in accordance with the terms of such higher and better offer as determined by the Debtors, in consultation with the Committee, to be the Successful Bidder (defined below).

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

A.    Submissions to the Debtors and the Committee.

All submissions to the Debtors and the Committee required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

a.    **Debtors**.  Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

b.    **Debtors' Counsel**.  Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

c.    **Debtors' Investment Banker**.  SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com).

d.    **Committee's Counsel**.  Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

B.    Potential Bidders.

The Debtors and their financial advisors have identified, and may in the future, in consultation with the Committee, identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**"), other than the Stalking Horse Bidder, must deliver or have previously delivered, if determined to be necessary by the Debtors:

a.    an executed confidentiality agreement on terms acceptable to the Debtors, in consultation with the Committee (a "**Confidentiality Agreement**"), to the extent not already executed; and

b.    the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

-2-

Appx. 00757

C.    Qualified Bidders.

    a.    A "**Qualified Bidder**" is a Potential Bidder:  (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined by the Debtors, in consultation with the Committee; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below).  On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times.  MidCap Funding IV Trust ("**Midcap**"), solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times; *provided* that MidCap Funding IV Trust's right to credit bid shall be subject to the provisions set forth in the Bidding Procedures Order and these Bidding Procedures.

    b.    If any Potential Bidder is determined by the Debtors, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

    c.    Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, in consultation with the Committee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

    d.    Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

D.    Due Diligence.

    a.    **Diligence Provided to Potential Bidders**.

    Only (a) the Stalking Horse Bidder, and (b) Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders other than the Stalking Horse Bidder, the due

diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors, in consultation with the Committee, may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors, in consultation with the Committee, determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors, in consultation with the Committee, determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors, in consultation with the Committee, as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to MidCap and the Committee.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

b. **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Committee, to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

-4-

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

E.      Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors, in consultation with the Committee, in their reasonable business judgment, shall constitute a "**Qualified Bid**." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

   a.    **Assets**. Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

   b.    **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"). The Purchase Price must be in cash consideration and must equal or exceed $7,825,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) and (iii) a $100,000 incremental amount (a "**Minimum Bid**").

   c.    **Deposit**. With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**"). Within three (3) business days after the conclusion of any Auction, the Successful Bidder and Backup Bidder shall submit by wire transfer of immediately available funds, a supplemental cash deposit in an amount that, when added to the amount of the Deposit, is equal to ten (10) percent of the aggregate cash Purchase Price set forth in their respective Successful Bid and Backup Bid. The foregoing notwithstanding, the Stalking Horse Bidder shall not be required to submit any Deposit.

   d.    **Residents**. Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms. Each Bid must further provide a description of the Potential Bidder's accreditation status with the Accreditation Council on Graduate Medical Education, including a description of accredited residency and fellowship programs currently offered by the Potential Bidder and/or expected to be offered in the future.

e. **Same or Better Terms**. Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors, in consultation with the Committee. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors, in consultation with the Committee, that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f. **Contingencies; No Financing or Diligence Outs**. A Bid shall not be conditioned on (i) the Potential Bidder obtaining financing, (ii) approval of the Potential Bidder's shareholders, board of directors or other internal approval, or (iii) the outcome or completion of due diligence by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment, in consultation with the Committee, than those set forth in the Stalking Horse Sale Agreement.

g. **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h. **Demonstrated Financial Capacity**. A Qualified Bidder must have, in the Debtors' business judgment, as determined in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid. Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i.  **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Committee,.

j.  **Binding and Irrevocable**.  A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k.  **Expenses; Disclaimer of Fees**.  Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.  **Authorization**.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Committee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m.  **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

Appx. 00762

n.  **Adherence to Bid Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o.  **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p.  **Consent to Jurisdiction**.  Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q.  **Bid Deadline**.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Bid Deadline**").

The Debtors reserve the right, in consultation with the Committee, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

F.  Right to Credit Bid.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on all of the Resident Program Assets (a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object or challenge such creditor's lien thereunder (a "**Challenge**")) to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause.   In the event that the Committee or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected.  If such creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash as the closing of the Sale.

In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up fee in lieu of cash.

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order.

Any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee.

G.     Auction.

If, prior to the Bid Deadline, the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. By 6:00 p.m. on the date of the Bid Deadline, the Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids were received prior to the Bid Deadline. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement) prior to the Bid Deadline, the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Committee (the "**Baseline Bid**"), and provide copies of all Qualified Bid Documents supporting the Baseline Bid and each other Qualified Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Committee, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, and may include, among other things: (a) the number, type, and nature of any changes to the Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on August 7, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

a.     **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction, in consultation with the Committee as applicable. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of

each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and the Committee and all creditors will be permitted to attend. The Qualified Bidders, including the Stalking Horse Bidder, may appear at the Auction in person or through duly authorized representatives.

b.    **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a)    **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth in the Bidding Procedures Order or these Bidding Procedures (including the requirement of a cash component sufficient to pay all costs of sale including the Break-Up Fee).

(b)    **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may, in consultation with the Committee, announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors and the Committee.

(c)    **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(d)    **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have (i) in the initial Overbid round, identified an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or (ii) in subsequent rounds, identified an Overbid as

-10-

being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors, in consultation with the Committee, as the Prevailing Highest Bid as well as the value attributable by the Debtors, in consultation with the Committee, to such Prevailing Highest Bid.

c.  **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Committee, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors, the Committee, and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with the Committee, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider, in consultation with the Committee, how to value each Overbid.

d.  **Closing the Auction**.

(a)  The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Committee, to be the highest or otherwise best Bid in accordance with the Bid Assessment Criteria. Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed. The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

(b)  The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely.

(c)  As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

**e. No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder. All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors, the Committee, and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

H. Backup Bidder.

    a. Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Committee (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors. The Stalking Horse Bidder shall serve as a Backup Bidder only if (X) the Bid set forth in the Stalking Horse Agreement is not determined to be the Baseline Bid (as defined herein), and (Y) the Stalking Horse Bidder elects, in its sole discretion, to offer a higher and better bid at the Auction. The Stalking Horse Bidder's Bid described in the Stalking Horse Agreement shall not be a Backup Bid absent the express consent of the Stalking Horse Bidder.

    b. The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder. The foregoing notwithstanding, if the Stalking Horse Bidder serves as the Backup Bidder, its Backup Bid shall expire on the earlier of closing on an Alternative Transaction (defined below) or September 6, 2019. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

    c. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Committee, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

-12-

I.      Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights, in consultation with the Committee, to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

J.      Sale Hearing.

A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on **August 9, 2019, at 11:00 a.m. (ET)** before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Committee, by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder). The foregoing notwithstanding, if the Sale Hearing is continued without the consent of the Stalking Horse, the Stalking Horse may terminate the Stalking Horse Agreement.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

K.      Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

The Break-Up fee, to the extent owed by the Debtors, (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; (b) shall be payable at closing on of a Sale to a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**")without further order of the Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

L.      Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors, in consultation with the Committee, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction. The Stalking Horse Bidder shall not be required to provide a Deposit.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

M.      Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures prior to the commencement of the Auction if the Debtors' board of managers determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as the case may be, is required to comply with applicable law or the board's fiduciary obligations thereunder; *provided* that, in the event  the Debtors' board of managers determines to take any action, or refrain from taking any action, pursuant to this paragraph, without the consent of the Stalking Horse Bidder, the Stalking Horse Bidder may, but shall not be required to, terminate the Stalking Horse Agreement if taking such action or refraining from taking such action, as the case may be, would otherwise be grounds for termination under the Stalking Horse Agreement, it being understood that any material modification to the Bid Procedures without the consent of the Stalking Horse would be a breach of the Stalking Horse Agreement pursuant to which the Stalking Horse would have the right to terminate the Stalking Horse Agreement.

35612177.6 07/19/2019

# SCHEDULE 2

# RESIDENT'S NOTICE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) |
|  | ) |

## NOTICE TO RESIDENTS AND FELLOWS
## REGARDING PROPOSED SALE OF RESIDENCY PROGRAM ASSETS

**TO: ALL RESIDENTS AND FELLOWS AT HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Tower Health ("**Tower**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to Tower: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors file a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**"). A copy of the Agreement, the Bidding Procedures Order and the Bidding Procedures is enclosed herewith.

## THE PROPOSED SALE

If approved by the Court, the Agreement will enable residents and fellows (collectively herein, the "**Residents**") at Hahnemann to continue their training at one of six hospitals operated by Tower - Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania. **Residents have a choice, and are not required to continue their training with Tower**. For any Resident who elects to complete their training elsewhere, Tower or the Debtors, as applicable, will release the related cap on Medicare reimbursement on a temporary basis to accommodate that choice.

For Residents who elect to stay with Tower, Tower will provide housing for those residents doing rotations at Reading Hospital, which is sixty miles from Hahnemann. Tower has also agreed to seek to hire the faculty who are currently training Residents at Hahnemann to ensure continuity of the Hahnemann training programs. Tower will also provide free housing (subject to parameters set forth in the Agreement) for the remainder of the academic year or during the term of a resident's existing vacated lease if it is necessary for the Resident to relocate during the current academic year. Residents will receive free meals while in any Tower hospital, and Tower will also provide additional amenities to assist Residents and their families with the transition.

If the Sale is approved by the Court to someone other than Tower, the terms of the Sale, and the impact upon Residents, may be different than those under the Agreement.

The Debtors recognize the unique difficulties and challenges facing Residents in light of the bankruptcy filing and expected closure of Hahnemann. The Debtors believe that the proposed Sale is in the best interests of Residents because it provides Residents with the option to continue their training and, to minimize, to the greatest extent possible, the impact of Hahnemann's closure on Residents, their professional training and education, and their families.

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys,

whose contact information is in the signature block below, for more information.  In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; and (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019                  **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
     Mark Minuti (DE Bar No. 2659)
     Monique B. DiSabatino (DE Bar No. 6027)
     1201 N. Market Street, Suite 2300
     P.O. Box 1266
     Wilmington, DE  19899
     Telephone: (302) 421-6800
     Fax: (302) 421-5873
     mark.minuti@saul.com
     monique.disabatino@saul.com

       -and-

     Jeffrey C. Hampton
     Adam H. Isenberg
     Aaron S. Applebaum (DE Bar No. 5587)
     Centre Square West
     1500 Market Street, 38th Floor
     Philadelphia, PA 19102
     Telephone: (215) 972-7700
     Fax: (215) 972-7725
     jeffrey.hampton@saul.com
     adam.isenberg@saul.com
     aaron.applebaum@saul.com

     *Proposed Counsel for Debtors and*
     *Debtors in Possession*

Appx. 00774

# SCHEDULE 3

# PUBLICATION NOTICE

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
|  | Jointly Administered |
| Debtors. |  |

## NOTICE REGARDING PROPOSED SALE OF RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL INTERESTS, INCLUDING PERSONAL INJURY CLAIMS

**TO:     ALL PERSONS WITH CLAIMS AGAINST THE DEBTORS IN THE ABOVE CAPTIONED CASES, INCLUDING CLAIMS AGAINST HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Reading Hospital (the "**Purchaser**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to the Purchaser: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

**PLEASE TAKE FURTHER NOTICE** that the Sale, if approved, will be free and clear of all Interests, including claims of successor liability.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

**PLEASE TAKE FURTHER NOTICE THAT, IF THE SALE IS APPROVED, THE PURCHASER WILL NOT BE LIABLE ON ACCOUNT OF ANY CLAIMS AGAINST ANY OF THE DEBTORS (OTHER THAN CLAIMS AFFIRMATIVELY ASSUMED BY THE PURCHASER), INCLUDING CLAIMS OF PATIENTS TREATED AT HAHNEMANN, INCLUDING CLAIMS OF WHICH THE HOLDER MAY NOT BE PRESENTLY AWARE.**

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors filed a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which sets forth certain key dates and deadlines in connection with the proposed Sale. In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids. A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**").

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys, whose contact information is below, for more information. In addition, Residents should contact their Program Director with questions specific to their situation.

## Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower, and (d) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee.

## <u>CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION</u>

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Mark Minuti*

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Proposed Counsel for Debtors and
Debtors in Possession*

35642133.2 07/19/2019

Appx. 00778

# SCHEDULE 4

## INITIAL NOTICE OF ASSUMPTION AND ASSIGNMENT

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## NOTICE OF PROPOSED ASSUMPTION AND
## ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 and July 1, 2019 (the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion [D.I. 142] (the "**Sale Motion**") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets (the "**Residents Program Assets**") to Tower Health (the "**Stalking Horse Bidder**"), including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"), attached as **Exhibit B** to the Sale Motion; (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July 19, 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") [D.I. [●]] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herewith.

      **PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder, or any other Successful Bidder, the Designated Contracts. A schedule listing the Designated Contracts (the "**Designated Contracts List**") is attached hereto and may also be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "**Cure Payments**") is set forth on the Designated Contracts List.

      **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO AN INITIAL DESIGNATED CONTRACT IN THE INITIAL DESIGNATED CONTRACTS LIST**. Under the terms of the proposed Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Designated Contracts until the opening of business on the date of the Auction, or until the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline. Following the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Payments. If the Initial Designated Contracts List is modified, the Debtors will serve a supplemental notice of assumption and assignment on the affected counterparty, which shall identify the deadline for filing an objection with respect to the applicable Designated Contract.

### IMPORTANT PROPOSED DATES AND DEADLINES

1.     The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "**Sale Order**") and all objections related to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m. (ET)** (the "**Sale Objection Deadline**").

2.     The Auction for the Residents Program Assets, if one is necessary, will commence on **August 7, 2019 at 10:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

3.     A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

35599108.3 07/19/2019

Appx. 00781

## FILING ASSUMPTION AND ASSIGNMENT OBJECTIONS

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("**Designated Contract Objections**"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on August 5, 2019**. Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

Failure to timely file a timely Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE A TIMELY OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE PROPOSED BIDDING PROCEDURES ORDER AND THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

35599108.3 07/19/2019

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:*/s/ Aaron S. Applebaum*
 Mark Minuti (DE Bar No. 2659)
 Monique B. DiSabatino (DE Bar No. 6027)
 1201 N. Market Street, Suite 2300
 P.O. Box 1266
 Wilmington, DE 19899
 Telephone: (302) 421-6800
 Fax: (302) 421-5873
 mark.minuti@saul.com
 monique.disabatino@saul.com

 -and-

 Jeffrey C. Hampton
 Adam H. Isenberg
 Aaron S. Applebaum (DE Bar No. 5587)
 Centre Square West
 1500 Market Street, 38th Floor
 Philadelphia, PA 19102
 Telephone: (215) 972-7700
 Fax: (215) 972-7725
 jeffrey.hampton@saul.com
 adam.isenberg@saul.com
 aaron.applebaum@saul.com

 *Proposed Counsel for Debtors and*
 *Debtors in Possession*

-4-

Appx. 00783

## Designated Contracts List

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Master Agreement for Shared Rotational Arrangements with Hahnemann University Hospital dated June 29, 2007 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $0.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Temple University Hospital | Academic Affiliation Agreement with Tenet HealthSystem St. Christopher's Hospital for Children, LLC, dated October 19, 2007 | $0.00 |
| 15 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |

35599108.3 07/19/2019

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 17 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |
| 18-X | [INDIVIDUAL RESIDENTS] (to be provided and/or filed under seal) | Resident Employment Contract | $0.00 |

35599108.3 07/19/2019

Appx. 00785

# SCHEDULE 5

# AUCTION AND SALE NOTICE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) | |
| *al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 and July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale and Bidding Procedures Motion**")[2] seeking the entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of certain of the Debtors' assets to Tower Health (the "**Stalking Horse Bidder**") for $7.5 million plus the assumption of certain contracts and responsibilities of the Debtors with respect to Residents at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) the form and manner of notices related to the Sale; and (c) procedures for the assumption and assignment of contracts in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that on July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety. To the extent that there are any inconsistencies between the Bidding Procedures and the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bidding Procedures Motion.

summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects. The deadline by which all Bids must be *actually received* by the parties specified in the Bidding Procedures Order is August 5, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Residents Program Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

| Proposed Investment Banker to Debtors | Proposed Counsel to Debtors |
|---|---|
| SSG Advisors, LLC<br>Five Tower Bridge, Suite 420<br>300 Barr Harbor Drive<br>West Conshohocken, PA 19428<br>J. Scott Victor (jsvictor@ssgca.com)<br>Teresa Kohl (tkohl@ssgca.com)<br>Craig Warznak (cwarznak@ssgca.com)<br>(610) 940-3615 | Saul Ewing Arnstein & Lehr LLP<br>1201 N. Market Street, Suite 2300<br>Wilmington, Delaware 19899<br>Mark Minuti (mark.minuti@saul.com),<br>Jeffrey C. Hampton (jeffrey.hampton@saul.com),<br>Aaron S. Applebaum (aaron.applebaum@saul.com)<br>(215) 972-7777 |

## Obtaining Additional Information

Copies of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Purchase Agreement and all other documents filed with the Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

## Important Dates and Deadlines

1. The deadline to submit a Qualified Bid is August 5, 2019 at 4:00 p.m. (prevailing Eastern time).

2. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "**Sale Order**") and all objections relating to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m.** (prevailing Eastern time) (the "**Sale Objection Deadline**").

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Residents Program Assets. The Auction, if one is necessary, will commence on August 7, 2019 at 10:00 a.m. (prevailing Eastern time), or such other date as determined by the Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre

Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

4. Objections to the conduct of the Auction and the terms of a sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "**Auction Objections**") may be raised at the Sale Hearing (as defined below).

5. A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Court on **August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

**Filing Objections**

Sale Objections, if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

**CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

        -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

# TAB 10

|   |   |
|---|---|
| 1 | UNITED STATES BANKRUPTCY COURT |
|   | DISTRICT OF DELAWARE |
| 2 |   |
|   | .    Chapter 11 |
| 3 | IN RE:                          . |
|   | .    Case No. 19-11466 (KG) |
| 4 | CENTER CITY HEALTHCARE, LLC,     . |
|   | d/b/a HAHNEMANN UNIVERSITY       . |
| 5 | HOSPITAL, *et al.*,              . |
|   | .    Courtroom No. 3 |
| 6 | .    824 North Market Street |
|   | .    Wilmington, Delaware 19801 |
| 7 | . |
| 8 | Debtors.      .    September 4, 2019 |
|   | . . . . . . . . . . . . . . .    10:00 A.M. |
| 9 |   |
|   | TRANSCRIPT OF OMNIBUS HEARING |
| 10 | BEFORE THE HONORABLE KEVIN GROSS |
|   | UNITED STATES BANKRUPTCY JUDGE |
| 11 |   |
| 12 | APPEARANCES: |
| 13 | For the Debtors:        Mark Minuti, Esquire |
|   | John Demmy, Esquire |
| 14 | Monique DiSabatino, Esquire |
|   | SAUL EWING ARNSTEIN & LEHR LLP |
| 15 | 1201 N. Market Street |
|   | Wilmington, Delaware 19801 |
| 16 |   |
| 17 | - and - |
| 18 | Aaron Applebaum, Esquire |
|   | 1500 Market Street |
| 19 | Philadelphia, Pennsylvania 19102 |
| 20 |   |
|   | Audio Operator:         GINGER MACE |
| 21 |   |
|   | Transcription Company:  Reliable |
| 22 | 1007 N. Orange Street |
|   | Wilmington, Delaware 19801 |
| 23 | Email:  gmatthews@reliable-co.com |
| 24 | Proceedings recorded by electronic sound recording, transcript |
| 25 | produced by transcription service. |

```
 1   APPEARANCES (Continued):

 2   For the Committee:        Andrew H. Sherman, Esquire
                               SILLS CUMMIS & GROSS P.C.
 3                             1 Riverfront Plaza, Suite 10
                               Newark, New Jersey 07102
 4
 5   For SBJ Group:            R. Stephen McNeill, Esquire
                               POTTER ANDERSON & CORROON LLP
 6                             Hercules Plaza
                               1313 North Market Street, 6th Floor
 7                             P.O. Box 951
                               Wilmington, Delaware 19801
 8
     For Reading Hospital:     Robert Lapowsky, Esquire
 9                             STEVENS & LEE
                               620 Freedom Business Center Suite 200
10                             Valley Forge, Pennsylvania 19406
11
     For U.S. Government:      Marc Sacks, Esquire
12                             Commercial Litigation Branch
                               Civil Division
13                             UNITED STATES DEPARTMENT OF JUSTICE
                               P.O. Box 875
14                             Ben Franklin Station
                               Washington, D.C. 20044
15
     For Jefferson Health:     Patrick Jackson, Esquire
16                             Marita Erbeck, Esquire
                               DRINKER BIDDLE & REATH LLP
17                             222 Delaware Avenue Suite 1410
                               Wilmington, Delaware 19801
18
19                             - and -

20                             Andrew Kassner, Esquire
                               One Logan Square, Suite 2000
21                             Philadelphia, PA 19103

22   For MidCap:               Gretchen Santamour, Esquire
                               STRADLEY RONON
23                             2005 Market Street
                               Philadelphia, Pennsylvania 19103
24
25
```

1  APPEARANCES (Continued):

2  For the Pennsylvania        David Smith, Esquire
   Department of Health:       SCHNADER HARRISON SEGAL & LEWIS LLP
3                              1600 Market Street, Suite 3600
                               Philadelphia, PA 19103
4

5  For the U.S. Trustee:       Juliet Sarkessian, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
6                              OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
7                              Lockbox 35
                               Wilmington, Delaware 19801
8

9  For KPC Global Health:      Brett Fallon, Esquire
                               MORRIS JAMES LLP
10                             500 Delaware Avenue, Suite 1500
                               Wilmington, Delaware 19801
11

12 For AAMC/ECFMG:             Justin Alberto, Esquire
                               BAYARD, P.A.
13                             600 N. King Street, Suite 400
                               Wilmington, Delaware 19801
14 For Tenet & Conifer:        Timothy Cairns, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
15                             919 North Market Street, 17th Floor
                               Wilmington, Delaware 19801
16

17 For PASNAP:                 Mitchell Malzberg, Esquire
                               LAW OFFICES OF MITCHELL J. MALZBERG
18                             6 E Main Street, Suite 7
                               Clinton, New Jersey 08809
19
                               - and -
20
                               Claiborne Newlin, Esquire
21                             MARKOWITZ & RICHMAN LLP
                               123 S. Broad Street
22                             Philadelphia, PA 19109

23 For Strategic Global:       Gary Klausner, Esquire
                               LEVENE NEALE BENDER YOO & BRILL
24                             10250 Constellation Boulevard
                               Suite 1700
25                             Los Angeles, California 90067

1

INDEX

2

**#1.** Debtors' Motion for Entry of Orders (I)(A) Establishing
Bidding Procedures Relating to the Sale of the Debtors'

3
Resident Program Assets, Including Approving a Break-Up Fee,
(B) Establishing Procedures Relating to the Assumption and

4
Assignment of Certain Executory Contracts, Including Notice
of Proposed Cure Amounts, (C) Approving Form and Manner of

5
Notice Relating Thereto, and (D) Scheduling a Hearing to
Consider the Proposed Sale; (II)(A) Approving the Sale of the

6
Debtors' Resident Program Assets Free and Clear of All Liens,
Claims, Encumbrances, and Interests, and (B) Authorizing the

7
Assumption and Assignment of Certain Executory Contracts; and
(III) Granting Related Relief [D.I. 142; filed: 07/09/19]

8

9

10   DEBTORS' WITNESS(s)

11   **J. Scott Victor**

12          Direct examination by Proffer          24

13          Cross-examination by Mr. McNeill         38

14   **Allen Wilen**

15          Direct examination by Proffer          42

16          Cross-examination by Mr. Sherman        53

17          Cross-examination by Mr. Lapowsky       55

18          Cross-examination by Mr. McNeill         58

19          Cross-Examination by Mr. Sacks          62

20

21   **Laurence Merlis**

21          Direct examination by Proffer          71

22          Cross-examination by Mr. Sacks          77

23          Cross-examination by Mr. McNeill         82

24          Cross-examination by Mr. Smith          87

25          Redirect examination by Ms. Erbeck       88

| | EXHIBITS: | ID | Rec'd |
|---|---|---|---|
| D-1 | Copy of the Auction Transcript | | 24 |
| D-2 | Copy of the Asset Purchase Agreement With Jefferson Consortium | | 24 |
| D-3 | Copy of Asset Purchase Agreement With Backup Bidder, Reading Hospital | | 90 |
| D-4 | Demonstrative | | 67 |
| D-5 | Provider Agreement | | 91 |

 1          (Proceedings commenced at 9:01 a.m.)

 2          (Call to Order of the Court)

 3                THE COURT:  Good morning everyone.  You may be

 4    seated.

 5                Mr. Minuti, good morning.

 6                As I was walking in I was thinking, apropos to

 7    this case, if an apple a day keeps the doctor away what keeps

 8    the judge away.  And if you can think of anything, let me

 9    know.

10          (Laughter)

11                MR. MINUTI:  Not much, Your Honor.  We appreciate

12    that.

13                Your Honor, for the record Mark Minuti from Saul

14    Ewing Arnstein & Lehr here on behalf of the debtors.  At

15    counsel table with me today, Your Honor, is my partner

16    Jeffrey Hampton.

17                THE COURT:  Mr. Hampton, yes.

18                MR. MINUTI:  Also in the courtroom today, Your

19    Honor, is Allen Wilen our CRO.

20                THE COURT:  Good morning.  Welcome.

21                MR. MINUTI:  Two rows back hiding is Mr. Victor

22    our investment banker.

23                THE COURT:  I see him, yes.

24                MR. MINUTI:  Your Honor, we're very pleased to be

25    here today and simply by way of preview, Your Honor, as I

1  mentioned at our last hearing, a case altering event occurred

2  in these cases during the auction of the debtor's residency

3  program assets on the evening of August 8th.  Following

4  fifteen rounds of bidding the debtors, in consultation with

5  the committee, ultimately accepted the winning bid of the

6  Thomas Jefferson University Hospital for the debtor's

7  residency asset or residency program assets.

8           Jefferson is working with a consortium of

9  healthcare providers in our region including Albert Einstein

10 Healthcare Network, Main Line Health, Inc., Temple University

11 Health Systems, Christiana Care Health Systems and the Cooper

12 Health System.

13          Your Honor, it's fitting that the, what I'll the,

14 Jefferson consortium was the winning bidder, that

15 approximately 350 of our former Hahnemann University Hospital

16 residents have already accepted positions with members of the

17 consortium and given the proximity of members of the

18 consortium to Hahnemann University Hospital, as a practical

19 matter, Your Honor, they have, essentially, taken over

20 patient care for the patients that formally went to Hahnemann

21 University Hospital.

22          As a result of the sale process that was approved

23 by this court the bid for these assets went from the stalking

24 horse bid of $7.5 million dollars to a gross bid of $55

25 million dollars.  This is a game changer for our cases.  It

1  will transform these cases and provide the debtors with a

2  host of options and opportunities to address a number of

3  concerns raised.  There is no question, Your Honor, that this

4  sale, if approved and once approved, will be beneficial to

5  our patients, our residents, our creditors.

6         We have five items on today's agenda.  Item Number

7  5 has been continued.  Items 2, 3 and 4 were all retention

8  applications of the committee's professionals.

9         THE COURT:  Yes.

10         MR. MINUTI:  I know that certificates of no

11  objection have been filed and --

12         THE COURT:  I didn't see orders, unfortunately.

13  Maybe they were -- the copies that I got of the certificates

14  of no objection did not have the orders with them.

15         MR. MINUTI:  Mr. Sherman advised me before Your

16  Honor took the bench that the orders have been uploaded.

17         THE COURT:  All right.

18         MR. MINUTI:  So, unless Your Honor has any

19  objection what I would suggest is at some point today we can

20  get to those orders.

21         THE COURT:  We will.  We will get those docketed

22  today.

23         MR. SHERMAN:  Your Honor, we also have hard copies

24  if that's easier.

25         THE COURT:  We can just take care of the uploaded

1   versions.

2          MR. SHERMAN:  Thank you, Mr. Sherman.

3          MR. MINUTI:  Your Honor, with that that does bring

4   us to the main event which is approval of our sale of our

5   resident program assets.

6          THE COURT:  Yes.

7          MR. MINUTI:  What I would like to do, Your Honor,

8   is simply provide a little bit of background and set the

9   table procedurally in terms of how I got here.  I do have two

10  witnesses in support of the motion; that would be both Mr.

11  Wilen and Mr. Victor.

12         Then, what I think makes sense, Your Honor, we

13  have a handful of objections remaining outstanding to the

14  sale, but the most complicated one, I think, is the objection

15  of the Government.  What I would propose is we address that

16  first because I think that will lead to, hopefully, resolving

17  some of the other objections or, at least, giving some

18  guidance in terms of how to deal with those.

19         Let me ask you this question because I also have

20  an objection from, is it, SJB wanting to purchase Hahnemann

21  as a going concern?

22         MR. MINUTI:  Correct, Your Honor.

23         THE COURT:  Should we hear that first, do you

24  think?

25         MR. MINUTI:  Your Honor, I'm happy to deal with

1  that first.  Your Honor may remember because we touched on

2  this a little bit because SBJ had objected to our motion at

3  the last hearing to reject a number of contracts related to

4  Hahnemann University Hospital.

5          THE COURT:  Yes.

6          MR. MINUTI:  Your Honor, Mr. Victor's testimony

7  will touch on a little bit of SBJ, but at the end of the day

8  SBJ is a disgruntled bidder.  They were not qualified to

9  purchase these assets.  Your Honor, they were not a qualified

10 bidder.  They did not submit a qualified bid and what their

11 objection basically says, Your Honor, is, look, I've got an

12 interest in acquiring Hahnemann University Hospital and

13 keeping it open.  So, don't approve this sale; leave things

14 open and maybe I'll bid.

15         The reality, Your Honor, is SBJ has offered

16 nothing.  There is no firm commitment to do anything.  There

17 is no commitment of financing.  There was all sorts of

18 contingencies in the bid that they did submit.  So, Your

19 Honor, what it really comes down to is business judgment.  We

20 will put on evidence of this, Your Honor, but certainly from

21 the debtor's position there is no reason, Your Honor, to

22 jeopardize a $55 million dollar sale for a "hope note" that

23 somebody is going to open Hahnemann University Hospital.

24         Now, when people say that, Your Honor, people get

25 excited, the press likes it, certainly the community likes

1    it.  Look, if there was a way to save Hahnemann University

2    Hospital, and I've said this many times, Your Honor, we would

3    have been all over it, but there simply was not way to do

4    that.  So, what we have, Your Honor, is we have SBJ, we also

5    have an entity called KPC.

6              THE COURT:  Yes.

7              MR. MINUTI:  You know, they're out there, Your

8    Honor, indicating that in the event that Your Honor turns

9    down this sale that they'd like to do something.  We've

10   talked to them, we will continue to talk to them, if there's

11   a way for some transaction to happen, Your Honor, we're

12   certainly willing to listen and to work to make that happen.

13   But nothing Your Honor is going to do today is going to

14   prohibit the sale of Hahnemann University Hospital if that's

15   what they want.

16             Now what's going to happen today is, if Your Honor

17   approves the sale, they're not going to be able to acquire

18   the resident slots, but they had a full and fair opportunity

19   to do that.  They could have bid like everybody else.  When

20   it comes to SBJ, Your Honor, they didn't even submit a

21   qualified bid for what we're selling today.  And when it

22   comes to KPC they dropped out at $29 million dollars, Your

23   Honor, and the bid ultimately went to $55 million dollars.

24             So, Your Honor, with regard to SBJ I will say

25   this, Your Honor; SBJ brought a token claim in the case to

1  give them standing, but, again, Your Honor, they've offered

2  and committed to do nothing here. I don't think Your Honor

3  should give their objection any weight.

4          With respect to KPC they did not object, Your

5  Honor.  They simply filed a notice indicating that they're

6  out there if Your Honor doesn't approve the sale today.

7          THE COURT:  Right.

8          MR. MINUTI:  I don't believe they have standing.

9  I think I've addressed that, Your Honor, but I will cede the

10 podium, I guess, at this point to SBJ's counsel to respond.

11         THE COURT:  All right.  Thank you, Mr. Minuti.

12         Mr. McNeill, good morning.

13         MR. MCNEILL:  Good morning, Your Honor; Steve

14 McNeill from Potter Anderson & Corroon here on behalf of SBJ

15 Group.

16         I guess the order has been changed up a little

17 bit, but I think certainly Mr. Minuti addressed my objection.

18 So, I think now is the time to deal with it.

19         With respect to SBJ's commitment or lack thereof,

20 Your Honor, SBJ is in the process of getting together a

21 committed financing package for $60 million dollars which

22 exceeds the current amount on the table for just the

23 residency program alone.  That would be -- you know, as we've

24 said from the start that would be related to a sale of,

25 substantially, all the assets of Hahnemann Hospital itself.

1  Those assets include the residency program, the MPI number,

2  the hospital license, et cetera.

3        I know the debtors say that my clients bid is

4  subject to a bunch of contingencies and, you know, ultimately

5  we weren't even able to bid at the auction because we

6  wouldn't bid solely for a subset of the assets, but that

7  position, conveniently, ignores the difficulties in trying to

8  get financing commitments to purchase an asset that the

9  debtor is steadfastly refusing to sell.  Investors are slow

10  to react to financing proposals where there is no clear court

11  approved path to acquiring the assets at issue.

12        Your Honor, with respect to, you know, approving

13  the sale today does nothing to our interest in acquiring the

14  rest of the hospital.  I think the residency program is

15  clearly a large component of the operating hospital, of the

16  going concern value of the hospital. And if you sell the

17  residency program the remnants of the hospital, especially

18  since it was a teaching hospital, are worth far less in value

19  and it's hard to restart a hospital from the ground with no

20  residents, no anything.

21        This process -- we believe this process has been

22  rushed, Your Honor.  There is probably some legitimate

23  reasons for that.  They're not entirely clear to me why when

24  you have not only SBJ, but now another bidder as well; both

25  of whom who have expressed interest in purchasing the

1  hospital on a going concern basis.  Why, at least, that

2  wasn't a potential avenue at the auction that was permitted

3  to see if truly a bid for, substantially, all the assets

4  would be a higher and better bid then a piecemeal sale of

5  just the residency program.

6         If Your Honor would allow, it would slow the

7  process down and permit bidding on the entire hospital as a

8  going concern.  The subsequent auction involving, at least,

9  two bidders and perhaps others would provide an even greater

10 return to the bankrutpcy estate.  I think there is no

11 question that the current auction did produce, I think, an

12 unexpected and very positive result, but it doesn't mean that

13 it's the highest and best value if you sell everything at the

14 same time.

15        Perhaps more importantly my client's bid, if

16 successful, would keep Hahnemann University Hospital open as

17 an acute care facility to serve the medical needs of the

18 members of the Philadelphia community that it is long served

19 including, in particular, some low income residents which I

20 think everyone agrees is what Hahnemann was doing a lot of

21 that kind of work.

22        Your Honor, my client has also been in close

23 contact with the Commonwealth of Pennsylvania and its

24 political sub-divisions.  We're informed that the

25 Commonwealth strongly favors a plan that would maintain

1    Hahnemann as an acute care facility and SBJ has the ability

2    to do so.  SBJ's principals have already turned around one

3    community hospital in Michigan that it acquired out of

4    bankruptcy.  So, they have experience doing this.

5              THE COURT:  I was going to ask who SBJ was or is.

6              MR. MCNEILL:  Its --

7              THE COURT:  Its SBJ Group, I believe.

8              MR. MCNEILL:  -- a group of individuals who have -

9    - I think SBJ is a new entity, but the principals have

10   acquired a hospital out of bankruptcy in the past in

11   Michigan.  They also operate another, I believe it's some

12   kind of a teaching hospital in the Caribbean as well.  So,

13   they do have experience in that regard.

14             They believe they're very close to having the full

15   commitment for the $60 million dollars.  As I said, Your

16   Honor, you know the circumstances of this case and the

17   debtors stanch unwillingness to even consider a going concern

18   bid has made the acquisition of financing much more

19   difficult, but we strongly believe that if the asset were

20   available as a going concern that our financing would be

21   firmly committed at that point in an amount in excess of the

22   current bid.

23             I guess, finally, Your Honor, the objection that I

24   think you're going to hear from the Government and others are

25   very complicated complex somewhat political issues; lots of

1  federal regulations involved.  This bid -- if our bid is

2  allowed to go forward, and an auction goes forward and there

3  ultimately is a going concern sale of Hahnemann University

4  Hospital that would eliminate, I believe, most if not all of

5  the objections raised by not only the Federal Government, but

6  also by Pennsylvania and the other entities as well it would

7  deal with the assignment issues, it would deal with the

8  Medicare issues, it would deal with the residency slot

9  issues; it would deal with pretty much every objection in

10 this case if that sale were allowed to go forward.

11          I understand a bird-in-the-hand is something

12 that's not easily turned down, but here where there are, at

13 least, two bidders who have indicated an interest in

14 purchasing the hospital on a going concern basis, I think

15 it's worth considering especially given the infirmities in

16 the current sale, at least, in the view of the Federal

17 Government.

18          THE COURT:  All right.

19          MR. MCNEILL:  Unless you have any other questions

20 that's all I have, Your Honor.

21          THE COURT:  I don't have any questions right now,

22 Mr. McNeill.  I think the best way to handle this, perhaps,

23 because Mr. Minuti, you indicated that Mr. Victor will be

24 testifying somewhat with respect to this issue.

25          MR. MINUTI:  Correct, Your Honor.

1          THE COURT:  So, I think we'll wait and I'll hear

2   that testimony.

3          MR. MCNEILL:  Okay.  Thank you, Your Honor.

4          THE COURT:  Here's Mr. Fallon.

5          MR. FALLON:  Good morning, Your Honor; Brett

6   Fallon for KPC Global Health.

7          THE COURT:  Yes.

8          MR. FALLON:  I have on the phone with me Gary

9   Klausner from the firm of Levene Neale Bender Yoo & Brill.

10  And if now would be a good time to hear from KPC I would like

11  to introduce Mr. Klausner.

12         THE COURT:  I don't know that they have standing

13  to be heard.  Is that right, Mr. Minuti?

14         MR. MINUTI:  I would object to this, Your Honor.

15  They have no standing.  They're not a creditor, they're not a

16  party in interest, they're not challenging the procedure we

17  used to sell the hospital; they're really a disgruntled

18  bidder.  They have nothing to add to this proceeding.  We

19  would object.

20         THE COURT:  I'm going to sustain the objection.

21         MR. KLAUSNER:  Your Honor, its Gary Klausner.  If

22  I could have a minute I'd like to address that.

23         THE COURT:  Well, I'll give you one minute.

24         MR. KLAUSNER:  Thank you.

25         Your Honor, I wouldn't consider us disgruntled.

1   We participated in the process properly.  We filed the

2   necessary agreement, supporting papers.  We were a qualified

3   bidder.  We did attend the bid.  Our client did provide proof

4   of financing, actually, at one point during the auction.  We

5   provided proof of financing to go up to $100 million dollars.

6           Our client has the history and experience of

7   owning and operating numerous hospitals, not only in

8   California, but in other parts of the world.  And our client

9   has a particular history of purchasing distressed hospitals

10  in connection with this. I've been involved -- in fact, I

11  represented the debtor in some cases in which KPC has

12  purchased hospitals out of bankruptcy proceedings, and turned

13  them around and operated them successfully.

14          We chose not to file a formal objection because,

15  frankly, our position isn't really an objection of such to

16  the transaction.  What we are attempting to do, not

17  inconsistently with the other party, but as somebody who did

18  qualify and did participate in the bid.  We're here to

19  provide an option for the debtor, and the other stakeholders

20  and the community which is a better outcome then that being

21  presented to you today.  And in particular there are two

22  advantages to what we're attempting to do.

23          Number one, from the standpoint of the community

24  our client is willing to reopen the hospital and our client

25  has experience in taking over distressed properties.

1          Secondly, our client's purchase, if it takes over

2    the hospital, avoids the confrontation wiht CMS which

3    regardless of what you do may end up in appeals that are

4    going to delay the process.

5          Thirdly, our client is willing to work with

6    Jefferson.  This is to say they've agreed to work with us,

7    but we're willing to with Jefferson in order to provide

8    Jefferson with slots that they may need while at the same

9    time allowing the hospital to re-open, allowing our client to

10   obtain the license, Medicare number and the remaining slots

11   to benefit everybody.

12         So, you know, to call us disgruntled isn't really

13   a fair characterization.  We're here because we think we can

14   provide a better outcome for the debtor, its stakeholders and

15   the community than anybody else standing before you.  And we

16   think that the process should allow the parties and the

17   stakeholders to get the best outcome possible including that

18   for the community.

19         THE COURT:  Yes.  Mr. Minuti, go ahead.

20         MR. MINUTI:  Your Honor, if I could just reply

21   briefly.

22         THE COURT:  Yes.

23         MR. MINUTI:  So, here's what I'm hearing; if we

24   bid $60 million dollars, right -- and by the way, this is the

25   first time we heard SBJ make a bid of $60 million dollars.

1   Think about it, if we bid $60 million dollars, and if we do

2   our due diligence, and we decide we want to go forward, and

3   if we can do this, and if we can get that, and maybe this

4   will happen, and maybe that will happen it will all be a

5   better outcome for everybody.

6           The reality is, Your Honor, that we've been in

7   bankruptcy since June 30th, July 1st, right.  The first day

8   of this case, crystal clear, it's been in the papers almost

9   every day we're closing the hospital.  Everybody knows that

10  the hospital is being closed and so if somebody wants to bid

11  on it they need to come forward, Your Honor.  That was June

12  30th, August 1st.

13          On 7/19, July 19th Your Honor entered bid

14  procedures.  We sent those procedures out.  Everybody knew

15  what was happening here.  Okay.  We had a bid deadline of

16  August 6th, Your Honor.  A bid deadline of August 6th.

17          THE COURT:  Which you extended.

18          MR. MINUTI:  Well, it got extended to August 6th,

19  but a bid deadline of August 6th.  What we've received, Your

20  Honor, is hope, contingencies, maybe this will happen, keep

21  it open for thirty days and maybe I'll place a bid, maybe it

22  will be $60 million dollars.  By the way, I need to get the

23  real estate, maybe I get it, maybe I don't; oh, by the way,

24  this has to happen.  I mean there are tons of contingencies

25  here and that is why, Your Honor, we're not moving forward

1  with any of these bids.

2         With regard to -- I mean we're going to put on

3  some evidence with respect to SBJ, Your Honor, but the

4  reality is we have a firm transaction here today for $55

5  million dollars.  And what you have, Your Honor, is a lot of

6  hearsay.  You have a lot of testimony from lawyers, but you

7  don't have anybody on the stand saying here's my ten percent

8  deposit.  We're ready to go forward.  You don't have that

9  because they're not.  If they were we wouldn't be here today,

10 Your Honor, with this transaction.

11        So, we don't have the luxury of putting at risk a

12 $55 million dollar transaction for the personal benefit of

13 these two bidders who would like to get the resident slots.

14 If they wanted the resident program, Your Honor, they could

15 have bid on it.  Right.

16        THE COURT:  Yes.

17        MR. MINUTI:  If they want the remaining assets of

18 Hahnemann we're all ears, let's talk about it.

19        THE COURT:  Well, look, Judge Walsh, who just

20 passed away last and who's funeral is tomorrow, used to say

21 at sale hearings that if Warren Buffet showed up with a check

22 and was willing to proceed on the same terms he would accept

23 that offer, but we don't have that here.  I agree with you,

24 Mr. Minuti, we have contingency on contingency it seems to

25 me.  I will certainly hear the testimony. And I'm not ruling

1    at this time, but I am inclined to reject these proposals.

2              MR. MINUTI:  Thank you, Your Honor.

3              MR. KLAUSNER:  Your Honor, if I could just jump-

4    in.  And I apologize, it's not the norm for me to be on a

5    CourtCall, but this is important.

6              My client is actually with me on the phone and he

7    has authorized me to go to $60 million dollars for the

8    residency assets alone.  We would have very much liked to bid

9    on the hospital.  We didn't create the sale process or the

10   sale procedures.  And, indeed, we reacted promptly and

11   submitted a qualified bid and explained to all parties at the

12   auction why we thought it was sensible to allow us to bid on

13   the hospital.

14             But if the only sale that is going to take place

15   today is for the residency program assets then our client is

16   prepared to bid on those assets alone.

17             THE COURT:  Well, the auction is closed as far as

18   the court is concerned.  I think the record represents that.

19   So, I am not going to accept, obviously, a telephonic bid of

20   $60 million dollars.  We have $55 million dollars here and

21   that is what we're going to hear today.  Thank you.

22             MR. KLAUSNER:  Thank you, Your Honor.

23             THE COURT:  Mr. Minuti, yes.

24             MR. MINUTI:  Thank you, Your Honor.

25             Your Honor, with that I'd like to proceed to

1   evidence.  Again, I've got two witnesses, Your Honor; Mr.

2   Victor and Mr. Wilen.  I am prepared to proffer both

3   witnesses or put them on the stand, whatever the court's

4   pleasure is.

5           THE COURT:  Well, I certainly would accept a

6   proffer.  Do I hear any objection to a proffer being made?

7       (No verbal response)

8           THE COURT:  Hearing none I would ask you to

9   proceed by proffer then, Mr. Minuti.

10          MR. MINUTI:  Thank you, Your Honor.

11          Before that, Your Honor, I do have a couple of

12  brief exhibits for today's hearing if I may approach.

13          THE COURT:  Yes.  All right.  Thank you.

14          MR. MINUTI:  Your Honor, we have four exhibits in

15  the binder.  The first exhibit is a copy of the transcript of

16  the auction itself.  The second exhibit is a copy of the

17  asset purchase agreement with the Jefferson consortium.  The

18  third exhibit is a copy of the asset purchase agreement with

19  our backup bidder, Reading Hospital.  Finally, the fourth

20  exhibit is a demonstrative exhibit that Mr. Wilen will

21  testify to.

22          What I would like to do at this time is move into

23  evidence the first three exhibits.  I don't believe there is

24  any objections, but let me pause and see if anybody does have

25  an objection.

 1                THE COURT:  Any objection?

 2          (No verbal response)

 3                THE COURT:  Hearing none the exhibits are

 4    admitted.

 5          (Debtor's Exhibits 1 and 2, admitted into evidence)

 6                MR. LAPOWSKY:  Your Honor?

 7                THE COURT:  Yes.  Mr. Lapowsky, good morning.

 8                MR. LAPOWSKY:  Good morning, Your Honor; Robert

 9    Lapowsky for Reading Hospital.

10                I just want to take a look at what was put in as

11    the Reading Hospital backup bid.  So, the -- if you could

12    just reserve on that one until I have a chance to look at it

13    I would appreciate it.

14                THE COURT:  I will do that.

15                MR. LAPOWSKY:  Thank you.

16                THE COURT:  Yes.

17                MR. MINUTI:  Your Honor, our goal is to get the

18    right one in.  So, if it's the wrong one we will fix that.

19                THE COURT:  I understand.

20                MR. MINUTI:  May I proceed, then, with Mr.

21    Victor's proffer, Your Honor?

22                THE COURT:  Yes.

23                MR. MINUTI:  With me today, in the courtroom, is

24    J. Scott Victor.  If called to the stand to testify Mr.

25    Victor would testify as follows.

1    Consistent with prior hearings, Your Honor, I'm

2  going to skip Mr. Victor's background if acceptable to the

3  court.

4    THE COURT:  That's fine.

5    MR. MINUTI:  Mr. Victor would testify that on or

6  about July 9th, 2019 the debtors and Tower Health executed a

7  letter of intent attached to the motion, the sale motion, to

8  effectuate the sale of the debtor's resident's program

9  assets, subject to a court approved sale process and subject

10  to higher and better bids.  On or about July 19th, 2019 the

11  debtors and Reading Hospital, as assignee and designee of

12  Tower Health, finalized and filed the asset purchase

13  agreement consistent with the letter of intent.

14    Mr. Victor would testify that by order dated July

15  19th, 2019 the court approved Reading Hospital as a stalking

16  horse granting Reading Hospital a break-up fee of $225,000

17  dollars upon the satisfaction of certain conditions and

18  approved the bidding procedures to establish an orderly

19  process for soliciting higher and better bids for the

20  resident's program assets.

21    Specifically, the bidding procedures included a

22  bid deadline of August 5th, 2019 followed by an auction, if

23  necessary, on August 7th, 2019 and a sale hearing scheduled

24  for August 9th, 2019 at ten o'clock in the morning.  With the

25  courts permission the sale hearing was ultimately continued

1  until today.

2         Mr. Victor would testify that following the

3  debtor's execution of the letter intent his firm, SSG Capital

4  Advisors, contacted approximately 111 healthcare providers

5  and institutions who may have interest in acquiring the

6  debtor's resident's program assets and sent those contacts a

7  form of confidentiality agreement. Following the entry of the

8  bidding procedures order the SSG team followed up with a

9  number of interested parties.  Of the parties contacted ten

10 signed confidentiality agreements, six parties engaged in

11 various levels of due diligence.

12        Mr. Victor would testify that SSG and the debtor's

13 management conducted numerous in-person meetings with

14 potential bidders.  By electronic mail dated August 1st, 2019

15 the debtors were advised that the University of Pennsylvania

16 Health System would be collaborating with Tower Health and

17 Reading Hospital regarding an increased bid for the

18 resident's program assets in the event there was an auction.

19        Mr. Victor would testify that during the marketing

20 process a serious and credible bidder requested that the bid

21 deadline be extended to provide more time for this bidder to

22 finalize its bid.  After consulting with the unsecured

23 creditor's committee and consistent with the bid procedures

24 Mr. Victor would testify that on August 2nd, 2019 the debtors

25 notified Tower, Reading Hospital of its decision to briefly

1  extend the bid deadline and to move the auction by one day.

2        By notice dated August 2nd, 2019 the debtors

3  notified all potential bidders and all parties in interest

4  that the bid deadline was moved to four p.m. Eastern time on

5  August 7th, 2019 and that the auction was moved to August

6  8th, 2019.

7        Mr. Victor would testify that by August 7th, 2019

8  -- that by the August 7th, 2019 bid deadline the debtor

9  received three bids in addition to the stalking horse bid of

10  Reading Hospital.  Bids were submitted by SBJ Group,

11  Strategic Global Management, Inc., or KPC, Your Honor, and

12  Thomas Jefferson University Hospital working with a

13  consortium of healthcare providers including Albert Einstein

14  Healthcare Network, Christiana Care Health Systems, Main Line

15  Health Inc., Temple University Health System and the Cooper

16  Health System.

17        During the evening of August 7th, 2019 Mr. Victor

18  would testify that the debtor's chief restructuring officer,

19  Mr. Wilen, the debtor's professionals and the committee's

20  professionals met at Saul Ewing's offices in Philadelphia to

21  analyze the various bids.  During that meeting the debtors,

22  in consultation with the committee, qualified the bids

23  submitted by KPC and the Jefferson consortium.  Mr. Victor

24  would testify that each of the qualified bidders were

25  informed that they were qualified and the two qualified

1   bidders -- excuse me, qualified bids were shared with each of

2   the qualified bidders including Reading Hospital.

3           Even though the debtors were not seeking to sell

4   the other assets of Hahnemann University Hospital Mr. Victor

5   would testify that serious consideration was given to the

6   bids submitted by SBJ Group, Inc., which proposed, subject to

7   numerous conditions, the possibility of purchasing a

8   significant portion of Hahnemann University Hospital's assets

9   and keeping Hahnemann University Hospital open.

10          Ultimately, Mr. Victor would testify, however,

11  that the debtors, in consultation with the committee,

12  determined that the SBJ bid was not a qualified bid for a

13  host of reasons including the SBJ bid was at the minimum

14  purchase price to get into the auction, $7.825 million

15  dollars, but that price was subject to downward adjustment

16  based upon further required due diligence.

17          Further, Mr. Victor would testify that the SBJ

18  bid, including other significant valuable Hahnemann

19  University Hospital assets, for no additional consideration

20  including acquiring the real property necessary for the

21  hospital's operation by way of a purchase or lease on

22  undisclosed terms acceptable to SBJ.  The bid also included

23  furniture, fixtures, equipment, computers, computer systems,

24  accounts receivable and so on.  Mr. Victor would further

25  testify that the SBJ bid was determined not to be a qualified

1   bid because it was accompanied by a contingent financial

2   commitment letter from a third-party for only $10 million

3   dollars.

4            Mr. Victor would testify that the SBJ bid was

5   contingent on ordinary course operations of Hahnemann

6   University Hospital while SBJ conducted further due diligence

7   for an unspecified period of time notwithstanding the fact,

8   Your Honor, that Hahnemann University Hospital's patient care

9   was being wound-down and the debtors lacked the funds, as a

10  practical matter, to continue providing patient care.

11  Finally, Mr. Victor would testify that the SBJ bid was

12  entirely contingent on further due diligence described by

13  SBJ's counsel of at least thirty days with no commitment to

14  purchase anything.

15           On the evening of August 8th Mr. Victor would

16  testify that he called SBJ's counsel and informed him that

17  SBJ's bid was not qualified for the reasons already stated.

18  Mr. Victor invited SBJ to come to Saul Ewing's offices the

19  day of the auction, encouraged SBJ to amend and limit its bid

20  to only the resident program assets and expressed the

21  debtor's willingness to continue discussions with SBJ

22  regarding its desire to acquire other Hahnemann University

23  Hospital assets to keep Hahnemann University Hospital open.

24           Mr. Victor would further testify that the

25  representatives of SBJ did come to Saul Ewing's offices on

1  the day of the auction and that Mr. Victor and debtors

2  counsel met with SBJ, and, again, encouraged it to modify its

3  bid to the resident program assets only.  SBJ refused to

4  amend its bid.  So, there was no need to discuss with SBJ the

5  other concerns with its bid.  SBJ left before the auction

6  began.

7           Mr. Victor would testify that representatives of

8  the debtor, the committee, the qualified bidders, and various

9  creditors and parties in interest convened at Saul Ewing's

10 offices at ten o'clock a.m. on August 8th for purposes of

11 conducting and participating in the auction.  During the

12 morning and afternoon Mr. Victor would testify that he, the

13 debtor's CRO, and the debtor's counsel met with each of the

14 qualified bidders to ask questions and to clarify certain

15 provisions of each bid.

16          Mr. Victor would testify that from the debtor's

17 perspective the bid submitted by the Jefferson Consortium was

18 substantially similar to the stalking horse bid submitted by

19 Reading Hospital.  The bid submitted by KPC was different.

20 Like SBJ, KPC's asserted goal was to acquire further assets

21 of Hahnemann University Hospital to keep Hahnemann University

22 Hospital open.  Like SBJ, at KPC's proposal for continuing

23 the operations of Hahnemann University Hospital was subject

24 to further unspecified due diligence, a need to obtain

25 control of non-debtor real estate, whether by purchase or

1   lease, and various other conditions.

2        Unlike SBJ, however, KPC was willing to

3   participate in the auction for the resident program assets

4   with the understanding that no credit would be given at the

5   outset for the expression -- sorry, for the expressed desire

6   to possibly purchase other assets of Hahnemann University

7   Hospital and keep Hahnemann University Hospital open.

8        To the extent bids were changed or amended during

9   the day of the auction or during the auction, itself, Mr.

10  Victor would testify that the other qualified bidders were

11  informed of such changes or provided with written copies of

12  such changes when available.  Mr. Victor would testify that

13  based upon discussions and changes made to bids during the

14  day the debtors, in consultation with the committee, selected

15  the bids submitted by KPC as the highest and best baseline

16  bid to begin the auction.  That bid provided gross

17  consideration of $8,825,000 dollars.

18       The auction, itself, began at approximately 5:30

19  p.m. Eastern time.  At the beginning of the auction Mr.

20  Victor and the debtor's counsel announced the KPC bid as the

21  baseline bid and informed all parties of the rules of the

22  auction.  Mr. Victor would testify that the auction lasted

23  approximately six hours and consisted of approximately

24  fifteen rounds of bidding.  There were frequent breaks during

25  the auction.

1          Throughout the auction the debtors regularly

2     consulted with the committee.  Mr. Victor would testify that

3     at one point toward the end of the auction Reading Hospital

4     announced that Drexel University Hospital of Medicine was

5     providing it with certain financial support related to its

6     future bids or further bids.

7          Mr. Victor would testify that ultimately the

8     debtors, in consultation with the committee, selected the

9     final bids submitted by the Jefferson Consortium as the

10    highest and best bid for the debtor's resident's program

11    assets providing gross consideration of $55 million dollars

12    consisting of cash in the amount of $51 million dollars, a $3

13    million dollar escrow and a commitment to reimburse the

14    debtors for $1 million dollars in tail insurance for all

15    Hahnemann University Hospital residents for the period of

16    time the residents provided services to Hahnemann University

17    Hospital through the closing.

18         Reading Hospital's last bid provided adequate

19    consideration of up to $51 million dollars and was selected

20    as the highest and best backup bid consistent with the bid

21    procedures.  The bid consisted of cash in the amount of

22    $46,775,000 dollars, a $3 million dollar escrow, a $1 million

23    dollar tail insurance coverage reimbursement and a credit bid

24    of their breakup fee, Your Honor, of $225,000 dollars.

25         Mr. Victor would testify that the terms of the

1  Jefferson consortium's final bid are set forth in the asset

2  purchase agreement which has now been admitted before the

3  court at Exhibit 2.  Mr. Victor would testify that Reading

4  Hospital's backup bid is substantially similar to the winning

5  bid of Jefferson Consortium except that the gross

6  consideration is lower.  He would identify the document

7  attached to our binder as Exhibit 3 as the backup bid of

8  reading Hospital.

9         Mr. Victor would testify that each bid includes a

10  number of contracts to be assumed and assigned to the buyer.

11  There are no cure amounts associated with any of the

12  contracts to be assumed and assigned.  He would further

13  testify that to his knowledge neither the Jefferson

14  consortium nor Reading Hospital are affiliated in any way

15  with the debtors or the debtor's insiders.

16         Mr. Victor would testify that to his knowledge

17  both the Jefferson consortium and Reading Hospital acted in

18  good faith during the due diligence and auction process and

19  that negotiations between the debtors, and the Jefferson

20  consortium and Reading Hospital were at arm's length and

21  fair.  Mr. Victor is not aware of any facts to suggest that

22  the bids of either the Jefferson consortium or Reading

23  Hospital were the product of bad faith or collusion among

24  bidders.

25         Mr. Victor would testify that the debtors complied

1  with the court approved bid procedures, that the sale process

2  was complete, that all bidders had a full and fair

3  opportunity to bid on the debtor's residency program assets

4  and the winning bid of the Jefferson consortium and the

5  backup bid at Reading Hospital represents the highest and

6  best offers for the purchase of those assets.  Because the

7  winning bid and backup bid were the product of a full and

8  fair auction process Mr. Victor would testify that the

9  purchase price to be paid for the assets represents the

10  highest and best price available under the circumstances.

11          Mr. Victor would testify that he read the notice

12  filed by KPC and would encourage the court to give it no

13  weight.  KPC is a California based for profit operator who

14  dropped out of the bidding for the resident program assets at

15  a little over $29 million dollars.  Mr. Victor would testify

16  that while KPC's notice suggests that it is now prepared to

17  bid $60 million dollars and keep Hahnemann University

18  Hospital open KPC has not committed to do anything and can

19  walk away at any time.

20          Mr. Victor would testify that there are

21  significant contingencies to KPC's expression of interest

22  including, again, unspecified due diligence and other

23  conditions.  In Mr. Victor's judgment it would be foolish and

24  contrary to the best interest of the debtor's estates to

25  abandon the sale of the resident program assets in favor of

1   KPC's vague suggestions.

2            Finally, Mr. Victor would testify that he read the

3   objection filed by the United States to the proposed sale and

4   is aware that in the objection the Government criticized the

5   debtor for failing to communicate with the Government

6   regarding the sale.  Mr. Victor would testify that on

7   Thursday, August 22nd, 2019 he attended an approximate three

8   and a half hour meeting at Saul Ewing's Philadelphia office

9   with the debtor's counsel, representatives of the Government

10  and representatives of the Jefferson consortium.

11           Mr. Victor would testify that the purpose of the

12  meeting was to attempt to resolve the Government's concerns

13  regarding the proposed sale.  During the meeting Mr. Victor

14  would testify that he, representatives of the debtor, and the

15  Jefferson consortium described the proposed transaction, the

16  fact that the Jefferson consortium has, as a practical

17  matter, become the successor to Hahnemann University

18  Hospital's patient operations at their own hospitals and they

19  answered any questions raised by the government.

20           Mr. Victor would testify that while both the

21  debtors and the Jefferson consortium attempted to engage the

22  Government in discussions as to whether the transaction

23  structure could be changed or amended to resolve the

24  Government's concerns the Government simply did not engage

25  and there were no negotiations.

 1                    That would complete his testimony, Your Honor.

 2                    THE COURT:  All right.  Mr. Victor is in the

 3    courtroom.  Does anyone wish to cross-examine Mr. Victor?

 4                    Mr. Lapowsky, how about Exhibit 3?

 5                    MR. LAPOWSKY:  Exhibit 3 is not the final version,

 6    Your Honor.  That is the only reason that I rise.

 7                    THE COURT:  All right.

 8                    MR. LAPOWSKY:  Exhibit 3 is going to have to be

 9    replaced.  There were some negotiations last night and into

10    this morning.  So, I believe Mr. Applebaum is having the

11    corrected form of the Reading Hospital agreement brought over

12    to the court so that it can be made part of the record.

13                    THE COURT:  All right.  Good morning.

14                    MR. APPLEBAUM:  Good morning, Your Honor; Aaron

15    Applebaum for the debtors.

16                    That is correct.  We did file the final version of

17    the backup bid asset purchase agreement this morning under

18    certification of counsel.  It's at Docket Number 635.

19    Unfortunately, the exhibit binders were created without that

20    final version being placed in.

21                    THE COURT:  All right.

22                    MR. APPLEBAUM:  The corrected copies or the

23    updated copies are being brought over as we speak and we will

24    replace them in binders.

25                    THE COURT:  All right.  That's fine.  Thank you.

1          MR. APPLEBAUM:  Thank you, Your Honor.

2          MR. LAPOWSKY:  And, Your Honor, one more thing I

3  would note is that when the revised APA gets here you're

4  going to see that it does not have two exhibits attached to

5  it.  One is the sale order, that would be the Reading

6  Hospital sale order, and the other is the escrow agreement.

7  Both of those -- the sale order certainly is close to final,

8  if not final, but it's not attached.  It will track pretty

9  closely to the Jefferson order, but it will have some

10 differences.  So, those two documents still remain to be

11 finalized.

12         THE COURT:  All right.  Should I wait to admit

13 then Exhibit 3 until we have those other exhibits?

14         MR. LAPOWSKY:  It's not my case, Your Honor, but I

15 would not see the need to not admit Exhibit 3 as revised as

16 long as it's subject to those qualifications that I put on

17 the record.

18         THE COURT:  All right.

19         MR. MINUTI:  Your Honor, Mark Minuti.

20         So the record is clear, let me withdraw the

21 Exhibit 3 that we have entered.  When the final version gets

22 here I'll ask Your Honor to admit it at that time.

23         THE COURT:  That's fine.  Thank you, Mr. Minuti.

24         MR. LAPOWSKY:  Thank you, Your Honor.

25         THE COURT:  Mr. McNeill, did you wish to cross-

 1  examine Mr. Victor?

 2          MR. MCNEILL:  Yes, Your Honor.  I have a few

 3  questions.  If others do I'm happy to defer to them and go at

 4  the end as they may have similar questions, but I'm also

 5  happy to go first.

 6          THE COURT:  All right.  I will let you go first.

 7  Mr. Victor, if you will come forward, sir.  Good morning, Mr.

 8  Victor.

 9          MR. VICTOR:  Good morning.

10          THE COURT:  If you will remain standing while your

11  testimony is affirmed.

12           J. SCOTT VICTOR, DEBTOR WITNESS, SWORN

13          THE CLERK:  Please state and spell your name for

14  the record.

15          THE WITNESS:  J. Scott Victor, V-I-C-T-O-R.

16          THE CLERK:  Thank you.

17          THE COURT:  All right.  Mr. McNeill, you may

18  proceed.

19          MR. MCNEILL:  Thank you, Your Honor.

20                        CROSS EXAMINATION

21  BY MR. MCNEILL:

22  Q    Good morning, Mr. Victor.

23  A    Good morning.

24  Q    Steve McNeill from Potter Anderson & Corroon.  I don't

25  believe we have met before, but I am counsel for SBJ Group

1  here in Delaware, at least.  I have a few questions about

2  your proffered testimony.

3      First, Mr. Minuti read in your proffer that SSG sent

4  out approximately 111 flyers or something to that effect to

5  your contacts.  Was SBJ one of those contacts?

6  A    SBJ was not one of those 111, but SBJ did sign an NDA

7  for the Hahnemann sale when we originally tried to sell

8  Hahnemann as a going concern.  And the SBJ Group did due

9  diligence.

10 Q    So, SBJ was one of the ten confidentiality agreements

11 even though they weren't part of the 111?

12 A    Correct.

13 Q    And once it got down to the three initial bidders Mr.

14 Minuti, in a proffer, indicated that you gave serious

15 consideration to SBJ's bid, but there were a number of

16 reasons why that bid was ultimately not deemed to be a

17 qualified bidder.  Is that correct?

18 A    Correct.

19 Q    One of those conditions was that the bid was for a sale

20 of substantially all the assets of Hahnemann Hospital

21 including a condition that required the acquisition of the

22 lease for the property in which the hospital sits, is that

23 correct?

24 A    Or the actual fee of the real estate.

25 Q    Okay.  In your experience, if someone is seeking to

1  purchase substantially all the assets of an operating entity,

2  and in particular a hospital, would the acquisition of the

3  property on which it sits or, at least, the lease on which it

4  sits be a necessary part of that bid?

5  A    It would be.

6  Q    And similarly there was an indication that SBJ's offer

7  included the purchase of certain fixtures, and equipment and

8  accounts receivable.  Is it true that that is also consistent

9  with an offer to purchase, substantially, all the assets?

10  A    Not necessarily the accounts receivable, no.

11  Q    But the fixtures and the equipment certainly would be

12  included in that part of the sale?

13  A    Sure, but that's not what we were selling.

14  Q    I understand.  And also Mr. Minuti indicated that it

15  was not the debtor's initial intention to sell the hospital

16  as a going concern, is that correct?

17  A    It was.  Prepetition we marketed the hospital and went

18  out to a broad market to try to see if anyone would buy

19  Hahnemann as a going concern prior to the filing and prior to

20  the shutdown process.

21  Q    And SBJ participated in that process or they came

22  later?

23  A    SBJ came a little bit later, but they were part of the

24  process looking at Hahnemann as a going concern.

25  Q    Okay.  So, then is it fair to say that prepetition you

 1  did a process, you determined that there was no interest in

 2  the hospital as a going concern and so, ultimately, you

 3  pivoted to -- the debtor's pivoted to attempt to sell the

 4  resident program only?

 5  A    Yes, but there wasn't a lot of time in the prepetition

 6  marketing process for trying to sell Hahnemann as a going

 7  concern.  There wasn't cash available.  The shutdown process

 8  had to be initiated based upon our financing and negotiating

 9  a debtor-in-possession financing package with MidCap.  So,

10  there just wasn't time for a long period of marketing for

11  Hahnemann as a going concern.

12  Q    And do you think that if you had more time and you had

13  the necessary funding that you would have -- if you had that

14  time and that financing do you think you would have made a

15  stronger effort to sell the hospital as a going concern?

16  A    No.  I think we did go out to all the logical parties,

17  in our view.  SBJ and KPC came a bit later with their

18  expression to purchase Hahnemann as a going concern, but by

19  that time the shutdown process had been initiated.  So, it

20  was very difficult to sell Hahnemann as a going concern.  We

21  just didn't have the capital or the liquidity under the DIP

22  financing.

23  Q    And have you done a valuation of the remaining assets

24  that are not included in this sale of Hahnemann Hospital?

25  A    No.

```
 1   Q     Do you have any intention of doing evaluation and/or
 2   trying to sell those assets in a separate process?
 3   A     Well, I know the CRO has a good idea of what he
 4   believes that the equipment is worth. People have been out,
 5   various liquidators and firms that purchased medical
 6   equipment have been on site and have expressed interest in
 7   buying that equipment or, at least, marketing that equipment
 8   for sale.  And the CRO also knows what the accounts
 9   receivable are and will endeavor to collect them.
10   Q     Okay.  And I don't know if you can answer this question
11   without disclosing confidential information, but do you
12   believe that the value of those assets is worth more than $5
13   million dollars?
14   A     I believe the value of the accounts receivable and the
15   fixed assets on hand are greater than $5 million dollars,
16   yes.
17             MR. MCNEILL:  I have no further questions.  Thank
18   you.
19             THE COURT:  Thank you, Mr. McNeill.
20             Does anyone else wish to cross-examine Mr. Victor?
21         (No verbal response)
22             THE COURT:  All right.  You may step down, Mr.
23   Victor.  Thank you.
24         (Witness excused)
25             MR. MINUTI:  Your Honor, my next witness by way of
```

1 proffer would be the CRO Allen Wilen.  Mr. Wilen is in the

2 courtroom today, Your Honor.  If called to the stand to

3 testify he would testify as follows.

4    Again, Your Honor, same with Mr. Victor, I will

5 skip Mr. Wilen's background.

6    THE COURT:  Yes.

7    MR. MINUTI:  Mr. Wilen would testify that he

8 signed a declaration in support of various first-day motions

9 in these Chapter 11 cases and that the information set forth

10 in his first-day declaration remains true and correct today.

11 As Mr. Wilen has previously testified the debtors could not

12 afford to keep Hahnemann University Hospital fully open and

13 operating since shortly before the petition date and

14 continuing to this day the debtors have taken steps to wind-

15 down the operations of Hahnemann University Hospital.  That

16 being said, Mr. Wilen would testify that Hahnemann -- excuse

17 me.  That being said, Mr. Wilen would testify that Hahnemann

18 University Hospital remains in business today and is

19 continuing to provide various services to the community and

20 will do so until the shut-down plan is completed.

21    Mr. Wilen would testify that once it was clear

22 that there was no viable alternative to closing the Hahnemann

23 University Hospital the debtors began working with SSG

24 Capital Advisors, the debtor's investment banker, to explore

25 options for the disposition of the debtor's resident's

1 program assets.  Because Hahnemann University Hospital is in

2 the process of closing he would testify that the debtors no

3 longer had a need for the resident program assets, but that

4 those assets, in fact, do have value to others looking to

5 expand their own residency training efforts and programs.

6 　　　　　Mr. Wilen would testify that Tower Health was

7 immediately identified as the potential purchaser of the

8 resident program assets.  On or about July 9th, 2019 the

9 debtors and Tower Health executed a letter of intent attached

10 to the sale motion to effectuate the sale of the debtor's

11 resident program assets subject to higher and better bids.

12 That same day the debtor filed the sale motion before the

13 court.

14 　　　　　Mr. Wilen would testify that on July 19th, 2019

15 the debtors filed the asset purchase agreement with Reading

16 Hospital as the assignee/designee of Tower Health.  Mr. Wilen

17 participated in the meeting of the evening of August 7th to

18 analyze the various bids that were received in connection

19 with the auction.  After consulting with the official

20 committee of unsecured creditors Mr. Wilen would testify that

21 the debtors qualified two other bids for the auction, but

22 determined that the bid submitted by SBJ Group Inc., was not

23 a qualifying bid for the reasons already stated by Mr.

24 Victor.

25 　　　　　Nevertheless, and as testified by Mr. Victor,

1   representatives of SBJ were invited to Saul Ewing's offices

2   on August 8th.   And Mr. Victor and the debtor's counsel met

3   with representatives of SBJ to further explain why its bid

4   was not qualified and to explain what was needed for its bid

5   to become a qualified bid.   SBJ declined to change its bid ad

6   accordingly was not permitted to participate in the auction.

7          In addition to the qualifying stalking horse bid

8   of Reading Hospital the other qualifying bids were submitted

9   by Strategic Global Management Inc., an affiliate of KPC

10   Global and Thomas Jefferson Hospital working with a

11   consortium of healthcare providers.

12          Throughout the morning and afternoon of August 8th

13   Mr. Wilen would testify that he, Mr. Victor and the debtor's

14   counsel met with each of the qualified bidders, asked

15   questions and discussed various issues concerning their bids

16   and requested clarification on certain terms of the bid.   Mr.

17   Wilen attended the auction on August 8th.   Throughout the

18   auction Mr. Wilen would testify that the debtors frequently

19   consulted with the committee.   At appropriate times the

20   debtors took breaks during the auction and the debtor's

21   representatives met with their professionals to analyze the

22   bids and consider the risk and rewards associated with each

23   such bid.

24          At the end of the auction Mr. Wilen would testify

25   that after consulting with the committee the debtors selected

1   the final bid submitted by the Jefferson consortium as the

2   highest and best bid for the debtor's resident program assets

3   and designated the final bid of Reading Hospital as the

4   highest and best backup bid.

5        Mr. Wilen was in the courtroom when Mr. Victor

6   generally described the terms of those bids and he would

7   confirm that Mr. Victor accurately testified to the terms of

8   those bids.  Mr. Wilen would identify Debtor's Exhibit Number

9   2 as the final asset purchase agreement with the Jefferson

10  consortium.

11       He would testify that given the increasing

12  purchase price, given the identity of the members of the

13  Jefferson consortium, and given their active involvement in

14  the local healthcare community the terms and conditions of

15  the Jefferson consortium asset purchase agreement is the

16  highest and best bid for the debtor's resident program

17  assets.

18       Mr. Wilen would testify that to his knowledge

19  neither the Jefferson consortium nor Reading Hospital are

20  affiliated in any way with the debtors or the debtor's

21  insiders.  He would further testify that to his knowledge

22  both the Jefferson consortium and Reading Hospital acted in

23  good faith during the due diligence process and during the

24  auction process and both negotiated with the debtors at arm's

25  length and on fair terms.

1          Like Mr. Victor, Mr. Wilen is not aware of any

2  facts to suggest that the bids of either Jefferson consortium

3  or the Reading Hospital were the product of bad faith or

4  collusion among bidders.  Mr. Wilen would also testify that

5  the debtors complied with the court approved bidding

6  procedures and because the winning bid and backup bid were

7  the product of a full and fair auction process he would

8  testify that the purchase price to be paid for the resident

9  program assets represents the highest and the best price

10  available under the circumstances.

11          Mr. Wilen would testify that the proposed assumed

12  contracts that are attached or identified in connection with

13  the Jefferson consortium bid are to be assumed and assigned,

14  and there are no cure amounts to be paid.  Your Honor, one of

15  the objectors in the case was Temple University Health

16  Systems Inc.

17          THE COURT:  Yes.

18          MR. MINUTI:  That objection went to a particular

19  contract.  Mr. Wilen would testify, Your Honor, that that

20  objection is moot because the contract at issue in that

21  objection is not being assumed and assigned as part of this

22  transaction.

23          THE COURT:  Okay.

24          MR. MINUTI:  Mr. Wilen would further testify that

25  he read the objection filed by the Association of Medical

1    Colleges and the Educational Commission for Foreign Medical

2    Graduates, and the joinder filed by the Accreditation Counsel

3    for Graduate Medical Education which raised concerns

4    regarding the purchase of tail insurance coverage for all

5    Hahnemann University Hospital residents and the retention of

6    reside records.

7           Mr. Wilen would testify that as he announced at

8    the auction to all bidders he feels strongly that appropriate

9    tail coverage must be purchased and maintained for all

10   Hahnemann University Hospital residents; not just residents

11   that have gone to work for the consortium.  And that he is

12   committed to paying for such coverage from the proceeds of

13   the closing of the sale of the resident program assets.

14          As a result, Your Honor, Sections 4.11 and 6.11 of

15   the Jefferson consortium's asset purchase agreement requires

16   the debtor to purchase such coverage on or prior to closing.

17   The tail policy to be purchased, Your Honor, shall be for a

18   twenty-five year term.

19          As for the resident records and consistent with

20   the objection Mr. Wilen would testify that the debtors have

21   made arrangements to transfer the resident records to the

22   Federation of State Medical Boards and those records

23   maintained on microfilm have been transferred to Drexel

24   University.

25          Mr. Wilen would also testify that he read MidCap's

1  objection to the sale and specifically the portion of the

2  objection related to the $500,000 dollar payment made by

3  Tower Health prior to the petition date for a Medicare GME

4  affiliation agreement.  As Mr. Wilen has informed MidCap on

5  numerous occasions these funds, prepetition, were placed in

6  the debtor's general operating account and swept by MidCap as

7  part of the debtor's prepetition revolving credit facility.

8          Mr. Wilen would identify again the asset purchase

9  agreement marked as Exhibit 2 as the final asset purchase

10  agreement with Jefferson University Hospital.  He would

11  testify that it is fitting for Jefferson consortium's bid to

12  be the highest and best bid as approximately 350 of Hahnemann

13  University's former residents have already become employed as

14  residents with members of the consortium and it is the

15  members of the consortium, given the proximity of their

16  hospitals and medical facilities to Hahnemann University

17  Hospital, that have accepted the transfer or, otherwise,

18  taken care of the significant majority of Hahnemann

19  University Hospital's former patients.

20          Mr. Wilen would identify the debtor's Exhibit 4 in

21  the binder, Your Honor.

22          THE COURT:  Yes.

23          MR. MINUTI:  It's a demonstrative exhibit that he

24  prepared.  Mr. Wilen would testify that as depicted in the

25  exhibit and based upon patient zip codes approximately

seventy-seven percent of the patient provided services at
Hahnemann University Hospital in 2018 are located within
three miles of Jefferson, Temple and Einstein; three members
of the consortium.  He would testify that a sale of the
resident program assets to the Jefferson consortium will be a
tremendous benefit to Philadelphia and Pennsylvania as the
Hahnemann University Hospital resident programs and related
assets and needed medical training, Your Honor, will remain
and continue in Philadelphia.

Absent the sale, and as Mr. Wilen understands it,
CMS will likely cancel the Hahnemann University Hospital
program and distribute the resident program slots to others
throughout the country with no assurance that such resident
slots will remain in Philadelphia or Pennsylvania.  In other
words, the debtors will have no ability to monetize these
assets for the benefit of their estates and Philadelphia and
Pennsylvania are highly like to lose vital important medical
training programs.

Mr. Wilen would testify that Hahnemann University
Hospital's former residents will receive a significant
benefit from the sale to the Jefferson consortium as the
transfer ensures the payment of tail malpractice insurance
coverage for all residents, not just those working for the
Jefferson consortium.  Absent the closing of the sale of the
debtor's resident program assets it is Mr. Wilen's

1  understanding that the resident's claims against Hahnemann

2  University Hospital for tail coverage would be simply general

3  unsecured claims in these cases.

4         Finally, Mr. Wilen would testify that the closing

5  of the sale to of the resident asset program will result in

6  significant funds for the debtor's estates and help resolve a

7  number of challenges that the debtors have faced and will

8  continue to face going forward as they try to sell St.

9  Christopher's Children's Hospital as a going concern to

10 ensure its continuation.

11        With respect to possible CMS overpayments, Your

12 Honor, Mr. Wilen would testify that for cost year ending

13 December 31st, 2018 for an entire year when Hahnemann

14 University Hospital was fully operational, Hahnemann

15 University Hospital received CMS overpayments of only

16 approximately $800,000 dollars.

17        Under the asset purchase agreement with the

18 Jefferson consortium a $3 million dollar escrow is being

19 established and available to cover any possible overpayments

20 for the approximate nine month period, Your Honor, during

21 which services and Medicare reimbursements at Hahnemann

22 University were declining; Hahnemann University Hospital were

23 declining.

24        Consistent with the Reading Hospital asset

25 purchase agreement and the July 19th, 2019 order, Your Honor.

1   The debtors will pay Reading Hospital a break-up fee of

2   $225,000 dollars solely from the proceeds of the closing of

3   the transaction with the Jefferson consortium.  If the

4   Jefferson Consortium fails to close the debtors intend to

5   proceed with the backup bid submitted by Reading Hospital.

6          For all these reasons, Your Honor, Mr. Wilen would

7   testify that the debtor's decision to proceed with today's

8   motion for authority to close the transaction with the

9   Jefferson consortium or Reading Hospital as a backup bidder

10  represents an appropriate exercise of the debtor's business

11  judgment and he would encourage the court to approve the

12  motion.

13          That would complete his direct testimony.

14          THE COURT:  Thank you, Mr. Minuti.

15          Any cross examination of Mr. Wilen?  Yes, Mr.

16  Sherman.

17          MR. SHERMAN:  Ten seconds to consult with Mr.

18  Minuti.

19          THE COURT:  Sure.

20          MR. SHERMAN:  Your Honor --

21          THE COURT:  Yes, Mr. Sherman.

22          MR. SHERMAN:  -- we would like to cross-examine

23  Mr. Wilen on just a few limited issues, Your Honor.

24          THE COURT:  All right.  Mr. McNeill, we'll have

25  Mr. Sherman go first and then you'll follow-up.

```
 1              MR. MCNEILL:  Okay.

 2              THE COURT:  Thank you.  Mr. Wilen, yes, if you

 3   will come forward and remain standing while your testimony is

 4   affirmed, Mr. Wilen.

 5                 ALLEN WILEN, DEBTOR WITNESS, SWORN

 6              THE CLERK:  Please state and spell your name for

 7   the record?

 8              THE WITNESS:  Allen Wilen, A-L-L-E-N, W-I-L-E-N.

 9              THE CLERK:  Thank you.

10              THE COURT:  Good morning, Mr. Wilen,

11              THE WITNESS:  Good morning.

12              THE COURT:  All right.  Mr. Sherman.

13              MR. SHERMAN:  May I proceed, Your Honor?

14              THE COURT:  Yes, you may.

15              MR. SHERMAN:  Thank you, Judge.

16                        CROSS EXAMINATION

17   BY MR. SHERMAN:

18   Q    Good morning, Mr. Wilen.

19        During the proffer Mr. Minuti discussed your testimony

20   regarding the tail coverage for the residents.  Do you recall

21   what Mr. Minuti said?

22   A    Yes, I do.

23   Q    Okay.  And in connection with your duties as CRO is it

24   your duty to manage the budget and the cash for these

25   estates?
```

1  A     Yes, it is.

2  Q     And in connection with those budgeting duties is it

3  your belief that the debtors have the ability of paying for

4  tail coverage for the residents outside of the sale that's

5  currently contemplated on the resident program assets?

6  A     At this point that's unknown.

7  Q     So, we understand a means to pay the tail coverage for

8  the residents is through this program assets?

9  A     Correct.

10 Q     And if it's not approved then there's no certainty that

11 there will be tail coverage to the residents?

12 A     That is correct.

13 Q     And Mr. Minuti also discussed a $3 million dollar

14 escrow.  Do you remember that testimony?

15 A     Yes, I do.

16 Q     And is it your belief that -- in connection with your

17 duties as CRO did you gain an understanding of any potential

18 amounts which would be due back to CMS for overpayments or

19 underpayments in connection with this operation?

20 A     Other then what was in the cost report that was filed,

21 no.

22 Q     So, it is your belief that the $3 million dollar escrow

23 that's to be established should cover any potential exposure

24 that these estates would have or the debtor's prepetition

25 operations which would potentially be due to CMS?

1  A      Yes.

2          MR. SHERMAN:  Thank you.  No further questions,

3  Your Honor.

4          THE COURT:  I have a quick question for you, Mr.

5  Wilen, if I may.  Is there any difference between the tail

6  insurance being provided by Jefferson and Tower?  Somewhere

7  along the line I had the impression that the Tower tail

8  insurance was only applicable to people working for Tower

9  entities.

10         THE WITNESS:  That is my belief as well, Your

11 Honor.

12         THE COURT:  Whereas the Jefferson is applicable to

13 all residents.  Is that correct?

14         THE WITNESS:  Well, at the sale hearing, Your

15 Honor, I put on the record that we would cover all the

16 residents as part of the sale process and not just limited to

17 the Tower Group because it was an assertion of Jefferson that

18 they wanted to make sure that all of the residents were

19 covered.

20         THE COURT:  All right.  Thank you.

21         Mr. Lapowsky, yes, sir.

22         MR. LAPOWSKY:  Thank you, Your Honor; Robert

23 Lapowsky for Reading Hospital.

24                     CROSS EXAMINATION

25 BY MR. LAPOWSKY:

1  Q     Let's start with the tail insurance.  You're testifying

2  that there is a difference between the tail insurance that's

3  being provided under the Reading Hospital backup bid and the

4  tail insurance that's being provided under the Jefferson

5  winning bid?

6  A     No, it's not.  I just said to Your Honor's question was

7  at the auction I opened it up and said that we would cover,

8  as part of a sale process here, out of proceeds of the sale

9  coverage on the tail for all of the residents.

10 Q     And, in fact, based on the revised asset purchase

11 agreement between -- the backup asset purchase agreement

12 between the debtor and Reading Hospital the tail insurance

13 provided for under the Reading Hospital agreement is now the

14 sale as the tail being provided under the Jefferson bid.  Is

15 that correct?

16 A     That is my understanding.

17 Q     Thank you.

18       You testified, in your proffer, that the contracts

19 being assigned pursuant to the Jefferson -- that you were

20 familiar with the contracts being assigned pursuant to the

21 Jefferson bid and that there were no cure amounts required

22 under those contracts.  Is that accurate?

23 A     Correct.

24 Q     Okay.  Are you also familiar with the contracts being

25 assigned under the Reading Hospital backup bid?

1    A       Yes.

2    Q       And there is no cures due under those either, is that

3    correct?

4    A       That's correct.

5    Q       Are you familiar with Reading Hospital?

6    A       Yes, I am.

7    Q       Do you believe that Reading Hospital has the ability to

8    perform in the future under the contracts that would be

9    assigned under the Reading Hospital contract?

10   A       Yes.

11   Q       You testified that one benefit of the Jefferson

12   proposal is that it would keep resident slots in

13   Pennsylvania, Southeastern Pennsylvania and in the

14   Philadelphia area, correct?

15   A       Correct.

16   Q       Reading Hospital is also located in Pennsylvania,

17   correct?

18   A       Yes.

19   Q       And if Reading Hospital were -- if the backup bid were

20   the one that would be closing the resident slots would also

21   stay in Pennsylvania, correct?

22   A       Yes.

23   Q       You testified about the $3 million dollar amount that

24   is provided for under the Jefferson bid for CMS.  Do you

25   recall that testimony?

1  A     Yes, I do.

2  Q     Okay. And that provision in the Reading Hospital

3  agreement is identical to the provision in the Jefferson

4  agreement?

5  A     Yes, it is.

6          MR. LAPOWSKY:  Thank you, Your Honor.  No other

7  questions.

8          THE COURT:  All right. Thank you, Mr. Lapowsky.

9          Mr. McNeill?

10         MR. MCNEILL:  Thank you, Your Honor.  I have just

11 a few questions.  And again for the record Steve McNeill from

12 Potter Anderson & Corroon here for SBJ Group.

13                     CROSS EXAMINATION

14 BY MR. MCNEILL:

15 Q     Good morning, Mr. Wilen.

16       I believe in response to Mr. Sherman's question a few

17 minutes ago you indicated that you're responsible for

18 budgeting for the debtors.  Is that correct?

19 A     Yes, I am.

20 Q     Can you tell me what the debtor's current caring costs

21 are for Hahnemann University Hospital?

22 A     Current caring costs I still have payroll, I still have

23 approximately seventy-five to eighty people who are on the

24 payroll still providing services at the hospital.  We're

25 still operating a business.  So, we have utility costs which

1   are significant.  We have insurance costs which are

2   significant.  And we are still dealing with processing bills

3   that are out there.  So, we're still paying a vendor on

4   billing.  So, our monthly costs are still, you know,

5   significant.

6   Q     Can you give me a ballpark figure for budgeting

7   purposes?  A monthly figure is fine or a weekly, whatever is

8   easier.

9   A     Up until last week the number was -- we were running

10  about $8 to $10 million dollars every two weeks.  Going

11  forward we will probably be in the $5 million dollar range.

12  Q     Thank you.

13        And when will those costs cease, if you know?

14  A     It will be a while at this point in time, until we go

15  through the final closure process.  As I said before, we're

16  still operating a business and until we have a formal closure

17  notice from the court and from the State we're still going to

18  be operating.

19  Q     Thank you.

20        And how are those costs being funded?  Is it part of

21  the DIP financing?

22  A     Out of borrowings from our receivables that we still

23  have in the hospital.

24  Q     Okay.  And how much, historically, I guess, do the

25  debtors receive each year from CMS on account of the

1    residency slots?

2    A    The debtors receive approximately $100,000 dollars per

3    slot.

4    Q    Per slot each year?

5    A    Per slot, yes.

6    Q    And how many slots, roughly?

7    A    Five hundred plus.

8    Q    Five hundred plus.  Thank you.

9         And my final question.  On a going concern basis do you

10   believe that Hahnemann University Hospital is more valuable

11   now then it was as an operating hospital?

12   A    Well, it had continuing systematic losses and

13   systematic requirements that were CapEx related to which,

14   quite frankly, I asked your client if he had a plan for that

15   and he said no.  So, the answer is it's probably worth more

16   shutdown then operating losses occurring in the future and

17   the CapEx need in the future to keep it open.

18   Q    And when you say more you mean more valuable to a

19   potential third-party purchaser?

20   A    No.  I think more valuable to an estate.  We were

21   continuing to have massive operating losses at Hahnemann

22   similar to what Tenent had in the past.  I don't think anyone

23   has operated at this hospital at a profit for years.  There

24   were systematic problems in this hospital's ability to

25   actually operate and generate a profit and be sustainable.

1   The working capital needs to keep this hospital open and/or

2   to continue the hospitals operations going forward are

3   enormous, well in excess of the $60 million dollars your

4   client said that he was able to obtain through financing.

5   Q    So, it's your view then that liquidating the hospital

6   is more valuable than selling it as a going concern?

7   A    The best test of value is the market.  And we had a

8   process to sell the hospital.  We had folks come in and look

9   at it.  The buyers all said the same thing.  It had

10  systematic problems and systematic losses and CapEx needs

11  that you cannot operate this hospital at a profit.

12      So, to shut off the bleeding, yes.

13  Q    And you're aware that there are two parties that

14  continue to express an interest in buying the hospital as a

15  going concern notwithstanding --

16  A    And neither one of them answered any of my questions

17  regarding diligence requests.  Your client specifically I

18  asked on multiple occasions when I met with him about what he

19  needed from a diligence perspective to keep the hospital

20  open, what questions he had and all he was interested in was

21  how he could move the slots to Pontiac, Michigan.  Okay.

22  Q    I think you've answered my question.  Thank you.

23  A    Okay.

24          MR. MCNEILL:  No further questions, Your Honor.

25          THE COURT:  Thank you, Mr. O'Neill.

1          THE COURT:  Yes, sir.

2          MR. SACKS:  May I examine the witness?

3          THE COURT:  Yes.

4          MR. SACKS:  Thank you, Your Honor; Marc Sacks with

5   the DOJ on behalf of CMS.  I've been on the phone a few times

6   with the court.

7          THE COURT:  Yes.

8          MR. SACKS:  It's nice to be here in person.  Thank

9   you for having me.

10          THE COURT:  Yes.

11                    CROSS EXAMINATION

12   BY MR. SACKS:

13   Q    Mr. Wilen, nice to see you again.  Just brief questions

14   for you.

15          What medical services are Hahnemann providing to the

16   community today?

17   A    So, Hahnemann is still providing a number of services

18   to the community primarily, what I'll call, medical navigator

19   services.  So, a patient calls up and says, hey, I was a

20   patient here, I was seeing Dr. so and so, I need to figure

21   out follow-up care, and we have somebody who is there on the

22   phone who's trained that can direct them to other service

23   providers for those services for follow-up care.  It's not

24   like we just, you know, shut the doors, walked out and said

25   to people go find your own doctor, figure it out.  These are

1  not the most educated of folks, a lot of the patients in the

2  hospital.  So, we've had to spend a lot of time giving them

3  direction and guidance of where to go.

4      We are providing medical records and medical care to in

5  the sense of when we get a call from the emergency room

6  saying, hey, I have a patient sitting here at Temple's

7  emergency room, they were seen at Hahnemann, we need to get a

8  copy of their medical records and information and their

9  imaging studies sent over to us immediately.  We are doing

10  that still at this point in time.

11      We are providing thousands of patients who have asked

12  us for their medical records to be transitioned to new

13  providers for care.  We still have sublet tenants in the

14  building who are providing everything from OB services, to

15  laboratory testing.  We're still cleaning out our stem cell

16  issues that we had and operations that we had.  So, from that

17  perspective there is still, what I would consider to be,

18  medical services being provided.

19  Q    Okay.  So, let me make sure I understand your answer.

20  So, you're providing medical navigator services and providing

21  patient medical records to both other institutions and the

22  patients themselves or their new providers.  IS that right?

23  A    Correct.

24  Q    Okay.  Are there any residents still at Hahnemann?

25  A    No, there are not.

```
 1  Q     All of them have left for other institutions??A  Yes.

 2  Q     Are there any doctors still at Hahnemann besides

 3  residents?

 4  A     A chief medical officer, but that's pretty much it.

 5  Q     Anyone else?

 6  A     No other doctors.  There are nurses as well.

 7  Q     Is the ER open?

 8  A     No, it is not.

 9  Q     When was it closed?

10  A     A couple weeks ago, a week and a half ago fully closed.

11  Q     How many patients are in the hospital now?

12  A     Zero.

13  Q     And all of the former Hahnemann residents that you

14  mentioned have gone to new institutions, those institutions

15  are eligible to receive temporary funding for those residents

16  for the length of their residency, right?

17  A     That's my understanding.

18  Q     Was it your testimony that you are a hundred percent

19  certain that potential over-payments that might be owed to

20  CMS is less than $3 million dollars?

21  A     It was not -- I did not say I was a hundred percent

22  certain.

23  Q     What did you say?

24  A     What I said was it was likely that my estimate based

25  upon our past experience was that it was something less than
```

1  $3 million dollars.

2  Q    Okay.  But you're not certain?

3  A    No.  But I also have no reason to believe it's greater

4  than that amount either.

5  Q    Understood.  Do you have an understanding of what

6  Jefferson is acquiring from Hahnemann in this proposed sale?

7  A    Yes.

8  Q    Okay.  Do you understand that to be permanent residency

9  slots that are funded by Medicare?

10  A    Yes.

11  Q    Okay.  What other assets of Hahnemann are being

12  purchased in this sale?

13  A    Our NPI's, the provider agreement.

14  Q    Okay.  And what does the provider agreement do for

15  Jefferson beyond giving them the right to receive funding for

16  the residents?

17  A    It provides them with the ability to continue to

18  operate the hospital or merging the license to their existing

19  facility.

20  Q    Continue to operate Hahnemann Hospital?

21  A    No.  To operate with the same NPI numbers and the

22  residency slots following it.

23  Q    Okay.  Is there a GME affiliation agreement between

24  Jefferson and Hahnemann, do you know?

25  A    I do not recall.  There are GME affiliation agreements

1   wiht other hospitals in the region.

2            THE COURT:  GME?  I'm sorry, Mr. Sacks.

3            MR. SACKS:  Graduate medical education.

4            THE COURT:  Okay.  Thank you.

5            MR. SACKS:  Hospitals -- well, we can get into

6   this more later, but hospitals can partner with each other to

7   allow for yearly transfer of residency slots.  Those are not

8   permanent transfers.  The question here is whether Jefferson

9   and Hahnemann have such an agreement.  I don't believe they

10  do.  Mr. Wilen said that he is not certain.

11           THE COURT:  Thank you.

12           THE WITNESS:  I do know we have agreements, by the

13  way, with other members of the consortium.

14           MR. SACKS:  Right.  My question was just about

15  Jefferson.

16           Thank you, sir.  I appreciate your time.

17           THE WITNESS:  Thank you.

18           THE COURT:  All right. Anyone else?  Any follow-up

19  at all, Mr. Minuti?

20           MR. KLAUSNER:  Your Honor, its Gary Klausner.

21  Could I be permitted to have just a couple quick questions to

22  clear up what I think might be an error in the record.

23           THE COURT:  Mr. Minuti, yes.

24           MR. MINUTI:  First of all, number one, Your Honor,

25  they have no standing.  Number two, it's highly unusual to

 1  question a witness over the phone and therefore the debtors

 2  would object.

 3          THE COURT:  All right.  I won't permit that

 4  questioning because you're not in the courtroom and the

 5  standing issue also arises.

 6          Mr. Wilen, you may step down.

 7      (Witness excused)

 8          MR. MINUTI:  Your Honor, there is one further

 9  witness.

10          THE COURT:  Did you mean to admit Exhibit 4?

11          MR. MINUTI:  It's a demonstrative, but I would

12  move it into evidence.

13          THE COURT:  All right. That is admitted then.

14      (Debtor's Exhibit 4, admitted into evidence)

15          MR. MINUTI:  Your Honor, we --

16          MR. KLAUSNER:  Your Honor, just one quick point.

17  We do have local counsel in the courtroom.  I could defer to

18  him to ask a couple of questions.  I understand the standing

19  question.  I think that's, sort of, an over-technical problem

20  here.  We're an interested party in attempting to provide

21  greater value to the estate.  I don't think allowing us to

22  ask a couple of questions is really going to undermine the

23  integrity of the process.

24          THE COURT:  I have already ruled and I don't think

25  it's appropriate at this point.

 1           MR. MINUTI:  Your Honor, next we have a Jefferson

 2   witness, but before that, Your Honor, I could use a five

 3   minute break.

 4           THE COURT:  All right.  Given the number of the

 5   people in the courtroom let's take fifteen minutes.

 6           MR. MINUTI:  Thank you, Your Honor.

 7       (Recess taken at 11:24 a.m.)

 8       (Proceedings resumed at 11:40 a.m.)

 9       (Call to Order of the Court)

10           THE COURT:  Thank you, everyone.  You may be

11   seated.

12           Mr. Minuti, yes.

13           MR. MINUTI:  Your Honor, for the record, Mark

14   Minuti on behalf of the debtors.  Thank you for the break.  I

15   needed it, Your Honor.

16           THE COURT:  Anytime anyone needs a break, please

17   ask.

18           MR. MINUTI:  Thank you, Your Honor.

19           Your Honor, the next witness we have is a

20   Jefferson witness that we're going to put on or the Jefferson

21   consortium to put on.

22           But before we do that, Your Honor, I do need to

23   correct the record in terms that something that Mr. Weiland

24   testified to and I've already alerted Mr. Sacks to this

25   issue.

 1           THE COURT:  All right.

 2           MR. MINUTI:  I believe Mr. Weiland testified that

 3  the CMO was still there.  And after Mr. Weiland was done

 4  testifying, we went in the back and I talked to -- we were

 5  just talking to some of the other folks from the hospital.

 6  We learned that, in fact, the CMO resigned at the end of the

 7  month.  He got another job offer to take the other job.

 8           THE COURT:  All right.

 9           MR. MINUTI:  So, I think the good news, as least

10  he's coming out of the key employee retention plan.

11           THE COURT:  Yes.

12           MR. MINUTI:  The bad news is the testimony was

13  inaccurate and Mr. Weiland wanted to make sure that I

14  corrected that so Your Honor didn't have the misimpression.

15  So, again, if they want to cross-examine Mr. Weiland, again,

16  based on that correct, he's here and available.

17           THE COURT:  Mr. Sacks, any problem with that?

18           MR. SACKS:  No, Your Honor.

19           THE COURT:  All right, thank you, Mr. Minuti;

20  thank you, Mr. Sacks.

21           Mr. Jackson, good morning.

22           MR. JACKSON:  Just checked myself.

23           THE COURT:  Yes.

24           MR. JACKSON:  Patrick Jackson, Drinker Biddle &

25  Reath on behalf of Thomas Jefferson University Hospitals,

1    Inc.  I just wanted to rise to introduce my colleague, Marita

2    Erbeck, from our Florham Park, New Jersey office.  I believe

3    Your Honor has previously granted admission *pro hac vice* --

4               THE COURT:  Yes.

5               MR. JACKSON: -- but she'll be handling the proffer

6    of our witness, the proposed proffer of our witness.

7               THE COURT:  All right, Mr. Jackson, thank you.

8               Good morning.

9               MS. ERBECK:  Good morning, Your Honor.  Marita

10   Erbeck, Drinker Biddle & Reath, on behalf of Thomas Jefferson

11   University Hospitals, Inc.

12              THE COURT:  And you're proposing to make a

13   proffer, is that correct?

14              MS. ERBECK:  I am, Your Honor.  We would propose

15   to present testimony of Laurence Merlis, the executive vice

16   president of Strategic Partnerships Ventures and Innovation

17   for Thomas Jefferson University and Jefferson Health.

18              I would propose that we do it by proffer.  Mr.

19   Merlis is here.

20              THE COURT:  Is there any objection to the court

21   receiving the proffer?

22          (No verbal response)

23              THE COURT:  All right, hearing none, you may

24   proceed with your proffer.

25              MS. ERBECK:  Thank you, Your Honor.

1          Present in the courtroom today is Laurence M.

2   Merlis, executive vice president of Strategic Partnerships

3   Ventures & Innovation --

4          THE COURT:  And his name is spelled how?

5          MS. ERBECK:  Laurence - L-A-U-R-E-N-C-E.  And then

6   the last name is Merlis -- M-E-R-L-I-S.

7          THE COURT:  All right, thank you.

8          MS. ERBECK:  And he is executive vice president,

9   as I explained, for Thomas Jefferson University & Jefferson

10  Health and is the authorized representative today for Thomas

11  Jefferson University Hospitals, Inc., the proposed purchaser.

12         If called to testify, Mr. Merlis would -- if

13  called to testify, Mr. Merlis would testify under oath

14  substantially as follows.

15         Mr. Merlis would testify that he's the executive

16  vice president of Strategic Partnerships Ventures &

17  Innovation for Thomas Jefferson University and Jefferson

18  Health in Philadelphia, Pennsylvania.

19         He has served in this capacity since May of 2018.

20  Before May 2018, Mr. Merlis served as chief operating officer

21  for Jefferson Health since May 2015.

22         Mr. Merlis would further testify that before

23  joining Jefferson Health, he held the following positions in

24  other healthcare institutions.

25         From February 2010 through May 2015, he was

1   president and CEO of Abbington Health in Abbington,

2   Pennsylvania.

3            From July 1999 through February 2010, he was

4   president and CEO of GMBC Healthcare in Baltimore, Maryland.

5            From January 1997 through June 1999, he was an

6   executive vice president at Meridian Health in Wall Township,

7   New Jersey.

8            From May 1993 through January 1997, he was

9   president and CEO of Riverview Health Services, Riverview

10  Medical Center in Red Bank, New Jersey.

11           And from January 1986 through May 1993, he was

12  president and CEO of Essex Valley Healthcare, East Orange

13  General Hospital in East Orange, New Jersey.

14           Mr. Merlis would further testify that Jefferson

15  Health operates fourteen hospitals in Pennsylvania and New

16  Jersey including Thomas Jefferson University Hospital in

17  Center City, Pennsylvania.

18           Mr. Merlis would testify that he was one of the

19  Jefferson personnel with primary responsibility for this

20  matter, and that he has been involved since inception of the

21  transaction including in the conduct of due diligence, the

22  preparation and submission of the purchaser's initial bid for

23  Hahnemann's residence program assets, the participation in

24  the auction for such assets, and the negotiation of the final

25  form of asset purchase agreement.

1          Mr. Merlis would further testify that the

2   purchaser has formed or intends to form a consortium

3   including itself, Temple University Health System, Albert

4   Einstein Health Network, Mainline Health, Inc., Christiana

5   Care Health System, and the Cooper Health Systems, a New

6   Jersey not-for-profit corporation.

7          And I will refer to this sort of generally as the

8   consortium.  You've heard that term used already today.

9          THE COURT:  Yes.

10         MS. ERBECK:  The consortium will be formed for

11  purposes of operating a graduate medical education network,

12  that's the GME, as a qualified Medicare GME affiliated group.

13         Mr. Merlis would further testify that the

14  purchaser directly or through a GME network affiliate has

15  assumed or will assume placement of former Hahnemann

16  residents who have agreed to become residents training at a

17  hospital operated by the purchaser or other GME network

18  affiliate in furtherance of continuing quality medical

19  education in the Delaware Valley Region.

20         Each of the consortium members is or will be a GME

21  network affiliate.  Between them, the consortium members have

22  taken on approximately 265 of the residents displaced from

23  Hahnemann.

24         Mr. Merlis would further testify that consortium

25  members, Jefferson, Temple University Health System and

1  Albert Einstein Health Network, operate hospitals in close

2  proximity to Hahnemann and have each experienced an increase

3  in in-patient admissions, emergency room visits, and out-

4  patient visits since Hahnemann commenced its closure plan on

5  July 1st, 2019.

6          Between them, consortium members have hired

7  approximately 450 staff positions and other employees who

8  were formally with Hahnemann and have another approximately

9  200 employees in various stages of the employment process.

10          Mr. Merlis would further testify that the

11  purchaser submitted its qualified bid with the understanding

12  that there has not been and will not be a cessation of

13  business of Hahnemann at any time prior to the actual

14  completion of its Pennsylvania Department of Health approved

15  closure plan on or after September 6th, 2019.

16          Mr. Merlis would further testify that the

17  acquisition and merger of Hahnemann's Medicare provider

18  agreement into the Medicare provider agreement of Jefferson

19  for the aggregation of legacy Hahnemann residency slots with

20  the Jefferson residency slots through another mechanism is an

21  integral component of the proposed transaction.

22          It is the purchaser's understanding that as a

23  result of such acquisition and merger, legacy Hahnemann

24  residency slots temporarily following any displaced Hahnemann

25  residents will revert to the purchaser upon graduation of

1  those residents from their respective programs.

2          Thereafter, the purchaser, including for these

3  purposes, as applicable, the purchaser's qualifying

4  affiliates participating in the GME affiliated group will be

5  entitled to be paid by the Centers for Medicare and Medicaid

6  services or CMS for graduate medical education funding at

7  aggregated legacy Hahnemann and Jefferson resident slot

8  counts.

9          Mr. Merlis would further testify that another

10 integral component of the proposed transaction is the capping

11 of the purchaser's liability to CMS for preclosing amounts to

12 an amount certain set forth in the purchase agreement.  And,

13 more generally, the acquisition of the purchased assets free

14 and clear of all liens, claims, and encumbrances other than

15 the assumed liabilities set forth in the purchase agreement.

16         Mr. Merlis would further testify that without the

17 acquisition of the provider agreement, the aggregation of the

18 legacy Hahnemann residency slots with those of Jefferson for

19 GME funding purposes, and the limitation of successor

20 liability and the purchase of assets free and clear, the

21 purchaser would not have submitted its qualified bid,

22 participated in the auction, or agreed to enter into the

23 purchased agreement.

24         Mr. Merlis would further testify that absent

25 assurances that it will acquire the resident program

1   including the provider agreement and that residency slots

2   will be aggregated, successor liability to CMS will be

3   limited, and the assets are acquired free and clear as

4   contemplated in the purchase agreement, the purchaser would

5   not be willing to close the transaction contemplated by the

6   purchase agreement.

7           Mr. Merlis would further testify that the

8   purchaser has sufficient capital to meet its obligations

9   under the purchase agreement, to perform any post-closing

10  obligations under any contracts assigned to it under the

11  purchase agreement, and to meet the operational needs of the

12  acquired resident program going forward.

13          The purchaser has all of the necessary legal and

14  operational qualifications to hold the Medicare provider

15  agreement and reasonably anticipates that the consortium will

16  satisfy all necessary conditions to qualify as a Medicare GME

17  affiliated group.

18          Mr. Merlis would further testify that there is no

19  common identity between Hahnemann and the purchaser.  And,

20  finally, Mr. Merlis would testify that the purchaser

21  negotiated the sale transaction with Hahnemann in good faith

22  and did not participate in any collusion, fraud, or engage in

23  any conduct to control the sale price between or among

24  potential bidders.

25          And that concludes my proffer of his testimony.

1            THE COURT:  Thank you, Ms. Erbeck.

2            MS. ERBECK:  Thank you, Your Honor.

3            THE COURT:  Does anyone wish to cross-examine Mr.

4   Merlis? Mr. Sacks?

5            MR. SACKS:  Yes, I do, Your Honor.

6            THE COURT:  All right, Mr. Merlis, if you'll come

7   forward, sir.  Thank you, Mr. Merlis.  And if you'll remain

8   standing in the witness stand while your testimony is

9   affirmed.

10            LAURENCE MERLIS, WITNESS, SWORN

11            THE CLERK:  Please state and spell your name for

12  the record.

13            THE WITNESS:  Laurence Merlis; L-A-U-R-E-N-C-E and

14  M as in Michael - E-R-L-I-S as in Sam.

15            THE CLERK:  Thank you.

16            THE COURT:  You may proceed, Mr. Sacks, when

17  you're ready.

18                  CROSS-EXAMINATION

19  MR. SACKS:

20  Q    Mr. Merlis, hello.  My name is Mark Sacks.  I'm an

21  attorney with the Department of Justice representing CMS in

22  this bankruptcy.  How are you?

23  A    Fine, thank you.

24  Q    Great.  Hahnemann is closing, as you understand it, is

25  that right?

1  A      It's my understanding that Hahnemann is still open.

2  Q      Okay. Do you understand it to be in the process of

3  closing?

4  A      Correct.  I'm not a lawyer, but my sense is that the

5  Department of Health determines when it's open and closed.

6  Q      Okay. Do you think you need to be lawyer to understand

7  if a hospital is closing?

8  A      It's in the process of.

9            MS. ERBECK:  Objection, Your Honor.

10           THE COURT:  Sustained.

11 BY MR. SACKS:

12 Q      Jefferson is attempting to purchase the permanent

13 residency slots associated with Hahnemann's provider

14 agreement, is that correct?

15 A      It's my understanding that what we are purchasing is

16 the resident program assets.

17 Q      Okay.  What are the resident -- sorry.

18 A      Our ability to actually operate the GME program, as

19 well as the certainty that we would have in terms of the

20 resources that would be available to carry that forward into

21 the future, as well as the appropriate reimbursement from CMS

22 based on applicable law.

23 Q      Okay.  Can you breakdown the resident program assets

24 for me?  List those starting from one to how many there are?

25 A      Well whatever is part and parcel the resident asset

1   program, I would refer to counsel for the detail.

2   Q     Well what's your understanding?

3   A     It would be the Medicare assets related to the resident

4   program.

5   Q     I'm sorry?

6   A     The Medicare assets related to the residence program.

7   Q     Medicare assets relating to the residency program.  Can

8   you explain what those assets are?

9   A     I don't know in detail.

10  Q     Okay.  Apart from the right to receive Medicare funding

11  for the permanent residency slots, can you identify other

12  assets that are being purchased by Jefferson under this

13  transaction?

14  A     Just those that I just outlined.

15  Q     Okay.  How many permanent residency slots are being

16  purchased, do you have an understanding of that?

17  A     I believe there's approximately 500 plus.

18  Q     Five hundred plus.  Thank you.

19        Do you have a position as to whether CMS must approve

20  the transfer of these residency slots?

21        MS. ERBECK:  Objection, Your Honor.  I think that

22  calls for a legal conclusion.

23        THE COURT:  Mr. Sacks.

24        MR. SACKS:  I've just asked for his understanding,

25  Your Honor.  It's not a legal conclusion.

```
 1              THE COURT:  I'll sustain the objection.  I do
 2    believe it is -- does require a legal conclusion.  Yes.
 3    BY MR. SACKS:
 4    Q    Can you identify another transaction where a hospital
 5    purchased permanent residency slots from a closing hospital?
 6              MS. ERBECK:  Objection, Your Honor.
 7              THE COURT:  Yes.
 8              MS. ERBECK:  I think -- I'm not sure that Mr.
 9    Merlis is qualified to canvass every healthcare transaction,
10    you know, nationwide regarding, you know, Medicare assets or
11    other assets.
12              THE COURT:  I think the question was if he's
13    aware.
14              MR. SACKS:  I asked if he could identify one.
15              THE COURT:  If he can identify.  And I'll overrule
16    that objection.
17    BY MR. SACKS:
18    A    I don't know.
19    Q    So you can't identify one?
20    A    That's correct.  I don't know.
21    Q    Are you familiar with Affordable Care Act, Section
22    5506?
23    A    I know of it.  I don't know in great detail.
24    Q    What's your understanding of what it does?
25    A    It allows for the application for displaced residents.
```

1   Q      So when a hospital closes, the residency slots are

2   distributed by HHS pursuant to a process where hospitals can

3   bid on those slots, is that right, or apply for them?

4          MS. ERBECK:  Your Honor, I'm going to object here.

5   I think -- I allowed it the first few questions, but I think

6   we're delving into a territory where Mr. Merlis is being

7   asked to interpret 5506 and, again, he's not a lawyer.  He's

8   not counsel.  He has counsel that advises him on 5506.

9          THE COURT:  I'll sustain that objection.  I think

10  you're correct.

11  BY MR. SACKS:

12  Q      Has Jefferson ever bid on or applied for residency

13  slots through Section 5506?

14  A      I do not know.

15  Q      Okay.  You were at Abbington before, is that correct?

16  A      Correct.

17  Q      Did Abbington bid, apply for residency slots?

18  A      I do know that.

19  Q      Do you know how many residents are currently in the

20  consortium, what's it six hospitals?

21  A      Could you rephrase the question?  Related to the

22  displaced residents or total?

23  Q      Generally, how many residents there are?

24  A      As it relates to Jefferson Health, there's

25  approximately 1400 residents.  For the other members of the

1  consortium, I do not know.

2  Q     Okay.  And of those 1400, do you know how many receive

3  Medicare funding in some way?

4  A     I do not know the exact number.

5          MR. SACKS:  Thank you, sir.

6          THE COURT:  Any redirect, Ms. Erbeck?

7          MR. MCNEILL:  Your Honor.

8          THE COURT:  Oh, I'm sorry.  Mr. McNeill, yes.

9  Forgive me.

10         MR. MCNEILL:  Your Honor, again, Steve McNeill for

11 SBJ Group.

12         THE COURT:  Yes, sir.

13         MR. MCNEILL:  I have -- I hope just two questions.

14         THE COURT:  All right, take your time.

15         MR. MCNEILL:  Following up Mr. Sack's questions.

16         THE COURT:  Sure.

17                     CROSS-EXAMINATION

18 BY MR. MCNEILL:

19 Q     Mr. Merlis, you just, in response to Mr. Sack's

20 questioning, said that there were approximately 500 plus

21 residency slots that were being purchased in this

22 transaction, is that correct?

23         MS. ERBECK:  Objection, Your Honor.  I just -- I

24 think Mr. Merlis' testimony was that he was purchasing the

25 Medicare graduate medical education program assets, not

1  purchasing slots.  I know that that -- I think it sort of

2  presupposes that the slots are what are being purchased.

3          THE COURT:  Can you rephrase the question.  I'll

4  sustain that objection.

5  BY MR. MCNEILL:

6  Q    Okay.  All right, Mr. Merlis, you previously testified

7  in response to Mr. Sack's question that you believe that

8  there were approximately 500 plus residency slots at issue

9  that would be covered by the residency program that the

10 consortium is purchasing.

11 A    I was referencing that I believe there was

12 approximately 500 plus residents displaced.

13 Q    Okay.  And do you -- is it your understanding that the

14 consortium is acquiring the rights -- this may be the wrong

15 word.  I'm not a healthcare practitioner, so I apologize.  Is

16 it your understanding that the consortium is acquiring the

17 rights to those 500 plus residency positions as part of this

18 transaction?

19          MS. ERBECK:  Same objection, Your Honor.

20          THE COURT:  I'll overrule that objection.  I think

21 the question is clear enough; yes.

22 BY MR. MCNEILL:

23 A    It's my understanding we're acquiring the assets

24 related to the residency program and all that's within that.

25 Q    Okay.  I don't know how to rephrase the question, so

1   I'll move on.

2        How are the residency program assets being allocated

3   among the members of the consortium?

4   A    I would refer to the letter of intent that was

5   provided.

6   Q    It was filed on the docket?

7            MS. ERBECK:  Your Honor, Mr. Merlis is referring

8   to a letter of intent that was submitted in connection with

9   the bid so it not filed on the docket, but submitted in

10  connection with the auction and the bid process and so, it's

11  not publicly available.

12           THE COURT:  All right.  But I think the question

13  is proper.  If Mr. Merlis can answer the question.

14  BY MR. MCNEILL:

15  A    Could you just restate the question, please?

16  Q    The question is how are the residency program assets

17  being allocated among the members of the consortium?

18  A    It's based on the terms and conditions that we

19  discussed as a consortium and future terms and conditions

20  that would come about in terms of what the appropriate

21  formula would be.

22  Q    So it's unknown at this time?

23  A    It's something we will be developing.

24  Q    And does the consideration being paid changed by each

25  consortium member changed based on the ultimate determination

1  of that allocation?

2       MS. ERBECK:  Objection, Your Honor.  I don't think

3  that these sort of allocation of how, you know, it's not

4  appropriate for this hearing to discuss sort of how the

5  consortium reaches its ultimate purchase price.

6       MR. MCNEILL:  I'm not asking for the ultimate

7  purchase price.  I'm just asking -- there are four, five, six

8  hospitals in the consortium here.

9       THE COURT:  Yes.

10      MR. MCNEILL:  Each of them is presumably providing

11  some consideration for some portion of the residency program.

12  I'm trying to figure out what the -- you know, how those

13  assets are being allocated among the various hospitals and

14  what those -- and what portion of the purchase price,

15  whatever it ultimately ends up being, is being provided by

16  the various members.

17      MS. ERBECK:  And that's not relevant for today's

18  hearing.  Thomas Jefferson University Hospitals, Inc. is the

19  purchaser.

20      THE COURT:  Yes.

21      MS. ERBECK:  The purchase price is $55 million

22  dollars and beyond that, it doesn't have a place at this

23  hearing.

24      THE COURT:  I'll sustain that objection.  I agree

25  with Ms. Erbeck.

1   BY MR. O'NEILL:

2   Q     Okay.  So, of the residency program assets, again, with

3   the understanding that there are several hospitals involved

4   here, what portion of those assets are being transferred

5   outside of the Philadelphia area as part of the transaction?

6            MS. ERBECK:  Objection, Your Honor.  I think Mr.

7   Merlis has already addressed the question of how assets are

8   being allocated as part and parcel of this transaction.

9            THE COURT:  I'll overrule that objection because I

10  think one of the issues is the delivery of healthcare in

11  Philadelphia.

12           MR. MCNEILL:  Correct, Your Honor.

13           THE COURT:  And I'll overrule the objection.

14  BY MR. MCNEILL:

15  A     The consortium is part of the greater Philadelphia and

16  greater Delaware Valley region and the six organizations are

17  part of that.

18  Q     So, the fact that some of the hospitals are in Delaware

19  and others are in New Jersey, your view is they're close

20  enough?

21  A     Yes.

22  Q     Okay.

23           MR. MCNEILL:  No further questions, Your Honor.

24           THE COURT:  Thank you, Mr. McNeill.

25           Yes, sir.  Good afternoon now.

1      MR. SMITH:  Good afternoon, Your Honor.  David

2  Smith, Schnader Harrison, representing the Pennsylvania

3  Department of Health.

4      THE COURT:  Yes, sir.

5      MR. SMITH:  I have two questions of Mr. Merlis.

6                    CROSS-EXAMINATION

7  BY MR. SMITH:

8  Q    The first is would you agree that the consortium

9  members are not purchasing any license granted by the

10  Pennsylvania Department of Health to Hahnemann University

11  Hospital?

12  A    We don't believe we need the license, correct.

13  Q    So, there is -- they are not purchasing it?

14  A    My understanding, yes.

15  Q    And second question would you agree that the consortium

16  members have not submitted any license application to the

17  Pennsylvania Department of Health relating to the residency

18  program assets that are the subject of the asset purchase

19  agreement?

20  A    My understanding that's correct.

21      MR. SMITH:  Thank you very much.

22      THE COURT:  All right, Mr. Smith, thank you.

23      Any redirect, Ms. Erbeck?

24      MS. ERBECK:  I just have one question for

25  redirect, Your Honor.

1          THE COURT:  Yes.

2                    REDIRECT EXAMINATION

3  BY MS. ERBECK:

4  Q     Hi, Mr. Merlis.  In Mr. Sack's cross-examination, he

5  asked you a lot of questions about purchasing slots, and I

6  just wanted to clarify.  Is Thomas Jefferson University

7  Hospitals, Inc. purchasing slots as part of this transaction?

8  A     No, we are not.

9  Q     And what is Thomas Jefferson University Hospitals, Inc.

10 purchasing?

11 A     It's the assets of the residency program.  It's our

12 ability to be able to actually operate the GME residency

13 program, and it's also the certainty that we would have that

14 there are resources available for us to be able to continue

15 the program into the future.

16         MS. ERBECK:  Thank you.  I have nothing further,

17 Your Honor.

18         THE COURT:  All right.

19         Mr. Sacks, anything further?

20         MR. SACKS:  No, Your Honor.

21         THE COURT:  All right, thank you.  You may step

22 down then, Mr. Merlis.  Thank you.

23      (Witness excused)

24         THE COURT:  Mr. Minuti.

25         MR. MINUTI:  Your Honor, I now have in the

```
 1  courtroom the actual agreement with Reading Hospital.

 2            THE COURT:  Good.

 3            MR. MINUTI:  If I may approach?

 4            THE COURT:  Yes, you may.  Thank you, sir.  Thank

 5  you.  All right.  You even got holes in it.  Thank you much.

 6            MR. MINUTI:  Your Honor, and what I would do is I

 7  would move that into evidence as the Debtors' Exhibit 3.

 8            THE COURT:  All right, yes, Mr. Lapowsky.

 9            MR. MINUTI:  And I think Mr. Lapowsky just has a

10  couple of clarifying comments with respect to the exhibit.

11            THE COURT:  All right, Mr. Lapowsky.

12            MR. LAPOWSKY:  Thank you, Your Honor.  Robert

13  Lapowsky for Reading Hospital.

14            Yes, Your Honor, what has now been handed up is

15  the final version, not yet signed, still with some blanks,

16  still with some exhibits to be attached that haven't been

17  finalized yet.  But the agreement itself, putting aside the

18  schedules and the exhibits is the final form of the

19  agreement.

20            THE COURT:  All right.

21            MR. LAPOWSKY:  The schedules and the exhibits will

22  be worked out over the next few days, I assume.

23            THE COURT:  All right.

24            MR. LAPOWSKY:  And then filed.

25            THE COURT:  But the exhibit as introduced is what
```

1   it is?

2           MR. LAPOWSKY:  The exhibit to the extent -- right.

3   To the extent it is the purchase agreement itself, that is

4   the final version.

5           THE COURT:  Exactly.  All right, thank you.

6       (Debtors' Exhibit 3 admitted into evidence)

7           MR. MINUTI:  Your Honor, that would then complete

8   the debtors' evidentiary record with respect to the motion.

9   We're prepared to move to argument.

10          THE COURT:  Does anyone have any other evidence

11  they wish to introduce any witnesses?

12      (No verbal response)

13          THE COURT:  All right, hearing none --

14          MR. MINUTI:  I'm sorry.  Your Honor, I'm reminded

15  of one thing, Your Honor.  We did attach to our reply the

16  provider agreement that's at issue here.  We would like to

17  move that into evidence as Exhibit 5.

18          THE COURT:  Any objection?

19          MR. SACKS:  I had no objection that that would be

20  moved into evidence.  I take exception to the fact of calling

21  that a provider agreement.  Maybe it is the sole entirety of

22  the provider agreement that negotiates relationship between

23  CMS and Hahnemann Hospital.

24          There are a number of documents that make up the

25  provider agreement.  We attached one to the objection we

1   filed last night which is the application that Hahnemann

2   filed to transfer from its previous owner to Hahnemann.

3               So certainly, no problem with that --

4               THE COURT:  So, your objection is to calling it

5   the provider agreement.

6               MR. SACKS:  It's a piece of the provider

7   agreement, yes.

8               THE COURT:  Mr. Minuti, is that your position as

9   well?

10              MR. MINUTI:  Your Honor, I didn't mean to bind

11  anybody by my characterization.  We just want the document

12  into evidence.  So if there's no objection to that, then we

13  can reserve argument as to what it is.

14              THE COURT:  All right, no objection, Mr. Sacks?

15              MR. SACKS:  There is no objection.

16              THE COURT:  All right, it is admitted then as

17  Exhibit 5.

18          (Debtors' Exhibit 5 admitted into evidence)

19              MR. MINUTI:  Your Honor, my suggestion in terms of

20  how we proceed with argument, I think, obviously, CMS's

21  objection is the largest objection and, perhaps, the most

22  complicated.  I think what would make sense is that we deal

23  with that now. And I'm, like I said, at Your Honor's

24  pleasure.  I can either talk about the objection.  We can let

25  Mr. Sacks present the objection and I can respond; however,

1   Your Honor would like to proceed.

2           THE COURT:  Well, let me ask Mr. Sacks how you

3   would like to proceed because it's your objection.  Would you

4   like to go first and proceed with your objection or have Mr.

5   Minuti discuss initially?

6           MR. SACKS:  It's really the court's preference.

7   I'm happy to do either.

8           THE COURT:  Why don't I have Mr. Minuti discuss it

9   initially then.

10          MR. MINUTI:  Thank you, Your Honor.

11          Again, Your Honor, Mark Minuti for the debtor.

12  Again, we're very pleased to be here, Your Honor, to ask the

13  court to approve this sale.  And I'm going to focus my

14  comments now on the objection filed by the United States --

15          THE COURT:  That's right.

16          MR. MINUTI:  -- on behalf of the Department of

17  Health & Human Services and the Center for Medicare and

18  Medicaid Services.

19          Your Honor, what I'll do is I'll just refer to

20  them as CMS throughout.  I think we all understand that.

21          THE COURT:  Exactly.

22          MR. MINUTI:  So, let me start, Your Honor, by

23  talking about what the CMS objection is not objecting to or

24  what they don't dispute.

25          CMS, Your Honor, does not dispute that the sale of

1   the residency program assets is in the best interest of the

2   debtors' estate and their constituents.  They don't dispute

3   that the majority of the former Hahnemann University Hospital

4   residents are now with the Jefferson consortium.  They don't

5   dispute that the members of the Jefferson consortium as a

6   practical matter have absorbed the operations.  They have our

7   doctors, they have our patients, albeit, at nearby locations.

8           They don't dispute that the members of the

9   consortium are all approved license medical providers.  In

10  other words, they don't dispute the quality of care to be

11  provided by those hospitals.  These are not fly-by-night, for

12  profit, sketchy institutions.  They're some of the most

13  respected institutions in our area.

14          CMS does not dispute that the majority of our

15  residents are not providing the services at the Jefferson

16  Consortium.  They don't dispute that the sale provides

17  tremendous benefit to the former residents ensuring medical

18  malpractice tail coverage.  They don't dispute it would be a

19  tremendous benefit to the Philadelphia community, that by

20  providing critical resources to local hospitals in the

21  Jefferson consortium.  It keeps the resident programs and the

22  medical training in the Philadelphia area, so those in need

23  of medical services can, in fact, get those services.

24          And, finally, they don't dispute that the

25  transaction provides a much-needed infusion of cash to these

1   estates.  We certainly have had our challenges in these

2   cases, Your Honor.  Your Honor has had a front-row seat to

3   some of those challenges, allowing us to consummate this sale

4   and bringing cash will go a long way, Your Honor, to

5   resolving a number of issues in these cases and should put to

6   rest any fear, Your Honor, that we're going to make it

7   through a sale of St. Christopher's Hospital as a going

8   concern, which is really the debtors' main motivation at this

9   point in these cases.

10          So what's this objection all about, Your Honor?

11  It really boils down to two legal arguments.  First, CMS

12  argues that the proposed sale violates federal law.  Because,

13  according to CMS, a provider agreement and a provider number

14  can only be transferred if there is a "change of ownership."

15          Again, according to CMS, federal law provides that

16  in order for there to be a change of ownership, there must be

17  a purchase of substantially all of the debtors' assets and

18  that the buyer must continue operating the debtors' business

19  as a going concern.

20          That's what it says, Your Honor, in their initial

21  timely objection at paragraphs three and twenty-two.  But the

22  reality, Your Honor, is that there is no federal law.

23  There's no statute.  There's no rule.  There's no regulation

24  that requires our purchaser to purchase substantially all of

25  the assets of Hahnemann University Hospital or to acquire

1  Hahnemann University Hospital as a going concern.  Again,

2  there is no statute, rule, regulation, anything, Your Honor,

3  that precludes Your Honor from approving the sale that's

4  before Your Honor today.

5          The only federal law that the government CMS cites

6  that precludes this transaction is 42 CFR 49818.  That's a

7  regulation.

8          And I don't know if Your Honor has a copy of our

9  reply in front of you.

10          THE COURT:  I do.

11          MR. MINUTI:  Attached to the reply, Your Honor, I

12  believe, it is at Exhibit A is a copy of that regulation.

13          THE COURT:  And I copied it myself, Mr. Minuti.

14          MR. MINUTI:  Thank you, Your Honor.

15          Give me just one second to find it, Your Honor.

16          THE COURT:  And this is 489.18 in 42 CFR, change

17  of ownership or leasing effect on provider agreement?

18          MR. MINUTI:  Correct, Your Honor.

19          This is the federal law that CMS argues precludes

20  Your Honor from approving this transaction.  And if you look

21  at the regulation, Your Honor, it is not a long regulation.

22          THE COURT:  No.

23          MR. MINUTI:  But when you read it, what you will

24  see is that it in no way precludes the transaction that's

25  before Your Honor today.  Again, as Your Honor just pointed

1   out, the title of the regulation is change of ownership or

2   leasing effect on provider agreement.

3          And it goes onto provide that, Your Honor, under

4   certain transactions, certain facts, none of which are before

5   you today, those facts constitute a change of ownership.  And

6   if those facts occur, and there is a change of ownership, it

7   goes onto say at subsection (c) that the provider agreement

8   under those facts automatically transfers.

9          But under the plain meaning of that regulation,

10  Your Honor, and I know Your Honor has read it before you came

11  out on the bench today and you can look at it right now has

12  nothing to do with the sale before the court today. Contrary

13  to CMS's assertions, Your Honor, the regulation does not say

14  that there must be a change in ownership to transfer a

15  provider agreement and provider note.

16         It does not say that a change in ownership under

17  the circumstances described in the regulation is the only way

18  a provider agreement can be transferred.  It does not say

19  that a provider agreement can only be transferred to a buyer

20  who acquires substantially all of the assets of the selling

21  entity.  It doesn't say that.  It doesn't say, Your Honor,

22  that the purchaser must actually operate the seller's

23  business.  Again, it doesn't say that.

24         So what the government is asking the court to do

25  is add language to a plain and unambiguous regulation and/or

1    to conclude that the only way that you can transfer a

2    provider agreement and provider number is under the specific

3    circumstances set forth in this regulation.  But the

4    regulation doesn't say that, Your Honor.

5            And the government itself must concede that a

6    provider agreement can be transferred in ways outside of the

7    regulation.  In fact, and as pointed out in paragraph fifty-

8    nine of our reply, the government's own materials, CMS's own

9    materials including its program integrity manual and its

10   provider reimbursement manual specifically recognized

11   circumstances under which provider agreements could be

12   transferred outside of regulation 489.18.

13           There simply is no basis and no reason for the

14   court to rewrite this regulation to suit CMS's needs in these

15   cases whatever they may be.  Certainly, there's no basis to

16   do that and no grounds to do that when this sale transaction

17   before Your Honor is going to provide so much good to this

18   debtor, its creditor, Philadelphia, the Philadelphia

19   community and the healthcare community in general.

20           The bottom-line, Your Honor, is that there is

21   nothing in 42 CFR 489.18 that precludes the sale.  There's no

22   support for the government's self-selected reading of this

23   regulation.  And the government, again, hasn't pointed to

24   another rule, statute, regulation which would preclude the

25   sale that's before the court today.

1          THE COURT:  Let me ask you this question.  Does it

2   provide for a transfer in a change of ownership by exclusion?

3   In other words, if I look at (c) 489.18(c) "When there is a

4   change of ownership then the existing provider agreement will

5   automatically be assigned to the new owner."

6          By exclusion, if you will; does that mean that

7   there has to be a change of ownership?

8          MR. MINUTI:  I would submit not, Your Honor.  I

9   think the point -- look, my reading of the regulation or the

10  point of the regulation, which by the way the government

11  creates, right.  If they wanted a regulation that said what

12  they say, 489 says they could do that.  But my read of 489,

13  Your Honor -- let me make sure I have the right number here.

14         My read of 489.18, Your Honor, is that what

15  they're making clear is that in those circumstances, in the

16  circumstances specifically spelled out, the provider

17  agreement automatically goes.

18         THE COURT:  Right.

19         MR. MINUTI:  Because what they don't want is a

20  situation where those transaction happens and then the

21  surviving entity says oh, no, no.  We didn't take the

22  provider agreement.

23         THE COURT:  Right.

24         MR. MINUTI:  That doesn't by definition mean that

25  the only way you can transfer a provider agreement is a

1  change of ownership.  I just don't read that there.   And,

2  again, Your Honor, if the government wanted a regulation that

3  said that, they could create it.  It doesn't exit.

4          So, they want Your Honor to read into the statute

5  or, excuse me; the regulation that something that is not

6  there, again, to suit their own purposes, we have no idea

7  what they are, Your Honor.

8          But let me take Your Honor's position.  Let's even

9  assume that you're right, that there has to be a -- or not

10  your right, but let's assume their right.  This idea that

11  there has to be a change of ownership in order for there to

12  require to be a transfer.

13          The definition of change of ownership that's

14  contained in this regulation cannot by definition be the only

15  circumstances under which there's a change of ownership.  In

16  fact, we know based on the government's own materials that

17  there are changes of ownership outside the strict reading of

18  48919.  So what do we have here, Your Honor?

19          We have Hahnemann University Hospital, when you

20  really boil it down, what do we have here patients, right,

21  and we have doctors, right.  The doctors are going to the

22  consortium.  The patients are going to the consortium, right.

23  You heard the statistics.

24          Their admissions have gone up.  We have a

25  substantial majority of our residents have already gone over

1   there.  Their within three miles, three of the members of the

2   consortium are in three miles of this hospital.  That's where

3   the business operations, right, the patient providing the

4   patient care.  That's where it's going.  It's going to the

5   consortium.  They're taking it over.

6           So, I would argue as a practical matter, Your

7   Honor, if you're hung up on this idea that there has to be

8   change of ownership, and I would submit we don't have to have

9   that, I would submit that the Jefferson consortium has taken

10  ownership of the main thing this hospital did which is

11  provide care to patients with doctors and residents and

12  that's where we are.

13          So for all these reasons, Your Honor, we believe

14  the government's objection based upon 489.18 should be

15  overruled.  Again, it simply does not say what they say it

16  says and certainly, they haven't pointed to anything, Your

17  Honor, that would restrict the transaction before the court.

18          So, let me get to their second argument, Your

19  Honor.

20          Their second argument is that the only way the

21  provider agreement and provider agreement can be transferred

22  is for pursuant to Section 365 of the Bankruptcy Code.

23          THE COURT:  That's right.

24          MR. MINUTI:  And, by the way, you have to do it

25  under 365 and the only way you can do it under 365 is if the

1  buyer takes unlimited successor liability.  That's their view

2  of the law and that's required.  But that position is wrong

3  as a matter of law and it's consistent with CMS's own past

4  practice in other cases, Your Honor, where it agreed to cap

5  the liability.

6       Now, first, the provider agreement is an asset

7  that can be sold pursuant to Section 363 of the Bankruptcy

8  Code, free and clear of interest.  It does not have to be

9  transferred under Section 365.

10       The Medicare provider agreement, Your Honor, my

11  characterization, is Exhibit B to our reply.  Your Honor can

12  look at it.  It's one page.

13       THE COURT:  Right.

14       MR. MINUTI:  It's a one-page document, Your Honor.

15  You know what it does?  It incorporates the statutory and

16  regulatory scheme of Medicare.  Right?  The rights and

17  responsibilities of both the government and the debtor don't

18  arise under this document.  They arise by statute.  Because

19  they arise by statute, Your Honor, it is an asset that can be

20  transferred, pursuant to 363.

21       There's only one case --

22       THE COURT:  University Medical Center case.

23       MR. MINUTI:  Well, I'll talk about University

24  Medical Center in a minute, Your Honor, but I'm talking about

25  the BDK Health Management case, Bankruptcy Court of Florida.

1          Now the government wants to belittle this and say

2    it's only one court, but it's the only court that's directly

3    dealt with the issue before Your Honor today.  In the context

4    of a sale, is this, in fact, an asset that can be sold or is

5    it is a contract that must be assumed and assigned.

6          In that case, the judge easily concluded that a

7    provider agreement and provider number are not executory

8    contracts, but instead are statutory entitles that can be

9    sold.  In reaching the conclusion, the court pointed out that

10   the rights and duties of a healthcare provider and the

11   government are set forth not in the provider numbers and

12   agreements but, rather, in the Medicare statutes and

13   regulations.

14         The court went onto say that the government's

15   entitlement to recover overpayments was statutory and did not

16   arise under an executory contract.  Because the party's

17   rights are based in statute and not contractual rights, a

18   healthcare provider can't bring a breach of contract case

19   against the government.  It must proceed pursuant to the

20   statutory scheme.

21         For these reasons, the court easily concluded that

22   the provider numbers are not executory contracts and, thus,

23   11 U.S.C. 365 does not apply. Consequently, Your Honor, the

24   movants do not have to comply with the requirements of

25   Section 365 in order to effectuate a sale of their assets.

1           Like in this case, Your Honor, and let's talk

2   about University Medical Center, in that case the BDK case,

3   the government brought up the Third Circuit case of

4   University Medical.  And said, wait a minute.  We got this

5   Third Circuit case out here and in this Third Circuit case,

6   the Third Circuit held it was an executory contract.

7           But the BDK court looked at that and said, but

8   wait a minute.  Everybody in that case assumed it was an

9   executory contract.  The issue wasn't presented to the Third

10  Circuit.  The Third Circuit didn't decide the issue --

11          THE COURT:  Didn't discuss that.

12          MR. MINUTI:  Didn't discuss that.  It was presumed

13  to be the case.

14          And just like the court in BDK, I think Your Honor

15  is not bound by a decision in University Medical because they

16  didn't decide the issue.  We're putting the issue before Your

17  Honor today.

18          Now, by the way, the BDK court is holding that the

19  provider agreement is not an executory contract is consistent

20  with other courts.  And, in fact, is consistent with the

21  position the government has taken in other context.

22          The position they take in another context is that

23  a provider agreement is not an executory contract.  As

24  pointed out in our reply, Your Honor, the government argued

25  the exact position -- excuse me; the exact opposite position

1   in <u>United States vs Tenet Healthcare Corp</u>.   That's a case in

2   the central district of California.   In the <u>Southeast</u>

3   <u>Arkansas Hospice</u> case.   That's in the Eastern District of

4   Arkansas.

5            And based upon the government's arguments, to the

6   contrary, courts outside of bankruptcy have held that

7   provider agreements, provider numbers are statutory

8   entitlements, not executory contracts.

9            THE COURT:   And that business lawyer article that

10  you provided as well.

11           MR. MINUTI:   And what that's led, Your Honor, is a

12  lot of guys like me who represent debtors who get frustrated

13  who say, wait a minute.   The government for years, a long

14  time, has taken this position outside of bankruptcy.   But

15  when it's in bankruptcy court, they take the exact opposite

16  position, and that's led to a lot of frustration, Your Honor.

17           We attached that article, you'll see as Exhibit C.

18           THE COURT:   Yes.

19           MR. MINUTI:   But, Your Honor, I keep coming back

20  to the exhibit that we've now moved into evidence that's

21  Exhibit B to our reply. It's a one-pager, right.   The meat of

22  the relationship here, nobody can debate.   The meat of the

23  relationship is in the statues and the regulations.   That's

24  why this is a statutory entitlement. That's why it's not an

25  executory contract.

1    Because it's a statutory entitlement, we can sell

2    it under 363(f), free and clear of interest, and we can do

3    that, Your Honor, because whatever they think they're

4    entitled to, and we don't even know, that number is in

5    dispute or, alternative, Your Honor, we're talking about

6    money satisfaction, right.  365(f) -- excuse me; 363(f)(5)

7    says, that if an objecting party can be required to accept

8    the money satisfaction it can be sold free and clear of their

9    interest.  And that's exactly what's happening here, Your

10   Honor.

11   So, under 363, the court can authorize the sale.

12   But, again, if Your Honor decides I'm wrong and this is a 365

13   issue, we can still assume and assign this agreement under

14   365 free and clear and not require our buyer to take on

15   unlimited successor liability.

16   Now under 365, Your Honor, there's two

17   requirements that we have to prove or establish in order to

18   assume and assign a contract.  One is we have to cure any

19   defaults or show adequate assurance that we'll probably cure

20   a default.  And, number two, we have to show that our buyer

21   or there's adequate assurance of future performance.  In

22   other words, our buyer is going to abide by the contract.

23   So, let's talk about cure first.  We listed the

24   agreements at issue here with a zero-cure amount.  The

25   government has never objected.  They never asserted there's a

1  cure amount, so we're not talking about cure here.  We're

2  talking about adequate assurance of future performance.

3          More specifically, what we're talking about is, if

4  it turns out that the debtor was overpaid who's going to pay

5  the government back to ensure that they're going to be made

6  or to provide adequate assurance that they're going to be

7  made whole.  That's what we're talking about.

8          We solved that problem under the structure of the

9  asset purchase agreement with the Jefferson consortium.

10  Under the asset purchase agreement with the Jefferson

11  consortium, we have a $3 million dollar escrow account that's

12  going to sit there that's going to be available to pay the

13  government to the extent it turns out there is any

14  overpayment that was made to the debtor during its operation.

15          And you heard Mr. Weiland testify for all of 2018,

16  the overpayment amount was about $800,000 dollars.  We're

17  talking about nine months of 2019 at a time when their

18  operations at the hospital were trailing off; therefore,

19  reimbursements are trailing off and, yet, we have a $3

20  million dollar escrow.

21          Okay.  Now, meanwhile, we met with the government

22  and we said look, we have $3 million dollars sitting here.

23  That should be more than enough.  Do you think it's enough?

24  Do you think it should be more?  But, again, they wouldn't

25  engage, Your Honor.  Right.  We're trying to -- frankly, we

1   didn't want to be here in this fight.

2          Now what the government says is well, no, you

3   can't solve this adequate assurance problem by creating an

4   escrow.  The only way to fix it is if the buyer signs on for

5   unlimited liability and that's wrong as a matter of law.

6          Courts here, everywhere, routinely cut off

7   contractual provisions or contractual obligations in the

8   context of assumption and assignments related to adequate

9   assurance.  And I'll give Your Honor a simple example.

10          Your Honor has had a ton of retail cases.  In

11   every retail case when a lease is signed, typically those

12   retail leases have a number of provisions, and I'll give you

13   a couple of examples.

14          Having indemnification provision.  Somebody slips

15   and falls, tenant has to indemnify the landlord.  Right.  A

16   lot of those leases have what are called yearend adjustments,

17   right.

18          THE COURT:  Yes.

19          MR. MINUTI:  We estimate what the electricity is

20   going to be for the year.  We bill the tenant one twelfth.

21   And then we get to the end of the year.  And if we under-

22   estimate, the debtor has to pay the different, make it up.

23   Okay.

24          So how do we deal with those issues once the

25   debtor is transferring that lease to somebody else?  Well, we

1   show adequate assurance of future performance.  How do we do

2   that?

3            We'll use my slip and fall example.  One way we do

4   that is to say hey, the debtor had adequate insurance

5   coverage.  So if it turns out a slip and fall happened on the

6   debtors' watch, but the claim doesn't arise until the buyer

7   owns the property or has the lease, the landlord can look to

8   the insurance coverage and, therefore, there's adequate

9   assurance.

10           So, the new tenant doesn't take on the obligation.

11  We show adequate assurance because the debtor has the ability

12  to cover that eventuality.

13           Use my yearend adjustment scenario.  Sometimes,

14  the new tenant will take on the obligation.  But sometimes

15  the debtor says no.  I'm going to have enough money at the

16  end of the day that whatever those adjustments turn out to

17  be, we're going to have the ability to pay it.

18           In other words, we're going to show adequate

19  assurance that that contract will be honored and that

20  contract will be made whole and, therefore, it can be assumed

21  and assigned.

22           Now, remember, adequate assurance is not a

23  guarantee.  And it was interesting the cross-examination,

24  right.  It's not a guarantee.  But what we have to show, Your

25  Honor, is that there's a reasonable probability that at the

1  end of the day, the nondebtor contract party is going to be

2  protected, right.

3          THE COURT:  Right.

4          MR. MINUTI:  We think $3 million dollars satisfies

5  adequate assurance of future performance.  It's sitting there

6  for the government.  Our history is, Your Honor, a full year

7  at $800,000 dollars and, therefore, we think we've provided

8  adequate assurance.

9          So, the government is wrong when it says that the

10 only way there can be adequate assurance in this case, Your

11 Honor, is because the buyer has to take on unlimited

12 successor liability.

13         Now in support of their argument, Your Honor, the

14 government relies upon the U.S.A. vs. Vernon Home Health

15 case.  I do want to touch on that briefly.

16         That's a Fifth Circuit case.  It didn't involve

17 bankruptcy.  And there, you had a buyer, Your Honor, who

18 pointed to a Texas state law to say that that Texas state law

19 trumped the federal law and absolved him of liability.  It

20 has nothing to do with the facts of our case, Your Honor.

21 It's not even relevant to what we're here today or doing

22 today.

23         What we're doing today, Your Honor, is talking

24 about adequate assurance of future performance and for all

25 the reasons I've already mentioned, I think we met it, Your

1  Honor.  There is an easy fix.  We set aside money.

2          If $3 million dollars is not enough, if Your Honor

3  thinks it should be more, we'll set aside more.  But the

4  point is nobody is trying to stick the government up. Nobody

5  is trying to leave the government holding the bag. We're

6  trying to demonstrate adequate assurance of future

7  performance and we think we've done that.

8          And if Your Honor thinks it should be more, again,

9  we'll do what's necessary to get the transaction done because

10  the transaction brings about so much good.  We think that's a

11  practical and appropriate way, Your Honor, to balance the

12  dueling needs here in this case which is to protect the

13  government, and I don't make light of that, Your Honor;

14  protect the government that they're not going to be left

15  holding the bag.  But, at the same time, allow a transaction

16  to go through that no regulation precludes that's going to

17  bring about so much good for these debtors and this estate.

18          Now, again, Your Honor, we think the better

19  analysis here is that we can sell the Medicaid assets

20  pursuant to 363.  But if 365 Your Honor ultimately concludes

21  that applies, then I think I've outlined exactly how we can

22  do it in a fair and appropriate way that complies with the

23  statute.

24          Now let me hit on a new argument, Your Honor, that

25  was raised by the government which is or CMS which is that

1  the provider agreement somehow terminates, is terminated or

2  will terminate.

3          THE COURT:  Yes.

4          MR. MINUTI:  Right.  Now, here, Your Honor, the

5  testimony of Mr. Weiland was unrebutted. While it is clear

6  we're not continuing to see patients, the business of the

7  hospital is not shut down.  There are a host of things going

8  on at the hospital.  We've got numerous employees at the

9  hospital.  We're doing billing and collecting.  You know,

10 we're doing the patient navigation services that we

11 indicated.  We're dealing with hospital records.

12         You know, we have a closure plan.  Your Honor has

13 heard a lot about.  We negotiated with the city.  We've been

14 negotiating with the Department of Health.  That closure plan

15 has a lot of steps, Your Honor, that has to be implemented

16 going forward into the future.  Until those steps are done,

17 until we are completed, until we shut everything done, the

18 hospital remains in business, and that's what it's doing,

19 Your Honor.

20         The regulation the government cites 42 CFR

21 489.52(b)(3), I encourage Your Honor to look at the

22 regulation closely because what the government does is cite

23 that regulation.  But then it goes onto talk about the fact

24 that the debtor is not seeing patients.  But that's not what

25 the regulation says, Your Honor.  The regulation doesn't say

1  that you've terminated when you stop seeing patients.

2         It says, Your Honor, that it's when there's a

3  cessation of business, when there's a cessation of business

4  that's when there's deemed to be a termination of the

5  provider agreement.  So, it doesn't turn on when you stop

6  seeing patients.  It turns on when you stop being in

7  business.

8         And, again, on this point, Your Honor, Mr.

9  Weiland's testimony was quite clear and unrebutted.  The

10  hospital is still in business, notwithstanding the fact that

11  we're no longer seeing patients.  Again, the term used in the

12  statute is ceasing business.

13         THE COURT:  Right.

14         MR. MINUTI:  Finally, Your Honor, I want to talk

15  about the argument that this really goes back to 365 that

16  this violates the Anti-assignment Act because the government

17  gets the consent and they're not going to provide their

18  consent in these circumstances.

19         In response, Your Honor, we did cite the ANC

20  Rental Corporation case. That's at -- I think it's 277 B.R.

21  226, the year 2002.  It looks like Your Honor may have been

22  one of the litigants there, one of the parties in that case.

23  But there, the judge, I think it was Judge Walrath took a

24  look at 365(c)(1) and said, look the point of 365(c)(1) is

25  really to cover a couple of circumstances.

1              The first circumstance is where you have a

2   personal services contract, right.  And you can't assign a

3   personal services contract to somebody who couldn't

4   necessarily provide the services.  That's not what's going on

5   here, Your Honor. We're assigning these rights to some of the

6   most respected healthcare institutions.  Nobody is

7   questioning their ability to provide the services going

8   forward, so that's not what's going on here.

9              Next, Your Honor, 365(c)(1) really deals with this

10  idea of public safety, right. We wouldn't want to assign

11  these rights to somebody that can't provide healthcare.  You

12  know, Joe Schmo, somebody off the street who has no history.

13  Again, because we're assigning the rights here to some of the

14  most respected healthcare institutions in the region, the

15  reason for 365(c)(1) is simply not at issue in this case,

16  just like it wasn't at issue in the ANC case and, therefore,

17  Your Honor, the Anti-Assignment Act which would otherwise

18  have given the government a veto right over this transaction

19  simply does not apply because those provisions 365 do not

20  hold.

21             So, in conclusion, Your Honor, look, I guess, I'll

22  say this before the government gets up, Your Honor.  We are

23  very disappointed to be here in a contested matter with the

24  government.  But we were unable to reach any agreement in

25  terms of how we could move forward to satisfy the

1  government's concerns.

2         Look, no doubt, Your Honor, they have acted

3  professional in the process.  They're clearly were very

4  interested in the process.  They wanted to understand the

5  transaction.  I think they do understand the tremendous

6  benefits here if Your Honor approves these sales.

7         And what's so little frustrating here is we know

8  they agreed to cap liability in other cases and for whatever

9  reason, they chose not to engage in this case.  We also know

10  that they're very concerned about a finding that provider

11  agreement and a provider number can be sold pursuant to

12  Section 363 is very much of a concern to them.

13         And, look, nobody -- somebody touched on this

14  earlier, Your Honor.  Nobody in the courtroom wants to see

15  this dealt with in a long-drawn-out appeal.  So, I think, in

16  conclusion, Your Honor, what I'd like to say is I certainly

17  we are on the better side of the case law here for all the

18  reasons I've already mentioned.

19         But I know that in this case and in other cases,

20  Your Honor has been successful in encouraging parties to talk

21  and, perhaps, making some preliminary comments to give

22  parties an idea of why they should talk and maybe see if

23  there's a resolution here.

24         And so, again, while we believe strongly that we

25  are on the right-side of the law, we don't necessarily care

1    how we get there, Your Honor.  If we come up with a

2    methodology where we can approve the sale to bring about so

3    much good, that's what we want to do.

4            So, perhaps, the court at some appropriate point

5    can give us some guidance without a full ruling but, if not,

6    Your Honor, for all the reasons I've already articulated, we

7    think Your Honor is well within the law to authorize the

8    transfer of these assets, and we would encourage Your Honor

9    to do so.  Thank you.

10           THE COURT:  Thank you, Mr. Minuti.

11           Mr. Sacks.  Oh yes, I'm sorry.  Mr. Jackson, yes,

12   sir.

13           MR. JACKSON:  Thank you, Your Honor.  Patrick

14   Jackson, Drinker Biddle & Reath of the purchaser, Thomas

15   Jefferson University Hospitals, Inc.

16            I just rise to note that we had joined in the

17   written reply that the debtors had filed and we certainly

18   join in Mr. Minuti's arguments just now.

19           We would like to additionally make some argument,

20   but I think I don't want to preempt Mr. Sacks and I think our

21   preference would be, if possible, to offer our commentary

22   following Mr. Sack's argument.  I think there's way that we

23   may -- depending on how the issues shake out and certainly

24   what Your Honor's concerns may be or questions may be.  I

25   think we may be able to offer some assistance.

1          We have a slightly different perspective on the

2  transaction. And certainly, our bid was the driver of some of

3  the changes that you may have seen between the sale order

4  that was filed with respect to our transaction versus the

5  stalking horse sale order.

6          THE COURT:  Yes.

7          MR. JACKSON:  There's a lot of changes to that.

8  And we were the driver of a lot of that and there were

9  reasons for those.  And I think it may shed some light or it

10  may be helpful in either court's assessment of the objections

11  raised by CMS for us to be heard on those. But I think it

12  makes more certainly and certainly our preference would be to

13  be able to regroup a little bit before presenting that to

14  Your Honor.

15          So, I just wanted to throw that out there.  I'm

16  happy if Your Honor would rather hear our additional thoughts

17  now, happy to do that to, but I just wanted to rise to make

18  sure that the train didn't leave the station without me.

19          THE COURT:  All right.  All right, Mr. Jackson.

20          Well, let me say this.  You know its quarter to

21  one.  It's kind of getting to be lunchtime and I know we have

22  a way to go and I do think we need a break.

23          And the reason I think we need a break is this and

24  I direct this primarily to you, Mr. Sacks, because I

25  recognize your arguments.  I appreciate your arguments.  But

1  if you win, this bankruptcy case fails.  And I don't know

2  what benefit that is to the government or to anyone.

3          I just point that out to you because it's the

4  reality of this situation and I don't think the government

5  wants this bankruptcy case to file on its arguments.  So, I'm

6  going to suggest that over lunch the parties talk and see if

7  there isn't some way to accommodate the government's needs

8  with the debtors' needs, with Jefferson's needs because I

9  think it's there.

10          And, look, I'd be happy to take you back into

11  chambers and talk to you about this.  And if that's what the

12  parties want, you know, just ask after you've talked and I'll

13  do that.  I know there are other objections that remain to be

14  addressed as well, serious objections.  And the court does

15  take all of those objections seriously.

16          But this is the primary objection, as far as the

17  court is concerned, and I do think that there is a way --

18  there has to be a way around it.

19          Mr. Sacks, yes, sir.

20          MR. SACKS:  Can I be heard briefly, Your Honor, on

21  that point?

22          We have spoken with the debtors and the purchasers

23  together at length.  They ask us to come see them and let

24  them present the transaction to us. We did that.  They've

25  told you that we didn't engage.  That's their perspective.  I

1    think we did.  We asked a lot of questions of them. They ask

2    a lot of questions of us.  I think we made an effort to

3    understand what each other was thinking and doing and the

4    perspectives we each brought to process.

5            CMS, you heard Mr. Minuti talk about what are our

6    purposes.  He doesn't know what our purposes are.  The

7    purposes are very simple, Your Honor.  It's to apply the law

8    to the facts.  That's all it is.  And I don't know enough to

9    say if this bankruptcy will fail if the sale transaction does

10   not go through.  That's not my providence to say.

11           All I can say is, is the sale transaction proposed

12   consistent with law.  And our position is that it's not.  So,

13   I appreciate the offer for us to speak further.  I just don't

14   think there's anything more to talk about.  And I think we've

15   talked about everything that can be discussed.  And if that

16   means the court is going to rule against us, I understand

17   that.

18           But we need to stand in our legal objections

19   because this is not an area where there's gray to negotiate

20   as we see it.  Its black letter law applied to this

21   situation.  And I'm happy to explain that more when we

22   discuss the objection, but I don't think further discussion

23   will be fruitful because there is simply no gray area in

24   which to compromise.

25           THE COURT:  But it's not the cure amount really,

1    is it, Mr. Sacks?  Isn't the $3 million dollars more than

2    sufficient to provide the overpayment protection?

3          MR. SACKS:  No one can know that, Your Honor.  And

4    that's why when there is a change of ownership and when you

5    look at 489.18, it tells you that when you take on a provider

6    agreement, you take on all the burdens and the benefits.

7    That's full successor liability.  That is what Medicare law

8    requires.  That law applies outside of bankruptcy.  And based

9    on mission product, the Supreme Court affirming again, that

10   law applies in bankruptcy.   That is the only means by which

11   there can be an assumption and assignment of the Medicare

12   agreement under Section 365.

13         THE COURT:  All right.

14         MR. SACKS:  So but, again, there are multiple

15   levels of why this transaction is contrary to law.  Before we

16   get to the question, you only get to the cure amount if it's

17   an appropriate sale.  And then we determine whether or not

18   there's adequate assurance of future performance.  But we

19   never get there as we see it, and I'm happy to explain that

20   more to the court.

21         THE COURT:  All right.  Why I do think we need a

22   break in any event because we've been going a good while and

23   I'll hear from Mr. Sacks after the break.

24         You know I recognize your arguments, Mr. Sacks.  I

25   just think that perhaps you're viewing this too narrowly.

1    But I understand the argument and I'll hear you at two

2    o'clock.  All right.

3              We'll take a break until two.

4              MR. KLAUSNER:  Your Honor, it's Gary Klausner.  I

5    just wanted to reiterate that our client is available.  We're

6    interested in the hospital which I think would alleviate some

7    of the problems that have been raised by CMS if we could be -

8    - we would be happy to be included in any discussion either

9    on or off the record with CMS, Jefferson, the debtor and the

10   committee to see if our participation might be able to bridge

11   the gaps here.

12             THE COURT:  All right, well obviously that will

13   depend on the ruling and we'll see where we are at the end.

14             Thank you.  With that, we'll stand in recess.

15             MR. KLAUSNER:  Thank you.

16        (Recess at 12:43 p.m.)

17        (Proceedings resume at 1:58 p.m.)

18        (Call to Order of the Court)

19             THE COURT:  Good afternoon, everyone, you may be

20   seated.  Thank you.  I hope you all had a decent lunch.

21             Mr. Minuti.

22             MR. MINUTI:  We did, Your Honor.  Mark Minuti.

23   Thank you for the lunch break, Your Honor.  I know a number

24   of folks needed it.

25             Consistent with Mr. Sack's comments, Your Honor,

 1  there really was no dialogue during the break, to his words,

 2  so I think, at this time, it's the government's argument.

 3              THE COURT:  All right thank you, Mr. Minuti.

 4              Mr. Sacks, you're at bat.

 5              MR. SACKS:  May I please the court --

 6              THE COURT:  I got your reply this morning.

 7              MR. SACKS:  Yes.

 8              THE COURT:  I did not have a chance to read it,

 9  but I will do so.

10              MR. SACKS:  Okay.  Thank you, Your Honor.

11              Yes, and I apologize for filing so close to the

12  hearing itself.  As you know, the debtor has filed their

13  reply to our previous objection last Wednesday and we've been

14  working since then to craft an objection that restates what

15  we have said twice already to the court, but in a little more

16  detail, and also responds to points raised by the debtors.

17              THE COURT:  Okay.

18              MR. SACKS:  And so, I think, I would hope, since I

19  wrote it, it would not be a waste of the court's time to look

20  at it.

21              THE COURT:  Of course.

22              MR. SACKS:  Your Honor, about a month and a half

23  ago, you held a hearing.  I believe Mr. Minuti said at the

24  time CMS has a veto power over this transaction.  They're

25  going to have to agree to it.  And I think after I had spoken

1   by phone, he said, CMS counsel stood up here and said, you

2   know, look, you need our approval for this transaction to

3   happen, and we agree with that, Your Honor.  We agree with

4   that.

5           So, we think that's the case.  Obviously, things

6   have changed and the debtors are now asking the court, over

7   CMS's objection, to approve the sale and we understand that,

8   but we do think that CMS approval should be required, and

9   I'll talk about why that is.

10          But let's start first, if we could, with the

11  resident slots.  You've heard testimony about the resident

12  slots.  There's over 500 permanent CMS funded resident slots

13  that are associated with the Hahnemann provider agreement,

14  right.

15          And, of course, throughout the bankruptcy Your

16  Honor has been very concerned, rightfully so, about the

17  residents at Hahnemann who essentially had the carpet pulled

18  out from under them, right, in the middle of their

19  residencies.  That's not at issue here.

20          As I think you know, they've all gone to other

21  hospitals and they are all eligible to receive temporary

22  Medicare funding for their residency slots that will last as

23  long as their residencies go.  So, they're taken care of.

24  That's no longer at issue here in this sale.

25          While the debtors will tell you, of course, the

1   tail insurance is, and they've talked a little bit about

2   that, but the residents themselves taken care of.  So what

3   we're talking about are the 500 permanent resident slots that

4   have been awarded to Hahnemann by CMS and whether or not

5   those can be transferred in a private sale when Hahnemann is

6   closing.

7          And I think it really doesn't matter whether the

8   court believes Hahnemann today has stopped providing medical

9   services to the community as 49.52 talks about or whether it

10  will do so soon because there's no dispute it's closing

11  imminently.

12         And so, Congress has spoken to what happens to

13  permanent resident slots when a hospital closes.  And that

14  came about in the ACA in 2010.  Because way back in 1997, the

15  Balance Budget Act capped the number of resident slots

16  nationwide that are funded by CMS and so, those slots,

17  obviously, are valuable to hospitals, valuable to their

18  ability to provide patient care but they were capped by

19  Congress at that time and they are means by which you may be

20  able to get new ones or exchange them, but they're very

21  limited.

22         So what Congress did in 2010 recognizing when a

23  hospital closed, the resident slots would extinguish, it came

24  up with a process and a plan as to what happens when a

25  hospital closes.  And so, if you look at 42 U.S.C

1  1395ww(h)(4)(H)(vi) -- it's a long complicated cite there,

2  but essentially, you know, I asked Mr. Merlis about this and

3  there was objections as to, you know, -- you need a lawyer to

4  understand it.  You really don't.  I think it's pretty

5  simple.

6          And what it says is that when a hospital closes

7  the resident slots are distributed by HHS, hospitals can

8  apply and there is a priority scheme set up by Congress

9  within the statute as to how HHS awards these slots.

10          Now since 2010, this has been done fourteen times

11  and Jefferson and Abbington, who I believe is one of the

12  consortium members, have bid and submitted applications for

13  CMS and, in some cases, won resident slots through this

14  public process.  But, again, this is Congress speaking to

15  what happens to a closing hospital's resident slots.

16          And it's not that those hospitals can transfer

17  them privately to anyone they want.  HHS is responsible for

18  administering a public process by which the residency slots

19  are applied for and then awarded based on the priority scheme

20  Congress set forth.

21          And essentially what the debtors and Jefferson are

22  asking this court to do is ignore Congress' express intent

23  for what happens when a hospital closes and allow a private

24  sale.  And as we lay out in our objection, there's multiple

25  reasons why that should not be permitted to happen.  And

1    essentially, parties don't have the authority to privately

2    contract when Congress is given that power to HHS.

3            And were this court to order the sale and allow

4    that private sale, arguably there might be separation of

5    powers concerned when Congress has said this is what happens

6    to residency slots when a hospital closes.  So, I think

7    that's important to consider.

8            The debtors have not addressed that statute in its

9    implication here in their reply or their discussions today.

10   May Jefferson will --

11           THE COURT:  Can you give the cite to that statute

12   if you don't mind, Mr. Sacks?

13           MR. SACKS:  Sure.  42 U.S.C. 1395ww, then there's

14   four parens, (h)(4)(H)(vi).

15           THE COURT:  Okay.  All right.  And that's in your

16   papers?

17           MR. SACKS:  Absolutely, Your Honor, yes.  And

18   essentially even more broadly than that residency slots,

19   right, the right to have a resident that is paid for by CMS

20   is not property of the estate to begin with and should not be

21   considered so such that the court can oversee how it gets

22   disposed of in the bankruptcy.

23           These residency slots are solely a function of

24   CMS's creation of them, CMS's allocation of them, and CMS's

25   oversight of them.  There's no property right in a resident

1   slot.  It is a function of having a Medicare provider

2   agreement with the slots associated with it, approved and

3   allocated by CMS.

4           So, again, Hahnemann, whether you consider it

5   closed or closing, (indiscernible) there, it's important to

6   understand what Congress has said about those residency

7   slots.

8           And you heard me ask Mr. Merlis, I said, what are

9   you acquiring from Hahnemann.  And, again, his lawyer

10  objected a number of times.  I had a hard time understanding

11  what he was saying beyond the residency slots.  Maybe you

12  did, Your Honor.  I could not come up with any actual assets

13  he was identifying.

14          I think what this transaction is, and maybe I'll

15  be disabused of that notion by Jefferson in their argument.

16  What this transaction is, is the right to have these 500 plus

17  permanent resident slots going forward. That's what's

18  happening here.

19          They're not purchasing Hahnemann's equipment.

20  They're not purchasing Hahnemann's patient records.  They're

21  not purchasing any of Hahnemann's doctors or staff.  None of

22  that.  It's the provider agreement.  And they're not going to

23  bill under that provider agreement because they're not

24  providing any services to Hahnemann.  The provider agreement

25  comes with the residency slots.  That is the sole thing at

1  issue here.

2          And I understand the court's perspective.  That

3  must be valuable because someone is willing to pay $55

4  million dollars for it and that's beneficial of the estate

5  because what the government is telling me is the answer is

6  zero because it can't be sold.

7          All I can to that is, that's the law and that's

8  what Congress has said because when a hospital closes, its

9  residency slots are distributed in a public process by which

10  any hospital can submit a bid and either receive or not

11  receive slots based on what CMS -- what HHS determines.

12          And I know Your Honor is also concerned, the

13  debtors have talked about this a lot, that they believe this

14  transaction is beneficial because it keeps all the residents

15  local.

16          THE COURT:  That's right.  That's right.

17          MR. SACKS:  Right.  So when you look at the

18  statute 1395ww or (h)(4)(H)(vi) what you'll see is that the

19  priority scheme talks about -- and if I can find it briefly,

20  Your Honor -- the priority order begins with one, hospitals

21  located in the same core based statistical area or a core

22  based statistical area contiguous to the hospital that

23  closed.

24          So, again, I can't predict or tell you what's

25  going to happen to these 500 plus resident slots.  All I can

1  tell you is the priority order and how that might shake out.

2  And so, certainly, there appears from the operation statue

3  that the first priority will be to keep those resident slots

4  in this area, but that, of course, depends on who bids and

5  what their applications are.

6          And, again, you don't have to pay for those

7  resident slots.  That process under 1395ww, you don't have to

8  pay for them.  You just submit an application and they're

9  awarded based on the priority scheme.

10         So, I don't think the court can get around that

11 statute. I don't think they can do it as a private party

12 contracting around it.  I don't think the court can make an

13 award around it because if Hahnemann is closing, Congress has

14 said what happens to its residents.

15         THE COURT:  Do the statutes say is closing or

16 closed?  I can look that up myself.

17         MR. SACKS:  Yeah, I can. . .  I have to pull that

18 up, Your Honor.

19         THE COURT:  I can look that up.

20         MR. SACKS:  Well here's what it says.  It says,

21 "In the case where a hospital with an approved medical

22 residency program closes," so that's the exact language of

23 the statute.  And, of course, Hahnemann had an approved

24 residency program and that program, as Mr. Weiland told you,

25 is closed.  There are no residents at Hahnemann.  It remains

1  --

2            THE COURT:  Isn't that modifying hospital, not

3  resident program?

4            MR. SACKS:  It may well be.  But when Hahnemann

5  closes, CMS is going to follow Section -- 1395 is also

6  Section 5506 of the ACA, Affordable Care Act.  You can use

7  either term.

8            But CMS and HHS are going to follow that process

9  when Hahnemann closes.  And essentially -- and we can get

10 more into this later -- but the debtors filed their sale

11 order about 11:30 last night and so, we haven't had a lot of

12 time to look at it very closely.

13            THE COURT:  No, neither have I.

14            MR. SACKS:  But one of the things that it does is

15 essentially if the court were to order as written would

16 enjoin an order CMS to do a number of different things.  And

17 I would submit that this court does not have the power to do

18 that in a sale order.

19            If debtors want to bring an adversary proceeding

20 against CMS and seek a preliminary junction and make it

21 permanent and they have the law to do that, then that's an

22 avenue open to them. But I don't believe a sale order is the

23 proper means by which this court should enjoin CMS from doing

24 what it's going to do which is follow Section 5506 of the

25 ACA.

1          So putting that issue aside for a second, the next

2    issue becomes why are we objecting to the transaction.  And

3    it's because the federal laws and regulations that exist

4    outside of bankruptcy, and we can call that Medicare program

5    law, right, that governs what a Medicare provider agreement

6    and over that agreement essentially can or cannot do, right.

7          That law certainly outside of bankruptcy applies

8    to someone who has a provider agreement.  No one would

9    dispute that.  I would submit the same laws and regulations

10   apply within bankruptcy. And, again, the Supreme Court in

11   Mission Product or Tempnology, however you want to refer to

12   it, recently made that point very clear. That you don't get

13   greater rights in bankruptcy than you had out of bankruptcy.

14   You can't come into bankruptcy to avoid regulations that were

15   applying to you outside of bankruptcy.

16          So, we'll talk about 365 versus --

17          THE COURT:  But hasn't CMS taken a different

18   position outside of bankruptcy than inside bankruptcy?

19          MR. SACKS:  So if what you're asking about is

20   whether the position about whether or not a provider

21   agreement is an executory contract, is that what you're

22   asking?

23          THE COURT:  Yes, yes.

24          MR. SACKS:  So, I would submit the answer to that

25   is essentially no, but let me try to explain.

1          So absolutely outside of bankruptcy, CMS has made

2   the argument and courts have accepted the argument that the

3   government granting you a statutory entitlement to receive

4   Medicare reimbursements through the Medicare provider

5   agreement is not a contract that allows you to enforce

6   contract rights against the government.  Absolutely clear

7   that's our position.

8          Our position in bankruptcy and what court after

9   court after court has accepted and we'll talk in a minute

10  about University Medical Center because with all due respect

11  to the court, I think this court is bound by what that, what

12  the Third Circuit has done there.  And even if the court

13  disagrees, there's no room to go outside of that precedential

14  holding.

15         But in any event, when we talk about what happens

16  in bankruptcy, it's not so much that the government is

17  arguing that the provider agreements are an executory

18  contract which is contrary outside of bankruptcy.

19         What we argue, as I understand them, is that you

20  have to consider what the rights and obligations are

21  associated with the provider agreement in bankruptcy and

22  figure out what is the best means to harmonize Medicare law

23  and bankruptcy law.  And we think the best way to do that is

24  to consider the assumption and assignment of a Medicare

25  provider agreement under Section 365.

1           It's clear a Medicare provider is not a license or

2      a property right that can be analyzed under 363.  So that

3      leaves us really with 365.  And, again, I think University

4      Medical Center speaks to that -- and if I can find it

5      quickly.

6           You know I think we start with footnote 13.

7           "All of the Bankruptcy Code does not define

8            executory contract.  The Code's legislative

9            history states that this term generally includes

10           contracts in which the performance remains due to

11           some extent on both sides."

12          A Medicare provider agreement easily fits within

13     this definition.

14          So, I know that the debtors have told you that

15     University Medical Center did not actually decide whether a

16     Medicare provider agreement should be considered under 365.

17     It was merely dicta.

18          THE COURT:  Yes.

19          MR. SACKS:  I submit that's not accurate.  I think

20     even if it was accurate then what we'd be saying is, the

21     Third Circuit issued this opinion and knowingly understood

22     that a Medicare provider agreement was not to be analyzed in

23     365, but didn't say so.  I don't think that makes any sense.

24          THE COURT:  How about -- what is it BDK?

25          MR. SACKS:  Sure.  So, BDK you've got a bankruptcy

1   case from, I believe, 21 years ago that's unpublished that

2   did look at a Medicare provider agreement under 363 and

3   considered it to be an asset that, you know property of the

4   estate that can be transferred in that way.

5            THE COURT:  Right.

6            MR. SACKS:  You can read that case.  I mean

7   perhaps the court will adopt the reasoning.  However, I can

8   submit to you that in the twenty years since, there has been

9   court after court after court, including Third Circuit

10  courts.  You've got the Charter bankruptcy case that we cited

11  to in our pleadings that analyzed Medicare provider

12  agreements under Section 365 as an executory contract.

13           So, I understand the perspective that is the

14  government being inconsistent here.  I don't think we are.  I

15  don't think we're telling you it is an executory contract.  I

16  think we're telling you to harmonize Medicare law in

17  bankruptcy, the best means for considering how you can

18  transfer a provider agreement is to look at 365.

19           And, again, the debtors have consistently

20  maintained throughout this bankruptcy that Section 365 is the

21  proper means of transferring the agreement and the asset

22  purchase agreement for the sale to Jefferson includes the

23  agreement as a contract to be assumed and assigned.

24           It was only in their filing of their reply on

25  Wednesday of last week that they for the first time with the

1  court raised the issue that the court could also consider the

2  provider agreement to be an asset under Section 363.  And we

3  addressed that at length in our objection and I'm happy to

4  talk to you more about that.

5          But let's talk again about the Medicare laws

6  outside of bankruptcy that apply in bankruptcy and why they

7  don't permit the transaction that has been proposed here.

8  And there's four things that I think we need to talk about

9  here.

10          And I think the first is what happens when a

11  hospital closes.  And that's 42 C.F.R. 489.52(b)(3).  And

12  what that regulation talks about is that when a provider

13  stops providing medical services to the community, the

14  provider agreement is deemed terminated.

15          And we can debate whether or not that's happened

16  already or whether or not it will happen imminently. We know

17  there's no patients at Hahnemann.  We know there's no doctors

18  at Hahnemann.  I think based on Mr. Weiland's testimony, what

19  we do now is that they talk to people on the phone and tell

20  them where to go and they transfer medical records to other

21  institutions.

22          THE COURT:  Yes.

23          MR. SACKS:  In any event though, Your Honor, I

24  think it's the providence of CMS to determine whether or not

25  that constitutes operations that keep a hospital open and not

1    so much the court's authority to interpret CMS's regulations

2    in that way.

3              And CMS is clear here that you can't transfer a

4    provider agreement from a closing hospital because upon

5    closure, the agreement terminates.  And that is by operation

6    of law unquestionably in 42 C.F.R. 489.52.

7              Even if the court were to say CMS, I don't agree

8    with you.  I think Hahnemann is still open.  I don't think

9    the provider agreement is terminated.  So, there is the

10   potential for it to be transferred to Jefferson.  How can

11   that be done?  Right?  And Mr. Minuti has spent a lot of time

12   talking to you about 49.18 and how that seems to leave a wide

13   door open for all different types of transactions.  And if

14   the court wouldn't mind, I'd like to walk the court through

15   how to analyze that regulation somewhat.

16             THE COURT:  All right.

17             MR. SACKS:  And to do that --

18             THE COURT:  489.18.

19             MR. SACKS:  Yes.

20             THE COURT:  Okay.

21             MR. SACKS:  But as the court wells knows that

22   obviously one of the ways to interpret a regulation is to

23   read the plain language, right.  Another way is to look at

24   other regulations and harmonize them together to see if we

25   can understand what the regulation is saying and doing.

1          So, I think the place we start -- and I'm trying

2     to pull this up on my computer --is with 42 C.F.R. 424.550.

3     And we cite to that in our papers.

4          But what that regulation says is prohibitions on

5     the sale or transfer of billing privileges.  Subsection (a):

6     "A provider or supplier is prohibited from selling its

7     Medicare billing number to any individual or entity."  So

8     CMS, to begin with, says you can't sell your provider

9     agreement.  You can't do it.  You're not allowed to do it.

10          Subsection (b) of 424.550 says, "In the case a

11    provider undergoing a change of ownership in accordance with

12    Part 489, the current owner and the perspective new owner

13    must complete and submit enrollment applications for a change

14    of ownership."

15          So (a) says you can't sell the provider agreement.

16    (b) says you can as long as you go through a change of

17    ownership under Section 489 which includes 489.18.

18          So what Mr. Minuti wants you to believe, I think,

19    and I understand where he's coming from, is that 489.18

20    doesn't really tell us that's the only means to provide, to

21    transfer a provider agreement, but it is because you can't

22    sell it.  You can't do it unless you comply with 489.18 and

23    have a change of ownership.

24          And if Your Honor still has 489.18 in front of

25    him, I'd like to talk to you about that for a second.  Do you

1    have that there?

2            THE COURT:  Yes.

3            MR. SACKS:  Okay.  So if you look at Subsection

4    (a) what constitutes change of ownership, it lists four

5    essentially procedural mechanisms by which you can change

6    ownership.  Right?

7            THE COURT:  Right.

8            MR. SACKS:  And what Mr. Minuti has told you is

9    those are not exclusive because CMS has recognized in its

10   policies other procedural means of changing ownership.  He's

11   exactly right.  They have.  Asset purchase agreements between

12   two private parties are not one of the four enumerated ways

13   here but CMS absolutely recognizes those as valid change of

14   ownership as long as the substance of that transaction

15   complies with the rest of 489.18.  Right.

16           The fact that Hahnemann and Jefferson are having

17   an asset purchase agreement would procedurally meet the

18   requirements of 489.18 if they were transferring the

19   substance in accordance with the regulation.  And that's

20   where we have the problem.

21           And so, you see in Section (b)(c) that when

22   there's a change of ownership as specified in paragraph (a),

23   the existing provider agreement will automatically be

24   assigned to the new owner.  And in Subsection (d) says an

25   assigned agreement has said that all applicable statutes and

1 regulations and the terms and conditions under which it was

2 originally issued.

3          In Charter, Vernon, University Medical Center make

4 clear in practice what that means is full successor liability

5 for the purchasing entity that is being assigned the Medicare

6 provider agreement.  That's simply the way it's done.  That's

7 what the law requires.

8          And this law applies in bankruptcy, as well as it

9 does out of bankruptcy.  So we could talk about 365 and cure

10 and adequate assurance of performance and, of course, those

11 are important, but those must be viewed within the framework

12 of what Medicare law requires which is assuming full

13 successor liability through a CHOW -- a change of ownership -

14 - under 489.18 which is the only authorized way to transfer

15 provider agreement because 424.550 tells us you can't sell it

16 otherwise.

17          So, if what is happening here is not a CHOW, then

18 it's an illegal sale.  They can't do it because they're

19 selling the provider agreement.  If it is a CHOW, then a CHOW

20 requires that the -- because the provider agreement is

21 essentially given to operations of an institution at a

22 location, a valid CHOW requires continuity of those

23 operations in some fashion or form.

24          If Jefferson were going to continue to operate

25 Hahnemann it was taking all its assets and not just cherry-

1  picking the residency slots, then we may have the means here

2  for a valid CHOW.  And as long as there was assignment and

3  full successor liability, I don't think CMS would have any

4  objection to that because it would meet the regulations as

5  they state.

6         But that is, of course, not what's happening.  And

7  I understand where Your Honor is coming from, wants the

8  government to try to cooperate and find an area for

9  compromise, but a CHOW is binary.  If you take over a

10 provider agreement, you either assume it fully or you reject

11 it and apply for a new one.  And there is no gray area in

12 that binary black or white choice.

13        THE COURT:  So is it the successor liability that

14 is primarily the problem that CMS is having?

15        MR. SACKS:  No, it's not. Again, that is a

16 tertiary issue in this case because the first issue is we're

17 only transferring residency slots.  Can you do that?  We

18 talked about why.  We don't think you can if the hospital is

19 closing.

20        Can you transfer the provider agreement if the

21 hospital is closing?  No, we don't think you can do that

22 either because Hahnemann is closing and 489.52 says it

23 terminates upon closure -- upon the stopping of providing

24 medical services.

25        And then even if that wasn't the case for CMS to

1   approve a CHOW, there has to be continued operations of the

2   hospital or medical facility in some way, shape or form.

3   Simply taking one of the assets, the residency slots and not

4   continue to operate any other part of the hospital is not a

5   CHOW that CMS would approve.

6        So, you go to go through all those hoops.  And if

7   the court says no, I don't care.  The residency slots can be

8   transferred.  No, Hahnemann is not closed.  The regulations

9   don't permit that.  No, this is a CHOW or doesn't have to be

10  a CHOW.  Then we get to the question of, okay.  If the court

11  says all that and the court, over our many objections, is

12  going to allow the transaction to go forward, the question

13  then becomes what is -- to assume and assign a contract under

14  365 does that bring 489.18 in such that you have to take full

15  successor liability.  And I think, again, the court here is

16  constrained by University Medical Center and Charter on that

17  issue.  I just don't think there's any dispute about that.

18        And Mr. Minuti has brought up on numerous

19  occasions, again I understand why he does, that there have

20  been cases in which CMS has reached an agreement about what

21  its cap of its cure amount essentially is going forward.

22        THE COURT:  Right.

23        MR. SACKS:  Right?

24        THE COURT:  Yes.

25        MR. SACKS:  And, again, those situations involve

1   none of the preliminary objections we talked about here,

2   right.  That is a sale of an ongoing hospital to someone else

3   who's going to continue to operate the hospital.  And the

4   only question is, is that hospital going to be fully liable

5   for potential overpayment that could go back three to six

6   years or is CMS going to make an agreement that caps their

7   liability and allows them to go forward with that cap.

8          And there have been cases.  For instance, there's

9   a situation where there is an under-served community and a

10  hospital is going to close.

11          THE COURT:  Yes.

12          MR. SACKS:  And it closes and no one can will be

13  providing services there.  And the only way someone will buy

14  that hospital is to say look, I'll buy it, but I can't do it

15  if I have to take full successor liability.

16          In order to assure care, CMS may be willing and I

17  think has in the past, may be willing to consider capping its

18  liability in that situation.  But that's not -- we don't have

19  those facts here.  I think, in fact, we've been told that the

20  hospitals in Philadelphia have fully taken in all of the

21  patients and all of the residents.  And they are doing just

22  fine with that, so I don't think we had those same issues

23  here.

24          And, again, all those other examples have none of

25  the initial objections we talked about here. And, again, even

1    if HHS had just settled every other case, that's still not

2    binding on what HHS does here.  And, you know, 489.18, I

3    think, is clear on successor liability.

4              And, in fact, you know, Mr. Minuti talked to you

5    about Docket Number 4591-2 that he moved into evidence which

6    we talked about.  Was that the provider agreement or it was

7    the piece of the provider agreement, right?

8              THE COURT:  Right.

9              MR. SACKS:  If you look at that document, it says,

10   "In the event of a transfer of ownership, this agreement is

11   automatically assigned to the new owner subject to the

12   conditions specified in this agreement in 42 C.F.R. 489."

13   That document itself is telling you, the court, that if you

14   want to give that to somebody else, you can only do it

15   through 42 C.F.R. 489.  It's automatically assigned subject

16   to all the conditions in the Medicare law.  It's unequivocal

17   on the face of the single page document.

18             And then the fourth point we would raise is the

19   Anti-Assignment Act.  And we would argue that it applies here

20   such that under 365(c)(1) if CMS does not approve the

21   assignment, this court may not order it.  And we have Matter

22   of West Electronics, a Third Circuit case, 852 F.2d 79.  No

23   assignment of an executory contract with a federal agency

24   under the bankruptcy Code without United States consent.

25             We can, again, debate whether or not a Medicare

1    provider agreement is an executory contract in the context of

2    the Anti-Assignment Act, but I think it's, again, harmonizing

3    the Medicare law with the bankruptcy law.  It's best viewed

4    as such and, therefore, the Anti-Assignment Act would apply.

5              We also know, of course, that 28 U.S.C. Section

6    959(b) requires the debtors to comply with their regulatory

7    obligations in bankruptcy, right.  And that is consistent

8    with what we're telling the court needs to happen here which

9    is that Medicare law applies in bankruptcy.

10             So, let me address briefly Section 365 and Section

11   363 if the court wants to hear any further about.  And --

12             THE COURT:  Yes, briefly.

13             MR. SACKS:  Okay.  Sure.  And, again, I think I've

14   already addressed these points --

15             THE COURT:  I think so.

16             MR. SACKS:  -- and so, I will be very brief.

17             But I think the most important and fundamental

18   thing to consider is that regardless of whether the court

19   concludes, and if the court goes ahead with the transfer,

20   that 365 or 363 is the means to do it.  Medicare law applies

21   equally.

22             And there is no under 363, there's really no

23   property right and a statutory entitlement Medicare

24   agreement.  And even if there was you can't sell it free and

25   clear of Medicare's rights to recoup which is not an interest

1   and a property like a lien is.  So, I just don't think we can

2   fit within the rubric of 363.  But even if we can, you're

3   still no ability to sell free and clear and, in our papers,

4   we go through each of the five elements of 363(f) and explain

5   why none of those can be met in this situation.  So, again,

6   there can be no free and clear sale even if the court

7   believes the provider agreement is an asset that could be --

8   is a property right that is initially subject to transfer

9   under 363.

10         And, again, I won't belabor 365.  There is

11   overwhelming wealth of case law that makes very clear binding

12   in this circuit that courts consider in bankruptcy a Medicare

13   provider agreement under Section 365.  And if the court gets

14   there, we don't think it should, but if it does get there, we

15   believe that's the appropriate way to analyze it.

16         If I have no questions from the bench, I'm happy

17   to --

18         THE COURT:  I have no further questions right now

19   for you, Mr. Sacks.  Thank you.

20         MR. SACKS:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         Mr. Minuti, are you going ahead or Mr. Jackson;

23   I'm not sure?

24         MR. MINUTI:  I am, Your Honor.  Your Honor, if you

25   don't mind, I'd like the opportunity to reply to some of

1  CMS's argument.

2          THE COURT:  Sure.  Yes.

3          MR. MINUTI:  And I'll try to do this in a concise

4  fashion, Your Honor, but there's a little bit of jumping

5  around.

6          THE COURT:  All right.

7          MR. MINUTI:  But let me start with the reply that

8  CMS filed at 5:15 this morning.  And Mr. Sacks was quite

9  candid, Your Honor, what he said was that that really repeats

10 the arguments they've already raised twice.  And then what it

11 does is it replies to our reply.

12         Well what it really is, Your Honor, is a surreply.

13 It's not permitted under our local rules and, therefore, I

14 don't think it's appropriate for Your Honor to consider a

15 forty-six page objection that they dropped on the, literally

16 hours before the hearing where they cited a bunch of new

17 cases, a bunch of new sections, and so on and so forth.

18         So, if Your Honor is going to consider that, we'd

19 like the opportunity to respond to it at the appropriate time

20 but, hopefully, we don't need to get there, Your Honor.

21         Next, Mr. Sacks talked about what we said at the

22 bid procedures hearing that quoting from me, and I always

23 love when somebody quotes me back to me --

24         THE COURT:  I'm glad you do.  I don't.

25     (Laughter)

1    MR. MINUTI:  Yeah, I was going to say I'm sure

2  Your Honor approves the same thing.

3    But, Your Honor, at that time we were talking

4  about the Tower Health transaction.  The Tower Health

5  transaction, at the time, required CMS consent.  And that's

6  what we were talking about.  We have a different transaction

7  before Your Honor.  So, of course, nothing I said at that

8  time is in any way binding with respect to the transaction

9  that's before Your Honor today.

10    THE COURT:  I mean the present Tower secondary bid

11  does not require CMS consent.

12    MR. MINUTI:  I think in that regard, Your Honor,

13  it's identical now to the Jefferson bid.

14    THE COURT:  Okay.

15    MR. MINUTI:  Okay.  So, Your Honor, you know, I

16  keep coming back to something I argued when I was at the

17  podium before which is, you know what we heard a lot is what

18  CMS requires.  CMS requires this.  It has to be a change of

19  ownership.  CMS requires their consent.  CMS requires that

20  they decide when something is a change of ownership or they

21  decide when this can happen.

22    So, but what we didn't hear a lot, Your Honor,

23  beyond pointing to 42 C.F.R. 489.18 was an actual regulation

24  or rule that governs that.  And if we go to 489.18, again,

25  and, again, it's Exhibit B that we attached, what you see

 1   here, Your Honor is that it talks about what circumstances

 2   constitute a change of control.

 3            And then Mr. Sacks said something that's, at

 4   least, curious to me, he said well, you know, a sale of

 5   assets can be a change of control.  But if it's a sale of

 6   assets, but then we go back to 489 and you have to comply

 7   with 489, but that's not what 489 says.

 8            And then what he said was well, okay, so it can

 9   apply in a sale of assets but only applies to the kind of

10   sale of assets that we like.  And the kind of sale of assets

11   that we like, CMS likes, is where you're buying the whole

12   hospital or you can continue the hospital as a going concern

13   or you're going to continue it in the same place, right.

14            So, it's not that we can't sale it as an asset.

15   What they're saying is you can only sell it as an asset if

16   you bundle it with a bunch of other stuff that we like and

17   then sell it all.  Then you can do that.

18            But, again, where does it say that, Your Honor.

19   Where does it say that if you can concede we can sell it as

20   an asset or we can transfer it as an asset sale, all right,

21   where does it say it's got to be substantially all of the

22   assets.  Where does it say --

23            THE COURT:  It doesn't even say asset purchase

24   agreement in here.

25            MR. MINUTI:  It doesn't even say asset purchase

1  agreement.  So and we know because it's happened before that

2  provider agreements are transferred with an asset purchase

3  agreement.

4          Now, let me go now to where he started his

5  argument which was well the hospital is closed and,

6  therefore, the agreement terminated.  But that's not what the

7  regulations say, Your Honor.  It doesn't say if the hospital

8  is closing or if the hospital is going to close in the

9  future, you can't sell a provider agreement.

10         What we're doing is, we're selling the provider

11  agreement before we cease business.  And remember I talked

12  about this before.  What the statute talks about is ceasing

13  business.  It doesn't say stopping providing healthcare.  It

14  says ceasing business.

15         And Mr. Weiland was very clear on this point.

16  We're still doing business today.  Now, you know, we can

17  quarrel is that enough.  You know, you know, we don't like

18  that amount of business you're doing, but we're doing

19  business, Your Honor. We're providing services to the

20  community.

21         I was a patient there.  I now need follow-up care.

22  I call Hahnemann. Somebody answers the phone. Somebody talks

23  to me.  Somebody says hey, we've got your chart.  We see your

24  condition.  Here's five doctors in your area that will be

25  beneficial to you.  Here's a hospital you can go to.  Here's

1    where we're going to transfer your records.  That's a

2    valuable service.  That's providing care to the community and

3    we're still doing that, Your Honor.

4            Remember, closing a hospital, you don't lock the

5    door and walk away.  It's a whole process.  Trust me. We've

6    spent -- there's a lot of people in this room spent hours and

7    hours negotiating, coming up with a plan, revising that plan.

8    There's a lot involved. We need to stay in business while we

9    close the hospital.

10           So, the statute doesn't say hey if you're going to

11   close, right.  It says if you're closed and it's terminated,

12   and we're not closed.  And how do know that to be the case,

13   Your Honor?  Well, it's common sense.

14           If we know that somebody can sell substantially

15   all their assets and transfer a provider agreement, well

16   clearly the seller in that situation is not going to be

17   providing healthcare after the transaction.  And, yet, nobody

18   says hey, you're closing.  So, we can't transfer that

19   provider agreement.

20           So, it doesn't make any sense, Your Honor.  And,

21   again, look, I think -- look, I don't -- clearly, the

22   government doesn't like what we're doing here.  Clearly, I

23   think the government would prefer that there be some

24   handcuffs on how this works.  And, look, it doesn't take a

25   lot to think of scenarios where somebody could abuse this

1   process, right and actually transfer these assets to somebody

2   who's not going to do the right thing or whatever.

3          We can all envision that scenario.  And so, it

4   doesn't surprise me that the government is concerned about

5   this, right, but not this case, Your Honor.  We didn't hear

6   one thing about the fact that the consortium can't provide

7   these services.  We didn't hear one thing about the

8   consortium not being already licensed in their own regard and

9   qualified to do what they're going to do once they get the

10  residency program assets.

11         So, again, while I appreciate while the government

12  wants to try to limit the transactions where this can take

13  place.  If you follow it to its logical conclusion, Your

14  Honor, there is nothing that prevents this.

15         Because think about it, if we all say, okay, it

16  can happen in an asset sale, right, well does it have to

17  substantial all the assets.  What if I don't transfer my AR.

18  Well maybe it's okay.  Maybe it's not okay.  What if I send

19  you my business records?  Well maybe it's okay, not okay.

20  Where's the line?  Where's the line?

21         Now if there is a line, I submit it's got to be in

22  a statute or rule or a regulation, and there is no line, Your

23  Honor.  There's no line here.  So, we know they can be sold.

24  It happens all the time.  Maybe not in this forum, but there

25  has to be something that says we can't do what we're doing

1  and there's nothing that says that.  We keep coming back to

2  489.18 and 489.18 does not say that, Your Honor.

3        Your Honor, we simply disagree with Mr. Sacks that

4  this is property of the estate.  That's what the BDK case is

5  all about.  I mean whether it's old, whether it's new.  I

6  mean, look.  It's the case we were able to find that their --

7  that dealt with this direct issue.  This direct issue still

8  good law as far as we're concerned, Your Honor.  We

9  appreciate its only persuasive authority, but it's really the

10  only case out there on this exact point.

11        THE COURT:  How about the Anti-Assignment Act?

12        MR. MINUTI:  Well, let's talk about the Anti-

13  Assignment Act.  I'm glad counsel brought that up, and I

14  addressed this a little bit, Your Honor.  But, again, I go

15  back to what I said before.

16        365(c) -- I think it's (c)(1).  The whole idea of

17  the Anti-Assignment Act, right, under statute, their entitled

18  to say whether it happens or not.  It really ties into

19  365(c)(1).  And as I said before what 365(c)(1) is all about

20  is, we don't want you to assign a personal services contract

21  where really it's not going to be the same performance.

22  Right.  Or if there's a public safety issue, we don't want

23  you to be able to transfer a contract where there's going to

24  be a public safety issue.

25        And here's what's interesting, Your Honor.

1   Counsel brought us the West Electronic Inc. case.

2   Interesting case.  I've got it right there.  In that case,

3   Your Honor, the government was moving to lift the automatic

4   stay to terminate a contract arguing that the debtor in that

5   case couldn't assume and assign that contract to anybody

6   else.  Do you know what that contract involved?  Missile

7   launchers.

8           Now, you wouldn't want to be able to assign a

9   missile launcher contract to just anybody. So, I can

10  certainly understand why it is the government in that case

11  said we should have to consent to that because we don't want

12  Mark Minuti being in charge of a missile launcher, so you

13  can't assign it to Mark Minuti, right.

14          But if I'm selling a residency program to some of

15  the most respected hospitals in my area that already do this

16  work, we don't have the same concern, Your Honor.  So, the

17  Anti-Assignment Act, Your Honor, does it apply here.  They

18  don't have a veto power under the Anti-Assignment Act over

19  this.  Maybe they have it over a missile launcher, Your

20  Honor, but not under our facts of this particular case.

21          Bear with me just for a moment, Your Honor.

22          THE COURT:  Sure.  Now, Mr. Sacks refers to the

23  statute and I have the number here somewhere that creates

24  priorities of distribution of the residence slots.

25          MR. SACKS:  We call it 5506 of the --

 1                    THE COURT:  That's it --

 2                    MR. SACKS:  ACA probably going to --

 3                    THE COURT:  Yes.  Thank you.  Thank you, Mr.

 4   Sacks.

 5                    MR. MINUTI:  There are two responses to that.

 6   That kicks in if the hospital closes.  Think about what

 7   happens. If the hospital closes, slots are terminated, the

 8   government then gets the slots back and the government can

 9   redistribute them.  And Mr. Sacks was crystal clear on this.

10   Maybe there's a priority given to the local area but nobody

11   knows where those slots are going to go, Your Honor.  What we

12   know under the transaction before Your Honor is those slots

13   are going to stay in our community.  That's the difference,

14   Your Honor.

15                    But, again, we get back to this whole idea it

16   doesn't say if you're going to close or maybe you're going to

17   close in the future.  It says you have to cease doing

18   business.  And the only evidence on that point is unrebutted.

19   We haven't ceased business.

20                    So, Your Honor, I think you've heard enough from

21   me today.  I think with that, I'm going to sit down.

22                    THE COURT:  Thank you, Mr. Minuti.

23                    MR. MINUTI:  Thank you, Your Honor.

24                    THE COURT:  Thank you.  Thank you.

25                    And we have a number of other objections, so let's

1    try and be a little bit on the brief side here, Mr. Jackson.

2           MR. JACKSON:  Yes, Your Honor, and I will just --

3    I'll adopt Mr. Minuti's arguments and I'll attempt not to

4    duplicate here.

5           THE COURT:  All right.

6           MR. JACKSON:  I did just want to point out and at

7    the risk of citing Your Honor back to yourself.  I happen to

8    be sitting at the July 11 hearing in this case and at the

9    outset of that hearing, Your Honor said, you know this is a

10   difficult case.  And what I would really hope is that all of

11   the affected players here, you said, the City of

12   Philadelphia, the state.  And you named Jefferson by name.

13   Jefferson Hospital.

14          THE COURT:  Yes.

15          MR. JACKSON:  That I would hope that all of the

16   parties given the nature of the interest at stake here would

17   come together and try to find a solution for this case.  And

18   we took that to heart.  I went right back to the client with

19   that.

20          I said, look, you know, the judge, there's an

21   opportunity here to try to do something within, you know, to

22   the extent it's within our means and within the scope of our

23   own business to do so, there's some opportunity here and we

24   really should take a look at this.  Judge Gross expects us to

25   pitch in, if we can.  And here we are.

1            THE COURT:  Yes.

2            MR. JACKSON:  I was at the bid procedures hearing.

3   I saw the Tower, you know, stalking horse deal being

4   presented at the bid procedures here.  I have to say at the

5   time I kind of commended the debtors.  I was thinking for the

6   sort of creativity of finding a way to salvage something of

7   value from what appeared to be a very difficult situation

8   with Hahnemann Hospital.  Obviously, by that time, it didn't

9   seem likely that there would be a going concern purchase of

10  it, but they managed to find something that could be realized

11  of value from the Hahnemann situation.

12           And I thought it was very creative at the time.

13  And ultimately when Jefferson and the consortium decided to

14  participate in the bidding on that asset, to great success,

15  frankly, in terms of where the ultimate purchase price landed

16  for the estate --

17           THE COURT:  Yes, yes.

18           MR. JACKSON:  Again, that was what Jefferson and

19  the consortium members could do within the scope of their own

20  mission to, you know, help bring about an elegant solution to

21  the case.  Obviously, they have an interest in the

22  transaction, you know, beyond merely alter-interest in the

23  transaction.

24           But, you know, we really were -- we thought when

25  the auction ended well, you know, here it is.  Judge Gross

1   asked for this.  You know, as a result of this auction

2   process we're about to go back to the court with somewhat of

3   an elegant solution. And maybe not solution for the entire

4   case, but certainly, you know, considering what I know to be

5   coming up in the next couple of weeks and, obviously, the

6   difficulties with the DIP and with Tenet and the like, you

7   know, very important development for the case.

8           So, I just wanted to point out that that's the

9   trajectory that we've been on.  You know, for a while we were

10  kind of sitting on the sidelines and monitoring the case

11  because it's of great interest to us, but, you know, Your

12  Honor invited us to participate and here we are.

13          THE COURT:  Yes.

14          MR. JACKSON:  Now, at the bid procedures hearing,

15  again, I understand Mr. Minuti's distinction about the

16  reference that he was making to CMS consent being required

17  was, you know, in reference to the stalking horse deal.  I

18  can say every bid that we put in, in general, the idea was,

19  if possible, we would want CMS approval.

20          But where the bidding ultimately landed and with

21  both bidders was that it is a waivable condition.  It

22  something we would prefer.  But I, frankly, to the extent the

23  argument is that there's this, you know, statement on the

24  record of the bid procedures hearing that Mr. Minuti made or

25  there's language in the bid procedures order that somehow is

1   binding today, I just wanted to point out that Jefferson

2   wasn't present at the -- didn't appear on the record at the

3   bid procedures hearing.  We wouldn't have had standing to.

4          THE COURT:  Right.

5          MR. JACKSON:  If we had, I would have probably

6   pointed out that I didn't think it was the case that CMS

7   consent was required for many of the reasons that have been

8   presented to Your Honor.

9          You know, our sale order, our proposed sale order

10  that you saw this morning has a lot of these provisions in it

11  relating to the dual tracking of the 363 and the 365 and all

12  the various arguments.  Certainly, it was our view that CMS

13  consent, although preferred, was not required under the

14  bankruptcy law.

15         And I think Mr. Minuti correctly pointed out in

16  his remarks just now that what you heard and what you didn't

17  hear from CMS.  And I think, what I would say, how I would

18  describe the proceeding so far that I've seen today is this

19  seems to come down to institutional prerogative is what we're

20  talking about.

21         You know Your Honor invited Mr. Sacks to the

22  table, again, on the break to -- is there anything we can do

23  to bridge the gap here.  And he said, and it seems sincere,

24  no, there's not.  Because this for the reasons that he

25  explained, this is not a transaction that fits within the

1   norms that CMS is used to within its preferred interpretation

2   of its regulations and practices.

3             So, I think it's fair to say that what we have

4   here is a dispute about institutional prerogative.  There's

5   no equity in that position.

6             THE COURT:  Is it an arbitrary and capricious

7   position?  I don't think so.

8             MR. JACKSON:  I don't think -- I'm not going to

9   say that.  I mean I understand -- what I was going to say is

10  I understand institutional prerogative viewed from the

11  perspective of an institution.  So, it's not unprincipled.  I

12  understand their position.

13            THE COURT:  Yes.

14            MR. JACKSON: But I think there are dueling

15  prerogatives in this case.  Your Honor, this court has an

16  institutional prerogative.  And I think that's the thing

17  that's been -- we've been kind of getting at it, their

18  various arguments.  But I just want to throw it right out

19  there.

20            The court has institutional prerogatives that are

21  baked into the Bankruptcy Code which is a co-equal enactment

22  of the Congress.  You know, as any Medicare law -- I mean

23  it's all written.  It's all issued from the same pen, so to

24  say.

25            THE COURT:  Yes.

1          MR. JACKSON:  Now within this court's prerogatives

2   and this touches on a point Mr. Sacks made about, you know,

3   whether the court has authority to interpret CMS regulations,

4   for example.

5          You do.  28 U.S.C. 1334(e)(1) that's the exclusive

6   jurisdiction over all property of the bankruptcy estate in

7   the bankruptcy court when referred to this court through the

8   standing reference order.

9          Now courts have generally interpreted the vesting

10  of exclusive jurisdiction over property of the estate to also

11  vest in the court the exclusive jurisdiction to determine

12  what is property of the estate.

13         So if the argument is that Medicare provider

14  agreements are so tied in with Medicare regulations that the

15  only way to understand what they are and what to do with them

16  is to look at the regulation, of course you can read the

17  regulation, Your Honor.  You're the only one who can in order

18  to make a conclusion whether that regulation gives rise or

19  describes what could be called property of the estate under

20  the Bankruptcy Code.

21         Now 363 of the Bankruptcy Code permits the sale,

22  new sale or lease of property of the bankruptcy estate within

23  the exclusive jurisdiction of this court.

24         THE COURT:  Yes.

25         MR. JACKSON:  There was some mention of, you know,

1  obviously, where we've been going back and forth about 363

2  versus 365.  I just wanted to point out, lest it be lost in

3  the shuffle, that int his circuit it's not either or between

4  363 and 365. It's both.

5         365 is a subset.  Contracts that are subject to

6  365 are property of the estate.  It's just that they are also

7  subject to some additional rules set out in 365.  It's sort

8  of one of those all squares are rectangles but not all

9  rectangles are squares things.

10        So, and the court has, again, the institutional

11 prerogatives of the court evidenced in 363 and 365 include

12 powers to override provisions of non-bankruptcy law, whether

13 that be federal law, state law.  In particular, in the 365

14 context, you have Anti-Assignment invalidation.

15        In both 365 and 363, you have invalidation of ipso

16 facto provisions.  And I raise that because I thought at one

17 point in Mr. Sack's argument it was interesting because he

18 was really approaching in response to Your Honor's

19 questioning, he was almost approaching this almost admission

20 that well what we don't like about these sales is that if

21 they don't go with successor liability, we don't like them.

22        Well successor liability is something that is

23 modified by the Bankruptcy Code.  So, I don't know any other

24 way to interpret.  If the thing that we don't like about this

25 transaction, ultimately, at the end of the day, is something

1    that the Bankruptcy Code is a result that the Bankruptcy Code

2    has on the transaction, I don't know how to interpret that

3    other that this is essentially providing the government an

4    option to create a forfeiture of property of the estate by

5    virtue of the debtors' bankruptcy or by virtue of the

6    debtors' failure to pay a claim that is dischargeable in the

7    bankruptcy which, of course, implicates 525 of the Bankruptcy

8    Code.

9              So, there are a lot of tools in Your Honor's tool

10   kit to deal with the claim of a government entity such as

11   CMS.

12             There also was a question about some provisions in

13   the sale order which we get to if Your Honor is inclined to

14   approve the transaction.  We want to walk through the sale

15   order about enjoining CMS to do things.

16             THE COURT:  Right.

17             MR. JACKSON:  Well, Your Honor, 106 of the

18   Bankruptcy Code, I mean to the extent there's any question

19   about the status as a unit -- as a government unit or

20   associated with the federal government has any special sway

21   in the bankruptcy court.  It doesn't.  106 specifically

22   waives the, you know, sovereign immunity of the federal

23   government in connection with 363 and 365 and 105, and the

24   list goes on.

25             It goes onto say that the court may issue against

1  a government unit, any order, process or judgment, under any

2  of these sections for which the sovereign immunity is waived.

3  So, yes, it is a little unusual.  And, again, we can talk

4  about it if we get to the order.

5        But it's not unusual for a sale order to say this

6  transaction is approved.  This transaction is happening.  And

7  everybody is in receipt of the sale order is hereby directed

8  to do whatever is necessary to get it done.  We've

9  essentially done that with some more precise detail, if you

10 will.

11       And I think another statement of Mr. Sacks on the

12 record makes us glad that we did include such detail because

13 he indicated that when the hospital closes, CMS's intention

14 is to follow 5506 of the ACA.

15       Now I hope that what he meant is that unless Your

16 Honor has directed otherwise in an order of the court that

17 provides that the Medicare provider agreement has been

18 transferred prior to the closure and so on, but again it

19 doesn't really give -- as the potential purchaser, it doesn't

20 give us a lot of comfort that the idea that once Hahnemann

21 closes, if the sale has closed, that CMS's position could be,

22 whoops, sorry.  We're going to take the slots back and

23 reallocate them, but we don't that would be consistent with

24 our view of the transaction.

25       So, just to be clear, that's why those provisions

1    are in our proposed form of order.  And it's perfectly within

2    this court's prerogative as the bankruptcy court armed with

3    the tools that are set out in the Bankruptcy Code.

4              I know -- I apologize.  I wanted to keep it brief,

5    but I did want to touch on --

6              THE COURT:  No, your comments are helpful, Mr.

7    Jackson.  Thank you.

8              MR. JACKSON:  Well thank you, Your Honor.

9              I guess I'll -- I think -- so to affect Your

10   Honor's prerogatives to do equity to the parties in interest

11   to do equity to the parties in interest in the case before

12   you and certainly to, you know, afford as good a recovery to

13   creditors and protect other stakeholders as you can, I think

14   this, the briefing and certainly our proposed form of order

15   and our transaction structure, I would say provides many

16   pathways up the mountain for the court.  And our proposed

17   order kind of follows all of them at once because it's set up

18   in alternative findings.

19             We think that you can approve this under 363 and

20   365.  It doesn't really matter.  We think the better read of

21   the law, as we agree with Mr. Minuti, is that 363 applies.

22             And I'll just, in that connection, remind Your

23   Honor the case cited in the debtors' papers.  You and I spent

24   a good amount of time, about six years ago, talking about

25   executoriness in a very abstract sense.  And that was in the

1   context of a copyright license, as you may recall, in the

2   SuperMedia case.

3           THE COURT:  Yes.

4           MR. JACKSON:  But one thing that we talked about

5   in length, and you agreed with me at the time, and on

6   reconsideration was that there was a Third Circuit decision

7   in the Exide matter in 2011 that was really a game-changer

8   for how executoriness under 365 needs to be analyzed.  And

9   then that was the case where Judge Carey had made rather

10  extensive findings about the contracts that were at issue

11  before him.

12          And then somewhat surprisingly to all of us when

13  the decision came down, the Third Circuit reversed him but

14  they did a very extensive analysis. And what's clear post-

15  Exide is that, you know, you cannot rely on obiter dictum

16  from other cases just, you know, saying well this type of

17  contract just per se is or isn't executory.  You just can't

18  because it's a case by case analysis.  It's a contract by

19  contract analysis.

20          I would challenge you to find a copy of a Medicare

21  provider agreement in any of the cases finding it to be

22  executory.  They don't attach it.  Now it's a form and maybe

23  it hasn't changed over the years, but I don't know that.

24          So, the provider agreement that the Third Circuit

25  was talking about in University Medical Center in a footnote

 1  which, of course, indicates that it's not really the central

 2  point of the decision.  I don't know that the provider

 3  agreement says.  I know what ours says.  And I understand the

 4  dispute about whether the exhibit that the debtors put in is

 5  the provider agreement or whether there's more.

 6          I just point out to the extent the government's

 7  position is that the Medicare provider agreement that we're

 8  arguing about is more than what's in the record.  How is Your

 9  Honor supposed to make a finding on whether it's executory or

10  not.  You need to look at it under Exide.

11          THE COURT:  Yes.

12          MR. JACKSON:  So if you look at what's in the

13  record and I did want to tease out this nuance from the Exide

14  decision, one of the key distinctions that Exide made was

15  that we follow the countryman definition of executory

16  contracts which we've known for some time which requires

17  material on performed obligations on either part, to either

18  party of the contract.

19          So usually the first stop on the analysis is let's

20  look and see if there's bilateral obligations.  And what I

21  think was a really crucial insight from Exide was the Third

22  Circuit and this is where they overturned Judge Carey was

23  they said well you have to distinction between an obligation

24  and the condition.

25          THE COURT:  Yes.

1          MR. JACKSON:  So if you look at the provider

2   agreement that's in the record, I think the initial -- I

3   don't have it right in front of me.  The initial lead-in of

4   it says that in order to receive payment under the applicable

5   statute, in order to receive payment 18 of the Social

6   Security Act, part, as the provider of services, agree to

7   conform to the provision of the statute.  That's a condition.

8          If I have an employment contract that says in

9   order for you to receive a paycheck, you have to show up and

10  do work.  And I don't show up and do work, I don't get my

11  paycheck, but I'm not in breach of a contract because I never

12  covenanted to show up and do work.

13         So, this, on its face, conditional.  Under Exide

14  that doesn't even -- that's not even an obligation.  And

15  that's on the part of the provider.  Never mind that there's

16  nothing in the contract remotely suggesting that there's any

17  obligations on the part of CMS.  So, it's not even a

18  bilateral executory agreement which it would need to be under

19  Exide.

20         So, it's just, you know, if the argument is you

21  have to call this specific provider agreement executory

22  because there was a footnote several years ago and before

23  Exide that said that some provider agreement that wasn't

24  attached to that decision is executory, I mean I disagree

25  with that, but if Your Honor rules that way I don't know what

1  to say.  I don't think that's binding on the court.

2         And I would point out in this connection that the

3  Mission Product case that's also cited as finding that the

4  provider agreement was executory, it was an unreported

5  decision, it's in the federal appendix.  The posture of the

6  decision also was there was the creditor's committee

7  appealing from an order of the Bankruptcy Court authorizing

8  the assumption and assignment of a provider agreement with

9  the consent of CMS.

10         The committee was appealing something having to do

11  with the cure settlement.  And the Third Circuit in that

12  decision didn't reach the merits of the appeal because they

13  concluded statutory mootness applied.  It was unreported and

14  it literally found nothing; it dismissed the appeal on

15  mootness grounds.  So, that's not authority.

16         So, I think it's beyond clear to us, which is why

17  when we put in our bid and drafted our proposed sale order we

18  included primarily 363 based relief.  It's abundantly clear

19  to us that this is a 363 question only.  There was -- now, if

20  we are under 363 something Mr. Sacks pointed out is that

21  there is no ability to sell free and clear of recoupment

22  rights under 363, that's right.  We have that from the Folger

23  Adam case in the Third Circuit.  So, the -- what you can tell

24  free and clear are set-off rights.  The distinction between

25  set-off and recoupment has to do with, you know, same

1    transaction different transaction.

2              THE COURT:  Right.

3              MR. JACKSON:  That's what University Medical

4    Center is relevant for.  University Medical Center tells us

5    that Medicare overpayment liability is in the nature of

6    recoupment if it relates to the post-petition time period.

7    And by implication it's not in the nature of recoupment if

8    it's not.  And in the Third Circuit the opposite of

9    recoupment is -- you know, the sort of counterpart to

10   recoupment is set-off.

11             You can sell free and clear of set-off rights

12   under 363(f), that's clear at the Circuit level.  Folger

13   Adam, the IT Group case that was cited, the Judge Walrath

14   decision was also cited in the debtor's papers.  That was

15   another one where the court dealt with the sale of executory

16   contracts free and clear of set-off rights arising under the

17   contract.

18             Now what our transaction structure does is it

19   provides a $3 million dollar escrow.  What we can't sell free

20   and clear of under 363(f) is recoupment, but what University

21   Medical Center tells us recoupment is, is this is the post-

22   petition overpayment period.  The only evidence in the record

23   of what the CMS overpayment recoupment right might be

24   relating to the post-petition period is Mr. Wilen's testimony

25   that it's likely not to exceed three million.

1          I agree wiht Mr. Minuti, that's all that we

2   needed.  Why is that all that we needed?  Well, if we're

3   proceeding under 363 the remedy for a party that says, no,

4   you can't sell free and clear of that is to demand adequate

5   protection of the interest that's being sold free and clear

6   of.  363(p) of the code says that in a hearing where somebody

7   is asserting adequate protection the party asserting the

8   right to adequate protection bears the burden of establishing

9   the nature and scope of the property interest that's

10  deserving of protection.

11         So, Mr. Wilen's testimony, although, you know,

12  perhaps not one hundred definitive as he admitted on cross

13  examination, it's all that there is and the Government had

14  the burden to prove that it was anything more than that.  So,

15  on the record before you there would be no basis to conclude

16  that CMS has any recoupment right in excess of the $3 million

17  dollars that's provided under our agreement.  And, Your

18  Honor, that was by decision in our agreement.  We saw a few

19  moves ahead, you know.

20         Now, if we're under 365, and not to belabor the

21  points, I think this waterfront was covered very thoroughly,

22  but if we are under 365 another nuance that I wanted to point

23  out, because I think it gets lost in the shuffle, is that 365

24  doesn't -- the obligation of an executory contract assignee

25  to perform under the contract post-assignment does not

1    require it to perform obligations that can be stripped off

2    free and clear.

3           Now, for that we have direct authority in the <u>IT</u>

4    <u>Group</u> case, again cited in the debtor's papers.  Now that was

5    a case where there was a number of contracts between a debtor

6    and a counterparty.  And the debtor sold some of the

7    contracts and kept some of the contracts, and then rejected

8    them.  There was a provision in all of the contracts,

9    including the ones that were assigned to the assignee that

10   said, you could describe it as a cross offset provision.  It

11   said that the counterparty could withhold any payments owing

12   to the counterparty which was now the purchaser who had

13   stepped in the shoes of the debtor.

14          This cross offset provision said if there's any

15   right to payment that the non-debtor counterparty has against

16   who is originally the debtor or arising out of any other

17   transaction they can hold it back.  Post-closing of an

18   assignment of some of the contracts.  To the counterparty or

19   to the buyer, the counterparty of the contract said, well,

20   no, the debtor stiffed me on these four contracts that it

21   rejected so I'm going to recoup my rejection damages from the

22   amounts that I owe you under these contracts.

23          The purchaser, I think, oddly enough, represented

24   by Judge Sontchi or then attorney Sontchi, curiously, came in

25   and said, no, that doesn't work. We bought these free and

1  clear.  The issue that was litigated among the parties is can

2  you sell free and clear under 365; yes, you can because 365

3  rights are property rights.  They are subject to both 365 and

4  363.

5           What Judge Walrath said was, look, the party who

6  takes assignment of a contract can't escape any recoupment

7  that there may be because that's a defense, that's not

8  something that can sold free and clear of as Mr. Sacks said

9  and as we discussed in the 363 context.  But Judge Walrath

10  said no problem concluding that the right to payment of other

11  transactions gets stripped off.

12           So, that is really kind of what we have here, what

13  we've spent so much time talking about says that normally,

14  outside of bankrutcy, says that the person who takes

15  assignment of a provider agreement takes all the liabilities.

16  That is fine outside of bankruptcy, just like its fine

17  outside of bankruptcy that the party in the IT Group case had

18  all these cross offset provisions in its contract, but once

19  bankruptcy intervenes and the application of the principals

20  of 363(f) and 365 apply it changes things.  That is not

21  because it's giving the debtor anything greater than they had

22  outside of bankruptcy, which, you know, a theme of Mr.

23  Sacks's comments, yes, that's true, but that's not what's

24  happening here.  We're just applying the provisions of the

25  bankruptcy code and the provisions of the bankruptcy code

 1   change things.

 2          So, I apologize for taking up so much of your

 3   time, Your Honor. I did want to kind of drill down on a

 4   couple of those nuances that jumped out at me from the

 5   presentation.

 6          I would be remiss to if I didn't mention I am a

 7   bankruptcy lawyer, I know just enough to be dangerous about

 8   regulatory issues, but we have somebody who knows about

 9   regulatory issues that we brought with us.  To the extent it

10   would be helpful for Your Honor to drill down on some of the

11   more specific provisions in the regulations or in the

12   Affordable Care Act, you know, we would certainly be able to

13   have Michael Lambert from Ropes & Gray in Boston.  I would

14   move his admission if Your Honor would like to hear on any of

15   that; otherwise, we can certainly hold because I've taken

16   enough time at the podium.

17          THE COURT:  I should hear a little bit about that,

18   yes.

19          MR. JACKSON:  Okay.  So, we can follow-up with a

20   written *pro hac* motion, but I would move Mr. Lambert's

21   admission *pro hac vice* for purposes of this argument.  I

22   believe he was admitted in the Commonwealth of Massachusetts.

23          MR. LAMBERT:  I am.

24          THE COURT:  You are admitted.

25          MR. JACKSON:  And I can vouch, he's a pretty good

1  guy.

2          THE COURT:  All right.  Good afternoon.

3          MR. LAMBERT:  Thank you.  Good afternoon.  As Mr.

4  Jackson said I'm Michael Lambert of Ropes & Gray.  I'm here

5  as healthcare regulatory counsel for Jefferson.

6          THE COURT:  Yes.

7          MR. LAMBERT:  In connection with those aspects of

8  this specific transaction involving the Medicare provider

9  agreement and the residency slot assets.

10          In that limited capacity there were four points

11  that I thought were necessary to address arising out of some

12  of what was in the brief that was filed this morning and some

13  of what was said today.  The first of those four points is

14  whether there is a provider agreement to transfer.  The

15  second is whether the provider agreement can be transferred.

16  The third is whether Section 5506 of the Affordable Care Act

17  has anything to say about that.  And I think the fourth is

18  how to effectuate the transaction, assuming it doesn't.  And

19  I will take them in turn.

20          So, is there a provider agreement?  The Government

21  has cited to Section 42 CFR 49.52.  For architecture and just

22  because I'm a Medicare regulatory lawyer, part 49 of 42 CFR

23  is the part that governs provider agreements, that's the

24  caption of it.

25          THE COURT:  Okay.

1          MR. LAMBERT:  Section 52 or .52 governs when a

2   provider agreement can be terminated by a provider.  And so I

3   think there are two reasons that that does not cause the

4   provider agreement not to exist here.

5          The first is the basis of its language, that has

6   already been discussed.  It applies if there has been a

7   cessation of business.  It has been addressed that there is

8   business occurring at the hospital.

9          THE COURT:  Yes.

10          MR. LAMBERT:  The second, and I think more

11   important, comes from what the regulation does.  As I said,

12   .52 addresses when a provider can terminate its provider

13   agreement.  Subsection (a) of Section 52 describes that if a

14   provider wants to terminate its provider agreement it needs

15   to give notice.

16          Section (b) then says if a provider has given

17   notice when is that notice effective.  It's generally

18   effective not more than six months from the date of the

19   notice.  That period can be accelerated if its acceleration

20   would avoid disruption and then there's the part that the

21   Government cited here which is, I think, Sub-Clause (3) at

22   any rate.  It says that if the provider is closing then the

23   notice is effective when the provider closes.

24          The section that we've been talking about, right,

25   it's the Section that says when a provider's own termination

1   of its provider agreement becomes effective.  And that's not,

2   I think, where we are because there's a separate section,

3   it's the next section, its .53; .53 talks about when CMS can

4   terminate a provider agreement.  And .53 goes through a

5   litany of different cases in which CMS can terminate a

6   provider agreement.  They generally get to when the provider

7   isn't doing what Medicare requires hospitals to do.  And as a

8   general matter CMS needs to give a fifteen day notice if CMS

9   wishes to terminate a provider agreement.

10          So, what I would suggest with regard to Medicare

11  provider agreement law is that .52 really doesn't apply here

12  because Hahnemann, at least to my knowledge, hasn't given

13  notice that it is terminating its provider agreement and

14  while the Government may seek for the provider agreement to

15  be terminated the process for that is under 53 and requires

16  notice, advanced notice of, at least, fifteen days.

17          So, I think that the first point, as I said, is,

18  is there a provider agreement to transfer.  And based on the

19  non-application of 52 and then the process of 53 I would say,

20  yes, there is.

21          That then would move me to the second point which

22  is can it be transferred.  The first point I'd have there,

23  which has been made before, is there is no statutory or

24  regulatory prohibition on its transfer.  A supplemental point

25  I would make though that hasn't been made yet is Section 1871

1   of the Social Security Act requires that if CMS, if the

2   secretary, wishes to apply any rule requirement or other

3   statement of policy, I'm reading with ellipsis, that

4   establishes or changes a substantive legal standard governing

5   payment for services or the edibility of entities to furnish

6   or receive services or benefits under this title, Section 18

7   of the Social Security Act, that's Medicare, it must -- the

8   secretary must do so by regulation.  The last bit I

9   paraphrased, but must do so by regulation.

10          So, I'd say that the statute, the Social Security

11  Act says that if CMS wants to limit payment rights it's free

12  to do so, but it has to do so by regulation.  And so the

13  regulation of course, that we've been talking about is 49.18.

14          THE COURT:  Yes.

15          MR. LAMBERT:  So, again, that's in 489.  So, it's

16  the regulation that is governing; it's the part that governs

17  Medicare provider agreements.

18          As has already been discussed there are the four,

19  I'd sort of call them, the always CHOW.

20          THE COURT:  I'm sorry, the…

21          MR. LAMBERT:  The always CHOW.  If a partnership

22  has a change of partner, well that is always a CHOW.  If an

23  unincorporated association, I think it says, has a change of

24  assets it's always a CHOW.  For a corporation, if there is a

25  merger that is always a CHOW.  For a lease, I believe it is,

1  if there is a lease that is always a CHOW.

2          And it says if an always CHOW happens then there

3  is an assignment of the provider agreement and as the

4  Government said, with that comes the good and the bad.  That

5  is, in my view, the purpose of the regulation saying if you

6  do an always CHOW you get the good with the bad.  That is not

7  exclusive, as others have said already, there are asset sales

8  that happen with great frequency.  Those are not described in

9  4918.

10          I'd then point to Medicare's manuals.  There are

11 operating manuals that CMS has developed.  They were

12 mentioned briefly earlier.  One is called the program

13 integrity manual.  There is a section there, it's in Chapter

14 15 of the program integrity manual and the citation is a

15 bear; its 15.7.7.1.1.  That describes that a CHOW can occur

16 when there is an acquisition or a merger, which is when two

17 or more entities combine.  A point I would make is that CMS

18 does not direct that that has to be a statutory merger.  It

19 simply indicates that when there is a combination; when two

20 or more entities combine as one pathway to a CHOW.

21          The same section talks about that there can be

22 other financial or administrative changes that a provider

23 believes constitute a CHOW.  Then the next Section 15.7.7.1.2

24 instructs that CMS's contractors, if there is a question as

25 to whether there has been a CHOW are instructed to do two

1  things.  The first thing they are instructed to do is to

2  decide whether there is a CHOW.

3       So, I will turn to the second thing that they're

4  instructed to do which is to determine whether the acquirer

5  is accepting the Medicare assets and liabilities.  Here, I

6  would say, certainly, that the Medicare assets are the

7  Medicare payment rights being transferred.  The Medicare

8  liabilities that defer, candidly, to the bankruptcy lawyers

9  to address the way in which the liabilities are addressed,

10 but would submit that they can be addressed that way.

11      There was a note that was made earlier about the

12 provider agreement itself.  It's that one page document.

13           THE COURT:  Yes.

14           MR. LAMBERT:  It says that it is subject -- and it

15 states that it's subject to part 489.  What I wanted to note

16 there is that part 489, as I said, is the full section that

17 governs provider agreements.  So, what CMS is saying there is

18 that the provider agreement is subject to the regulations

19 that govern provider agreements.

20      To go through quickly what some of those are the

21 first -- this is 489.10, it says that any provider, and I

22 will just read highlights, but its 489.10, has to agree to

23 meet Title 6 of the Civil Rights Act not to discriminate.  It

24 needs to provide for handicapped persons.  It needs to comply

25 with the Discrimination Act.  So, it's sort of a non-

1  discrimination section.

2          Flipping forward 489.11 describes what happens

3  when CMS accepts a provider to participate in the Medicare

4  program.  And it just says CMS gives written notice and it

5  sends two copies of the provider agreement.  So, it's

6  administrative.

7          There is another Section 389.12 says what happens

8  if CMS denies an applicant for a -- who is initially applying

9  for a provider agreement.

10         The next Section that comes on 489.18, we've

11 already talked about this.  In the next section of my book,

12 there are other sections there.

13         489.20 talks about the essentials of provider

14 agreements, that's its caption.  And that says that the

15 essentials are that providers have to agree to limit their

16 charges to beneficiaries in accordance with Medicare law to

17 comply with provisions of Medicare law regarding disposition

18 of amounts incorrectly collected that it needs to comply with

19 requirements about hiring former employees or intermediaries.

20 It's all very technical about how providers have to operate.

21         I will stop there in going through what 49 does,

22 but what I will say is in reading the provider agreement and

23 in reading that section that says, hey, if you've received

24 assignment of a provider agreement you need to comply with

25 Part 489.  What that's doing is just directing two provisions

1   like that that say you need to do what it is that Medicare

2   providers do which, of course, is what Thomas Jefferson

3   University Hospital, that is a provider, under a provider

4   agreement currently, is doing.  So, that was the second

5   point.

6           The third is what Section 5506 has to say about

7   this.  There I'd say the fundamental purpose, and this was

8   actually reflected in the Government's brief this morning, is

9   ultimately to act as a safety net.  It's to say if a hospital

10  closes and upon closure if the hospital is voluntarily

11  closing in .52 and the provider agreement then goes away we,

12  Congress, have decided that we don't want slots to get

13  stranded.  So, it's a safety net sitting underneath hospitals

14  to say if you close we will catch and redistribute your slots

15  at the very end.  There is a safeguard.  If other provisions

16  aren't made for them we're going to make sure that they don't

17  die with you.

18          Here, by spirit would certainly say that that

19  spirit is met in this transaction.  The slots aren't dying

20  with Hahnemann.  The slots are being transferred together

21  with the Medicare provider agreement. That is number one.

22          There are the orders of preference and priority

23  which would say are met too by keeping the resources and the

24  assets in the region.  Then turning from the purpose to the

25  language it would say they, as you had already noted, in a

1   case where a hospital with an approved medical residency

2   program closes all of this happened.  Well if the transaction

3   happens before the program closes 5506 doesn't attach.

4           Secondarily, I would posit as a question whether

5   Hahnemann is, in fact, a hospital with approved medical

6   residency training programs today because my understanding is

7   that the approval given by the ACGME, which is the

8   Accreditation, and I'll get it wrong, but it's the

9   accrediting body for medical residency programs, was either

10  lost or surrendered.  I don't know the particulars there, but

11  it doesn't exist right now.

12          So, while I think, frankly, the main point is that

13  if the hospital doesn't close 5506 doesn't attach.  I would

14  subject that there would be, at least, a question as to

15  whether if the hospital closes not then having an approved

16  program it attaches anyway.  That's the third point.

17          So, the fourth is really about the pathway for the

18  transfer of the Medicare provider agreement.  I'm speaking

19  now purely as a regulatory lawyer seeking, candidly, the

20  cleanest path for any transaction.  Ultimately, the path

21  here, which is the path, I think, described in the proposed

22  sale order that the debtors put forward, is having a finding

23  that this is, in fact, a CHOW that has occurred.  That, sort

24  of, puts the transaction in an established channel.

25          If the finding is that this is, in fact, a merger

1    of the provider agreements that puts in a deeply established

2    channel because what happens, and this is described in the

3    Medicare manuals as well, if there is a merger what CMS is

4    supposed to do is -- I'll illustrate by saying to stack the

5    two provider agreements on top of each other.  The mechanism

6    to do it, and this is described at the end of the sale order,

7    is to issue what is called a tie-in notice that ties the two

8    provider agreements together to then retire the old provider

9    number and provider agreement because having merged in that

10   number is no longer relevant.

11          What's called the MAC, it's the Medicare

12   Administrative Contractor, then updates its own systems to

13   reflect those changes and changes of address and, sort of,

14   actual practicalities.  That really is the established

15   pathway for what happens when there is a CHOW.

16          So,  I think what the sale order does is,

17   essentially, says if we take the provider agreement we

18   recognize that there has been a CHOW and consider that CHOW

19   to be the merger of the provider numbers that sort of

20   establishes and puts it in a pathway that then follows the

21   established Medicare processes.

22          So, those in brief, at least, from a Medicare

23   provider agreement healthcare regulatory perspective, which

24   is my limited capacity, frankly, are the points.  We'd be

25   glad to hit any further detail on any of those, but,

1  otherwise, defer to others.

2          THE COURT:  I appreciate that description very

3  much.

4          MR. LAMBERT:  Thank you.

5          THE COURT:  Mr. Sacks, do you have anything -- oh

6  I'm sorry, the committee.  Mr. Sherman.

7          MR. SHERMAN:  Your Honor, I will be brief.  I

8  don't want to belabor the record.

9          Since our constituency, Your Honor, is the primary

10 beneficiary of the proceeds of the sale to the extent Your

11 Honor considers it we would join in Mr. Minuti's erudite

12 comments.  It was well spoken, a great statement of the law

13 and, sort of, synthesizing it, Your Honor, is we heard from

14 the Government that there are paths to follow when you assign

15 things, but not, as Mr. Minuti said, the only paths.

16         If you sort of harmonize bankruptcy law with

17 Medicare law or Medicaid law you can bring these together and

18 then create different paths.  They shouldn't be read, in sort

19 of, silos. You got to harmonize the various statutes.  And as

20 you harmonize the statutes there is a path to get there.

21         The other thing I just wanted to point out, Your

22 Honor, in looking at the great one page of the provider

23 agreement --

24         THE COURT:  Yes.

25         MR. SHERMAN:  -- it doesn't restrict assignment.

1  We see lots of contracts in our jobs.  And most of them, if

2  they want to prohibit something, they will say it prohibits

3  it.  But in looking at the provider agreement it doesn't

4  prohibit assignment as Mr. Sacks tries to sort of weave

5  through the statutes to say.  All it says is in the event of

6  a transfer of ownership.

7            One would think if by contract you want to

8  prohibit something you would prohibit it by contract.  It is

9  as clear as day.  There is no prohibition on assignment just

10 on the face of the provider agreement.  So, the Government

11 may want to graph stuff, but maybe they should change their

12 own form, Your Honor, because this is what people rely on.

13           Other than that, Your Honor, again, we would join

14 in support of the comments of Mr. Minuti.

15           THE COURT:  Thank you, Mr. Sherman.

16           MR. SACKS:  May I be heard briefly, Your Honor?

17           THE COURT:  Yes, you may.  Yes, sir.

18           MR. SACKS:  I'm not going to reiterate anything I

19 said, but just make two points I don't think I've raised yet.

20           THE COURT:  All right.

21           MR. SACKS:  Following on what I believe Mr.

22 Jackson and Mr. Lambert said I think Mr. Lambert told you

23 that you should conclude this is a CHOW.  So, I think it's

24 important to understand what the Social Security Act says

25 about CMS's and HHS's jurisdiction.  And we talk about it on

1   Page 22 to 23 of our objection filed this morning.

2            The jurisdictional bar of the Social Security Act

3   says that except for conducting judicial review of the

4   secretary's final decision, a court is barred from

5   jurisdiction over any Medicare program determination.  And

6   that bar applies to Section 1344.  It applies to the

7   bankruptcy code and court's jurisdiction as well.

8            So, this court, we would submit, has no power to

9   determine this is a CHOW, only CMS can do that and there can

10   be judicial review after exhaustion of administrative

11   remedies from that process.  The court, we would say, does

12   not have the power to do that.

13            My final point I would like to make is that I

14   don't know what Your Honor's intention is.  The sale order,

15   as I mentioned before, has some sweeping releases in it and

16   some unprecedented constraints on the agency.  So, I don't

17   know if Your Honor intends to enter something like that

18   today.

19            THE COURT:  No, I don't.

20            MR. SACKS:  We'd like the opportunity to be heard

21   on that, too brief on that at some point before Your Honor

22   wood order anything.  And I think it's important to

23   understand here I don't think there is any urgency to get

24   this sale completed because the only asset, again, involved

25   is these permanent residency slots.  And they don't come into

1   play until the existing residents finish their residencies.

2   So, there is no urgency for these to be transferred today or

3   tomorrow in that sense.

4           THE COURT:  I think residencies expire in July,

5   don't they, usually?

6           MR. SACKS:  Yes.

7           THE COURT:  Okay.

8           MR. SACKS:  To the extent there is some turnover

9   it would be next July.

10          THE COURT:  All right.

11          MR. SACKS:  Thank you, Your Honor.

12          THE COURT:  We're not going to wait till July.

13  Don't worry about that.

14          All right.  Thank you, Mr. Sacks.

15          MR. CAIRNS:  Your Honor, Tim Cairns.

16          THE COURT:  Mr. Cairns, good afternoon.

17          MR. CAIRNS:  Pachulski Stang Ziehl & Jones on

18  behalf of Tenet and Conifer.  I don't know if you want to

19  hear about people who support the sale or people who object,

20  but --

21          THE COURT:  Are you supporting or objecting?

22          MR. CAIRNS:  We supporting, Your Honor.

23          THE COURT:  All right.  I will hear you then.

24          MR. CAIRNS:  Your Honor, it was interesting to

25  hear Mr. Sacks talk about urgency of the sale because one of

1    the reasons we are, obviously, supporting the sale is because

2    we have a motion to compel and administrative claim that Your

3    Honor has directed us to work with the debtors to try to come

4    to an agreed amount.

5              Let's be clear, when Mr. Wilen was talking about

6    some of the operations that were still going on at the

7    hospital many of those operations are being performed by

8    Conifer.

9              THE COURT:  Yes.

10             MR. CAIRNS:  So, we are still incurring

11   administrative costs.  So, we believe there is some urgency

12   here.  We do have to come to an agreement with the debtors on

13   an administrative claim by the end of next week.  So, we

14   would like to see the money come into this day.  We would

15   like to see the sale get approved on an expedited basis.

16             One of the other things I wanted to mention and I

17   haven't heard from the DIP lenders, but there was an

18   objection filed that said the money should be given directly

19   to them.  Obviously, we would disagree with that.  We'd like

20   the money to go to the estate for their ongoing

21   administrative costs.

22             Thank you.

23             THE COURT:  All right.  Thank you.

24             Mr. Alberto, yes.

25             MR. ALBERTO:  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon.

2          MR. ALBERTO:  Justin Alberto from Bayard on behalf

3   AAMC, the Association of American Medical Colleges, and

4   ECFMG, the Educational Commission for Foreign Medical

5   Graduates.  I've been preparing those acronyms all night.

6          I'm pleased to report today, Your Honor, we filed

7   an objection at Docket 360.  Our issues have been resolved by

8   my friend, Mr. Wilen's proffer earlier.  The two issues that

9   we raised were with respect to tail insurance and records

10  retention.

11         THE COURT:  That's right.

12         MR. ALBERTO:  With respect to tail insurance we

13  understand that there is going to be a twenty-five year tail

14  on the claims made policy that is currently in effect and

15  that the prior policy with current space we believe that as a

16  package residents will be protected going forward.

17         On the records we understand that the micro fees

18  should be delivered to Drexel College of Medicine which was

19  appreciated as well as the paper and electronic records being

20  delivered to FSMB so that the residents can access them at

21  later points in their career as needed.

22         I rise to say that we withdraw our objection and

23  also to thank the professionals involved in this case for

24  getting to this point.  Mr. Minuti and his team have shown

25  the utmost professionalism in getting our issues resolved.

1               Behind me is Doug Carlson from the ACGME.  And I

2      believe he is going to tell you something very similar to

3      what I just stated for his client.

4               THE COURT:  All right.  Thank you, Mr. Alberto.

5               MR. ALBERTO:  Thank you, Your Honor.

6               MR. CARLSON:  Douglas Carlson for the

7      Accreditation --

8               THE COURT:  Yes, Mr. Carlson.  I remember you.

9               MR. CARLSON:  Thank you, Your Honor.

10              We joined in the limited objection of counsel.

11     For the same reasons we withdraw that joinder.

12              THE COURT:  All right. Thank you, Mr. Carlson.

13              MR. NEWLIN:  Good afternoon, Your Honor.

14              THE COURT:  Good afternoon.

15              MR. NEWLIN:  Claiborne Newlin from Markowitz &

16     Richman representing the Pennsylvania Association of Staff

17     Nurses & Allied Professionals.

18              We filed an objection.  And standing next to me is

19     Mitchel Malzberg who has been admitted *pro hac vice* and I

20     cede my time to him.

21              THE COURT:  All right. Thank you.

22              MR. MALZBERG:  Good afternoon, Your Honor.  I will

23     be brief.

24              We join support of the objection of CMS, HMS in

25     opposing the sale.  As you know, the heart of the objection

1    is resulting from the sale of the residency slots. We concur

2    with the statements of the Government.  We think this sets a

3    dangerous precedent allowing hospitals to be sold for its

4    parts when the parts may be more valuable than the whole.

5    And most struggling communities are in rural areas or inner

6    cities.  The impact of allowing the parts to be sold and

7    these residency slots will have a detrimental effect on these

8    communities causing more hospitals to be closed and the parts

9    to be sold.

10            I'm not going to belabor the record.  We again

11   join in the support.  As Your Honor does know there are

12   bidders who may be interested in selling or purchasing the

13   hospital as a going concern and we support that.  It supports

14   the sale in a sale process which allows that process to go

15   forward for the reopening of the Hahnemann for the benefit of

16   the community and all of its workers.

17            THE COURT:  All right.  Thank you.

18            Good afternoon.

19            MR. CARICKHOFF:  Good afternoon, Your Honor.  May

20   I please the Court?

21            THE COURT:  Mr. Carickhoff, good to see you.

22            MR. CARICKHOFF:  Thank you.  David Carickhoff of

23   Archer & Greiner.  I'm here on behalf of certain physicians,

24   Your Honor, under the Philadelphia Academic Health System

25   Physician Practice Plan.  And unlike Mr. Alberto, I haven't

 1  really been able to come up with a good acronym for them.

 2          THE COURT:  No, I can't think of one.

 3          MR. CARICKHOFF:  The plan covered about 107

 4  physicians.  I'm representing approximately 50 of those

 5  physicians, all who are under the Hahnemann umbrella.  And I

 6  apologize, I haven't filed anything, Your Honor --

 7          THE COURT:  I didn't think so.

 8          MR. CARICKHOFF:  -- because I was recently

 9  retained.

10          THE COURT:  Yeah.

11          MR. CARICKHOFF:  So, my issues are similar to that

12  of Mr. Alberto, where they were asking for tail coverage for

13  the residents.

14          THE COURT:  Right.

15          MR. CARICKHOFF:  My ask is for tail coverage for

16  the non-resident physicians.  We believe for much of the same

17  reasons that were articulated in Mr. Alberto's objection,

18  this is not an expense that should be hoisted on the

19  physicians.  Without the proper tail coverage, Your Honor,

20  the physicians will be exposed, personally, to liabilities

21  relating to patients seen during their employment with

22  Hahnemann and, again, this is something that state law

23  requires the physicians to have.

24          THE COURT:  These were employees of the hospital

25  and their insurance was being paid by the hospital; is that

1    right?

2            MR. CARICKHOFF:  These are employees within the

3    Hahnemann umbrella.

4            THE COURT:  Okay.

5            MR. CARICKHOFF:  There were different debtors that

6    they had employment agreements with, so TSP 4 of PA, LLC, for

7    example, certain of the physicians may have had an employment

8    agreement with that entity, but generally came under the

9    Hahnemann umbrella.

10           My understanding is that there currently is

11   coverage in place now and that will be in place until we get

12   to the St. Christopher's sale, Your Honor.  So, my

13   expectations --

14           THE COURT:  So, you have a little bit of time to

15   talk --

16           MR. CARICKHOFF:  My expectation is you'll be

17   hearing from me again, but we would ask that the proceeds

18   from this sale be set aside to address that issue; that would

19   be our ask.

20           We do support the sale, Your Honor.  We think it's

21   a valuable asset and the estate should realize the benefit

22   there.

23           THE COURT:  All right.  Mr. Carickhoff, thank you.

24           MR. CARICKHOFF:  Thank you.

25           THE COURT:  And, obviously, you'll have

 1  discussions with debtors about the tail insurance.

 2           MR. CARICKHOFF:  And, again, I've been new to the

 3  proceeding and have already started those discussions and

 4  they've been more than accommodating to have those

 5  discussions, so I expect the best.

 6           THE COURT:  All right.  Thank you.

 7           MR. CARICKHOFF:  Thank you.

 8           THE COURT:  Good afternoon.

 9           MR. SMITH:  Good afternoon, again, Your Honor.

10  David Smith representing the Pennsylvania Department of

11  Health.

12           THE COURT:  Yes.

13           MR. SMITH:  Mr. Merles (ph) testified that the

14  consortium members have not purchased a license from the

15  Department of Health, nor have they applied for a license

16  with the Department of Health, relating to the assets

17  purchased or proposed to be purchased.

18           But as Mr. Jackson commented, some of the

19  provisions of the proposed order are broad enough that they

20  would cover licensing issues.  And I look first at Paragraph

21  21 of the proposed order which unsecured creditors as a prior

22  speak said with ellipsis says, The purchaser shall be

23  authorized to operate under any transferred license and any

24  such licenses are deemed to have been and are hereby directed

25  to be transferred, leaving out a lot of verbiage in between

1   those.  And then Paragraph 20 prohibits government unit from

2   denying, revoking, suspending, or refusing to renew licenses

3   relating to the operation of the purchased assets.

4           I think that that language is overbroad and it

5   seeks to usurp the independence and discretion of the

6   Pennsylvania Department of Health.  We proposed on a couple

7   of occasions that language such as, Nothing in this order is

8   intended to abrogate or limit the authority or discretion of

9   the Pennsylvania Department of Health over regulatory matters

10  such as closure and licensing would be appropriate in the

11  order and would permit the Department of Health to withdraw

12  its objection.

13          THE COURT:  All right.  Mr. Smith, thank you.

14          I will tell you, I have not studied the order yet.

15  That paragraph that you just described, Paragraph 20, does

16  trouble me and perhaps you can reach accommodation with the

17  debtors.

18          MR. SMITH:  Thank you, Your Honor.

19          THE COURT:  Thank you.  Ms. Santamour, yes?

20          MS. SANTAMOUR:  Good afternoon, Your Honor.

21          THE COURT:  Good afternoon.

22          MS. SANTAMOUR:  Gretchen Santamour on behalf of

23  MidCap Financial.

24          THE COURT:  Yes.

25          MS. SANTAMOUR:  We basically had three objections.

1    I think all of them have been resolved or addressed one way

2    or the other.  The first one was with respect to the five-

3    hundred-thousand-dollar initial payment.

4              THE COURT:  Yes.

5              MS. SANTAMOUR:  MidCap is satisfied that that went

6    through the lockbox, so that's no longer an issue.

7              The third objection was with respect to language

8    that we asked to be included in the order, which I believe

9    has been -- or unless it's in Paragraph 25 of our objection

10   in modified language that's acceptable to MidCap was included

11   in the proposed order.

12             THE COURT:  Do you know what paragraph in the

13   order that is, Ms. Santamour?

14             MS. SANTAMOUR:  I do not, Your Honor.

15             THE COURT:  All right.  You can look that up.

16             MS. SANTAMOUR:  Paragraph 31, Your Honor.

17             THE COURT:  31, okay.  All right.  I'll read that

18   more carefully, but, yes.

19             MS. SANTAMOUR:  Okay.  And then the remaining

20   issue was with respect to MidCap's assorted lien against the

21   proceeds of the residence program.

22             THE COURT:  Yes.

23             MS. SANTAMOUR:  And the committee and MidCap agree

24   that we would each reserve our positions, with respect to

25   that.  I think the committee, I understand, is going to bring

1   an adversary proceeding within the deadline under the DIP

2   order on or before September 15th to tee up the issue as to

3   whether or not MidCap has a lien against the resident program

4   sale proceeds.

5         THE COURT:  All right.  So, your objection is

6   largely been resolved at this point?

7         MS. SANTAMOUR:  Right.  With the reservation of

8   the issue regarding the lien against the proceeds.

9         THE COURT:  Exactly, okay.

10        MS. SANTAMOUR:  Thank you, Your Honor.

11        THE COURT:  Mr. Sherman, yes?

12        MR. SHERMAN:  Your Honor, just an instance where

13  Ms. Santamour's client wants to be sued, but unfortunately we

14  will --

15        THE COURT:  Yeah, I --

16        MR. SHERMAN:  Strange, but if that's what they

17  want, that's what we'll do.

18        THE COURT:  You're still investigating; is that

19  right?

20        MR. SHERMAN:  Well, as far as the issue of the

21  lien on the proceeds?

22        THE COURT:  Yes.

23        MR. SHERMAN:  No, I think we're pretty comfortable

24  in our position that they don't have a lien and we'll tee

25  that up through an adversary.

1              THE COURT:  Okay.

2              MR. SHERMAN:  But that will be initiated by -- as

3    I said, if they want to challenge by the deadline, we'll do

4    what we have to do, but that will be initiated.

5              THE COURT:  All right.  Mr. Sherman, thank you.

6              Mr. McNeill, you're back?

7              MR. MCNEILL:  Yes, Your Honor, I am.  I'm not

8    going to repeat my argument from earlier, but I do have a

9    couple additional thoughts --

10             THE COURT:  All right.

11             MR. MCNEILL:  -- following the testimony.

12             THE COURT:  Yes?

13             MR. MCNEILL:  First, it seems clear to me that

14   this unabashedly is not in the best interests of the City of

15   Philadelphia, notwithstanding some representations to the

16   contrary about this being a good result for Philadelphia.

17   They've lost a hospital, not to mention, you know, several

18   thousand jobs.

19             I think more to the point, we're talking about it

20   looks like close to half of the residents are not currently,

21   at least, employed by any of the conglomerate hospitals of

22   the 500 -- there were 265 they had retained, and even of that

23   265, based on Mr. Merles' testimony, it's unclear how many of

24   those 265 are actually working at the three members that are

25   within a few miles of Hahnemann University Hospital versus

1  how many of them are working either here in Delaware or in

2  New Jersey.

3        So, Philadelphia has lost at least half, and

4  probably more of their residents, alone, in addition to the

5  doctors, staffs, and other jobs.  Obviously, my client is

6  interested is in because our proposal would keep the hospital

7  open, would preserve those jobs, would preserve that hospital

8  for the benefit of the community there and especially the

9  low-income people who don't have the funds to travel to New

10 Jersey or Delaware to get treatment.  They're probably

11 overloading some of the other Philadelphia-area hospitals.

12        But the same number of patients and not the same

13 number of doctors is not a positive result either, and I

14 think to echo, CMS' comments, we also think that this

15 process, we've always thought it was rushed.  It seems that

16 it's -- there's no pressing need to have this resolved today.

17 The contracts have been rejected.  There's testimony that

18 there's a five-million-dollar run rate going forward

19 regardless of whether the sale closes or not.

20        I think, you know, Tenet/Con's point is a fair

21 one, but I assume they're included within that five-million-

22 dollar number every two weeks.  So, really, the ship has kind

23 of sailed here; nonetheless, my client and at least one other

24 party are still interested in purchasing the hospital as a

25 going-concern.

1          We think if we took a break, gave some time for

2    kind of the -- I know that the sixty-million-dollar number

3    kind of came out the woodwork this morning or in the last

4    couple of days.  I think if we gave -- if we paused for a

5    minute, gave those time to develop with the new developments

6    and kind of new financing commitments that have come in, I

7    think those conversations are worth pursuing and we should

8    take a step back, given that the status quo has already

9    changed and nothing further is really going to change by not

10   approving this transaction today.

11          THE COURT:  All right.  Thank you.

12          MR. MCNEILL:  Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. McNeill.

14          Mr. Minuti, any response to the objections at this

15   point?

16          MR. MINUTI:  Your Honor, if you could just give me

17   one minute?

18          THE COURT:  Sure.  How about if we take a ten-

19   minute break and I'll come --

20          MR. MINUTI:  That would be helpful, Your Honor.

21          THE COURT:  -- back out at 4:00.

22      (Recess taken at 3:42 p.m.)

23      (Proceedings resumed at 3:58 p.m.)

24          THE COURT OFFICER:  Please rise.

25          THE COURT:  Thank you.  You may be seated,

1   everyone.

2           Mr. Minuti?

3           MR. MINUTI:  Your Honor, again, I think I speak

4   for everybody in the courtroom when I say thank you for your

5   patience today.  Obviously, these are unusual issues.  These

6   are complex issues --

7           THE COURT:  Yes.

8           MR. MINUTI:  -- and they're obviously significant

9   issues to this case.  I certainly took it from Your Honor's

10  comments that you wanted to give this a little thought and

11  you're likely not to enter an order today, and we appreciate

12  that, but I'm going to have to disagree with the comments

13  made by some of the counsel here in terms of we have all the

14  time in the world here, Your Honor.

15          THE COURT:  No, I know you don't.

16          MR. MINUTI:  It is very critical to us that Your

17  Honor rule on this either way very quickly, and the reason

18  for that, Your Honor, is, we have an outstanding closing

19  date, number one, under our asset purchase agreement with

20  Jefferson Hospital Friday and, look --

21          THE COURT:  Your closing is Friday?

22          MR. MINUTI:  Friday.  But, you know, could they be

23  flexible?  Might they be flexible?  We could have that

24  conversation.

25          But there are other factors at issue here, Your

1   Honor, that requires us to ask Your Honor to move this

2   quickly, and Your Honor has heard some of the factors today.

3   You know, we've got a union, Your Honor, that's prepared to

4   do anything to stop this transaction.  By the way, the

5   outcome, which is not going to help -- if the outcome is

6   positive, it's actually going to help them, but, yet, they're

7   here arguing against it, okay.  So, every day we're dealing

8   with that, Your Honor.

9           We have two non-bidders, or maybe I'll call them

10  "completely contingent bidders" Your Honor has seen today

11  that will stop at nothing to try to stop this transaction.

12  Create all kinds of disinformation out there in the public

13  domain, and that's only hurting the process and hurting these

14  cases, Your Honor.

15          In addition, Your Honor well knows a decision

16  hopefully in the debtors' favor is going to bring a lot of

17  stability to our cases, for our creditors, for our doctors,

18  certainly for our residents, former residents, so on and so

19  forth.  So, there's a lot of urgency here.

20          Your Honor, there are some things, by the way, in

21  the interim, that can be done that can be prejudicial to the

22  debtors' position.  You heard some of those suggestions in

23  terms of how the regulations work and whether notices can be

24  sent and so on, and we certainly don't want anything like

25  that to happen.  So, I don't want to put any pressure on Your

1   Honor, but here is my suggestion, Your Honor.

2           What I did hear was some people have issues with

3   the order and we appreciate the order got filed late

4   yesterday.  I also under Judge Walsh's funeral is tomorrow

5   morning.  I certainly prepared -- had hoped to go to the

6   wake.  I'd actually like to do that.  I suspect Your Honor

7   would, too.

8           THE COURT:  Yes.

9           MR. MINUTI:  And so, if Your Honor is prepared to

10  do it, my suggestion would be that we come back tomorrow at

11  two o'clock and hopefully Your Honor would be in a position

12  at that time to rule.  If people have issues with the order,

13  we can discuss it at that time.  Your Honor can quickly --

14  you know, to me, those are issues that can easily be decided

15  with a thumbs-up or a thumbs-down and then hope we could get

16  the order entered tomorrow.

17          We would ask, Your Honor, and take -- I mean, I

18  think the parties sort of suggested this -- that there is

19  going to be a standstill; nothing is going to happen in the

20  interim.  We'd like that to be the case; in other words, we

21  don't want the passage of time to be prejudicial to anybody,

22  but we also don't want to rush the Court and want to give the

23  Court time.  So, I don't know if that gives Your Honor enough

24  time, but that is my request.

25          THE COURT:  Well, originally, I was going to

1    suggest issuing a ruling on Friday at two o'clock.  That was

2    my timing.  I thought that would be my timing.  I do have the

3    funeral tomorrow.  I have an appointment at one o'clock and I

4    have some work to do in the meantime, obviously.

5              (Laughter)

6              THE COURT:  So, but I don't want to hold things

7    up.  I agree with you, Mr. Minuti.  I appreciate the time

8    factor involved here.  But the order is going to take some

9    time, as well, I think, for parties to talk about.

10             Why don't we do this, I will be ready for you by

11   three o'clock tomorrow.  That'll give me time.  I'll issue an

12   oral ruling, because I won't have time to write a ruling by

13   tomorrow, and then we can go over the order thereafter,

14   assuming that meets with -- and Counsel can be on the

15   telephone for that matter.  I won't have a problem with that.

16   If out-of-town counsel want to be on the phone and talk about

17   the order, over the telephone, that's great and you can

18   listen, obviously, to the ruling over the phone.  So, that's

19   what we'll do.

20             MR. MINUTI:  Thank you very much, Your Honor.

21             THE COURT:  Three o'clock tomorrow, and where we

22   are.

23             MR. MINUTI:  Very well, Your Honor.

24             Again, we appreciate all the attention today and

25   thank you very much.

1          THE COURT:  All right.  With that, we'll stand in

2    recess.  Have a good evening, everyone.  Safe travel.

3          COUNSEL:  Thank you, Your Honor.

4       (Proceedings concluded at 4:03 p.m.)

5

6

7

8                          CERTIFICATE

9

10   I certify that the foregoing is a correct transcript from the

11   electronic sound recording of the proceedings in the above-

12   entitled matter.

13
     /s/Mary Zajaczkowski_____          September 5, 2019
14   Mary Zajaczkowski, CET**D-531

15

16

17

18

19

20

21

22

23

24

25

# TAB 11

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                      .   Chapter 11
 3      IN RE:                        .
                                      .   Case No. 19-11466 (KG)
 4      CENTER CITY HEALTHCARE, LLC,  .
        d/b/a HAHNEMANN UNIVERSITY    .
 5      HOSPITAL, et al.,             .
                                      .   Courtroom No. 3
 6                                    .   824 North Market Street
                                      .   Wilmington, Delaware 19801
 7                                    .
                                      .
 8                       Debtors.     .   September 5, 2019
        . . . . . . . . . . . . . . . .   3:00 P.M.
 9
                            TRANSCRIPT OF HEARING
10                 BEFORE THE HONORABLE KEVIN GROSS
                     UNITED STATES BANKRUPTCY JUDGE
11
12      APPEARANCES:

13      For the Debtors:         Mark Minuti, Esquire
                                 John Demmy, Esquire
14                               Monique DiSabatino, Esquire
                                 SAUL EWING ARNSTEIN & LEHR LLP
15                               1201 N. Market Street
                                 Wilmington, Delaware 19801
16
                                 - and -
17
                                 Aaron Applebaum, Esquire
18                               1500 Market Street
                                 Philadelphia, Pennsylvania 19102
19

20      Audio Operator:          GINGER MACE

21      Transcription Company:   Reliable
                                 1007 N. Orange Street
22                               Wilmington, Delaware 19801
                                 Email:  gmatthews@reliable-co.com
23

24      Proceedings recorded by electronic sound recording, transcript
        produced by transcription service.
25
```

```
 1   APPEARANCES (Continued):

 2   For the Committee:          Andrew H. Sherman, Esquire
                                 SILLS CUMMIS & GROSS P.C.
 3                               1 Riverfront Plaza, Suite 10
                                 Newark, New Jersey 07102
 4
 5   For SBJ Group:             R. Stephen McNeill, Esquire
                                 POTTER ANDERSON & CORROON LLP
 6                               Hercules Plaza
                                 1313 North Market Street, 6th Floor
 7                               P.O. Box 951
                                 Wilmington, Delaware 19801
 8
     For Reading Hospital:      Robert Lapowsky, Esquire
 9                               STEVENS & LEE
                                 620 Freedom Business Center Suite 200
10                               Valley Forge, Pennsylvania 19406
11
     For U.S. Government:       Marc Sacks, Esquire
12                               Commercial Litigation Branch
                                 Civil Division
13                               UNITED STATES DEPARTMENT OF JUSTICE
                                 P.O. Box 875
14                               Ben Franklin Station
                                 Washington, D.C. 20044
15
     For Jefferson Health:      Patrick Jackson, Esquire
16                               Marita Erbeck, Esquire
                                 DRINKER BIDDLE & REATH LLP
17                               222 Delaware Avenue Suite 1410
                                 Wilmington, Delaware 19801
18
                                 - and -
19
                                 Andrew Kassner, Esquire
20                               One Logan Square, Suite 2000
                                 Philadelphia, PA 19103
21
     For MidCap:                Gretchen Santamour, Esquire
22                               STRADLEY RONON
                                 2005 Market Street
23                               Philadelphia, Pennsylvania 19103
24

25
```

```
 1  APPEARANCES (Continued):

 2  For the Pennsylvania       David Smith, Esquire
    Department of Health:      SCHNADER HARRISON SEGAL & LEWIS LLP
 3                             1600 Market Street, Suite 3600
                               Philadelphia, PA 19103
 4

 5  For HSREP VI Holding,      Stuart Brown, Esquire
    LLC:                       DLA PIPER LLP (US)
 6                             1201 North Market Street, Suite 2100
                               Wilmington, Delaware 19801
 7

 8  For KPC Global Health:     Brett Fallon, Esquire
                               MORRIS JAMES LLP
                               500 Delaware Avenue, Suite 1500
 9                             Wilmington, Delaware 19801

10  For AAMC/ECFMG:            Justin Alberto, Esquire
                               BAYARD, P.A.
11                             600 N. King Street, Suite 400
                               Wilmington, Delaware 19801
12

13  For Tenet & Conifer:       Timothy Cairns, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
14                             919 North Market Street, 17th Floor
                               Wilmington, Delaware 19801
15

16  For PASNAP:                Mitchell Malzberg, Esquire
                               LAW OFFICES OF MITCHELL J. MALZBERG
17                             6 E Main Street, Suite 7
                               Clinton, New Jersey 08809

18                             - and -

19
                               Claiborne Newlin, Esquire
20                             MARKOWITZ & RICHMAN LLP
                               123 S. Broad Street
21                             Philadelphia, PA 19109

22  For American Renal         William Chipman, Esquire
    Management, LLC:           CHIPMAN BROWN CICERO & COLE LLP
23                             1313 N. Market Street, Suite 5400
                               Wilmington, Delaware 19801
24

25
```

INDEX

**#1.**  Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief [D.I. 142; filed: 07/09/19]

**RULING:**                                                                 **6**

 1            (Proceedings commenced at 3:14 p.m.)

 2            (Call to Order of the Court)

 3                THE COURT:  Good afternoon, everyone.  You may be

 4    seated.  Thank you.

 5                Mr. Minuti, good afternoon.

 6                MR. MINUTI:  Good afternoon, Your Honor; Mark

 7    Minuti, Saul Ewing Arnstein & Lehr, here today on behalf of

 8    the debtors.

 9                I certainly know the court has been working hard.

10    We do appreciate that, Your Honor.  We truly appreciate the

11    court's attention to this matter and the work of your staff

12    as well, regardless of how the outcome or what the outcome

13    may be here to our motion.

14                THE COURT:  Yes.

15                MR. MINUTI:  We are obviously here today to learn

16    the court's decision and ruling on the debtor's motion to

17    sell the resident program assets.  Your Honor, we did make

18    some changes to the form of order that we -- in the event

19    that Your Honor is inclined to grant the motion we made some

20    changes to the form of the order that we filed Tuesday

21    evening.  We uploaded those changes today.  I have a

22    blackline.  There's not a lot.  We can walk Your Honor

23    through those when we get there.

24                THE COURT:  Sure.

25                MR. MINUTI:  I think we we've been able, with

1   those changes, to resolve some of the issues that you heard a

2   little bit about yesterday with the form of the order, but I

3   don't think we've resolved all of the issues.

4           The other thing, Your Honor -- Your Honor, I'm

5   sure, has not seen it, but literally two minutes before Your

6   Honor took the bench CMS filed an objection to the form of

7   the order.  It's a two pager.  Candidly, I just scanned it

8   very quickly.  So, I anticipate that they have some issues

9   with the form of the order.

10          THE COURT:  I think that's right from yesterday's

11  hearing.

12          MR. MINUTI:  But at this point, Your Honor, those

13  are relevant.  Obviously, if the court grants the motion at

14  this point I think we welcome the court's decision and then

15  we can go from there.

16          THE COURT:  All right.  Mr. Minuti, thank you.

17  Thank you very much.

18          And this is, of course, the court's decision on

19  the sale of the resident program assets.  And I have a fairly

20  lengthy ruling.  So, it may take a little bit of time and I

21  hope everyone will be patient with me.

22          There are cases that cause a judge to lie awake at

23  night trying to do what is right and knowing that in some

24  cases the decision will offend some or many.  And the case

25  before me is such a case.  And the issue whether or not to

1   approve the sale of the debtor's residency program assets

2   highlights the judge's dilemma.

3           The background, which I recite for purposes of any

4   appeal of my decision is relatively uncontroverted.  Debtors

5   filed their bankruptcy petitions on June 30th and July 1st,

6   2019.  Relevant to the court's ruling debtors filed their

7   motion for the sale of the residency program on July 9th,

8   2019 at Docket Item 142.

9           In the motion debtors sought to sell Hahnemann

10  University Hospitals, which I will refer to as the hospital,

11  graduate medical education training programs to Tower Health,

12  which I will refer to as Tower.  And Tower was acting in its

13  capacity as the stalking horse bidder or the sale could occur

14  to such other entity which might outbid Tower.

15          Debtor's asset purchase agreement with Tower

16  provided for a purchase price of $7.5 million dollars of

17  which $3 million dollars would be placed into escrow to cover

18  the purchase of tail insurance, which was limited to

19  residents training with Tower; an amount to cover any

20  overpayment of Medicare; cure of costs for contracts and

21  other indemnifiable losses of Tower.

22          On July 19th, 2019 the court entered the order

23  approving the bidding procedures at Docket Item 249.  The

24  court later entered an order on August 2nd, 2019 extending

25  the deadline for parties to submit bids until August 7th,

1   2019.   Debtors received more than one qualified bid and

2   conducted an auction on August 8th, 2019.   The winning bidder

3   was Thomas Jefferson University Hospital, Inc., on behalf of

4   a consortium of non-profit hospitals.   The court will refer

5   to the wining bidding as Jefferson or the consortium.

6           The consortiums purchase price is $55 million

7   dollars.   And Tower is the backup bidder at $51 million

8   dollars. The result of the auction to have an increase in the

9   sale price from $7.5 million to $55 million dollars is in the

10  court's view a stunning success for debtors.   The consortium

11  also agreed to pay up to $1 million dollars to reimburse

12  debtors for the purchase of tail insurance.

13          The court will address the objections to the sale

14  of the residency program to the consortium, but before doing

15  so the court notes the following:

16          The entire bankruptcy case and the sale motion are

17  emotionally charged matters effecting many persons and,

18  indeed, the delivery of healthcare in the City of

19  Philadelphia. Hahnemann served many people of flesh and blood

20  including a large number of under-privileged persons.   And

21  the closure of the hospital will represent a major loss to

22  the city.   It has already impacted the delivery of healthcare

23  in the city and the court is well aware of and is greatly

24  pained by this debacle.

25          Number two, local hospitals, particularly

1  Jefferson, Temple and Albert Einstein, who are all part of

2  the consortium have stepped into the breach created by the

3  forthcoming Hahnemann closure and are providing care to many

4  of Hahnemann's patients.

5       Number three, it is not people, physician

6  residents, who are being purchased, but the right of members

7  of the consortium to provide resident positions in the

8  future.  Most, if not all, of Hahnemann's most recent

9  residents have already been placed at other institutions.

10       Number four, the benefit to the community from the

11  sale, if approved, is that it will provide placement of

12  resident doctors within Philadelphia and its environs thereby

13  assisting in the delivery of healthcare in the immediate area

14  and Philadelphia in particular.  In addition, the sale

15  provides needed tail insurance for residents.

16       Number five, in its ruling the court will

17  intermingle findings of facts with its conclusions.

18       There were a number of objections to the sale

19  motion and all but two have been withdrawn or resolved.  The

20  only remaining objections are those of the Pennsylvania

21  Association of Staff Nurses & Allied Professionals which

22  joins in the objection of the United States, which the court

23  will shortly address, and the objection of SBJ Group which

24  purportedly seeks to purchase Hahnemann as a going concern

25  and to operate it as a hospital.

1          As an aside, the court today received a late filed

2     objection from the American Pain Association keeping to keep

3     the hospital open, which the court will deny because it is

4     late filed and because the American Pain Association is not a

5     creditor.

6          Returning to the second group of objectors they

7     argue that they are prepared to purchase Hahnemann as a going

8     concern including the residency program.  And they argue that

9     if the residency program is sold it will stymie the purchase

10    of Hahnemann as a going concern.  The objections under this

11    umbrella -- the objectors under this umbrella are SBJ Group

12    and KPC Global; although, KPC is not an objecting party.  It

13    filed a notice of intention to participate in the sale of

14    Hahnemann as a going concern.

15         This is issue is of concern to the court because

16    the court, like many, many others, would have much liked to

17    see Hahnemann's existence sustained.  The problem is the

18    debtors have already held an auction.  We have all gathered

19    to consider the sale of the residency program and debtors do

20    not have the luxury of time.

21         Certainly the sale of a going concern is

22    preferable, but is the court to give weight to a going

23    concern sale which is far from certain in lieu of a sale

24    certain; that is the sale of the residency program.  We don't

25    have terms, or due diligence studies, or a negotiated term

1   sheet.  All we have is an expressed, self-serving interest

2   that comes late and that is insufficient to defeat a ready to

3   close transaction.  Accordingly, that objection is overruled.

4          The court will now address the objection of the

5   United States on behalf of the Department of Health & Human

6   Services acting through the Centers of Medicare & Medicaid

7   Services, which I will refer to as CMS.

8          CMS provided the court with a lengthy sur-reply,

9   which the court will accept even though it technically

10  violates the local rules.  In making its ruling the court is

11  treading into an area of the law which is replete with

12  statutes and regulations, namely Medicare and the Affordable

13  Care Act and Social Security.  It is a very complex subject

14  for sure, but circumstances require the court to analyze teh

15  statutes and regulations and to rule.

16         CMS makes the following arguments in support of

17  its objection:

18         Number one, Hahnemann's provider agreement, which

19  it is seeking to sell, has terminated because it has ceased

20  to provide medical services; therefore, Hahnemann may not

21  assume and assign the residency program which includes the

22  provider agreement.  And CMS cites 42 Code of Federal

23  Regulations Sections 489.52(b)(3) and 413.79(h).

24         Number two, the asset purchase agreement is not a

25  valid change of ownership under 42 CFR Section 489.18 because

1   the consortium is not purchasing all of debtor's assets or,

2   otherwise, providing what is a change of ownership under that

3   provision.

4            Number three, the asset purchase agreement between

5   debtors and Jefferson does not impose successor liability

6   upon Jefferson as required by the regulations.  According to

7   CMS the transfer cannot occur unless the consortium agrees to

8   assume all of the liabilities for any pre-closing Medicare

9   overpayments.

10           Number four, CMS has not consented to the sale as

11  required.  There is a scheme for the redistribution of

12  residency slots and it is not within Hahnemann's control to

13  sell the residency program.

14           Number five, the transfer of the residency program

15  requires debtors to assume and assign the program pursuant to

16  Bankruptcy Code Section 365.  And instead, debtors are

17  seeking a sale pursuant to bankrutpcy Code Section 363.

18  This, even though the provider agreement does not belong to

19  debtors, that is, is not property of debtor's estate.

20           Number six, the transaction violates the

21  Assignment of Claims Act 31 U.S.C. Section 3727 which

22  prohibits the transfer of a contract to another party without

23  consent.

24           Many of CMS's arguments are highly technical and

25  the brevity of time for a ruling on the sale motion does not

1   enable the court to study and address those arguments as

2   fully and completely as would be the court's preference, but,

3   again, a prompt ruling is required.

4         Let the court note at the outset that CMS concedes

5   that the sale is in debtor's best interest.  The court

6   agrees; although, a sale of the residency program is

7   unpopular with many on non-bankruptcy grounds, the terms of

8   the sale are in debtor's best interest and are the result of

9   a fair and open process, and represent debtor's exercise of

10  its business judgment -- of their business judgment.

11        Debtors, joined by the consortium and the

12  creditors committee, counter the CMS arguments:

13        First, the Medicare provider number and provider

14  agreement are not contractual, but are statutory

15  entitlements.  This is so because provider agreements do not

16  obligate either the United States or the provider to do

17  anything which is not contained in the law and regulations.

18        There are a number of cases holding that the

19  provider agreement is not a contract, but a statutory

20  entitlement.  Those cases include Memorial Hospital v.

21  Heckler, 706 Federal 2d 1130 at Page 1136, a decision of the

22  Eleventh Circuit in 1983; and PAMC Ltd. v. Sebelius, 747 F.3d

23  1214 at Page 1221, a decision of the Ninth Circuit in 2014.

24  Both cases, and a number of others, find that the Medicare

25  programs are statutory entitlements and not contracts.

1    The court also refers to an article which appears

2  in the Business Lawyer Publication, Volume 71, Page 1207,

3  which concludes,

4    "Bankruptcy courts should recognize that the

5  Medicare provider agreement is a license that can be sold

6  under Section 363 of the Bankruptcy Code, free and clear of

7  interests including successor liability."

8    And that appears at Page 1239.

9    Finally, debtors refer the court to In Re BDK

10  Health Management, Inc., 1998 Westlaw 34188241, a decision of

11  the Bankruptcy Court in the Middle District of Florida in

12  1998.  There the court held that provider agreements are,

13  indeed, statutory entitlements that may be sold pursuant to

14  Bankruptcy Code Section 363 free and clear of successor

15  liability obligations.

16    Secondly, CMS argues that the provider agreement

17  has been held by the Third Circuit Court of Appeals to

18  constitute an executory contract and they cite University

19  Medical Center v. Sullivan, In Re University Medical Center,

20  973 F.2d 1065 at Page 1075 in 1992.  Therefore, this requires

21  assumption and assignment of the agreement, but a reading of

22  the decision causes the court to reject the University

23  Medical argument CMS makes because in University Medical

24  Center the Third Circuit assumed that the provider agreement

25  was an executory contract.  There was no contention that it

1   was anything else.

2          The issue is not before the court for decision.

3   Also, the court relies heavily for deciding that the provider

4   agreement is not an executory contract on In Re Exide

5   Technologies, 607 F.3d 957 at Page 962, a decision of the

6   Third Circuit in 2010 in which the Third Circuit quoting from

7   its opinion in In Re Columbia Gas, 50 F.3d 233 at Page 239

8   wrote,

9          "With congressional intent in mind this court has

10  adopted the following definition, (an executory contract).

11  An executory contract is a contract under which the

12  obligation of both the bankrupt and the other party to the

13  contract are so far under-performed that the failure of

14  either to complete performance would constitute a material

15  breach excusing the performance of the other.  Thus, unless

16  both parties have un-performed obligations that would

17  constitute a material breach if not performed the contract is

18  not executory under Section 365."

19         The situation at hand does not provide for the

20  court to find that the provider agreement is an executory

21  contract.  The provider agreement, which serves as the basis

22  of the residency program, does not meet the definition by the

23  Third Circuit.  The court, therefore, rejects CMS's argument

24  that the Third Circuit found that a provider agreement was an

25  executory contract.  It simply was not an issue in University

1   <u>Medical Center</u>.

2          For these reasons the court finds that the

3   provider agreement, which debtors seek to sell to the

4   consortium, is a statutory entitlement and not a contract,

5   and as such debtors are entitled to sell the provider

6   agreement pursuant to Code Section 363.  And the purchaser,

7   Jefferson on behalf of the consortium, does not take with

8   successor liability.

9          Licenses issued by Government agencies are

10  property of a debtor's estate and, therefore, may be

11  transferred.  The court refers the parties to, among other

12  decisions, <u>In Re TAC Communications</u>, 985 F.2d 916, a decision

13  of the Seventh Circuit in 1993.

14         Next, CMS's position depends upon the closure of

15  Hahnemann.  A closed hospital cannot sell its resident

16  program, but the testimony of Allen Wilen, the hospital's

17  CRO, substantiated that Hahnemann remains in business and

18  continues to provide medical services by referring patients

19  elsewhere to doctors and hospitals and by delivering records

20  elsewhere.  It is also clear to the court that an asset

21  purchase agreement is a valid change of ownership and that

22  CMS has recognized asset purchase agreements as a change of

23  ownership in the past.

24         Finally, in so far as CMS argues that the sale

25  represents a violation of the Anti-Assignment Act the court

1   must reject this argument. The sale does not represent either

2   a personal services contract or a risk to public safety and

3   as such does not violate the Anti-Assignment Act.  And for

4   that position the court cites In Re ANC Rental Corp., 277

5   B.R. 225 at Pages 235 to 236, a decision of this court in

6   2002.  Indeed, the purchasers of the resident program, the

7   consortium are all hospitals in good standing.

8           For the foregoing reasons the court finds that the

9   sale by debtors of the resident program to the Jefferson

10  Hospital consortium is proper and the court will grant the

11  sale motion.

12          Finally, and we will have to discuss the order, of

13  course, in greater detail, but the order provides that

14  Paragraph 32 that the order shall be effective and

15  enforceable immediately upon entry.  Rule 6004(h) of the

16  Bankruptcy Rules provides that an order authorizing a sale

17  is,

18          "Stayed until the expiration of fourteen days

19  after entry of the order unless the court orders otherwise."

20          The court does not know if CMS will appeal the

21  decision, but given the complexity of the issues and the

22  strong position that CMS took the court is compelled to give

23  CMS time, if it chooses, to seek a stay pending appeal from

24  the District Court.

25          Now the court recognizes that debtors and

1   Jefferson intend to close tomorrow.  That cannot happen.  The

2   court has exceeded the debtor's timing request including

3   issuance of this ruling and has continued the sale hearing on

4   one or two occasions.  Accordingly, the order must provide

5   that the effectiveness of the order is stayed, and I am going

6   to use seven calendar days from the court's entry of the

7   order.  The court does not want CMS to have to rush to the

8   District Court tonight to seek a stay or for the appeal to be

9   equitably moot by reason of the closing.

10          That is the court's ruling in this matter.

11          So, I think we now have to discuss the order, Mr.

12  Minuti.  I'm going to approve the sale.  I am not going to

13  make it effective immediately.  I recognize that may cause

14  some difficulties for the debtors, and for Jefferson and the

15  consortium, but I think it's the only appropriate position

16  for the court to take.

17          MR. MINUTI:  We appreciate and respect the court's

18  ruling.

19          Your Honor, what I think would make sense --

20          THE COURT:  Yes.

21          MR. MINUTI:  -- is if we could maybe take ten

22  minutes --

23          THE COURT:  Yes.

24          MR. MINUTI:  -- in light of some of Your Honor's

25  comments.  It's going to require, I think, some changes to

1  the order that we will need to discuss with Jefferson and

2  then we can come back on the record, if acceptable to Your

3  Honor, and talk about any other issues anyone else may have.

4          THE COURT:  All right. Is ten minutes really

5  enough or do you need fifteen or twenty?

6          MR. MINUTI:  How about fifteen and then we'll

7  knock on the door if we need more.

8          THE COURT:  All right.  That's fine.  Let's take a

9  recess.  Thank you all.

10          MR. BROWN:  Your Honor?

11          THE COURT:  Yes.  Is this Mr. Sacks?

12          MR. BROWN:  No, Your Honor.  This is Stuart Brown.

13  I'm sorry.  I had an appearance before the Seventh Circuit

14  this morning.  So, I'm not able to join you in person today.

15          THE COURT:  All right.

16          MR. BROWN:  I did want to raise an emergency oral

17  motion that if I raise it now maybe while the debtors are out

18  they can also try to address this issue as well.  I'm not

19  trying to sandbag anybody.

20          We came to learn that a health and safety issue

21  exists at one of the medical office buildings as part of the

22  Center City campus by virtue of the debtor's refusal, or

23  inability or unwillingness to make emergency repairs to two

24  elevators at a cost of $105,000 dollars which puts at issue

25  certain dialysis patients of a dialysis practice on the 11th

1   or 12th floor of that building.  Obviously, the patients

2   can't walk up the eleven or twelve flights.  And we wanted to

3   make an emergency motion to compel the debtors to make those

4   repairs for the health and safety of those patients, Your

5   Honor.

6            THE COURT:  All right.

7            MR. MINUTI:  Your Honor, Mark Minuti again for the

8   record on behalf of the debtors.  Mr. Chipman is in the

9   courtroom.  He actually represents the dialysis group.  Mr.

10  Chipman reached out to me this morning, Your Honor.

11           Long story short, Your Honor, it's not an

12  emergency.  The issue is taken care of.  We can discuss that

13  during the break and I will be prepared, if necessary, to put

14  on testimony to that effect if we have to, but it's not an

15  issue for today, Your Honor.

16           THE COURT:  All right.  Mr. Chipman, did you want

17  to be heard on this.  Good afternoon.

18           MR. CHIPMAN:  Good afternoon, Your Honor.

19           Yes, I did speak with Mr. Minuti before the

20  hearing.  We do have a few concerns that maybe we can work-

21  out during the break and we can revisit it after the break.

22           THE COURT:  That would be fine.  Let's do that.

23           MR. CHIPMAN:  Thank you, Your Honor.

24           THE COURT:  All right, everyone, we will stand in

25  recess.

 1          (Recess taken at 3:37 p.m.)

 2          (Proceedings resumed at 4:21 p.m.)

 3          (Call to Order of the Court)

 4               THE COURT:  Thank you, everyone.  You may be

 5   seated.

 6               Mr. Minuti?

 7               MR. MINUTI:  Your Honor, again, for the record

 8   Mark Minuti on behalf of the debtors.

 9               Your Honor, so we have, as I indicated to Your

10   Honor at the outset, we did file a slightly revised form of

11   order right before the hearing.  I don't know if Your Honor

12   has a copy.

13               THE COURT:  I have not.

14               MR. MINUTI:  I have a blackline.  May I approach?

15               THE COURT:  Yes.  Certainly, Mr. Minuti.  Yes,

16   please.  Thank you.

17               MR. MINUTI:  Your Honor, what I'm going to do is

18   have Mr. Jackson actually walk Your Honor through the order

19   or address Your Honor on specific issues.

20               THE COURT:  All right.

21               MR. MINUTI:  I have a couple gating issues to talk

22   about before we talk about the specific paragraphs of the

23   order.

24               THE COURT:  Yes.

25               MR. MINUTI:  So, we heard Your Honor loud and

1   clear with respect to the stay issue and giving the

2   Government the opportunity to seek relief if they choose to

3   do that.  We don't have any quarrel with that, Your Honor.

4   We respect the court's ruling, but here is our concern.

5           Your Honor, there are things that could happen --

6   so, obviously, we're going to be stayed from closing to give

7   the Government the opportunity to take some action it

8   believes necessary to protect its interest.  Our fear, Your

9   Honor, is that in the interim there are things that other

10  parties can do including the Government that may, in fact,

11  impact and harm the ability to close this transaction; for

12  example, if they were to issue a termination notice so on and

13  so forth.

14          So, what we would like to ask of the court, and

15  Mr. Jackson will address this in a little more detail, but

16  what we would like to ask of the court is to include -- if

17  we're not going to be allowed to immediately close then it

18  should be fair on both sides and we should have stay language

19  put into the order that precludes anybody from taking any

20  action that would put in jeopardy the transaction so that

21  everybody can exercise their rights if they choose to do

22  that.

23          THE COURT:  Are there any other concerns you have

24  about parties taking action?

25          MR. MINUTI:  Well, Your Honor, look, in theory,

1   the Pennsylvania Department of Health could take action with

2   respect to the license.  You know, we don't intend to in any

3   way change what we're doing.  So, somebody could argue that

4   the hospital's business has been terminated, but might

5   somebody else do something to try to take that position.

6          So, I think it would be simply safer to put in

7   something that makes it clear that we're going to maintain

8   the status quo. I think Your Honor's point was to give

9   parties an opportunity to protect their rights, not to give

10  anybody a procedural advantage and that's what it would do.

11         THE COURT:  Okay.

12         MR. MINUTI:  Next, Your Honor, just a couple of

13  things and I think this will prevent a bunch of folks from

14  coming up to the podium.  The ACGME has asked me to put on

15  the record to make clear, Your Honor, there's some language -

16  - you will remember that as part of the transaction we were

17  going to buy tail coverage.

18         THE COURT:  That's right.

19         MR. MINUTI:  They wanted me to make clear on the

20  record that there is nothing in the order that caps the

21  amount that the debtors can pay for that tail coverage.  So,

22  I'm happy to put that on the record, Your Honor.

23         Next, Your Honor, and this is really a question

24  for the court, the way the order that we uploaded was drafted

25  it really allowed Your Honor to approve the transaction in

1  the alternative under 363 or 365.  So, throughout the order

2  that we've submitted --

3          THE COURT:  I saw that, yes.

4          MR. MINUTI:  -- we have a bunch of 365 language.

5  So, depending upon whether Your Honor wants to rule in the

6  alternative we can keep the 365 language in.  If not we can

7  strike that, that's really a question for Your Honor.

8          THE COURT:  I think you should strike it.

9          MR. MINUTI:  Thank you, Your Honor.  We will do

10  that.

11          THE COURT:  Yes.

12          MR. MINUTI:  Finally, Your Honor, before I turn it

13  over to Mr. Jackson, the only other thing that I wanted to

14  say, and this was at the request of Tenet and Conifer, Tenet

15  and Conifer wanted me to be clear on the record, Your Honor,

16  that nothing -- their contracts are not being assumed and

17  assigned or dealt with in any way as part of the order,

18  number one.  And, obviously, nothing in this order is in any

19  way prejudicing any of the parties whether it be the debtors

20  or Tenet and Conifer with respect to their disputes.

21          As a reminder, Your Honor, we do have a hearing

22  coming up next week, the 13th to report on Your Honor where

23  we are with coming to an agreement with Tenet and Conifer in

24  terms of paying for post-petition services.  So, hopefully,

25  we reach agreement and come back and tell Your Honor we have

1   an agreement or if not we'll tell Your Honor exactly where we

2   are.  Again, the point is that this order has nothing to do

3   with that and we're not trying to seek in any way to

4   prejudice Tenet or Conifer.

5           THE COURT:  And there's nothing in this order that

6   relates to that.

7           MR. MINUTI:  That is correct, Your Honor.

8           THE COURT:  Yes.

9           MR. MINUTI:  So with that, Your Honor, let me turn

10  it over to Mr. Jackson.

11          THE COURT:  All right. Thank you.

12          Mr. Jackson for the consortium.

13          MR. JACKSON:  For Jefferson.

14          THE COURT:  For Jefferson, right.

15          MR. JACKSON:  The counterparty, yes.

16          THE COURT:  Yes.

17          MR. JACKSON:  We're friends with the consortium.

18  Patrick Jackson, Drinker Biddle, for Jefferson University

19  Hospitals, Inc., for the record.

20          I had -- if I could rewind for a second, there was

21  another thing that if Your Honor would indulge me I would

22  request that you address.  This was Mr. Minuti referenced

23  earlier that there was an objection filed by the United

24  States about two minutes before the hearing. I don't know if

25  --

1          THE COURT:  Relating to the order?

2          MR. JACKSON:  Right.  I don't know if Your Honor

3    has had a chance to see that in the fifteen minutes.

4          THE COURT:  I have.

5          MR. JACKSON:  What I would request is that you

6    actually -- I mean, I think it's late filed, but I would

7    actually request that you consider it on the merits and you

8    overrule it.  I can explain why.  It's important for us that

9    that happen.

10         As Your Honor may recall, actually, another matte

11   that we've had recently before Your Honor in the Greenfield

12   case.  There was a trial, rather lengthy trial, in front of

13   Your Honor where there were some non-core matters and Your

14   Honor's judgment on the merits ended up being in the form of

15   recommended findings of fact for the District Court.  That

16   was in November.  That is still in front of the District

17   Court on the party's 9033 briefing.

18         THE COURT:  Okay.

19         MR. JACKSON:  It happens, as Your Honor knows.

20         THE COURT:  I do.  We're working hard over there.

21         MR. JACKSON:  A concern that I have is that I

22   think the result of the -- if the DOJ's position is that the

23   order that Your Honor would enter memorializing today's

24   ruling is not final for Stern purposes and thus is really

25   recommended findings of fact.  We disagree with that and we

1  think Your Honor, you know, should make clear that this order

2  that will be entered is final order for <u>Stern</u> purposes.

3         Obviously, that is something that is subject to be

4  appealed and other courts can look at that determination, but

5  it is important for us just to be clear that the nature of

6  the order that Your Honor would be entering is a final order.

7  It is not recommended findings of fact for the District

8  Court.

9         The substantive basis for Your Honor to overrule

10  this objection would be, without getting into the case law, a

11  simple procedural basis to overrule it and that's that under

12  our local rule 9013-1(h) any objections to a motion are

13  required to include a statement that the party consents or

14  does not consent to the court's entry of a final judgment for

15  <u>Stern</u> purposes.  And the rule says that in the absence of a

16  statement that the party does not consent,

17         "The filing party shall have waived the right to

18  contest the authority of the court to enter final orders or

19  judgments."

20         Now, both of the pleadings that CMS had filed in

21  opposition to the sale of Docket 363 on August 5th and then

22  the very lengthy late sur-reply just before the hearing at

23  Docket 633 neither of them included any statement that they

24  did not consent to this court's entry of a final order.  The

25  motion, itself, asserted that this was a core matter.  As it

1    is it's an asset sale.

2         THE COURT:  Yes.

3         MR. JACKSON:  No court has ever held that an asset

4    sale is not a core matter of the bankruptcy court.  So, I

5    would submit that this issue has been waived.

6         I will just point out, again, that the

7    jurisdictional issue raised by Stern is a limitation on the

8    court's power, but it is one of the limitations that is

9    rooted in the consent of the parties.  It's not a structural

10   limitation.  The parties can and do consent to it.  And if

11   the parties consent or in the case of our local rules are

12   deemed to consent then the court can enter a final order.

13        So, it's important for us.  I suppose I would ask

14   that you -- if you are inclined to agree with me that you

15   supplement your earlier ruling and conclude that this order

16   will be a final order and that this latest filed objection is

17   overruled.

18        THE COURT:  Well, how about the provisions that

19   CMS has objected to on the basis of, for example, Stern?

20        MR. JACKSON:  I don't think that they've objected

21   to them on the basis of Stern, actually, Your Honor. We can

22   walk through the provisions in the order if you'd like.  What

23   they did, and I actually have a hand-out of it if you want.

24        THE COURT:  I have it here, yes.

25        MR. JACKSON:  If you want me to address it, it was

1    in Pages 21 through 24 of their sur-reply.

2              THE COURT:  Okay.

3              MR. JACKSON:  If I may approach I have a copy of

4    the statute that was cited.

5              THE COURT:  Oh, yes.  That would be fine.  Thank

6    you, Mr. Jackson.

7              MR. JACKSON:  I apologize, I don't have enough

8    copies for everyone in the courtroom.  I had just brought

9    two.

10             In their brief and as I understood Mr. Sacks

11   argument yesterday he was referencing a provision of the

12   Medicare statute.  You know, it's funny, I printed the

13   excerpt, but I don't have the full site.  It was discussed at

14   Pages 21 through 24 of their sur-reply.

15             It's under a sub-heading.  It's under a very long

16   Section 405 that talks about evidence, procedure and

17   certification for payments.  It talks about administrative

18   proceedings before the commissioner of Social Security on

19   entitlement to benefits.  And if you read the entire statute,

20   which is not excerpted on my hand-out, but if you look at teh

21   entire thing it really talks about individual benefits

22   determinations.

23             There is a Subsection (h) which is the operative

24   section cited in the brief that talks about the finality of

25   the commissioner's decision.  It says.

1          "The findings and decision of the commissioner of

2    Social Security, after a hearing, shall be binding on all

3    individuals who are parties to such a hearing."

4          Individuals, not corporations, not individuals.

5    And it says,

6          "No findings of fact or decision of the

7    commissioner shall be reviewed by any person, tribunal or

8    Government agency except as herein provided."

9          It goes onto say, and I think this was the

10   provision that Mr. Sacks was referencing yesterday in his

11   argument,

12         "No action against the United States, the

13   commissioner of Social Security, or any officer of employee

14   thereof shall be brought under Section 1331 or 1346 of Title

15   28 to recover any claim arising under this subchapter."

16         So, there is a lot of reasons, and I can unpack

17   them very quickly, that this has nothing to do with these

18   proceedings.  And I think this was really the basis.  Stern

19   wasn't mentioned at all in the sur-reply.  So, I think it was

20   this statute that actually formed the basis of the objection

21   to the applicable provisions of the order.

22         Quickly, there was no -- this is not a proceeding

23   before the commissioner.

24         THE COURT:  Right.

25         MR. JACKSON:  There was no individuals.  This is

1   about benefits determinations.  There was no finding of fact

2   or decision of the commissioner that we're asking Your Honor

3   to review.  There is a contested matter in a bankruptcy

4   proceeding that we're asking you to rule on and that you have

5   ruled on.

6          This is not an action against the United States.

7   The United States is a party in interest.  This is a

8   bankruptcy proceeding which is *in rem* under this court's 1334

9   jurisdiction.  This is not a federal question mater under

10   1331 and it's not an action against the United States under

11   1346.  It's not to recover a claim against the Government.

12   It's to determine whether the debtor can sell property over

13   which the court has exclusive jurisdiction for the reasons I

14   said yesterday.

15          So, this is just not -- it's not applicable. So, I

16   think with that, to the extent that's helpful I would ask,

17   again, that Your Honor overrule this latest filed objection

18   and make the overruling of that objection part of Your

19   Honor's ruling on the motion.

20          THE COURT:  Well, here's my concern; you know, the

21   order was only submitted the night before the hearing.  And I

22   thought that Mr. Sacks made it clear that he had some

23   concerns about language in the order that we were then going

24   to discuss.  Isn't that what his objection goes to?

25          MR. JACKSON:  If it does that's fine.  I

1   understand that. I guess my point is to the extent  he was

2   making a categorical -- well, first of all, to the extent

3   he's making a Stern objection that shipped sailed on August

4   5th when he didn't raise it in his first pleading.

5           THE COURT:  Right.

6           MR. JACKSON:  And to the extent he's making a

7   jurisdictional objection to provisions of the order that's

8   fair, but for the reasons I've cited, the statute that he

9   cited is the basis for that jurisdictional objection I don't

10  believe applies.  So, obviously, if Your Honor would like to

11  hear from them on that I understand.

12          THE COURT:  Of course.

13          MR. JACKSON:  I think the Stern objection is

14  untimely. That is what was really the subject of today's

15  filing.  I thin, at a minimum, the Stern objection could be

16  overruled and then perhaps we could address the other issues

17  in the context of the specific order provisions if you would

18  like.

19          THE COURT:  All right.  Mr. Sacks, are you on the

20  phone?

21      (No verbal response)

22          THE COURT:  Mr. Sacks?

23      (No verbal response)

24          THE COURT:  He's not on the phone.

25          OPERATOR:  This is the operator, Your Honor.  He

1    is no longer on the line.

2              THE COURT:  Was he on earlier?

3              OPERATOR:  He was, Your Honor, yes.

4              THE COURT:  Okay.

5              MR. JACKSON:  I suppose in that regard --

6              THE COURT:  I'm a little bit surprised because I

7    thought that we were going to discuss the order.

8              MR. MINUTI:  Your Honor, Mark Minuti.  I'll tell

9    you what I'll do; I'll just step out for a moment and call

10   him and ask him to dial back in if that's acceptable.

11             THE COURT:  That would be fine, Mr. Minuti.  Thank

12   you.

13             MR. JACKSON:  I suppose if -- however you would

14   like to proceed.  If you want to pause in general or if you

15   would like to talk about other aspects of the order and pause

16   when we get to CMS.  I don't know what would be the best for

17   you.

18             THE COURT:  Well, I'm reluctant to do that without

19   Mr. Sacks participating.

20             MR. JACKSON:  Let's just pause then, Your Honor.

21             THE COURT:  Okay.

22             MR. JACKSON:  And everything that he wasn't on the

23   line then for anything that I just said about all of that I'm

24   not going to ask that you rule for me.

25             THE COURT:  Right.  Okay.  So, your point is that

1  if their objection is a <u>Stern</u> objection, <u>Stern v. Marshall</u>

2  objection that I should overrule that objection?

3  MR. JACKSON:  Right.  Our reason for asking you to

4  do that is because we just have concern that it would cast

5  into doubt the finality of any order that you may enter.  And

6  we don't think there is any doubt and that Your Honor would

7  intend for there to be any doubt.

8  THE COURT:  No, I would not.  I will certainly

9  give Mr. Sacks an opportunity to convince me otherwise.

10  MR. JACKSON:  Okay.  And apologies for everyone in

11  the courtroom if I have to go over that again with him on the

12  line.

13  OPERATOR:  Pardon the interruption, Your Honor,

14  Mr. Sacks is back on the line.

15  THE COURT:  Oh, wonderful.  Mr. Sacks, good

16  afternoon.

17  (No verbal response)

18  THE COURT:  Mr. Sacks?

19  MR. SACKS:  Yes, Your Honor.  I apologize.  I have

20  been online, but as I went to press the unmute button I

21  accidentally pressed the hang-up button.  I apologize.

22  THE COURT:  That's quite all right.  Did you hear

23  Mr. Jackson's concerns about your objection?

24  MR. SACKS:  I did, yes.  And I am prepared to

25  address those now or -- I understand he was also going to run

1   through the entirety of the proposed sale order.  Happy to

2   address the objection how or wait until he's done.

3           THE COURT:  Well, I think he was -- I think Mr.

4   Jackson, perhaps others, are concerned as to the finality of

5   the order --

6           MR. SACKS:  Sure.

7           THE COURT:  -- based on Stern.

8           MR. SACKS:  Right.  So, I am happy to address that

9   now.

10          THE COURT:  All right.

11          MR. SACKS:  So, the objection that we filed prior

12  to the hearing based on Stern is not an objection relating to

13  the jurisdiction of HHS under the Social Security Act as

14  addressed in our objection at 21 to 25, which Mr. Jackson was

15  talking to you about.  We have concerns about that relating

16  to the terms of the order, itself.  I'm happy to get into it,

17  but the Stern objection is a different matter.

18          So, let me try to explain that to the court.

19  First, substantively why I think it applies and then

20  procedurally why I don't think that it's been waived here.

21          First, substantively, the issue is whether the

22  relief the court is providing in the sale order arises under

23  bankrutcy law, essentially.  And to the extent the court is

24  providing relief relating to the debtor in the property of

25  the estate that may arise under bankrutpcy law.  And that is

1  not the source of our <u>Stern</u> objection.

2          Our objection relates to the fact that the

3  proposed terms of the order would have the court granting

4  relief relating to CMS's rights, the Government's rights

5  including under ERISA and tax law against Jefferson as

6  purchaser.  So, in a sense the court would be defining the

7  rights between two non-debtor parties through that order.

8          And, of course, I think the order can be written

9  not to do that and still grant the sale.  Obviously, we

10  objected to that and the court overruled that.  I think the

11  order can be written in that way, but in terms of it right

12  now are not.  And so that is our objection.  And we list in

13  our objection the paragraph to which we think the proposed

14  order adjudicates rights between the Government and

15  Jefferson; again, not relating to the debtor itself.  So,

16  that is substantively the basis of that objection.

17          I think the court should consider our non-consent

18  to be timely because, again, the final terms of the order

19  were not submitted until 11:30 the night before the hearing

20  and only after we had a chance to fully examine the final

21  proposed order and understand what rights it was adjudicating

22  did we understand fully what was being done and we moved to

23  make our objection as soon as practically possible after

24  that.  So, I don't believe we waived our consent.

25          THE COURT:  All right.  I understand your point,

1   Mr. Sacks.

2          Mr. Jackson?

3          MR. JACKSON:  Sure.  I will address the waiver

4   first.  I think -- I don't think the Stern objection -- I

5   understand that it may reference specific paragraphs of the

6   order, but obviously the relief the debtor was seeking was

7   plenary in the sale of an asset that you heard yesterday at

8   length and read at length in the papers that CMS

9   categorically believed that it was not an asset that the

10  court had the ability to sell.

11         So, I don't agree that it wasn't something that

12  should have been raised.  And if there was a Stern issue

13  specifically to that relief I don't believe that's something

14  that shouldn't have been raised at the outset.  It's not

15  merely triggered by the specific provisions of the order, but

16  I'm not going to stand purely on the waiver.

17         On the merits the issue about adjudicating rights

18  between non-debtor parties --

19         THE COURT:  Yes.

20         MR. JACKSON:  -- jurisdictionally that's less of a

21  Stern issue.  That's more of a whether there's related to

22  jurisdiction.  That is the Pacor whether something satisfies

23  the related to test for jurisdiction.  And, yes, there are

24  cases that talk about adjudicating rights between non-

25  parties.  It's not something that the Bankruptcy Court can

 1   exercise related to jurisdiction over --

 2           THE COURT:  Right.

 3           MR. JACKSON:  -- because related to jurisdiction

 4   under Pacor requires that there be a nexus in effect on the

 5   estate.  That is not in question here.  First off, again,

 6   that is not a Stern issue.  Stern has to do with whether the

 7   court is exercising the judicial power of the United States

 8   by granting relief.  And its only ever been applied really in

 9   the context of counterclaims, in personam claims for

10   judgments against a party.  It's never, to my knowledge, been

11   applied to limit the court's *in rem* jurisdiction over

12   property of the estate or dispositions of the property of the

13   estate.

14           Now, I guess if you say, to adopt Mr. Sacks

15   terminology, the adjudications of the rights between the

16   purchaser and CMS throughout our order, those satisfy the

17   related to jurisdiction of the court because they effect the

18   property of the estate. There is no question that the sale

19   effects property of the estate and that the outcome of those

20   provisions of the order impacts the bankruptcy estate.

21           So, yes, there are non-debtor parties to it, but

22   just in the same way that if the court were to authorize the

23   sale of a parcel of land over the objection of somebody who

24   had an interest in that parcel of land the court would be

25   adjudicating the rights of third-parties; the purchaser and

1  the third-party interest holder, but that doesn't mean that

2  that provision of the order is not part of the court's final

3  order and its merely a recommended finding that then goes up

4  to the District Court under the Bankruptcy Rule 9033 process.

5  I mean no sale would ever get done if that's how things

6  happened.

7          THE COURT:  But would I be deciding the rights

8  between the non-debtors, if you will?

9          MR. JACKSON:  You will be, but they were placed

10  squarely before you.  They were fully briefed.  And if the

11  rights between the parties are the right to buy the asset

12  that Your Honor has ruled that my client can buy and the

13  obligation of CMS to respect Your Honor's ruling as to the

14  purchase of that asset then those rights are squarely within

15  the proper jurisdiction of the court to address in a 363

16  order.  And in any event, they don't implicate Stern.

17          THE COURT:  I agree with that.  And I think Mr.

18  Sacks agrees with that as well.

19          MR. JACKSON:  Okay.  So, if it's a more general

20  jurisdictional challenge I think they're subsumed within Your

21  Honor's ruling earlier today.  Implicitly you concluded that

22  you had jurisdiction.  Again, we're happy to -- as we go

23  through the order, if that's what Your Honor would like to

24  do, happy to revisit jurisdictional concerns that you may

25  have as to any specific provisions of the order.  But I just

1    wanted to -- the mention of Stern, you know, gave me a little

2    concerns again about the case that I mentioned where we're

3    tied up at the District Court now for several months.  I just

4    didn't want to see that happen here, obviously, with the

5    sensitivity of the timing.

6          THE COURT:  Well, just so I'm clear, Mr. Sacks,

7    you're not saying that there will not be a final order

8    entered in this case, right?

9          MR. SACKS:  Well, Your Honor, I think it goes to

10   the court's power to issue a final order that effects the

11   rights between the non-debtor parties.  So, we don't dispute

12   the court has the power to enter a final order approving the

13   sale.

14         THE COURT:  Right.

15         MR. SACKS:  Okay.  That is clear.  Once that final

16   order goes beyond approving the sale and constrains the

17   Government in its rights against Jefferson we think in that

18   case it becomes a Stern issue where the court does not have

19   the power to issue a final order.  An Article 3 Court must do

20   so.

21         I'm not familiar with the case Mr. Jackson was

22   talking about.  This is not a delay tactic on the part of the

23   Government in an attempt to buy more time.  It's a

24   fundamental issue about the court's authority under the

25   constitution to implicate the Government's rights against

1  non-debtor parties.

2          THE COURT:  Well, why don't we do this, why don't

3  we go through the order and we'll see what terms concern Mr.

4  Sacks and perhaps we can resolve them.

5          Does that make sense, Your Honor?

6          MR. JACKSON:  Sure, Your Honor.  It makes sense.

7          THE COURT:  And I hate to make a general ruling at

8  this point.

9          MR. JACKSON:  Of course, I understand.  I did want

10  to note for the record Mr. Sherman, to the extent we get back

11  to waiver or if you'd like to address it now Mr. Sherman also

12  had something to add on the waiver point.

13          THE COURT:  All right. Mr. Sherman, yes.

14          MR. SHERMAN:  Thank you, Judge.  I didn't mean to

15  interrupt Mr. Jackson's flow, but dealing with the waiver

16  issue, Your Honor, this is, sort of, a post-judgment or post-

17  hearing relief by the Government is we went through a

18  hearing, Your Honor, on this issue.

19          THE COURT:  Yes.

20          MR. SHERMAN:  And everybody walked into court

21  knowing that this issue was not before the court.  So, just

22  because Mr. Sacks listened to what happened yesterday and

23  then after the hearing -- the evidence was closed.  The whole

24  purpose of implied consent or forfeiture I think is actually

25  the issue.  I just read a decision by Judge Silverstein

1  dealing with consent in _Millennium_ --

2          THE COURT:  Yes.

3          MR. SHERMAN:  Where she had a quote where she

4  dealt with the difference between forfeiture and an implied

5  consent, but the Government consented.  And everybody went

6  through the hearing yesterday in the evidential portion of

7  the record.

8          Your Honor, it would be really bad precedent, bad

9  form for parties to say, oh, let me go through the hearing

10  and see what happens.  And if the tea leaves aren't going my

11  way I'm not going to consent to a final order which is, sort

12  of, what we have happening here is all of a sudden somebody

13  woke up and, no disrespect to Mr. Sacks, realized that this

14  may not be going the Government's way and said I'm not going

15  to consent to a final order.

16          Everybody walked into court knowing the relief

17  which was sought, which was a fee and clear order under 363.

18  Whether it effects rights on non-debtors, and I can address

19  that also because this court does it every day when you do a

20  363 order is you will affect the rights because the landlord

21  and the sub-tenant; it just  happens all the time.  So,

22  everybody walked into court knowing what the rules of

23  engagement were.  And it would just not be proper to after

24  those rules were defined, everybody played by those rules, to

25  say, oh, by the way, I want a mulligan.  It's just --

 1            THE COURT:  But if the language of the order

 2  exceeds my jurisdiction --

 3            MR. SHERMAN:  If it does then he can object to it

 4  and we can go through it --

 5            THE COURT:  Right.

 6            MR. SHERMAN:  -- but --

 7            THE COURT:  And that's what he's done.

 8            MR. SHERMAN:  -- we will go through that today,

 9  Your Honor, but to come out and say that there are <u>Stern</u>

10  issues relating to the 363 nature I --

11            THE COURT:  I don't think Mr. Sacks is saying

12  that.

13            MR. SACKS:  I believe we should be really clear,

14  Your Honor, as to what's happening because we can go through

15  the various pieces, and I respect that, and if Mr. Sacks has

16  issues we can go through it.  As far as the over-arching

17  nature of the relief everybody should understand what we

18  started with.

19            THE COURT:  All right.  I suggest --

20            MR. SACKS:  May I be heard briefly, Your Honor?

21            THE COURT:  Yes, Mr. Sacks.  Of course.

22            MR. SACKS:  I think we did address it.  I think

23  you just asked me point blank are we saying the court can't

24  issue a final order of sale.  Again, that is not what our

25  objection says.  It only relates to what is contained within

1    that order and we do think the court cannot enter the

2    proposed order as written now. It is certainly possible there

3    could be adjustments to that to make it something we would

4    not have a certain objection to.

5            And then on the time limits issue I understand

6    where Mr. Sherman is coming from.  I think it would also set

7    a dangerous precedent if a debtor can file a proposed final

8    order less then twelve hours before a hearing and, therefore,

9    prevent parties from having a chance to review it and have

10   concerns about it before it's entered.

11           THE COURT:  I agree with that.  I agree with that,

12   Mr. Sacks.  Of course.  I know that the debtors were working

13   hard and the order came over late.  And I think that's why we

14   need to go through it at this point and hear your concerns.

15           MR. SACKS:  Thank you.

16           THE COURT:  Yes.  So, why don't we -- I have your

17   objection, Mr. Sacks, and you have a number of paragraphs

18   where you have expressed problems.  Why don't we go through

19   those?  The first being Paragraph (m).

20           MR. SACKS:  Thank you, Your Honor.

21           THE COURT:  You don't have the revised order, I

22   don't think, or does Mr. Sacks have the blackline, Mr.

23   Minuti?

24           MR. MINUTI:  It's filed, Your Honor.

25           THE COURT:  Okay.

1      MR. SACKS:  I do, Your Honor.  I don't think, for

2  the most part, that the changes in the -- they effect one

3  paragraph numbering, but I don't think they generally effect

4  the substance of what we're concerned about.

5      MR. MINUTI:  I think that's correct, Your Honor.

6      THE COURT:  All right.

7      MR. SACKS:  So, Your Honor, I think if we look at

8  -- let me talk a little bit more broadly here about what is,

9  in part, the basis of our objection because there are really

10  two things that we are concerned about here.  If we go

11  through I can distinguish, but I don't necessarily -- let me

12  explain it this way.

13      We do have a concern to the extent that the order

14  is adjudicating the rights between the Government and non-

15  debtor parties.  We also have a concern to the extent the

16  order is usurping the jurisdiction granted by Congress to the

17  agency under the Social Security Act.  And Mr. Jackson talked

18  to you a little bit about that and he suggested that he gave

19  you a copy of the statute and said it only involves an

20  individual, it's only about seeking benefits for the United

21  States.  He tried to paint it as a very narrow jurisdictional

22  bar.  I don't think that's accurate.

23      I think if you look at the cases we've cited, at

24  Pages 21 to 25 of our objection, I think you will see that's

25  not the case.  I think if you look at the Illinois counsel

1  case, for instance, which is 529 U.S. 1 that involved a

2  nursing home, so not an individual, dissatisfied with the

3  determination by the agency; and the question is, is their

4  original jurisdiction within the Federal Court to challenge

5  that or is the jurisdiction something that must be pursued

6  within the agency until the exhaustion of remedies before at

7  that point you can go to Federal Court.

8       As we've explained in our papers that

9  jurisdictional bar is broad and sweeping and would include

10  the jurisdiction granted to the Bankruptcy Court.  The point

11  being that determinations that are given to HHS or CMS to

12  make are determinations that the agency can make.  And any

13  party agreed by that can then pursue administrative remedies,

14  and if necessary and permitted go to a Federal Court.  The

15  Bankruptcy Court does not have the authority to make those

16  determinations itself.

17       So, the other part of our objection is that the

18  order contains numerous language where it's asking the court

19  to, essentially, make determinations conclusively that only

20  CMS has the authority to make.  So, if we look, for example,

21  at Paragraph (m) --

22       THE COURT:  Yes.

23       MR. SACKS:  -- there's a number of findings and

24  decrees that the debtors and the purchasers say that the

25  court has made they're relying on.  So, one of those, if you

 1  look at Romanette (I), the findings there is not been and

 2  will not be a cessation of business at Hahnemann University

 3  at any time prior to the actual closing date.  That is a

 4  determination for CMS to make whether there has or has not

 5  been a cessation of business under CMS's regulation.

 6         The new language added in the blackline and the

 7  participating provider agreement is in full force and effect.

 8  Only CMS can say if a provider agreement is in full force or

 9  effect.  So, those are examples where we believe that the

10  debtors have included language that goes beyond this court's

11  jurisdiction to resolve.

12         THE COURT:  Well, didn't I find that there was no

13  cessation of business?

14         MR. SACKS:  You did find that, Your Honor.

15  Obviously, I'm not trying to argue substantively to that

16  conclusion, but if we are concluding that CMS must find that

17  or must agree with the court I think that's something that is

18  beyond the court's jurisdiction.  You interpreted the

19  regulation and made a determination, but that is not binding

20  on CMS because CMS has originally jurisdiction to make that

21  ruling under the Social Security Act.

22         MR. JACKSON:  Your Honor, if I may?

23         THE COURT:  Yes.

24         MR. JACKSON:  Ordinarily when an action arises

25  against the United States in Federal Court it's brought under

1   either 1331 or 1346 of Title 28, that's federal question or

2   actions against the United States.  Those are the specific

3   statutes that are carved out in the Medicare jurisdictional

4   statute that Mr. Sacks cites.

5          Even if CMS has original jurisdiction over the

6   matters that Your Honor has issued a ruling on so does Your

7   Honor.  1334 of Title 28 says the court has original, but not

8   exclusive jurisdiction over matters arising under the code,

9   arising in a case under the code, related to a case.  It goes

10  onto say that the Bankruptcy Court has exclusive jurisdiction

11  over property of the estate.

12         So, we would submit that this all falls within

13  Your Honor's exclusive jurisdiction under property of the

14  estate, but it doesn't matter because regardless  Your Honor

15  has original jurisdiction over it by virtue of the broad

16  grant of jurisdiction or 1334 which is not carved out from

17  the jurisdictional statute, the Medicare jurisdictional

18  statute.  So, there are times when there is concurrent

19  jurisdiction over an issue.  The issue has joined here.

20         There is no proceeding before the commissioner of

21  Social Security to determine the rights that are issue.  The

22  debtor joined issue on these rights by filing the motion

23  under 363 which Your Honor has adjudicated.

24         THE COURT:  Yes.

25         MR. JACKSON:  So, I say that, in general, is the

1  answer to all of these jurisdictional challenges to the

2  extent they're rooted on the Medicare statute.

3         MR. SACKS:  And, Your Honor, I would point the

4  court to Parkview, 842 F.3d 757, which says the majority of

5  circuits have adopted the view that even though Section 4058

6  specifically mentions a bar of jurisdiction only under 1331

7  and 1346.  Its jurisdictional bar applies to other grants of

8  jurisdiction under Title 28 including bankruptcy jurisdiction

9  under 1334.

10        THE COURT:  Well, I don't see how I can enter a

11  final order approving the sale without making this finding.

12  Isn't that right, Mr. Sacks?  Isn't that correct?

13        MR. SACKS:  I'm not sure you can, Your Honor.  I

14  think that goes back to the objection, but I understand you

15  overruled that objection.  You may overrule our objection I

16  understand that as well.  It's something I have to raise and

17  make sure the court understands.

18        THE COURT:  All right, well I'm going to reject

19  your objection to that language.  I do think it's appropriate

20  in this sale order.

21        MR. SACKS:  And then going beyond that in

22  paragraph M --

23        THE COURT:  Yes.

24        MR. SACKS:  -- you look at romanette two that

25  talks about the residency slots reverting to the purchaser.

1  And the purchaser shall be entitled to be paid by CMS for

2  funding for those slots.

3          So there, I think, we've also gone with to an

4  issue of whether CMS is obligated to pay Jefferson and have

5  those slots reverted to Jefferson.  Again, I think Your Honor

6  may say the same thing.  How can I make a ruling to approve

7  the sale without doing that?

8          But I think in doing that what the court has done

9  is a) you usurp CMS's jurisdiction to decide who gets the

10 residency slots.  I know you've overruled that, but b) it

11 also defines the relationship and obligates CMS to pay

12 Jefferson which I think goes beyond the court's jurisdiction

13 under bankruptcy law.

14         THE COURT:  I'm inclined to believe that Mr. Sacks

15 is right on that point.

16         MR. JACKSON:  I can offer some guidance that may

17 help, Your Honor.  And it's just, I suppose, you could call

18 it a practical consideration more than anything.  And that's

19 that the asset purchase agreement with Jefferson, as I

20 believe is the case with the Tower backup bid APA, has a

21 condition to closing that CMS has consented to the

22 transaction which is, obviously, not --

23         THE COURT:  Which it has not done.

24         MR. JACKSON:  It's a waivable condition.

25         Another condition of the Jefferson APA is that the

1   purchaser has been provided assurance reasonable -- and I'm

2   not getting the language probably exactly correct.  But has

3   been provided assurance to its reasonable satisfaction or to

4   its, I think maybe even absolute satisfaction that it will

5   obtain the benefit of the bargain that this will happen.

6   That as a result of the acquisition of the provider agreement

7   that it will obtain the funding the future GME funding to

8   which it is entitled by virtue of the transfer of the

9   provider agreement.

10          So, my practical point is, the reason that this

11  language is in the order is because if there's going to be a

12  closing without the condition of CMS consent being satisfied

13  then, frankly, we need this.  And as far as the legal basis

14  for this which, obviously, this isn't purely a practical

15  issue, Mr. Lambert at yesterday's hearing explained to Your

16  Honor, walked through the pathway that if Your Honor finds

17  that this was a CHOW which you did --

18          THE COURT:  Yes.

19          MR. JACKSON:  -- in your ruling, this is what

20  happens under the law.  Yes, are you making some

21  determinations about what happens under Medicare law?  Yes,

22  you are.  You're making it on a very complete record and you

23  were presented argument explaining and connecting the dots.

24          And really Mr. Lambert's argument yesterday was

25  kid of a prelude to this order and the various steps that are

1  laid out in the order.  We would submit all of them follow

2  from Your Honor's determination which you have made that the

3  transfer of the provider agreement is contemplated by the

4  purchase agreement is a CHOW.

5          So, without these findings making explicit what

6  the effects of that are, Jefferson, as the purchaser, doesn't

7  have the assurance that it needs in the absence of expressed

8  CMS consent that it's going to be getting anything -- that

9  it's going to be getting the future GME funding that it's

10  relying on in order to commit a $55 million dollar purchase

11  price.

12          MR. MINUTI:  Judge, can I be heard briefly on this

13  point?

14          THE COURT:  Mr. Minuti, it's an important point.

15          MR. MINUTI:  It is an important point, Your Honor,

16  and it's one that I think we really need to deliver to

17  Jefferson.  But let me put it in context because I'm

18  surprised this is that controversial and the reason that I'm

19  surprised is this.

20          Your Honor will remember when we had, when we

21  dealt with resident issues, right.  And the residents wanted

22  to leave and what happens, and what happens if they went to

23  somewhere else what happened with that residency slot.

24          Well, the way it works, Your Honor, is that they

25  could go to another hospital and their resident funding would

1  go with them.  But when they were done their residency, it

2  kind of comes back to Hahnemann, right.

3          THE COURT:  Right.

4          MR. MINUTI:  I think that's a statement of the law

5  or how it works and that's the order says.  And so, if Your

6  Honor validly finds that we can sell the resident slot, all

7  this is saying is that if we own a residency slot but that

8  resident has left and gone somewhere else, when they're done

9  their residency, that residency slot where when Hahnemann

10  owned it would come back to Hahnemann.  It now is going to go

11  to my buyer.

12          So, it's not a controversial I think issue.  I

13  don't think we're displacing any determination.  All we're

14  saying is if there's been a valid transfer of the residency

15  slot, this is what happens.

16          And so, I understand the government doesn't like

17  Your Honor deciding the residency slot can be transferred.

18  And once that ruling is made, this is just a natural

19  statement as to what happens.  And so, based on some of the

20  comments the government made yesterday, I can understand why

21  Jefferson wants the comfort of having it in the order.

22          But, again, all Your Honor I think is being asked

23  to do is to say what happens when those residents complete

24  their training that are being trained somewhere else. So,

25  again, I don't think it's a controversial issue or shouldn't

1  be.

2              MR. SACKS:  Your Honor, may I be heard further?

3  This is Mr. Sacks.

4              THE COURT:  Yes, Mr. Sacks, yes.

5              MR. SACKS:  Yes, I think what, you know, I

6  understand what Mr. Jackson and Mr. Minuti are saying.  What

7  Mr. Minuti just said, though, is that when a temporary

8  resident ends his or her time that that resident slot goes

9  directly to Jefferson because presumably Hahnemann will not

10 continue to be operating at that point in time.  And that's

11 an issue for CMS to determine if Jefferson is entitled to

12 that residency slot at that time.

13             And the other thing I think is important to

14 understand is the way I heard Your Honor's order earlier; I'm

15 trying not to be too technical here.  But I think what Your

16 Honor said is that an asset purchase agreement is a CHOW.

17 And certainly, the government never argued or objected to the

18 fact that an asset purchase agreement can be a CHOW.  But CMS

19 still has a legal right to approve or reject a change of

20 ownership.

21             And so, to the extent this order -- and we'll get

22 there eventually -- is requiring CMS to approve this CHOW

23 that, again, I think, outstrips the jurisdiction this court

24 has over what Congress has said is CMS's rights and duties.

25             THE COURT:  Why I know I'm treading on thin ice,

1  Mr. Sacks, but I'm going to overrule your objection.  I do

2  understand the point you've made but I do believe that this

3  language is appropriate within the context of my ruling.

4          MR. SACKS:  I understand, Your Honor.

5          THE COURT:  Yes.

6          MR. JACKSON:  Thank you, Your Honor.

7          MR. SACKS:  Should we move forward?

8          THE COURT:  Yes, yes, let's move forward.

9  Absolutely.

10          MR. SACKS:  Give me one second here because I'm

11  trying to balance the older order and the newer order.

12          THE COURT:  All right.

13          MR. SACKS:  So, I think if we look at paragraph O.

14          THE COURT:  Yes.

15          MR. SACKS:  So, the language here is a little

16  more generally relating to the free and clear asset sale, but

17  there's language at romanette one that essentially prevents

18  and it strips the government of its rights related to

19  purchaser's interest in the assets and the contracts.

20          And, again, whatever those rights and interest may

21  be I don't believe the bankruptcy court has a jurisdiction to

22  define the government's rights against Jefferson.

23          THE COURT:  Well if the government --

24          MR. SACKS:  And further in paragraph O that's the

25  language Mr. Jackson I think was mentioning to you that says

1  CMS is deemed to have consented to the sale.  I understand

2  that you're going to overrule me, but I don't think the court

3  has the power to deem CMS's consent.

4          THE COURT:  I don't like that language either.  I

5  don't believe that CMS has consented to the sale.  But I do

6  believe that the other language, again, falls within the

7  purview of the ruling; otherwise, what is Hahnemann selling?

8  So, I agree with you that CMS has not consented to the sale.

9  They have not consented.

10          MR. JACKSON:  Of course.  And I point out, Your

11  Honor, that this language doesn't say that they have.  It

12  says this is an iteration of the sort of standard 363(f)

13  finding that says that one of the -- it either has, as

14  applicable, each party has consented -- is deemed to have

15  consented, has a claim subject to a bona fide dispute, or it

16  could be compelled.

17          We're happy to add a proviso saying is deemed to

18  have consented or, you know, in part of CMS from the deemed

19  consent because it was a disjunctive series.

20          THE COURT:  All right, all right. Do that, and I

21  will be satisfied with that.

22          MR. JACKSON:  Okay.  I'll make a note.

23          MR. SACKS:  And I'll continue, Your Honor.  I

24  won't waste the court's time.  I understand you're going to

25  overrule most of my objections.  I hope you don't mind them

1  that I make them for the record.

2          THE COURT:  I don't mind, Mr. Sacks.  Take your

3  time. We have to go through this.

4          MR. SACKS:  So, paragraph P, the next paragraph,

5  talks about the participating provider agreement, again, and

6  that it's a valid and effective transfer of the purchased

7  assets.  Obviously, you've made that ruling.  Our position is

8  that only CMS can say who has good titles to a -- I'm not

9  sure titles is the right word, but who may operate under a

10  valid provider agreement.

11          THE COURT:  All right, and I will overrule that

12  objection, Mr. Sacks.

13          MR. SACKS:  Thank you.

14          Next paragraph, paragraph Q.  Paragraph Q I think

15  is a little more broad, a little different than some of the

16  other paragraphs.  Paragraph Q has some very broad releases

17  including releases relating to ERISA. About halfway down

18  which I don't think ERISA has been brought up or discussed.

19  I'm not sure how that plays out here and why there needs to

20  be releases relating to ERISA within this order.

21          I think there may -- I don't recall now if there

22  are releases relating to taxes in this provision as well.

23          THE COURT:  Mr. Jackson.

24          MR. JACKSON:  This is sort of a successor -- you

25  could say a successor liability provision and it's similar to

1    anytime you're buying a substantial amount of assets from a

2    debtor you include language that says that by buying these

3    assets, we're not assuming any employee benefits or anything

4    like that or liability on account of employee benefit plans

5    for which there can be enterprise liability under, otherwise,

6    applicable law, for example.

7           So, I don't understand there to have been any

8    objections raised as to the ability of the debtor to sell the

9    purchased assets free and clear of employment benefits,

10   liability and the likes. So, this, you know --

11          THE COURT:  A protective type language, as I read

12   it.

13          MR. JACKSON:  That's the intent, Your Honor.

14          THE COURT:  All right.

15          MR. JACKSON:  And it's certainly not, I don't

16   think there's any suggestion that by executing this

17   transaction that Jefferson would be liable. We're not

18   acquiring any employees.  We're not acquiring, you know --

19          THE COURT:  That's right.  All right, Mr. Sacks, I

20   understand your objection.  I am going to overrule it within

21   the context of generally sale orders that we enter in the

22   court.  I do think the language is -- it is broad, but I

23   think it's appropriate here.

24          MR. SACKS:  Understood, Your Honor.

25          If we go forward to paragraph T --

1              THE COURT:  Yes.

2              MR. SACKS:  -- and this may be -- the debtors may

3    want to talk about this. I think as you know they talked

4    about this order was written to apply either to 365 or 363,

5    depending on how the court made its decision.  T is mainly

6    regarding, I believe, findings the court would make under

7    365. So, I don't know if that's something that's going to

8    remain in the order or be removed. And if it's going to be

9    removed then, obviously, I don't need to talk about it now.

10             MR. JACKSON:  I think Your Honor had instructed us

11   to remove that.  I mean its kind of --

12             THE COURT:  Yes.

13             MR. JACKSON:  Since it is kind of interspersed

14   throughout the order that is going to require some work to

15   do.

16             THE COURT:  Editing.

17             MR. JACKSON:  But the idea is we are going. . .

18             You know, there are certain, obviously,

19   subparagraphs under T that are crucially important for us, so

20   we will --

21             THE COURT:  I think you want to make the finding

22   that it's not an executory contract, for example.

23             MR. JACKSON:  Right. And then we're going to need

24   to move -- we can't simply strike the romanettes that refer

25   to 365. There's some concepts in those romanettes, for

1  example, the definition of the CMS preclosing amounts and the

2  like that we're going to have to realign in light of Your

3  Honor's ruling.

4          THE COURT:  Okay.

5          MR. JACKSON:  I think there equally applicable

6  under the 363 context, so we'll put them there and line them

7  up with Your Honor's ruling.  But we're going to, you know,

8  continue to define CMS preclosing amount as $3 million

9  dollars and the like.

10         And I can't -- you know as I sit here, I can't say

11  exactly how that's going to change, but I don't think Mr.

12  Sacks needs to address the 365 findings because Your Honor

13  told us -- I think maybe while he was dropped from the line

14  that we're going to be taking those out and Your Honor is not

15  going to be making alternative findings under 365.

16         THE COURT:  That's correct.

17         Mr. Sacks --

18         MR. SACKS:  And, perhaps, Your Honor, it's

19  important --

20         THE COURT:  Yes, go on.

21         MR. SACKS:  I'm sorry.

22         THE COURT:  Go on, Mr. Sacks.

23         MR. SACKS:  And, perhaps, that, again, I know what

24  the courts going to say, but looking within that paragraph at

25  romanettes 3 and 4 and 6 and 7, those are all court findings

1   regarding CMS's regulations about the transaction. And so, I

2   understand the court has told us already that it believes it

3   has the power to make those findings, but we would object

4   because we believe that's within the providence of CMS's

5   jurisdiction.

6          So, to the extent those would make it into the

7   final order, we make the objection, I understand the court is

8   going to overrule it.

9          THE COURT:  I assume that language will remain, is

10   that right, Mr. Jackson?

11          MR. JACKSON:  I apologize, Your Honor.  Is this

12   the romanette three that basically the CHOW finding?

13          THE COURT:  That's right.

14          MR. JACKSON:  Right. That is crucial.

15          THE COURT:  Yes.

16          MR. MINUTI:  I think, Your Honor -- again, Mark

17   Minuti, Your Honor. These are all consistent with the

18   findings.

19          THE COURT:  That's right.

20          MR. MINUTI:  The romanette three, the no successor

21   liability, romanette four; romanette six, right. There's been

22   no cessation of business.

23          THE COURT:  Right.

24          MR. MINUTI:  Romanette seven. Again, I think

25   that's all consistent with Your Honor's ruling.

1        MR. JACKSON:  On the 365 point, Your Honor, I

2   should clarify, Mr. Applebaum pointed out that there are --

3   we're not going to simply strike all references to 365

4   because there are other agreements that for which the normal

5   non-CMS specific 365 language would be appropriate.

6        THE COURT:  Correct.

7        MR. JACKSON:  So, our point as we go and sort of

8   take the pen to the order, it will be to remove CMS specific

9   365 provision but leaving in the provisions of the order that

10  would apply to the other contracts that are coming over.

11       THE COURT:  All right, I agree with that, Mr.

12  Jackson.

13       MR. JACKSON:  So, I think --

14       THE COURT:  So, then we come to paragraph nine.

15       MR. JACKSON:  And the decretal paragraphs on --

16       THE COURT:  Upon payment by the persons with the

17  escrow amount.

18       MR. JACKSON:  And this is a 365.  I mean what I

19  would suggest here, Your Honor, again, actually if Mr. Sacks

20  has a point he like to raise.  If it was just that this is

21  couched in 365, I can address how we probably will rejigger

22  this.

23       THE COURT:  Here's my concern.  I did not receive

24  any evidence and make any findings on the amount of the

25  Medicare overpayments.  I realize that the argument is that

1  they're certainly contained within the $3 million dollar

2  escrow based upon historical facts.

3          But where I'm saying, for example, that the

4  governmental bodies will be forever bound by the maximum cure

5  amounts, that causes me a little bit of hesitation.

6          MR. JACKSON:  Sure, and I can -- I may be able to

7  help on that, Your Honor.  I touched on it yesterday,

8  although I touched on a lot of things yesterday, so I

9  wouldn't blame anybody for not remembering every one of them.

10          So if this is a 363 transaction --

11          THE COURT:  Yes.

12          MR. JACKSON:  I think the way to look at the $3

13  million dollars is I agreed yesterday in the argument that

14  363(f) does not allow recoupment rights to be stripped free

15  and clear.

16          THE COURT:  That's right.

17          MR. JACKSON:  University Medical Center makes

18  clear that in the overpayment Medicare context recoupment

19  rights are generally limited to post-petition versus post-

20  petition.  Anything prepetition is not viewed as recoupment

21  for bankruptcy purposes.

22          THE COURT:  Correct.

23          MR. JACKSON:  363(e) of the Bankruptcy Code

24  provides that any party that has an interest in property to

25  be sold free and clear under 363 may request adequate

1    protection of their interest and their property.

2              THE COURT:  Right.

3              MR. JACKSON:  I pointed out yesterday that

4    procedurally the burden is on the party requesting adequate

5    protection to establish the nature of the interest for which

6    they seek protection.

7              So, I think the way to look at the $3 million

8    dollar escrow in light of Your Honor's 363 ruling is although

9    Mr. Sacks didn't maybe specifically invoke 363, I think

10   363(e), I suppose, we could view his objection in the nature

11   of I request adequate protection for the overpayment

12   recoupment rights that cannot be sold free and clear under

13   363.

14             It was his burden under 363(p) to prove the amount

15   of adequate protection that would be necessary for those

16   rights.  He didn't.  The only evidence that was brought

17   forward on that point was Mr. Weiland's testimony about the

18   historical overpayments. And I think from that testimony, and

19   I think Mr. Weiland even said it in these terms, it was

20   likely that it would not exceed $3 million dollars.  And

21   their being no contrary evidence.

22             I think that's what -- that's what I would propose

23   this is.  The $3 million dollars in light of Your Honor's 363

24   ruling is CMS's adequate protection for its recoupment rights

25   that cannot be sold free and clear. So, I think that's

 1  conceptually how we get there.  It will require some

 2  rejiggering of the wording of the provision of the order.

 3          THE COURT:  Any comments, Mr. Sacks?

 4          MR. SACKS:  Yes, thank you, Your Honor.

 5          That's an issue, actually, I'd like to think

 6  through a little bit further and, perhaps, that we can

 7  communicate with the debtors and the purchaser about what

 8  that might look like in a revised order. Again, because we've

 9  consistently dealt with this issue as 365 and any CHOW needs

10  to have successor liability, so I'd like to think this a

11  little bit more, if that's okay.

12          My objection relating to paragraph nine really had

13  to do with the fact that this was a more discerned objection

14  that there's language limiting the government's recourse

15  against the purchaser.  And then that's something, again, we

16  believe goes beyond bankruptcy or even relating to bankruptcy

17  law.

18          MR. JACKSON:  And, Your Honor, our response on

19  that is that that's key to Your Honor's ruling finding that

20  the provider agreements can be sold as assets under 363 free

21  and clear.

22          THE COURT:  Yes.

23          MR. JACKSON:  Our transaction document

24  contemplates that there would be a -- it's called the CMS

25  preclosing amount which was an amount that the APA

1  contemplated would either be agreed with CMS or determined by

2  Your Honor at the hearing.  So, there needs to be an amount

3  in order for that mechanism in the APA to work.

4         And the idea is that as an assumed liability, the

5  purchaser assumes liability up to and limited by the CMS

6  preclosing amount --

7         THE COURT:  Yes.

8         MR. JACKSON:  -- which is then set aside in escrow

9  and so on.  And so, we do need that mechanism in order to

10  effectuate Your Honor's ruling that we can acquire the asset

11  free and clear, but happy to work with Mr. Sacks on the exact

12  mechanism.

13         THE COURT:  But I agree with you conceptually, Mr.

14  Jackson.

15         MR. MINUTI:  Your Honor, again, Mark Minuti for

16  the record on behalf of the debtors.

17         I think there's an easy fix here, Your Honor.

18  Your Honor has held that under 363(f), the asset can be

19  transferred free and clear successor liability.

20         THE COURT:  That's right.

21         MR. MINUTI:  Contractually, our buyer here has

22  agreed to set aside $3 million dollars with respect to the

23  government, and that's all that's being done.

24         THE COURT:  Yes.

25         MR. MINUTI:  So, I don't think there's any reason

1    to have further discussions about what the government's

2    claims or, what they think they might be.  If they think they

3    have a claim against the estate, they can assert it at some

4    later time.  There's nothing cutting off their ability to do

5    that.

6         But for purposes of this order, it's a 363 order.

7    The asset is being transferred free and clear.  We have a

8    contractual obligation to set aside three for the government.

9    That's all that's being done here.

10        THE COURT:  All right.  I would say this.  Think

11   about it, Mr. Sacks.  Have some conversation conceptually.  I

12   am in agreement with this paragraph, but obviously you can

13   tweak the language.

14        MR. SACKS:  Understood.  Thank you, Your Honor.

15   I'll try to keep moving ahead quickly.

16        Paragraph twelve.

17        THE COURT:  Yes.

18        MR. SACKS:  And so, I think this also has some

19   standard, you know, 363 release language.  And I think

20   there's some concerns we have about language that goes beyond

21   just the terms of the transaction in a way that limits the

22   government.

23        And so, if you look maybe about ten lines down, it

24   talks about releasing liability on any theory of law related

25   to claims, administrative proceedings or actions brought -- I

1    think there's a typo there; at least if I'm looking at the

2    old order -- on behalf of any governmental body, accrediting

3    body, a third party relating to the operation of the business

4    prior to closing.  So, again, that's broader, I think, than

5    the transaction itself.

6            Romanette seven, I believe -- sorry; eight, claims

7    or actions or proceedings brought under Medicare, Medicaid

8    statutes or regulations applicable to other governmental

9    reimbursement programs.  I think, again, broader release or

10   exception then limited to this transaction and has the impact

11   of potentially constraining or enjoining the government from

12   other actions it may want to take unrelated to this

13   transaction.

14           MR. JACKSON:  I'm not sure how it could be

15   construed that way.  This is to effectuate the finding on

16   obtaining assets free and clear of successor liability.  It's

17   not merely free and clear of overpayment liability.  It's

18   free and clear of any liability arising prior to the closing.

19           Closing is day one for purchaser's liability going

20   forward.  If there's anything preclosing, it stays with the

21   estate.  That's the point of this.  And these are claims.

22   You know, these are claims -- you know, other than assumed

23   liabilities, assumed liabilities being the $3 million dollars

24   that's being set aside for CMS.

25           THE COURT:  And this language is not entirely

1    directed at CMS.  It's other parties as well.

2            MR. JACKSON:  And I think to understand it, I mean

3    the lead-in to the paragraph admittedly, it's one of those

4    long, you know, legal paragraph.  But the bleed-in says

5    except for the assumed liabilities and pursuant to 363(f),

6    upon the closing purchased assets and assigned contracts

7    shall be free and clear of all interest of any entered this

8    date including without limitation.

9            THE COURT:  Yes.

10           MR. JACKSON:  And that's where you get into the

11   litany of stuff. So, I mean it's simply -- it restates the

12   general proposition of what free and clear --

13           THE COURT:  Prepetition, yes.

14           MR. JACKSON:  -- what free and clear means.

15           THE COURT:  Preclosing, I mean, yes.

16           MR. JACKSON:  Right.

17           THE COURT:  I think it's appropriate.  I must say

18   I have not read the new language that was just handed to me.

19   But does it go along with that scheme?

20           MR. JACKSON:  The new language ties to the $3

21   million dollars set aside just to kind of make clear that the

22   -- and I mean this is some mechanic that, I guess, if we're

23   rejiggering the order in general with respect to the $3

24   million, we can talk to Mr. Sacks about it in that context.

25           But the idea was that kind of ties the assumed

 1  liability up to the CMS preclosing amount, ties it to the

 2  escrow account that's being set up for its benefit, so I

 3  think we can talk to Mr. Sacks about that.

 4          THE COURT:  All right, but I certainly agree with

 5  the general concept.

 6          MR. SACKS:  Thank you, Your Honor.

 7          Briefly in paragraph sixteen, essentially what the

 8  terms of the order are it constrains, as I understand it, the

 9  federal government to essentially accept the order as

10  approving the transaction. Again, obviously, you're going to

11  overrule us, but we think that could be read to require CMS

12  to do something that it has the power to do in its own

13  determination.

14          THE COURT:  Yeah, I will overrule you on that, Ms.

15  Sacks.  I think this is appropriate language for a sale

16  order.

17          MR. SACKS:  Thank you, Your Honor.

18          And then if we look at paragraph twenty.

19          THE COURT:  How about seventeen.  I think that was

20  one of your other concerns.  Right, seventeen?

21          MR. SACKS:  Yes, I'm sorry, Your Honor.  I'm

22  looking at it again.  I was trying to speak more narrowly on

23  the ones that we were most concerned with in the interest of

24  time.

25          THE COURT:  Okay.

1          MR. SACKS:  I think we can pass on seventeen for

2    the moment.

3          THE COURT:  All right.

4          MR. SACKS:  So, I take the court to paragraph

5    twenty.

6          THE COURT:  Yes.

7          MR. SACKS:  And, essentially, this is essentially

8    an injunction under, you know, Section 105(a) against the

9    government prohibiting it very broadly, I believe, relating

10   to the operation of the purchased assets or the assigned

11   contracts.

12         And I think especially in relation to what the

13   government not do with Jefferson which, again, is beyond, I

14   think, what the court has power to do, we think this goes too

15   far.

16         MR. JACKSON:  Your Honor, this almost entirely

17   mirrors 525 of the Code.  I'd say where it deviates from 525

18   of the Code, it's to make clear that it applies to Jefferson.

19         THE COURT:  Yes.

20         MR. JACKSON:  525 of the Code applies to debtors

21   and anyone associated with the debtor. Courts have concluded

22   that in the sale context that includes the purchaser.

23         THE COURT:  Right.

24         MR. JACKSON:  So, essentially, what we've done is

25   lifted the language from 525 but made it clear that it's also

1   applicable to Jefferson.

2          And, again, the lead-in to that language, the lead

3   into this paragraph is pursuant to enter the fullest extent

4   permitted by 105 and 525.

5          THE COURT:  Right.  All right, I'll overrule that

6   objection.

7          THE COURT:  Thank you, Your Honor.

8          And I think if we could go to paragraph thirty-

9   one.

10          THE COURT:  Thirty-one.  That wasn't on your list,

11   but I'll take it.

12          MR. SACKS:  Well that was paragraph thirty on our

13   list, Your Honor.  Paragraph thirty-one --

14          THE COURT:  Oh, I see.

15          MR. SACKS:  -- paragraph thirty we numbered to

16   thirty-one.

17          THE COURT:  I'm sorry.  Yes, go ahead.

18          MR. SACKS:  And so, paragraph thirty-one is

19   extensive but contains a large number of essentially

20   injunctive directions to CMS, it's regional office, and its

21   max Medicare administrative contractors.

22          And, of course, the debtors and purchaser will

23   tell you these are all necessary in order to effectuate the

24   transaction but we believe, again, go beyond the court's

25   power to instruct CMS how to essentially operate its

1   business, how to follow its own laws and regulations.

2          THE COURT:  All right, Mr. Jackson, I'm looking at

3   the new language.

4          MR. JACKSON:  Sure.  And, Your Honor, as you can

5   imagine these are particular important to us and I think it's

6   particular important in light of Mr. Sacks.  Some of Mr.

7   Sacks' argument yesterday and actually which he reiterated

8   earlier today which is this notion of CMS is going to do what

9   it believes is within the scope of its authority to do.

10          If we don't have language prescribing the steps

11   necessary to execute upon the implications of Your Honor's

12   finding that this was a CHOW, then our concern, and I think

13   it's legitimate based on the record before you, is that the

14   transaction effectively gets shut down because CMS takes it

15   upon itself to conclude in the exercise of its exclusive

16   jurisdiction that some subsequent step necessary in order to

17   connect the dots in the pathway that Mr. Lambert explained to

18   you yesterday that some step in that chain gets broken as a

19   result of CMS, you know, believing or -- CMS or one of its

20   agents.

21          I mean there's a lot of people that work together

22   to implement these types of transactions. So, our point is to

23   just ensure that the transaction is respected and is

24   respected at all levels that are necessary in order to affect

25   a transaction in practice.

1          Now, admittedly, what I'd say a normal say order,

2   and I'll go back to the analogy of, you know, a sale of land.

3   In a more typical sale order where you're selling a parcel of

4   land, this type of provision might read something more like,

5   you know the filing clerk at the records office will accept

6   this order as definitive proof that there has been a

7   transaction of the land.

8          This is conceptually the same thing as that.  It's

9   just we're not dealing with a filing clerk at a land records

10  office.

11         THE COURT:  But can I direct a regional office to

12  instruct the mac?

13         MR. JACKSON:  Well that's how the machination

14  works.   So, let me put it this way.  If you don't instruct

15  the regional office to direct the mac, then we do have the

16  prospect which is something my client is very concerned about

17  that we essentially have a pocket veto of the transaction at

18  some point in the administrative chain afterward.

19         So, if Your Honor's central finding that this

20  transaction is a CHOW means that these things should happen

21  for the reasons that Mr. Lambert walked Your Honor through

22  yesterday on the record.

23         Now whether Your Honor can direct the government

24  to do things, you can.  106 of the Bankruptcy Code

25  specifically says that you can issue orders necessary and

1  appropriate against the U.S. Government for purposes of

2  effecting 363 transactions.

3          THE COURT:  Yes.

4          MR. JACKSON:  So, this, I would say this is

5  injunctive only insofar as it precludes the government from

6  disregarding the ruling of this court and the necessary

7  implications of that ruling.

8          THE COURT:  All right, I will allow the language.

9          MR. SACKS:  Thank you, Your Honor.

10         THE COURT:  I think that was the end of Mr. Sacks'

11 objections, is that right?

12         MR. SACKS:  That is correct, Your Honor.  There is

13 two more points I'd like to make.  I don't know if this is an

14 appropriate time to make them or not.

15         THE COURT:  go ahead.

16         MR. SACKS:  Okay.  The first is that I think Mr.

17 Jackson talked about that we appreciate the fact that the

18 court has decided not to waive in its entirety Section

19 6004(h) and allow us seven days' stay.  Mr. Jackson said that

20 if the court is going to do that, it should, at the same

21 time, essentially stay the government from taking any action

22 during that seven-day period.

23         I can tell the court that I am aware, after

24 talking to my client, of no action the government intends to

25 take during that seven-day period.  But conceptually, I don't

1  think it would be appropriate for the court to stay CMS from

2  taking regulatory action if it so chooses and needs to during

3  that time period.  That's the first point I'd like to make.

4          And the second thing I'd like to do, and I'm happy

5  to do this when Your Honor would like to do it.  I would like

6  to request a stay pending appeal under Rule 8007, if the

7  court's willing to entertain that orally today.

8          THE COURT:  I am.

9          MR. SACKS:  Okay.  Would this be an appropriate

10  time to make that argument?

11          THE COURT:  Yes.

12          MR. SACKS:  Okay. And I will try to do so very

13  briefly, Your Honor.  I understand it's getting late and I

14  don't want to take up people's time.

15          As the court is aware, obviously, there are four

16  factors under -- they could, of course, look at in deciding

17  whether to grant a stay pending appeal, whether the stay

18  applicant has made a strong showing that he is likely to

19  succeed in the merits.

20          Obviously, the court has ruled against us based on

21  the court's preliminary language before its ruling, I think

22  the court recognizes that this is a complicated difficult

23  issue that potentially could go either way.  So, I think

24  there is some showing the government has made that they do

25  have a chance to succeed on the merits.

1    Two, whether the applicant will be irreparably

2   injured absent a stay.  As we talked about a little bit

3   yesterday, the proposed order, I think, in paragraph (j)

4   talks about two reasons why it's important to stay close

5   immediately.  One, because a potential damage to the asset

6   being transferred and, two, the need to provide residents

7   with the assurance they'll get tail coverage.

8    So, we talked about yesterday on that first point,

9   these permanent slots don't become potentially active for, at

10  least, nearly a year from now until next summer.  So, I don't

11  think there is an immediacy there.

12    I understand what Your Honor is concerned about

13  the tail coverage to the residents.  If the sale goes

14  through, they'll get it.  I'm not sure how -- what the harm

15  would be if they don't have that reassurance today.  So, I

16  don't think there is a large of significant irreparable

17  injury -- I'm sorry.  I'm tired.  I'm missing the point.

18  That's where they will be, the government will be irreparably

19  injured.

20    And the point I think there is twofold.  One,

21  that, obviously, as you heard we believe that the residency

22  program which is entirely the public interest would be

23  significantly and seriously harmed were a court to allow a

24  private transfer of residents between parties and could open

25  the door to hospitals in rural areas trying to monetize

1   residents by selling them to more wealthy hospitals in areas

2   that have a higher socioeconomic class of patients who can

3   pay more for those services.  And essentially this could open

4   the door to that nationwide.  So, we believe there is

5   significant and irreparable injury that would result from

6   this transaction going forward.

7          And then, of course, the second part of that is,

8   that should this action go forward, there's a danger of

9   equitable mootness.  So, my preface point was to number three

10  would the stay harm the other parties. And for those reasons,

11  I don't think that it would.

12         And then, finally, the public interest point, the

13  same as I made before.  Because the residency program and

14  CMS's funding of it really is in the public interest, this is

15  a serious significant issue with nationwide implications that

16  dramatically affects the public interest.

17         And I know that when courts consider these four

18  factors, the first two are more important. The third and

19  fourth are not looked at as closely. But, in this case, I

20  believe, the fourth factor is significant.

21         So, for those reasons, the court -- sorry, the

22  government would ask the court enter a stay pending appeal

23  under Section 8007.

24         THE COURT:  All right, are you prepared to address

25  -- oh, Mr. Minuti, yes.

1              MR. MINUTI:  I am --

2         (Laughter)

3              THE COURT:  I didn't know it would be.

4              MR. MINUTI:  I'm prepared, Your Honor.

5              THE COURT:  Yes.

6              MR. MINUTI:  I'm preparing to go.

7              THE COURT:  Yes.

8              MR. MINUTI:  Your Honor, again, Mark Minuti on

9    behalf of the debtor.

10             Your Honor should deny the oral request.  First of

11   all, Your Honor, the statute itself talks about a motion

12   being filed.

13             THE COURT:  Yes.

14             MR. MINUTI:  If the government wants a stay, they

15   should file a motion.  We should get a chance to respond and

16   we should get an opportunity to look at what they're going to

17   say and have a full opportunity to argue that to the court,

18   but let's move to the factors, Your Honor.

19             The first is whether CMS is likely to succeed on

20   the merits of the case.  Your Honor's ruling was very

21   detailed.  It was very complete.  Your Honor decided that

22   they were -- they did not prevail.  You overruled the

23   objection.  I think that's grounds to suggest that they're

24   not likely to succeed on the appeal.  I think Your Honor's

25   ruling was well reasoned for all the reasons I argued at

1   yesterday's hearing. So, they fail on prong one.

2           Prong two, Your Honor, shows, you know, whether

3   they are going to be irreparably harmed.  They're not going

4   to be irreparably harmed, Your Honor, in the event that -- if

5   the ruling goes forward and there is no stay, Your Honor.

6           While CMS did not believe the transaction was

7   appropriate under federal law, there's no irreparable harm to

8   be suffered by the government if this transaction closes.

9   Life will go on.  By definition, CMS, Your Honor, is

10  protected by the escrow so they, in fact, will recoup, you

11  know, any overpayments due to them.  So, the protections for

12  them is built in.

13          You know, Your Honor, I think what they want to

14  argue here is that there's precedent here they don't like.

15  It's going to impact, you know, cases going forward. Well,

16  Your Honor, I think I made it pretty clear, the debtor was

17  willing to do everything and everything to try to satisfy the

18  government's concerns in a way where Your Honor didn't have

19  to rule and in a way they didn't like.

20          They didn't supplement opportunity, Your Honor.

21  They forced Your Honor to make a decision. And,

22  unfortunately, now they're going to have to live with that

23  decision. So that's not irreparable harm, Your Honor, the

24  fact that Your Honor has made a ruling.  There's no case that

25  I'm aware of that would provide that a ruling is irreparable

1  harm because somebody else may follow it.

2          Obviously, I believe, the ruling was well-reason.

3  I assume Your Honor believes the ruling was well-reasoned.

4  And, therefore, that is not irreparable harm on the part of

5  the government.

6          Third is, Your Honor, whether the issuance of the

7  stay will negatively impact the debtors, their creditors,

8  their estates.  It will, Your Honor.  It's going to impact

9  everybody here.  It's going to delay the closing of this

10  transaction, number one.  We need this money.  We need this

11  money into the estate right away, Your Honor, for all the

12  reasons we've already talked about.

13          Your Honor, if there is a stay put in place, Your

14  Honor, for an extended period of time, we've got to keep the

15  business of the hospital going because, again, at some point,

16  the government may try to pull the rug out from under us and

17  say, hey wait a minute now.  The hospital is closed.  Your

18  asset evaporated.  It went away.

19          We already talked about all -- you know,

20  everything that's going on and the pressure, Your Honor, the

21  pressure we're getting from a number of other peoples. The

22  uncertainty that's created the longer this stays out there.

23  So, the passage of time alone, Your Honor, may cause damage

24  to these estates and cause this asset to disappear.

25          And so, we will be prejudiced if there's a stay

1  pending appeal in these cases, Your Honor. Again, it's just

2  going to provide more opportunity for mischief.

3         THE COURT:  And don't I have to do a balancing of

4  the two, of the harm to the debtor versus the harm to the

5  government?

6         MR. MINUTI:  I think that's exactly right, Your

7  Honor.  Here, I don't even think the call is close for the

8  reasons I've already mentioned.

9         Finally, Your Honor, one of the things you have to

10 balance here, Your Honor, is the public interest.  The public

11 interest, Your Honor, here we have two competing concerns,

12 right.  We have the maximizing the value of the debtors'

13 assets. That's one concern and actually that's the public

14 concern that brought up the entire Bankruptcy Code, right.

15 And we have the concern of maintaining the integrity of the

16 Medicare system.

17        And what Your Honor has held today is that, in

18 fact, the Medicaid system is in no way imputed by what we're

19 trying to do here.  It is appropriate what we're trying to

20 do. And so, the concern here that we need to be considered

21 about, the public concern, is allowing the debtors to

22 maximize their assets and move forward with these

23 transactions.

24        So, the public interest here is best served by

25 allowing the debtors to move forward consummating this

1 transaction and there should be no stay.

2          Your Honor has given them the right to go to an

3 appeal. And, by the way, we still want to talk to the

4 government, if the government wants to talk to us about a way

5 we can resolve this and avoid an appeal. We're more than

6 happy to do that.  But there should be no stay here, Your

7 Honor.  We've waited long enough.  There's going to be a lot

8 of harm that will happen or that could happen if there's a

9 prolonged stay.  We'd ask Your Honor to deny the request.

10          Let me talk briefly about the first issue, this

11 idea of staying the status quo.

12          THE COURT:  Yes.

13          MR. MINUTI:  Look, I think Your Honor has given

14 the government time to prosecute its appeal and we understand

15 why you did that.  You, obviously, don't want them to be

16 prejudiced and give them the opportunity and the leeway to go

17 to the District Court.  But, again, as I said before, Your

18 Honor, there are things the government can do that, in fact,

19 will make this asset dissipate.

20          And so, if it's going to be fair to stay the

21 closing to give the government time, it should be fair, Your

22 Honor, for the government to take no action here in the

23 interim.  So, we would request that language be added to the

24 order.  If the government doesn't want to live with our

25 language then we should get an immediate ability to close the

1  transaction, Your Honor.  It should be we both either stay or
2  we both don't stay.

3          So, Your Honor, I'd ask that you deny the request
4  for a stay pending appeal.

5          THE COURT:  Thank you, Mr. Minute.  Yes, Mr.
6  Sherman.

7          MR. SHERMAN:  Your Honor, and the committee joins
8  in the opposition opposing a stay and just augmenting Mr.
9  Minuti's well-founded statements. There's no assurance, Your
10 Honor, that the purchaser is going to hang around here while
11 any stay is pending.  And there's fifty-five million reasons
12 for my constituents to be concerned with this.

13         And also, I respect Your Honor's decision where
14 Your Honor implicitly gave a seven-day stay effectively
15 through 6004. So, there is no irreparable injury by operation
16 of Your Honor's own decision where the seven-calendar days
17 was triggered by Your Honor.

18         So, there is no reason for stay. We think it
19 should be rejected.

20         THE COURT:  All right, Mr. Sherman.

21         Mr. Jackson, did you wish to be heard on this
22 point?

23         MR. JACKSON:  On the stay pending appeal, Your
24 Honor, I wouldn't add to anything that Mr. Minuti or Mr.
25 Sherman stated.  I would simply join that.

1          I did -- I can either address it now or after Your

2    Honor rules on the stay pending appeal.  I did have some

3    points that I wanted to talk about briefly about the concept

4    of this status quo, the preservation of the status quo during

5    the stay of the effectiveness of the order that Your Honor

6    has ordered.

7          It was addressed by Mr. Sacks just now.  I wanted

8    to come back to it, but I understand the motion before you

9    right at this moment is the stay pending appeal.

10         THE COURT:  Well that's right.  I do have that

11   motion before me.  And I think, Mr. Minuti, you're correct.

12   Technically requires the filing of a motion.  I think that

13   very often courts do accept an oral motion on this point.

14         And I am going to deny the motion, Mr. Sacks.  I

15   do believe, frankly, balancing the harm to the government

16   versus the harm to the debtors, it falls clearly within the

17   debtors' square here that the harm would occur if I do stay

18   pending appeal.

19         I've given you seven days to go to the District

20   Court to seek a stay and I think that's sufficient for these

21   purposes.  So, I will deny your motion to stay pending

22   appeal.

23         MR. SACKS:  Thank you, Your Honor.  We do

24   appreciate the seven days and we appreciate you hearing the

25   motion orally.

1          THE COURT:  Sure.  And, Mr. Jackson, did you want

2     to comment on the status quo?

3          MR. JACKSON:  Yes, Your Honor.

4          I think -- I appreciate Your Honor's agreement,

5     you know, the recognition that there's some mutuality here

6     that's needed on the preservation of the status quo.  I just

7     wanted to point out that, on the one hand, there's some --

8     there are actions that could be taken which, of course, we

9     would like to include language in the order stating that

10    there shall be no such actions taken that would affect the

11    status quo between now and the seven day effectiveness of the

12    sale order.

13         But I wanted to point out also that there's facts.

14    We have a factual record that was made yesterday.  And there

15    are facts on the ground that could also change. We'd like to,

16    subject to kind of talking it through, when we revise the

17    order, also include conceptually something in the order

18    preserving the status quo fully, not merely against any

19    actions but just making sure that when the order becomes

20    effective it's becoming effective on the record that was

21    created factually and, particularly, around Your Honor's

22    findings about the fact that Hahnemann is not closed and that

23    Hahnemann -- or has not ceased operations within the meaning

24    of the applicable statute.

25         So, I just wanted to point that out. But that's

1    also something that if Your Honor conceptionally is in

2    agreement that it's important to preserve that status quo

3    then that's something that we would attempt to address in the

4    form of order that we submit to Your Honor as well.

5              And then the other point is that I wanted to

6    submit for Your Honor's consideration that if the purpose of

7    the seven-day stay of effectiveness of the order was to

8    provide Mr. Sacks an opportunity to pursue a stay pending

9    appeal, at this point, from the District Court since he's

10   already moved, Your Honor, and laid the predicate that he

11   needs for the District Court in such a motion, I would

12   respectfully request that the stay of effectiveness of the

13   order run from today. Because today, Mr. Sacks has everything

14   that he needs to file his application to the District Court.

15             He has the bases for your ruling.  He has the

16   bases -- the fact that he has moved, Your Honor, for a stay

17   pending appeal and been denied on the bases for Your Honor's

18   denial of that. So, in a sense, he can prepare his papers.

19   My only concern there is I don't want to lose any time if

20   we're working with him, for example, to make the order as

21   acceptable as we can.  I don't want to be prejudiced by the

22   time that we spend finalizing the order.

23             THE COURT:  Doesn't he need an order for purposes

24   of seeking a stay?

25             MR. JACKSON:  I don't believe so.  He doesn't need

 1  an order, for example, to file his notice of appeal.  You can

 2  file it before the order's entered based upon the ruling.

 3  You know, just for your consideration, Your Honor, I wanted

 4  to -- I'm just trying to game out in my mind, you know, the

 5  minimization of risk to the transaction as we navigate this,

 6  sort of, seven day period.

 7          THE COURT:  Well, I agree with your point

 8  regarding the status quo.  I do think that there ought to be

 9  a general status quo of parties taking actions.  I will leave

10  it to you to address the language.

11          MR. JACKSON:  Okay.

12          THE COURT:  As far as the seven days is concerned

13  I do believe it should be from the date that the court enters

14  the order.

15          MR. JACKSON:  Okay.  Understood.

16          THE COURT:  Hopefully that will be tomorrow, but I

17  know that these things do drag on a little bit.

18          MR. JACKSON:  We will get on our horses.

19          THE COURT:  All right.  And what about Mr.

20  Chipman's concern about the elevators.

21          MR. MINUTI:  I was just going to raise that, Your

22  Honor.

23          THE COURT:  Yes.

24          MR. MINUTI:  Mark Minuti on behalf of the debtor.

25          So, Your Honor, I will just tell you what

1  happened.  Mr. Wilen is here. If we have to put him on the

2  stand we can do that.  So, I don't think it's an emergency

3  situation.

4          So, let me put it in context, Mr. Chipman's client

5  runs a dialysis in the (indiscernible) Building which is part

6  of Hahnemann.  There's an elevator bank that has two

7  elevators in it and their lease is on the 12th Floor.

8          THE COURT:  Okay.

9          MR. MINUTI:  There's an elevator bank that has two

10 elevators in it that take their patients up to the 12th

11 floor.  We learned yesterday that there's an issue with one

12 of the elevators.  So, one of the elevators is shut.  The

13 other elevator remains open, Your Honor.  We also have a

14 freight elevator that we've told Mr. Chipman's client that

15 they can have access to if they need more than one elevator

16 in that particular elevator bank.

17         There is a whole other elevator bank in the south

18 tower of the building.  All right.  What we've done is -- so,

19 now we've provided parking for their patients close to the

20 south tower and we've opened up the 12th floor because, in my

21 mind anyway, this is the way I visualize it, their space is

22 on one side of the building, they had to walk through another

23 space to get to it.  We have opened up that other space.  So,

24 they have one active elevator.

25         THE COURT:  A freight elevator in the south tower.

1              MR. MINUTI:  They have a freight elevator and now

2    they have elevator banks on the south tower.  Mr. Chipman

3    wanted me to commit, tonight, that we were going to take

4    steps to fix the elevator.  Your Honor, we just found out

5    about this yesterday.  We're trying to get our arms around

6    it.  So, I don't want to commit to anything that I can't

7    really deliver on.

8              What I can commit to, Your Honor, is getting our

9    arms around it right away and solving the problem as quickly

10   as we can, but in the meantime they have access.  The

11   patients can get to where they need to go to.  In fact, what

12   I've been told is it's actually a shorter distance when they

13   first became tenants in the building.

14             So, I don't think it's an emergency today.  We

15   will certainly communicate with Mr. Chipman and let him know

16   where we're going and if he's got an issue I know he knows

17   how to get a hold of Your Honor.  I don't think it's a today

18   issue.

19             THE COURT:  Mr. Chipman?

20             MR. CHIPMAN:  Thank you, Your Honor.  And for the

21   record my client's name is American Renal Management, LLC.

22             Most of what Mr. Minuti said is absolutely

23   correct.  And I appreciate with Mr. Minuti agreeing to work

24   with us.  I just learned about this, this morning and when I

25   got the call one elevator had been shut down.  There are two

1  elevators in our building on the 12th floor as Mr. Minuti

2  indicated.  Obviously, our biggest concern is our patients --

3            THE COURT:  Yes.

4            MR. CHIPMAN:  -- being able to get the dialysis

5  that they need. These are not able bodied people, Your Honor,

6  some of them.  And when I first heard about this what I was

7  told was one of the elevators was shut down today because of

8  safety issues.  So, they just shut it down.  They are only

9  left with one elevator that -- I can read to you what

10 information we got, but the elevator has issues.  Our client

11 is not confident it's going to continue to run through the

12 end of the month when the debtors are, I guess, scheduled to

13 reject the lease.  So, then we will be dealing with the

14 building owner, Your Honor.  We're a tenant in the building.

15           THE COURT:  Okay.

16           MR. CHIPMAN:  So, our concern was we only had two

17 elevators.  One of them was going to be shut down -- one of

18 them was shut down, one of them sometimes it works, sometimes

19 it doesn't work.  They're having people come out and fix it.

20 Obviously, that is not an elevator we can rely on for our

21 patients.  We were offered the freight elevator.  Obviously,

22 that is not a really great solution for our patients.  My

23 understanding is it may not be air conditioned.  It's

24 probably farther away from our space.  We appreciate that

25 accommodation, but, obviously, our patients should not be

1   riding up in a freight elevator under the lease.

2          And then with regard to the south tower which I

3   guess is further away, I heard from Mr. Minuti before the

4   hearing they're willing to open those up and open the floor

5   up.  We were told today they were going to be shut down

6   tomorrow.  So, we were going to be left with one elevator.

7   So, as long as those elevators are open and working in the

8   south tower and we have access for our patients, and there's

9   directions for them to get there, and they can get there

10  easily I think we're okay.

11         Really, the biggest concern is making sure that

12  the elevator that is shut-down for safety reasons gets fixed

13  and gets fixed soon so we do have a backup near our space so

14  the patients can use either elevator.  And god forbid in the

15  other elevator that's working that has issues that they

16  believe we were told that elevator 24 is currently

17  operational and should remain so for the foreseeable future,

18  really don't have a lot of confidence in.

19         What we don't want to have happen is one of our

20  patient's use that elevator, and it break down, and are stuck

21  in the elevator.

22         THE COURT:  Right.

23         MR. CHIPMAN:  So, Your Honor, that was the genesis

24  of the emergency.  Right before the hearing Mr. Minuti and I

25  talked and I appreciate Mr. Minuti's agreement to keep us

1   informed.  We do request that they fix the elevator that's

2   broken.

3           Thank you, Your Honor.

4           THE COURT:  Well, let's do this; I don't want to

5   order the debtors to fix the elevator tonight, you know, or

6   something like that, but if the elevator remains not working

7   and there isn't sufficient delivery to the 12th floor then I

8   would want to hear about it and I'll take it up with the

9   parties at that point because I do think that there ought to

10  be elevator service to the 12th floor, obviously.  Let's see

11  what the situation is.  And you will know more, I think,

12  probably tomorrow, Mr. Chipman.  And we can address it at

13  that point if need be.

14          MR. CHIPMAN:  I appreciate that, Your Honor.  I

15  will continue to work with Mr. Minuti.

16          THE COURT:  All right.

17          MR. CHIPMAN:  Thank you.

18          THE COURT:  Very fine.  Thank you.

19          Mr. Minuti?

20          MR. MINUTI:  Your Honor, I think that completes

21  our hearing.  We appreciate the court's time.  I just

22  realized it's close to six.  So, again, thank you and thanks

23  to your staff.

24          THE COURT:  All right.  I will wait for the order

25  and with that we will stand in recess.

1          MR. MINUTI:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          UNIDENTIFIED SPEAKER:  Your Honor, I have a

4    document that was filed on the 23rd of August at 1:43 p.m. in

5    the court; 132 pages.  It says objection because bankruptcy

6    auction held 8th of August by the United States Constitution,

7    amended five equal protection.  As far as anybody has seen

8    this document failed to show up in the court.  Okay.

9          THE COURT:  I did not think it was an appropriate

10   document to be docketed.

11         UNIDENTIFIED SPEAKER:  You don't think that's an

12   appropriate document?

13         THE COURT:  I did not think it was.  I reviewed it

14   and I thought it was, frankly, controversial and scandalous.

15         UNIDENTIFIED SPEAKER:  I went to the bankruptcy

16   auction yesterday or on the 3rd of September.  I filed a

17   motion against Google, LLC which actually accused them of

18   securities fraud for violating their Securities & Exchange

19   Act. And this is in case 5:19(c)(b)00834.  And essentially,

20   based on that, there is a $6.5 billion dollar judgment that

21   is out there and that was to be used and allow me to

22   negotiate with hat.

23         Based on that information and the $130 million

24   dollars Google just agreed to pay the federal government, I

25   think that money could be actually given to Hahnemann

 1   Hospital to keep the hospital open right now.

 2              THE COURT:  I appreciate your views. And I

 3   understand them.

 4              UNIDENTIFIED SPEAKER:  Okay.  I'm just saying this

 5   is what is out there.  These documents are all filed, even

 6   though I'm not a lawyer, and even though I believe there is

 7   significant obstruction of justice here, I just thought I

 8   would tell you what's out there.

 9              THE COURT:  Thank you.  Thank you.

10              MR. BARKASY:  Your Honor, if I may?

11              THE COURT:  Yes, yes.

12              MR. BARKASY:  I'm sorry.

13              THE COURT:  That's okay, Mr. --

14              MR. BARKASY:  Your Honor, it's Rich Barkasy --

15              THE COURT:  Yes, of course.

16              MR. BARKASY:  -- for the Pennsylvania Department

17   of Health.

18              THE COURT:  Yes.

19              MR. BARKASY:  In the order that was filed this

20   afternoon, the debtors included some language that we had

21   requested yesterday.  But there was some additional language

22   added.

23              The DOH doesn't consent to the language added

24   after the semicolon in paragraph twenty-two. We've had some

25   discussions during the break.  I've actually proposed some

1  alternative language and, hopefully, that will be resolved.

2  But I just wanted to note that for the record at this point.

3          THE COURT:  If it's not resolved and clearly when

4  the order is submitted, you may address that matter.

5          MR. BARKASY: Thank you, Your Honor.

6          THE COURT:  You bet.  All right.  With that, we're

7  concluded.  Good evening, everyone.

8          MR. MINUTI:  Thank you, Your Honor.

9      (Proceedings concluded at 5:52 p.m.)

10

11

12                      CERTIFICATE

13

14  I certify that the foregoing is a correct transcript from the

15  electronic sound recording of the proceedings in the above-

16  entitled matter.

17
   /s/Mary Zajaczkowski                    September 6, 2019
18  Mary Zajaczkowski, CET**D-531

19

20

21

22

23

24

25

# TAB 12

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB No. 0938-0832

## HEALTH INSURANCE BENEFIT AGREEMENT

(Agreement with Provider Pursuant to Section 1866 of the Social Security Act,
as Amended and Title 42 Code of Federal Regulations (CFR)
Chapter IV, Part 489)

### AGREEMENT

between

THE SECRETARY OF HEALTH AND HUMAN SERVICES

and

Center City Healthcare, LLC

doing business as (D/B/A)    Hahnemann University Hospital

In order to receive payment under title XVIII of the Social Security Act,    Center City Healthcare, LLC

D/B/A    Hahnemann University Hospital    as the provider of services, agrees to
conform to the provisions of section of 1866 of the Social Security Act and applicable provisions in 42 CFR.

This agreement, upon submission by the provider of services of acceptable assurance of compliance with title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973 as amended, and upon acceptance by the Secretary of Health and Human Services, shall be binding on the provider of services and the Secretary.

In the event of a transfer of ownership, this agreement is automatically assigned to the new owner subject to the conditions specified in this agreement and 42 CFR 489, to include existing plans of correction and the duration of this agreement, if the agreement is time limited.

ATTENTION: Read the following provision of Federal law carefully before signing.

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or make any false, fictitious or fraudulent statement or presentation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years or both (18 U.S.C. section 1001).

Name _Joel Freedman_    Title ___CEO___

Date ____12/10/17____

ACCEPTED FOR THE PROVIDER OF SERVICES BY:

NAME *(signature)*

TITLE | DATE

ACCEPTED BY THE SECRETARY OF HEALTH AND HUMAN SERVICES BY:

NAME *(signature)*

TITLE | DATE
Manager, Certification & Enforcement Branch | February 12, 2018

ACCEPTED FOR THE SUCCESSOR PROVIDER OF SERVICES BY:

NAME *(signature)*

TITLE | DATE
Joel Freedman | 12/10/17

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0832. The time required to complete this information collection is estimated to average 6 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to CMS, Attn: PRA Reports Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.

Form CMS-1561 (07/01) Previous Version Obsolete    65

Appx. 01091

# TAB 13

This document is scheduled to be published in the
Federal Register on 11/12/2019 and available online at
**https://federalregister.gov/d/2019-24138**, and on **govinfo.gov**

**Billing Code 4120-01-P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 405, 410, 412, 414, 416, 419, and 486**

**[CMS-1717-FC]**

**RIN 0938-AT74**

**Medicare Program:  Changes to Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs; Revisions of Organ Procurement Organizations Conditions of Coverage; Prior Authorization Process and Requirements for Certain Covered Outpatient Department Services; Potential Changes to the Laboratory Date of Service Policy; Changes to Grandfathered Children's Hospitals-Within-Hospitals; Notice of Closure of Two Teaching Hospitals and Opportunity to Apply for Available Slots.**

**AGENCY**:  Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION**:  Final rule with comment period.

**SUMMARY**:  This final rule with comment period revises the Medicare hospital outpatient prospective payment system (OPPS) and the Medicare ambulatory surgical center (ASC) payment system for Calendar Year 2020 based on our continuing experience with these systems.  In this final rule with comment period, we describe the changes to the amounts and factors used to determine the payment rates for Medicare services paid under the OPPS and those paid under the ASC payment system.  Also, this final rule with comment period updates and refines the requirements for the Hospital Outpatient Quality Reporting (OQR) Program and the ASC Quality Reporting (ASCQR)

Program.  In addition, this final rule with comment period establishes a process and requirements for prior authorization for certain covered outpatient department services; revise the conditions for coverage of organ procurement organizations; and revise the regulations to allow grandfathered children's hospitals-within-hospitals to increase the number of beds without resulting in the loss of grandfathered status; and provides notice of the closure of two teaching hospitals and the opportunity to apply for available slots for purposes of indirect medical education (IME) and direct graduate medical education (DGME) payments.

**DATES**:  Effective date:  This final rule is effective on January 1, 2020.

Comment period:  To be assured consideration, comments on the payment classifications assigned to the interim APC assignments and/or status indicators of new or replacement Level II HCPCS codes in this final rule with comment period must be received at one of the addresses provided in the **ADDRESSES** section no later than 5 p.m. EST on December 2, 2019.

**ADDRESSES:**  In commenting, please refer to file code CMS-1717-FC when commenting on the issues in this final rule with comment period.  Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

Comments, including mass comment submissions, must be submitted in one of the following three ways (please choose only one of the ways listed):

1.  Electronically.  You may (and we encourage you to) submit electronic comments on this regulation to http://www.regulations.gov.  Follow the instructions under the "submit a comment" tab.

2.  By regular mail.  You may mail written comments to the following address

ONLY:

Centers for Medicare & Medicaid Services,

Department of Health and Human Services,

Attention:  CMS-1717-FC,

P.O. Box 8013,

Baltimore, MD 21244-1850.

Please allow sufficient time for mailed comments to be received before the close

of the comment period.

3.  By express or overnight mail.  You may send written comments via express or

overnight mail to the following address ONLY:

Centers for Medicare & Medicaid Services,

Department of Health and Human Services,

Attention:  CMS-1717-FC,

Mail Stop C4-26-05,

7500 Security Boulevard,

Baltimore, MD 21244-1850.

b.  For delivery in Baltimore, MD—

Centers for Medicare & Medicaid Services,

Department of Health and Human Services,

7500 Security Boulevard,

Baltimore, MD 21244-1850.

For information on viewing public comments, we refer readers to the beginning of the "SUPPLEMENTARY INFORMATION" section.

**FOR FURTHER INFORMATION CONTACT:**

2-Midnight Rule (Short Inpatient Hospital Stays), contact Lela Strong-Holloway via email Lela.Strong@cms.hhs.gov or at 410-786-3213.

Advisory Panel on Hospital Outpatient Payment (HOP Panel), contact the HOP Panel mailbox at APCPanel@cms.hhs.gov.

Ambulatory Surgical Center (ASC) Payment System, contact Scott Talaga via email Scott.Talaga@cms.hhs.gov or at 410-786-4142 or Mitali Dayal via email Mitali.Dayal2@cms.hhs.gov or at 410-786-4329.

Ambulatory Surgical Center Quality Reporting (ASCQR) Program Administration, Validation, and Reconsideration Issues, contact Anita Bhatia via email Anita.Bhatia@cms.hhs.gov or at 410-786-7236.

Ambulatory Surgical Center Quality Reporting (ASCQR) Program Measures, contact Nicole Hewitt via email Nicole.Hewitt@cms.hhs.gov or at 410-786-7778.

Blood and Blood Products, contact Josh McFeeters via email Joshua.McFeeters@cms.hhs.gov or at 410-786-9732.

Cancer Hospital Payments, contact Scott Talaga via email Scott.Talaga@cms.hhs.gov or at 410-786-4142.

CMS Web Posting of the OPPS and ASC Payment Files, contact Chuck Braver via email Chuck.Braver@cms.hhs.gov or at 410-786-6719.

Control for Unnecessary Increases in Volume of Outpatient Services, contact Elise Barringer via email Elise.Barringer@cms.hhs.gov or at 410-786-9222.

Composite APCs (Low Dose Brachytherapy and Multiple Imaging), contact Elise Barringer via email Elise.Barringer@cms.hhs.gov or at 410-786-9222.

Comprehensive APCs (C-APCs), contact Lela Strong-Holloway via email Lela.Strong@cms.hhs.gov or at 410-786-3213, or Mitali Dayal via email at Mitali.Dayal2@cms.hhs.gov or at 410-786-4329.

CPT and Level II HCPCS Codes, contact Marjorie Baldo via email Marjorie.Baldo@cms.hhs.gov or at 410-786-4617.

Grandfathered Children's Hospitals-within-Hospitals, contact Michele Hudson via email Michele.Hudson@cms.hhs.gov or 410-786-4487.

Hospital Cost Reporting and Chargemaster Comment Solicitation, contact Dr. Terri Postma at 410-786-4169.

Hospital Outpatient Quality Reporting (OQR) Program Administration, Validation, and Reconsideration Issues, contact Anita Bhatia via email Anita.Bhatia@cms.hhs.gov or at 410-786-7236.

Hospital Outpatient Quality Reporting (OQR) Program Measures, contact Vinitha Meyyur via email Vinitha.Meyyur@cms.hhs.gov or at 410-786-8819.

Hospital Outpatient Visits (Emergency Department Visits and Critical Care Visits), contact Elise Barringer via email Elise.Barringer@cms.hhs.gov or at 410-786-9222.

Inpatient Only (IPO) Procedures List, contact Lela Strong-Holloway via email Lela.Strong@cms.hhs.gov or at 410-786-3213, or Au'Sha Washington via email at Ausha.Washington@cms.hhs.gov or at 410-786-3736.

New Technology Intraocular Lenses (NTIOLs), contact Scott Talaga via email Scott.Talaga@cms.hhs.gov or at 410-786-4142.

No Cost/Full Credit and Partial Credit Devices, contact Scott Talaga via email Scott.Talaga@cms.hhs.gov or at 410-786-4142.

Notice of Closure of Two Teaching Hospitals and Opportunity to Apply for Available Slots, contact Michele Hudson via email Michele.Hudson@cms.hhs.gov or 410-786-4487.

OPPS Brachytherapy, contact Scott Talaga via email Scott.Talaga@cms.hhs.gov or at 410-786-4142.

OPPS Data (APC Weights, Conversion Factor, Copayments, Cost-to-Charge Ratios (CCRs), Data Claims, Geometric Mean Calculation, Outlier Payments, and Wage Index), contact Erick Chuang via email Erick.Chuang@cms.hhs.gov or at 410-786-1816, or Scott Talaga via email Scott.Talaga@cms.hhs.gov or at 410-786-4142, or Josh McFeeters via email at Joshua.McFeeters@cms.hhs.gov or at 410-786-9732.

OPPS Drugs, Radiopharmaceuticals, Biologicals, and Biosimilar Products, contact Josh McFeeters via email Joshua.McFeeters@cms.hhs.gov or at 410-786-9732.

OPPS New Technology Procedures/Services, contact the New Technology APC mailbox at NewTechAPCapplications@cms.hhs.gov.

OPPS Packaged Items/Services, contact Lela Strong-Holloway via email Lela.Strong@cms.hhs.gov or at 410-786-3213, or Mitali Dayal via email at Mitali.Dayal2@cms.hhs.gov or at 410-786-4329.

OPPS Pass-Through Devices, contact the Device Pass-Through mailbox at DevicePTapplications@cms.hhs.gov.

OPPS Status Indicators (SI) and Comment Indicators (CI), contact Marina Kushnirova via email Marina.Kushnirova@cms.hhs.gov or at 410-786-2682.

Organ Procurement Organization (OPO) Conditions for Coverage (CfCs), contact Alpha-Banu Wilson via email at AlphaBanu.Wilson@cms.hhs.gov or at 410-786-8687, or Diane Corning via email at Diane.Corning@cms.hhs.gov or at 410-786-8486.

Partial Hospitalization Program (PHP) and Community Mental Health Center (CMHC) Issues, contact the PHP Payment Policy Mailbox at PHPPaymentPolicy@cms.hhs.gov.

Prior Authorization Process and Requirements for Certain Hospital Outpatient Department Services, contact Thomas Kessler via email at Thomas.Kessler@cms.hhs.gov or at 410-786-1991.

Rural Hospital Payments, contact Josh McFeeters via email at Joshua.McFeeters@cms.hhs.gov or at 410-786-9732.

Skin Substitutes, contact Josh McFeeters via email Joshua.McFeeters@cms.hhs.gov or at 410-786-9732.

Supervision of Outpatient Therapeutic Services in Hospitals and CAHs, contact Josh McFeeters via email Joshua.McFeeters@cms.hhs.gov or at 410-786-9732.

All Other Issues Related to Hospital Outpatient and Ambulatory Surgical Center Payments Not Previously Identified, contact Elise Barringer via email Elise.Barringer@cms.hhs.gov or at 410-786-9222.

**SUPPLEMENTARY INFORMATION**:

Inspection of Public Comments:  All comments received before the close of the comment period are available for viewing by the public, including any personally

identifiable or confidential business information that is included in a comment.  We post all comments received before the close of the comment period on the following website as soon as possible after they have been received:  http://www.regulations.gov/.  Follow the search instructions on that website to view public comments.

**Addenda Available Only Through the Internet on the CMS Website**

In the past, a majority of the Addenda referred to in our OPPS/ASC proposed and final rules were published in the **Federal Register** as part of the annual rulemakings. However, beginning with the CY 2012 OPPS/ASC proposed rule, all of the Addenda no longer appear in the **Federal Register** as part of the annual OPPS/ASC proposed and final rules to decrease administrative burden and reduce costs associated with publishing lengthy tables.  Instead, these Addenda are published and available only on the CMS website.  The Addenda relating to the OPPS are available at: https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/HospitalOutpatientPPS/index.html.  The Addenda relating to the ASC payment system are available at:  https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/HospitalOutpatientPPS/index.html.

grandfathered children's HwHs to increase their beds would not impart an economic advantage to these hospitals.

Response:  We thank commenters for their support.

In light of the comments received, we are finalizing our proposal without modification.

**XXII.  Notice of Closure of Two Teaching Hospitals and Opportunity to Apply for Available Slots**

a.  Background

Section 5506 of the Affordable Care Act (Pub. L. 111-148) added subsection (vi) to section 1886(h)(4)(H) of the Act and modified language at section 1886(d)(5)(B)(v) of the Act, to instruct the Secretary to establish a process to redistribute residency slots after a hospital that trained residents in an approved medical residency program closes. Specifically, the Secretary is instructed to increase the full-time equivalent (FTE) resident caps for teaching hospitals based upon the FTE resident caps in teaching hospitals that closed "on or after a date that is 2 years before the date of enactment" (that is, March 23, 2008).  In the CY 2011 OPPS final rule with comment period (75 FR 72212), we established regulations at 42 CFR 413.79(o) and an application process for qualifying hospitals to apply to CMS to receive direct graduate medical education (DGME) and indirect medical education (IME) FTE resident cap slots from the hospital that closed. We made certain modifications to those regulations in the FY 2013 IPPS/LTCH PPS final rule (77 FR 53434), and we made changes to the section 5506 application process in the FY 2015 IPPS/LTCH PPS final rule (79 FR 50122 through 50134).  The procedures we established apply both to teaching hospitals that closed on or after March 23, 2008,

and on or before August 3, 2010, and to teaching hospitals that close after

August 3, 2010.

b.  Notice of Closure of Hahnemann University Hospital, Located in Philadelphia, PA, and the Application Process--Round 16

CMS has learned of the closure of Hahnemann University Hospital, located in

Philadelphia, PA (CCN 390290).  Accordingly, this notice serves to notify the public of

the closure of this teaching hospital and initiate another round of the section 5506

application and selection process.  This round will be the 16th round ("Round 16") of the

application and selection process.  Table 66 below contains the identifying information

and IME and DGME FTE resident caps for the closed teaching hospital, which are part of

the Round 16 application process under section 5506 of the Affordable Care Act.

**Table 66.--IME and DGME FTE RESIDENT CAPS FOR HAHNEMANN UNIVERSITY HOSPITAL**

| CCN | Provider Name | City and State | CBSA Code | Terminating Date | IME FTE Resident Cap (including +/- MMA Sec. 422[1]) | Direct GME FTE Resident Cap (including +/-MMA Sec. 422[1]) |
|---|---|---|---|---|---|---|
| 390290 | Hahnemann University Hospital | Philadelphia, PA | 37964 | September 6, 2019 | $587.25 - 30.44 = 556.81$ [2] | $603.96 - 29.14 = 574.82$ [3] |

[1] Section 422 of the MMA, Pub. L. 108-173, redistributed unused IME and DGME residency slots effective July 1, 2005.
[2] Hahnemann University Hospital's 1996 IME FTE resident cap is 587.25.  Under section 422 of the MMA, the hospital received a reduction of 30.44 to its IME FTE resident cap:  $587.25 - 30.44 = 556.81$.
[3] Hahnemann University Hospital's 1996 DGME FTE resident cap is 603.96.  Under section 422 of the MMA, the hospital received a reduction of 29.14 to its DGME FTE resident cap:  $603.96 - 29.14 = 574.82$.

c.  Notice of Closure of Ohio Valley Medical Center, Located in Wheeling, WV, and the

Application Process -- Round 17

CMS has learned of the closure of Ohio Valley Medical Center, located in

Wheeling, WV (CCN 510039).  Accordingly, this notice serves to notify the public of the

closure of this teaching hospital and initiate another round of the section 5506 application

and selection process.  This round will be the 17th round ("Round 17") of the application and selection process.  Table 67 below contains the identifying information and IME and DGME FTE resident caps for the closed teaching hospital, which are part of the Round 17 application process under section 5506 of the Affordable Care Act.

**Table 67--IME and DGME FTE RESIDENT CAPS FOR OHIO VALLEY MEDICAL CENTER**

| CCN | Provider Name | City and State | CBSA Code | Terminating Date | IME FTE Resident Cap (including +/- MMA Sec. 422[1]) | Direct GME FTE Resident Cap (including +/-MMA Sec. 422[1]) |
|---|---|---|---|---|---|---|
| 510039 | Ohio Valley Medical Center | Wheeling, WV | 48540 | September 20, 2019 | $24.37 - 3.33^2 + 1.89^3 = 22.93$ | $24.91 - 3.74^2 + 1.76^3 = 22.93$ |

[1] Section 422 of the MMA, Pub. L. 108-173, redistributed unused IME and DGME residency slots effective July 1, 2005.
[2] Ohio Valley Medical Center's 1996 IME FTE resident cap is 24.37.  Under section 422 of the MMA, the hospital received a reduction of 3.33 and an increase of 1.89 to its IME FTE resident cap:  $24.37 - 3.33 + 1.89 = 22.93$. Note that the slots associated with an IME cap increase under section 422 of the MMA are paid under 42 CFR 412.105(d)(4) using a special multiplier of 0.66.
[3] Ohio Valley Medical Center's 1996 DGME FTE resident cap is 24.91.  Under section 422 of the MMA, the hospital received a reduction of 3.74 and an increase of 1.76 to its DGME FTE resident cap:  $24.91 - 3.74 + 1.76 = 22.93$.  Note that the slots associated with a DGME cap increase under section 422 of the MMA are paid under 42 CFR 413.77(g) using the appropriate locality-adjusted national average per resident amount (PRA).

d. Application Process for Available Resident Slots

The application period for hospitals to apply for slots under section 5506 of the Affordable Care Act is 90 days following notice to the public of a hospital closure (77 FR 53436).  Therefore, hospitals that wish to apply for and receive slots from the above hospitals' FTE resident caps, must submit applications (Section 5506 Application Form posted on Direct Graduate Medical Education (DGME) website as noted at the end of this section) directly to the CMS Central Office no later than [insert date 90 days after the date of display of this rule at the Office of the **Federal Register**].  The mailing address for the CMS Central Office is included on the application form.  Applications must be received by the CMS Central Office by the [insert date 90 days after the date of display of this rule at the Office of the **Federal Register**] deadline date.  It is *not* sufficient for applications to be postmarked by this date.

After an applying hospital sends a hard copy of a section 5506 slot application to the CMS Central Office mailing address, the hospital is encouraged to notify the CMS Central Office of the mailed application by sending an email to: ACA5506application@cms.hhs.gov.  In the email, the hospital should state:  "On behalf of [insert hospital name and Medicare CCN#], I, [insert your name], am sending this email to notify CMS that I have mailed to CMS a hard copy of a section 5506 application under Round [16 or 17] due to the closure of [Hahnemann University Hospital or Ohio Valley Medical Center].  If you have any questions, please contact me at [insert phone number] or [insert your email address]."  An applying hospital should *not* attach an electronic copy of the application to the email.  The email will only serve to notify the CMS Central Office to expect a hard copy application that is being mailed to the CMS Central Office.

We have not established a deadline by when CMS will issue the final determinations to hospitals that receive slots under section 5506 of the Affordable Care Act.  However, we review all applications received by the deadline and notify applicants of our determinations as soon as possible.

We refer readers to the CMS Direct Graduate Medical Education (DGME) website at:  https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/DGME.html to download a copy of the section 5506 application form (Section 5506 Application Form) that hospitals must use to apply for slots under section 5506 of the Affordable Care Act.  Hospitals should also access this same website for a list of additional section 5506 guidelines for the policy and procedures

for applying for slots, and the redistribution of the slots under sections 1886(h)(4)(H)(vi) and 1886(d)(5)(B)(v) of the Act

## XXIII.  Files Available to the Public via the Internet

The Addenda to the OPPS/ASC proposed rules and the final rules with comment period are published and available via the Internet on the CMS website.  In the CY 2019 OPPS/ASC final rule with comment period (83 FR 59154), for CY 2019, we changed the format of the OPPS Addenda A, B, and C, by adding a column entitled "Copayment Capped at the Inpatient Deductible of $1,364.00" where we flag, through use of an asterisk, those items and services with a copayment that is equal to or greater than the inpatient hospital deductible amount for any given year (the copayment amount for a procedure performed in a year cannot exceed the amount of the inpatient hospital deductible established under section 1813(b) of the Act for that year).  For CY 2020, we are retaining these columns, updated to reflect the amount of the 2020 inpatient deductible.

To view the Addenda to this final rule with comment period pertaining to CY 2020 payments under the OPPS, we refer readers to the CMS website at: http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/HospitalOutpatientPPS/Hospital-Outpatient-Regulations-and-Notices.html; select "1717-FC" from the list of regulations.  All OPPS Addenda to this final rule with comment period are contained in the zipped folder entitled "2020 NFRM OPPS Addenda" at the bottom of the page.  To view the Addenda to this final rule with comment period pertaining to CY 2020 payments under the ASC payment system, we refer readers to the CMS website at:  http://www.cms.gov/Medicare/Medicare-Fee-for-